## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRCT OF NEW YORK

| | |
|---|---|
| HUMBERTO LOZADA, Individually and on Behalf of All Others Similarly Situated, | |
| | Case No. 1:22-cv-1479 |
| Plaintiff, | |
| | <u>CLASS ACTION</u> |
| v. | |
| | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| TASKUS, INC., BRYCE MADDOCK, JASPAR WEIR, and BALAJI SEKAR, | |
| Defendants. | |

Plaintiff Humberto Lozada ("Lozada" or "Plaintiff"), by and through his counsel, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on, among other things, the independent investigation of counsel. This investigation includes, but is not limited to, a review and analysis of: (i) public filings by TaskUs, Inc. ("TaskUs" or the "Company") with the Securities and Exchange Commission ("SEC"); (ii) transcripts of TaskUs conferences with investors and analysts; (iii) press releases and media reports concerning the Company; (iv) analyst reports concerning TaskUs; and (v) other public information and data regarding the Company.

## NATURE OF THE ACTION AND OVERVIEW

1. Plaintiff brings this securities class action on behalf of all persons and entities that purchased or acquired TaskUs publicly traded securities between June 11, 2021 and January 19, 2022, inclusive (the "Class Period").

2. The claims Plaintiff asserts herein are alleged against: (i) TaskUs; (ii) the Company's Chief Executive Officer ("CEO") Bryce Maddock ("Maddock"); (iii) the Company's

President Jaspar Weir ("Weir"); and (iv) the Company's Chief Financial Officer ("CFO") Balaji

Sekar ("Sekar"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934

("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

3.       TaskUs is a business process outsourcing company focused on providing three key

services to technology companies: (1) Digital Customer Experience, specifically digital customer

support services offered via email, chat, in-app messaging, and other non-voice channels; (2)

Content Security, specifically the review and disposition of user and advertiser generated content;

and (3) Artificial Intelligence ("AI") Operations, primarily consisting of data labeling, annotation,

and transcription services.

4.       TaskUs held its initial public offering ("IPO") on or around June 10, 2021, offering

and selling 5,553,154 shares of Class A common stock priced at $23 per share, and certain selling

stockholders sold an additional 9,626,846 shares of Class A common stock.  TaskUs completed

the IPO on June 15, 2021, receiving net proceeds of $120.7 million.

5.       The Class Period starts on June 11, 2021, the day that TaskUs stock began publicly

trading on the NASDAQ Stock Market ("NASDAQ").  In the offering documents for the IPO, the

Company repeatedly claimed to have "industry-leading growth and profitability" and insisted that

its "market opportunity is over $100 billion."  TaskUs supported these lofty claims, in part, with

market data that showed "the content moderation solutions market was $5.3 billion in 2020" and

estimated to "grow at a CAGR [compound annual growth rate] of 40-50% from 2016 to 2021" as

well as by touting the revenue generated from its largest client, Facebook, Inc. ("Facebook").

Additionally, TaskUs overstated the size of its workforce, and touted its "low[] employee attrition

levels" which "leads to lower hiring and training costs and higher employee productivity."

6.     Throughout the Class Period the Company continued to assert that its "market opportunity . . . is simply massive," and the "market across the specialized services we deliver is over $100 billion, and demand for some of these services is growing up to 50% annually.  So we are just getting started."  TaskUs also specifically touted "continued revenue growth from our top 2 clients" and asserted that "our largest customer [Facebook] saw improved revenue concentration, which was 32% in 2020.  In Q1 of 2021, it was 29%, and then in Q2 of 2021, it was 27%.  So while that client is continuing to grow very aggressively, the rest of the business is outpacing their growth."

