**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRCT OF NEW YORK**

| | |
|---|---|
| HUMBERTO LOZADA and OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>TASKUS, INC., BRYCE MADDOCK, JASPAR WEIR, BALAJI SEKAR, AMIT DIXIT, MUKESH MEHTA, SUSIR KUMAR, JACQUELINE D. RESES, and BCP FC AGGREGATOR L.P.,<br><br>Defendants. | Case No.  No. 1:22-cv-01479<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

## TABLE OF CONTENTS

I.     SUMMARY OF THE ACTION ................................................................ 1

II.    JURISDICTION AND VENUE ........................................................... 8

III.   Parties ............................................................................................. 8

    A. Plaintiffs ..................................................................................... 8

    B. Defendants .................................................................................. 9

IV.   BACKGROUND ALLEGATIONS ................................................... 11

    A. The BPO Industry and Human Capital Disclosure Requirements ............................ 11

    B. TaskUs's Business Model and Premium Valuation Depend on Controlling Attrition and Maintaining Employee Satisfaction ..................................... 13

    C. Blackstone Invests $250 Million in TaskUs; BCP and the Officer Defendants Decide to Conduct the IPO .................................... 16

    D. Defendants Violate the Securities Laws by Reporting a Misleadingly Low Attrition Rate and Omitting the Human Capital Measures TaskUs Used to Manage Its Business ................................. 17

      1. CEO Maddock and TaskUs's Executive Leadership Team Internally Tracked TaskUs's High Attrition Rate, Monthly Terminations, and Monthly Hiring ............................................. 17

      2. TaskUs Used These Human Capital Measures to Manage Its Business ............... 20

      3. In the IPO, Defendants Nonetheless Falsely Reported to Investors That TaskUs Had "Low Attrition" ...................................... 22

      4. In the IPO, Defendants Omitted TaskUs's Actual Human Capital Measures in Violation of SEC Item 101 ................................ 24

      5. Defendants Omitted TaskUs's Known, Unfavorable Trend of High Attrition in Violation of Item 303 ........................................ 25

    E. Defendants Misleadingly Touted TaskUs's Glassdoor Rating While Manipulating and Inflating It ................................................ 25

      1. Defendants Implement a Corporate Policy to Inflate TaskUs's Glassdoor Rating ........................................................ 28

      2. Lead Counsel's Proprietary Analysis of TaskUs's Glassdoor Reviews Confirms That Its Rating Was Manipulated ............................ 30

    F. Defendants Complete the IPO to Raise $330 Million, Over 63% of Which Is Paid to BCP, Maddock, and Weir ................................. 37

    G. Defendants Complete the Secondary Offering Based on Material Misstatements and Omissions; BCP, Maddock, and Weir Reap Another $742 Million, 100% of the Net Proceeds ........................................................................... 37

    H. Defendants Continue to Misrepresent TaskUs's Attrition and Glassdoor Rating Through the End of the Class Period ........................................................... 42

V.    FORMER EMPLOYEE ALLEGATIONS ........................................................ 43

VI.   DEFENDANTS ARE SUBJECT TO CONTROL PERSON LIABILITY ..................... 48

    A. The Individual Defendants ............................................................................ 48

    B. The Officer Defendants ................................................................................. 48

    C. Defendant BCP ............................................................................................. 50

VII.  SECURITIES ACT ALLEGATIONS ............................................................... 54

    A. The Registration Statements Contained Material Misstatements and Omissions ...... 54

       1. Material Misstatements Regarding Employee Attrition and Hiring .................... 55

       2. Material Omissions, in Violation of Item 101, of the Human Capital Measures Defendants Focused on in Managing the Business ............................. 56

       3. Material Omissions of Known, Material Attrition Trends in Violation of Item 303 ......................................................................................................... 57

       4. Material Misstatements Regarding Glassdoor Rating .......................................... 59

VIII. CLASS ACTION ALLEGATIONS ................................................................. 62

IX.   INAPPLICABILITY OF STATUTORY SAFE HARBOR ...................................... 64

X.    CLAIMS FOR RELIEF PURSUANT TO THE SECURITIES ACT ............................ 65

    COUNT I ......................................................................................................... 65

    COUNT II ........................................................................................................ 66

    COUNT III ....................................................................................................... 68

XI.   EXCHANGE ACT ALLEGATIONS ................................................................ 70

    A. Exchange Act Materially False and Misleading Statements ......................... 70

       1. False and Misleading Statements and Omissions in the Registration Statements ...................................................................................... 70

       2. Q2 2021 False and Misleading Statements .......................................................... 71

       3. Q3 2021 False and Misleading Statements .......................................................... 72

       4. November 18, 2021 False and Misleading Statements ......................................... 72

    B. Additional Allegations of Scienter ............................................................... 73

1.   Defendants Maddock and Weir Were Highly Motivated to Inflate TaskUs's Share Price for Personal Profit Through Insider Sales of $311 Million.................................................................................... 74

2.   Former Employee Allegations ............................................................. 77

3.   The Officer Defendants Received Regular Reports Tracking TaskUs's Attrition Rates and Other Human Capital Measures ............................................... 77

4.   TaskUs's Corporate Policy of Manipulating Its Glassdoor Rating Supports Scienter ........................................................................ 78

5.   The Officer Defendants Spoke Repeatedly About TaskUs's Attrition and Glassdoor Rating, Which Wall Street Analysts Emphasized ............................ 80

6.   Corporate Scienter .............................................................. 81

C.   Loss Causation ...................................................................... 82

D.   Presumption of Reliance and Fraud-on-the-Market Doctrine .................................. 84

XII.   CLAIMS FOR RELIEF PURSUANT TO THE EXCHANGE ACT .............................. 85

    COUNT IV........................................................................... 85

    COUNT V............................................................................ 86

    COUNT VI........................................................................... 87

XIII.   JURY DEMAND ....................................................................... 88

XIV.   PRAYER FOR RELIEF ................................................................. 88

Lead Plaintiff Humberto Lozada ("Lozada") and Named Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters" and, together with Lozada, "Plaintiffs"), allege (i) strict liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), and (ii) fraud-based claims under Sections 10(b), 20(a), and 20A of the Exchange Act of 1934 (the "Exchange Act") for a class period of June 11, 2021 to January 19, 2022, both inclusive (the "Class Period"), against TaskUs, Inc. ("TaskUs" or the "Company"), Bryce Maddock (TaskUs's co-founder and CEO), Jaspar Weir (TaskUs's co-founder and President), BCP FC Aggregator L.P. ("BCP") (TaskUs's controlling shareholder), Balaji Sekar (CFO), and TaskUs's Board of Directors ("Board") members who signed the Registration Statements.

Plaintiffs, by and through their counsel, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on, among other things, the independent investigation conducted by and through Lead Counsel. This investigation includes, but is not limited to, a review and analysis of public filings by TaskUs with the Securities and Exchange Commission ("SEC"); transcripts of TaskUs conferences with investors and analysts; press releases and media reports concerning the Company; analyst reports concerning TaskUs; other public information and data regarding the Company; and interviews with former employees of TaskUs conducted in Lead Counsel's investigation.[1]

## I.    SUMMARY OF THE ACTION

1.      TaskUs's human capital—the workers who provide services billed to TaskUs's clients—drives the value of its business and stock.  This securities class action arises from Defendants' material misstatements and omissions about two key human capital metrics:

---

[1] Emphasis is added and citations are omitted unless otherwise noted.

TaskUs's employee attrition rate and its rating on Glassdoor (a widely used website for employees' reviews of their employers). Defendants manipulated these quantitative metrics to portray TaskUs as unique, different, and more valuable than its business process outsourcing ("BPO") peers. This allowed them to raise over **one billion dollars** in TaskUs's June 2021 IPO and October 2021 secondary offering. TaskUs went public at $23.00/share, and Defendants pumped the stock to its all-time high of $83.51 in September 2021. This allowed three insiders—including BCP, an affiliate of the private equity firm Blackstone—to rake in **$951 million** by selling their artificially inflated shares to the Class. In reality, however, TaskUs is no different than its BPO competitors. After Defendants cashed out, the truth was revealed, and TaskUs's stock dropped nearly 20%.

2.     TaskUs operates in the BPO industry—the unglamorous field of providing companies with thousands of outsourced, low-paid employees to perform repetitive, menial tasks, like staffing offshore call centers. TaskUs provides technology-sector clients with these low-paid personnel for entry-level tasks such as telephonic customer support and so-called "content moderation" on social media (*i.e.*, screening for sexual imagery, violent content, and what TaskUs has described as "political advertising manipulation, bullying and hate speech").

3.     Human capital is admittedly the "core of [TaskUs's] business." TaskUs publicly touted that its "happy, motivated and hardworking employees in turn produce high-quality work for [TaskUs] clients." The premise that TaskUs had uniquely happy employees—who were therefore more productive and more likely to stay at TaskUs—directly affected its valuation and bottom line. That is because revenue directly depends on the number of workers TaskUs can hire, retain, and staff on projects for its customers. With more employees, TaskUs can take on more customers and projects. Because TaskUs depends on and sells its employees' labor, its attrition

rate (the rate of employees who leave TaskUs) and employees' rating of TaskUs as a workplace are key business metrics.

4.       Before TaskUs's IPO, the U.S. Securities and Exchange Commission implemented disclosure requirements specifically aimed at ensuring that companies such as TaskUs make full and complete disclosures about their "human capital resources," including the "measures or objectives" the company "focuses on in managing the business."   17 C.F.R. § 229.101(c). The SEC enacted these requirements precisely because these metrics are material to investors. In adopting these requirements, then-SEC Chairman Jay Clayton remarked:

> I fully support the requirement in today's rules that companies must describe their human capital resources, including any human capital measures or objectives they focus on in managing the business, to the extent material to an understanding of the company's business as a whole.  From a modernization standpoint, today, **human capital accounts for and drives long-term business value in many companies much more so than it did 30 years ago**.  Today's rules reflect that important and multifaceted shift in our domestic and global economy.

5.       In particular, investors and analysts focus on BPO companies' employee attrition and ratings because they directly impact revenue, profitability, and growth prospects.  High attrition threatens to reduce revenue, raise costs, and reduce profits.  Without enough employees to handle client projects, BPO companies cannot sustain and increase revenue.   Further, profitability depends on retaining employees long enough to recoup the substantial costs of training and onboarding them.  In TaskUs's words, "a significant increase in the turnover rate among trained employees could increase our costs and decrease our operating profit margins." Confirming that attrition is inherently linked to TaskUs's financial performance, TaskUs listed the Company's ability to "manage attrition" among its "Risks Related to Finance and Accounting." Attrition is also linked to employees' satisfaction, as measured through ratings of TaskUs as a workplace; TaskUs stated that "happy employees deliver better results and higher retention."

6.      Defendant Maddock (TaskUs's CEO and co-founder), Defendant Sekar (CFO), and other TaskUs executives on its "Executive Leadership Team" (ELT) obsessively tracked attrition rates.  During 2020, they received monthly internal reports showing that TaskUs's attrition rate across its entire workforce was typically above 40% and that more than 50% of employees left within their first 60 days.  These high attrition rates impaired TaskUs's ability to generate revenue and saddled it with the costs of replacing the departing employees.  Internally, TaskUs's high attrition—driven in part by tasks like reviewing suicide-related content on social media—was a subject of constant executive discussion and concern, causing CEO Maddock to record an internal video exhorting employees to refer only new workers who would "stick around and not just quit."

7.      Further, TaskUs had an internal corporate policy of manipulating its Glassdoor rating.  This policy, implemented through TaskUs's onboarding software, required newly hired TaskUs employees—who had yet to start actual work—to submit Glassdoor reviews of TaskUs during their training.  Because the employees had yet to experience the grim reality of working at TaskUs, their coerced reviews were disproportionately positive and inflated the Glassdoor rating.

8.      The truth was that TaskUs was no different from its competitors in the BPO industry, which is generally known for high attrition rates and dissatisfied employees due to the monotonous, low-paid work.  Revealing that truth—that TaskUs had significant employee attrition, and its Glassdoor rating was heavily manipulated—would have made TaskUs a far less attractive investment; that, in turn, would have tanked TaskUs's IPO and eviscerated any profits for TaskUs's controlling shareholder, BCP.

9.      Thus, to have a successful IPO, Defendants had to distinguish TaskUs from the rest of the BPO industry.  By creating the illusion that TaskUs was different from its BPO peers—able

to generate maximum revenue without high attrition and its costs—TaskUs could command a premium valuation.  Defendants did so by claiming in the Registration Statements that:

- TaskUs had "low attrition" and a "14.9%" attrition rate for 2020 for employees who were employed by TaskUs for more than 180 days;

- TaskUs had a Glassdoor rating "of 4.6 out of 5.0" as of March 2021 (and "4.7 out of 5.0" as of June 2021) which purportedly "validated" TaskUs's "differentiated culture"; and

- TaskUs's Glassdoor ratings exceeded its competitors' ratings of 3.2 to 4.2 stars.

10.    In short, the Registration Statements touted TaskUs's purportedly low attrition rates and industry-leading Glassdoor rating to differentiate TaskUs from the rest of the BPO industry and support a premium valuation of its stock.  Analysts took the bait:  a July 6, 2021 J.P. Morgan report praised TaskUs's "industry-low attrition rate of 15% in 2020" and "industry-high Glassdoor score of 4.6," while a July 6, 2021 Wells Fargo report remarked that TaskUs's "strong culture is reflected in some of the industry's lowest levels of attrition rates (<15% voluntary attrition in 2020)" and "one of the highest glassdoor [sic] scores."  Underscoring the centrality of TaskUs's Glassdoor rating, which reached 4.7 stars by June 2021, CEO Maddock declared that "[n]o one in our space comes even close to that."

11.    Based on the false premise that TaskUs was different and more valuable than its BPO peers, TaskUs's stock price skyrocketed from $23.00 at the June 2021 IPO to its all-time high of $83.51 in September 2021, just three months later.  This allowed Defendants to line their pockets by raising $330 million in TaskUs's June 2021 IPO and $742 million in its October 2021 secondary offering (the "Secondary Offering").  In these offerings, BCP and TaskUs's co-founders, Defendants Maddock and Weir, pocketed a total of *$951 million*:  $640 million for BCP and $155.5 million each for Maddock and Weir.

12.     Under the Securities Act, TaskUs is strictly liable for the Registration Statements' material misstatements and omissions, and the remaining Defendants are liable for their negligence.

13.     <u>First</u>, TaskUs did not have "low attrition."  A former TaskUs employee involved in creating internal attrition reports for Defendant Maddock and other senior executives verified that during 2020, those reports showed an attrition rate above 40% for TaskUs's entire workforce and that over 50% of employees left within their first 60 days—attrition rates that were far from "low." Moreover, the specific "14.9%" attrition rate that Defendants touted was a materially misleading half-truth, since it only reflected a narrow, non-representative slice of employees who had worked at TaskUs for more than 180 days.  This misleadingly concealed the fact that over 50% of employees left within their first 60 days and TaskUs's overall attrition rate, as the Company itself internally calculated it, was above 40%.

14.     <u>Second</u>, Defendants violated two SEC affirmative disclosure requirements. The human capital disclosure requirement of Item 101(c) of Regulation S-K, 17 C.F.R. § 229.101(c), required TaskUs to disclose "any human capital measures or objectives that [it] focuses on in managing the business," including those addressing the "retention of personnel." TaskUs violated Item 101(c) by omitting three human capital measures Defendants focused on in managing the business:  (1) the Company-wide attrition rate above 40%, (2) the number of terminated employees, and (3) the number of new hires, each of which was internally reported to CEO Maddock and CFO Sekar every month.  Defendants also violated Item 303 of Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), by omitting the internally reported attrition rate in 2020, which was a "known trend" that was having and was "reasonably likely to have a material . . . unfavorable impact on net sales or revenues or income from continuing operations."

15.    Third, Defendants' statements touting TaskUs's "4.6" and "4.7" Glassdoor ratings were misleading because the ratings were artificially inflated as a result of TaskUs's corporate policy of manipulation.    Lead Counsel's proprietary analysis has confirmed that TaskUs's Glassdoor reviews experienced a highly unusual, significant spike—with a *695%* increase in daily reviews and a statistically significant increase in the reviews' average rating—just before TaskUs's IPO.    This manipulation went hand-in-hand with TaskUs's misleading public claims of a low attrition rate, since many of the new hires who submitted positive Glassdoor ratings quickly left TaskUs, yet were not counted in the "14.9%" attrition rate for employees of more than 180 days.

16.    Plaintiffs also bring fraud claims under the Exchange Act against Defendants TaskUs, Maddock, Weir, and Sekar based on their material misstatements and omissions about TaskUs's attrition and Glassdoor ratings.    Maddock and Sekar were members of the Executive Leadership Team that received monthly reports on TaskUs's attrition rates, terminations, and hires, and TaskUs's corporate policy of Glassdoor manipulation required senior management approval.    Further, while knowing material non-public information, Maddock and Weir exploited TaskUs's inflated share price to sell stock for personal gain.    These insider sales— which generated $311 million in proceeds, largely from selling near peak prices—strongly support Maddock's and Weir's scienter.    They also give rise to Section 20A insider trading claims on behalf of Oklahoma Firefighters and all other Class members who purchased stock contemporaneously with Maddock's and Weir's unlawful insider trading.

17.    Investors ultimately learned that TaskUs's premium valuation was an illusion:  its true attrition rate was far beyond what TaskUs had previously disclosed, and TaskUs was no different than its BPO peers, calling into question its purportedly high Glassdoor rating.  TaskUs's share price fell far below its $83.51 peak, with a nearly 20% decline on January 20 and 21, 2022

alone.   TaskUs's share price was just $17.10 as of the filing of this Complaint on December 16, 2022.

## II.   JURISDICTION AND VENUE

18.   This Court has jurisdiction over the subject matter of this action pursuant to: (i) Section 22 of the Securities Act of 1933 (15 U.S.C. § 77v); and, separately, (ii) Section 27 of the Exchange Act of 1934 (15 U.S.C. § 78aa).  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

19.   Venue is proper in this District pursuant to: (i) Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)); and, separately, (ii) Section 27 of the Exchange Act (15 U.S.C. § 78aa).  In addition, venue is proper pursuant to 28 U.S.C. § 1391(b) because the acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District.  TaskUs's Class A common stock trades on the NASDAQ, which is headquartered in this District.

20.   In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.    Plaintiffs

21.   Plaintiff Lozada purchased TaskUs Class A common stock on September 24, 2021 traceable to the IPO Registration Statement, as set forth in the Certification attached hereto as Exhibit A.

