N9SsLOZc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LOZADA,

                    Plaintiff,

            v.                          22 Civ. 1479 (JPC)

TASKUS, et al.,

                    Defendants.

------------------------------x

                                        New York, N.Y.
                                        September 28, 2023
                                        3:15 p.m.

Before:

                    HON. JOHN P. CRONAN,

                                        District Judge

                          APPEARANCES

BLEICHMAR FONTI & AULD LLP
      Attorneys for Plaintiff
BY:  JOSEPH A. FONTI
      THAYNE D. STODDARD
      SUSAN PODOLSKY
      EVAN A. KUBOTA

SIMPSON THACHER & BARTLETT LLP
      Attorneys for Defendants
BY:  JONATHAN K. YOUNGWOOD
      MEREDITH D. KARP

N9SsLOZc

(Case called)

LAW CLERK:  Can counsel, starting with plaintiffs, please state your name for the record.

MR. FONTI:  Good afternoon, your Honor.

Joseph Fonti for the plaintiffs in the class.

MR. KUBOTA:  Good afternoon, your Honor.

Evan Kubota from Bleichmar Fonti & Auld.

MR. PODOLSKY:  Good afternoon, your Honor.

Susan Podolsky with the Podolsky Law Offices.

MR. STODDARD:  Good afternoon, your Honor.

Thayne Stoddard from Bleichmar Fonti & Auld for the plaintiffs.

THE COURT:  Good afternoon, I should say, everyone.

Mr. Fonti, Mr. Kubota, Ms. Podolsky  and your last name?

MR. STODDARD:  Mr. Stoddard.

THE COURT:  Yes, of course.  Mr. Stoddard.

For the defendants.

MR. YOUNGWOOD:  Good afternoon.

Jonathan Youngwood, Simpson Thacher & Bartlett for the defendants.

MS. KARP:  Meredith Karp, Simpson Thacher & Bartlett for the defendant.

THE COURT:  Good afternoon, Mr. Youngwood and Ms. Karp.

One moment here.  Thank you, first of all, for the parties for adjusting by an hour today.  I had forgotten about an earlier commitment I thought would have cut it a little too close with 2:00.  We're, of course, here for oral argument on the defendants' pending motion to dismiss in this case.  I was thinking of roughly about 30 minutes per side, although I'll be flexible on that.

I'll start with the defendants since this is your motion, and then hear from the plaintiffs, and I'll allow Mr. Youngwood, if you wish, a little bit of rebuttal as well.

Mr. Youngwood or Ms. Karp, do you wish to begin?

MR. YOUNGWOOD:  Thank you, your Honor.

My understanding of your rules would actually allow Ms. Karp and I to split this?

THE COURT:  Absolutely.

MR. YOUNGWOOD:  I'm going to take the bulk of it, and Ms. Karp will address the standing issues related to Section 12.

THE COURT:  Thank you.

MR. YOUNGWOOD:  Your Honor, I think this is a well-briefed motion on both sides.  I think the issues are squarely presented to you.  I'm going to go through what I think is controlling and, of course, interested in any questions that you have that I might be able to address.

What strikes me about this case is its fairly atypical

for a securities case, particularly one that might survive a motion to dismiss, really in two ways. One, the two categories of alleged misstatements are both non-financial metrics, and second, there is no allegation that any statement was actually false. If anything, it's an omissions case and it's an omissions case about things that weren't said that there does not appear to be a duty to have said, even if they are true, which we also don't think is well pled in terms of the things that weren't said or were not well pled.

There is no allegations that the numbers were false. There is no misstatement obviously. And also of note, the case originated out of a short seller report in January of 2020 from Spruce Point that had a whole host -- I went through, obviously, the deck to prepare for this again, and there is just a whole host of things that Spruce Point points out about the company, almost none of which now appear in this amended complaint. The one exception is the allegation relating to attrition, which is two or three pages of that Spruce Point deck.

And then added to this is something that is nowhere in the Spruce Point deck, as you've seen in our papers, which is the *glassdoor.com* rating category of misstatements, which when I get to it, will affect loss causation. So what you have, your Honor, is a significant stock drop, perhaps an event that could be tied to it, but that event has barely any overlap with

the current complaint.

Your Honor, I'm going to start with falsity and go through both categories, the attrition and the Glassdoor.  If I'm right on falsity, none of the rest of the argument matters.  That would control all the claims.

I'll discuss scienter, which obviously alleged 34 Act claims.  And I do think is one, if we get that far, one of the very rare 10(b) cases where loss causation on the pleadings is something worthy of, I think, significant attention I think on both the attrition and the Glassdoor, but particularly on the Glassdoor.

And then, as I said, Ms. Karp will close it out discussing what we think are reasonably dispositive issues on the Section 12 claim.  Again, if we get that far.

THE COURT:  When you say Ms. Karp is going to talk about standing, included in that will be whether or not the defendants, each of the defendants qualify as a statutory seller?

MR. YOUNGWOOD:  That will be the primary focus of the Section 12.

Again, if there are no misstatements, it doesn't much matter.  Although perhaps as a logical way, you may need to start there since it is often considered a threshold issue.  If it's OK.  We'll still do it at the end.

THE COURT:  Absolutely.  Thank you.

N9SsLOZc

MR. YOUNGWOOD:  Your Honor, I'm going to start -- and I'm going to go misstatement, scienter, loss causation.

I'm going to start with the statements related to the Glassdoor, which as we say is a new allegation in the amended complaint, and also new that it's not in any way mentioned in our view in the Spruce Point short seller report.  There is, again, no allegation that the actual ratings that the company discussed in its filings and elsewhere was inaccurate in the sense that that is what Glassdoor produced.  So roughly the 4647.

But what appears to be in the complaint is that the company did not disclose an alleged internal policy that plaintiffs say in some way affected that number.  So that said, even if you take those allegations as true -- and the fact that there was a policy, if we just take that as true, which I'm not sure itself is well pled -- there is still no allegation that TaskUs forced individuals to give a particular rating.  The allegation relates to the timing, that TaskUs encouraged somebody to change or manipulate a rating, that TaskUs in speaking about it lied about the rating or asked an employee to lie about it, that TaskUs precluded employees from changing their ratings after they were no longer at the company, assuming they were filling these out in the early days or that I think, quite significantly, that anyone would have given a different rating had they entered the rating later.

There is no allegation -- this is the first point I started with -- that these ratings directly tie to any financial metrics.  There is also no allegation that any of the information -- and this leads a little bit into the scienter part -- that any of this information wasn't there for anyone who wished to figure out, be it on an aggregate level about the company or an individual level.  And so I'm not a Glassdoor expert, but if you go on Glassdoor, you register and go on it, anyone can get there.  You can look at each of these ratings. It's what the plaintiffs did to make their allegations.

THE COURT:  It seems like they did a pretty sophisticated analysis to get there.  It wasn't a matter of just looking on a few Glassdoor pages and figuring out how many were a rater with a short tenure at the company and how many were longer.

MR. YOUNGWOOD:  Your Honor, I don't know how much work they did.  They obviously did more work than I could do in a minute or an hour.  I will certainly concede that whether it is sophisticated or not -- I don't know whether it was sophisticated -- I think it has some self-admitted significant flaws into it, which also calls into question -- which is somewhat with the data.  You know, a number of the employees, I think it's 14 percent by plaintiff's count, said that they didn't give their length of time.  And then of the remaining, only 82 percent of the remaining, 70 percent of the whole were

even under a year.  And, of course, there is no category that tells you that it was the first day.

So while I'm not going to deny there was a lot of effort put into it, I don't know that that makes it sophisticated or even useful when it's lined up against the conclusions they draw from.

THE COURT:  Putting aside the possible flaws in the analysis that you alluded to, my question is:  How much work and analysis should a reasonable investor be expected to do to get to the results that the plaintiffs claim they got to?

MR. YOUNGWOOD:  So, your Honor, I think measured by number of hours, that is difficult for me to say.

THE COURT:  Sure.

MR. YOUNGWOOD:  But what I can say is that I don't think you didn't need to do all that they did to get out of it what they got out of it.  In the sense that you could go on, you could spend half an hour, an hour.  And, again, we believe in an efficient market, it doesn't require everyone to do it.  It requires some people to have done that, and you could poke around.  And if you, for example, thought it highly significant that 70 percent of the people are filling this out in the first year, you could maybe wouldn't get the 70 without adding them all up.  But you could do a pretty quick look and see a pretty significant number, if these numbers are correct, were within the first year.

What inferences you draw from that, I think that would be up to the individual investor. I don't think it is up to the plaintiffs to draw those conclusions because I think there are other conclusions that you could draw. You could draw that people, when they get there, want to fill it out. That would be something you could draw from. Even if this policy they allege were, in fact, a policy, a little bit, so what?

Why would that make you think a person is going to give a higher rating the day or the week they show up than a year later, and why would you think that person, if they truly are dissatisfied and if, as they allege, some employees felt coerced or forced to do this, you would think having then been there a while, they would go in and change the rating because they are reacting to it?

Because there is nothing in their allegation that the company tried to prevent people from trying to change those ratings. I think I strayed a little bit from your question, your Honor. I think the answer is, for something like this, there is a pretty easy access that you could get directionally what they found without having lots of Excel spreadsheets and everything and adding it up.

I mean, the public, you know, people in general are quite facile today with Tripadvisor and all sorts of ways everything seems to be rated, right. I suspect everything is rated. Law firms are rated. We're all rated. We're all rated

N9SsLOZc

on these websites.  I think it's pretty easy to go in and play with the data, if that is something that actually interests you.

THE COURT:  But in interest, TaskUs for sure, it was in their SEC filings, repeatedly in the statements, so it was something that was important to the company.

MR. YOUNGWOOD:  It was certainly something they talked about both in their SEC filings and in statements to investors. I agree with that, your Honor.