7.     These statements were materially false and misleading.  In truth: (1) TaskUs was experiencing severe financial strain and business challenges, particularly with its most important customer Facebook; (2) the Content Security market was smaller than Defendants represented and Defendants' representations were based on outdated market data; (3) TaskUs improperly recognized revenue from certain key contracts; (4) Defendants overstated the size of TaskUs' workforce as well as employee retention rates, and understated attrition rates; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

8.     On January 20, 2022, Spruce Point Capital Management, LLC ("Spruce Point") issued an 80-page report on TaskUs titled "Moderating the Bull Case Content" (the "Spruce Point Report" or the "Report") based on its "forensic financial and accounting review" of the Company.  In the Executive Summary of the Report, Spruce Point stated, TaskUs "has a pattern of exaggerated and inflated business claims, including revenue, and is covering-up financial strain with reduced disclosures, cherry-picked market data, and non-standard key performance metrics.  With 28% of sales to Facebook and related to the controversial area of 'Content Moderation' we find evidence

of increasing financial strain in the relationship and believe margins and cash flow are set to contract more than expected."  Also in the Executive Summary, Spruce Point stated, "we find a pattern of embellishing the size of its workforce and making overly optimistic revenue growth claims."

9.     More specifically, regarding TaskUs' financial strain and business challenges, Spruce Point stated, "We Believe TASK Is Not Transparent About Challenges In Its Content Security Business" and "Spruce Point finds clear evidence that TASK's revenue per front line content security employee has been in steep decline.  It appears that key clients like Facebook are requiring more labor to fill tasks, but that it is not translating into additional revenue."  Spruce Point also stated "Facebook uses multiple firms and TASK's reported Content Security segment growth rate shows signs of business slowing.  This could suggest that Facebook is insourcing some of the work, consolidating, or redistributing it to other vendors."  Additionally, Spruce Point stated, "We Believe TASK Doesn't Disclose Key Metrics That Would Reveal Severe Business Challenges," including annual contract value, interest income, revenue per employee, cost per employee, and recruitment expense.

10.     Regarding TaskUs' claims about the size of the Content Security market, Spruce Point explained that the Company "cites the Everest Group report from Sept 2019 for market data in Content Security, and says from 2016-21E the market will grow 40-50%.  It pairs this with data from JC Market Research to say the market is $5.8 billion in 2021."  But Spruce Point pointed out that more recent data published by Everest Group shows that "the Content Security market is $4-$5 billion and projected to grow 30-40% from 2020-23.  Thus, it appears that TASK cherry-picked data to avoid showing that its key market was both smaller and projected to slow down going forward."

11.     Concerning TaskUs' revenue recognition, "Spruce Point observes that TASK's unbilled receivables to [last twelve months] revenues had been rising steadily for 18 months" which "suggests that TASK may have been booking revenue ahead of receiving collections." Spruce Point similarly stated, "We believe unbilled receivables rising reflect a worsening of the quality of business that TASK is undertaking, and that it may be booking revenue ahead of certainty of payment."

12.     In terms of TaskUs' workforce, Spruce Point specifically stated, "TASK removed its only mention of gross hires from its early prospectus.  In subsequent filings, it made vague mention of hiring 'thousands of employees.'  On its conference calls and earnings releases it references 'net new' additions.  Given its 2019 disclosure of 12,000 new employees, we estimate 7,400 employees departed.  Therefore, we estimate employee attrition at 46.0% or significantly higher than the 26.6% figure cited by management."  Additionally, Spruce Point stated that "TASK Obscures Trend of Declining [Employee] Referral Rates Which Contribute to Rising Personnel Costs," and stated that there is "Evidence Referral Costs Are Rising" and "Data Suggests Hiring Is Decelerating."

13.     On this news, the price of TaskUs stock fell $5.46 per share, or more than 15%, from $35.59 per share on January 19, 2022, to $30.13 per share at the close of trading on January 20, 2022, on unusually heavy trading volume.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of TaskUs securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because the acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District.  TaskUs' common stock trades on the NASDAQ, which is headquartered in this District.

17.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

18.     As detailed in the Certification submitted herewith, Plaintiff Humberto Lozada purchased TaskUs securities at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the securities laws alleged herein.

19.     Defendant TaskUs is a Delaware corporation with its corporate headquarters in New Braunfels, Texas.  TaskUs' common stock trades on NASDAQ under the ticker symbol "TASK."