22.   Named Plaintiff Oklahoma Firefighters is a public pension fund established in 1980 to administer pension benefits for Oklahoma firefighters.  Oklahoma Firefighters manages more

than $3.5 billion on behalf of more than 26,000 participants.  As set forth in the Certification attached hereto as Exhibit B, Oklahoma Firefighters purchased TaskUs Class A common stock, including a purchase in the Secondary Offering on October 21, 2021 at the $63.50 offering price directly from Goldman Sachs & Co. LLC, an underwriter of the Secondary Offering, in the United States.  That purchase settled on the October 25, 2021 settlement date.

23.    As a result of Defendants' material misstatements and omissions, Plaintiffs purchased or otherwise acquired TaskUs Class A common stock at artificially inflated prices.

**B.    Defendants**

24.    Defendant TaskUs is a Delaware corporation with its corporate headquarters in New Braunfels, Texas.  TaskUs's Class A common stock trades on NASDAQ under the ticker symbol "TASK."  TaskUs issued Class A common stock in the IPO and the Secondary Offering.

25.    Defendant Maddock is a Co-Founder of TaskUs and has been its CEO at all relevant times.  He was also a member of TaskUs's Board at the time of the IPO and Secondary Offering, and remains a member of the Board today.  Defendant Maddock signed the Registration Statements.  In addition, he was one of the selling stockholders who offered TaskUs Class A common stock to the public in the IPO and Secondary Offering.  Defendant Maddock also made false and misleading statements on conference calls with investors and analysts, as alleged specifically herein.  Defendant Maddock had the power and authority to, and in fact did, approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

26.    Defendant Weir is a Co-Founder of TaskUs and has been its President at all relevant times.  He was also a member of TaskUs's Board at the time of the IPO and Secondary Offering, and remains a member of the Board today.  Defendant Weir signed the Registration Statements. In addition, he was one of the selling stockholders who offered TaskUs Class A common stock to the public in the IPO and Secondary Offering.  Defendant Weir had the power and authority to,

and in fact did, approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

27.    Defendant Sekar has been TaskUs's CFO at all relevant times.  Defendant Sekar signed the Registration Statements.  In addition, he signed certain SEC filings that contained false and misleading statements, as alleged specifically herein.  Defendant Sekar had the power and authority to, and in fact did, approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

28.    Defendant BCP FC Aggregator L.P. is an investment fund associated with The Blackstone Group, Inc. (now doing business as Blackstone Inc. ("Blackstone")), one of the largest asset managers in the world.  Defendant BCP is a limited partnership organized under Delaware law, with its principal place of business at 345 Park Avenue, New York, New York 10154.  Prior to the completion of the Secondary Offering, Defendant BCP was the beneficial owner of a majority of TaskUs's outstanding stock, and BCP maintained a majority of the voting power of all TaskUs stockholders at all relevant times, including after the Secondary Offering. Defendant BCP directly held the TaskUs common stock offered by BCP to the public in the IPO and Secondary Offering.

29.    Defendant Amit Dixit has been a member of TaskUs's Board since October 2018 as BCP's designee pursuant to the Stockholders Agreement.  Defendant Dixit signed the Registration Statements.  Defendant Dixit has also been the Head, Asia Private Equity for Blackstone since May 2021, and was previously the Co-Head Asia Acquisitions and Head, India Private Equity at Blackstone from January 2020 to May 2021, and Senior Managing Director and Head, India Private Equity at Blackstone from February 2007 to December 2019.

30.     Defendant Mukesh Mehta has been a member of TaskUs's Board since October 2018 as BCP's designee pursuant to the Stockholders Agreement.  Defendant Mehta signed the Registration Statements.  Defendant Mehta has also been Blackstone's Senior Managing Director since December 2020, and was previously a Managing Director at Blackstone from August 2016 to December 2020.

31.     Defendant Susir Kumar has been a member of TaskUs's Board since July 2019 as BCP's designee pursuant to the Stockholders Agreement.  Defendant Kumar signed the Registration Statements.  Defendant Kumar previously founded Intelenet Global Services, a BPO company, and served as its CEO from 2000 to August 2015.  In September 2015, Blackstone entered into an agreement to acquire a majority stake in Intelenet Global Services for £250 million, and Defendant Kumar served as its Chairman from September 2015 to September 2018. In October 2018, Blackstone sold Intelenet Global Services to Teleperformance for $1 billion.

32.     Defendant Jacqueline D. Reses has been a member of TaskUs's Board since July 2019.  Defendant Reses signed the Registration Statements.

33.     Defendants Maddock, Weir, Sekar, Dixit, Mehta, Kumar, and Reses are collectively referred to herein as the "Individual Defendants."  Defendants Maddock, Weir, and Sekar are collectively referred to herein as the "Officer Defendants."  TaskUs and the Officer Defendants are collectively referred to herein as the "Exchange Act Defendants."

## IV.     BACKGROUND ALLEGATIONS

### A.     The BPO Industry and Human Capital Disclosure Requirements

34.     The business process outsourcing industry has been around for decades, providing outsourced services for such tasks as data entry and IT services in the 1980s and offshore call centers in Asia during the early 1990s.  The widespread advent of the internet and social media

created new applications for BPO services, such as social media "content moderation" and performing repetitive tasks, like reviewing driver's licenses, for companies like Uber.  The rise of applications like Uber and Zoom also expanded the need for traditional BPO applications like telephonic customer and billing support.

35.    The BPO industry is based on human capital—the thousands of low-paid employees who provide the services that are billed to BPO providers' clients and generate revenue.

36.    BPO companies compete fiercely to hire and retain sufficient entry-level employees.  This competition is particularly intense because BPO employees often change companies, or leave the industry entirely, due to the monotonous, low-paid work.  As a whole, the industry is known for high attrition rates, which result in higher labor costs, as BPO companies are constantly forced to incur new recruitment and training costs to replace departing employees.  One academic report regarding attrition in the BPO industry specifically noted that "high employee attrition increases the costs to the organization considerably," including "expenditures incurred on recruitment, training and orientation," and the "valuable time" devoted to these efforts.[2]

37.    The SEC has issued specific human capital disclosure requirements.  In particular, Item 101(c)(2)(ii) of Regulation S-K requires companies to provide:

> A description of the registrant's human capital resources, including the number of persons employed by the registrant, and ***any human capital measures or objectives that the registrant focuses on in managing the business*** (such as, depending on the nature of the registrant's business and workforce, measures or objectives that address the development, ***attraction and retention of personnel***).

38.    In an August 26, 2020 release explaining this disclosure requirement, which became effective on November 9, 2020, the SEC stated:

---

[2] Dr. Pavan Mishra and Neha Solanki, *A study of the factors leading to attrition in employees of BPO Industry with special focus on attitude towards job and employee engagement*, INT'L J. OF CREATIVE RES. THOUGHTS Vol. 6 Issue 2 (April 2018), at 159, *available at* https://ijcrt.org/papers/IJCRT1812244.pdf.

> We believe that, in many cases, human capital disclosure is important information for investors. Human capital is a material resource for companies and often is a focus of management, in varying ways, and an important driver of performance.

(SEC Release No. 33-10825, Aug. 26, 2020.)

39.     Then-SEC Chairman Clayton explained that "today, human capital accounts for and drives long-term business value in many companies much more so than it did 30 years ago." He emphasized that when human capital measures have a "material impact on [company] performance, I believe investors benefit from understanding the drivers of that performance," including "meaningful qualitative and quantitative disclosure" of the "metrics that companies actually use in managing their affairs." He went on to comment that "the rules we adopt today are rooted in materiality and seek to elicit information that will allow today's investors to make more informed investment decisions."

### B.     TaskUs's Business Model and Premium Valuation Depend on Controlling Attrition and Maintaining Employee Satisfaction

40.     TaskUs was founded in 2008 by Defendants Maddock and Weir. TaskUs provides outsourced customer support, content moderation, and data analysis services using tens of thousands of low-paid employees, primarily located in the U.S. and the Philippines.

41.     Like other BPO companies, TaskUs depends on its human capital. The IPO Registration Statement described TaskUs's employees as "the core of our business":

**Human Capital Resources**

Our employees are the core of our business. Our success depends on our ability to attract, hire, train and retain sufficient numbers of employees in a timely fashion at our sites to support our operations.

42.     More specifically, TaskUs's business, growth prospects, and revenue depend directly on its headcount. The IPO Registration Statement explains that TaskUs's "business depends on maintaining large numbers of employees to service our clients' business needs" and

that TaskUs needed "to retain sufficient employees to serve our clients' increasing business needs and position ourselves for growth."  In other words, without sufficient employees to provide its labor-intensive services, TaskUs cannot maintain existing projects and clients—much less attract new ones.  Further, because many existing projects were billed by headcount (FE-1), the revenue TaskUs generated from a given project was directly tied to the number of employees it was able to provide.

43.    Attrition—the rate of employees who leave TaskUs—plays a crucial role.  High attrition threatens to reduce TaskUs's revenue by leaving it unable to staff existing and new projects.  Further, attrition directly impacts TaskUs's profitability because large numbers of employee terminations increase TaskUs's training and onboarding costs, which (a) are wasted as to the departed employees, and (b) must then be incurred again to train their replacements.  In this way, high attrition decreases TaskUs's profit margins.  TaskUs admitted as much, stating that "a significant increase in the turnover rate . . . could increase our costs and decrease our operating profit margins and could have an adverse effect on our ability to complete existing contracts in a timely manner, meet client objectives and expand our business," while "lower employee attrition leads to lower hiring and training costs."  Similarly, TaskUs stated that "[s]ignificant competition for employees could have an adverse effect on our ability to expand our business and service our clients, as well as cause us to incur greater personnel expenses and training costs."

44.    High attrition is a particular concern if employees depart early—before TaskUs has even started to recoup the substantial costs of training and onboarding them.

45.    Headcount and attrition are key business metrics that are highly material to investors and analysts because they directly impact TaskUs's revenues, profits, and growth prospects.  Indeed, the IPO Registration Statement recognized that TaskUs's "success depends to

a significant extent on our ability to attract, hire, train and retain skilled employees" and that the failure to do so "could have a material adverse effect on our business, financial condition, results of operations and prospects."

46.    Employee satisfaction—measured by quantitative metrics like ratings of TaskUs as a workplace—is another key business metric because it dovetails with TaskUs's headcount and attrition rate.  Satisfied employees are more likely to continue working for TaskUs, increasing revenues, reducing costs, and ultimately enabling greater profits and growth.  By contrast, dissatisfied employees will leave, reducing TaskUs's headcount, increasing its attrition rate, and negatively impacting revenues, costs, profits, and growth.

47.    In this regard, TaskUs explained in the IPO Registration Statement that "[t]he outsourcing industry as well as the technology industry generally experience high employee turnover."  However, TaskUs claimed to have a "differentiated culture" that was superior to its BPO peers, stating in the IPO Registration Statement:

> Our employee-centric culture, our focus on employee wellness and satisfaction and our employee-centric site selection enable us to meet that challenge and motivate our employees to stay for the long term. Our happy, motivated and hardworking employees in turn produce high-quality work for our clients.

48.    A personal letter from co-founders Maddock and Weir, also included in the IPO Registration Statement, claimed that TaskUs stood in "contrast" to "traditional outsourced service providers who were notorious for high attrition rates and awful working environments."

49.    TaskUs further claimed that its "focus on employee culture" led to "lower employee attrition levels," and that its "differentiated culture . . . is validated by" its purported rating of "4.6 stars" (out of five stars) on Glassdoor as of March 2021.

C. **Blackstone Invests $250 Million in TaskUs; BCP and the Officer Defendants Decide to Conduct the IPO**

50.     On October 1, 2018, Blackstone invested over $250 million in TaskUs and acquired a majority stake. This left Defendant BCP with approximately two-thirds of TaskUs's outstanding securities, while Defendants Maddock and Weir each maintained a 16% ownership stake.

51.     Following Blackstone's 2018 investment, TaskUs grew rapidly. For example, between 2018 and 2020, TaskUs achieved a revenue compound annual growth rate ("CAGR") of 60%, from $254 million in 2018 to $478 million in 2020.

52.     In late 2020, the Officer Defendants and BCP decided to capitalize on TaskUs's rapid growth via an IPO that would allow them to cash out by selling a portion of their TaskUs shares in exchange for hundreds of millions of dollars of cash.

53.     The IPO's success hinged on convincing investors in the public market that TaskUs was different from other BPO companies and should command a premium valuation. TaskUs's low attrition rate and high Glassdoor rating were crucial validators of TaskUs's supposedly "differentiated culture" and ability to generate strong revenues, profits, and growth. Investors and analysts were thus keenly attuned to whether TaskUs was truly different than its BPO industry peers. In this context, revealing the truth—that TaskUs had massive employee attrition and its Glassdoor rating was heavily manipulated—would be devastating.

54.     To maximize their own profits and maintain the illusion that TaskUs was different and more valuable than its BPO peers, the Officer Defendants and BCP caused TaskUs to file the materially false and misleading IPO Registration Statement.[3] As detailed below, the

---

[3] After filing a confidential draft registration statement and amendments, on April 12, 2021, TaskUs publicly filed a draft Form S-1 Registration Statement, as amended on May 6, 2021, June 2, 2021, and June 10, 2021 (the "Amendments"). On June 14, 2021, TaskUs filed the final IPO Prospectus (the "IPO Prospectus"), which forms part of the Registration Statement. The draft

IPO Registration Statement (1) misleadingly touted an attrition rate of 14.9% for a narrow, non-representative subset of employees; (2) in violation of SEC Item 101, omitted the actual human capital measures of attrition, terminations, and hires that Defendants used to manage the business, and in violation of Item 303, omitted the known, unfavorable trend of high attrition; and (3) misleadingly touted TaskUs's Glassdoor rating while concealing that TaskUs had artificially inflated the rating through its corporate policy of requiring reviews during training.

###### D. Defendants Violate the Securities Laws by Reporting a Misleadingly Low Attrition Rate and Omitting the Human Capital Measures TaskUs Used to Manage Its Business

55.     The allegations in this section and throughout the Complaint are based on Lead Counsel's investigation, which included interviews with former TaskUs employees.  The former employees identified herein provided information on a confidential basis and are specifically described in Section V by job description and responsibility, and duration of employment, thereby providing sufficient details to establish their reliability and personal knowledge (the "Former Employees" or "FEs").  Allegations attributed to a particular Former Employee are designated by reference to their "FE-__" designation or job description.

###### 1. CEO Maddock and TaskUs's Executive Leadership Team Internally Tracked TaskUs's High Attrition Rate, Monthly Terminations, and Monthly Hiring

56.     During 2020, TaskUs's ELT, including Defendants Maddock and Sekar, met monthly via Zoom meetings, typically on Mondays (FE-1).  In advance of these monthly meetings, James "Jim" Maddock, TaskUs's Senior Director of Human Resources Information Systems

---

registration statement, the Amendments, and the IPO Prospectus are collectively referred to herein as the "IPO Registration Statement."

("HRIS")—no relation to CEO Bryce Maddock—emailed PowerPoint presentations to ELT members showing attrition rates above 40% globally (FE-1).[4]

57.    As FE-1—a TaskUs HRIS specialist from June 2018 to December 2020 and human resources generalist from December 2020 to August 2021—explained, a small team was responsible for producing attrition and headcount reporting for the ELT and TaskUs management. This team consisted of Jim Maddock, FE-1, and at most two other employees (FE-1).  FE-1's role, through December 2020, was to provide reports regarding headcount and employee attrition.

58.    To generate the monthly PowerPoint presentations to the ELT, Jim Maddock directed FE-1 to prepare global attrition reports (FE-1).  To do so, FE-1 created an Excel file using data from TaskUs's Oracle Human Capital Management ("HCM") system, which maintained employee start dates and departure dates.  The Excel file contained TaskUs's total number of employees hired and terminated globally over the past 30 days (FE-1).

59.    The Excel file also contained a pivot table that calculated TaskUs's attrition rate as a percentage (FE-1).  This percentage was calculated as total terminations divided by total hires over the prior 30-day period (FE-1), shown in the following formula:

$$\frac{\text{Total Employees Terminated in Period}}{\text{Total Employees Hired in Period}} = \text{Attrition Rate (\%)}$$

60.    For example, if 400 employees left and 1,000 employees were hired over a 30-day period, this formula yielded an attrition rate of 40%.

61.    The Excel files showed that TaskUs had attrition rates above 40% globally during 2020, while certain regions had even higher attrition during 2020 (FE-1).  For example, in the U.S.,

---

[4] Allegations regarding the Former Employees' roles, tenure, and the information provided by them are summarized in Section V.

TaskUs saw attrition rates of approximately 130% (meaning that 1.3 times as many employees departed as were hired) during 2020, and India and Mexico typically saw attrition rates of 50% to 70% (FE-1).  In requesting the Excel files from FE-1, Jim Maddock told FE-1 that he would use the results in his presentations to the ELT (FE-1).  Further, Jim Maddock conveyed to FE-1 that during ELT meetings, the ELT asked Jim Maddock about the Company's attrition rate and how many people were being hired.

62.    In addition to TaskUs's attrition rate (calculated using the formula above), the monthly reports to the ELT included the number of terminations and the number of hires (FE-1). In 2020, these figures typically included at least 400 terminations and 1,000 hires per month for the U.S. and Philippines alone and were relatively steady throughout the year (FE-1).

63.    TaskUs publicly reported that its global headcount increased by 5,200 employees in 2020 (from 18,400 to 23,600 employees).  However, TaskUs did not publicly disclose that (a) it had to hire at least 12,000 new employees in the U.S. and Philippines in 2020 to reach these numbers, or (b) at least 6,800 employees left during 2020 (yielding the net headcount increase of 5,200).  Indeed, in an effort to obscure its massive hiring and termination figures, in the Registration Statements, TaskUs publicly differentiated itself from its "larger competitors [that] hire tens or even hundreds of thousands of people each year."

64.    The internal reports to the ELT also stated that over 50% of employees left within their first 60 days of employment (FE-1).  Corroborating FE-1, FE-3—a customer service representative and team lead[5] between August 2020 and September 2021—stated that most attrition at TaskUs occurred within the first 60 days of employment.  For example, during a

---

[5] TaskUs's team leads each were responsible for supervising approximately fifteen employees who performed customer service, content moderation, and other entry-level work.

campaign for a payroll company from December 2020 to March 2021, FE-3 observed new trainee classes of around 25 newly hired employees, but only 12 to 15 employees, at most, completed the 30-day training course. Once these employees began actual work on the client campaign, attrition worsened, with only three employees from the original 25-person class typically remaining after 60 days of employment (FE-3).