But there is no indication that it was inaccurate, and I don't think these allegations, even if true about having a policy -- and even if I'm bleeding into scienter, we'll get to in a minute -- even if the people actually named in the complaint were aware of the policy -- and I don't think that's pled at all, I don't think that's pled at all --

THE COURT:  But isn't it pled enough that there was this policy in effect, at least for this stage we're in now?

MR. YOUNGWOOD:  Is it enough for what, your Honor?

THE COURT:  That the policy did, in fact, exist at the company.

MR. YOUNGWOOD:  I don't think it's enough for either being a misleading statement or for scienter, your Honor.

For scienter, maybe I'll just jump there on this part.

THE COURT:  Yes.

MR. YOUNGWOOD:  There is no allegation really

whatsoever that the leadership team, that the two individuals who are alleged to -- well, who did sell, I'm not going to say alleged -- that one I'll agree on that they sold.  We'll talk about the effect of that selling in a bit.  But there is no real allegation that any of them were part of the policy, forming the policy.  Again, we're assuming there is something wrong with the policy and it needed to be disclosed, which we don't concede.

The closest they come, I think, is in paragraph 96, when there is a reference to FE-1, who is the one confidential witness that they most focus on.  And what FE-1 says there is there was a meeting with the Randi Zimmerman, and that Ms. Zimmerman was made aware of some anecdotal complaints about the policy that FE-1 was aware of and said that she would raise them with Mr. Bryce Maddock, and then nothing was done.

A couple things.  She might raise them doesn't mean she did.  And, if anything, the fact that it wasn't changed might suggest that she didn't.  I mean, that is the closest they come, that one paragraph, to showing that Mr. Bryce Maddock -- and I say, as you understand rather, for confusion sake, there are two Mr. Maddocks here.

THE COURT:  And none of them are related, right?

MR. YOUNGWOOD:  That's my understanding.  They are not related and very different in seniority.

THE COURT:  Yes.

N9SsLOZc

MR. YOUNGWOOD:  But I don't think there is any allegation that any of the other people named as defendants or in a position to control decisions here or in any way to lead to a corporate scienter were ever involved in the creation or knowledge of this policy.

So even if you think that it's something that should have been disclosed, which we don't, you then stumble on scienter.

THE COURT:  Sure.  That goes to recklessness potentially for scienter for the Exchange Act claims.  But for the Securities Act claims, there is no need for scienter.  I guess my question is --

MR. YOUNGWOOD:  Correct.

THE COURT:  -- consider you're arguing that the complaint does not sufficiently allege that this policy existed for purposes of a 12(b) motion.

MR. YOUNGWOOD:  I think that there is no allegation that it existed in the sweeping way that they have outlined it, but there are some allegations of it.  I will say that, your Honor.

THE COURT:  OK.

MR. YOUNGWOOD:  I think the primary argument we have is, just to get back to core principles, there is no alleged misstatement.  These were not the Glassdoor ratings.  There is no logical, from my perspective, your Honor, suggestion that

this is something that the public needed to know or would have judged the Glassdoor ratings different.

I mean, every way in which a company -- an individual employee interacts with its employer is going to affect a Glassdoor rating potentially.  Whether or not they are given the opportunity to fill them out early, encouraged to fill then out early, encouraged to fill them out later, told all these things.  There are so many multitudes.  It's very difficult to know what it is that you would disclose.

And I think, again, the third prong of that, your Honor, is none of it was secret in the sense that it wasn't like all that was told was the final Glassdoor average -- I'm going back to the earlier discussion -- it was all out there. They figured it out.  Maybe the typical investor wouldn't spend the amount of time they did, although I'm sure some of the more sophisticated investors did, and if you believe in an efficient market that should reflect in the price.  But any investor who wished to do any research on the company, and I suspect that many investors probably spent more time if they were going on Glassdoor than they did on SEC filings, very thick SEC filings, you could see, you could see directionally what they claim to be the case if, in fact, it's the case, it wouldn't take more than looking at 20 or 30 of them, if there is truly this pattern, to see that most of them are in the first year.  What you draw from that, I don't know.

N9SsLOZc

THE COURT:  But with respect to the existence of the policy, certainly this is not alleged that employees were required to submit a favorable rating, but even if employees were not required to submit a favorable rating, isn't it plausible that a reasonable investor would view the integrity and significance of the Glassdoor ratings differently if they knew that the ratings were being submitted because employees were required to submit them so early on in their employment, as opposed to the employee's opting to submit it early on, or at some point?

I mean, like, for example, and you're at a firm I'm sure everyone is always happy, but if summer associates were required to submit a Glassdoor rating three weeks into their summer while they are in the honeymoon period, that rating, I suspect, would be a lot higher than an associate six, seven years in.

MR. YOUNGWOOD:  I hope you're wrong on that, your Honor.  But I think it's a helpful example in the sense that I think -- I mean, take the example, your Honor, slightly away from it and come back to it.  Take the example of what is in the news about the *U.S. News & World Report* rankings and how, you know, colleges were basically, you know, catering to the test, right.  They were trying to do things they could do, and some colleges and law schools said I'm not going to do it anymore and walked away.

N9SsLOZc

I don't think anyone was surprised when they learned that a law school or a college was trying to do things that would up their *U.S. News & World Report*.  Similarly, I don't think anyone would be surprised if they learned that at least some law firms care greatly about what the *American Lawyer* or *The Vault* or whatever says about them and try to give opportunities for people to fill things out.

In other words, I don't think anyone would be that surprised to learn that TaskUs or any of its competitors, knowing the Glassdoor was important, tried to arrange things in a way that would be helpful, not harmful.  I just don't think any reasonable investor would be surprised by that.  I don't think -- basically answering your question with a no, I don't think any reasonable investor would be all that shocked, surprised, or interested to see that, if true, TaskUs encouraged people to fill this out early.

THE COURT:  OK.

MR. YOUNGWOOD:  Again, it gets to, your Honor, what are you going to disclose.  Once you get to the admission part of the securities law, the test is different.  Look, if these were factually wrong, I have a problem on the misstatements.  But when you get to, like, what is disclosed and what is not surrounding it, where do you draw the line?

Why this as opposed to anything else about, I mean, what if it's not pled.  But what if TaskUs gives everyone, you

N9SsLOZc

know, a cape their first day or free lunch their first day or the first three, as you say, honeymoon example for summer associates.  You wine and dine these new employees because you think they are most likely to fill out the rating early on. Would you have to disclose that?

I think the ratings are the ratings.  They are transparently there.  They can be changed, and there is no allegation that they were falsely reported or that TaskUs did anything to make the employee fill them out in a certain manner.

THE COURT:  OK.

MR. YOUNGWOOD:  I'll move on to the attrition.

THE COURT:  Yes.

MR. YOUNGWOOD:  Your Honor, it's a similar coin, slightly different.  Here, we have three theories to walk through:  101, 303, and a general sort of omission statement.

Again, like Glassdoor, no allegation that the number was false.  No allegation -- and this fits into this allegation that just the word low attrition is somehow actionable -- TaskUs told the world exactly what low attrition meant.  They were measuring it based on the 180-day plus attrition number.

There is no allegation that that number was false, so that is kind of the overview of all three of these.  If you walk through --

THE COURT:  I'm sorry to interrupt you there.

A couple of the alleged misstatements on attrition were tied to the period that was being disclosed, the employees who were there more than six months. One of the statements was the culture and focus on people allow us to retain talent, continuously improve, and give us an advantage on key metrics of efficiency, client satisfaction, and low attrition. That wasn't tied to the particular timeframe like the other statements.

MR. YOUNGWOOD: So two answers on that, your Honor.

One, you have our arguments that, you know, we think are quite dispositive here on puffery. Not a lot of people say we have a crappy work environment.

Two, even if that exact statement of that exact instance didn't tie it to a formula to calculate low attrition, so even if you don't call that puffery, the other statements that are out there are 100 percent clear as to what attrition means and they should all be read together. If you're looking, what did they mean by low attrition, they tell you. In terms of we get back quite a bit here on --

Actually, let me do this slightly differently, your Honor. I think this is perhaps the first time I'm going to, maybe the last time I'll mention the cases from this afternoon, unless you have questions. There are three cases that I think are prominently discussed in our papers. I think they are discussed in the context of general omission, outside of 101

and 303, but think I think they overlap.  It's the *Lopez* case, the *Netflix*, case, and the *Shenwick v. Twitter* case.

Each of the three are quite instructive of why this isn't an omission or not an actionable one.  Each of them, perhaps most on point *Lopez*, basically say if a company is clear on what they are telling you, then judge them on what they are telling you.  I would actually argue, your Honor, that the *Lopez* facts are closer to the line than these.  I think *Lopez* was properly decided.

*Netflix* is an older case, but, again, it stands for the basic proposition that if a company is clear about what it's disclosing, even if an investor or a plaintiff thinks there is something else they would have liked disclosed, that is not -- and maybe that other thing would have looked less favorable, that's not actionable.

And then I think *Twitter*, which they raise, *Twitter* is a really interesting example because there were two original claims in that case.  That was our case, so I'm, perhaps, too intimately familiar with it.  But there were two original claims, one related to what they focus on which is whether and what preceded to summary judgment and, frankly, the morning of trial, which was whether the fact that your DAU might be growing at the same rate as your MAU, your daily users and your monthly users, that somehow perhaps daily user deteriorating or not growing as fast would be a predicter of MAU.  Talking about

one without the other might be omissive.

The other part was dismissed by Judge Tigar, which was the quality of the MAU, and I would say this is much more akin to the quality of the MAU.  The allegation MAU was in part growing, but growing with garbage and bots and things that maybe couldn't be monetized in the same way as other users.  I think that is more akin to this, which is what's happening in your first six months determinative of what is happening later.

I don't need to make this argument, but, your Honor, I think there is an argument partially particularly when you get to inferences of scienter, but I think also for misstatements, there is a pretty strong argument that the better number, the better number for measuring the health of a company is not the person who walks in and out, but the people that you've got and the core of your labor force and they then stay.