20.     Defendant Maddock is a co-founder of TaskUs and is, and at all relevant times was, the Company's CEO.

21.     Defendant Weir is a co-founder of TaskUs and is, and at all relevant times was, President of the Company.

22.     Defendant Sekar is, and at all relevant times was, the Company's CFO.

23.     Defendants Maddock, Weir, and Sekar are collectively referred to herein as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

24.     The Individual Defendants were provided with copies of the Company's presentations and SEC filings alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

25.     Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

### SUBSTANTIVE ALLEGATIONS

#### Background

26.     TaskUs is a business process outsourcer focused on serving high-growth technology companies to represent, protect and grow their brands.  TaskUs provides three services to its technology company clients: (1) Digital Customer Experience; (2) Content Security; and (3)

AI Operations.  Digital Customer Experience consists of customer support services offered through non-voice channels such as email, chat, in-app messaging, SMS, and social media.  Content Security consists of the moderating of content generated by its customers' users and advertisers. AI Operations primarily consist of data labeling, annotation, and transcription services.  The Company purports to have approximately 100 clients spanning a variety of industry segments within the digital economy, including social media, e-commerce, gaming, food delivery and ride sharing, health information technology, and financial technology.

27.     On or around June 10, 2021, TaskUs held its IPO, offering and selling 5,553,154 shares of Class A common stock priced at $23 per share, and certain selling stockholders sold an additional 9,626,846 shares of Class A common stock.  TaskUs completed the IPO on June 15, 2021, receiving net proceeds of $120.7 million.

28.     In connection with the IPO, TaskUs first filed a draft Form S-1 Registration Statement with the SEC on April 12, 2021 ("Registration Statement").  The Company filed subsequent amended Registration Statements on May 6, 2021, June 2, 2021, and June 10, 2021 (the "Amendments").  On June 14, 2021, Task Us filed the final IPO Prospectus, which forms part of the Registration Statement.  On June 10, 2021, the SEC issued a Notice of Effectiveness of the Registration Statement.

**Materially False and Misleading Statements Issued During the Class Period**

29.     The Class Period begins on June 11, 2021, the first day TaskUs began trading on the NASDAQ.  The Notice of Effectiveness linked to the Registration Statement, the Amendments, as well as the IPO Prospectus.

30.     In the Registration Statement, TaskUs touted its, "Recurring revenue model with a track record of high growth and profitability at scale," and stated, "We believe that we have delivered industry-leading growth and profitability."

31.     In the Registration Statement, TaskUs discussed its "Market Opportunity." Specifically, the Company stated:

> ***The aggregate size of our market opportunity is over $100 billion, and consists of the following service offerings***:
>
> ***Digital Customer Experience***: IDC estimates that global customer care outsourcing services spend was $77 billion in 2020. Unlike many traditional outsourced providers, whose voice-based solutions largely cater to telecommunications, cable and financial services companies, we focus on the fast growing digitally enabled consumer brands and traditional players catering to their customers in multiple channels. According to Everest Group, the digital customer experience market is projected to grow at a 20-25% CAGR from 2018 to 2021 and will continue to drive overall industry growth.
>
> ***Content Security:*** According to Domo, every minute, Facebook users upload 147,000 photos, Instagram users post 347,222 stories and YouTube users upload 500 hours of video. JC Market Research estimates that the content moderation solutions market was $5.3 billion in 2020. Further, Everest Group estimates that the market will grow at a CAGR of 40-50% from 2016 to 2021.
>
> ***Artificial Intelligence (AI) Operations***: The development of Artificial Intelligence technology often requires massive amounts of data that has been annotated by human experts and must be refined through ongoing manual training. These factors have significantly contributed to the growth of the AI services market, which includes data labelling and algorithm training. IDC predicts that the worldwide AI services market will grow from $18.4 billion in 2020 to $37.8 billion in 2024 at a CAGR of 20% over the four-year period.

(emphasis in original).

32.     In the Registration Statement, TaskUs also discussed its client base, stating, in relevant part: "Our top ten and twenty clients accounted for 68% and 81% of our revenue for the fiscal year ended December 31, 2020, respectively.  Our largest client, Facebook, generated 32% and 35% of our revenue for the fiscal years ended December 31, 2020 and 2019, respectively."