### 2. TaskUs Used These Human Capital Measures to Manage Its Business

65.    As described above, during 2020, TaskUs's ELT—including Defendants Maddock and Sekar—was continuously monitoring and aware of (a) TaskUs's attrition rate, (b) the underlying termination and hiring figures, and (c) the fact that over 50% of TaskUs's employees left within the first 60 days. These human capital measures were used to manage TaskUs's business and directly impacted TaskUs's revenue, profitability, and growth.

66.    First, because of the direct relationship between headcount and revenue, TaskUs's senior management—including CEO Maddock, CFO Sekar, and other ELT members—needed to know TaskUs's attrition rates, terminations, and hiring at all times. As FE-1 explained, TaskUs customers paid based on headcount, meaning that if a customer wanted 100 employees for a campaign, but 20 of those employees left, TaskUs could only charge for the remaining 80 and "felt the hit" to revenues.

67.    As a result, attrition was meticulously tracked throughout the Company. Moreover, in addition to attrition being a key business metric for management, TaskUs's customers themselves needed detailed headcount reporting: FE-3 and other TaskUs team leads were required to track the employees from their teams who were terminated and report this data to operations managers on a weekly basis; in turn, the operations managers provided TaskUs's customers with more comprehensive spreadsheets that contained headcounts and other metrics for each campaign

(FE-3). Further, TaskUs's Oracle HCM system specifically tracked hiring and departure dates and was used to prepare the granular reports provided to the ELT, as detailed above.

68. TaskUs's senior executives, including Defendant Maddock, regularly received other detailed data and reporting on demand. In addition to the regular monthly reports to the ELT, Jim Maddock frequently asked FE-1 for other reports and data, often indicating that the requests came from Defendant Maddock, Chief People Officer ("CPO") Carla Johnson, and Brandy Zimmerman, then-Vice President of People Operations. For example, in July 2020, Jim Maddock forwarded FE-1 an email from Defendant Maddock requesting a specific report regarding attrition within the human resources department. In October 2020, Jim Maddock called FE-1 around 4:00 p.m. on a Thursday, while FE-1 was in Mexico at a funeral for FE-1's grandfather, with an urgent request from Defendant Maddock for a headcount report for year-to-date 2020 by Friday at noon. FE-1 had to leave the funeral and return to the U.S. to generate the report Defendant Maddock had requested.

69. Second, Defendant Maddock and other members of TaskUs's senior management took notice of the high attrition rate reported to them. In this regard, FE-4—a Learning Experience Leader (*i.e.*, a trainer) from September 2018 to July 2021—noted that in mid-2019, a video of Defendant Maddock was circulated internally via email in which he instructed employees referring individuals to work for the Company to make sure that they were "going to stick around and not just quit." Maddock did so because elevated levels of departures—especially early in employment—reduced TaskUs's revenues and profitability.

70. Indeed, the extremely high attrition rates within employees' first 60 days were a topic of constant discussion and concern (FE-1). For example, CPO Carla Johnson—who received reports on the number of terminations and hires from Jim Maddock—asked in a meeting why

TaskUs lost so many people in the first 60 days and stated that TaskUs needed to work to improve retention (FE-1). The high attrition rate also resulted in pressure on TaskUs's recruitment team to hire and retain more people (FE-1). Recruiters were graded on how many employees they onboarded and how many stayed (FE-1). The pressure on recruitment resulted in moving the recruiting function from the Human Resources department to the Operations team in early 2021 (FE-1).

71.     Third, each human capital measure reported to the ELT played a distinct purpose. TaskUs's internal formula to measure attrition—terminations divided by hires over the same period—allowed its ELT to monitor and track the strength of TaskUs's hiring activity relative to the number of employees who were leaving. Seeing the actual numbers of terminations and hires allowed the ELT to gauge the volume of employee turnover in absolute terms and relative to the Company as a whole. And seeing the percentage of employees who left within their first 60 days— the period when most attrition occurred—allowed the ELT to track the crucial level of attrition in the early stages of employment, when TaskUs had yet to recoup its substantial training and onboarding costs.

### 3.    In the IPO, Defendants Nonetheless Falsely Reported to Investors That TaskUs Had "Low Attrition"

72.     The IPO Registration Statement claimed that TaskUs had a "differentiated culture" that allowed TaskUs "to *retain talent*" and gave it "an advantage on key people metrics of efficiency, client satisfaction, and *low attrition*." It further claimed that "[t]he voluntary attrition rate for employees who were employed by TaskUs for more than 180 days was *14.9%*" for the year "ended December 31, 2020."

73.     These statements were materially false and misleading when made. First, TaskUs did not have "low attrition." As detailed above, the monthly reports provided to TaskUs's ELT

showed global attrition above 40% in 2020, and over 50% of employees left within their first 60 days.

74.     <u>Second</u>, the specific "14.9%" attrition rate that Defendants touted was a materially misleading half-truth.  Defendants cherry-picked the most favorable figure by reporting attrition only for employees who had worked at TaskUs for more than 180 days, when attrition was lowest, while misleadingly concealing TaskUs's internally reported attrition rate of well over 40% and the fact that over 50% of employees left within their first 60 days, when attrition was highest.  Indeed, Defendants' cherry-picked calculation missed the "heavy attrition we saw at 30 and 60 days," as FE-1 described it.  FE-1 was never asked to perform such a calculation (and was not aware that any other member of FE-1's team, which was responsible for producing attrition and headcount reporting, did so).

75.     Analysts believed these misstatements, praising TaskUs's purportedly low attrition as a key factor distinguishing it in the BPO industry.  A July 6, 2021 J.P. Morgan report noted that TaskUs reported "an industry-low attrition rate of 15% in 2020," while a July 6, 2021 Wells Fargo report similarly credited Defendants' false claims, writing, "Managements' [sic] commitment to its front line workers across the globe, and the success they've had building and scaling their strong culture is reflected in some of the industry's lowest levels of attrition rates (<15% voluntary attrition in 2020)."  A July 6, 2021 RBC Capital Markets report portrayed TaskUs as a "**Leader in talent acquisition, which is key in the Digital CX & Content Security industries.** We believe the company's focus on fostering employee culture has led to lower employee attrition, as indicated by a voluntary attrition rate for those employed for over 180 days of 14.9%." (Emphasis in original.)

### 4. In the IPO, Defendants Omitted TaskUs's Actual Human Capital Measures in Violation of SEC Item 101

76.     As detailed above, TaskUs focused on three human capital measures to manage its business: attrition rate, the number of terminations, and the number of hires. The IPO Registration Statement omitted all three human capital measures, violating Item 101's requirement to disclose the "human capital measures and objectives that the registrant focuses on in managing the business," including measures addressing the "attraction and retention of personnel." As the SEC emphasized in adopting this disclosure requirement, human capital "is a material resource for companies" and "an important driver of performance"; similarly, on August 26, 2020, then-Chairman Clayton called for "meaningful qualitative and quantitative disclosure" of the "metrics that companies actually use in managing their affairs" because "human capital accounts for and drives long-term business value."

77.     First, the IPO Registration Statement omitted TaskUs's actual attrition rate of well over 40% that was reported monthly to Defendants Maddock and Sekar and other members of the ELT, as detailed above.

78.     Second, the IPO Registration Statement omitted TaskUs's actual number of terminations, which was also reported monthly to the ELT (including Defendants Maddock and Sekar). In 2020, this figure was typically at least 400 terminations per month for the U.S. and Philippines alone (FE-1), as detailed above.

79.     Third, the IPO Registration Statement omitted TaskUs's actual number of new hires, which was also reported monthly to the ELT (including Defendants Maddock and Sekar). In 2020, this figure was typically at least 1,000 hires per month for the U.S. and Philippines alone (FE-1), as detailed above.

### 5. Defendants Omitted TaskUs's Known, Unfavorable Trend of High Attrition in Violation of Item 303

80.    In violation of Item 303, the IPO Registration Statement omitted the internally reported attrition rate, which was a known, unfavorable trend. TaskUs's high attrition rate during 2020 was known because it was reported to the ELT on a monthly basis as above 40%, and it was a trend because it persisted for at least a year, as detailed above. And the trend was materially unfavorable because the persistently high attrition directly impacted TaskUs's revenue, profitability, and growth prospects by reducing headcount, increasing costs (to train the departing workers' replacements), and ultimately reducing profits. This material impact is precisely why, as alleged above, CEO Maddock and other ELT members focused on TaskUs's attrition rate in managing the business.

### E. Defendants Misleadingly Touted TaskUs's Glassdoor Rating While Manipulating and Inflating It

81.    TaskUs touted its purportedly industry-leading Glassdoor rating to differentiate the Company from the rest of the BPO industry. TaskUs's Glassdoor rating was a material metric that, according to the IPO Registration Statement, purportedly "validated" TaskUs's "differentiated culture." TaskUs's Glassdoor rating was material to investors because it purportedly proved that TaskUs had "happy employees [who] deliver better results and higher retention" and demonstrated an "employee culture [that] leads to lower employee attrition levels."

82.    The IPO Registration Statement prominently presented TaskUs's claimed "4.6" Glassdoor rating, listing it on the second page of the IPO Prospectus—immediately following the cover page—alongside other key performance metrics such as TaskUs's 2020 revenue, net income, number of clients, and revenue and adjusted EBITDA CAGR for 2017-2020.

83.    The IPO Registration Statement claimed that TaskUs had a "differentiated culture" that was "validated by" TaskUs's Glassdoor rating of "4.6":



84.    The IPO Registration Statement also included the following chart purportedly showing that TaskUs's Glassdoor rating exceeded those of its competitors:



85.    These statements were materially misleading when made because TaskUs actively manipulated its Glassdoor rating through TaskUs's internal policy of requiring employees to submit reviews during training, as detailed below.

86.    This policy inflated TaskUs's Glassdoor rating leading up to the IPO.  In 2018, TaskUs's Glassdoor rating was 4.3.  In or around October 2018, TaskUs programmed its Jobvite system to require new employees to submit a Glassdoor review after seven days of employment,

as explained below.  This boosted TaskUs's rating to 4.4 in December 2020.  Thereafter, TaskUs's manipulation went into overdrive as it prepared for the June 2021 IPO, inflating TaskUs's Glassdoor rating to 4.7 by June 2021.  The rating increase of 0.3 stars is material.  For example, if Accenture—one of the competitors TaskUs identified above—had experienced a rating increase from 4.0 to 4.3, it would have had the second-highest Glassdoor rating (rather than the fifth-highest) among the competitors TaskUs ranked above.  Moreover, TaskUs stated in the Registration Statements that "[a]ccording to a 2019 Glassdoor analysis, having a 1-star higher overall higher [sic] rating on Glassdoor attracts talent to a company at about six times the rate of paying a $10,000 per year higher salary."  In other words, a higher Glassdoor rating was a significant driver of TaskUs's purported ability to attract and retain employees.

87.    Unaware of the truth, analysts credited TaskUs's inflated Glassdoor rating as a key advantage that reduced attrition and evidenced "tangible business value."  A July 6, 2021 report from William Blair stated that TaskUs "management heavily emphasizes the company's Glassdoor rating, which currently stands at 4.7 stars and shows strong results across a variety of metrics," concluding:  "We believe that TaskUs's *employee-centric and start-up-like culture* has *tangible business value*, driving higher attendance, more engaged employees, and *lower attrition*, and results in higher-quality work and customer satisfaction."  Similarly, a July 6, 2021 report from RBC Capital Markets stated that "TaskUs has built an employee-centric culture at every company site, which we believe has led to strong talent acquisition and retention," citing TaskUs's Glassdoor "rating of 4.6 out of 5.0."  A July 6, 2021 Wells Fargo report stated that TaskUs had "some of the industry's lowest levels of attrition . . . and *one of the highest glassdoor [sic] scores*."

1.    **Defendants Implement a Corporate Policy to Inflate
TaskUs's Glassdoor Rating**

88.    In fact, however, TaskUs's Glassdoor rating was artificially inflated as a result of

TaskUs's corporate policy of manipulation.

89.    Specifically, by late 2018, TaskUs had a policy of requiring new employees to

submit Glassdoor reviews during their training—before they had done any paying work for actual

TaskUs clients.  TaskUs required new employees to complete training assignments on a software

platform called Jobvite (FE-1, FE-2).  As a matter of policy, TaskUs required new employees to

submit Glassdoor reviews during their training and then certify on Jobvite that they had done so.

90.    FE-2—a TaskUs employee from early summer 2017 to August 2021, who was an

HRIS specialist from October 2018 through December 2020—was responsible for programming

the Jobvite system.  In or around October 2018, at the direction of VP of People Operations

Brandy Zimmerman, FE-2 programmed Jobvite to require new employees to submit a Glassdoor

review after seven days of employment; the Jobvite requirement contained a link to the Glassdoor

website to complete the review.  In late 2020, FE-2 was instructed to update Jobvite to require a

Glassdoor review after one month of employment.

91.    FE-1 (who worked with FE-2) confirmed that FE-2 programmed the Jobvite system

to implement the Glassdoor review requirement.  FE-1 added that during training, TaskUs's

trainers directed employees to submit Glassdoor reviews and provided time for them to complete

their reviews on Glassdoor's website, with newly hired groups of employees submitting their

reviews on the same day.  FE-4 verified that the Jobvite system prompted new TaskUs employees

to post reviews on Glassdoor, and that new employees were not qualified to accurately review the

Company as they did not even know everyone's name yet.

92.     TaskUs's internal policy of manipulating its Glassdoor rating by requiring employees to submit reviews during training is a violation of Glassdoor's Terms of Service for employers.   The version of the Terms of Service effective from September 3, 2020 to November 30, 2022 states: "You may not coerce employees to leave reviews.  Coercion includes asking employees to provide proof to an employer that they wrote a review whether or not that proof includes the content of the review itself."  TaskUs did precisely that by requiring employees to submit Glassdoor reviews during training, then verify on Jobvite that they had done so.

93.     The "reviews" that resulted from TaskUs's policy were overly positive and not based on any actual experience working at TaskUs.  Indeed, FE-1 confirmed that the purpose of requiring reviews during training was to ensure that the Company received better reviews, as these employees were still excited about the Company based on management's promises that it was a "fun place to work," and had not yet experienced the disappointing reality of working at TaskUs.

94.     In truth, TaskUs was no different from the "traditional outsourced service providers" with "high attrition rates and awful working environments" that Defendants Maddock and Weir derided in the IPO Registration Statement.  For example, FE-3 identified several problems that drove TaskUs's high attrition rates, including pay variances between employees, insufficient training, and not permitting employees to use their earned paid time off.  In addition, misleading information was conveyed to recruits, such as telling recruits who would speak with customers by telephone that they would instead be providing customer service through email and chat programs (FE-3).  Similarly, FE-4 reported that TaskUs's recruiters purposely did not tell new recruits about the negative aspects of performing content moderation—such as reviewing suicide-related content—and many new employees left during training after learning what the work entailed.

95.     Confirming the impact of TaskUs's policy of manipulating its Glassdoor rating, in employee exit interviews, departing employees often told FE-1 that it was "unfair" for TaskUs to force employees to write a review after being employed for just a few days.  These employees indicated that they would have submitted less positive reviews after actually working on client campaigns (FE-1).  Corroborating FE-1's account, FE-2 learned from human resources managers and employees during monthly human resources department meetings that employees complained that the review requirement "was a scam" because their reviews "were not accurate anymore" given their later experience at the Company (FE-2).

96.     FE-1 had a meeting with VP of People Operations Zimmerman to discuss employee complaints and whether to remove TaskUs's requirement of reviews during training (FE-1).  Although Zimmerman stated that she would discuss the issue with Defendant Maddock, the requirement remained in place (FE-1).

97.     TaskUs's policy of requiring new employees to submit Glassdoor reviews during training succeeded in artificially inflating TaskUs's overall Glassdoor rating by procuring thousands of coerced, highly positive reviews that diluted the impact of any genuine, negative reviews.  The substantial impact of this policy on TaskUs's Glassdoor rating, determined through Lead Counsel's proprietary analysis, is further detailed below.

> **2.      Lead Counsel's Proprietary Analysis of TaskUs's Glassdoor Reviews Confirms That Its Rating Was Manipulated**

98.     To verify and quantify the extent of TaskUs's inflation of its Glassdoor rating, Lead Counsel performed a proprietary analysis of over 9,000 Glassdoor reviews submitted by TaskUs employees.

99.     As detailed below, this analysis found three highly significant trends in the months leading up to the IPO, when TaskUs's rating was inflated from 4.4 to 4.7:  (1) TaskUs's average

daily volume of Glassdoor reviews spiked by **695%**; (2) there was an unusual, statistically significant increase in the average daily reviews by recently hired employees; and (3) there was an unusual, statistically significant increase in the reviews' average rating. These analyses are detailed below.

100.    **Proprietary Methodology**: Lead Counsel's analysis began with collecting and processing TaskUs's Glassdoor reviews by utilizing a custom "scraping" code that autonomously copied all 9,344 reviews (as of June 2022) and their accompanying data. This data was further processed to allow Lead Counsel to perform proprietary, non-public analyses, including the number of reviews submitted each day, the number of reviews submitted by employees of different tenures, and trends in average ratings during particular periods. In addition, Lead Counsel retained a consulting expert to perform proprietary, non-public statistical analyses that determined whether the number and characteristics of reviews submitted in the period leading up to the IPO differed to a statistically significant degree from reviews submitted in other periods, including in the months following the IPO. Because TaskUs's policy applied to current employees, the analyses excluded reviews by former TaskUs employees.

101.    The information gleaned from this proprietary and extensive data collection, processing, and statistical analysis of more than 9,000 individual Glassdoor reviews—spanning over 900 pages on Glassdoor's website—goes well beyond what an investor or analyst could learn simply from viewing Glassdoor's website. Glassdoor's website only displays ten reviews per page; provides only limited search functionality, only allowing searching by general job function (*e.g.*, finance or human resources), job type (*i.e.*, current, part-time, or full-time), location, and language; and does not provide any statistical analysis of trends.

102.   **Sudden, Dramatic Increase in Reviews Before IPO**:  At the time of the IPO, TaskUs's Glassdoor rating was based on more than 6,000 individual reviews.  Lead Counsel's analysis revealed that the number of reviews submitted to Glassdoor increased sharply at the beginning of December 2020 and remained dramatically elevated through the June 2021 IPO.