If the facts were opposite, I have no doubt my friends, the plaintiffs, if the bad numbers were the late months and the good numbers were the early months and the company disclosed the early, then here they should have disclosed the late.  I'm not telling if they are right or wrong.  What I'm saying is, under *Netflix* and *Twitter* and *Lopez*, if the company is clear as to what it's doing, it should be judged on whether it was honest.  And what it says, not on all the millions, millions of other metrics, like, how do you slice it, why not just slice one week, one month.  You could

give infinite number of attrition statistics.  This is the one the company gave, and it gave it honestly and truthfully, and there is no allegation to the contrary there.

That, I think, largely covers, frankly, 101 and 303 without going through them specifically.  I do want to talk a little bit maybe about 303 and then come back to FE-1, which I think blends both into whether or not this was a misstatement at all or an omission, but also, of course, just for the 34 Act claims on scienter.

THE COURT:  For 303, does a trend need to be moving in a particular direction?

MR. YOUNGWOOD:  I think if it was moving in a particular direction, I have a harder argument.

THE COURT:  Yes.

MR. YOUNGWOOD:  Here, we have no allegation of movement up, down, left, right, whatsoever.  And, in fact, if you looked at the Spruce report and you believe it, which again on this point, I think this is important on this point.  The Spruce report was coming purely from public information.  There is one former employee they allege to have spoken to.  If you read that description, we cover it in our brief, that person has no knowledge of the company whatsoever.

So the calculations in the Spruce report, perhaps like the Glassdoor, were out there and derived, actually walked through their math, quite simple math, talk about how many

people had been hired, how many people there next year, and make some conclusion about turnover based on that.

But what is significant, if there is a trend, if there is a trend based on the facts pled in this case, the trend is down.  The Spruce report said 46 percent in 2019.  The plaintiffs allege Spruce said 40 percent in 2020.  So I certainly say, if there is a trend and it is favorable, that has got to get you out of the 303.  But there is no allegation here that this was a trend or a fact that the company was tying to an increased risk of ultimate problems with financial numbers, which is, of course, ultimately I think what the investor is going to care most about.  So I would say that's 303.

And on 101, again, the rule says you've got to disclose -- this will bleed into FE-1 and perhaps scienter -- you've got to disclose what led matters to you, not what matters to an individual investor or a plaintiff in a litigation.  Then you get into their very earnest attempt to make FE-1, the person that tells us what the senior people at the company thought was important.  And the problem is FE-1 is at least two people removed from that senior leadership team. There is no allegation whatsoever that FE-1 was ever in a room with any of the defendants.  Full stop.  Any of the defendants, much less the defendants that were making these decisions.

The best they can do is say that FE-1 prepared

information for Jim Maddock and that Jim Maddock prepared information for the leadership team.  But what we don't know, because there is no allegation that FE-1 ever saw what Jim Maddock gave the leadership team, we don't know what Jim Maddock took from FE-1 to give to the leadership team.  All we know is FE-1 gave a bunch of stuff.  Jim Maddock gave more stuff.  Even if we knew what Jim Maddock gave, he wasn't in charge of figuring out what numbers mattered to the company.  Even if we have those decks and those decks included 100 pages of different attrition measures, that wouldn't mean that the company cared equally about 100 different measures of attrition metrics.

So I think that takes care of 101, and it also largely goes into the scienter part of this, which is there is really no allegations -- again, scienter doesn't help me on the 33 Act claims.  I know that, but as for the 10(b) claims and associated 34 Act claims, there is just nothing that ties these individuals to plaintiff's vision and the Spruce report's vision of what mattered.  And that kind of walks you through both scienter, and it's sort of a case where scienter and misstatements overlap to some degree, because you're talking about scienter 101, what matters to the company.  You really have no tie that any of these things mattered to the company.

Two quick other points on scienter, your Honor, and I'll end with loss causation and give the floor to my partner.

First, there are allegations of stock sales. There were stock sales. The amount of dollars raised was large amounts of dollars. But what I think is significant, it's only the stock sales of the two individuals who sold, not of the investment vehicle that sold. There is no scienter allegations tied to that investment vehicle.

What is significant, your Honor, is a few things. One, yes, they sold -- if the plaintiffs math is correct -- 23 percent of their holdings, which means they held 77 percent of their holdings. We cite, your Honor, a number of cases, I think it's in footnote 13 of the reply, that have much, much higher thresholds before you start thinking that's an indication of scienter. And then what's interesting is, while they were locked up for part of the class period, they weren't locked up for the very end of it.

If you're a true fraudster and you know the truth is coming out, you sell, and they didn't. They continued and continued and continued to hold. And at no point other than in -- I think courts recognize this as significant as well -- other than in the IPO and SPO, did these men who founded the company, which did really well and up until this point had no opportunity to cash out, yes, they sold. And the IPO and SPO completely publicly disclosed and held everything else. So I don't think this is a case where the stock sales, even if the dollars are big, get you over the scienter hurdle either in

isolation or together with the other allegations.

Finally, I'll note on cooperation, I suspect time on it.  If you can't get there otherwise, if you can't find individual scienter, you can't just, in something like this, say, hey, poor operations.  It's all solved.  I don't think this case is a poor operations case, unless you get there somewhere else.

Finally, your Honor, loss causation.  As I said, it is a rare case -- and, again, this is only a 34 Act argument -- it is a rare case where loss causation will result in dismissal when the other elements are satisfied at the pleading stage.  I don't think the other elements are satisfied.  If you found any of them to be, I think loss causation on both, on both the attrition and on the Glassdoor are incredibly weak, because what they are alleging was already out there for both.  But it's stunningly weak on the Glassdoor, because Glassdoor isn't in the document they say is the corrective disclosure.  It's just not there at all.

Their answer is you don't have to have a complete mirror image.  I don't know what analogy to use.  There is no image at all.  There is just nothing nearing the Glassdoor allegations, which means that the correct disclosure didn't correct them.  Therefore, there is no loss causation.

THE COURT:  What about the turnover rate, though, that was in --

MR. YOUNGWOOD:  The turnover rate was in there, but, again, based on purely public information.

THE COURT:  Yes.

MR. YOUNGWOOD:  So I think this goes to -- I think it's in our opposition at -- I'm sorry, our moving brief page 24, footnote -- page 24, footnote 15 of the moving brief. We collect some cases that basically stand for the proposition that, other than in rare circumstances, short seller reports are not correct disclosures.  They are based on public information.  Their answer there is no, no, look, they interviewed people.  That wasn't public until they made it public.

What I would say is, on the attrition, on the attrition which is the only thing that the Spruce report has that in any way comes close to matching the allegations in this complaint, there is one individual who's a former employee that they interview.  I think it's on page 36, if I have the page number right.  Let me just check.

Yes, it's page 36.  There is a giant orange box where they interview former past executive.  Your Honor, I won't read it here, but if you read it, there is no nonpublic information coming from this TaskUs employee.  He or she is just talking about the industry generally.  And so the math that Spruce does on the next page, 37, is stunningly simple math.  They look at -- they look at a draft prospectus.  They compare it to the

N9SsLOZc

final prospectus.  They talk about how many employees were added in 2019 according to the draft prospectus.  They then look at the final, which is how many employees they have, and they do a stunningly simple substraction.  It's not even an algebra calculation to come up with it.  Anyone else could have done that.  Whether it's done right or not is a different thing.

THE COURT:  Where is that information available; is that from the draft?

MR. YOUNGWOOD:  It's cited on the -- sorry, I closed the book.  So I'm looking on page 37.  And what I think the math comes from, if I read it correctly, is the draft prospectus and then the final prospectus.  Of course the draft prospectus comes out before the final, and then the final comes.  And, again, Ms. Karp will talk about whether anyone purchased pursuant to the prospectus.

But if somebody looked at the draft prospectus and looked at the final prospectus, they could have done the same math that Spruce did.  And while, you know, your Honor, you and I had a conversation about whether or not the study of Glassdoor was something everyone should do or not, this didn't look very complicated to me at all.

So I would say that my argument on loss causation for Glassdoor is stunningly straightforward.  It's just not mentioned.  It can't be corrective.  This one, I'm telling you,

N9SsLOZc

can't be corrective, wasn't disclosed in anything, wasn't public.  It's just somebody's view, and somebody's view is not a corrective disclosure.

THE COURT:  Can I just go back briefly to 101 and the scienter point.

Although FE-1 wasn't in the room for the ELT meetings, why did the information provided there taken together to show that management was focused on human capital metrics to include attrition.  FE-1 talked about how that person worked was Jim Maddock to prepare the Excel spreadsheets that included hires, terminations, and also you could figure out attrition.

Jim Maddock told FE-1 that those results are being presented to the ELT, and then there other indications Bryce Maddock was focused on human capital data.  And that was the urgent request from Jim Maddock in October, Bryce Maddock in October 2020, for a head count report.  There was a video in which Bryce Maddock emphasized the need for anyone referred to the company to stick around.  There was stuff from Johnson, who is a VP of operations, asking a meeting why so many employees were leaving in the first six months.

Taking all of that together, even if FE-1 was not in the room and may have been one or two people removed, at this stage, why is that enough to show that management was focused on this?

MR. YOUNGWOOD:  Your Honor, I think, at most, one of

those may have related clearly to the first six months.  The fact that Mr. Bryce Maddock cared about attrition, well, they did care about attrition.  That is why they reported the numbers that they do report about attrition.

The fact that FE-1 gave Jim Maddock a wealth -- we don't know what FE-1 specifically gave Jim Maddock because they don't tell us.  But even if we knew everything that was given, we do not know, we do not know what was in the decks that Jim Maddock gave the leadership team.  And even if we knew that, we would not know, other than knowing they cared about attrition, we would not know what they thought the leading statistic was on attrition.