33.     In the Registration Statement, TaskUs also discussed "Trends and Factors Affecting our Performance," including:

> We seek to retain sufficient employees to serve our clients' increasing business needs and position ourselves for growth. We believe our focus on employee culture leads to lower employee attrition levels. Apart from driving our high client satisfaction and retention metrics, lower employee attrition leads to lower hiring and training costs and higher employee productivity. The voluntary attrition rate for employees who were employed by TaskUs for more than 180 days was 14.9% and 26.6% for the years ended December 31, 2020 and 2019, respectively.

34.     In the Registration Statement, TaskUs also discussed its revenue recognition policy, stating:

> We recognize revenue as services are performed and amounts are earned. Determining the method and amount of revenue to recognize requires us, at times, to make judgments and estimates. Specifically, we apply judgments in determining whether performance obligations are satisfied over-time and the method to measure progress towards completion. Additionally, the nature of our contracts gives rise to several types of variable consideration, including estimates on collectability, discounts, and client credits. Some contracts may include incentives or penalties related to costs incurred, benefits produced or adherence to schedules that may increase the variability in service revenues and margins earned on such contracts. Our estimates are monitored over the lives of our contracts and are based on an assessment of our anticipated performance, historical experience and other information available at the time.

35.     On August 10, 2021, TaskUs held its Q2 2021 Earnings Call.  During the call, Defendant Maddock stated:

> The market opportunity in front of us is simply massive. The total addressable market across the specialized services we deliver is over $100 billion, and demand for some of these services is growing up to 50% annually. So we are just getting started.

36.     During the Q2 2021 Earnings Call, Defendant Maddock also stated, "In Q2, we saw continued revenue growth from our top 2 clients, while revenue concentration from our largest client continued to improve in the quarter.  Our largest client, which represented 32% of our 2020 revenues and 29% of our Q 2021 revenues, delivered 27% of our Q2 revenues."

37.     During the Q2 2021 Earnings Call, an investment analyst asked, "I know you guys said the top client was 27%.  How big was the top 2 client? And overall, are these top 2 growing much faster than the overall client portfolio?  Are you kind of seeing growth being driven from maybe the non-top, call it, 20 clients going forward?"  In response, Defendant Maddock stated, "So as I said, our largest customer saw improved revenue concentration, which was 32% in 2020. In Q1 of 2021, it was 29%, and then in Q2 of 2021, it was 27%.  So while that client is continuing to grow very aggressively, the rest of the business is outpacing their growth."

38.     During the Q2 2021 Earnings Call, an investment analyst asked, "when we think about how big this year is going to be, can you still do your 25% growth off of what just seems like such a massive comp this year?"  Defendant Maddock replied, "Absolutely.  We guided in our IPO process to think about 25% year-on-year revenue growth in the medium term.  And we absolutely intend to deliver on that for 2022 and beyond."

39.     During the Q2 2021 Earnings Call, Defendant Sekar stated: "The current quarter was impacted primarily by an increase in accounts receivable, which was driven by the 57.4 percentage year-over-year revenue growth."

40.     On November 10, 2021, TaskUs held its Q3 2021 Earnings Call.  During the call, Defendant Sekar stated:

> In Q3, we also saw continued revenue growth from our top client. However, that growth was exceeded by the ongoing expansion of our entire client base. As a result, our revenue concentration with our largest client was just below 27%, approximately flat compared with Q2, but less than the 32% of 2020 revenues. Our second largest client was 11% of our revenue, down from 12% in Q2. Our top 10 and top 20 clients accounted for 61% and 76% of revenues, respectively, in the quarter. Revenue concentration continues to improve in our top 10 and top 20 clients, both year-over-year and quarter-over-quarter.

41.     During the Q3 2021 Earnings Call, Defendant Sekar also stated:

> In Q2, I briefly discussed the increase in accounts receivables as a result of our strong revenue growth. We saw the impact of strong revenue growth on receivables

again in Q3 as AR increased by $29.7 million from Q2 of 2021. We are implementing a new audit of cash process as we onboard new clients and expect to reduce our DSO [Days Sales Outstanding] in 2022.

42.     During the Q3 2021 Earnings Call, Defendant Sekar also stated: "In closing, we had a tremendous 2021, nearly doubling our growth rate from 2020.  As we head into 2022, we expect to deliver sustainable revenue growth and world-class margins.  While we aren't giving a formal outlook for the next year yet, I will reaffirm that we remain confident in our ability to grow at or about 25% in the medium term."