103.   The chart below depicts the daily reviews of TaskUs submitted to Glassdoor by current TaskUs employees on each day from January 1, 2020 through October 30, 2021:



Daily Glassdoor Reviews of TaskUs

104.   An average of 1.96 reviews were submitted each day from November 6, 2019 through November 5, 2020, while this figure spiked to an average of 15.58 daily reviews—a ***695% increase***—from November 6, 2020 (when TaskUs confidentially filed its first draft registration statement with the SEC) through the June 10, 2021 IPO.[6]

---

[6] The figure for November 6, 2020 to March 31, 2021 is an average of 14.64 daily reviews, a 647% increase.

105.    The dramatic increase in daily reviews shortly before the IPO cannot be explained by an increase in TaskUs's headcount.  While the average daily reviews spiked by 695%, as detailed above, TaskUs's total headcount only increased by about 33% over similar periods.[7]  Even after controlling for any increase in headcount, the average number of reviews submitted per day per TaskUs employee increased by 490% over this same period.   This increase is statistically significant.

106.    Lead Counsel's analysis also revealed numerous single-day spikes in daily reviews, consistent with FE-1's observation that TaskUs required newly hired groups of employees to submit their reviews on the same day.  For example, on March 24, 2021 alone, Glassdoor received 68 new reviews of TaskUs—far in excess of the 1.96 average from November 6, 2019 through November 5, 2020.  In the period from November 6, 2020 through the June 10, 2021 IPO, 5 days had 50 or more reviews submitted, and 28 days had 30 or more reviews submitted.[8]

107.    Finally, the total number of new reviews increased by 371% between the periods (a) from November 6, 2019 through November 5, 2020 (when current TaskUs employees submitted 718 reviews) and (b) from November 6, 2020 to the June 10, 2021 IPO (when current TaskUs employees submitted 3,380 reviews).  This finding is particularly significant because the second period is only seven months—compared to the first period of one year—yet almost *five times* as many reviews were submitted.[9]  Moreover, confirming the broad corporate policy

---

[7] Specifically, TaskUs reported a total headcount of 23,600 as of December 2020, and a total headcount of 31,500 (33% higher) as of June 2021, which does not explain the 695% increase in average daily reviews or any of the other increases detailed herein.

[8] From November 6, 2020 to March 31, 2021, 3 days had 50 or more reviews submitted, and 17 days had 30 or more reviews submitted.

[9] From November 6, 2020 to March 31, 2021, 2,137 reviews were submitted—an increase of 198% over the 718 reviews submitted from November 6, 2019 through November 5, 2020.

that FE-1, FE-2, and FE-4 observed, the spike in the number of reviews was driven by employees from TaskUs sites spanning at least 6 countries and 4 continents.

108.    **New Employees Disproportionately Drove TaskUs's Spike in Reviews:**  Further confirming TaskUs's policy of requiring newly hired employees to submit reviews, the vast majority of reviews submitted between November 6, 2020 and June 10, 2021 came from recently hired TaskUs employees.    Specifically, 3,380 reviews were submitted by current TaskUs employees between November 6, 2020 and June 10, 2021, of which 2,892 indicated the tenure of their employment.  Within this group, 82%—or 2,380—were from employees whose tenure was less than one year, well above the figures of 62% and 58% for 2020 and 2019, respectively. [10]

109.    The following chart breaks down the number of TaskUs's Glassdoor reviews over six-month periods based on the employment duration of the employees who submitted the reviews. This data demonstrates that (a) the vast majority of reviews submitted in the months leading up to the June 2021 IPO were submitted by recently hired employees, (b) this proportion was far higher than past trends, and (c) after the IPO, the proportion of reviews by recently hired employees reverted to its historical trend:

---

[10] Between November 6, 2020 and March 31, 2021, 2,137 reviews were submitted by current TaskUs employees, of which 1,833 indicated the tenure of their employment.  Within this group, 81%—or 1,477—were from employees whose tenure was less than one year.



Glassdoor Reviews of TaskUs By Employment Duration

110.   Average daily reviews by recently hired employees also increased sharply before the IPO.  As a group, employees whose tenure was less than one year submitted an average of approximately one review per day between November 6, 2019 and November 5, 2020, compared to approximately 11 reviews per day between November 6, 2020 and June 10, 2021.[11]  Even after controlling for any increase in headcount, the average number of reviews submitted per day per TaskUs employee with tenure less than one year increased by 822% over this same period.  This increase is statistically significant.

---

[11] Employees whose tenure was less than one year submitted an average of approximately 10 reviews per day between November 6, 2020 and March 31, 2021.

111.    Finally, the total number of new reviews by employees whose tenure was less than one year increased by 576% between the periods (a) from November 6, 2019 through November 5, 2020 (when such employees submitted 352 reviews) and (b) from November 6, 2020 to the June 10, 2021 IPO (when such employees submitted 2,380 reviews).[12]  In other words, although the second period is just over half as long as the first period (seven months vs. one year), almost *seven times* as many reviews were submitted.

112.    **Statistically Significant Spike in Average Ratings Before IPO:**  Importantly, not only did the volume of TaskUs's Glassdoor reviews increase before the IPO—disproportionately driven by recently hired employees—but the average *rating* of the reviews also increased.  In the periods from November 6, 2019 to November 5, 2020 and June 11, 2021 to September 16, 2021, the average rating was 4.59 out of 5 stars (based on 1,025 reviews).  While this figure was already inflated as a result of TaskUs's policy, in the period from December 2020 to June 2021, the average rating increased to 4.78 (based on 3,380 reviews).[13]  This increase in average ratings is statistically significant.

113.    In summary, the facts reported by the Former Employees and Lead Counsel's proprietary analysis confirm that TaskUs artificially and materially inflated its Glassdoor rating in the months leading up to the IPO.

---

[12] The total number of reviews by employees whose tenure was less than one year increased by 320% between the periods of (a) November 6, 2019 through November 5, 2020 (when such employees submitted 352 reviews) and (b) November 6, 2020 to March 31, 2021 (when such employees submitted 1,477 reviews).

[13] In the period from December 2020 to March 2021, the average rating increased to 4.80 (based on 2,137 reviews).

F.    **Defendants Complete the IPO to Raise $330 Million, Over 63%**
      **of Which Is Paid to BCP, Maddock, and Weir**

114.    On June 10, 2021, the IPO Registration Statement became effective, TaskUs sold 5,553,154 shares of Class A common stock, and Defendants Maddock, Weir, and BCP sold 9,626,846 shares of Class A common stock (including 1,980,000 shares pursuant to the exercise of the underwriters' option to purchase additional shares), each at an offering price of $23.00/share.

115.    On June 11, 2021, TaskUs Class A common stock began to trade on NASDAQ, popping 35% (to $31.09/share) in the first trading day.

116.    In total, TaskUs's IPO generated $330 million in net proceeds (after deducting underwriting discounts and commissions).  Of this amount, $209.2 million went to Defendants BCP, Maddock and Weir (with BCP receiving about $141 million and Maddock and Weir receiving about $34 million each).  While the remaining $120.7 million went to TaskUs, all of TaskUs's proceeds were used to pay holders of what TaskUs called "phantom shares," including approximately $11.8 million for Defendant Sekar alone.  As a result, TaskUs did not retain a single dollar of the $330 million raised in the IPO.

G.    **Defendants Complete the Secondary Offering Based on**
      **Material Misstatements and Omissions; BCP, Maddock, and**
      **Weir Reap Another $742 Million, 100% of the Net Proceeds**

117.    Following the IPO, Defendants Maddock, Weir, and BCP maintained large ownership positions in TaskUs.  Specifically, Defendants Maddock and Weir each continued to hold more than 13.4 million shares of Class B common stock, and BCP held more than 55.2 million shares of Class B common stock, meaning that these insiders together held 84.4% of TaskUs's total shares of Class A and Class B common stock then outstanding.

118.    To inflate and maintain the value of TaskUs stock and their substantial retained shares, after the IPO, Defendants Maddock, Weir, and BCP continued to mislead investors about TaskUs's employee attrition and Glassdoor rating.

119.    To that end, on August 10, 2021, TaskUs filed a Form 8-K announcing Q2 2021 results, which claimed as one of its "Second Quarter 2021 Frontline Highlights" that TaskUs's "Glassdoor score as of June 30, 2021 was 4.7" (an increase from the 4.6 rating, as of March 2021, reported in the IPO Registration Statement).  After the close of trading on August 10, 2021, Defendants held an earnings call—TaskUs's first as a public company—where Defendant Maddock again touted the 4.7 rating.

120.    Investors reacted positively.  In an August 10, 2021 report, RBC Capital Markets noted that in a highly competitive hiring market the Company was well positioned given it had "a 4.7 Glassdoor rating."  An August 11, 2021 J.P. Morgan report stated, "Encouragingly, TaskUs is not seeing significant supply challenges—it had its best ever hiring quarter (headcount was up by 4,000 or 15%) and attrition rate is running below 2019 levels."  TaskUs Class A common stock closed at $39.40 on August 11, 2021—a single-day increase of more than 16%.

121.    TaskUs's share price continued to climb.  By September 7, 2021, TaskUs Class A common stock closed at more than $72.00/share, over three times the IPO price of $23.00/share.

122.    With the stock trading at record highs, Defendants pushed forward with the Secondary Offering to unload millions of additional shares on investors at an inflated valuation. Defendants confidentially filed a draft registration statement for the Secondary Offering on September 17, 2021.  Just six days later, on September 23, 2021, TaskUs Class A common stock reached its all-time peak price, closing at $83.51 per share.

123.    On October 18, 2021, TaskUs issued a press release announcing the Secondary Offering of 10 million shares of Class A common stock by "certain of its stockholders" (*i.e.*, Defendants Maddock, Weir, and BCP).  The press release noted that "TaskUs is not selling any shares of Class A common stock in the offering and will not receive any proceeds from the sale." Thus, only Defendants Maddock, Weir, and BCP stood to reap profits from the Secondary Offering, while TaskUs would receive nothing (and bear all the associated costs pursuant to a registration rights agreement between TaskUs and BCP, Maddock, and Weir).  That same day, Defendants filed the preliminary prospectus for the Secondary Offering.

124.    On October 20, 2021, TaskUs issued a press release announcing the upsizing of the Secondary Offering to 12,077,480 shares and the offering price of $63.50 per share, and filed an amendment to the registration statement for the Secondary Offering signed by Defendants Maddock and Weir.  The Secondary Offering Registration Statement became effective the same day.[14]

125.    The following chart shows the share price of TaskUs Class A common stock from the IPO through December 15, 2022, demonstrating how Defendants conducted the Secondary Offering near TaskUs's all-time peak:

---

[14] On October 22, 2021, Defendants filed the Prospectus for the Secondary Offering pursuant to Rule 424(b)(4) (the "Secondary Offering Prospectus"), which forms part of the Secondary Offering Registration Statement.  The September 17, 2021 draft registration statement, October 18, 2021 preliminary prospectus, October 20, 2021 amended registration statement, and the Secondary Offering Prospectus are collectively referred to herein as the "Secondary Offering Registration Statement" (together with the IPO Registration Statement, the "Registration Statements").



126.    The Secondary Offering Registration Statement largely repeated the false and misleading statements and omissions made in the IPO Registration Statement.

127.    <u>First</u>, it falsely claimed that TaskUs had "low attrition" and misleadingly stated that "[t]he voluntary attrition rate for employees who were employed by TaskUs for more than 180 days was 14.9% and 26.6% for the years ended December 31, 2020 and 2019, respectively."  As discussed above, TaskUs's attrition was not "low," and the "14.9%" attrition rate was a materially misleading half-truth based on a narrow, non-representative slice of employees.

128.    <u>Second</u>, in violation of Item 101, the Secondary Offering Registration Statement again omitted three human capital measures TaskUs focused on to manage its business:  attrition rate, the number of terminations, and the number of hires.

129.    <u>Third</u>, in violation of Item 303, the Secondary Offering Registration Statement again omitted the internally reported attrition rate, which was a known, unfavorable trend.

130.   Fourth, the Secondary Offering Registration Statement misleadingly touted TaskUs's Glassdoor rating of 4.7 out of 5 stars as of June 2021.  As demonstrated above, TaskUs manipulated and artificially inflated its Glassdoor rating through a policy of requiring new employees to submit reviews during training.

131.   Indeed, while TaskUs had already inflated its Glassdoor rating by June 2021, as detailed above, in the months leading up to the Secondary Offering, TaskUs redoubled its efforts. After the June 2021 IPO, Glassdoor reviews from employees whose tenure was less than one year temporarily returned to its pre-December 2020 average of approximately one per day during July, August, and September 2021.  However, from September 17, 2021 (the date Defendants announced the Secondary Offering) to October 25, 2021 (the date TaskUs announced its completion), such employees submitted an average of 5.59 reviews per day—an increase of *482%*. Even after controlling for any increase in headcount, the average number of reviews submitted per day per TaskUs employee increased by 106% over this same period.  The increase in average daily reviews by employees whose tenure was less than one year is statistically significant.

132.   The average rating of new reviews also increased leading up to the Secondary Offering.  In the three months before the Secondary Offering was announced, the average rating was 4.49, while the average rating in reviews submitted between September 17, 2021 and October 25, 2021 was 4.72.  Again, this increase is statistically significant.

133.   On October 25, 2021, TaskUs announced the completion of the Secondary Offering, which resulted in net proceeds to Defendants Maddock, Weir, and BCP of *$742 million* after underwriting discounts.  Specifically, Defendants Maddock and Weir each sold 1,974,799 shares of Class A common stock, reaping net proceeds of over $121 million each.  Defendant BCP sold 8,127,882 shares of Class A common stock, reaping net proceeds of over $499 million.

134.    In total, based on selling shares in the IPO and Secondary Offering, Defendants Maddock, Weir, and BCP earned massive windfalls totaling over *$951 million*.

**H.    Defendants Continue to Misrepresent TaskUs's Attrition and Glassdoor Rating Through the End of the Class Period**

135.    After the Secondary Offering, TaskUs and the Officer Defendants continued to make false and misleading statements regarding TaskUs's attrition rate and Glassdoor rating. For example, the Company's Form 8-K announcing Q3 2021 results, filed on November 10, 2021, stated that "TaskUs [sic] Glassdoor score as of September 30, 2021 was 4.7." During the Q3 2021 earnings call held that same day, Defendant Maddock again touted TaskUs's 4.7 Glassdoor rating.

136.    On November 18, 2021, during the J.P. Morgan Ultimate Services Investor Conference, an analyst asked Defendant Maddock, "[W]hy can't like a large competitor copy your model . . . . *Like what's the secret sauce?*" In response, Defendant Maddock declared that "[c]ulture also enables us to attract and retain talent better than the competition," backing up this claim by stating that TaskUs had a "15% attrition rate" in 2020 and touting its purportedly high Glassdoor rating:

> If you look on Glassdoor, as of the end of Q3, *we had a 4.7 star rating on Glassdoor. No one in our space comes even close to that.* You have to look at some of our competitors. That *matters a lot* in the environment where there is increasing competition for talent, increasing wage pressure.

137.    These statements concealed that TaskUs had manipulated and artificially inflated its Glassdoor rating, and that the 15% attrition rate Defendant Maddock publicly touted was misleading and non-representative.

138.    Unaware of the truth, investors and analysts credited these misstatements. A November 10, 2021 RBC Capital Markets analyst report stated that in the face of a competitive hiring market, TaskUs "achieved . . . a 4.7 Glassdoor rating." A November 19, 2021 J.P. Morgan

report listed "TASK differentiators," including "lower attrition rates . . . running below 2019 level of 26%."

## V.    FORMER EMPLOYEE ALLEGATIONS

139.    FE-1 worked at TaskUs as an HRIS (Human Resources Information Systems) specialist from June 2018 to December 2020, then as a human resources generalist from December 2020 to August 2021.    FE-1 reported to Senior Director HRIS James "Jim" Maddock.[15] Jim Maddock reported to Chief People Officer ("CPO") Carla Johnson until Johnson's departure in January 2021, and reported to Johnson's replacement, Rajinish Sinha, starting in April 2021. Johnson and Sinha both reported to Defendant Maddock during their respective tenures. According to FE-1, based on personal knowledge:

   i.    <u>FE-1 Created Attrition Reports on a Regular Basis</u>:  During FE-1's tenure as an HRIS specialist from June 2018 to December 2020, FE-1 was specifically responsible for providing reports regarding headcount and employee attrition.  Only FE-1's team, consisting of Jim Maddock, FE-1, and at most two other employees, was responsible for producing attrition and headcount reporting for the Executive Leadership Team ("ELT"), including Defendants Maddock and Sekar, and other members of TaskUs management.

   ii.    <u>TaskUs Regularly Experienced 40%+ Attrition During 2020</u>:    Jim Maddock requested global attrition reports from FE-1 on at least a monthly basis.  To prepare these reports, FE-1 created an Excel file using data from TaskUs's Oracle Human Capital Management ("HCM") system, which maintained employee start dates and departure dates.  The Excel file contained TaskUs's total number of employees hired and terminated globally over the past 30 days, and a pivot table that calculated TaskUs's attrition rate as a percentage.  This percentage was calculated as total terminations divided by total hires over the prior 30-day period.  These reports showed attrition rates above 40% globally during 2020.

   iii.    <u>TaskUs's ELT Continuously Monitored Attrition and Hiring</u>:  TaskUs's ELT included Defendants Maddock and Sekar.  During 2020, the ELT met monthly via Zoom meetings, typically on Mondays.  During these meetings, the ELT asked

---

[15]  Jim Maddock and Defendant Maddock have no familial relation.