Your Honor, a big public company, a medium-sized public company, even a small one has so much data on everything that matters and everything that doesn't.  And the securities laws can't require or expect even a small fraction of it to be disclosed.  So they place in the hands of management the responsibility to pick what they think is important, not what some investor thinks is important, like any omissions after the fact they knew.

And I'm circling back to where I began.  As long as you're clear about what you're giving, I think the lesson -- again, there is not a lot of law on 101.  I'm not aware of any specific cases in the employment context on 101 yet, but I don't think it's any different really than the way the law

N9SsLOZc

looks in general about omissions.

And circling back to *Netflix* and *Lopez* and *Twitter*, just those three examples, it's pretty clear, if you're clear and honest about what you're saying, you're on the OK side of the line and you just can't be second guessed to come up with every single measure of how to measure attrition.

Why just the six months?  Why not the first month?  Why not -- I mean, why not just put in your FE-1's spreadsheets?  The answer to my question is obvious.  But here, what you're doing is picking and choosing and you're saying here is the thing you didn't disclose I wish you had because the Spruce report based on public information said something about it later.

THE COURT:  Thank you.

MR. YOUNGWOOD:  I'll let Ms. Karp stand.

THE COURT:  Yes.

MS. KARP:  Good afternoon, your Honor.  Just a few minutes on the Section 12 claim.

As you know, to bring that claim, the law requires that plaintiffs plead that they purchased pursuant to a false and misleading prospectus.  And if they have reached that hurdle, then they can bring a claim against a seller of the shares and those who solicited those shares.

First, there is no dispute that no plaintiff purchased pursuant to the prospectus in the IPO.  Mr. Lozada purchased

shares in September, a couple months after the June IPO, and Oklahoma Fund purchased in October through December of 2021. Again, multiple months after the IPO. So those weren't shares made pursuant to that prospectus.

Now, we do acknowledge that they pled that Oklahoma has purchased pursuant to the SPO, and so I would like to talk about the seller requirement because we don't think that they have met that.

THE COURT: Yes.

MS. KARP: Now, they also plead and provide support that Oklahoma, they didn't purchase directly from the company or any of the defendants. They purchased their shares through Goldman Sachs. Goldman Sachs is not a defendant in the litigation. They have sued TaskUs, its executives, and BCP on the Section 12 claim.

Now, they have a few creative arguments as to how the defendants have sued could be considered statutory sellers. I'll address each one since you raised it earlier, which makes me think you're interested in it.

So as to, I'll start with TaskUs. In TaskUs, they cite the regulation 159(a), which extends to the definition of a seller to issuers in a primary offering of securities. That's not what this was. This was a secondary offering of securities. TaskUs didn't issue any securities in the SPO. These were securities offered by BCP and Maddock and Weir.

I think that takes care of that. No court has applied Rule 159(a) in that circumstance.

THE COURT: Has any court said that 159(a) does not apply in that circumstance?

MS. KARP: Now, I don't know if we've seen a grave statement. We would have put it in our briefs that confirmed it that way. I'll note that the cases that plaintiff cite in their brief that supposedly would extend 159(a) to this context are not actually not in this context. Secondary offerings. Not secondary offerings of securities, they were primary offerings of securities.

THE COURT: So 159(a) refers to a primary offering of securities of the issuer and also refers to the initial distribution of such securities. If only one primary offering could occur with respect to a security, wouldn't the language say the primary offering of the securities rather than a primary offering of the securities?

MS. KARP: Well, I'm not prepared to argue that that's the only circumstance that it could ever be, but I can say that with respect to the facts here, there was no offering of the securities here. And, again, there are no cases that support it. Plaintiffs get creative and they said that Maddock and Weir had to convert their shares before they sold them. I think that's recognizing the flaws in not meeting this primary offering of securities language.

N9SsLOZc

But converting the shares doesn't transform a secondary public offering to an offering by TaskUs.  So, again, if we had that perfect case that supported our argument, we would have shown it to you.  We haven't seen something on the other side, and we submit that the plain reading of that regulation supports our interpretation.

They also ask TaskUs include a few -- they say that TaskUs also filed the prospectus and that they disseminated the materials.  If you actually look at the allegations, they cite in the complaint for those.  Yes, TaskUs filed the prospectus.  We cite case law in our briefs that say that is not good enough to meet the solicitation prong.  And in terms of dissemination, there are no nonconclusory allegations of dissemination.  They are focusing on the filing.  We submit that is not good enough.

As to Weir and Maddock, they pleaded that they signed the SPO.  But, again, that is not enough under the law.  I'll submit that they plaintiffs do submit case law, earlier case law that did sustain certain allegations.  We submit our own case law that is later, and including some of their own cases that support that signing of prospectus itself is not enough.

THE COURT:  But there was more here.  Maddock and Weir each sold, I believe, almost two million shares themselves.  They had very, very few shareholders in the company at the time of the IPO, so there were not many people who had the shares they had to sell.  And Maddock was on, I believe, at least one

N9SsLOZc

call between the IPO and the SPO presumably to help drum up interest in the SPO.

Doesn't that mean there was more than just signing the registration statements here?

MS. KARP: I was going to address that next. Yes, they primarily argue they signed the registration statements here and they also plead that they were motivated by their own financial interests. If it were enough that anytime you sold, that that meant that you solicited, I just don't think that that is the law.

If you look at the allegations that they cite to show that they were motivated by their own financial interest, they are allegations that are pled only in the counts. There is no, you know, well-pled allegation that supports that. So, again, it would come down to, is it sufficient that you sold a large, you know, seemingly large number of shares in the offerings to be enough to say that you have solicited it. I haven't seen case law that says that that is good enough under the law, and we do not believe that it is.

Then with respect to BCP -- and I'll focus on BCP specifically first -- their allegations, again conclusory allegations of control, control of TaskUs. There are no nonconclusory allegations of control of anyone who actually solicited the Oklahoma funds or any absent class members' purchases. And then with respect to all of the defendants,

they talk about that they were likely prepared, in preparing, filing, and disseminating the prospectus.  But, again, there are no factual allegations to that effect in the complaint. And in any event, we cite cases in our briefing that says that those sorts of allegations are not sufficient to meet the solicitation requirement.

THE COURT:  The Supreme Court's decision in *Gustafson v. Alloyd* that dealt with Section 12(a)(2), it seems to me, doesn't that case stand for the proposition that Section 12(a)(2) refers to public offers by issuers and their controlling shareholders, that is, regulating the initial offer of any particular set of securities in the public market, not the first time that securities of the company go into the public market.

Isn't that what the Supreme Court seems to be saying there?

MS. KARP:  Are you referring that they have to be traceable to the --

Are you referring to the first prong now?

THE COURT:  Sure.  I'm referring to, I guess, a bit of understanding what primary means in the context of Rule 159(a).

MS. KARP:  159(a).

THE COURT:  And whether it requires it to be --

One question:  Does primary just mean first there, as opposed to maybe most significant?

But assuming it means first, is it just the first time that any securities of the company hit the public market, or the first time a particular set of those securities goes back out in the public market?

MS. KARP:  So we understand the word primary there not necessarily that it has to be tied to an offering by the issuer of those shares and here --

Sorry, I wish I had that case right here.

THE COURT:  That's OK.

MS. KARP:  -- to the inquiry is, I want to think about your question a little bit more.  Maybe I'll sit down and be able to give it more thought.

But the issue is not about the first, but it was that TaskUs, in the secondary offering, it was other parties selling their own shares.  It was not TaskUs selling theirs.  And because the spirit of 159(a) is to extend the definition of seller to issuers, that it makes sense that that would then be tied to offerings of shared by issuers versus by others selling their shares.

I'm happy to sit down and give it a little bit more thought and reserve.  That's the way we understood it, and that's the way we put forth the argument in our papers.

THE COURT:  In terms of the standing issue, the plaintiffs rely on this Second Circuit case, *NECA-IBEW Health and Welfare Fund* to make various arguments, including whether

N9SsLOZc

or not claims can be brought under the same statute for different prospectuses and different registration statements. And also, I guess, with respect to Lozada, whether or not they can be brought across different statutes.

Do you want to address that a little bit?

MS. KARP:  Sure.

So we think that that issue gets addressed when we've shown that even Oklahoma, that Oklahoma hasn't met the standard with respect to the Section 12 claim.  Because NECA also says that class standing requires both statutory and Article III standing.  So it's our view that once you knock out Oklahoma for theirs, that it addresses the issue across the board.

THE COURT:  If Oklahoma is not knocked down, does that rationale mean there would be class standing across the board?

MS. KARP:  We haven't argued in our papers that that would not be the case.

THE COURT:  OK.  Thank you very much.

Mr. Fonti.

MR. FONTI:  Thank you, your Honor.  Thank you for giving us this opportunity to argue.

Before I begin, I just wanted to introduce to you the executive director of Oklahoma Fire, Mr. Chase Franklin, here attending --

THE COURT:  Good afternoon.

MR. FONTI:  -- on behalf of the fund.

So a lot has been said and a lot has been argued.  I think I would like to focus a bit on what hasn't been said, and in that, respond in good measure to what we just heard.

The case arises and rises and falls from the difference between what was said publicly versus what was said internally.  The external disclosures versus the internal facts.  And your Honor seized upon several of the key allegations.

Like you, I'll begin with the Section 11 claim because the only element is falsity.  This is a company that differentiated itself.  A lot of what we heard was maybe nobody really cared about some of these metrics.  But this company wholly differentiated itself on its attrition rate, on its culture, on its Glassdoor rating.  And I'll go into the reaction of analysts to all of that.

It is the reason why the stock traded at a premium.  These defendants launched the IPO, which is the only way for them to monetize their equity, and then this stock rose, we think, due to the false statements to an all-time high.  And they immediately triggered the secondary offering which was the only way for them to sell, right.