43.     During the Q3 2021 Earnings Call, an investment analyst asked, "Can you comment on the outlook you see for Content Moderation business given – specifically given the largest client [Facebook] has been in the news so much over the last few months?  What does all that news flow mean for near-term outlook of Content Moderation for you?"  In response, Defendant Maddock stated:

> So obviously, we can't comment on specifics of any individual customer, but let me talk about the social media space in general. Clearly, social media is facing increasing scrutiny and regulatory pressure here in the United States. And today, the most advanced regulatory regime probably exists in Europe. There, we've seen increased regulations lead to increased demand for essential services like Content Security and AI Operations from European service providers. So our belief is that as our clients in the social media space face the scrutiny, they're likely to continue to expand their investments in these services. Given our reputation as a best-in-class provider of Content Security services, we stand to benefit from this growth.

44.     During the Q3 2021 Earnings Call, Defendant Maddock also stated:

> Clearly, we've had an amazing 2021. And when we look at the year, Q1 is the quarter in which we had the strongest sales quarter in our company's history. Q2 and Q3 were also incredibly strong quarters, basically on par with one another, but well above the sales targets that we set for ourselves. And so I think that kind of sets the stage for the growth that we've seen in 2021.

> In 2022, we're expecting to see sustainable revenue growth and world-class margins. And clearly, we're not in the stage to give a formal outlook. But I will say we're very confident in our ability to grow at or above 25% into the medium term, so well beyond next year.

45.     During the Q3 2021 Earnings Call, an investment analyst stated, "You create platforms that seems [sic] really hard for clients to either move away from you or move to other kind of split volumes or anything.  Maybe explain a little bit about that just about your ability to kind of retain and not have like split volumes with other vendors and how that's all working,"  In response, Defendant Maddock stated:

> It is really about identifying the area of most need for our customers. And generally, that's a specialized service that brings a degree of sophistication that is difficult to deliver. And so we want to go on a journey with our clients. We want to start with whatever they're initially comfortable outsourcing. And very often, that can be fairly basic work. But as they get more comfortable outsourcing more sophisticated functions, TaskUs wants to be the provider who moves up the market with our clients' needs. And so there are many, many cases that I can point to where we've been successful in doing that. And I –so I think it's a combination of that.

> Also, it's worth mentioning the technical investments that we've made. We've got an incredible team of technologists. And our focus isn't on building huge enterprise systems or CRM systems. Instead, we're building lightweight browser-based extensions that actually sit on top of our clients' systems and suggest next-best actions to our teammates or automate large portions of our teammates' manual workflow. Using this approach, we've built chatbots, workflow automation tools and a suite of tools that improve the experience of our teammates on the front lines of Content Security.

> So I think it's a combination of sophistication of service, level of technical enablement that really makes the difference when it comes to TaskUs.

46.     During the Q3 2021 Earnings Call, an investment analyst asked, "how sustainable is the demand and growth trajectory that you're seeing right now?  And what are the key things that you're trying to watch to assess whether it's continuing to – that the vast trajectory can continue, can accelerate or perhaps can decelerate?"  In response, Defendant Maddock stated:

> Yes. It's something I think a lot about. We're ultimately a way to play the high-growth Internet space. And if that space is growing, we should be growing, too. We do that by delivering the 3 specialized services that we deliver today. And moving up the value chain is – our customers' sourcing means become more sophisticated. We also do that by identifying the next generation of services that our customers are going to be demanding. So fintech is a vertical that I've talked about in the past. It's incredibly exciting space for us where we've been adding lots of new customers and lots of new lines of service with existing customers.

47.     The above statements identified in ¶¶ 30-46 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.

48.     Defendants' statements touting TaskUs' revenue and profitability growth track record and potential, and its "massive" market opportunity were materially false and misleading because TaskUs was experiencing severe financial strain and business challenges, particularly with its most important client Facebook, and the Company was improperly recognizing revenue from certain key contracts.  Additionally, certain of Defendants' statements attesting to the size of the Content Security market were materially false and misleading because they were supported by outdated market data while more recent data indicated that the market was smaller than Defendants asserted and growth in the market was projected to slow.  Further, Defendants' statements regarding the Company's workforce were false and misleading because TaskUs' attrition rate was significantly higher than the Company asserted and there was evidence that employee referral costs were rising and hiring was decelerating.