Jim Maddock about the Company's attrition rate and how many people were being hired, as Jim Maddock conveyed to FE-1.

iv.   <u>40%+ Attrition Was Reported to TaskUs's ELT on a Monthly Basis During 2020</u>: In advance of the ELT's monthly meetings during 2020, Jim Maddock emailed PowerPoint presentations to the ELT members showing attrition rates above 40% globally.  Jim Maddock told FE-1, in requesting the Excel files detailed above, that he would use the results in his presentations to the ELT.

v.    <u>ELT Told of 400+ Terminations per Month and 50%+ Departure Rate for New Employees in 2020</u>:  The reports to the ELT included the number of terminations and the number of hires, which in 2020 typically included at least 400 terminations and 1,000 hires per month for the U.S. and Philippines alone.  These figures were relatively steady throughout the year.  The reports to the ELT also stated that over 50% of employees left within their first 60 days of employment.

vi.   <u>Higher Attrition in Certain Regions</u>:  Certain regions had attrition above 40% during 2020.  For example, in the U.S., TaskUs saw attrition rates of approximately 130% (meaning that 1.3 times as many employees departed as were hired) during 2020, and India and Mexico typically saw attrition rates of 50% to 70%.

vii.  <u>Internal Focus on Early Attrition</u>:  CPO Johnson received reports on the number of terminations and hires from Jim Maddock based on FE-1's analyses.  FE-1 recalled that the extremely high attrition rates within employees' first 60 days were a topic of constant discussion and concern.  For example, Johnson asked in a meeting why TaskUs lost so many people in the first 60 days and stated that TaskUs needed to work to improve retention.  The high attrition rate also resulted in pressure on TaskUs's recruitment team to hire and retain more people.  Recruiters were graded on how many employees they onboarded and how many stayed.  The pressure on recruitment resulted in moving the recruiting function from the Human Resources department to the Operations team, as FE-1 learned in a meeting in early 2021.

viii. <u>Defendant Maddock and Other Senior Executives Regularly Received Detailed Data and Reports on Attrition and Headcount</u>:  In addition to the monthly ELT reports, Jim Maddock frequently asked FE-1 for other reports and data, often indicating to FE-1 that the requests came from Defendant Maddock, CPO Johnson, and Brandy Zimmerman, then-Vice President of People Operations.  For example, in July 2020, Jim Maddock forwarded FE-1 an email from Defendant Maddock requesting a specific report regarding attrition within the human resources department.  In October 2020, Jim Maddock called FE-1 around 4:00 p.m. on a Thursday, while FE-1 was in Mexico at a funeral for FE-1's grandfather, with an urgent request from Defendant Maddock for a headcount report for year-to-date 2020 by Friday at noon.  FE-1 had to leave the funeral and return to the U.S. to generate the report Defendant Maddock had requested.

ix. <u>Management Did Not Focus on Attrition for Only 180-day+ Employees</u>: In contrast to how TaskUs carefully tracked attrition within employees' first 60 days, FE-1 was never asked to determine or report attrition only for those employees who had been with the Company for more than 180 days and was not aware that any other member of FE-1's team did so. FE-1 stated that such a calculation would miss the "heavy attrition we saw at 30 and 60 days," when attrition was generally highest.

x. <u>Attrition Directly Impacted TaskUs's Revenues</u>: TaskUs customers paid based on headcount, as VP of Operations Jon King conveyed to FE-1 during a morning meeting. For example, if a customer wanted 100 employees for a campaign, but 20 of those employees left, TaskUs could only charge for the remaining 80 and "felt the hit" to revenues. The connection between headcount and customer billing resulted in a strong emphasis on rapidly replacing departing employees.

xi. <u>TaskUs Required Employees to Submit Glassdoor Reviews During Training</u>: FE-1 worked with FE-2, who programmed TaskUs's training software (Jobvite) to require new employees to confirm that they had submitted a Glassdoor review to complete their training. During training, a trainer directed employees to submit Glassdoor reviews and provided time for them to complete their reviews on Glassdoor's website. Newly hired groups of employees would complete their assignment to submit a Glassdoor review on the same day. TaskUs required new hires to submit these reviews during onboarding and training to ensure that the Company received better reviews, as these employees were still excited about the Company based on management's promises that it was a "fun place to work," and had not yet experienced the disappointing reality of working at TaskUs.

xii. <u>TaskUs's Policy Inflated Employee Reviews</u>: FE-1 was tasked with conducting employee exit interviews. During these interviews, departing employees often lamented that it was "unfair" for TaskUs to force employees to write a review after being employed for just a few days. These employees indicated that they would have submitted less positive reviews after actually working on client campaigns. FE-1 had a meeting with VP of People Operations Zimmerman to discuss these complaints and whether to remove TaskUs's requirement that new hires submit reviews during training. Although Zimmerman stated that she would discuss the issue with Defendant Maddock, the requirement remained in place.

140. FE-2 was employed by TaskUs from early summer 2017 to August 2021. FE-2 joined the Company as a content moderator, before becoming a recruiting coordinator in August 2017. In October 2018, FE-2 became an HRIS specialist, and initially reported to Manager Julie Williams Edison until Edison left TaskUs in 2020, after which FE-2 reported to Senior

Director HRIS James "Jim" Maddock.  FE-2 became a talent acquisition analyst in December 2020, reporting to VP of Global Talent Acquisition Ryan Collins, and departed TaskUs in August 2021.  FE-2 lived in San Antonio, Texas, but worked remotely as an HRIS specialist and a talent acquisition analyst.  According to FE-2, based on personal knowledge:

  i.   FE-2 Implemented TaskUs's Policy of Requiring New Hires to Submit Glassdoor Reviews:  As an HRIS specialist, FE-2 was responsible for programming the Jobvite system through which new employees completed their onboarding and training assignments.  In or around October 2018, VP of People Operations Brandy Zimmerman instructed FE-2 to program Jobvite to require new employees to submit a Glassdoor review after seven days of employment.  FE-2 programmed the requirement in Jobvite to contain a link to the Glassdoor website to complete the review.  FE-2 was instructed in late 2020 to update Jobvite to require a Glassdoor review after one month of employment.  The Jobvite requirement applied to TaskUs employees in the U.S., Philippines, and Europe.

  ii.  Employees Complained About the Requirement to Submit a Glassdoor Review After a Short Time at the Company:  FE-2 learned from discussions with human resources managers and employees during monthly human resources department meetings that many employees complained about being required to submit a Glassdoor review so early in their employment.  Employees complained that the requirement "was a scam" because their reviews "were not accurate anymore" given their subsequent experience at the Company.  Indeed, at the time when employees were required to submit a review, many employees were still in training and were not performing the work they had been hired to do.

  iii. FE-1 Was Responsible for Attrition Reporting:  FE-2 worked with FE-1 and confirmed that FE-1 performed most of the attrition reporting at TaskUs during FE-2's tenure as an HRIS specialist.

141.    FE-3 worked at TaskUs as a customer service representative and a team lead between August 2020 and September 2021, and last reported to Operations Manager Briano Ortiz.  FE-3 was associated with the New Braunfels, Texas office, but worked remotely due to the COVID pandemic.  According to FE-3, based on personal knowledge:

  i.   Team Leads Reported Attrition to Operations Managers:  FE-3 and other team leads were required to maintain spreadsheets tracking the TaskUs employees from their teams who were terminated during the prior week.  The team leads emailed these spreadsheets to the operations managers at the end of each week.  In turn, the

operations managers prepared more comprehensive spreadsheets that contained headcounts and other metrics for each campaign, which were provided to TaskUs's customers.

ii.  <u>Attrition Rates Were Extremely High</u>:  FE-3 worked on a campaign for a payroll company from December 2020 to March 2021, and worked closely with the trainer and each group of new trainees for that campaign.  Each new trainee class typically consisted of around 25 newly hired employees but only 12 to 15 employees, at most, completed the 30-day training course.  Once these employees began actual work on the client campaign, attrition worsened, with only three employees from the original 25-person training class typically remaining at TaskUs after 60 days of employment.  According to FE-3, most attrition at TaskUs occurred within the first 60 days of employment.

iii.  <u>High Attrition Resulted from Employee Discontent</u>:  FE-3 identified several problems that drove TaskUs's high attrition rates, including pay variances between employees, insufficient training, and not permitting employees to use their earned paid time off.  In addition, misleading information was conveyed to recruits, such as telling recruits that they would be providing customer service through email and chat programs, when in fact they were joining campaigns requiring them to speak with customers by telephone.  This work was taxing and led to attrition.

142.  FE-4 was a Learning Experience Leader (*i.e.*, a trainer) at TaskUs from September 2018 to July 2021, and was based in the New Braunfels, Texas office.  In that role, FE-4 worked on several campaigns, but mainly worked on campaigns for Facebook.  FE-4 trained new employees to perform content moderation and customer support, and provided ongoing training to existing employees.  According to FE-4, based on personal knowledge:

i.  <u>Jobvite Prompted New Employees to Submit Glassdoor Reviews</u>:  The Jobvite system prompted new employees to post reviews on Glassdoor.  These new employees were not qualified to accurately review the Company as they did not even know everyone's name yet.  FE-4 was told to post a Glassdoor review soon after getting hired at TaskUs.

ii.  <u>TaskUs Concealed Negative Aspects of Content Moderation from New Recruits</u>:  TaskUs's recruiters purposefully did not tell new recruits about the negative aspects of performing content moderation.  As a result, many new employees left TaskUs during training after learning what the work entailed.  Even as a trainer, FE-4 was not informed that FE-4 would be training employees to review suicide-related content for a particular campaign until FE-4 began work on that campaign.

     iii.   <u>Defendant Maddock Instructed Employees to Refer Individuals Who Would Stay at TaskUs</u>: In mid-2019, a video of Defendant Maddock was circulated internally via email (including to FE-4 and the employees working on the same client campaign as FE-4) in which he instructed employees referring individuals to work for the Company to make sure that they were "going to stick around and not just quit."

## VI.   DEFENDANTS ARE SUBJECT TO CONTROL PERSON LIABILITY

143.   Plaintiffs incorporate and reallege the allegations set forth above. In addition, the following allegations demonstrate Defendants' control over TaskUs at the time of the IPO and throughout the Class Period.

### A.   The Individual Defendants

144.   The Individual Defendants had control of TaskUs by virtue of their positions as directors of the Company. As its directors, the Individual Defendants were responsible for monitoring the operations of the Company on a regular basis and for authorizing the Company to take important actions, such as conducting the IPO and Secondary Offering.

145.   The Individual Defendants each authorized the content of and signed the Registration Statements. Specifically, Defendants Maddock, Weir, Dixit, Kumar, Mehta, Reses, and Sekar signed both Registration Statements.

### B.   The Officer Defendants

146.   The Officer Defendants had control of TaskUs due to their executive positions and their roles in management, their preparation and signing of TaskUs's SEC filings, their significant ownership of the Company, and their direct involvement in its day-to-day operations.

147.   The Officer Defendants held the top management positions within TaskUs and thereby controlled the Company. Specifically: (i) Defendant Maddock was TaskUs's Co-Founder, CEO, and a member of its Board throughout the Class Period; (ii) Defendant Weir

was the Company's Co-Founder, President, and a member of its Board throughout the Class Period; and (iii) Defendant Sekar was TaskUs's CFO throughout the Class Period.

148.    The Officer Defendants prepared and signed TaskUs's SEC filings throughout the Class Period.  Specifically, each of the Officer Defendants signed the Registration Statements, and Defendant Sekar signed TaskUs's August 10, 2021 and November 10, 2021 Form 8-Ks.

149.    Defendants Maddock and Sekar also spoke on behalf of the Company during conference calls with investors during the Class Period.  Both Defendants Maddock and Sekar presented TaskUs's financial results and answered analyst questions during the earnings calls on August 10 and November 10, 2021.  Defendant Maddock also participated in the J.P. Morgan Ultimate Services Investor Conference on November 18, 2021.

150.    Consistent with the Officer Defendants' control over the Company, the Registration Statements stated that the Company's success "depends on the continued service and performance of our senior management, particularly Bryce Maddock, our Co-Founder and Chief Executive Officer, and Jaspar Weir, our Co-Founder and President, and other key employees."

151.    Throughout the Class Period, Defendants Maddock and Weir maintained significant ownership stakes in the Company.  Prior to the IPO, Defendant Maddock and Weir each beneficially owned 16.4% of TaskUs's outstanding securities, and each beneficially owned 13.8% following the IPO.  Following the Secondary Offering, Defendants Maddock and Weir each held 11.9% of TaskUs's outstanding securities, and 15.7% of its outstanding voting power.  Further, the Amended and Restated Stockholders Agreement (the "Stockholders Agreement"), in effect at the time of the IPO and throughout the Class Period, granted Maddock and Weir the contractual entitlement to appoint one director each to TaskUs's Board (who could only be removed with the consent of the designating Defendant).

### C.     Defendant BCP

152.     As detailed below, Defendant BCP had control of TaskUs at the time of the IPO and throughout the Class Period due to its ownership of a majority of the Company's voting power, and its contractual rights to: (i) designate a majority of the members of TaskUs's Board through the completion of the Secondary Offering, (ii) access real-time information about the Company, (iii) demand that TaskUs complete the Secondary Offering to effect BCP's sale of hundreds of millions of dollars of TaskUs shares, and (iv) control the contents of the Secondary Offering Registration Statement.

153.     Prior to the IPO, BCP directly held a controlling 67.2% of TaskUs's outstanding securities.  Following the IPO and prior to the Secondary Offering, BCP directly held a controlling 56.8% of TaskUs's outstanding securities, and controlled 66.0% of total voting power.  Following the Secondary Offering, BCP directly held 48.4% of TaskUs's outstanding securities, and maintained a controlling 64.8% of total voting power.  In total, Defendants BCP, Maddock, Weir controlled more than *96%* of TaskUs's voting power at the IPO and throughout the Class Period.

154.     As the Registration Statements described, BCP's control of TaskUs's voting power meant that TaskUs was a "controlled company" under NASDAQ corporate governance standards.  Indeed, Defendant Dixit (who signed the Registration Statements) expressly referred to TaskUs as "[m]y portfolio company" in a LinkedIn post shortly before TaskUs's IPO:



155.    After the IPO—where Blackstone rewarded itself with $141 million—Ashwin Singh, a Blackstone Associate, praised the "TaskUs team for a successful IPO," calling it "a privilege to be a part of this incredible growth story."  Singh tagged Defendants Maddock, Weir, and Sekar, among others, thanking "our outstanding advisors . . . for helping us to make this happen."  Defendant Dixit "liked" the post, and Jarrod Johnson, TaskUs's Chief Customer Officer, commented in response.

156.    Moreover, BCP—with Defendants Maddock and Weir—controlled and dominated TaskUs's Board, and thus the Company, at time of the IPO and throughout the Class Period.

157.    In particular, because BCP maintained ownership of at least 50% of TaskUs's outstanding stock prior to the Secondary Offering, under the Stockholders Agreement, BCP was entitled to designate the lowest whole number that is greater than 50% of the total number of directors on TaskUs's Board.  Following the Secondary Offering and through the end of the Class Period, BCP owned between 40-50% of TaskUs's outstanding stock and was entitled to designate the lowest whole number that is greater than 40% of the total number of directors on TaskUs's Board.  BCP's director designees could only be removed with BCP's consent.

158.    During the Class Period, several of BCP's Board designees were current Blackstone employees.  Defendant Dixit was simultaneously Blackstone's Senior Managing Director and the Head of Asia Private Equity, and Defendant Mehta was Blackstone's Senior Managing Director in the Private Equity Group.  Each was a TaskUs director throughout the Class Period.  BCP also designated Defendant Kumar, who had previously founded a BPO company in which Blackstone acquired a majority interest, as a TaskUs director.  At the time of the IPO, these three Defendants comprised half of TaskUs's six-member Board; Defendants Maddock and Weir comprised two of the remaining three members.

159.    BCP also had control over TaskUs based on extensive contractual rights and rights under TaskUs's certificate of incorporation (the "Certificate") and amended and restated bylaws (the "Bylaws").

160.    First, BCP and other Blackstone affiliates were parties to a Support and Services Agreement with TaskUs, dated October 1, 2018 and in effect throughout the Class Period (the "Support and Services Agreement"), pursuant to which BCP and the other Blackstone affiliates provided "hands-on support to help [TaskUs] become more productive, efficient and valuable." The Support and Services Agreement specifically stated that "Blackstone expects to have its investment professionals actively monitor the operations of [TaskUs], including through on-site visits." The agreement required TaskUs to provide BCP with access to various information, including a direct link with TaskUs's systems in order to enable BCP "to retrieve data on a 'real-time' basis"; the Company's "quarter-end reports"; "copies of all materials provided to [TaskUs's] board of directors"; and "information in advance with respect to any significant corporate actions," including actions such as disposing of assets, issuing debt, or entering into mergers. The agreement also granted BCP the "right to consult with [TaskUs] . . . with respect to such actions." Thus, pursuant to the Support and Services Agreement, BCP had access to TaskUs's systems and records, and was deeply involved in the day-to-day management of TaskUs.

161.    Second, in connection with the IPO, TaskUs amended its Certificate and Bylaws, each effective as of June 10, 2021, to give BCP control over important corporate events and actions. Pursuant to the Bylaws, TaskUs cannot take certain actions "without the prior written consent" of BCP, including entering into certain related party transactions, making certain issuances of TaskUs securities, entering into bankruptcy, or amending TaskUs's Certificate or Bylaws "in a manner that adversely affects [BCP's] . . . rights disproportionately as compared to

other holders of Common Stock."  The Bylaws also provide that "at least two (2) [BCP] designees" must be present to constitute a "quorum of the Board."  Further, TaskUs's Certificate provides that so long as BCP maintains 30% of total voting power, "special meetings of the stockholders of the Corporation for any purpose or purposes shall also be called by or at the direction of the Board or the Chairman of the Board at the request of [BCP]."  Under the Bylaws, with regard to any such meeting requested by BCP, "the Board of Directors shall not postpone, reschedule or cancel such special meeting without the prior written consent of [BCP]."

162.    Third, in connection with the IPO, TaskUs, BCP, Maddock, and Weir entered into a Registration Rights Agreement dated as of June 15, 2021 (the "Registration Rights Agreement"). Pursuant to that agreement, each of Defendants BCP, Maddock, and Weir had the right to require TaskUs to complete a secondary offering of stock.  TaskUs admittedly made the Secondary Offering "pursuant to the [R]egistration [R]ights [A]greement," as the Secondary Offering Registration Statement explained, and on information and belief, TaskUs commenced the Secondary Offering at the direction of BCP.  This belief is based on the fact that BCP sold 8,127,882 shares, resulting in net proceeds of more than $499 million.  The Registration Rights Agreement also gave BCP the right to "determine the plan of distribution and select the managing underwriters, and any provider of capital markets advisory services," as well as "counsel for the selling Rights Holders," and the right to "piggyback" on a request for a secondary offering by Defendants Maddock and/or Weir.

163.    The Registration Rights Agreement also gave BCP the right to control the contents of the Secondary Offering Registration Statement.  Specifically, TaskUs was expressly required to provide BCP with drafts of any documents constituting the Secondary Offering Registration Statement "within a reasonable time prior to the filing" thereof, and to "fairly consider such

reasonable changes in any such documents prior to or after the filing thereof" that were provided by counsel for BCP (or the underwriters).

164.    The Registration Rights Agreement further guaranteed BCP ample access to Company information in connection with the Secondary Offering.  BCP was expressly entitled to access "all relevant financial and other records, pertinent corporate (or similar) documents and properties of the Company," and TaskUs was obligated to "cause appropriate officers, managers and employees of the Company to supply all information reasonably requested by" BCP or its representatives "in connection with their due diligence exercise."