We talked a little bit about the lockup.  So they could not sell a single share of the IPO for six months.  The only way they could sell was through the SPO.  Once the SPO happened, they couldn't sell again, as it turns out, until

January 19 of 2021, which is the day before the class period ends. By doing that, they monetized their equity ownership to the tune of over $950 million, which coincidentally turns out to be about what the entire company is worth today.

So when we look at their statements and how they were materially false, I would like to start with what I call the outright untruths -- there is three mechanisms, outright untrue statements, words of *Vivendi*, the half-truths and there are the omissions.

So the low attrition statement falls into the bucket of outright untrue. The attrition was simply not low. And we allege, as your Honor pointed out here in the arguments, internally at the company, the attrition measures they were using showed attrition at 40 percent. Month after month, if you measure the number of people who were terminated versus over the number of people who were hired, that ratio yielded a pretty consistent over 40 percent turn.

And the false statement that you point to which speaks to the differentiated culture, their environment and resulting in the low attrition was categorically false. What seems to me that the defendants are trying to hold us to a literal truth standard, right. That has been rejected for generations. Whether a statement is literally true has not been the law at any point in time.

And I know my colleague didn't choose to reference

N9SsLOZc

much case law, but I'm going to go through the controlling law on these points. And you start off with most recently the *Vivendi* decision, right, out of the Second Circuit, where the court identifies that a network of interrelated lies all slightly different, geared toward the same type of misperception, are actionable. And indeed, as the court said, it would be perverse for it to be something different. To be able to choose what you disclose and say, I am disclosing these, you know, these four corners, but the rest of the universe is in shambles, and I'm not going to tell you that. That is exactly what we have here.

We have a selective disclosure about the 14.9 attrition rate at 180 days. Yes, they said it's 14.9 at 180 days. But at the company, day in, day out, month after month they were measuring it as they always measured it, and it was showing that they were no different than their peers, right. So I think the disclosures would be quite different if they said at 180 days at 14.9, which may be great, I don't know. But month to month at 40 percent.

If you look at the people who have been there for 60 days, half of them, more than half are gone. That would be a very different disclosure, and it would take away this allusion they are any better than their peers and any allusion they should be trading at a premium.

THE COURT: But the 14.9 percent figure, you don't

allege that that was inaccurate as it was defined there with respect to employees who stayed for more than six months or whatever it was?

MR. FONTI:  We don't allege that that number in itself is false, in large measure because nobody that we talked to, in particular FE-1, ever calculated what it actually was.  It wasn't that was not a metric used by management in the reporting that was done month after month by the team doing the calculations.

THE COURT:  Putting aside maybe the 101 issue, but just the falsity of that statement of whether or not it was an omission, why wasn't the company able to really disclose what they wanted to disclose there, as long as they were transparent as to what the figure represented, a reasonable investor could look at it and think, well, that is a little odd that they are defining what they are disclosing in such manner, while they are defining the attrition only starting at a particular day. They are probably doing that for some reason.

But if the company is transparent about how they are defining that disclosed attrition rate, how is that misleading at all?

MR. FONTI:  It's misleading when you look at the context of the statements and how that is being used to differentiate them from other companies.  This is not like *Lopez*, where the plaintiffs complained that this metric could

have or should have been reported because maybe somehow somebody would know that there was sexual harassment of a very appropriate type happening at the company.

Here, this is a company that is exclusively differentiating themselves on these metrics. And if you look at, just like in an event, you look at this network of interrelated misstatements which put together led to the impression that they were far superior on attrition front, on the culture front, and employee retention front. By choosing to speak, they created their own obligation. And that has been the law, as I said, for generations.

So it is not enough to say, you know, it is not raining right now when it's been pouring ten minutes ago and it's going to pour in five minutes. You have to give investors the full context, once you choose to speak apart from 101.

101 puts into place an affirmative obligation to speak with the metrics that are focused on. And our investigation, our allegations are that 180 days was not the focus, and metrics around, you know, month over month, looking at 60 days, those are the metrics that were being used. That's what was being reported. It wasn't an isolated instance.

And we'll get to scienter. I'll break it down a little bit more, just brief overview. This is programmatic. This information is housed in the Oracle database at the company because it is vital to their operations. This is not

incidental.  It is vital to the operation.  The only product TaskUs has is people.  They don't have people in the seats, they don't have a product to sell, they don't have customers, they can't service their customers and are not going to generate revenue.

This is not incidental.  We like to hear this, we like to hear that.  This is what they are selling.  Every level of the company is focused on it.  We talk about the leadership team meetings, executive leadership.  We talk about the chief people officer focused on it.  We talk about the VP of operations focused on it.  We talk about operational teams reporting attrition on a weekly basis.

In fact, customers were -- information was reported to customers about attrition because they had an interest in knowing how many people were staying in the positions time over time.  The only people that didn't know were the investors that were asked to pony up their cash to buy the equity from these individual defendants.

So that is one half-truth.  The other half-truth is the Glassdoor statement, which your Honor spent some time on already.  That also satisfies the falsity requirement under Section 11.  It's a false half-truth.  It is a number, yes.  That is the number that Glassdoor published.  OK.  But what is concealed is the fact that that number is skewed by people, you know.  This is a job satisfaction rating, but it's being skewed

by people who haven't done the job yet.  In fact, people who don't even know what the job entails in some instances.

So it is not a reliable measure in any way.  I think your analogy of the summer associate versus the six or seventh-year associate, we have all lived that.  But at least the summer associate is doing some work, right.  These are people who had not even done the job that they are purportedly going to be rating.

And it was required.  If they weren't forced, they were forced.  They couldn't complete the training programmatically, the software wouldn't allow them to advance unless they did the review.  To me, that is being forced.  And you know the result would be better under those instances than if they had time, and we allege that.  There is an assertion we don't allege it.  We do allege that, in fact, the results would have been lower.

THE COURT:  This is bouncing ahead to scienter, but is there any allegation that the officer defendants here actually knew of that Glassdoor policy, or are you just relying on a core operations theory here?

MR. FONTI:  We are relying on recklessness under *Scholastic* that this is information that was possessed by the company that they had access to that.  This is a policy that was companywide.  They chose to speak about it.  They recklessly disregarded the information at the company that they

had access to. *Scholastic* provides that is sufficient, so it's not cooperation, per se, it really is recklessness under *Scholastic*.

I would like to -- maybe this is an appropriate point to talk about how important these statements were, because it really flows to how much, how significant they were, and how much the falsity drove the stock value. In paragraph 183, we allege that the Defendant Maddock said differentiated culture we have created is validated on the following metrics, and that is actually in the SEC filings. And right below that is the Glassdoor 4.6 rating. The validation of the entire model is established by the 4.6, right.

Then he is asked, Maddock is asked a specific question from JPMorgan. I would like to talk a little bit about how the ordinary mom/pop investor was supposed to be able to figure this out. JPMorgan didn't figure it out. Wells Fargo didn't figure it out. All right. RBC didn't figure it out.

They asked, What is the secret sauce? And Maddock responds, we have a 4.7 on Glassdoor. No one in our space comes even close to that. Paragraphs 136. So they are putting it front and center. They are talking about it as the validation of their entire model and their share price. They have a duty to know what is driving that number. We suggest that they did know. But at a minimum, we have recklessness.

Analysts believed it, right. Those same analysts come

N9SsLOZc

out, William Blair, they point paragraph 87 of the complaint, 4.7 stars strong results across a variety of metrics.  RBC, 4.7 indicates employee-centric culture.  Wells Fargo notes that TaskUs is one of the highest Glassdoor ratings in the industry, right.  Maddock goes even further.  He says the Glassdoor, one star differential in the Glassdoor rating is six times, six times more powerful incentive than a $10,000 salary raise.  So it's driving their model, it's driving their hiring, it's driving the retention.  That's paragraph 183.

So there is no doubt that they are putting it front and center.  They are connecting the dots.  I don't want to jump around too long.  That does bear on the loss causation as well that I'll get to in a moment.

Then we have the regulatory requirements and the omissions, right.  The 101 and 303, just take a moment on that.  As I said before, 101 puts into play, this is a required disclosure.  We had allegations under Section 11 that what they used internally was the attrition, as we just talked, the 40 percent and 50 percent, all across the company.  That's sufficient in and of itself.

303, the trend does not need to be going up or down.  The steady trend, the fact they were consistently at 40 percent is something that was material to operations.  And the purpose of 303, in its expressed language, is that it is supposed to put management, put investors in a position to see the company

through the eyes of management.  That's the phrase.

If management is utilizing, as we allege, utilizing these metrics, investors are entitled to know it.

THE COURT:  If 303 doesn't require a trend to be at least going in a particular direction, wouldn't that capture a whole lot?

MR. FONTI:  I think that is where the materiality comes in, your Honor.  If you're experiencing a steady state and this is a material trend, which we allege it is, you're consistently, despite saying we are doing things to improve, we are consistently experiencing this level of attrition.  Then that's a material trend to investors.  Certainly impacts the valuation.  We see that in -- loss causation, when the truth comes out, stock drops 20 percent, right.  We know that the farce about culture, attrition, retention just was value relevant.  I'll speak to that in a moment.

THE COURT:  In terms of going back to 101, you mentioned the allegation that this was important to the company.  But aren't these allegations one or two people removed from the management of the company whom this would have been important?

MR. FONTI:  So for purposes of Section 11, we need to establish the falsity of the statements.  We know, if I may kind of bring this into the world of scienter on the 10(b) side.  FE-1 is one of four people responsible for disseminating

this information.  We know the information revealed the 40 percent rate, and that information was incorporated to the presentation that went to management.  That is sufficient, right.

I think what wasn't talked about is what is the pleading standard for scienter.  This is a perfect point to jump into it.

THE COURT:  Maybe I'm thinking about this wrong, but you have the statement, you have the argument that when the company said in SEC filings that there was low attrition, that that was false, and the reason why it's false is because the actual rate was not low.