49.     On January 20, 2022, Spruce Point issued its Report after conducting a "forensic financial and accounting review" of the Company.  In the Executive Summary of the Report, Spruce Point stated, TaskUs "has a pattern of exaggerated and inflated business claims, including revenue, and is covering-up financial strain with reduced disclosures, cherry-picked market data, and non-standard key performance metrics.  With 28% of sales to Facebook and related to the controversial area of 'Content Moderation' we find evidence of increasing financial strain in the relationship and believe margins and cash flow are set to contract more than expected."  Also in the Executive Summary, Spruce Point stated, "we find a pattern of embellishing the size of its workforce and making overly optimistic revenue growth claims."

50.     More specifically, regarding TaskUs' financial strain and business challenges, Spruce Point stated, "We Believe TASK Is Not Transparent About Challenges In Its Content Security Business" and "Spruce Point finds clear evidence that TASK's revenue per front line content security employee has been in steep decline.  It appears that key clients like Facebook are requiring more labor to fill tasks, but that it is not translating into additional revenue."  Spruce Point also stated "Facebook uses multiple firms and TASK's reported Content Security segment growth rate shows signs of business slowing.  This could suggest that Facebook is insourcing some of the work, consolidating, or redistributing it to other vendors."  Additionally, Spruce Point stated, "We Believe TASK Doesn't Disclose Key Metrics That Would Reveal Severe Business Challenges," including annual contract value, interest income, revenue per employee, cost per employee, and recruitment expense.

51.     Regarding TaskUs' claims about the size of the Content Security market, Spruce Point explained that the Company "cites the Everest Group report from Sept 2019 for market data in Content Security, and says from 2016-21E the market will grow 40-50%.  It pairs this with data from JC Market Research to say the market is $5.8 billion in 2021."  But Spruce Point pointed out that more recent data published by Everest Group shows that "the Content Security market is $4-$5 billion and projected to grow 30-40% from 2020-23.  Thus, it appears that TASK cherry-picked data to avoid showing that its key market was both smaller and projected to slow down going forward."

52.     Concerning TaskUs' revenue recognition, "Spruce Point observes that TASK's unbilled receivables to [last twelve months] revenues had been rising steadily for 18 months" which "suggests that TASK may have been booking revenue ahead of receiving collections."  Spruce Point similarly stated, "We believe unbilled receivables rising reflect a worsening of the

quality of business that TASK is undertaking, and that it may be booking revenue ahead of certainty of payment."

53.     In terms of TaskUs' workforce, Spruce Point specifically stated, "TASK removed its only mention of gross hires from its early prospectus.  In subsequent filings, it made vague mention of hiring 'thousands of employees.'  On its conference calls and earnings releases it references 'net new' additions.  Given its 2019 disclosure of 12,000 new employees, we estimate 7,400 employees departed.  Therefore, we estimate employee attrition at 46.0% or significantly higher than the 26.6% figure cited by management."  Additionally, Spruce Point stated that "TASK Obscures Trend of Declining [Employee] Referral Rates Which Contribute to Rising Personnel Costs," and stated that there is "Evidence Referral Costs Are Rising " and "Data Suggests Hiring Is Decelerating."

54.     On this news, TaskUs' stock fell $5.46 per share, or more than 15%, from $35.59 per share on January 19, 2022, to $30.13 per share at the close of trading on January 20, 2022, on unusually heavy trading volume.

## **LOSS CAUSATION**

55.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of TaskUs securities and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on January 20, 2022, as alleged herein, the price of TaskUs securities fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of TaskUs securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired TaskUs publicly traded securities during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of TaskUs and their families and affiliates.

57.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of November 8, 2021, there were more than 27.2 million shares of TaskUs Class A common stock outstanding, owned by at least thousands of investors.