165.    As a result of its controlling voting power and the extensive contractual rights outlined above, BCP controlled TaskUs and its disclosures at the IPO and throughout the Class Period, including the statements made in the Registration Statements at issue.

## VII.    SECURITIES ACT ALLEGATIONS

166.    In this section of the Complaint, Plaintiffs assert strict liability and negligence claims based on Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 on behalf of all persons and entities who purchased or otherwise acquired TaskUs's Class A common stock pursuant and/or traceable to the IPO Registration Statement and/or Secondary Offering Registration Statement. Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately from Plaintiffs' Exchange Act claims.

### A.    The Registration Statements Contained Material
###    Misstatements and Omissions

167.    All of the statements and omissions in the Registration Statements that Plaintiffs allege to be actionable are included in this section.

168.    The Registration Statements violated the Securities Act for four reasons.  They (1) contained false and misleading statements about attrition and hiring, including that TaskUs had

"low attrition" and "14.9%" attrition for a narrow, non-representative slice of TaskUs's workforce; (2) in violation of Item 101, omitted the actual human capital measures TaskUs focused on in managing its business; (3) in violation of Item 303, omitted TaskUs's material trend of high attrition; and (4) contained misleading statements about TaskUs's Glassdoor rating, which was manipulated and artificially inflated as a result of TaskUs's corporate policy of requiring new employees to submit reviews during training.

### 1.  Material Misstatements Regarding Employee Attrition and Hiring

169.    Each Registration Statement contained the following statements:

The voluntary attrition rate for employees who were employed by TaskUs for more than 180 days was 14.9% and 26.6% for the years ended December 31, 2020 and 2019, respectively.

. . .

The voluntary attrition rate for employees who were employed by TaskUs for more than 180 days was 14.9% for the year ended December 31, 2020.

These statements were materially misleading when made because, having chosen to speak about TaskUs's attrition rate in 2020 and tout a "14.9%" attrition rate for employees who had worked at TaskUs for more than 180 days, the Registration Statements omitted the material facts that (a) the purported 14.9% rate was highly non-representative because in 2020, over 50% of employees left within their first 60 days, when attrition was highest, and (b) in 2020, TaskUs internally measured its Company-wide attrition rate at above 40%, as detailed above.  In failing to disclose these existing, material negative facts, the Registration Statements omitted material facts necessary to make the statements not misleading in the context in which they were made.

170.    Each Registration Statement contained the following statement:

The culture and focus on people allows us to retain talent, continuously improve, and gives us an advantage on key people metrics of efficiency, client satisfaction, and low attrition.

These statements were materially false and misleading when made.  First, TaskUs did not have "low attrition" or any "advantage" on that "key people metric[]."  Rather, as detailed above, in 2020, over 50% of employees left within their first 60 days, and TaskUs suffered from Company-wide attrition rates above 40%, as detailed above.  Second, in choosing to speak about TaskUs's "low attrition" while omitting these existing, material negative facts, the Registration Statements omitted material facts necessary to make the statements not misleading in the context in which they were made.

        **2.**      **Material Omissions, in Violation of Item 101, of the Human Capital Measures Defendants Focused on in Managing the Business**

171.    Both Registration Statements also violated Item 101(c)(2)(ii) of Regulation S-K by omitting the "human capital measures or objectives that [TaskUs] focuses on in managing its business," including three "measures . . . that address the . . . attraction and retention of personnel."

172.    Specifically, as detailed above, the Registration Statements omitted TaskUs's (1) attrition rate of over 40%, (2) the number of terminations (in 2020, typically at least 400 per month for the U.S. and Philippines alone), and (3) the number of hires (in 2020, typically at least 1,000 hires per month for the U.S. and Philippines alone), all of which were reported monthly to the ELT and focused on in managing TaskUs's business.

173.    The Registration Statements' narrow reference to a 14.9% "voluntary attrition rate for employees who were employed by TaskUs for more than 180 days" does not discharge Item 101's disclosure requirement.  Not only is that statement itself materially misleading and actionable, as alleged above, but TaskUs's claimed attrition rate of "14.9%" was not a measure that TaskUs focused on in managing the business.  In particular, it did not use the same data set TaskUs used internally, since it was limited to "employees who were employed by TaskUs for more than 180 days."  It is unsurprising that TaskUs's management did not focus on attrition only

for those "employed by TaskUs for more than 180 days," since TaskUs's revenues depend on headcount and attrition among *all* employees, not only those who had worked at TaskUs for more than 180 days.  Further, when TaskUs did internally calculate attrition for a subset of employees, it focused on attrition rates *early* in employment—*i.e.*, during the first 60 days, when attrition was highest—not a measurement that only considered the period *after* the majority of attrition had already occurred.  Because the "14.9%" figure in the Registration Statements was not a measure that TaskUs focused on in managing the business, its disclosure did not satisfy Item 101.

174.    Similarly, the Registration Statements' disclosure of TaskUs's headcount at the end of 2019 (18,400) and 2020 (23,600) is not a substitute for reporting the actual number of terminations and hires.  As detailed above, TaskUs's ELT focused on the actual number of terminations and hires in managing the business.  These figures allowed the ELT to gauge the volume of employee turnover in absolute terms and relative to the size of the Company as a whole.  By contrast, the headcounts in the Registration Statements are not an adequate substitute because they only show that the combined impact of terminations and hiring was a net increase of 5,200 employees during 2020.  This obscured the facts that (a) TaskUs had to hire at least 12,000 new employees in the U.S. and Philippines in 2020 to reach these numbers, as detailed above, and (b) at least 6,800 employees left during 2020 (yielding the net headcount increase of 5,200).  The reported headcounts alone provide no insight into TaskUs's actual number of departures and hires and do not satisfy Item 101.

### 3.    Material Omissions of Known, Material Attrition Trends in Violation of Item 303

175.    Item 303 of Regulation S-K requires that TaskUs, in the Management Discussion and Analysis section of its SEC filings, describe "any known trends or uncertainties that have had

or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

176. The failure to disclose a material trend, uncertainty, or event in violation of Item 303 is an omission that is actionable under the federal securities laws.

177. The SEC's May 18, 1989 interpretive release (No. 33-6835) provides a two-step test to determine whether disclosure under Item 303 is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

178. In violation of Item 303, the Registration Statements omitted TaskUs's internally reported attrition rate of over 40% during 2020, which was a "known" and unfavorable "trend."

179. TaskUs's high attrition rate during 2020 was known to TaskUs's management because it was reported to the ELT (including Defendants Maddock and Sekar) on a monthly basis. Specifically, as detailed above, the ELT was informed of an attrition rate above 40% using TaskUs's internal formula. The high attrition rate was a "trend" under Item 303 because it persisted for at least a year. Confirming that attrition is a "trend" subject to Item 303, the Registration Statements specifically included "Hiring and retention of employees" as one of the "Trends and Factors Affecting our Performance," although they violated Item 303 by omitting TaskUs's actual, internally reported attrition rate of over 40% during 2020. And the trend was materially unfavorable because the persistently high attrition directly impacted TaskUs's revenue,

profitability, and growth prospects by reducing headcount, increasing costs (to train the departing workers' replacements), and ultimately reducing profits. At minimum, TaskUs's management could not determine that "a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur" (the second step of the disclosure test above), and as a result, disclosure was required.

180.    Nonetheless, in violation of Item 303, the Registration Statements omitted TaskUs's internally reported attrition rate of over 40% during 2020.

### 4.    Material Misstatements Regarding Glassdoor Rating

181.    The IPO Registration Statement contained the following statement:

> Glassdoor ranked us number 40 on their 2019 Best Places to Work list among U.S. employers with at least 1,000 employees, and we held a rating of 4.6 out of 5.0 as of March 2021.

The Secondary Offering Registration Statement contained the following statement:

> Glassdoor ranked us number 40 on their 2019 Best Places to Work list among U.S. employers with at least 1,000 employees, and we held a rating of 4.7 out of 5.0 as of June 2021.

These statements were materially misleading when made because, having chosen to speak about TaskUs's Glassdoor rating, the Registration Statements omitted the material fact that TaskUs had manipulated and artificially inflated its Glassdoor rating, starting no later than October 2018, through TaskUs's internal policy of requiring employees to submit reviews during training, which materially inflated TaskUs's Glassdoor rating, as detailed above. In failing to disclose this existing, material negative fact, the Registration Statements omitted a material fact necessary to make the statements not misleading in the context in which they were made.

182.    The IPO Registration Statement included the below graphic:



The Secondary Offering Registration Statement included a similar graphic:



These statements were materially misleading when made because, having chosen to speak about

TaskUs's Glassdoor rating, the Registration Statements omitted the material fact that TaskUs had

manipulated and artificially inflated its Glassdoor rating, starting no later than October 2018,

through TaskUs's internal policy of requiring employees to submit reviews during training, which

materially inflated TaskUs's Glassdoor rating, as detailed above.  In failing to disclose this

existing, material negative fact, the Registration Statements omitted a material fact necessary to

make the statements not misleading in the context in which they were made.

183.    The IPO Registration Statement contained the following statement:

> Not only does our focus on culture drive internal metrics, but it boosts our public
> profile and our ability to attract talent.  According to a 2019 Glassdoor analysis,
> having a 1-star higher overall higher rating on Glassdoor attracts talent to a
> company at about six times the rate of paying a $10,000 per year higher salary.  The
> differentiated culture we have created is validated by the following metrics, each
> as of March 2021:



The Secondary Offering Registration Statement contained the following statement:

> Not only does our focus on culture drive internal metrics, but it boosts our public
> profile and our ability to attract talent. According to a 2019 Glassdoor analysis,
> having a 1-star higher overall higher rating on Glassdoor attracts talent to a
> company at about six times the rate of paying a $10,000 per year higher salary.  The
> differentiated culture we have created is validated by the following metrics, each
> as of June 2021:



These statements were materially false and misleading when made.  First, the statements falsely indicated that TaskUs's Glassdoor rating was the product of TaskUs's "focus on culture" and "validated" TaskUs's purportedly "differentiated culture."   In truth, the Glassdoor rating was driven by TaskUs's internal policy of requiring employees to submit reviews during training, as detailed above.  Second, having chosen to speak about TaskUs's Glassdoor rating, the Registration Statements omitted the material fact that TaskUs had manipulated and artificially inflated its Glassdoor rating, starting no later than October 2018, through TaskUs's internal policy of requiring employees to submit reviews during training, which materially inflated TaskUs's Glassdoor rating. In failing to disclose this existing, material negative fact, the Registration Statements omitted a material fact necessary to make the statements not misleading in the context in which they were made.

## VIII.   CLASS ACTION ALLEGATIONS

184.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following proposed Class:

- As to claims under the Securities Act, all persons that purchased or otherwise acquired TaskUs's Class A common stock pursuant and/or traceable to the IPO Registration Statement or Secondary Offering Registration Statement, and were damaged thereby; and

- As to claims under the Exchange Act, all persons and entities who purchased or otherwise acquired TaskUs's Class A common stock between June 11, 2021 and January 19, 2022, both inclusive, and were damaged thereby.

185.    Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of TaskUs and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest;

(v) TaskUs's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding five categories.

186.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of November 2, 2022, there were over 27.5 million shares of TaskUs Class A common stock outstanding, owned by at least thousands of investors.

187.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  The questions of law and fact common to the Class include, but are not limited to, the following:

(a)  Whether the federal securities laws were violated by Defendants' conduct as alleged herein;

(b)  Whether Defendants made any untrue statements of material fact or omitted to state any material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading;

(c)  Whether the Registration Statements contained any untrue statements of material fact or omitted to state any material facts required to be stated therein or necessary to make the statements therein not misleading;

(d)  Whether the Exchange Act Defendants acted with scienter as to Plaintiffs' claim for relief under Section 10(b) of the Exchange Act;

(e)  Whether the Officer Defendants were controlling persons as to Plaintiffs' claim for relief under Section 20(a) of the Exchange Act;

(f)  Whether the Individual Defendants and Defendant BCP were controlling persons as to Plaintiffs' claim for relief under Section 15 of the Securities Act;

(g)  Whether any Defendants can sustain their burden of establishing an affirmative defense under applicable provisions of the Securities Act;

(h)  Whether and to what extent the prices of TaskUs Class A common stock were artificially inflated or maintained during the Class Period due to the misstatements and non-disclosures complained of herein;

    (i)   Whether, with respect to Plaintiffs' claims under the Exchange Act, reliance may be presumed under the fraud-on-the-market doctrine;

    (j)   Whether and to what extent Class members have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

188.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.

189.    There will be no difficulty in the management of this action as a class action. Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

## IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

190.    The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue or misleading statements alleged herein.  The statements complained of herein concerned then-present or historical facts or conditions that existed or were purported to exist at the time the statements were made.  Further, the PSLRA safe harbor expressly excludes forward-looking statements "made in connection with an initial public offering," such as the IPO.  15 U.S.C. § 77z-2(b)(2)(D).

191.    To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures TaskUs or other Defendants made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was

approved by an executive officer of TaskUs who knew that the statement was untrue or misleading when made.

## X.    CLAIMS FOR RELIEF PURSUANT TO THE SECURITIES ACT

### COUNT I

**Section 11 of the Securities Act**
**In Connection with the IPO and Secondary Offering**
**(Against TaskUs and the Individual Defendants)**

192.    Plaintiffs repeat, incorporate, and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.

193.    This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the Registration Statements are alleged to have been materially misstated statements of opinion or belief when made.  For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless, or otherwise fraudulent intent.

194.    The IPO Registration Statement and Secondary Offering Registration Statement, at the time when each became effective, contained untrue statements of material fact, omissions of material fact required to be stated therein, and omissions of material fact necessary to make the statements therein not misleading.

195.    Defendants were responsible for the content and dissemination of the Registration Statements.    Each  Individual  Defendant  signed  the  Registration  Statements,  and Defendants Maddock, Weir, Dixit, Mehta, Kumar, and Reses were directors of the Company when each Registration Statement became effective.

196.    As the issuer and registrant for the IPO and Secondary Offering, TaskUs is strictly liable for the material misstatements and omissions in the Registration Statements.

197.    The other Defendants acted negligently in that none of them conducted a reasonable investigation or possessed reasonable grounds to believe that the statements contained in the Registration Statements were true and not misleading, and that the Registration Statements did not omit any material facts required to be stated therein or necessary to make the statements made therein not misleading.

198.    Plaintiffs and the Class acquired TaskUs Class A common stock pursuant and/or traceable to the Registration Statements.

199.    When they acquired TaskUs Class A common stock pursuant to and/or traceable to the Registration Statements, Plaintiffs and others similarly situated did not know, nor in the exercise of reasonable care could they have known, of the untruths and omissions contained (and/or incorporated by reference) in the Registration Statements.

200.    Plaintiffs and the Class have sustained damages.  The value of TaskUs Class A common stock has declined substantially subsequent to and due to Defendants' violations.

## COUNT II

### Section 12(a)(2) of the Securities Act
### In Connection with the IPO and Secondary Offering
### (Against Defendants TaskUs, Maddock, Weir, and BCP)

201.    Plaintiffs repeat, incorporate, and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.

202.    This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the Registration Statements are alleged to have been materially misstated statements of opinion or belief when made.  For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that the Defendants named in this Count acted with intentional, reckless, or otherwise fraudulent intent.

203.    The Defendants named in this Count offered, sold, and/or solicited the purchase of (or assisted in the offer, sale, or solicitation of the purchase of) TaskUs Class A common stock, within the meaning of the Securities Act, by means of a prospectus or oral communication. TaskUs, as the issuer of TaskUs Class A common stock, is a statutory seller under SEC Rule 159A. 17 C.F.R. § 230.159A(a).

204.    The Defendants named in this Count assisted in the planning of the IPO and Secondary Offering and actively participated in decisions regarding, among other things, the price of sale of the TaskUs Class A common stock and the information contained in the IPO Prospectus and the Secondary Offering Prospectus, all motivated by their own financial interests.  For example, Defendants Maddock, Weir, and BCP hired and assisted the underwriters for the IPO and Secondary Offering, and Defendants Maddock and Weir signed the Registration Statements.

205.    The IPO Prospectus and the Secondary Offering Prospectus included untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

206.    The Defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure that the IPO Prospectus and the Secondary Offering Prospectus did not include untrue or misleading statements or omissions of material fact.

207.    When they acquired TaskUs Class A common stock issued in the IPO and acquired TaskUs Class A common stock in the Secondary Offering, Plaintiffs and others similarly situated did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained in the IPO Prospectus and the Secondary Offering Prospectus.

208.    Plaintiffs and others similarly situated suffered damages in connection with the purchase or acquisition of TaskUs Class A common stock by means of the IPO Prospectus and the Secondary Offering Prospectus.

209.    By reason of the foregoing, the Defendants named in this Count are liable to Plaintiffs and others similarly situated for either (i) the consideration paid for the TaskUs Class A common stock with interest thereon, less the amount of any income received thereon, upon tender of such securities; or (ii) damages as to the TaskUs Class A common stock no longer owned.

## COUNT III

**Section 15 of the Securities Act**
**In Connection with the IPO and Secondary Offering**
**(Against the Individual Defendants and BCP)**

210.    Plaintiffs repeat, incorporate, and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.

211.    This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the Registration Statements are alleged to have been materially misstated statements of opinion or belief when made.  For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless, or otherwise fraudulent intent.

212.    At all relevant times, the Individual Defendants were officers and/or directors of the Company and were controlling persons of TaskUs within the meaning of Section 15 of the Securities Act.

213.    At all relevant times, BCP was a controlling person of TaskUs due to its ownership of a majority of TaskUs's voting power, its contractual right to designate over 50% of TaskUs's Board before the IPO (and over 40% after the IPO), its access to the Company's internal systems

and data, its control over the decision to cause the IPO, its contractual rights to cause the Secondary Offering, and the other reasons alleged herein.

214.    The Individual Defendants and BCP, by virtue of their positions of control and authority and their direct participation in and/or awareness of TaskUs's operations and finances, possessed the power to, and did, direct or cause the direction of the management and policies of TaskUs, its Board, and its employees, and cause TaskUs to issue, offer, and sell TaskUs Class A common stock pursuant to the defective Registration Statements.