That one argument, then there is the other argument about item 101, which looks at an obligation to report essentially matters that human capital measures that are the focus of management of the business.

MR. FONTI:  Right.

THE COURT:  For 101, you would have to establish that the metrics are the focus of management, and it seems like how you get there is through FE-1.  But FE-1 was never in those meetings with management.

MR. FONTI:  So I understand the point.  I appreciate it and hear where you're coming from on that.

We know that FE-1's reports were incorporated into the package.  It's not to say they didn't focus on other things.

We know they focused on the 40 percent because it was the subject of the reports month in and month out. We also know that Maddock called FE-1 back from a family funeral in Mexico for a report, and what that report shows is that same formula, same metric. That was the company's formula, terminations over hires.

THE COURT: I'm sorry. Remind me, which Maddock was that?

MR. FONTI: So it was Bryce Maddock, the CEO, needed a report. This is in October of 2020, paragraph 68. I'm not saying that Maddock called FE-1, but FE-1 was called back to the company to produce a report for Defendant Maddock in October of 2020, pulled away from her grandfather's funeral to put together this report.

THE COURT: Because the allegation is not that, you're right, it's not that Bryce Maddock called, but Jim Maddock called FE-1. But presumably the allegation appears to be that Defendant Maddock was the one who made the request that was conveyed by Jim Maddock to FE-1 while at the funeral, is that accurate?

MR. FONTI: That's exactly right.

FE-1 returned back, provided a report that was like all the other reports, focused on attrition, measured in that percentage form, nothing to do with 180 days. We also know that it was a constant focus of other senior people -- VP of

operations, chief people officer -- paragraph 70. It was a metric for recruiting. Again, went to customers.

Or to say that 101 doesn't require a focus to be the sole focus, but we know that all of the reporting, all the measurements done by the team responsible for doing it and the data set was focused on that, so we think that's sufficient.

Shall I move to scienter for a moment?

THE COURT: You may.

MR. FONTI: So what's really notably missing from their reply brief is any grappling with the Second Circuit longstanding law on scienter, right. They have effectively purported their own standard, which would be to be sitting in the room with a smoking gun and hearing a confession. Effectively, you have to have firsthand witness. That has never been the standard.

The Second Circuit reaffirming a generations old standard from the 1970s in Scholastic in 2001, that they were making allegations based on things like we're alleging, which is reports going to management, you need to allege three things. You have to allege who prepared the internal reports, how frequently, who reviewed them. And then if you have an additional indication of the nature of the report, that further supports the scienter.

We have pled exactly that. We have pled that FE-1's team prepared these reports. They were monthly. They were the

N9SsLOZc

global attrition reports.  They were also the specific requests we just talked about that went up, and that those reports went to the executive leadership team, which included our defendants.  And those meetings happened at least monthly, typically on a Monday, and during the pandemic, on Zoom.  That is paragraph 56 to 58 sets that out.

Then we have the additional detail, we have the fact that the data resided in the Oracle database, accessible to the defendants, utilized for many purposes.  And what the data showed, which was again the 40 percent attrition at 60 days, it was more than half, and the importance of that information.

So if you look at *Scholastic*, you look at *Novak*, which was contemporary with *Scholastic*, if you look at subsequent cases, including the Supreme Court's cases in *Tellabs* and *Matrixx*.  *Matrixx* has some similarity.  It also revolved around reporting going to senior management.  What we have alleged more than meets the pleading standard for recklessness under the Second Circuit law.

Defendants' arguments really just don't get us anywhere, right.  As I said, the direct contact rule has never been the law.  They cite a number of cases principally in footnote seven of their brief.  We haven't had a chance to address them.  If you don't mind, I'll tick through them.

*Henry Schein*, there was no allegation of the who, what, when, how of the reporting.

In *Doral*, that case was trying to allege involvement of the auditors. All that was alleged was the participation of an auditor in a meeting, but they couldn't name who the auditor was or what was discussed at the meeting. So this is not our facts.

*Glazer*, the details around the employee allegations didn't even specify that person's duties, and no allegations about the form or content of the communications around the underlying alleged misstated fact.

Likewise, they cited the *AmEx* case out of the Second Circuit in their opening brief. And that was, again, the context of the misstatement was not alleged with any specificity as to how the defendants came to know information.

Whereas here, we hit that. And you look at *Setzer*, which is a Second Circuit decision. The bottom line is they are reckless in choosing to disclose this information. To the extent the defendants have power over the extent of their disclosures, we're not here to say defendants need -- that the companies need to disclose everything. But if anybody has power over the scope of disclosures, it is the defendants. If they choose to speak, they have to speak completely, and that is what the Second Circuit has said for decades.

Motive and opportunity, again, there is a mismatch of counterfactuals, right. But *Scholastic* says motive and opportunity is established when you have a defendant making

N9SsLOZc

misrepresentations of material facts to keep the stock price high, while selling their own shares, right.

THE COURT:  So that doesn't apply.

MR. FONTI:  No, it does not.  Just to Maddock and Weir.

THE COURT:  OK.

MR. FONTI:  So we know, we have alleged abundantly that access to the internal info and these defendants controlled completely the disclosures, especially when it came to the offering documents.  Because they chose exactly when, how, and how much those offerings would be made at.  It was their own shares, right.

And one point to make here is that none of this money went to TaskUs, right.  This went only to the two defendants, Maddock and Weir, and to Blackstone.  So their argument that selling the IPO isn't sufficient, they cite to this *Omaha* case.  But, again, there, the defendant sold 700,000 shares out of 17 million.  Here, the two individuals sold over four million out of 12, the other eight obviously was PCP.

In *Omaha*, actually the defendants increased their share of the company.  *Calumet* did not involve inside trading at all.  Whereas Maddock and Weir sold about 23 percent of their shares.  They point -- really, I think I've clarified it. I'll say it again.  This notion they didn't sell any shares after the SPO, to me, is self-defeating.

But it's that they point to *Take-Two* and to *Reilly*. *Take-Two*, there is no offering. Same thing in *Reilly*. Defendants didn't sell after the SPO because they couldn't. They were locked up and prohibited from doing it. It wasn't some virtuous act. They were prohibited.

Then they also pointed to cases where there were large-scale sales where there was no insider trading or, I'm sorry, motive or opportunity established. The case they cite there is the *CRM* case. But in *CRM*, the company had what is known as a 10(b)(5) plan. I don't know if your Honor is familiar with those, prescribed plans to take out of the defendants' discretion when they sell. It's prescribed. So it's a defense basically, hey, I'm selling because the plan tells me to. As I said before, these offerings were directed by these people at the price that they went to market. They had sole discretion over it, so it's far afield.

Let's see. Glassdoor, is it worth unpacking that a little bit more?

THE COURT: Yes.

Just in terms of scienter, though, I appreciate the cases you went through.

Are you aware of any cases where scienter has been found where the complaint relied on confidential sources and none of them had direct contact with the individual defendants?

MR. FONTI: Yes, many.

N9SsLOZc

So I think *Scholastic* fits in that. *Celestica*, I know it does because I argued that at the circuit level. I believe in *Novak*, I don't -- you can confirm this. I believe in *Novak* there was no direct contact either. So those are, their suggestion that the reporting going up included not having direct contact. So certainly *Celestica*.

I'll say from my experience, your Honor, I haven't done this for a couple decades. It is rare, just like, you know, other types of matters, criminal matters that rely on confidential sources. It's not that common that you get -- you get somebody who is in the room who is actually turning over at the pleading stage. So it would be reverse for that to be required.

THE COURT: Yes.

MR. FONTI: Loss causation brings us back to Glassdoor a little bit, if I may.

THE COURT: Yes.

MR. FONTI: So they started off in the opening brief saying that loss causation wasn't met because Spruce Point is a short seller report, and short seller reports can't satisfy loss causation. In our opposition we cited to the *Lea v. TAL*, Second Circuit decision which disabuses anybody of that notion, that you can't, that is a short seller report, and the circuit upheld loss causation.

They make this argument about Glassdoor not being

mentioned and also make the argument that everything is public. So as to Glassdoor, they are trying to impose on us what is a rule, if you don't have the magic words in the disclosure, then it can't be corrective.  That is not the law.  The supreme Court says that in *Dura*, *Lentell* and its progeny.  No Second Circuit has required that you have to have magic words in a corrective statement.

What you have in Spruce Point is exactly proximately the cause of the drop, which is it is the first time that anybody states that the statements about employee culture and attrition, in the words of Spruce Point, highly exaggerated. They also say that, paragraph 257.  That the attrition is significantly worse, paragraph 258.  That, together with their calculation that attrition rate looked to be closer to 46 percent, doing the math that they did, and that is based on four employees who they interviewed and they quote.  And they were putting together a conclusion that had never been heard by anybody, right.  The analysts didn't conclude that.  No other investors had concluded it.  Spruce Point was the first one to put that together.

That is enough.  Because as I said moments ago, the defendants tied -- they are the ones who tied Glassdoor to attrition and tied to their competitive advantage on employee retention, right.  They are the ones who connected the dots. So Spruce Point doesn't have to say exactly this is wrong and

this is wrong and this is wrong.  They have to say, hey, what they've been saying, they are distinguishing factor.  Their premium on the stock price valuation isn't warranted, looks like what they have been saying is grossly exaggerated.

That is exactly what happens.  The stock drops 20 percent on that news.  It's never recovers, right.  The stock is currently trading about $9.  So they have not been able to redeem themselves, and to say that they are any better than anybody else, they are not.  All of that premium, all that hype, you know, has washed away.

So, and the same goes with the public nature, right.  So you have draft registration statement that's initially filed confidentially becomes public at some point.  It's overridden by the final registration statement.  The draft is labeled that it's not, you know, this is a draft and is shouldn't be relied upon.  And the Second Circuit has acknowledged that in *Lea v. TAL*, the case we cite for the short seller report, they also cite the District Court in *Flag Telecom*, comes to the same exact conclusion.  You can't hold investors to the need to go through and find buried tidbits and make calculations, harvesting information that's just not the requirement.  The caveat is out the door.  So *Flag Telecom*, which we don't cite, but the cite is 618 F.Supp. 311, 325, stands for that point.