58.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.  Whether Defendants violated the Exchange Act;

B.  Whether Defendants omitted and/or misrepresented material facts;

C.  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.  Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.  Whether the price of TaskUs' securities were artificially inflated;

F.  Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.  The extent of damage sustained by Class members and the appropriate measure of damages.

59.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

60.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

61.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

62.     TaskUs' "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective and inapplicable and cannot shield the statements at issue from liability.

63.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was made by or authorized and/or approved by an executive officer of TaskUs who knew that the statement was false.

## PRESUMPTION OF RELIANCE

64.     At all relevant times, the market for TaskUs securities was an efficient market for the following reasons, among others:

A.  TaskUs shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

B.  As a regulated issuer, TaskUs filed periodic public reports with the SEC;

C.   TaskUs regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.   TaskUs was followed by many securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

65.   As a result of the foregoing, the market for TaskUs securities promptly digested current information regarding TaskUs from all publicly available sources and reflected such information in the price.  Under these circumstances, all purchasers of TaskUs securities during the Class Period suffered similar injury through their purchase of TaskUs securities at artificially inflated prices and the presumption of reliance applies.

66.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

67.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

68.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase TaskUs securities at artificially inflated prices.

69.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for TaskUs securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

70.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about severe financial strain and business challenges with the Company's customers (including its most important customer Facebook), the size and revenue growth potential of the Content Security market, improper revenue recognition practices, the size of TaskUs' workforce, and the Company's business, operations, and prospects, as specified herein.

71.     During the Class Period, Defendants made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

72.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

for the purpose of concealing TaskUs' financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.

73.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for TaskUs securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

74.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

75.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

76.     Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

77.     Defendants Maddock, Weir, and Sekar acted as controlling persons of TaskUs within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about TaskUs, the Individual Defendants had the power and ability to control the actions of TaskUs and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

78.   **WHEREFORE**, Plaintiff prays for judgment as follows:

A.  Determining that this action is a proper class action under Rule 23 of the Federal
Rules of Civil Procedure;

B.  Awarding compensatory damages in favor of Plaintiff and other Class members
against all Defendants, jointly and severally, for all damages sustained as a result
of Defendants' wrongdoing, in an amount to be proven at trial, including interest
thereon;

C.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in
this action, including attorneys' fees and expert fees; and

D.  Awarding such equitable/injunctive or other further relief as the Court may deem
just and proper.

## JURY DEMAND

79.   Plaintiff demands a jury trial.

Dated: February 23, 2022                    Respectfully submitted,

                                            */s/ Javier Bleichmar*
                                            Javier Bleichmar
                                            Ross Shikowitz
                                            **BLEICHMAR FONTI & AULD LLP**
                                            7 Times Square, 27th Floor
                                            New York, New York 10036
                                            Telephone: (212) 789-1340
                                            Facsimile: (212) 205-3960
                                            jbleichmar@bfalaw.com
                                            rshikowitz@bfalaw.com

                                            *Counsel for Plaintiff*

                                            John A. Kehoe
                                            **KEHOE LAW FIRM, P.C.**
                                            41 Madison Avenue, 31st Floor

New York, New York 10010
Telephone: (212) 792-6676
jkehoe@kehoelawfirm.com

*Additional Counsel for Plaintiff*

## <u>CERTIFICATION</u>

I, Humberto Lozada, hereby certify as follows:

1.      I have reviewed the Complaint against TaskUs, Inc. ("TaskUs"), Bryce Maddock, Jaspar Weir, and Balaji Sekar alleging violations of the federal securities laws and have authorized its filing.

2.      I did not purchase securities of TaskUs at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

4.      My transactions in TaskUs securities that are the subject of this litigation during the Class Period are reflected in Schedule A, attached hereto.

5.      I have not sought to serve as a representative party in a class action filed under the federal securities laws in the last three years.

6.      Beyond my *pro rata* share of any recovery, I will not accept payment for serving as lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this _____ day of _____ 2022.  2/20/2022


DocuSigned by:

*Humberto Lozada*

72DB8FD1982046F...

_____

Humberto Lozada

**SCHEDULE A**
TRANSACTIONS IN
TASKUS, INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 09/24/2021 | 7,000.00 | 75.71 | ($529,969.30) |