215.    The Individual Defendants and BCP had the power to, and did, control the decision-making of TaskUs, including the content and issuance of the statements contained (and/or incorporated by reference) in the Registration Statements; they were provided with or had unlimited access to copies of the Registration Statements (and/or documents incorporated by reference) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued, and had the power to prevent the issuance of the statements or omissions or to cause them to be corrected; and they were directly involved in or responsible for providing false or misleading information contained in the Registration Statements (and/or documents incorporated by reference therein) and/or certifying and approving that information. The Individual Defendants each signed the IPO and Secondary Offering Registration Statements.

216.    The Individual Defendants and BCP acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the Registration Statements were true and not misleading as to all material facts and did not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

217.    Plaintiffs and others similarly situated suffered damages in connection with the purchase or acquisition of TaskUs Class A common stock pursuant and/or traceable to the Registration Statements.

## XI.    EXCHANGE ACT ALLEGATIONS

218.    The statements made by the Exchange Act Defendants (TaskUs, Maddock, Weir, and Sekar) that are alleged to be false and misleading are identified in the sections below.  For the avoidance of doubt, all of the statements and omissions that Plaintiffs allege to be actionable under the Exchange Act are included in this section.

219.    The false and misleading statements and omissions described below that were made in TaskUs's filings with the SEC are attributable to the Officer Defendants as follows:  Defendants Maddock, Weir, and Sekar each signed the Registration Statements.  Defendant Sekar also signed TaskUs's August 10, 2021 and November 10, 2021 Form 8-Ks.

### A.    Exchange Act Materially False and Misleading Statements

#### 1.    False and Misleading Statements and Omissions in the Registration Statements

220.    In the Registration Statements, the Exchange Act Defendants made the materially false and misleading statements and omissions set forth above with particularity in Section VII, which are actionable under both the Securities Act and the Exchange Act.  Specifically, the Exchange Act Defendants:

i.    made material misstatements about TaskUs's employee attrition and hiring (*see supra* ¶¶ 169-70); and

ii.    violated Item 101 by omitting the human capital measures Defendants focused on in managing the business (*see supra* ¶¶ 171-74);

iii.    violated Item 303 by omitting known, material attrition trends (*see supra* ¶¶ 175-80); and

iv.    made material misstatements about TaskUs's Glassdoor rating (*see supra* ¶¶ 181-83).

### 2.    Q2 2021 False and Misleading Statements

221.    On August 10, 2021, TaskUs filed a Form 8-K, signed by Defendant Sekar, announcing Q2 2021 results.  The Form 8-K stated, among the Company's "Second Quarter 2021 Frontline Highlights," that:

TaskUs Glassdoor score as of June 30, 2021 was 4.7.

This statement was materially misleading when made because, having chosen to speak about TaskUs's Glassdoor rating, Defendants TaskUs and Sekar omitted the material fact that TaskUs had manipulated and artificially inflated its Glassdoor rating, starting no later than October 2018, through TaskUs's internal policy of requiring employees to submit reviews during training, which materially inflated TaskUs's Glassdoor rating, as detailed above.  In failing to disclose this existing, material negative fact, the statement omitted a material fact necessary to make the statement not misleading in the context in which it was made.

222.    During TaskUs's August 10, 2021 earnings call, Defendant Maddock stated:

Our Glassdoor rating was 4.7 stars as of June 30.

This statement was materially misleading when made because, having chosen to speak about TaskUs's Glassdoor rating, Defendant Maddock omitted the material fact that TaskUs had manipulated and artificially inflated its Glassdoor rating, starting no later than October 2018, through TaskUs's internal policy of requiring employees to submit reviews during training, which materially inflated TaskUs's Glassdoor rating, as detailed above.  In failing to disclose this existing, material negative fact, the statement omitted a material fact necessary to make the statement not misleading in the context in which it was made.

### 3. Q3 2021 False and Misleading Statements

223.    On November 10, 2021, TaskUs filed a Form 8-K, signed by Defendant Sekar, announcing Q3 2021 results.  The Form 8-K stated, among the Company's "Third Quarter 2021 Frontline Highlights," that:

TaskUs Glassdoor score as of September 30, 2021 was 4.7.

This statement was materially misleading when made because, having chosen to speak about TaskUs's Glassdoor rating, Defendants TaskUs and Sekar omitted the material fact that TaskUs had manipulated and artificially inflated its Glassdoor rating, starting no later than October 2018, through TaskUs's internal policy of requiring employees to submit reviews during training, which materially inflated TaskUs's Glassdoor rating, as detailed above.  In failing to disclose this existing, material negative fact, the statement omitted a material fact necessary to make the statement not misleading in the context in which it was made.

224.    During TaskUs's November 10, 2021 earnings call, Defendant Maddock stated:

As of September 30, our Glassdoor score was 4.7 stars.

This statement was materially misleading when made because, having chosen to speak about TaskUs's Glassdoor rating, Defendant Maddock omitted the material fact that TaskUs had manipulated and artificially inflated its Glassdoor rating, starting no later than October 2018, through TaskUs's internal policy of requiring employees to submit reviews during training, which materially inflated TaskUs's Glassdoor rating, as detailed above.  In failing to disclose this existing, material negative fact, the statement omitted a material fact necessary to make the statement not misleading in the context in which it was made.

### 4. November 18, 2021 False and Misleading Statements

225.    On November 18, 2021, Defendant Maddock participated in the J.P. Morgan Ultimate Services Investor Conference.  During that virtual conference, a J.P. Morgan analyst

asked: "[W]hy is like TaskUs well positioned to benefit from this demand trend?  Like why can't

like a large competitor copy your model or what you have done and service some of those clients?

Like what's the secret sauce?"  Defendant Maddock responded:

> **So we publicly reported last year [2020] that we had a 15% attrition rate.**  In 2019,
> it was 26%, but we're well, well below that this year.  We're slightly up from 2020
> but closer to 2020 than 2019 in terms of 2021 attrition.

> If you look on Glassdoor, as of the end of Q3, **we had a 4.7 star rating on
> Glassdoor**.  **No one in our space comes even close to that.**  You have to look at
> some of our competitors.  That **matters a lot** in the environment where there is
> increasing competition for talent, increasing wage pressure.

These statements were materially false and misleading when made because, having chosen to

speak about TaskUs's purported "15% attrition rate" and "4.7 star rating on Glassdoor,"

Defendant Maddock omitted the material facts that (a) in 2020, over 50% of employees left

TaskUs within their first 60 days, and TaskUs suffered from Company-wide attrition rates above

40%, as detailed above, and (b) TaskUs had manipulated and artificially inflated its Glassdoor

rating, starting no later than October 2018, through TaskUs's internal policy of requiring

employees to submit reviews during training, which materially inflated TaskUs's Glassdoor rating,

as detailed above.  In failing to disclose these existing, material negative facts, the statements

omitted material facts necessary to make the statements not misleading in the context in which

they were made.

### B.    Additional Allegations of Scienter

226.    Together with the above-alleged facts, the Exchange Act Defendants each acted

with scienter in that each had the motive and opportunity to commit fraud, and each knew or

recklessly disregarded the true facts in making the materially false and misleading statements

identified herein.

        **1.**     **Defendants Maddock and Weir Were Highly Motivated**
                **to Inflate TaskUs's Share Price for Personal Profit**
                **Through Insider Sales of $311 Million**

227.    Defendants Maddock and Weir—TaskUs's co-founders—were motivated to make false statements and material omissions for personal profit. Inflating the price of TaskUs Class A common stock allowed them to reap ***$311 million*** from insider sales in the IPO and Secondary Offering.

228.    As detailed above, TaskUs's actual attrition rate, employee departures, and other negative information was reported to TaskUs's ELT, including Defendants Maddock and Sekar, on a monthly basis throughout 2020. Further, TaskUs had implemented its policy of manipulating and artificially inflating its Glassdoor rating by requiring new employees to submit reviews, and increased the magnitude of manipulation in or around December 2020.

229.    Revealing this negative information—and the truth that TaskUs was no different from its BPO peers—would have been disastrous for TaskUs's share price. Thus, by the time of the June 2021 IPO and continuing thereafter, Defendants Maddock and Weir (with Defendant CFO Sekar) repeatedly concealed TaskUs's actual attrition rate and other human capital measures, as well as the Glassdoor rating manipulation, while touting a misleading "14.9%" attrition rate and "4.6" and "4.7" Glassdoor ratings. These material misstatements and omissions created the illusion that TaskUs merited a premium valuation relative to its BPO peers.

230.    In turn, this illusion inflated and maintained TaskUs's share price during the Class Period. While the price of TaskUs Class A common stock was artificially inflated, Defendants Maddock and Weir unloaded 7.1 million shares in the IPO and Secondary Offering—or 23.3% of each insider's total holdings—to reap enormous personal proceeds of $311.1 million.

231.    Their insider sales during the Class Period and resulting proceeds are set forth below:

**Defendant Maddock (CEO):  Insider Transactions in TaskUs Class A Common Stock[16]**

| Date | Purchase (P) / Sale (S) | Shares Acquired or (*Sold*) | Share Price | Total Sale Proceeds |
|------|------|------|------|------|
| 6/15/2021 | S | (1,574,094) | $  21.735 | $   34,212,933.09 |
| 10/25/2021 | S | (1,974,799) | $  61.4363 | $  121,324,343.80 |

| | |
|------|------|
| **Total Shares Sold** | **3,548,893** |
| **Sale Proceeds** | **$   155,537,276.89** |
| **Shares Sold as % of Total Shares[17]** | **23.3%** |
| **Estimated Total Realized Profits** | **$   155,537,276.89** |

**Defendant Weir (President):  Insider Transactions in TaskUs Class A Common Stock**

| Date | Purchase (P) / Sale (S) | Shares Acquired or (*Sold*) | Share Price | Total Sale Proceeds |
|------|------|------|------|------|
| 6/15/2021 | S | (1,574,094) | $  21.735 | $   34,212,933.09 |
| 10/25/2021 | S | (1,974,799) | $  61.4363 | $  121,324,343.80 |

| | |
|------|------|
| **Total Shares Sold** | **3,548,893** |
| **Sale Proceeds** | **$   155,537,276.89** |
| **Shares Sold as % of Total Shares[18]** | **23.3%** |
| **Estimated Total Realized Profits** | **$   155,537,276.89** |

---

[16] These transactions and sale prices are drawn from the Forms 4 that each insider filed with the SEC and TaskUs's 2022 Proxy Statement filed on Schedule 14A.

[17] Total shares include Class A common stock, Class B common stock, and restricted stock units and options that vested during the Class Period.

[18] Total shares include Class A common stock, Class B common stock, and restricted stock units and options that vested during the Class Period.

232.     These insider sales were both large and unusual.  Maddock and Weir made no other sales of TaskUs stock from the June 2021 IPO to the present.  Nor did Maddock or Weir make any discretionary purchases of TaskUs stock after the IPO.   Instead, starting after the Secondary Offering, each insider only received a total of 344,485 of additional shares of Class A common stock in connection with the automatic quarterly vesting of RSUs (of which about 30%, or 100,707 shares for Maddock and 100,708 shares for Weir, was withheld "to cover tax withholding obligations").

233.     Further, Defendants Maddock and Weir stood to benefit substantially from the "green shoe" option in case of oversubscription of the IPO, which gave the underwriters the option to purchase an additional 1,980,000 shares, including from Defendants Maddock and Weir.  This further incentivized Defendants Maddock and Weir to make false and misleading statements and material omissions to increase demand in the IPO and maximize their own profits.  These efforts were successful and triggered the sale of the additional 1.98 million shares, resulting in proceeds of $43 million net of underwriting discounts.  Of this amount, Defendants Maddock and Weir received $7 million each (included in the chart above), while BCP received the remaining $29 million.

234.     In addition, Defendant Sekar received $11.8 million in compensation in exchange for 470,200 vested phantom shares that he held at the time of the IPO.

235.     All told, at least 24.3% of the $330 million in net proceeds from the TaskUs IPO, or $80.2 million, directly enriched the Officer Defendants (Maddock, Weir, and Sekar), while 32.7% of the $742 million in proceeds from the Secondary Offering, or $242.6 million, directly enriched Defendants Maddock and Weir.

### 2.    Former Employee Allegations

236.    The accounts of former TaskUs employees, detailed above, support the strong inference that the Exchange Act Defendants acted with scienter in making the alleged materially false and misleading statements and omissions.  The former employees' accounts corroborate one another and the additional facts alleged herein.

### 3.    The Officer Defendants Received Regular Reports Tracking TaskUs's Attrition Rates and Other Human Capital Measures

237.    Before the IPO and throughout the Class Period, the Officer Defendants regularly received internal reports showing the facts that their public statements misstated and concealed, underscoring their knowledge or recklessness.

238.    In particular, as members of TaskUs's ELT, Defendants Maddock and Sekar received monthly reports prepared from data drawn from TaskUs's Oracle HCM system.  Those reports showed attrition rates above 40% globally in 2020; the number of terminations and the number of hires (during 2020, typically 400 terminations and 1,000 hires per month for the U.S. and Philippines alone); and the fact that over 50% of employees left within their first 60 days of employment.  (FE-1.)

239.    The Officer Defendants also requested other human capital data.  As detailed above, in July 2020, Defendant Maddock requested a specific report on attrition that was forwarded to FE-1, and in October 2020, Defendant Maddock made an urgent request for a headcount report for year-to-date 2020 (requiring FE-1 to leave a funeral for FE-1's grandfather in Mexico and immediately return to the U.S. to generate the report for Defendant Maddock).  Confirming Defendant Maddock's awareness of high attrition, in mid-2019, Defendant Maddock prepared a video (circulated internally via email) instructing TaskUs employees who referred individuals to work for the Company to make sure that they were "going to stick around and not just quit" (FE-4).

240.    The fact that Defendants Maddock and Sekar regularly received and requested reports on TaskUs's attrition and other human capital measures supports a strong inference that the Officer Defendants knew or recklessly ignored that their public statements were materially false and misleading.

### 4.    TaskUs's Corporate Policy of Manipulating Its Glassdoor Rating Supports Scienter

241.    To sustain the illusion that TaskUs had a superior culture and warranted a higher valuation than its BPO peers, the Officer Defendants personally emphasized TaskUs's Glassdoor rating.    Beyond the Registration Statements that all three Officer Defendants signed, Defendant Maddock touted TaskUs's "4.7" Glassdoor rating in his opening comments on the August 10 and November 10, 2021 earnings calls.

242.    Defendant Maddock also cited TaskUs's Glassdoor rating as a reason for TaskUs's purported ability to retain its employees in a competitive environment.    In particular, during the J.P. Morgan Ultimate Services Investor Conference on November 18, 2021, Defendant Maddock insisted that "[n]o one in our space comes even close" to the 4.7 rating, and "[t]hat matters a lot in an environment where there is increasing competition for talent, increasing wage pressure."

243.    At the time of these statements, TaskUs was actively manipulating and artificially inflating its Glassdoor rating, as detailed above.    This scheme resulted in a flood of unusual reviews from newly hired employees, especially before the IPO and Secondary Offering, that gave TaskUs higher scores than in prior periods.

244.    Moreover, the prevalence of 4- and 5-star reviews became unusually consistent before both the IPO and the Secondary Offering.    As shown below, from January to November 2020, the proportion of 4- and 5-star reviews varied significantly, ranging from 78% to 93% of the monthly total.    From December 2020 to the June 2021 IPO, however, the proportion of 4- and 5-

star reviews remained within a remarkably narrow (and high) range—94% to 96%—even as the number of monthly reviews soared.  The months before the Secondary Offering show a similar pattern:[19]

| Month | Reviews of 4 and 5 stars | Reviews of 1, 2, and 3 stars | Number of Reviews Submitted |
|---|---|---|---|
| Jan. 2020 | 93% | 7% | 215 |
| Feb. 2020 | 89% | 11% | 98 |
| Mar. 2020 | 82% | 18% | 55 |
| Apr. 2020 | 87% | 13% | 30 |
| May 2020 | 85% | 15% | 26 |
| Jun. 2020 | 93% | 7% | 83 |
| Jul. 2020 | 84% | 16% | 50 |
| Aug. 2020 | 84% | 16% | 81 |
| Sep. 2020 | 82% | 18% | 73 |
| Oct. 2020 | 78% | 22% | 81 |
| Nov. 2020 | 84% | 16% | 112 |
| *Dec. 2020* | 94% | 6% | 399 |
| *Jan. 2021* | 94% | 6% | 417 |
| *Feb. 2021* | 96% | 4% | 580 |
| *Mar. 2021* | 96% | 4% | 774 |
| *Apr. 2021* | 95% | 5% | 687 |
| *May 2021* | 94% | 6% | 575 |
| *June 2021 IPO* | | | |
| Jun. 2021 | 83% | 17% | 194 |
| Jul. 2021 | 78% | 22% | 94 |
| Aug. 2021 | 77% | 23% | 111 |
| *Sep. 2021* | 92% | 8% | 337 |
| *Oct. 2021* | 92% | 8% | 210 |
| *October 2021 Secondary Offering* | | | |

245.    The smoothing out in review scores shown above is statistically significant, strongly suggesting that TaskUs's Glassdoor reviews were the product of artificial manipulation.

---

[19] In this chart, green and red shading respectively indicate data points that are near the top or bottom of the distribution.  For example, the deepest green shading indicates that a given month has the highest percentage of 4- and 5-star reviews and the highest number of reviews submitted.

246.     The magnitude of TaskUs's manipulation of its Glassdoor rating detailed above, the fact that it stemmed from TaskUs's corporate policy, and the Officer Defendants' statements connecting the Glassdoor rating to TaskUs's purported ability to retain its employees all support a strong inference that the Officer Defendants knew, or were reckless in not knowing, that their public statements were materially false and misleading.

**5.     The Officer Defendants Spoke Repeatedly About TaskUs's Attrition and Glassdoor Rating, Which Wall Street Analysts Emphasized**

247.     The Officer Defendants' statements about TaskUs's attrition and Glassdoor rating further corroborate their knowledge and access to the internal facts that their public statements concealed, supporting a strong inference of scienter.  For example, the Registration Statements that the Officer Defendants signed repeatedly cited TaskUs's Glassdoor rating, emphasized that it was higher than the ratings of any of TaskUs's competitors, reported on attrition rates, and claimed that TaskUs's focus on the employee experience drove "lower attrition" and motivated "employees to stay for the long term."