Just a final point on Glassdoor.  So we have the confidential witnesses, the former employees who speak to the

N9SsLOZc

fact that the Glassdoor rating requirement was hard-wired into the program, right.  We have FE-2 and FE-4, paragraphs 140 and 142.  It was programmed into the job, paragraph 92, right.  People did complain that they would have revised their ratings if they knew what the job was about.  We allege that in 95 and 96.

Our analysis corroborates those allegations.  It shows statistically, right, that that happened.  So we have -- to suggest that to look at a couple of websites, it is a little laughable, frankly.  You're talking about 9,000 entries, 900 web pages.  Right.  For somebody to do an analysis to understand the total landscape is just impossible.

We spent thousands of dollars and dozens of hours to do it, and it corroborates what these four employees are saying, that it was hard-wired.  It shows that 822 percent increase in employees under one year, and a 695 percent increase between November, I believe, and June of the daily reviews.  You also see these spikes and these batch reviews, meaning a group of people coming out of the training, and you have spikes.  That's at 106.  There is no suggestion.

You know, two things.  One is Glassdoor doesn't slice the data any more finely than somebody there for less than a year.  Nobody did it.  You wouldn't know whether the person was there for 364 days or for seven or 28.  So the key fact that is concealed is that these people hadn't done the job.  They were

just trainees.  They didn't know what the job entailed.

What they were doing, that we corroborate, was a violation of the Glassdoor policy.  So nobody should have been, unless the assumption should be we should assume companies are breaking rules and laws and policies, nobody would assume they are having trainees do this, right.  So it really flies in the face of what a reasonable investor is expected to do.

I'll land on this piece with a question, which is they don't explain why they had the huddle in order to skew results. Why do this?

If you're going to have a legitimate rating that is generated by legitimate reviews, why even bother?

I think that  --

THE COURT:  Let me go back to loss causation a minute here.

MR. FONTI:  Sure.

THE COURT:  The Spruce report, though, I understand your argument, that doesn't need to be a mirror image.  It doesn't even mention Glassdoor once, let alone the Glassdoor policy that the company had.  It doesn't even mention the company's Glassdoor rating, unless I missed it.  Sorry.

How could this be anywhere close to a corrective disclosure here?

MR. FONTI:  So there -- I just want to kind of bring the issue...

N9SsLOZc

THE COURT:  Yes.

MR. FONTI:  So as to low attrition, you know, superior culture, differentiation.  I don't think there is any dispute that Spruce Point, you know, sort of removes this mirage about this company better than anybody else on those metrics.  The mere fact it doesn't cite specifically to Glassdoor has never been a requirement.  The Glassdoor, as I said, when defendants say and the analysts say what is your secret sauce and point to the Glassdoor rating, that is the proxy.  They say the Glassdoor, like nobody is even close.  They said to the market that the Glassdoor rating validated their model, as I said earlier.  That was a validation of the entire business model.

So not having those words in there doesn't change the material decision of the concealed risk, which is what *Lentell* requires, that the misstatement is concealing the true fact that they aren't any different and they aren't superior.  The Glassdoor is part and parcel of that.  It is certainly a false statement.  But you don't need to mix and match each false statement with a corrective statement.  You rarely get that.

You might get this company is under investigation by the Department of Justice for anticompetitive conduct.  Well, that doesn't say, and their statements in their 10Ks, saying that the revenue is derived from legitimate means is false.  You know, you don't get that because all the market, all that loss causation requires is the proximate cause.  You had a

disclosure, proximately caused the drop.

You know, in discovery, at trial, we will have to prove the connection.  At this point, it's enough to plead it.  No court has applied anything more than that on loss causation.

THE COURT:  And for attrition, your argument that it was disclosed --

I guess, why was the disclosure that occurred previously in the draft report?

Why is that not sufficient?

MR. FONTI:  They are taking a number, right.  But the number that was disclosed was how many people they hired.  So if you have the starting point, you could do the math and say, well, this is the delta.  They never, in the final, they don't disclose the delta.  They walk away from disclosing how many people got hired.

So investors are not burdened with the obligation to go through a draft registration statement and doing the math to figure out, oh, here they disclose this and this means that and three steps removed.

THE COURT:  What was in the draft registration statement, though?

MR. FONTI:  It included that they had hired 12,000 people over the course of the prior year.  So with that number, you could do the math and say, OK, well, the delta number of people currently hired, they have a starting point for

N9SsLOZc

employees and endpoint for employees, and say middle, they hired 12,000.  So, you know, there's, you know, 46 percent had vanished.

THE COURT:  Yes.

MR. FONTI:  That, you know, as *Flag Telecom* concluded, as the Second Circuit said in *Lea*, investors aren't burdened with this obligation to forensically inquire.  And as I said, there were leading investment banks in the world that hadn't put it together, right.  So you can't attribute knowledge to an ordinary investor of a fact that is buried.

That is not the only fact, right.  The attrition, exaggeration of the attrition which Spruce Point speaks to, and exaggeration of their differentiation stands without issue.

I'll also say that the trigger for that, I think, inquiry was he was a former employee that revealed that those claims were exaggerated and mixing and matching these filings.

THE COURT:  Are there any cases out there that say information in a draft registration report would not be sufficient to put investors on notice?

MR. FONTI:  I think *Flag Telecom*.

THE COURT:  You think does *Flag Telecom* refer to a draft report, draft registration statement?

MR. FONTI:  I'll grab a copy of it.

In citing to *Flag*, the circuit quotes the following, and again, the cite is 618 F.Supp.2d 311, 325.

This court cannot rule that the scattered disclosures and various amendments, annexes --

(Reporter interruption)

This court cannot rule that the scattered disclosures in various amendments, annexes, and exhibits that the prospectus and registration statements were sufficient as a matter of law to disclose the material facts to reasonable investors.  That's the quote that the circuit points to in *Lea v. TAL*.

THE COURT:  L-e-a v. T-A-L, right?

MR. FONTI:  Yes.

And the cite there is 837 F.App. 20.  *Lea v. TAL* is in our opposition.  This *Flag Telecom* case is not in ours.

Before I go to 12(a)(2), I'll ask my colleagues if I have missed anything.  Anything else?

No.  OK.

So the 12(a)(2), I think, is pretty simple at the end of the day.  It really only relates to BCP, the Blackstone entity.  There is no dispute that TaskUs, Maddock, and Weir are properly named in Section 11 defendants.  So they are already liable under the 33 Act.

The test is whether there is under, *Pinter v. Dahl*, not about whether title passed from the seller, right.  It's whether the seller solicited the sale in its own financial interest, right.  It seems to me that the way they are crafting

N9SsLOZc

their interpretation is that the only statutory seller can be the underwriters.

So you can go to market and sell your own shares, which is what they did here, their own shares, not the company shares, and say I'm not a statutory seller.  I Don't think that has been adopted by any court and I don't think that is the law.  You have to look at what BCP did, right.  They directed and controlled the offering and they signed the registration statement and the prospectus.

THE COURT:  What is the basis for that allegations in the complaint?

I know that's in the complaint, but what is the source for that?

MR. FONTI:  Of the control?

THE COURT:  Yes, that BCP directed and controlled the offering.

MR. FONTI:  Sure.  They controlled 66 percent of the voting rights.  That's paragraph 153, 154.  Under the NASDAQ rules, they were deemed the controller.  They elected halve of the board, paragraph 158.  They were entitled contractually to realtime data from the company, financial data, and information related to the offering.  That's at 160.  They had a contractual right to time the SPO, which as I said earlier is critical, because they had a six-month lockup and the only way to sell is by the SPO.  So in order to dump the stock, the only

thing they could do was trigger that right and sell through the SPO. They also had the power to choose the underwriters, paragraph 162. They saw all the drafts, paragraph 163.

And as I said, they had financial access. Let's not forget that they had to, to go back to *Pinter v. Dahl*, they had the only financial interest, selling half a billion dollars worth of stock and the ones setting the price in the offering, their shares, how much, what price was their call. That's in contrast to the *SNL* case the defendants present. There was no allegations of control there.

Also, sort of contextually, Blackstone is one of the most sophisticated private equity outfits in the world. They had the contractual framework to exert the control that they needed to exert. So we think BCP controls and the 12(a)(2), both the IPO and SPO. TaskUs, Maddock, and Weir, likewise are statutory sellers, they are exerting the same kind of control over the offering. Otherwise, you are left with nobody being a statutory seller other than the underwriters.

The class standing point, there is no issue Mr. Lozada had Section 11 claims. He purchased shares that are traced back to the IPO. Under Second Circuit law, your Honor already referenced the *NECA* case. That puts him in a position to have class standing, and that's a due process issue, right. He has to have the same injury, same interest as 12(a)(2) claimants, and he does. Same misstatements, same obligation to pursue the

same theory of the case, and advance the same evidence.

THE COURT:  But *NECA* seems to be government involved, switching over interest one statute to another statute.

MR. FONTI:  I believe it has -- it's actually even more attenuated.  I believe if I have it right, it was somebody who purchased in one offering, pursuant to the same registration statement, had a class standing to represent somebody else who owned pursuant to a different offering.

Here we have a single offering, right.  Proximity is identical.  There was no daylight between Mr. Lozada's interests and anybody who has a 12(a)(2) claim who bought directly from the underwriters.  So there is no attenuation. *NECA* establishes it.  That is for pleading purposes.