248.     In each conference call with investors during the Class Period, Defendant Maddock detailed TaskUs's Glassdoor rating and attrition rates.  Defendant Maddock's statements indicated that he monitored attrition.  For example, during the Q2 2021 Earnings Call, Defendant Maddock stated in his introductory comments that, "while we have seen a slight increase in attrition from 2020, this year's numbers remain well below those of 2019."  During the November 10, 2021 earnings call, Defendant Maddock provided a detailed statement regarding attrition:

> I'm really proud of the team for their focus on attrition this year.  We've seen our attrition rates considerably lower than the rates that we had in 2019.  Obviously, attrition rates in 2020 were artificially depressed or lower as a result of the COVID environment.  But given the more challenging labor market that we're facing globally, to be at an attrition rate that is significantly lower than what we saw in 2019 is a remarkable accomplishment.

249.    Confirming analysts' focus on TaskUs's attrition rate, analysts specifically asked about the subject during earnings calls.  For example, during the Q2 2021 Earnings Call a J.P. Morgan analyst noted that "it seems like your attrition was still below 2019," and asked what TaskUs was "doing that is keeping the attrition low."  During the November 10, 2021 earnings call, an analyst asked Defendants about their "attrition expectations" for the remainder of 2021.

250.    The Officer Defendants spoke about these TaskUs's attrition rate and Glassdoor rating in detail because analysts frequently emphasized TaskUs's these issues as key factors distinguishing TaskUs from its BPO peers and warranting its higher valuation.  For example, a July 6, 2021 J.P. Morgan report stated that "TASK has an industry-high Glassdoor score of 4.6 (most peers are below 4.0, while GLOB/EPAM are at 4.2) and reported an industry-low attrition rate of 15% in 2020."  A July 6, 2021 Wells Fargo report stated that TaskUs's success in "building and scaling their strong culture is reflected in some of the industry's lowest levels of attrition rates (<15% voluntary attrition in 2020) . . . and one of the highest glassdoor [sic] scores."

### 6.    Corporate Scienter

251.    TaskUs possessed scienter for two independent reasons.  <u>First</u>, the Officer Defendants, who acted with scienter as set forth above, had binding authority over the Company and acted within the scope of their apparent authority in making the misstatements and omissions at issue.  The scienter of the Officer Defendants is imputed to the Company.

252.    <u>Second</u>, certain allegations herein establish TaskUs's corporate scienter based on (i) the state of mind of employees whose intent can be imputed to the Company, and/or on (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature.  It can be strongly inferred that senior executives at TaskUs possessed scienter such that their intent can be imputed to the Company.  For instance, TaskUs's human resources personnel, including FE-1 and FE-1's supervisor Jim Maddock, were

specifically tasked with tracking attrition and reporting it on a monthly basis to TaskUs's ELT (Executive Leadership Team), which included Defendants Maddock and Sekar. TaskUs's manipulation of its Glassdoor ratings was driven by a corporate policy of requiring newly hired employees to submit reviews during training, which was necessarily prepared and/or approved by senior TaskUs executives.

253. Given the detailed internal tracking and reporting of attrition to the Company's most senior executives, and the corporate policy regarding TaskUs's Glassdoor rating, it can be strongly inferred that additional executives unknown at this time and sufficiently senior to impute their scienter to TaskUs (i) knew of the misstatements alleged herein, and (ii) approved the false statements despite knowing of their false and misleading nature.

**C.    Loss Causation**

254. Defendants' fraudulent conduct directly and proximately caused Plaintiffs and the Class to suffer substantial losses as a result of purchasing or otherwise acquiring TaskUs Class A common stock at artificially inflated prices during the Class Period.

255. Through their materially false and misleading statements and omissions set forth above, Defendants concealed the truth that TaskUs suffered from an internally reported attrition rate above 40%, and that the Company's Glassdoor rating was artificially and materially inflated as a result of TaskUs's corporate policy of manipulation. These interrelated false and misleading statements and omissions concealed related risks, including the risk that if TaskUs's high attrition and/or inflated Glassdoor rating were publicly revealed, the illusion that TaskUs had a superior business relative to its BPO peers—and the resulting premium valuation—would evaporate.

256. When the false and misleading nature of Defendants' statements became known to the market, as alleged herein, the price of TaskUs Class A common stock materially declined, causing Plaintiffs and the Class to suffer losses, which were foreseeable and caused by the

materialization of the risks that the Exchange Act Defendants' fraudulent conduct concealed from investors.

257.    Specifically, on January 20, 2022 at 9:30 a.m. ET, Spruce Point Capital Management, LLC ("Spruce Point") issued a report on TaskUs titled "Moderating the Bull Case Content" (the "Report").  Based on a "forensic financial and accounting review" of TaskUs and interviewing former TaskUs executives and employees, Spruce Point concluded that "TASK's claim of a superior corporate culture evidenced by below industry standard workforce attrition appear[s] to be highly exaggerated."

258.    In particular, Spruce Point estimated that TaskUs suffered from 46% attrition in 2019—far higher than the figure TaskUs reported for that year.  The revelation that TaskUs had grossly misstated its attrition rate necessarily called into question the 2020 figure.  Indeed, the Report quoted a former TaskUs executive who broadly stated that "the attrition is significantly worse" than TaskUs had publicly reported.

259.    These disclosures also revealed that Defendants' prior statements regarding TaskUs's purportedly high Glassdoor rating—a related metric that supposedly differentiated TaskUs from its BPO peers—were false.  As detailed above, CEO Maddock cited both TaskUs's attrition rate and Glassdoor rating to declare that "[c]ulture also enables us to attract and retain talent better than the competition," and "[n]o one in our space comes even close to that."  In other words, TaskUs's attrition rate and Glassdoor rating were integrally linked, in that both metrics supposedly validated TaskUs's claims that it had "happy employees" and a "culture" that gave TaskUs an advantage over its BPO peers and justified TaskUs's higher valuation.  In short, employees were supposedly staying at TaskUs and rating it highly because they were happy.  By revealing that TaskUs suffered from a far higher attrition rate than it had previously claimed, the

Report revealed that TaskUs was no different from its BPO peers, calling into question the integrity of TaskUs's purportedly industry-leading Glassdoor rating and the veracity of Defendants' prior statements about the Glassdoor rating.

260.    As investors digested the reality that TaskUs was no different from its BPO peers and its premium valuation was an illusion, on January 20 and 21, 2022, the price of TaskUs Class A common stock declined from $35.59 per share on January 19, 2022 to $30.13 per share at the close of trading on January 20, 2022, a decline of $5.46 per share (or 15.3%) on unusually heavy trading volume.  As the market continued to digest the information in the Report, the price of TaskUs Class A common stock further declined by $1.34 (or 4.45%) to $28.79 per share at the close of trading on January 21, 2022, again on unusually heavy trading volume.

### D.    Presumption of Reliance and Fraud-on-the-Market Doctrine

261.    Plaintiffs are entitled to a presumption of reliance on the Exchange Act Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine.  At all relevant times, the market for TaskUs Class A common stock was an efficient market for the following reasons, among others:

> A.  TaskUs Class A common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;
>
> B.  The average weekly trading volume of TaskUs Class A common stock was significant;
>
> C.  As a regulated issuer, TaskUs filed periodic public reports with the SEC;
>
> D.  TaskUs regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other

wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

E. TaskUs was followed by many securities analysts employed by major brokerage firms who wrote reports that were published and distributed.

262.    As a result of the foregoing, the market for TaskUs Class A common stock promptly digested current information regarding TaskUs from all publicly available sources and reflected such information in the price of TaskUs Class A common stock.  Under these circumstances, all purchasers of TaskUs Class A common stock during the Class Period suffered similar injury through their purchase of TaskUs Class A common stock at artificially inflated prices, and the presumption of reliance applies.

263.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' omissions of material fact.

## XII.    CLAIMS FOR RELIEF PURSUANT TO THE EXCHANGE ACT

### COUNT IV

### Section 10(b) of the Exchange Act and Rule 10b-5
### (Against the Exchange Act Defendants)

264.    Plaintiffs repeat, incorporate, and re-allege each and every allegation contained above as if fully set forth herein.

265.    During the Class Period, the Exchange Act Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

266.    The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they:

    a)   Employed devices, schemes, and artifices to defraud;

    b)   Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c)   Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and other similarly situated in connection with their purchases of TaskUs Class A common stock during the Class Period.

267.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for TaskUs Class A common stock.  Plaintiffs and the Class would not have purchased TaskUs Class A common stock at market prices, or at all, if they had been aware that the market prices of TaskUs Class A common stock were artificially inflated and maintained by the Exchange Act Defendants' false and misleading statements and omissions.

268.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchases of TaskUs Class A common stock during the Class Period.

## COUNT V

### Section 20(a) of the Exchange Act
### (Against the Officer Defendants)

269.    Plaintiffs repeat, incorporate, and re-allege each and every allegation set forth above as if fully set forth herein.

270.    The Officer Defendants (Maddock, Weir, and Sekar) acted as controlling persons of TaskUs within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control TaskUs's public statements, the Officer Defendants had the power and

ability to control the actions of TaskUs and its employees.  By reason of such conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## COUNT VI

### Section 20A of the Exchange Act
### (Against Defendants Maddock and Weir)

271.    Plaintiff Oklahoma Firefighters repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

272.    Oklahoma Firefighters brings this claim against Defendants Maddock and Weir on behalf of itself and all other members of the Class who purchased TaskUs Class A common stock contemporaneously with the unlawful insider trading described below.

273.    During the Class Period, while TaskUs's Class A common stock traded at artificially inflated prices, Defendants Maddock and Weir personally profited by selling nearly 3.95 million shares of TaskUs Class A common stock while they were in possession of adverse, material non-public information about the Company, as detailed above, pocketing over $250 million (net of underwriting discounts) in insider trading proceeds.

274.    Plaintiff Oklahoma Firefighters purchased TaskUs Class A common stock at $63.50/share in the Secondary Offering, in which Defendants Maddock and Weir contemporaneously sold millions of shares at the same price:

| Party | Transaction Type | Settlement Date | Shares | Price Per Share[20] | Cost/Proceeds |
|---|---|---|---|---|---|
| Oklahoma Firefighters | Purchase | 10/25/2021 | 16,112 | 63.50 | ($1,023,112.00) |
| Maddock | Sale | 10/25/2021 | 1,974,799 | 63.50 | $125,399,736.50 |
| Weir | Sale | 10/25/2021 | 1,974,799 | 63.50 | $125,399,736.50 |

---

[20] The "Price Per Share" provided for the transactions of Defendants Maddock and Weir is the public offering price before any underwriting discounts.

275.    These insider sales by Defendants Maddock and Weir were based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders.

276.    Plaintiff Oklahoma Firefighters and all other members of the Class who purchased TaskUs Class A common stock contemporaneously with the sales of TaskUs Class A common stock by Defendants Maddock and Weir:  (1) have suffered damages because, in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of Section 10(b) and 20(a) alleged herein; (2) have suffered damages because Defendants Maddock and Weir gained an advantageous market position through their possession of material, nonpublic information; and (3) would not have purchased TaskUs Class A common stock at the prices they paid, or at all, if they had been aware that the market prices of TaskUs Class A common stock had been artificially inflated by Defendants' violations of the Exchange Act alleged herein.

277.    By reason of the foregoing, Defendants Maddock and Weir violated Section 20A of the Exchange Act and are jointly and severally liable to Plaintiff Oklahoma Firefighters and all similarly situated members of the Class for all profits gained and losses avoided by Defendants Maddock and Weir as a result of their insider trading.

## XIII.  JURY DEMAND

278.    Plaintiffs, on behalf of themselves and the Class, demand a jury trial.

## XIV.  PRAYER FOR RELIEF

279.    **WHEREFORE**, Plaintiffs pray for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result

of Defendants' wrongdoing, in an amount to be proven at trial, including interest
thereon;

C.  Awarding Class members with claims under Section 12(a)(2) of the Securities Act
the consideration paid for the TaskUs Class A common stock with interest thereon,
less the amount of any income received thereon, upon tender of such securities, or
damages as to the TaskUs Class A common stock no longer owned;

D.  Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in
this action, including attorneys' fees and expert fees; and

E.  Awarding such equitable/injunctive or other further relief as the Court may deem
just and proper.

Dated: December 16, 2022                        Respectfully submitted,

                                                */s/ Joseph A. Fonti*
                                                Joseph A. Fonti
                                                Nancy A. Kulesa
                                                Evan A. Kubota
                                                Thayne Stoddard
                                                **BLEICHMAR FONTI & AULD LLP**
                                                7 Times Square, 27th Floor
                                                New York, New York 10036
                                                Telephone: (212) 789-1340
                                                Facsimile: (212) 205-3960
                                                jfonti@bfalaw.com
                                                nkulesa@bfalaw.com
                                                ekubota@bfalaw.com
                                                tstoddard@bfalaw.com

                                                *Counsel for Lead Plaintiff Humberto Lozada*
                                                *and Named Plaintiff Oklahoma Firefighters*
                                                *Pension and Retirement System*

                                                John A. Kehoe
                                                Michael K. Yarnoff
                                                **KEHOE LAW FIRM, P.C.**
                                                41 Madison Avenue, 31st Floor
                                                New York, New York 10010

Telephone: (212) 792-6676
jkehoe@kehoelawfirm.com
myarnoff@kehoelawfirm.com

*Additional Counsel for Lead Plaintiff*
*Humberto Lozada*

# Exhibit A

DocuSign Envelope ID: 3BE23CB9-4931-4A0A-A5BB-9C225BE44E86

## CERTIFICATION

I, Humberto Lozada, hereby certify as follows:

1.     I have reviewed the Amended Class Action Complaint against TaskUs, Inc. ("TaskUs") and others alleging violations of the federal securities laws (the "Complaint") and have authorized its filing.

2.     I did not purchase or sell securities of TaskUs that are the subject of the Complaint at the direction of counsel in order to participate in any private action under the federal securities laws.

3.     I am willing to serve as lead plaintiff on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

4.     My transactions in the TaskUs Class A common stock that is the subject of the Complaint from the time of the June 10, 2021 IPO through the end of the Class Period specified in the Complaint (January 19, 2022) are reflected in Schedule A, attached hereto.

5.     Other than in the instant action, I have not sought to serve as a lead plaintiff in a class action filed under the federal securities laws in the last three years.

6.     Beyond my *pro rata* share of any recovery, I will not accept payment for serving as a lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this____day of December, 2022.    12/11/2022

DocuSigned by:

*Humberto Lozada*

72DB8FD1982046F...

_____

Humberto Lozada

1

**SCHEDULE A**
TRANSACTIONS IN
TASKUS, INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 09/24/2021 | 7,000.00 | 75.71 | ($529,969.30) |

# Exhibit B

## CERTIFICATION

I, Chase Rankin, on behalf of Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters"), as Executive Director of Oklahoma Firefighters, hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of Oklahoma Firefighters.

2.    I have reviewed the Amended Class Action Complaint against TaskUs, Inc. ("TaskUs") and others alleging violations of the federal securities laws (the "Complaint") and have authorized its filing.

3.    Oklahoma Firefighters did not purchase or sell securities of TaskUs that are the subject of the Complaint at the direction of counsel in order to participate in any private action under the federal securities laws.

4.    Oklahoma Firefighters is willing to serve as a representative plaintiff on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

5.    Oklahoma Firefighters' transactions in the TaskUs Class A common stock that is the subject of the Complaint from the time of the June 10, 2021 IPO through the end of the Class Period specified in the Complaint (January 19, 2022) are reflected in Schedule A, attached hereto.

6.    Oklahoma Firefighters has not sought to serve as a representative party in a class action under the federal securities laws during the last three years except in the following:

- *Logan v. ProPetro Holding Corp.*, No. 19-cv-00217 (W.D. Tex.)
- *In re Farfetch Ltd. Sec. Litig.*, No. 19-cv-08657 (S.D.N.Y.)
- *In re Resideo Technologies, Inc. Sec. Litig.*, No. 19-cv-02863 (D. Minn.)

- *Electrical Workers Pension Fund, Local 103, I.B.E.W. v. Six Flags Entertainment Corp.*, No. 20-cv-00201 (N.D. Tex.)
- *Hayden v. Portola Pharmaceuticals, Inc.*, No. 20-cv-00367 (N.D. Cal.)
- *Oklahoma Firefighters Pension and Retirement System v. Peabody Energy Corp.*, No. 20-cv-08024 (S.D.N.Y.)
- *Black v. Snap, Inc.*, No. 21-cv-08892 (C.D. Cal.)
- *Lee v. Goldman Sachs Group, Inc.*, No. 22-cv-00169 (S.D.N.Y.)
- *Oklahoma Firefighters Pension and Retirement System v. Biogen, Inc.*, No. 22-cv-10200 (D. Mass.)
- *Rasella v. Musk*, No. 22-cv-03026 (S.D.N.Y.)
- *Das v. Unity Software Inc.*, No. 22-cv-03962 (N.D. Cal.)

7.      Oklahoma Firefighters also sought to serve as a representative party, and was appointed, in the following pending class action filed under the federal securities laws:

- *In re Conduent Inc. Sec. Litig.*, No. 19-cv-08237 (D.N.J.)

8.      Beyond its *pro rata* share of any recovery, Oklahoma Firefighters will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this ___16___ day of December, 2022.


                                        Chase Rankin
                                        Executive Director
                                        *Oklahoma Firefighters Pension and Retirement System*

**SCHEDULE A**
TRANSACTIONS IN
TASKUS, INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 10/21/2021 | 16,112.00 | 63.50 | ($1,023,112.00) |
| Purchase | 11/08/2021 | 68.00 | 62.32 | ($4,237.54) |
| Purchase | 11/12/2021 | 394.00 | 64.37 | ($25,361.82) |
| Purchase | 11/12/2021 | 1,525.00 | 65.25 | ($99,501.22) |
| Purchase | 11/29/2021 | 131.00 | 46.32 | ($6,068.38) |
| Sale | 12/03/2021 | -1,358.00 | 37.40 | $50,791.92 |
| Sale | 12/03/2021 | -1,113.00 | 37.61 | $41,859.93 |
| Sale | 12/03/2021 | -402.00 | 37.88 | $15,227.28 |
| Sale | 12/06/2021 | -1,886.00 | 38.82 | $73,218.48 |
| Sale | 12/06/2021 | -497.00 | 39.06 | $19,412.82 |
| Sale | 12/06/2021 | -393.00 | 38.31 | $15,054.58 |
| Purchase | 12/27/2021 | 190.00 | 55.15 | ($10,478.63) |
| Sale | 01/07/2022 | -620.00 | 46.78 | $29,001.43 |

**CERTIFICATE OF SERVICE**

   I hereby certify that on December 16, 2022, a copy of the foregoing was filed electronically with the Clerk of Court via CM/ECF.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the court's CM/ECF system.

             /s/   *Joseph A. Fonti*

             Joseph A. Fonti