And also, just to allay the concern at class certification, that relationship has been deemed sufficient. And we cite the *Tellabs* case, District of Connecticut, that recently adopted that view.  There is no dispute that Oklahoma bought in the offering, bought from an underwriter.  It has standing on the 12(a)(2) claim despite this argument that, you know, without regard to the argument that BCP is not a statutory seller and the others are not.  That doesn't fly on the offering.  I don't know another court that held that an investor buying in the offering from an underwriter doesn't have a 12(a)(2) claim.  I don't recall them citing anything to that effect.

N9SsLOZc

But there's a lot been said, so I apologize if they have.

THE COURT:  What about the seller, why was Lozada seller for purposes of 12?

MR. FONTI:  Why does he have --

THE COURT:  Why does Lozada fall within the definition of a statutory seller?

MR. FONTI:  Why does he get the benefit?

THE COURT:  I'm sorry, TaskUs.

Why does TaskUs qualify?

MR. FONTI:  They are putting the offering out.  They have complete control over it.  It is their security.  I think you go back to the control element.  They are the offering entity and they are putting out the prospectus.  So I don't know what kind of world we live in, if the entity is putting forth the prospectus with their logo on it, say, buy our stock or not, is a statutory seller.  They are soliciting people to buy.

THE COURT:  A remedy under Section 12(a), too, could be rescission, whereby the issue would be able to repurchase a security.  But for the SPO, none of the securities that were sold were TaskUs' securities, or owned by TaskUs.  I should say they were owned by Maddock, Weir, BCP.

How would it be possible for them to be rescission then if TaskUs were considered to be a seller there?

N9SsLOZc

MR. FONTI:  I think this is an unusual circumstance. I don't want to say this with any sense of authority.  I haven't run this to ground.  But I believe that the sellers would -- the rescission flows to the seller, and so that is how it would work.  The concept is rescission damages, so it doesn't necessarily have to be a change back.  They have compensation for --

THE COURT:  What about why are the other sellers, you hit on BCP, but what about Maddock and Weir, why do they fall under --

MR. FONTI:  Likewise, they stand in a same position, right.  They are offering their own shares.  They are listed as sellers in the registration statement, like BCP, and also excerpt control over the entire process.  They are the executives of the company.  I don't think there is anything between any of these people.

Again, I think interpreting the regulations in the statute that only an underwriter is a statutory seller is not an interpretation I'm familiar with.

THE COURT:  The insider trading theory, just explain that a little bit more.

MR. FONTI:  Certainly.  It fits squarely into the 10(b)(5)) rubric.

We have scienter, access to nonpublic information, the additional element is the contemporaneous sale of the insiders,

N9SsLOZc

and that happened by virtue of the SPO.

THE COURT:  OK.

MR. FONTI:  So in the offering, both offerings.

THE COURT:  That requires the Section 10(b) to survive?

MR. FONTI:  Yes, exactly.

THE COURT:  Thank you.

Unless you have anything else.

MR. FONTI:  I was going to make sure my coaches over there are satisfied.

THE COURT:  You can do so.

MR. FONTI:  Thank you very much.

THE COURT:  Thank you.

Mr. Youngwood.

MR. YOUNGWOOD:  Your Honor, I'll be pretty brief because I think between the questions and what you and I covered before, we have covered most of it.

First, your Honor, I can't purport to have carefully checked *Novak* and *Scholastic*, but I did look at them and at least I know there are multiple versions of them.  But they came up when you asked counsel if there is any instances of confidential informants being as attenuated here.

Best I can tell, at least the Second Circuit decision in *Scholastic* cited the discussion as to who is attenuated or not relates to a defendant.  Mr. Marcia, if I pronounced his

name correctly, who was a vice president.  I won't go on, but it's at page -- my version doesn't have any pages -- headnote 15 of it, and it discusses his relationship, not a confidential informant.

I went and looked at least to the *Novak* decision that is cited in the briefs, and it doesn't seem to cover this issue.  I could be wrong.  Could be in the district court decisions, not obviously there.

And to answer your questions, I'm not aware of any cases so attenuated as this.  It's obviously a fact-by-fact thing, and in the first instance, obviously, up to the district court judge.  It's quite attenuated here, which is going to be the third point I'm going to raise, or the maybe fourth.  The second and third fold into it's really 101 and trend.  You asked me about trend.  You asked counsel about trend.

I think what is important here is what is important to TaskUs.  What is important to TaskUs, and I think the mark was coming, or at least they did have, and whether they are able to hire employees, whether they have attrition or not, and keep the people in the seats.

And there is no allegation that TaskUs wasn't always completely forthright as to how many employees they did have, and I think that gets to trend.  Because here the allegations are the trend was either flat or declining in TaskUs' favor in terms of the metric on attrition that plaintiff would like you

to look at.  If that is the case, it can't be a 303 requirement because there is nothing threatening the business, if whatever issues they have or situation they have with attrition and every employer has attrition is steady state and they are doing what they said they are doing.  I think in this context it's very hard to say that a 303 -- an item that isn't getting worse could be a trend required under 303.

And then point three is under 101.  Under 101, it was embedded in your Honor's question and I will not be as articulate, but 101 has a scienter aspect to it, which is what does the company think is important.  And that folds into this whole discussion we've had about FE-1 and any interaction that FE-1 had with senior management, and the answer is none.  To me, the most relevant paragraphs are 57 through the high 60s or so.  I won't go through each one.

But if you read them carefully, it is quite clear, one, never any contact between any of the FE-1's or anyone on Glassdoor or attrition.  These paragraphs relate to attrition. 57 through 61 talk about this spreadsheet, this Excel that it has a pivotable, it has all this stuff.  We don't know based on the pleadings what were in these decks that J. Maddock, Jim Maddock sends to the ELT.  We don't know because we don't have them and they are not pled, which means quite clear none of the FEs ever saw them.  The most we know is that end of paragraph 61, that Jim Maddock told FE-1 he would use the results in his

presentations to the ELT, but we don't know which results he would use.

And then we have -- and this is the only thing that comes back -- I think if this is the sentence that is going to get them there, this is their sentence.  Further Jim Maddock, end of paragraph 61, conveyed to FE-1 that during ELT meetings, the team asked Jim Maddock about the company's attrition and how many people were being hired.

Your Honor, that is not the misstatement that they are claiming here.  That is not the omission that they are claiming.  I'm not disputing the company, for purposes of these pleadings, cared about attrition or how many people worked there.  This sentence is the only who is coming back out that FE-1 is being told what senior management thinks.  It doesn't even touch on what the allegation is.

Then the final paragraph -- again, I think all of these are relevant -- but skipping to 68, which would be the final one I looked at, I raise it because it was raised in plaintiff's argument.  It's this Mexico incident or situation where the gentleman, if the allegations are true, is removed from a family funeral, which is a very sad thing.

But look at what's actually being alleged.  If you look middle of paragraph 68, for example, on July 2020, Jim Maddock forwarded FE-1 an e-mail from Defendant Maddock requesting a specific report regarding attrition within the

N9SsLOZc

human resources department.  That's not their allegations here, so that doesn't help them.

Then the second is this Mexico thing.  He's called at four o'clock.  He's at his grandfather's funeral.  But what is he requested to do?  He's requested for a head count report for year-to-date 2020, not, like, the first six-month attrition numbers or anything that we're talking about.  So, at most, all these things do is, frankly, do what the disclosures already do, which is say that one of the things that the company measured was head count and one of the things the company measured was attrition, and I could do the same discussion with Glassdoor.  I won't.

I think I discussed earlier that, at best, paragraph 96 ties this all together, and I've already explained why there is no allegation that Glassdoor numbers were actually wrong.  But this is a case where, yes, there is 33 claims and 34 claims.  And yes, only scienter applies to the 34.  But embedded within the 33 Act claims are what was important to the company.

I think that leads into the scienter analysis.  I don't know.  I think your Honor you've probably heard enough on 12(a)(2).  Again, there was --

THE COURT:  Yes.

MR. YOUNGWOOD:  I will say this one final thing. There was another case, a case that we didn't bring with us

N9SsLOZc

because it wasn't cited in the briefs, about whether or not you can look at earlier drafts of the prospectus.  Just from the snippet I was reading -- I don't know what the case says, I don't have it -- it's talking about piecing different things together from different parts of things.  That's not this.  This is like one sentence that was in the prospectus that said we lost 12 -- I'm sorry, let me get this right.

We hired -- I said the exact opposite -- hired 12,000 new employees in '19.  In the final prospectus they don't change it.  What they do is look forward and they say we hired thousands of new employees in 2020.  It's not a correction of the prior one, just a different statistic.  That is not digging.  That's not looking at lots of appendices.  That is right out there.  That bleeds into whether there was ever a misstatement, that bleeds into loss causation, and it frankly bleeds into scienter, too.

Thank you, your Honor.

THE COURT:  Thank you.

My only other question for the parties is whether or not you plan to order the transcript of this deposition?

I take it someone plans to do that.

MR. YOUNGWOOD:  I think you said deposition, your Honor.  Both counsel and I may feel we just had one.

Yes, we do.

THE COURT:  Yes.  Late in the day.

N9SsLOZc

MR. YOUNGWOOD:  We'll do that right now on the most expedited basis.

MR. FONTI:  Your Honor, to answer one of your questions.  You've heard a lot of argument.  To the question of cases, cases that have dealt with this issue about direct contact with defendants, page 12 of our opposition, that's ECF 37 that addresses that, citing *Chicago Bridge and Plumbers and Pipefitters*, as well as on page 23.  And then I direct the court to *In Re Avon*.  That's 2019 WL 6115349, speaks to that as well.

THE COURT:  Is *Avon* in your brief?

MR. FONTI:  It is not.

THE COURT:  Give me that cite then again.

MR. FONTI:  2019 WL 6115349.

THE COURT:  I'll give those a read then.

Thank you.  All three are excellent arguments and excellent briefings, of course, and I appreciate all the time you spent today.

So I hope to be able to get out the opinion relatively shortly.

I think that's it for now.  Thank you all very much.  Have a good day.

(Adjourned)