UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                         :

HUMBERTO LOZADA and OKLAHOMA     :
FIREFIGHTERS PENSION AND RETIREMENT :
SYSTEM, *individually and on behalf of all others* :
*similarly situated*,                :          22 Civ. 1479 (JPC)
                         :

            Plaintiffs,     :        OPINION AND ORDER
                         :

         -v-               :

TASKUS, INC. *et al.*,          :

            Defendants.    :

-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

     Lead Plaintiff Humberto Lozada and Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters" and collectively, "Plaintiffs") bring this action alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act"), in connection with statements made concerning employee attrition rates and workplace satisfaction at TaskUs, Inc. ("TaskUs"), including statements leading up to the company's initial public offering in June 2021 (the "IPO") and its subsequent public offering in October 2021 (the "SPO").  The IPO involved the sale of shares held by TaskUs, the company's two co-founders (Defendants Bryce Maddock and Jaspar Weir), and an investment fund (Defendant BCP FC Aggregator L.P. ("BCP")), and the SPO involved the sale of shares held by Maddock, Weir, and BCP.  Plaintiffs allege that TaskUs, as well as its officers Maddock, Weir, and Defendant Balaji Sekar (collectively, the "Officer Defendants"), made knowingly false and misleading statements in connection with the purchase or sale of a security, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and, as to the Officer Defendants, Plaintiffs assert control

person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Oklahoma Firefighters also allege that Maddock and Weir improperly traded on material non-public information in violation of Section 20A of the Exchange Act, *id.* § 78t-1(a).  Plaintiffs additionally allege that TaskUs, Maddock, Weir, Sekar, and other members of TaskUs's Board of Directors, specifically Defendants Amit Dixit, Mukesh Mehta, Susir Kumar, and Jacqueline D. Reses (collectively, the "Board Defendants"), violated Section 11 of the Securities Act, *id.* § 77k, by making materially false and misleading statements in registration statements that TaskUs filed with the SEC in connection with the IPO and the SPO.  They further allege that TaskUs, Maddock, Weir, and BCP violated Section 12(a)(2) of the Securities Act, *id.* § 77*l*(a)(2), based on materially false and misleading statements in prospectuses filed by TaskUs in connection with the IPO and the SPO.  And, finally, Plaintiffs assert control person liability under Section 15 of the Securities Act, *id.* § 77o(a), against the Officer Defendants, the Board Defendants, and BCP for the alleged Securities Act violations.

Defendants have moved to dismiss the Amended Complaint on multiple grounds.  First, Defendants argue that Plaintiffs' claims under Section 12(a)(2) of the Securities Act fail because Lozada did not purchase any shares directly in the IPO or the SPO, because Oklahoma Firefighters did not purchase any shares directly in the IPO, and because TaskUs, Maddock, Weir, and BCP do not fall within the statutory definition of a "seller" for purposes of Oklahoma Firefighters's direct purchases in the SPO.  Defendants further argue that Plaintiffs have not adequately alleged that Defendants made any materially false or misleading statements for purposes of Sections 11 and 12(a)(2) of the Securities Act and Section 10(b) of the Exchange Act.  As to the Exchange Act claims, Defendants also maintain that Plaintiffs have not sufficiently pleaded that Defendants acted with the requisite scienter and that the alleged misstatements or omissions caused Plaintiffs to suffer losses.   And because Defendants' arguments, if successful, would mean there was no

2

primary violation of either the Exchange Act or the Securities Act, Defendants reason that there can be no control person or insider trading claims under Section 15 of the Securities Act and Section 20 and Section 20A of the Exchange Act.

For the following reasons, Defendants' motion to dismiss is granted in part and denied in part.  Starting with the Securities Act claims, the motion to dismiss is granted as to Plaintiffs' Section 12(a)(2) claims, because neither Plaintiff made purchases in the IPO and because no named Defendant is sufficiently alleged to be a statutory seller in connection with the SPO for purposes of Section 12(a)(2).  Defendants' motion is also granted with respect to certain misstatements and omissions alleged to have violated Section 11—specifically, disclosures in SEC filings for the IPO and the SPO of the company's attrition rate for employees who were with the company for more than 180 days.  Plaintiffs' Section 11 and Section 15 claims only survive to the extent they are premised on statements in the IPO and SPO filings that the company had "low attrition" and statements regarding the company's Glassdoor rating.

Defendants' motion is also granted in part and denied in part as to the Exchange Act claims. Plaintiffs' Section 10(b) claims are dismissed with respect to statements about the company's Glassdoor rating because, although Plaintiffs have adequately pleaded the existence of misleading statements on that topic, they have failed to sufficiently allege scienter and loss causation. Plaintiffs' Section 10(b) claims regarding the alleged misstatements about "low attrition" are dismissed as to Weir, but survive as to Maddock, Sekar, and TaskUs.  Thus, the Section 20(a) claims are dismissed as to Weir but not as to Maddock and Sekar, and the Section 20A claims are dismissed as to Weir but not as to Maddock.  The dismissals are without prejudice and Plaintiffs are granted leave to amend to the extent they can cure the pleading deficiencies discussed herein.

## I. Background

### A.    Facts[1]

Defendant TaskUs is a business process outsourcing ("BPO") company: it provides personnel to third party businesses to perform a variety of tasks, such as telephonic customer support and "content moderation" on social media.  Dkt. 26 ("Am. Compl.") ¶¶ 2, 40.  Maddock is TaskUs's co-founder, its CEO, and a member of the company's Board of Directors.  *Id.* ¶ 25.  At all times relevant to this case, Weir, the other co-founder and also a member of the Board, has been the company's President, *id.* ¶ 26, and Sekar has been the company's CFO, *id.* ¶ 27.  BCP, an investment fund associated with the Blackstone Group, was the beneficial owner of a majority of TaskUs's outstanding stock before the SPO and maintained a majority of the voting power of all stockholders even after the SPO.  *Id.* ¶ 28.  BCP directly held the shares of TaskUs that it offered in the IPO and the SPO.  *Id.*  Dixit, Mehta, Kumar, and Reses—*i.e.*, the "Board Defendants"—are all members of TaskUs's Board of Directors.  *Id.* ¶¶ 29-32.  Plaintiffs' allegations largely revolve around Maddock, Sekar, and their exposure to two metrics: the company's employee attrition rate and employee satisfaction as reflected by the company's rating on Glassdoor, a website that allows employees to submit reviews of their employers.  *See id.* ¶ 1.

In 2020, TaskUs's Executive Leadership Team ("ELT"), which at the time included Maddock and Sekar, would receive internal reports on the company's attrition rates in advance of

---

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Amended Complaint, Dkt. 26, as well as documents incorporated by reference in the Amended Complaint.  *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (noting that on a motion to dismiss courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

its monthly meetings.  *Id.* ¶¶ 6, 56.  These reports took the form of PowerPoint presentations emailed to the ELT by Jim Maddock, a senior human resources ("HR") employee.[2]  *Id.* ¶ 56.  Jim Maddock worked with "a small team" of up to three other employees to produce attrition and headcount reporting for the ELT.  *Id.* ¶ 57.  One of the employees who worked with Jim Maddock in preparing the reports is referred to in the Amended Complaint as FE-1,[3] a former TaskUs employee who served as a Human Resources Information Systems ("HRIS") specialist from June 2018 to December 2020 and as an HR generalist from December 2020 to August 2021.  *Id.* Through December 2020, FE-1 was directed by Jim Maddock "to prepare global attrition reports," with FE-1 specifically responsible for "provid[ing] reports regarding headcount and employee attrition," so Jim Maddock could use that information "[t]o generate the monthly PowerPoint presentations to the ELT."  *Id.* ¶¶ 57-58.  Relying on human resources data, each month FE-1 would create for Maddock an Excel file that reflected the total number of employees hired and terminated globally over the prior thirty days.  *Id.* ¶ 58; *see also id.* ¶ 140(iii) (alleging that, according to FE-2, FE-1 performed most of the attrition reporting at TaskUs during FE-2's tenure). Each Excel file also would "contain[] a pivot table that calculated TaskUs's attrition rate as a percentage" by dividing the total terminations by the total hires over the preceding thirty-day period (the "Total Attrition Rate").  *Id.* ¶ 59.  The Excel files "showed attrition rates above 40% globally during 2020."  *Id.* ¶¶ 61, 139(ii).  As alleged, "Jim Maddock told FE-1 that he would use the results in his presentations to the ELT."  *Id.* ¶ 61.  Jim Maddock further "conveyed to FE-1

---

[2] Jim Maddock is not related to Defendant Bryce Maddock.  Am. Compl. ¶ 56.  Jim Maddock reported to Carla Johnson, TaskUs's Chief People Officer, until her departure in January 2021, and then to Johnson's successor, Rajinish Sinha, starting in April 2021.  *Id.* ¶ 139.  Both Johnson and Sinha reported to Bryce Maddock.  *Id.*  To differentiate between the two men, the Court will refer to Jim Maddock by his full name and Bryce Maddock as "Maddock."

[3] The Amended Complaint alleges information provided by four former TaskUs employees, who are identified as FE-1, FE-2, FE-3, and FE-4, and collectively as the FEs.

that during ELT meetings, the ELT asked Jim Maddock about the Company's attrition rate and how many people were being hired." *Id.* ¶ 61.

According to FE-1, the presentations Jim Maddock sent to the ELT for their monthly meetings during 2020 "show[ed] attrition rates above 40% globally" and "included the number of terminations and the number of hires, which in 2020 typically included at least 400 terminations and 1,000 hires per month for the U.S. and Philippines alone. These figures were relatively steady throughout the year. The reports to the ELT also stated that over 50% of employees left within their first 60 days of employment." *Id.* ¶ 139(iv)-(v). The Amended Complaint also alleges that FE-3, a customer service representative and team lead at TaskUs from August 2020 through September 2021, similarly recalled that most attrition at TaskUs occurred within the first sixty days of employment. *Id.* ¶ 64. FE-1 further reported that, in 2020, TaskUs experienced attrition rates of approximately 130% in the United States—"meaning that 1.3 times as many employees departed as were hired"—whereas India and Mexico typically saw attrition rates of 50% to 70%. *Id.* ¶ 139(vi).

TaskUs management received additional reporting and data on employee metrics. Carla Johnson, the company's Chief People Officer, "received reports on the number of terminations and hires from Jim Maddock based on FE-1's analyses." *Id.* ¶ 139(vii). In addition, "Jim Maddock frequently asked FE-1 for other reports and data, often indicating that the requests came from Defendant Maddock, . . . Johnson, and Brandy Zimmerman, then-Vice President of People Operations." *Id.* ¶ 68. Plaintiffs allege two examples of such requests from Maddock. First, in July 2020, Maddock requested a specific report regarding attrition within the HR department. *Id.*

¶ 68.  Second, in October 2020, Maddock made an urgent request, conveyed to FE-1 through Jim Maddock, for a headcount report for the year-to-date.  *Id.*

Further reflecting the company's interest in attrition numbers, FE-4—"a Learning Experience Leader (*i.e.*, a trainer) from September 2018 to July 2021"—recalled that, in mid-2019, a video was circulated internally at TaskUs in which Maddock instructed employees to make sure that anyone they referred to work at the company was "going to stick around and not just quit." *Id.* ¶ 69.  Plaintiffs allege that Maddock gave this direction "because elevated levels of departures—especially early in employment—reduced TaskUs's revenues and profitability." *Id.* Similarly, "[r]ecruiters were graded on how many employees they onboarded and how many stayed" at the company. *Id.* ¶ 139(vii).  Johnson also asked in a meeting why the company lost so many people in the first sixty days and commented about TaskUs's need to improve its retention. *Id.* ¶ 70.  According to FE-1, attrition rates during new employees' first sixty days were constantly discussed and a concern at TaskUs. *Id.* ¶ 139 (vii).

As mentioned, the other primary set of factual allegations in this case involves the company's Glassdoor rating.  The Amended Complaint alleges that TaskUs "had an internal corporate policy of manipulating its Glassdoor rating." *Id.* ¶ 7.  In or around October 2018, Zimmerman, a Vice President of People Operations, directed FE-2, an HRIS specialist at the time, to program TaskUs's training software to require new employees in the United States, the Philippines, and Europe to submit a Glassdoor review after seven days of employment. *Id.* ¶¶ 90, 140(i).  New employees were required to certify on that software that they had done so. *Id.* ¶ 89. In late 2020, FE-2 was instructed to update the system to require a Glassdoor review after one month of employment. *Id.* ¶ 90; *see also id.* ¶ 91 (FE-1 and FE-4 confirming that the system was programmed to require Glassdoor reviews, without specifying the exact timing of that requirement).  Trainers at TaskUs told employees to submit Glassdoor reviews and gave them time

7

to do so, "with newly hired groups of employees submitting their reviews on the same day" as their training.  *Id.* ¶ 91.  According to FE-1, "the purpose of requiring reviews during training was to ensure that [TaskUs] received better reviews, as these employees were still excited about [TaskUs] based on management's promises that it was a 'fun place to work,' and had not yet experienced the disappointing reality of working at TaskUs."  *Id.* ¶ 93.  This policy generated employee complaints, according to FE-1 and FE-2.  *Id.* ¶ 95.  Departing employees "often told FE-1 that it was 'unfair' for TaskUs to force employees to write a review after being employed for just a few days" and "indicated that they would have submitted less positive reviews after actually working" for the company.  *Id.*  And "FE-2 learned from human resources managers and employees during monthly human resources department meetings that employees complained that the review requirement 'was a scam' because their reviews 'were not accurate anymore' given their later experience at [TaskUs]."  *Id.*  At some point, FE-1 met with Zimmerman to discuss these complaints and whether to cease requiring new employees to submit Glassdoor reviews during their training.  *Id.* ¶ 96.  Although Zimmerman said she would discuss it with Maddock, the policy remained in place.  *Id.*

The policy allegedly resulted in a substantial improvement in TaskUs's Glassdoor rating. In 2018,[4] TaskUs's Glassdoor rating was 4.3; by December 2020, allegedly boosted by the policy implemented in October 2018, the company's rating rose to 4.4.  *Id.* ¶ 86.  Then, as alleged, "TaskUs's manipulation went into overdrive as it prepared for the June 2021 IPO, inflating TaskUs's Glassdoor rating to 4.7 by June 2021."  *Id.*  Lead Counsel's analysis points to what they call "three highly significant trends" that took place in the months leading to the June 2021 IPO when this rating spike occurred:  "(1) TaskUs's average daily volume of Glassdoor reviews spiked by **695%**; (2) there was an unusual, statistically significant increase in the average daily reviews

---

[4] The Amended Complaint does not specify when in 2018.

by recently hired employees; and (3) there was an unusual, statistically significant increase in the reviews' average rating." *Id.* ¶ 99.[5]

In June 2021, TaskUs conducted its IPO. *Id.* ¶¶ 1, 114-116. As part of the IPO, TaskUs submitted multiple filings to the SEC, several of which are relevant to Plaintiffs' allegations. First, it filed a draft Form S-1 registration statement on April 12, 2021 ("Apr. 12, 2021 IPO Registration Statement"). Dkts. 34 ¶ 3, 34-2 (excerpts). This registration statement was comprised of two parts: first, a preliminary prospectus and second, labeled as Part II, additional information not required for a prospectus. The company then filed three amendments to the registration statement: on May 6, 2021, on June 2, 2021, Dkts. 34 ¶ 4, 34-3 (excerpts), and on June 10, 2021, when the final registration statement was submitted, Dkts. 34 ¶ 2, 34-1 (excerpts). The amendments likewise were comprised of a preliminary prospectus and additional information not required for a prospectus. *See generally* TaskUs Amendment No. 1 to Form S-1 Registration Statement (filed May 6, 2021) ("May 6, 2021 IPO Registration Statement"); TaskUs Amendment No. 2 to Form S-1 Registration Statement (filed June 2, 2021) ("June 2, 2021 IPO Registration Statement"); TaskUs Amendment No. 3 to Form S-1 Registration Statement (filed June 10, 2021) ("Final IPO Registration Statement"). Finally, on June 14, 2021, the company filed the final prospectus— dated as of June 10, 2021—for the IPO. TaskUs Form 424B4 Prospectus (dated June 10, 2021) ("IPO Prospectus" and collectively, together with the draft registration statement and the three amendments, and including the Final IPO Registration Statement, the "IPO SEC Filings").[6]

As relevant for the instant motion, the IPO SEC Filings are alleged to have made the following statements relating to employee attrition and satisfaction. First, the IPO SEC Filings

---

[5] The Amended Complaint discusses Lead Counsel's analysis in detail. Am. Compl. ¶¶ 100-113.

[6] Complete versions of the Company's SEC filings can be accessed by searching for TaskUs in the SEC's filings database, available at https://www.sec.gov/edgar/search/. *See also* Dkt. 34 ¶¶ 2-4 (providing hyperlinks for the April 12, 2021, June 2, 2021, and June 10, 2021

claimed that TaskUs had a "differentiated culture" that allowed the company to "retain talent" and gave it "an advantage on key people metrics of efficiency, client satisfaction, and low attrition." Am. Compl. ¶ 72; Final IPO Registration Statement at 140.[7]  They also stated that the voluntary attrition rate for employees who were employed by TaskUs for more than 180 days was 14.9% for the year ending December 31, 2020 and 26.6% for the year ending December 31, 2019 (this metric—the voluntary attrition rate for employees employed by TaskUs for more than 180 days—is referred to herein as the "Disclosed Attrition Rate").  Am. Compl. ¶¶ 72, 127; Final IPO Registration Statement at 13, 93, 144; Dkt. 34-1 at 14.  The IPO SEC Filings also noted that "TaskUs had a Glassdoor rating of 4.6 out of 5.0 as of March 2021 . . . which purportedly validated TaskUs's differentiated culture," and included a chart showing that TaskUs's Glassdoor ratings well exceeded its competitors' ratings, which ranged from 3.2 to 4.2.  Am. Compl. ¶ 9 (internal

---

filings).  Each filing is incorporated by reference into the Amended Complaint, *see* Am. Compl. ¶ 54 n.3, and is subject to judicial notice, *ATSI Commc'ns*, 493 F.3d at 98.

[7] For convenience, at some points the Court cites to the Final IPO Registration Statement, which is the third amendment to the registration statement, when referring to the alleged misstatements in filings made in connection with the IPO.  As excerpts of the Final IPO Registration Statement, Dkt. 34-1, and other TaskUs SEC filings were filed on the docket, Dkts. 34-2, 34-3, 34-4, 34-5, 38-1, citations are provided to those docket entries where possible, using the page numbers generated by the Electronic Case File system rather than the internal page numbering of the filings.

quotation marks omitted); *accord id.* ¶ 182; Final IPO Registration Statement at 3, 124, 130, 144;

Dkt. 34-1 at 6.[8]  The chart is reproduced below:



Am. Compl. ¶ 84; Final IPO Registration Statement at 130.

TaskUs, Maddock, Weir, and BCP each sold stock in the IPO.  Am. Compl. ¶ 114.  In exchange for these sales, BCP received about $141 million, Maddock and Weir each received about $34 million, and TaskUs received about $120.7 million.  *Id.* ¶ 116.  TaskUs's proceeds, however, were entirely "used to pay holders of what TaskUs called 'phantom shares,' including approximately $11.8 million for Defendant Sekar."  *Id.*  After the IPO, Maddock, Weir, and BCP combined still held 84.4% of the company's total outstanding Class A and Class B common stock.  *Id.* ¶ 117.  While Lozada did not purchase stock during the IPO, he later purchased TaskUs Class

---

[8] The company's Glassdoor rating was also referenced on the graphic page that immediately followed the cover page for the preliminary prospectus included in the Final IPO Registration Statement.

A common stock that was "traceable to the" IPO. *Id.* ¶ 21; *see also id.*, Exh. A (certification by Lozada regarding his purchase of TaskUs shares).

On August 10, 2021, TaskUs filed with the SEC a Form 8-K, signed by Sekar, in which the company announced its financial results for the second quarter of 2021. *Id.* ¶¶ 119, 148; TaskUs Form 8-K Current Report (filed Aug. 10, 2021) ("Aug. 10, 2021 Form 8-K"). The filing again included TaskUs's Glassdoor score, which by then had risen to 4.7, among a list of "Second Quarter 2021 Frontline Highlights." Am. Compl. ¶ 119; Aug. 10, 2021 Form 8-K, Exh. 99.1. Maddock similarly "touted" the company's 4.7 Glassdoor rating in an earnings call the day of the filing. Am. Compl. ¶ 119. Two analyst reports that followed featured positive commentary based on the company's Glassdoor rating and attrition rate disclosures. *Id.* ¶ 120. TaskUs's stock price closed at $39.40 on August 11, 2021, the day after filing the August 10, 2021 Form 8-K, an increase of "more than 16%." *Id.*[9]

Over the next few months, the stock price continued to climb, reaching at least $72.61 on September 7, 2021. *See id.* ¶ 121; TaskUs, Inc. Class A Common Stock (TASK), TASK Historical Data, Nasdaq, available at https://www.nasdaq.com/market-activity/stocks/task/historical. On September 17, 2021, TaskUs confidentially filed a draft registration statement for an additional share offering, which would be the SPO. Am. Compl. ¶ 122; TaskUs Draft Form S-1 Registration (filed Sept. 17, 2021) at 1 ("Sept. 17, 2021 SPO Registration Statement). As before, the draft registration statement included a preliminary prospectus. *See generally* Sept. 17, 2021 SPO Registration Statement. On September 23, 2021, the company's stock price reached $83.51. Am. Compl. ¶ 122. On October 18, 2021, TaskUs announced the SPO, which at that time was an offering of up to 11.5 million shares of Class A common stock. *See id.* ¶ 123; TaskUs Registration

---

[9] Courts may take judicial notice of well-publicized stock prices. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

Form S-1 Registration Statement (filed Oct. 18, 2021) ("Final SPO Registration Statement") at

cover page (stating that 11.5 million shares of Class A common stock was the amount to be

registered). The press release announcing the offering noted that "TaskUs is not selling any shares

of Class A common stock in the offering and will not receive any proceeds from the sale." Am.

Compl. ¶ 123. Thus, as alleged, "only Defendants Maddock, Weir, and BCP stood to reap profits

from the Secondary Offering, while TaskUs would receive nothing (and bear all the associated

costs pursuant to a registration rights agreement between TaskUs and BCP, Maddock, and Weir)."

*Id.* A registration statement for the offering, which again included a preliminary prospectus, was

filed the same day. *Id.*; Final SPO Registration Statement; Dkts. 34 ¶ 5, 34-4 (excerpts of the Final

SPO Registration Statement).

Two days later, on October 20, 2021, TaskUs issued a press release announcing an increase

in the number of shares being offered, and filed what Plaintiffs allege to be an "amendment to the

registration statement" that incorporated by reference the Final SPO Registration Statement,

including its preliminary prospectus, and was signed by Maddock and Weir. Am. Compl. ¶ 124;

*accord* TaskUs Form S-1 Registration Statement (filed Oct. 20, 2021) ("Oct. 20, 2021 SPO

Registration Statement").[10] Finally, on October 22, 2021, TaskUs filed a final prospectus for the

SPO. TaskUs Form 424B4 Prospectus (dated Oct. 20, 2021) ("SPO Prospectus" and collectively

---

[10] Although Plaintiffs describe this document as "amendment to the registration statement,"
Am. Compl. ¶ 124, it appears to be a new registration statement for the additional shares that were
to be offered in the SPO when the offering was upsized. *See* Oct. 20, 2021 SPO Registration
Statement at 1 n.3 (filed Oct. 20, 2021) ("The Shares of Class A common stock being registered
hereunder are in addition to the 11,500,000 shares of Class A common stock registered pursuant
to [the prior registration statement].").  The filing incorporated by reference the Final SPO
Registration Statement. *Id.* at 2.

with the September 17, 2021 draft registration statement, the Final SPO Registration Statement, and the filing on October 20, 2021, the "SPO SEC Filings").[11]

The Amended Complaint alleges that the SPO SEC Filings included nearly identical misleading statements as the IPO SEC Filings. First, the SPO SEC Filings again stated that TaskUs had "low attrition" and that "[t]he voluntary attrition rate for employees who were employed by TaskUs for more than 180 days was 14.9% and 26.6% for the years ended December 31, 2020 and 2019, respectively." Am. Compl. ¶ 127; *see* Final SPO Registration Statement at 13, 91, 141. Second, the SPO SEC Filings noted that TaskUs's Glassdoor rating was 4.7 as of June 2021. Am. Compl. ¶ 130; *see* Final SPO Registration Statement at 3, 122.[12]

On October 25, 2021, the company announced the completion of the SPO. Am. Compl. ¶ 133. Maddock and Weir's stock sales in the SPO generated proceeds of over $121 million for each, and BCP received over $499 million through its sales. *Id.* Combining their stock sales in the IPO and SPO, Maddock, Weir, and BCP collectively received over $951 million in proceeds. *Id.* ¶ 134. Oklahoma Firefighters purchased shares in the SPO directly from Goldman Sachs & Co. LLC ("Goldman"), which served as an underwriter of the SPO. *Id.* ¶ 22; *see also id.*, Exh. B (certification by Oklahoma Firefighters regarding its purchase of TaskUs shares).

After the SPO, TaskUs continued to make statements about the company's Glassdoor rating and attrition rate. On November 10, 2021, the company filed with the SEC a Form 8-K,

---

[11] Similar to the Court's treatment of the IPO filings, *see supra* n.7, where specific statements from the SPO filings are referenced, at some points the Court will cite only to the Final SPO Registration Statement for convenience. The SPO SEC Filings and the IPO SEC Filings are collectively referred to in the remainder of this Opinion and Order as the "Offerings SEC Filings." As with the IPO SEC Filings, the SPO SEC Filings are incorporated by reference into the Amended Complaint, *see* Am. Compl. ¶ 124 n.14, and are subject to judicial notice, *ATSI Commc'ns*, 493 F.3d at 98.

[12] The company's Glassdoor rating was also referenced in the SPO SEC Filings in a graphic that immediately followed the cover page to the preliminary prospectus.

again signed by Sekar, which announced its third quarter 2021 results and referred to the 4.7 Glassdoor rating, this time measured as of September 30, 2021.  *Id.* ¶ 135; TaskUs Form 8-K Current Report, Exh. 99.1 (filed Nov. 10, 2021) ("Nov. 10, 2021 Form 8-K").  And Maddock again referenced the rating in an earnings call held on November 18, 2021, boasting that TaskUs's "culture . . . enables us to attract and retain talent better than the competition," citing the company's "15% attrition rate" in 2020, and then stating:

> If you look on Glassdoor, as of the end of Q3, we had a 4.7 star rating on Glassdoor. No one in our space comes even close to that. You have to look at some of our competitors. That matters a lot in the environment where there is increasing competition for talent, increasing wage pressure.

Am. Compl. ¶ 136.

On January 20, 2022, Spruce Point Capital Management, LLC ("Spruce Point") issued a report on TaskUs articulating Spruce Point's view that TaskUs's stock was overvalued.  *Id.* ¶ 257; Dkt. 34-6 (the "Spruce Report").[13]  While the Spruce Report leveled a litany of attacks against the company, most relevant here is the report's accusation that TaskUs's "claim of a superior corporate culture evidenced by below industry standard workforce attrition appear[ed] to be highly exaggerated."  Spruce Report at 6.  The Spruce Report estimated that TaskUs had 46% attrition in 2019 and quoted a former TaskUs executive as stating that "the attrition is significantly worse" than TaskUs had publicly reported.  Am. Compl. ¶ 258; Spruce Report at 8, 36-37.  The company's stock fell from $35.39 on January 19, 2022, to $30.13 at the close of trading on January 20, 2022,

---

[13] References to page numbers in the Spruce Report use the internal page numbering of the report rather than the page numbers generated by the Electronic Case Files system.

a 15.3% drop.  Am. Compl. ¶ 260.  The stock price further declined the next day, falling another $1.34 (or 4.45%) to $28.79 at the close of trading on January 21, 2022.  *Id.*

## B.   Procedural History

Lozada filed his initial Complaint on February 23, 2022.  Dkt. 5.  On October 20, 2022, the Court granted Lozada's unopposed motion to be appointed Lead Plaintiff pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, *see* Dkt. 20.  On December 16, 2022, Lozada and Oklahoma Firefighters filed the Amended Complaint.  Dkt. 26. Plaintiffs bring claims under both the Securities Act and the Exchange Act on behalf of the following proposed classes: "as to claims under the Securities Act, all persons that purchased or otherwise acquired TaskUs's Class A common stock pursuant and/or traceable to the [IPO SEC Filings] or [SPO SEC Filings], and were damaged thereby, and as to claims under the Exchange Act, all persons and entities who purchased or otherwise acquired TaskUs's Class A common stock between June 11, 2021 and January 19, 2022, both inclusive, and were damaged thereby."  Am. Compl. ¶ 184.  The Amended Complaint pleads six causes of action: (1) violation of Section 11 of the Securities Act in connection with the IPO and the SPO, against TaskUs, Maddock, Weir, Sekar, Dixit, Mehta, Kumar, and Reses, *id.* ¶¶ 192-200 ("Count I"); (2) violation of Section 12(a)(2) of the Securities Act in connection with the IPO and the SPO, against TaskUs, Maddock, Weir, and BCP, *id.* ¶¶ 201-209 ("Count II"); (3) violation of Section 15 of the Securities Act in connection with the IPO and the SPO, against Maddock, Weir, Sekar, Dixit, Mehta, Kumar, Reses, and BCP, *id.* ¶¶ 210-217 ("Count III"); (4) violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against TaskUs, Maddock, Weir, and Sekar, *id.* ¶¶ 264-268 ("Count IV"); (5) violation of Section 20(a) of the Exchange Act against Maddock, Weir, and Sekar, *id.* ¶¶ 269-270 ("Count V");

and (6) violation of Section 20A of the Exchange Act against Maddock and Weir, *id.* ¶¶ 271-277 ("Count VI")[14].

Defendants moved to dismiss the Amended Complaint on February 17, 2023.  Dkts. 32, 33 ("Motion"), 34.  Plaintiffs filed their opposition on March 31, 2023, Dkts. 37 ("Opposition"), 38, and Defendants replied on April 28, 2023, Dkt. 39 ("Reply").  On September 28, 2023, the Court held oral argument on Defendants' motion.  Dkt. 44 ("Tr.").  On September 29, 2023, the Court held a conference to discuss whether this case should be stayed pending a decision from the Supreme Court in *Macquarie Infrastructure Corporation v. Moab Partners, L.P.*, No. 22-1165 (U.S.).  Dkt. 42.  At a subsequent conference on October 13, 2023, the parties advised that they had reached an agreement that, in their view, obviated the need for a stay: Plaintiffs agreed to voluntarily dismiss, with prejudice, claims based on alleged omissions that violated Items 101 and 303 of SEC Regulation S-K, with all remaining claims and allegations unaffected.  *See* Minute Entry Oct. 13, 2023.   On October 16, 2023, the parties filed a stipulation of partial dismissal pursuant to this agreement, Dkt. 47, and on October 17, 2023, the Court so-ordered the stipulation, dismissing with prejudice any claims to the extent they alleged omissions in violation of Items 101 and 303, Dkt. 48 ("Stipulation of Dismissal").

## II.  Standard of Review

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative

---

[14] Count VI is brought by only Oklahoma Firefighters.  *See* Am. Compl. ¶¶ 271-272.

level." *Twombly*, 550 U.S. at 555.  Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

Plaintiffs bringing securities fraud claims must satisfy heightened pleading standards under Federal Rule of Civil Procedure 9(b).  *ATSI Commc'ns*, 493 F.3d at 99.  A plaintiff alleging fraud under Section 10(b) of the Exchange Act and SEC Rule 10b-5 "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Diesenhouse v. Soc. Learning & Payments, Inc.*, No. 20 Civ. 7436 (LJL), 2022 WL 3100562, at *4 (S.D.N.Y. Aug. 3, 2022) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  Conclusory allegations or allegations unsupported by factual assertions are insufficient.  *See ATSI Commc'ns*, 493 F.3d at 99.

Securities fraud claims under Section 10(b) must also satisfy the PSLRA's heightened pleading requirements.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007). The PSLRA requires that "the complaint . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *accord Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019).  In pleading scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); *see Tellabs*, 551 U.S. at 321.  "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  *Tellabs*, 551 U.S. at 323.  For an inference of scienter to

be strong, "a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *ATSI Commc'ns*, 493 F.3d at 99 (brackets and emphasis omitted) (quoting *Tellabs*, 551 U.S. at 324).

Although pleading standards are heightened for securities fraud claims, the Second Circuit has cautioned that courts "must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co*., 19 F.4th 145, 150 (2d Cir. 2021) (quoting *In re Synchrony Fin. Sec. Litig*., 988 F.3d 157, 161 (2d Cir. 2021)). The PSLRA does not demand "that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000). Nor does Rule 9(b) "require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

The pleading requirements for claims under Section 11 and Section 12(a)(2) of the Securities Act—which concern misstatements and omissions in registration statements and prospectuses or oral communications, respectively—differ slightly: "Issuers are subject to virtually absolute liability under section 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence. Moreover, unlike securities fraud claims pursuant to section 10(b) of the [Exchange Act], plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (citations and quotation marks removed). "In addition, where a plaintiff's claims do not sound in fraud, the plaintiff need not meet 'the heightened pleading standard of Rule 9(b).'" *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 595 (S.D.N.Y. 2022) (quoting *Rombach*, 355 F.3d at 171).

Here, Plaintiffs seek to evade Rule 9(b)'s pleading standard for their Section 11 and Section 12 claims by including the following sentences in each of Counts I, II, and III:

> This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the Registration Statements are alleged to have been materially misstated statements of opinion or belief when made.  For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless, or otherwise fraudulent intent.

Am. Compl. ¶¶ 193, 202, 211.  Plaintiffs cannot distance themselves from the thrust of their allegations so easily.  *See Rombach*, 355 F.3d at 172 ("[N]ominal efforts are unconvincing where the gravamen of the complaint is plainly fraud . . . ." (internal quotation marks omitted)); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 567 (S.D.N.Y. 2012) ("[S]imply disclaiming fraud does not preclude the applicability of the heightened pleading requirements of Rule 9(b).  In the Second Circuit, when the wording and imputations of the complaint are classically associated with fraud, Plaintiffs must meet the pleading standard of Rule 9(b) . . . ." (internal quotation marks omitted)).  Plaintiffs repeatedly allege that TaskUs and its management purposefully omitted the Total Attrition Rate from the Offerings SEC Filings and manipulated the company's Glassdoor rating, and that they did so to convince investors to buy company stock at inflated prices.  Those allegations sound in fraud.  And Plaintiffs do not argue that Defendants did not know, but should have known, that claims about the company's attrition rate and Glassdoor rating were false or misleading, as a complaint sounding in negligence would.  *Cf. Rombach*, 355 F.3d at 178 (noting that claims premised on underwriter's violation of a "duty to make a reasonable and diligent investigation of the statements contained in the Prospectus" sounded in negligence). The heightened pleading standard of Rule 9(b) therefore applies to Plaintiffs' Section 11 and Section 12(a)(2) claims.[15]

---

[15] Plaintiffs do not allege that information regarding the Total Attrition Rate or the Glassdoor rating made its way to the Board, and the only two Defendants who allegedly were members of the ELT are Maddock and Sekar.  Thus, arguably the Section 11 and Section 12(a)(2) claims only sound in fraud as they relate to Maddock, Sekar, and TaskUs.  But Defendants have not asserted any defenses specific to the other Defendants.  Rather, as discussed below, Defendants collectively argue that the challenged statements were not material misstatements or omissions

### III.  Discussion

**A.**      **Claims Under Sections 11 and 12(a)(2) of the Securities Act (Counts I and II)**

Count I alleges that TaskUs and the individual Defendants—*i.e.*, Maddock, Weir, Sekar, Dixit, Mehta, Kumar, and Reses—violated Section 11 of the Securities Act in connection with the registration statements from the IPO and the SPO.  Am. Compl. ¶¶ 192-200.  Section 11 provides, in relevant part:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—
>
> > (1) every person who signed the registration statement;
> >
> > (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
>
> * * * *

15 U.S.C. § 77k(a).  Thus, Section 11 "imposes liability on issuers and other signatories of a registration statement that, upon becoming effective, contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) (internal quotation marks and brackets omitted) (citing 15 U.S.C. § 77k(a)).  Once "a plaintiff establishes one of the three bases for liability under these provisions—(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing

---

and that the Plaintiffs lack a valid cause of action for their Section 12(a)(2) claims.  For such arguments, the Court's conclusions would be the same under the more lenient pleading standard of Rule 8.

disclosures from being misleading—then, in a Section 11 case, the general rule is that an issuer's liability . . . is absolute." *Id.* at 715-16 (internal citations, brackets, and quotation marks omitted).

Count II alleges that TaskUs, Maddock, Weir, and BCP violated Section 12(a)(2) of the Securities Act in connection with the IPO Prospectus and the SPO Prospectus.  Am. Compl. ¶¶ 201-209.  Section 12(a)(2) provides for liability for any person who

> offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission . . . .

15 U.S.C. § 77*l*(a)(2).  Thus, "Section 12(a)(2) holds liable any person who offers or sells a security by means of a prospectus that either (1) 'includes an untrue statement of a material fact' or (2) 'omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading,' provided that the seller 'shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission.'"  *Garnett*, 632 F. Supp. 3d at 595 (quoting 15 U.S.C. § 77*l*(a)(2)).

### 1.    Misstatements or Omissions of Material Fact

Plaintiffs originally alleged in the Amended Complaint four categories of misstatements or omissions of fact in the Offerings SEC Filings, in that those filings

> (1) contained false and misleading statements about attrition and hiring, including that TaskUs had "low attrition" and "14.9%" attrition for a narrow, non-representative slice of TaskUs's workforce; (2) in violation of Item 101, omitted the actual human capital measures TaskUs focused on in managing its business; (3) in violation of Item 303, omitted TaskUs's material trend of high attrition; and (4) contained misleading statements about TaskUs's Glassdoor rating, which was

manipulated and artificially inflated as a result of TaskUs's corporate policy of requiring new employees to submit reviews during training.

Am. Compl. ¶ 168.  As a result of the Stipulation of Dismissal, the second and third categories are no longer part of this case.  The Court thus addresses the first and fourth categories below.

> **i.    TaskUs's Attrition Rate**

The IPO SEC Filings and the SPO SEC Filings—both in their registration statements and prospectuses—included the following statements, which Plaintiffs allege were materially misleading or, for the last statement only, false:

- "The voluntary attrition rate for employees who were employed by TaskUs for more than 180 days was 14.9% and 26.6% for the years ended December 31, 2020 and 2019, respectively."   Am. Compl. ¶ 169; Apr. 12, 2021 IPO Registration Statement at 92; May 6, 2021 IPO Registration Statement at 93; June 2, 2021 IPO Registration Statement at 93; Final IPO Registration Statement at 93; IPO Prospectus at 96; Sept. 17, 2021 SPO Registration Statement at 92; Final SPO Registration Statement at 91; SPO Prospectus at 91.

- "The voluntary attrition rate for employees who were employed by TaskUs for more than 180 days was 14.9% for the year ended December 31, 2020."   Am. Compl. ¶ 169; Apr. 12, 2021 IPO Registration Statement at 13, 136; May 6, 2021 IPO Registration Statement at 13, 143; June 2, 2021 IPO Registration Statement at 13, 144; Final IPO Registration Statement at 13, 144; IPO Prospectus at 13, 147; Sept. 17, 2021 SPO Registration Statement at 13, 142; Final SPO Registration Statement at 13, 141; SPO Prospectus at 13, 141.

- "The culture and focus on people allows [sic] us to retain talent, continuously improve, and gives us an advantage on key people metrics of efficiency, client satisfaction, and low attrition."  Am. Compl. ¶ 170; Apr. 12, 2021 IPO Registration

Statement at 133; May 6, 2021 IPO Registration Statement at 140; June 2, 2021
IPO Registration Statement at 140; Final IPO Registration Statement at 140; IPO
Prospectus at 143; Sept. 17, 2021 SPO Registration Statement at 139; Final SPO
Registration Statement at 138; SPO Prospectus at 138.[16]

Plaintiffs allege that, in actuality, TaskUs did not have "low attrition" because monthly reporting
provided to the ELT showed that global attrition was above 40% in 2020 and that over 50% of
employees left within their first sixty days.  Am. Compl. ¶ 73.  Furthermore, given that data,
Plaintiffs allege it was materially misleading to only disclose the attrition rates for employees
employed by TaskUs for more than 180 days.  *Id.* ¶ 169.

Starting with the first two quoted statements, the Disclosed Attrition Rates for 2019 and
2020 reported in the Offerings SEC Filings were not misleading.  Those filings were transparent
as to the restricted time period of employee attrition being disclosed: each year's Disclosed
Attrition Rate covered only voluntary attrition for employees who were with the company for more
than 180 days.  Indeed, the Spruce Report expressly noted the significance of this restricted period
of disclosure: "TASK cites a turnover metric of 15%, *but qualifies it for employees that have been
with the Company over 180 days.*"  Spruce Report at 8 (emphasis added).  TaskUs did not profess
to disclose in the Offerings SEC Filings its full employee attrition rates (*i.e.*, rates that would
include employees who were with TaskUs for 180 days or fewer).  Revealing only the Disclosed
Attrition Rate to potential investors was a transparent decision made by TaskUs, and one which
certainly could have subjected the company to criticism or further questions.  A reasonable investor
might have wondered why TaskUs's metric excluded voluntary attritions of shorter duration

---

[16] The October 20, 2021 SPO Registration Statement for additional shares to be offered in
the SPO incorporated by reference the Final SPO Registration Statement, and thus included the
same alleged misstatements cited above from the Final SPO Registration Statement.  *See supra*
n.10.

employees and suspected that the attrition rate would be considerably higher accounting for employees who worked 180 days or fewer.  Indeed, that is exactly what the Spruce Report did, "call[ing] on [TaskUs] to clarify why its attrition is qualified for 180 days."  Spruce Report at 35.  But the disclosure here was unambiguous in its scope and cannot reasonably be construed as implying anything about the attrition rate for any subset of employees other than those working at TaskUs for more than 180 days.  *See Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 32 (S.D.N.Y. 2016) (holding that the company's disclosure of its voluntary turnover rate did not mislead as to its involuntary turnover rate).  Plaintiffs thus have failed to allege anything misleading about the first two statements quoted above.

Defendants' lead brief did not address the third statement quoted above, however, including most significantly the last part that TaskUs had "low attrition."  *See* Motion at 14-18.  Prior parts of that third statement reference the company's "culture and focus on people," which would arguably be non-actionable puffery standing alone, *see ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009), but the statement concludes with the more concrete assertion that the company had "low attrition."   While Defendants state in a footnote of their reply brief that they "'directly' contest the falsity of the statement that TaskUs's attrition rate was 'low,'" Reply at 4 n.6, that argument is nowhere to be found in their opening brief.  Plaintiffs argue that Defendants have waived any argument contesting the falsity of this statement, *see* Opposition at 9, and Defendants have not offered any reason why the Court should exercise its discretion to consider an argument raised for the first time on reply. *See Snyder v. Graham*, No. 09 Civ. 10307 (RJS) (KNF), 2012 WL 983536, at *5 (Mar. 22, 2012) ("The Court need not consider a new argument raised for the first time in a reply brief, as arguments presented in this fashion deny the opposing party a fair opportunity to respond." (quotations omitted)); *cf. Azzawi v. Int'l Ctr. for Dispute ADR*, No. 16 Civ. 548 (KPF), 2016 WL 6775437, at

*3 n.4 (S.D.N.Y. Nov. 14, 2016) (exercising discretion to consider argument raised for the first time on reply where the opposing party had not asserted that the argument was waived).  Nor do Defendants devote more than this footnote in their reply to substantively address the alleged falsity of this "low attrition" statement, only cursorily asserting that the statement was not misleading because it referred to the non-misleading Disclosed Attrition Rate, a point reiterated at oral argument, *see* Tr. at 16:18-17:18.  The "low attrition" statement was not made in the context of references to the Disclosed Attrition Rate, however.  Moreover, Plaintiffs' allegations regarding the independent falsity of these "low attrition" statements were clear.  In a subsection of the Amended Complaint titled, "In the IPO, Defendants . . . Falsely Reported to Investors that TaskUs had 'Low Attrition,'" Plaintiffs allege, after recounting that the Offerings SEC filings claimed that TaskUs's differentiated culture gave it "an advantage on key people metrics of efficiency, client satisfaction, and low attrition," that "TaskUs did not have 'low attrition.'"  Am. Compl. at 22, ¶¶ 72-73.  Defendants therefore were on notice of this aspect of Plaintiffs' misstatement theory and have waived any argument at the motion to dismiss stage challenging the misleading nature of the "low attrition" statements in the Offerings SEC Filings.  *E.g.*, *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)).[17]

### ii.    Glassdoor Rating

The IPO SEC Filings boasted that "Glassdoor ranked [TaskUs] number 40 on their 2019 Best Places to Work list among U.S. employers with at least 1,000 employees, and [that TaskUs]

---

[17] Given that Defendants have not fully briefed this issue, and only argue in their reply that the statement referred to the Disclosed Attrition Rate, Defendants have not meaningfully challenged the falsity of the statement that TaskUs had "low attrition," nor have they argued that it is a statement of opinion that is not actionable, so the Court does not reach those questions.  *Cf. Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (explaining when statements of opinion are actionable under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015)).

held a rating of 4.6 out of 5.0 as of March 2021."  Am. Compl. ¶ 181; Final IPO Registration

Statement at 3, 124; IPO Prospectus at 3, 127.  The SPO SEC Filings made substantively the same

claim, touting an even higher rating of 4.7 measured as of June 2021.  Am. Compl. ¶ 181; Final

SPO Registration Statement at 3, 122; SPO Prospectus at 3, 122.  The IPO SEC Filings presented

TaskUs's Glassdoor rating alongside fundamental business metrics such as revenue, net income,

number of clients, and the company's compound annual growth rate for 2017 through 2020 for its

adjusted earnings before interest, depreciation, taxes, and amortization; they also stated that

TaskUs had a "differentiated culture" that was "validated by" TaskUs's Glassdoor rating of 4.6.

Am. Compl. ¶¶ 82-83; Final IPO Registration Statement at graphic page following cover page to

preliminary prospectus, 13; IPO Prospectus at graphic page following cover page, 13.  The IPO

SEC Filings also included the chart reproduced above comparing TaskUs's rating to its

competitors.  Am. Compl. ¶ 84; Final IPO Registration Statement at 130; IPO Prospectus at 133.

The SPO SEC Filings featured a similar graphic.  Am. Compl. ¶ 182; Final SPO Registration

Statement at 128; SPO Prospectus at 128.  The IPO SEC Filings also contained the following

statement and graphic:

> Not only does our focus on culture drive internal metrics, but it boosts our public
> profile and our ability to attract talent.  According to a 2019 Glassdoor analysis,
> having a 1-star higher overall higher rating on Glassdoor attracts talent to a
> company at about six times the rate of paying a $10,000 per year higher salary.  The
> differentiated culture we have created is validated by the following metrics, each
> as of March 2021:



Am. Compl. ¶ 183; Final IPO Registration Statement at 144; IPO Prospectus at 147.  The SPO SEC Filings had the same graphic and statement, only updated with TaskUs's 4.7 Glassdoor rating as of June 2021.  Am. Compl. ¶ 183; Final SPO Registration Statement at 142; SPO Prospectus at 142.

Plaintiffs allege that these statements were materially false and misleading for two related reasons.  First, the statements suggested the Glassdoor rating was a product of a uniquely strong workplace culture rather than a corporate policy requiring new employees to submit ratings.  Am. Compl. ¶ 183.  And second, the statements did not reveal the existence of this policy, which was necessary to make the statements not misleading in the context they were made.  *Id.*  Defendants seek dismissal of claims premised on the company's Glassdoor rating, arguing that, as pleaded in the Amended Complaint, the length of tenure of each rater and the date of rating are both publicly available on Glassdoor, and therefore the information that Plaintiffs argue was misleadingly omitted was "publicly known."  Motion at 11.[18]  Defendants' argument has a few flaws.

The fact that someone, after embarking on substantial effort, could figure out that most of the company's ratings came from new employees does not mean that such information had been digested—and thus had become known—by the public.  The caselaw cited by Defendants does not

---

[18]  Citing Paragraph 101 of the Amended Complaint, Defendants contend that "the Complaint pleads that the length of each rater's tenure and date of rating are publicly available on Glassdoor."  Motion at 11.  Paragraph 101 does not allege, however, that the length of all user's tenure is revealed on Glassdoor.  *See, e.g.*, Am. Compl. ¶ 101 ("Glassdoor's website only displays ten reviews per page; provides only limited search functionality, only allowing searching by general job function (*e.g.*, finance or human resources), job type (*i.e.*, current, part-time, or full-time), location, and language; and does not provide any statistical analysis of trends.").  The prior paragraph of the Amended Complaint explains that Lead Counsel's methodology entailed analyzing "the number of reviews submitted each day, the number of reviews submitted by *employees of different tenures*, and trends in average ratings during particular periods."  *Id.* ¶ 100 (emphasis added).  But the Amended Complaint does not allege that the work tenure of each Glassdoor reviewer was publicly available.  If anything, the Amended Complaint's allegations suggest that Glassdoor users were not required to indicate their time on the job.  *See id.* ¶ 108 ("Specifically, 3,380 reviews were submitted by current TaskUs employees between November 6, 2020 and June 10, 2021, of which 2,892 indicated the tenure of their employment.").

suggest otherwise.  *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation ("Merrill Lynch")*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003) (cited at Motion at 11-12), for instance, involved a situation where the allegedly omitted information was far more accessible or publicly known.  There, the plaintiff alleged that Merrill Lynch failed to disclose conflicts of interest among an investment fund, the investment adviser for the fund, and a third Merrill Lynch affiliated entity that provided analyst reports on some companies that the fund invested in.  *Id.* at 248-52.  The court rejected this argument because the conflicts of interest had been extensively reported by public news sources.  *Id.* at 250-51.  Moreover, with respect to the specific conflict that Merrill Lynch provided investment banking services for some of the companies the fund invested in, that relationship had been publicly disclosed by those companies in their own SEC filings.  *Id.* at 249-50.  *Rubinstein v. Credit Suisse Group AG*, 457 F. Supp. 3d 289 (S.D.N.Y. 2020) (cited at Motion at 12), is similar.  The claims there arose out of an alleged failure by Credit Suisse to adequately disclose risks attendant to investments in securities based on an index that tracked the volatility of the stock market.  *Id.* at 292-93.  The relatively small market for those securities was susceptible to price distortions based on the trading activity of large trading institutions and also prone to spells of illiquidity during which investors would be unable to sell their securities.  *Id.* at 296-99.  Investors sued Credit Suisse, as the issuer of the securities, under Section 11 for failing to adequately disclose these risks.  *Id.* at 292, 295.  The Court dismissed the claims because Credit Suisse's SEC filings repeatedly, and sometimes in bold and underlined language, discussed the potential for price distortion in the securities based on those exact risks.  *Id.* at 296-99.  The court further noted that information about the risks associated with the price of the securities—including the market volatility over the prior decade—was publicly available and was not required to be repeated by Credit Suisse in a pricing supplement to adequately warn investors of the extent and impact of its hedging activities.  *Id.* at 299.

There is no allegation that TaskUs's internal Glassdoor rating policy or the impact of that policy has ever been publicly revealed, whether in the media, in SEC filings, or otherwise, prior to this lawsuit.   And there is a considerable difference between identifying clearly stated information in sixty-six public SEC filings, as was the case in *Merrill Lynch*, and combing through and distilling thousands of Glassdoor ratings and rater profiles.   *Compare Merrill Lynch*, 272 F. Supp. 2d at 250 ("Plaintiff[] . . . identifies 66 different companies held by the Fund where publicly-available SEC filings or other public information disclosed that [Merrill Lynch's broker-dealer affiliate] was performing investment banking services for those companies.") *with* Am. Compl. ¶¶ 109-110 (detailing number of Glassdoor reviews, in total and broken down by tenure, for TaskUs employees from the second half of 2018 through the first half of 2022).

Also unpersuasive is Defendants' contention that Plaintiffs' ability to employ a program to analyze Glassdoor's website "refut[es] the idea that the data-gathering was difficult."  Motion 12 n.6.  The need for Plaintiffs to resort to a computer program to collect the relevant data, *see* Am. Compl. ¶ 100, suggests that this information was not feasibly digestible by someone without the knowledge, ability, or resources to similarly procure a program to scrape Glassdoor's website.  A reasonable investor cannot be expected to have the ability to design or obtain a program to collect information from thousands of different Glassdoor ratings and associated rater profiles.  *Cf. In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580 (LGS), 2020 WL 1329354, at *7 (S.D.N.Y. Mar. 23, 2020) ("While it is generally true that in an efficient market, any information released to the public is presumed to be immediately digested and incorporated into the price of a security, it is plausible that complex economic data understandable only through expert analysis may not be readily digestible by the marketplace." (quoting *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014))).

It then follows from the facts alleged that the Amended Complaint plausibly pleads that TaskUs's disclosures of its Glassdoor ratings and the company's reliance on that metric were misleading.  By repeatedly emphasizing the company's Glassdoor rating, the company conveyed to potential investors that the rating accurately reflected the company's positive workplace culture. More fundamentally, public data on the raters' tenures would not have revealed the alleged reason so many reviews came from new employees: the existence of a policy at TaskUs requiring new employees to submit reviews.  *See, e.g.*, Am. Compl. ¶ 90 (alleging that, in or around October 2018, at the direction of Zimmerman, TaskUs's Vice President of People Operations, FE-2 programmed the company's training software to require new employees to submit a Glassdoor rating after seven days of employment and that, in late 2020, FE-2 updated the software to require a Glassdoor review after one month of employment).  As alleged, this was not a situation where new employees were voluntarily submitting ratings after quickly being impressed by the culture at TaskUs.

Defendants also argue that Plaintiffs fail to allege that TaskUs had a policy forcing new hires to provide particular ratings on Glassdoor (rather than just *a* rating) or that the company's rating would have been lower but for the alleged policy.  Motion at 12.  But even if employees were not required to submit a favorable rating, it is plausible that a reasonable investor would view the Glassdoor ratings differently if they understood the ratings were submitted because of a job requirement that employees submit a rating prior to being fully immersed into the company's culture.  *See* Am. Compl. ¶¶ 93 ("Indeed, FE-1 confirmed that the purpose of requiring reviews during training was to ensure that [TaskUs] received better reviews, as these employees were still excited about [TaskUs] based on management's promises that it was a 'fun place to work,' and had not yet experienced the disappointing reality of working at TaskUs."), 95 (alleging that, "in

employee exit interviews, departing employees . . . indicated that they would have submitted less positive reviews after actually working on client campaigns").

Defendants also argue that the portions of the Offerings SEC Filings stating that TaskUs's Glassdoor ratings reflected its "differentiated culture" and "focus on culture" are non-actionable puffery.  Motion at 13-14.  Standing alone, such general assertions regarding a company's culture arguably may be non-actionable puffery.  *See, e.g.*, *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 205-06.  But as alleged, these statements did not stand alone.  The statements appeared in the same paragraph revealing the Glassdoor rating.  Thus, these statements are part of the overall disclosure regarding the Glassdoor rating, which Plaintiffs have plausibly alleged were misleading.

### 2.   Plaintiffs' Ability to Bring Section 12(a)(2) Claims

Although Plaintiffs have adequately pleaded that the prospectuses in the Offerings SEC Filings contained certain misstatements and omissions, *see supra* III.A.1, the Court also must assess whether Plaintiffs have a valid cause of action under Section 12(a)(2) against TaskUs, Maddock, Weir, and BCP given certain limitations on the statute's scope.  Defendants argue that Plaintiffs are not proper plaintiffs for certain of the Section 12(a)(2) claims and further that none of the named Defendants is a proper defendant for purposes of liability under Section 12(a)(2).[19]

A Section 12(a)(2) claim may be brought only by "persons who have directly purchased the securities . . . in the subject public offering(s), and not in the secondary market."  *Pub. Emps.'*

_____

[19] Although Defendants frame their arguments as challenging Plaintiffs' "statutory standing," they are arguments about whether Plaintiffs are authorized by Section 12(a)(2) to bring their claims.  *See In re CarLotz, Inc. Sec. Litig.*, No. 21 Civ. 5906 (RA), 2023 WL 2744064, at *3 n.2 (S.D.N.Y. Mar. 31, 2023).  While such arguments have occasionally been referred to as implicating statutory standing, they are more properly characterized as arguments about the scope of the cause of action because they do not, as standing does, go to this Court's subject matter jurisdiction.  *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) ("[A] plaintiff must have a cause of action under the applicable statute.  This was formerly called statutory standing." (internal quotation marks omitted)); *In re CarLotz, Inc. Sec. Litig.*, 2023 WL 2744064, at *3 n.2 (quoting *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 402 n.4 (2d Cir. 2018)).

*Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (citing

*Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 578 (1995)).  In addition, Section 12(a)(2) claims may

only be brought against so-called "statutory sellers," a concept governed by the framework the

Supreme Court established in *Pinter v. Dahl*, 486 U.S. 622 (1988).  A statutory seller for purposes

of Section 12 includes (1) "the owner who passed title, or other interest in the security, to the buyer

for value" or (2) someone "who successfully solicit[ed] the purchase [of the security], motivated

at least in part by a desire to serve his own financial interests or those of the securities' owner."

*Id.* at 642, 647; *accord In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359 (citing *Pinter*,

486 U.S. at 642, 647); *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs.*

*Corp.*, 450 F. Supp. 3d 379, 404 (S.D.N.Y. 2020) (explaining that "'privity between the buyer and

seller is no longer required,' and those who solicit sales in question for financial gain will be liable

as statutory sellers under Section 12" (quoting *Com. Union Assur. Co. v. Milken*, 17 F.3d 608, 616

(2d Cir. 1994))).[20]

Neither Lozada nor Oklahoma Firefighters is alleged to have purchased shares directly in

the IPO, and thus neither can bring a Section 12(a)(2) claim based on alleged misstatements and

omissions in prospectuses in the IPO SEC Filings.  *See* Motion at 24-25; Opposition at 28-29 (not

contesting that neither Plaintiff purchased shares through the IPO).  Likewise, Lozada does not

allege that he purchased shares directly in the SPO, so he also cannot bring a Section 12(a)(2)

claim based on alleged misstatements and omissions in a prospectus distributed as part of that

offering.  Oklahoma Firefighters does allege, however, to have purchased shares in the SPO from

Goldman, an underwriter for the offering.  Am. Compl. ¶ 22.  Thus, Oklahoma Firefighters's

---

[20]  In holding that a statutory seller for purposes of Section 12 reaches those who "successfully solicit[ed] the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities owner," the Supreme Court reasoned that "solicitation is the stage at which an investor is most likely to be injured, that is, by being persuaded to purchase securities without full and fair information."  *Pinter*, 486 U.S. at 646-47.

Section 12(a)(2) claims on behalf of itself as to the statements in the prospectuses in connection with the IPO SEC Filings, and Lozada's Section 12(a)(2) claims on behalf of himself as to the prospectuses in connection with the IPO SEC Filings and the SPO SEC Filings, are dismissed.

Plaintiffs nonetheless argue that they can assert Section 12(a)(2) claims on behalf of the putative class arising from the prospectuses in the IPO SEC Filings because the claims are based on "identical misrepresentations" as those that give rise to claims for which Plaintiffs may bring, specifically, (a) Lozada's Section 11 claims based on alleged misstatements and omissions in the registration statements in the IPO SEC Filings and (b) Oklahoma Firefighters's Section 12(a)(2) claims based on alleged misstatements and omissions in the prospectuses in the SPO SEC Filings. Opposition at 28-29.

### i.      Lozada's Section 11 IPO Claims

A named plaintiff may bring claims on behalf of unnamed class members for a different violation of the same statute upon which the named plaintiff rests his claims if that plaintiff "plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (internal quotation marks and ellipsis omitted). Plaintiffs argue that Lozada's ability to bring Section 11 claims relating to the registration statements in the IPO SEC Filings allows him to also bring Section 12 claims regarding the prospectuses in the IPO SEC Filings on behalf of unnamed class members who purchased shares directly in the IPO because the alleged misrepresentations for each set of claims are identical. *See* Opposition at 28-29.[21]

---

[21] Lozada may bring Section 11 claims regarding the IPO because, unlike Section 12(a)(2), Section 11 requires a plaintiff to have purchased shares "traceable to the allegedly defective registration statement." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023); *see also DeMaria*

Adopting Plaintiffs' argument would unreasonably expand the Second Circuit's holding in *NECA-IBEW Health & Welfare Fund*.  It is correct that the alleged misstatements and omissions that form the basis of Lozada's Section 11 claims regarding the IPO SEC Filings are identical to those that would form the basis of Section 12(a)(2) claims on behalf of the putative class regarding the prospectuses in the IPO SEC Filings.  *Compare* Final IPO Registration Statement at 3, 13, 93, 124, 130, 140, 144 *with* IPO Prospectus at 3, 13, 96, 127, 133, 143, 147.  But that is not enough to allow Lozada to bring a Section 12(a)(2) claim on behalf of the putative IPO class.  In *NECA-IBEW Health & Welfare Fund*, the Second Circuit allowed a plaintiff to bring claims on behalf of a class under the same statutes regarding different prospectuses and registration statements; it did not, however, allow the ability to bring class claims that stretch across different statutes.  693 F.3d at 158-65.  Rather, in reaching its holding, the court noted that:

> [O]ne could imagine a series of corporate debt offerings, issued over the course of a year, all of which contained an identical misrepresentation about the issuing company's impending insolvency.  Sections 11 and 12(a)(2) claims brought by a purchaser of debt from one offering would raise a "set of concerns" nearly identical to that of a purchaser from another offering: the misrepresentation would infect the debt issued from every offering in like manner, given that all of it is backed by the same company whose solvency has been called into question.  In that case, the inappropriateness of denying class standing on the happenstance of the misrepresentation's location in one offering versus another seems patent.

*Id.* at 163.  This passage does not allow a plaintiff to bring claims on behalf of a class for one statute when the plaintiff only has a cause of action under a different statute.  Indeed, such a proposition would mark a significant revision of prevailing jurisprudence in this area.  *See In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 496 (S.D.N.Y. 2004) (collecting cases stating the rule that "at least one named plaintiff must have standing to pursue each claim alleged" for a

---

*v. Andersen*, 318 F.3d 170, 178 (2d Cir. 2003) ("[W]e hold that aftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue under § 11 of the 1933 Act.").  The Amended Complaint alleges that Lozada purchased shares "traceable" to the registration statements filed during the IPO.  Am. Compl. ¶ 21.

class action suit); Newberg and Rubenstein on Class Actions § 2:5 (6th ed.) ("Similarly, in a class action suit with multiple claims, at least one named class representative must have standing with respect to each claim . . . ."); *see also In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *25 (S.D.N.Y. Sept. 28, 2012) (holding that the named plaintiff needed to demonstrate a viable cause of action for putative Section 12(a)(2) class claims), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014). And neither of the other two cases that Plaintiffs cite, *see* Opposition at 29, support the outcome they seek. *See In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 77 (S.D.N.Y. 2018) (noting that the lead plaintiff voluntarily dismissed itself after determining that it lacked standing to sue); *N.J. Carpenters Health Fund v. DLJ Mortg. Cap., Inc.*, No. 08 Civ. 5653 (PAC), 2013 WL 357615, at *4 (S.D.N.Y. Jan. 23, 2013) (noting the named plaintiff could bring an action pursuant to the statute under which the putative class claims would be brought). Thus, Lozada cannot bring Section 12(a)(2) claims on behalf of the putative IPO class alleging misstatements or omissions in the prospectuses in the IPO SEC Filings based on his valid Section 11 claims arising from the registration statements in the IPO SEC Filings.

### ii.     Oklahoma Firefighters's Purchase in the SPO

The Court therefore turns to whether the Amended Complaint pleads viable claims under Section 12(a)(2) on behalf of Oklahoma Firefighters against TaskUs, Maddock, Weir, and BCP with respect to the prospectuses in the SPO SEC Filings.

Starting with TaskUs, Plaintiffs advance two theories for why the company qualifies as a statutory seller under Section 12(a)(2). First, the Amended Complaint alleges that TaskUs is an issuer for purposes of 17 C.F.R. § 230.159A ("SEC Rule 159A"), Am. Compl. ¶ 203, and second, Plaintiffs argue that TaskUs is a seller by virtue of having "filed and disseminated" the SPO SEC Filings, Opposition at 29-30 (citing Am. Compl. ¶¶ 122-24, 203). Defendants argue that TaskUs,

which sold no shares in the SPO, "cannot be held liable as a [statutory] 'seller' under [SEC Rule 159A], because that regulation extends the 'seller' definition to issuers only for a *primary* offering of securities' which the SPO is not."  Motion at 25 (emphasis added).  And they argue that there is no allegation that TaskUs disseminated the SPO SEC Filings.  Reply at 12.

TaskUs does not qualify as a seller under SEC Rule 159A.  The Rule provides that "in a primary offering of securities of the issuer, regardless of the underwriting method used to sell the issuer's securities, seller shall include the issuer of the securities sold to a person as part of the initial distribution of such securities."  17 C.F.R. § 230.159A(a).[22]  Plaintiffs argue that the SPO qualified as a "primary offering" because, through the SPO, Maddock, Weir, and BCP converted some of their Class B common stock into Class A common stock.  Opposition at 29 n.16 (citing Dkt. 38-1 at 22).[23]  This argument is unavailing.  TaskUs is not alleged to have sold or offered its securities in the SPO.  Maddock's, Weir's, and BCP's conversions of some of their own shares from Class B to Class A is irrelevant to question of whether TaskUs participated in a "primary offering of securities" in the SPO.  And further, the two cases Plaintiffs rely on to support their position here, *see* Opposition at 29, involved issuers that themselves sold securities in the relevant

---

[22] The SEC issued Rule 159A to clarify the scope of the statutory seller requirement in arrangements where an issuer registers its securities for offering to the public market, but first sells the shares to an underwriter before the shares are sold on the public market.  *See* Securities Offering Reform, 70 Fed. Reg. 44722-01, 44769, 2005 WL 1811282 (Aug. 3, 2005).  Such underwriting arrangements had caused "unwarranted uncertainty" as to whether such issuers could be held liable as statutory sellers given that they would not have directly passed title to public market purchasers.  *Id.*  In adopting Rule 159A, the SEC explained that "an issuer offering or selling its securities in a registered offering pursuant to a registration statement containing a prospectus that it has prepared and filed, or by means of other communications that are offers made by or on behalf of or used or referred to by the issuer can be viewed as soliciting purchases of the issuer's registered securities."  *Id.*

[23] Although the Amended Complaint does not expressly allege that these Defendants converted their Class B shares to Class A shares during the IPO, Defendants do not contest that the shares sold were converted in this manner, *see* Reply at 12, and the SPO Prospectus indicates that this conversion occurred, *see* Dkt. 38-1 at 22.

offering.  *See Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*, No. 19 Civ. 9270 (DLC), 2020 WL 3318029, at *1 (S.D.N.Y. June 18, 2020) ("As part of the offering, IPCI sold 2,775,231 shares of its common stock . . . ."); *In re 2U, Inc. Sec. Class Action*, Nos. TDC-19-3455, TDC-20-1006, 2021 WL 3418841, at *26 (D. Md. Aug. 5, 2021) ("Here, the parties agree that 2U sold its shares. . . .").  Thus, because the SPO allegedly involved Maddock, Weir, and BCP selling their own shares, and TaskUs is not alleged to have offered or sold any securities in the SPO, whether directly or through an underwriter, TaskUs does not qualify as a seller under SEC Rule 159A.

Plaintiffs' second argument—that TaskUs is a seller by virtue of filing and disseminating the registration statements for the SPO—also falls short.  This Court agrees with the weight of authority in this District that the mere preparation and filing of a registration statement does not suffice to establish a defendant as a statutory seller under Section 12(a)(2).  *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 260-61 (S.D.N.Y. 2020) (collecting cases); *Fed. Hous. Fin. Agency v. Stanley*, No. 11 Civ. 6739 (DLC), 2012 WL 5868300, at *4 (S.D.N.Y. Nov. 19, 2012) ("[T]he fact that a defendant assisted in preparing and filing a registration statement is not alone sufficient to impose solicitation liability under Section 12(a)(2)." (citing *Capri v. Murphy*, 856 F.2d 473, 478-79 (2d Cir. 1988)); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010) (concluding that this approach "better reflect[s] both the statutory scheme and the Supreme Court's decision in *Pinter*"); *cf. Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 857 (S.D.N.Y. 2019) (noting that some older cases in this District held that merely signing registration statements is sufficient); *Citiline Holdings*, 701 F. Supp. 2d at 512 (collecting cases reaching that contrary holding).[24]

---

[24] While the Second Circuit has not directly addressed this issue, it appears that other Courts of Appeals are in agreement "that an individual's signing a registration statement does not suffice as solicitation under Section 12(a)(2)."  *Citiline Holdings*, 701 F. Supp. 2d at 512 (collecting cases); *see also In re Am. Realty Cap. Props., Inc. Litig.*, No. 15 MC 40 (AKH), 2015 WL 6869337, at *3 (S.D.N.Y. Nov. 6, 2015) ("The Second Circuit has not addressed the issue of whether an

Under *Pinter*, assuming one is not an owner who passed title or other interest in the security to the buyer, "the term 'seller' must include the person 'who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the security owner.'" *Capri*, 856 F.2d at 478 (quoting *Pinter*, 486 U.S. at 647) (finding the defendants liable under Section 12 where they "prepared *and circulated* the prospectus to plaintiffs and that prospectus omitted material facts which significantly affected the risk undertaken by the investors" (emphasis added) (internal citation omitted)).  Plaintiffs have not alleged any dissemination of the SPO SEC Filings or other promotional efforts by TaskUs beyond filing the documents with the SEC.  *See* Am. Compl. ¶¶ 122-124, 204. Absent further allegations of activities by TaskUs that successfully solicited the purchase of the shares offered in the SPO, TaskUs cannot qualify as a statutory seller. *Cf. Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 522 (S.D.N.Y. 2016) (holding that distributing marketing materials through the defendant's "website and other channels" was insufficient to plead that the defendant was a statutory seller).[25]

Turning to the other Defendants named in Count II, Plaintiffs also do not allege that Maddock, Weir, or BCP passed title or other interest in any securities to Oklahoma Firefighters, so the analysis of whether these Defendants are statutory sellers also turns on the second alternative under *Pinter*.  Each of these Defendants is alleged to have substantial financial motivation for solicitation.  *See Pinter*, 486 U.S. at 647 (concluding that "liability extends . . . to the person who

---

individual's signing of a registration statement itself constitutes solicitation." (internal quotation marks omitted)).

[25] For instance, a defendant may be alleged to have engaged in sufficient active solicitation by participating in a "road show" to market the securities to potential investors.  *See Haw. Structural Ironworkers Pension Tr. Fund*, 422 F. Supp. 3d at 857 (holding that "an allegation that the defendant participated in the preparation of the registration statement and in road shows promoting the IPO, while motivated by the prospect for financial gain, is sufficient to constitute the active solicitation of securities" and collecting cases); *In re WorldCom, Inc. Secs. Litig.*, 294 F. Supp. 2d 392, 423 (S.D.N.Y. 2003) (similar).  There is no allegation that TaskUs conducted a road show regarding the SPO.

successfully solicits the purchase, *motivated at least in part by a desire to serve his own financial interests*" (emphasis added)).  As alleged, via an underwriter, Maddock and Weir "each sold 1,974,799 shares of Class A common stock [in the SPO], reaping net proceeds of over $121 million each," and BCP "sold 8,127,882 shares of Class A common stock [in the SPO], reaping net proceeds of over $499 million."  Am. Compl.  ¶ 133.  The question, therefore, is whether the Amended Complaint sufficiently alleges that any of them in fact successfully solicited the purchases in the SPO.  *See Pinter*, 486 U.S. at 647.

Starting with Maddock and Weir, the Amended Complaint lacks sufficient allegations of solicitation or promotional efforts on their part.  Rather, Plaintiffs rely predominantly on their financial interests and signings of the registration statements for the SPO, which are insufficient to make them statutory sellers under Section 12(a)(2).  Plaintiffs also argue that Maddock and Weir "planned the SPO, prepared the SPO Registration Statement, [and] hired the underwriters," Opposition at 30, but they point only to conclusory allegations to support these arguments, *id.* (citing Am. Compl.  ¶¶ 204, 231).[26]  Further, any efforts by Maddock and Weir to help plan the SPO or prepare the relevant prospectuses would, as pleaded in the Amended Complaint, *see* Am. Compl. ¶ 204 (alleging that Maddock and Weir "assisted in the planning of the" SPO), at most show "mere assistance in another's solicitation efforts," which is insufficient to establish their liability under Section 12(a)(2).  *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp 3d at 245, 261 (quoting *Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575, 681 (S.D.N.Y. 1996)); *accord Stanley*, 2012 WL 5868300, at *4; *see also Pinter*, 486 U.S. at 651 n.27.  For instance, neither Maddock nor Weir is alleged to have participated in a road show marketing the

---

[26] Paragraph 204 merely alleges that the Defendants named in Count II assisted in the planning of the IPO and the SPO, participated in decisions regarding the sale price of the stock and information contained in the prospectuses, and hired and assisted the underwriters of the offerings.  Am. Compl. ¶ 204.  Paragraph 231 is a chart reflecting stock sales by Maddock and Weir in the IPO and the SPO.  *Id.* ¶ 231.

shares offered in the SPO, *see* n.25, or to have made "regular[] appear[ances] before investors and financial news agencies to tout the financial vitality of" those securities, *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 187 (S.D.N.Y. 2003).[27]  In sum, without allegations that Maddock and Weir engaged in or directed the successful solicitation of purchases of securities in the SPO, Plaintiffs only allege their "mere participation in unlawful sales transactions."  *Pinter*, 486 U.S. at 650.  Neither individual therefore is sufficiently alleged to be a statutory seller under Section 12(a)(2).

Plaintiffs' allegations of solicitation as to BCP are slightly different.  Plaintiffs allege that the entire offering was commenced at BCP's direction, pursuant to contractual rights that BCP obtained as part of the IPO.  Am. Compl. ¶ 162 (alleging that BCP had the right to select underwriters and counsel, to "require TaskUs to complete a secondary offering of stock," and to determine the plan of distribution for such an offering).  The Amended Complaint further alleges that the SPO was made pursuant to the Registration Rights Agreement, which "gave BCP the right to control the contents of the Secondary Offering Registration Statement."  *Id.* ¶¶ 162-163.  BCP additionally is alleged to have been "deeply involved in the day-to-day management of TaskUs" as a result of its contractual arrangement with the company.  *Id.* ¶ 160.  Indeed, at the time of the IPO, a third of the company's Board was composed of Blackstone employees.  *Id.* ¶ 158.  Such control, however, does not constitute solicitation, even assuming that BCP played a central role in setting up the SPO.  *See Capri*, 856 F.2d at 478-79 ("While there is no doubt that [defendant] played a major role in setting up the [deal], that is not sufficient to cast [it] as a seller. Instead, plaintiffs must show that [defendant] actually solicited their investment . . . .");  *In re Weight*

---

[27] Plaintiffs allege that during an August 10, 2021 earnings call, Maddock "touted" the company's Glassdoor rating.  Am. Compl. ¶ 119.  Maddock is not alleged to have made any reference to the upcoming SPO in this statement and in fact this earnings call predated the SPO by over two months.  Moreover, and tellingly, Plaintiffs do not cite this conduct in their briefs as constituting solicitation on the part of Maddock.  *See* Opposition at 29-30.

*Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp 3d at 260-61 (finding that a shareholder was not a statutory seller where the shareholder sold shares in an offering that was "conducted as a result of" the shareholder exercising its contractual rights and the offering required the shareholder's consent to the choice of underwriters). As with Maddock and Weir, there are no allegations that BCP engaged in or directed any promotional or marketing efforts for the SPO. In the absence of such allegations to establish successful solicitation of the purchase of securities in the SPO, Plaintiffs have not sufficiently alleged BCP to be a statutory seller under Section 12(a)(2).

Because the Court concludes that none of the Defendants named in Count II are sufficiently alleged to qualify as statutory sellers for purposes of Section 12(a)(2), Count II is dismissed without prejudice.

### B.     Section 10(b) and Rule 10b-5 Claims

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b-5, provides, *inter alia*, that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). To state a claim under Section 10(b), a plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotation marks omitted).

Defendants argue that Plaintiff has failed to adequately plead a misstatement or omission of material fact, that Defendants acted with the requisite scienter, and that any misstatement or omission caused Plaintiffs' losses.  For purposes of their motion to dismiss, Defendants do not dispute that Plaintiffs have sufficiently alleged a connection between the alleged misrepresentation or omission and the purchase or sale of a security, reliance upon such alleged misrepresentation or omission, and economic loss.

### 1.      Material Misstatement or Omission

Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information."  *Matrixx Initiatives*, 563 U.S. at 44.  "Disclosure of an item of information is not required simply because it may be relevant or of interest to a reasonable investor."  *Kleinman v. Elan Corp.*, 706 F.3d 145, 152-53 (2d Cir. 2013) (ellipsis omitted) (quoting *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002)).  Instead, absent an independent duty to speak, disclosure is required "only when necessary 'to make statements made, in the light of the circumstances under which they were made, not misleading.'"  *Id.* (quoting *Matrixx Initiatives*, 563 U.S. at 44). "[W]hether a statement is misleading depends on the perspective of a reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015) (internal quotation marks omitted).

Plaintiffs assert that the same statements discussed above in the context of their Securities Act claims, *see supra* III.A.1.i-ii, were also false and misleading statements and omissions for purposes of the Exchange Act, and they further allege other misstatements and omissions that only violated the Exchange Act.  As for the alleged misstatements and omissions that apply only to their Section 10(b) claims, Plaintiffs point to: TaskUs's repeating of its updated Glassdoor rating in its August 10, 2021 Form 8-K, Am. Compl. ¶ 221; *see* TaskUs Aug. 10, 2021 Form 8-K, Exh. 99.1; Maddock's statement of the company's Glassdoor rating during the earnings call held on August

10, 2021, Am. Compl. ¶ 222; TaskUs again repeating the Glassdoor rating, updated with the higher rating as of September 30, 2021, in its November 10, 2021 Form 8-K, *id.* ¶ 224; *see* TaskUs Nov. 10, 2021 Form 8-K, Exh. 99.1; and Maddock's statements about attrition and the company's Glassdoor rating at an investor conference on November 18, 2021, Am. Compl. ¶ 225.  Plaintiffs contend that these statements were materially misleading for the same reasons argued for the statements in the Offerings SEC Filings.  *See supra* III.A.1.i-ii.

At the November 18, 2021 investor conference, Maddock was asked, "[W]hy is [] TaskUs well positioned to benefit from this demand trend?  [W]hy can't like a large competitor copy your model or what you have done and service some of those clients?  [W]hat's the secret sauce?"  He responded:

> So we publicly reported last year [2020] that we had a 15% attrition rate.  In 2019, it was 26%, but we're well, well below that this year.  We're slightly up from 2020 but closer to 2020 than 2019 in terms of 2021 attrition.  If you look on Glassdoor, as of the end of Q3, we had a 4.7 star rating on Glassdoor.  No one in our space comes even close to that.  You have to look at some of our competitors.  That matters a lot in the environment where there is increasing competition for talent, increasing wage pressure.

Am. Compl. ¶ 225 (alteration in original).  Maddock's emphasis on the Glassdoor rating is plausibly alleged to have been materially misleading for the same reasons noted above, because of TaskUs's failure to disclose the company's policy requiring new employees to submit ratings.  *See supra* III.A.1.ii.  Likewise, Plaintiffs have plausibly alleged that the statements about the company's Glassdoor rating in the August 10, 2021 Form 8-K, during the August 10, 2021 earnings call, and in the November 10, 2021 Form 8-K were materially misleading; these statements were not materially different than those in the Offerings SEC Filings.  *See id.* Maddock's statements at the November 18, 2021 investor conference about the company's attrition rates—*i.e.*, that TaskUs "publicly reported" that in 2020 it "had a 15% attrition rate" and that "it was 26%" in 2019, Am. Compl. ¶ 225—were not misleading, however.  While Maddock did not

qualify the attrition rate by mentioning that it only included employees at TaskUs for more than 180 days, the statement—including its mention of what the company "publicly reported"—can only plausibly be understood to reference the Disclosed Attrition Rates for 2019 and 2020.  *See supra* III.A.1.i.

### 2.   Scienter

To plead scienter, a complaint must allege facts showing "either: 1) a 'motive and opportunity to commit the fraud'; or '2) strong circumstantial evidence of conscious misbehavior or recklessness.'"  *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ATSI Commc'ns*, 493 F.3d at 99).  "A complaint will survive if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* (internal quotations omitted).

### i.   Motive

Sekar's only alleged motive[28] was to benefit from the additional stock compensation he received because of the IPO.  Am. Compl. ¶¶ 234; *see* Opposition at 25-26.  The Second Circuit has explained that "incentive compensation can hardly be the basis on which an allegation of fraud is predicated."  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (brackets omitted); *see also Ganino*, 228 F.3d at 154 (holding that the PSLA adopted the scienter level used by the Second Circuit prior to the PSLRA's passage in 1998).  Plaintiffs thus have not adequately pleaded scienter for Sekar based on motive and opportunity.

---

[28] While the relevant portion of Defendants' brief is titled, "The Complaint Does Not Plead That The Officer Defendants Had A Motive *Or Opportunity* To Commit Fraud," Motion at 19 (emphasis added), they do not argue a lack of opportunity on the part of the Defendants alleged to have violated Section 10(b), *i.e.*, the Officer Defendants and TaskUs, *see id.* at 19-20; *see also* Reply at 7-8.  Corporate officers are generally considered to have the opportunity to commit fraudulent acts based on insider information.  *In re Scholastic*, 252 F.3d at 74.

As to Maddock and Weir, Defendants argue that Plaintiffs have alleged nothing unusual about their respective stock sales, so there is no basis for a finding of scienter.  Motion at 19-20. Plaintiffs respond that Maddock and Weir—as well as BCP—were motivated to propagate material omissions and misstatements by a desire to keep the stock price high because, collectively, they owned 100% of the company's stock before the IPO.  Opposition at 25.  Plaintiffs argue that this motive is further substantiated by the "'unusual,' highly lucrative stock sales" these three Defendants executed during the IPO and the SPO.  *Id.*

To properly allege motive, plaintiffs "must assert a concrete and personal benefit to the individual defendants resulting from the fraud."  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 307-08).  "Motives generally possessed by most corporate directors and officers do not suffice."  *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 420 (S.D.N.Y. 2011) (citing *Kalnit*, 264 F.3d at 139).  "Insider sales of stock may be evidence of scienter if the trades are unusual or suspicious in timing or amount."  *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (citing *Acito*, 47 F.3d at 54). Stock sales by insiders "made a short time before a negative public announcement are suspiciously timed."  *Id.*  Other "[f]actors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."  *In re Scholastic*, 252 F.3d at 74-75.

The amount of profit, change in volume of insider sales, and the number of insiders selling cut in favor of a finding of motive and opportunity.  Maddock and Weir are estimated to have made roughly $155.5 million each through their sales in the IPO and the SPO.  Am. Compl. ¶ 231. All three of TaskUs's shareholders prior to the IPO—Maddock, Weir, and BCP—sold shares in both offerings.  *Id.* ¶¶ 50, 114, 133.  Maddock and Weir also have not made any other sales of their TaskUs stock since the SPO.  *Id.* ¶ 232.

46

On the other hand, as Plaintiffs acknowledge, "[t]hroughout the Class Period, Defendants Maddock and Weir maintained significant ownership stakes in the Company." *Id.* ¶ 151. Specifically, "[p]rior to the IPO, Defendant Maddock and Weir each beneficially owned 16.4% of TaskUs's outstanding securities, and each beneficially owned 13.8% following the IPO. Following the [SPO], Defendants Maddock and Weir each held 11.9% of TaskUs's outstanding securities . . . ." *Id.*[29] Moreover, their sales did not shortly precede a negative announcement involving the company: their last sales occurred in the SPO roughly three months before the Spruce Report was released. *Compare id.* ¶ 231 (timing of Maddock and Weir stock sales, with final sales occurring on October 25, 2021) *with id.* ¶ 257 (Spruce Report released on January 20, 2022); *cf. In re Oxford Health Plans*, 187 F.R.D. at 139-40 (finding scienter where stock sales preceded negative announcement). The absence of a negative disclosure closely following insider stock sales weighs against a finding of scienter based on such sales. *E.g.*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008) ("The lapsing of nearly three months between Take-Two's issuance of the alleged false statement and the lion's share of Winters's stock sales, and of approximately four months between these substantial sales and the revelation of the alleged falsity, inescapably attenuates any inference of scienter that may be drawn in Lead Plaintiffs' favor."); *see Reilly v. U.S. Physical Therapy, Inc.*, No. 17 Civ. 2347 (NRB), 2018 WL 3559089, at *14 (S.D.N.Y. July 23, 2018) (collecting cases); *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 595-96 (S.D.N.Y. 2006) (same).

---

[29] The sales amount to 23.3% of each of these Defendants' individual holdings. Courts have found scienter in cases involving higher and lower sales percentages. *See, e.g.*, *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592-93 (S.D.N.Y. 2011) (cataloging cases coming out different ways on scienter with varying ownership percentages). At oral argument, Plaintiffs relied on *In re Scholastic* to argue that motive is adequately pleaded. *See* Tr. at 51:23-52:2. But in *In re Scholastic*, the defendant "sold 80 percent of his holdings . . . ." 252 F.3d at 75.

In the end, the more plausible inference regarding Maddock's and Weir's stock sales is that, as co-founders of a highly successful company, these individuals reasonably sought to profit from that success in the IPO and the SPO.  Any inference of fraudulent motive is undercut by the fact that Maddock and Weir retained significant ownership stakes in the company after the two offerings.  Nor is there any suggestion that they expected any negative news to emerge regarding the integrity of the company's Glassdoor ratings, the company's policy requiring new employees to submit Glassdoor reviews, or the company's attrition numbers, and Plaintiffs make no allegations that the company restated its financials or otherwise updated its public disclosures following the Spruce Report.  Accordingly, although the alleged significant stock sales by Maddock and Weir cut to some degree in favor of establishing motive, Plaintiffs have not adequately pleaded scienter as to Maddock and Weir based on motive and opportunity alone.

### ii.    Conscious Misbehavior or Recklessness

Defendants also argue that the Amended Complaint lacks sufficiently particularized allegations to show conscious misbehavior or recklessness because its allegations fail to establish that the Officer Defendants were aware of the data omitted from disclosures regarding the company's attrition rate that Plaintiffs claim rendered those disclosures materially misleading.  Motion at 20-22.  In addition, Defendants note the absence of any allegation that the Officer Defendants were "aware of, let alone approved" the Glassdoor policy.  *Id.* at 22.  They also restate their retort that Plaintiffs fail to allege the Glassdoor rating was manipulated in the first place, which logically would mean the Officer Defendants could not have possessed scienter for any statements about that rating.  *See id.*  Plaintiffs respond that they have adequately alleged scienter regarding the "attrition statements and omissions . . .  based on the monthly reports provided to the ELT, including Defendants Maddock and Sekar, and the Officer Defendants' strong focus on and statements about these metrics."  Opposition at 23.  Plaintiffs argue that "[i]n advance of the ELT's

48

monthly meetings, Defendants Maddock and Sekar received monthly reports in 2020 that detailed attrition rates above 40% and included total hires and terminations for each month." *Id.* at 23-24 (citing Am. Compl. ¶¶ 56, 62, 64). As for the Glassdoor rating, Plaintiffs argue the policy was either known or obvious to the Officer Defendants given its breadth, Maddock's repeated emphasis on the company's Glassdoor rating, and an instance in which another senior executive, Zimmerman who was the Vice President of People Operations, said she would raise concerns about the policy with Maddock. *Id.* at 24-25.

Given the absence of a finding of scienter based on motive and opportunity, Plaintiffs must show "strong circumstantial evidence of conscious misbehavior or recklessness." *Emps.' Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 306 (quoting *ATSI Commc'ns*, 493 F.3d at 99). The latter requires a showing of "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (quotations omitted). Recklessness has also been defined as "at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 308). "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Emps.' Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 306 (internal quotations marks omitted). Where "Plaintiffs cannot make the motive showing, . . . the strength of the circumstantial allegations must be correspondingly greater." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 198-99 (internal quotations marks omitted). Assessment of whether conscious misbehavior

or recklessness has been adequately plead "is a highly fact-based inquiry," *Kalnit*, 264 F.3d at 142, and one that must "analyz[e] scienter holistically," *Setzer*, 968 F.3d at 213 n.11. *Accord Tellabs*, 551 U.S. at 326 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.").

The analysis as to Weir is relatively straightforward. There are no specific allegations that Weir received information regarding employee attrition at TaskUs or the company's Glassdoor ratings that either contradicted or rendered statements on either topic false or misleading. Plaintiffs do not allege that Weir was a member of the ELT, which is the primary forum where the other Officer Defendants allegedly received attrition data. And there are no allegations that Weir received reports about attrition outside of the ELT. Nor are there allegations of Weir receiving reports regarding the company's Glassdoor ratings, and, unlike Maddock, Weir is not alleged to have spoken publicly about those ratings. While Weir allegedly signed the registration statements filed for each offering, *e.g.*, Am. Compl. ¶¶ 26, 124, merely signing such documents does not suffice for scienter. *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015). Plaintiffs have therefore failed to plead scienter as Weir.

The scienter analysis, at least with respect to the attrition data, differs for Maddock and Sekar because, among other reasons, both were allegedly members of the ELT. *E.g.*, Am. Compl. ¶ 56. To sufficiently plead scienter, Plaintiffs must show that Maddock and Sekar "actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants were aware of certain information, and mere allegations that defendants would have or should have had such knowledge is insufficient." *Glaser*, 772 F. Supp. 2d at 590-91 (internal quotation marks omitted). Plaintiffs' allegations that Maddock and Sekar actually possessed TaskUs's attrition data rely heavily on the accounts of the FEs. "Courts . . . will credit confidential source allegations, generally, in two situations. The first is when those sources' positions and/or

50

job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations.  Second, when independent adequately plead factual allegations corroborate a confidential source's statements, the requirement of a description of the source's job is loosened."  *Id.* at 590 (internal quotation marks and brackets omitted).

Defendants urge the Court to disregard the FEs' allegations in its scienter analysis, dismissing the FEs as "low-level employees who had no insight into what the Officer Defendants were focused on."  Motion at 21 (internal quotation marks omitted).  But while FE-1, as a former HRIS specialist and HR generalist, Am. Compl. ¶ 57, may not have been on the officer level at TaskUs, the specific information attributed to FE-1, combined with FE-1's position at the company, allows for the reasonable inference that the ELT received and possessed knowledge of attrition data that indicated TaskUs did not have "low attrition."  *See In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580 (LGS), 2018 WL 2382600, at *10 (S.D.N.Y. May 24, 2018) (finding that the inference of scienter was not undermined by the fact that "some of the CW[]s lacked direct contact with the Individual Defendants" where two of the confidential sources did not "opin[e] about facts as to which they had no personal knowledge" but rather "detailed the types of relevant information made available to senior executives" and confirmed that the information was "discussed at monthly meetings").  As alleged, FE-1's reports showing the Total Attrition Rate (revealed by use of a pivot table), total terminations, and total hires were provided to Jim Maddock.  Am. Compl. ¶¶ 58-61.  Jim Maddock told FE-1 that "he would use the results in his presentations to the ELT" and also told FE-1 that the ELT asked him "about the Company's attrition rate and how many people were being hired."  *Id.* ¶¶ 61, 139(iii).  As alleged, the monthly reports to the ELT, which were compiled with information from FE-1, contained not only "TaskUs's attrition rate," but also "the number of terminations and the number of hires."  *Id.* ¶ 62; *see also id.* ¶¶ 139(iv) ("In advance of the ELT's monthly meetings during 2020, Jim Maddock

emailed PowerPoint presentations to the ELT members showing attrition rates above 40% globally."), 139(v) ("The reports to the ELT included the number of terminations and the number of hires, which in 2020 typically included at least 400 terminations and 1,000 hires per month for the U.S. and Philippines alone.").

The Amended Complaint contains various other allegations sourced to FE-1 that reflect Maddock's knowledge of attrition data beyond the Disclosed Attrition Rate.  In July 2020, Maddock requested a specific report concerning attrition within the HR department.  Am. Compl. ¶ 68.  A few months later, in October 2020, Maddock made an urgent request for a headcount report for the year-to-date, demanding the data by noon the following day.  *Id.*  FE-4 also reported that a video was circulated within TaskUs in mid-2019, which featured Maddock instructing employees to make sure that anyone they referred to work at the company was "going to stick around and not just quit."  *Id.* ¶ 69.  This direction was given because, as alleged, "elevated levels of departures—especially early in employment—reduced TaskUs's revenues and profitability." *Id.*  Recruiters similarly were graded not only on how many employees they brought on board, but also on how many of those employees stayed at the company.  *Id.* ¶ 139(vii).  Plaintiffs also allege considerable detail as to FE-1's position and responsibilities, *id.* ¶¶ 57-58, 139(i), as well as corroboration from other former employees for certain aspects of FE-1's information, *e.g.*, *id.* ¶¶ 89, 91, 95, 140(iii), which further bolsters the strength of FE-1's reporting.  *See, e.g.*, *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637-38 (S.D.N.Y. 2010) (noting that descriptions of witnesses were sufficiently detailed "to allow the Court to conclude that a person in the position of each of the witnesses would have had access to the information alleged").  Considered together, these allegations show that the company's senior management, in particular Maddock, possessed information concerning the company's Total Attrition Rate.[30]

---

[30] While Defendants argue that the data provided to the ELT did not reveal that the

FE-1's information therefore is alleged to be sufficiently reliable, even in the absence of FE-1 having direct contact with Maddock or Sekar. *See In re Avon Sec. Litig.*, No. 19 Civ. 1420 (CM), 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019) ("The notion that [former employees] cannot be believed because none had direct contact with any individual Defendant is contrary to law."); *cf.*, *Plumbers & Pipefitters Nat'l Pension Fund*, 89 F. Supp. 3d at 615-16 (finding scienter sufficiently pleaded where former employees interacted directly with an individual defendant's predecessor and would therefore be "highly probable" to interact with the individual defendant and "attest[ed] to the participation of the individual defendant[]" in the alleged fraud (internal quotation marks omitted)). Viewed holistically, the allegations from FE-1—particularly those concerning the data FE-1 provided to Jim Maddock and Jim Maddock's confirmation that he then presented that information to the ELT—allow for the plausible inference that the Total Attrition Rate was presented to the ELT. *Cf. In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *3, 10 (finding scienter where allegations were based on first-hand knowledge that information was in a system available to the individual defendants, the relevant data was discussed at monthly meetings attended by the individual defendants, and the defendants had failed to comply with generally accepted accounting principles in their SEC filings). Thus, as to Maddock,

---

Disclosed Attrition Rate was wrong, they do not appear to contest in their motion that the company's overall employee attrition was high. *See* Motion at 21-22 ("Plaintiffs argue that these presentations revealed TaskUs had a high Total Attrition Rate. But . . . that does not reveal that the Attrition Rate statements were wrong, and TaskUs was not legally required to disclose the Total Attrition Rate."). Rather than presenting arguments defending the "low attrition" statement, Defendants' scienter arguments focus on whether the ELT is credibly alleged to have been presented with the Total Attrition Rate. But, as discussed, Plaintiffs' allegations concerning the "low attrition" statement, which appeared in the IPO SEC Filings and the SPO SEC Filings in a manner that was not tied to the Disclosed Attrition Rate, *see* Apr. 12, 2021 IPO Registration Statement at 133; May 6, 2021 IPO Registration Statement at 140; June 2, 2021 IPO Registration Statement at 140; Final IPO Registration Statement at 140; IPO Prospectus at 143; Sept. 17 SPO Registration Statement at 139; Final SPO Registration Statement at 138; Oct. 20, 2021 Registration Statement at 2; SPO Prospectus at 138, survive dismissal, even if Plaintiffs' allegations concerning the Disclosed Attrition Rate do not. *See supra* III.A.1.i.

Sekar, and TaskUs,[31] Plaintiffs have adequately pleaded scienter regarding the statement that the company had "low attrition."

The scienter analysis is different as to the Glassdoor ratings, however.  There are no specific allegations that either Maddock or Sekar was ever informed of the company policy. Plaintiffs principally rely on two cases to argue that it is implausible that Maddock and Sekar did not know about the policy and that scienter can be imputed to Maddock because he had "a duty to familiarize himself with the basis of his statements."  *Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 390 (S.D.N.Y. 2011) *aff'd*, 776 F.3d 94 (2d Cir. 2015), *and aff'd*, 598 F. App'x 25 (2d Cir. 2015); *id.* at 389 ("While officers cannot be imputed with knowledge about all transactions which occur at a corporation, they do have a duty to familiarize themselves with the core operations of the Company."); *In re Wells Fargo & Co. Shareholder Derivative Litig.*, 282 F. Supp. 3d 1074, 1099-100 (N.D. Cal. 2017) (finding that it was "implausible that the Director Defendants were unaware of the [alleged fraud] given the extent of the alleged fraud and the number of red flags"); *see* Opposition at 24-25.  Those cases, however, involved operations central to the relevant companies' businesses and far-reaching, undisclosed negative facts.  *Stratte-McClure* concerned allegations of understated mark-downs of $2.5 billion related to the deterioration in Morgan Stanley's holdings of subprime mortgages.  784 F. Supp. 2d at 389.  *In re Wells Fargo & Co. Shareholder Derivative Litigation* involved allegations about the national scandal regarding wide-spread falsified account creation practices at Wells Fargo.  282 F. Supp. 3d at 1082-83, 1100-01.

---

[31] The scienter of management level employees is usually sufficient to impute scienter on a corporation.  *See, e.g.*, *Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*, No. 22 Civ. 8228 (JSR), 2023 WL 4744197, at *6 (S.D.N.Y. July 24, 2023) ("The scienter of [two officers of the corporation] can be imputed to the corporation because they are management-level employees that made the alleged misstatements.").  Defendants argue that Plaintiffs fail to allege corporate scienter only because the Amended Complaint does not adequately plead scienter as to the Officer Defendants and "does not allege scienter against anyone else who might otherwise serve as a proxy for TaskUs's corporate scienter."  Motion at 22.

While Maddock allegedly emphasized the importance of the Glassdoor ratings, Am. Compl. ¶ 136, a company's Glassdoor rating is not comparable to the consequential nature of the information at issue for the two businesses in *Stratte-McClure* or *Wells Fargo*.

At oral argument, Plaintiffs additionally asserted that they adequately plead scienter because the existence of the Glassdoor policy was "information that was possessed by the company that [the Officer Defendants] had access to," relying on *In re Scholastic*, 252 F.3d at 76.  Tr. at 43:17-44:3.  But the complaint in *In re Scholastic* "contain[ed] detailed allegations as to what defendants knew on a daily, weekly and monthly basis" on the topic of the alleged fraud.  252 F.3d at 76.  In contrast, there are no allegations in the Amended Complaint of FE-1 reporting that any information regarding the company's Glassdoor rating policy was included in Jim Maddock's presentations to the ELT, and there are no particularized allegations that the Officer Defendants were aware of the Glassdoor policy.  Plaintiffs therefore have failed to allege scienter as to all three Officer Defendants with respect to the Glassdoor ratings.  Because scienter is lacking for the Officer Defendants as to the Glassdoor policy, scienter is also lacking as to company, given Plaintiffs' absolute reliance on the scienter of the Officer Defendants to establish corporate scienter.  *See supra* n.31.

### 3. Loss Causation

The Court now turns to the last element for a Section 10(b) violation, loss causation.  To carry their burden on loss causation, Plaintiffs must allege "that the misstatement or omission [in question] concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).  Plaintiffs allege that the Spruce Report's estimate "that TaskUs suffered from 46% attrition in 2019" revealed that TaskUs had grossly misstated its attrition rate for 2019 and "necessarily called into question the 2020 figure."  Am. Compl. ¶ 258.  The Amended Complaint then points to a quote in

the report from "a former TaskUs executive who broadly stated that 'the attrition is significantly worse than TaskUs had publicly reported.'" *Id.*[32]

As discussed, Plaintiffs' Section 10(b) claims as to the Glassdoor ratings fail because Plaintiffs have not adequately pleaded scienter. *See supra* III.B.2. Such claims are additionally deficient in that Plaintiffs have failed to adequately allege loss causation with respect to the Glassdoor rating. There is no allegation that the company's manipulation of its Glassdoor rating was ever publicly revealed prior to this lawsuit. Plaintiffs argue that the Spruce Report "also revealed that Defendants' prior statements regarding TaskUs's purportedly high Glassdoor rating . . . were false." Am. Compl. ¶ 259. But Plaintiffs cite no portion of the Spruce Report to support that claim, nor does such an assertion appear in the Spruce Report. Plaintiffs further argue that "[b]y revealing that TaskUs suffered from a far higher attrition rate than it had previously claimed, the [Spruce] Report revealed that TaskUs was no different from its BPO peers, calling into question the integrity of TaskUs's purportedly industry-leading Glassdoor rating and the veracity of Defendants' prior statements about the Glassdoor rating." *Id.* This argument is tenuous at best. Plaintiffs cite no reporting or other sources questioning the integrity of TaskUs's Glassdoor rating following the Spruce Report or indicating that the details of TaskUs's Glassdoor rating were publicly exposed prior to the analysis conducted by Lead Counsel as part of this litigation. As the only alleged drop in TaskUs's price followed the publication of the Spruce Report, which did not question the integrity of the company's Glassdoor rating, Plaintiffs have not met their burden on loss causation as to the Glassdoor rating.

---

[32] Plaintiffs assert that they do not need to plead loss causation with particularity, and instead only must meet the lower standard prescribed by Federal Rule of Civil Procedure 8. Defendants did not contest this assertion, and application of Rule 8 accords with the general practice in this Circuit. *See Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90 v. Intercept Pharms., Inc.*, No. 21 Civ. 36 (LJL), 2022 WL 837114, at *23 (S.D.N.Y. Mar. 21, 2022) (collecting cases). The Court therefore assumes—without deciding—that Rule 8 applies to the issue of loss causation.

Whether Plaintiffs have met their burden for the attrition rate is less straightforward.  As discussed, the misleading statements in this regard are the statements in the Offerings SEC Filings that the company had "low attrition."  *See supra* III.A.1.i, III.B.1.  The Spruce Report did discuss TaskUs's attrition rate, claiming that the company's publicly disclosed figures were misleading, and basing that information on figures disclosed in a draft prospectus and on an interview with a former TaskUs executive.  *See* Spruce Report at 37.

Information contained in public SEC filings usually cannot later serve as the basis for a corrective disclosure.  *See Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013); *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 496 (S.D.N.Y. 2016); *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 177-79 (E.D.N.Y. 2019).  This is an application of the more general principle that loss causation, when alleged through a corrective disclosure, requires that previously non-public information be revealed.  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511-13 (2d Cir. 2010).  Yet, a report that conducts sophisticated analysis of accounting disclosures in SEC filings can be a corrective disclosure.  *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *7-8; *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 324 (S.D.N.Y. 2009) ("[I]nvestors need not cobble together information from various parts of the Registration Statement to uncover material information." (citing *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 171 (1994)).  Reports based on publicly filed information that are sufficient to serve as corrective disclosure are, however, "the exception, not the rule."  *Meyer*, 710 F.3d at 1199 n.10 (citing *In re Winstar Commc'ns*, No. 01 Civ. 3014 (GBD), 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006)).  The Spruce Report calculated the attrition rate by relying on publicly available and straightforward information in a publicly filed draft prospectus concerning the total number of hires in 2019.  Disclosure of that information in the Spruce Report, standing alone, is insufficient to plead loss causation.

But the Spruce Report also relied on statements attributed to a former TaskUs "executive" to argue that the company had been making "[p]otentially [m]isleading [e]mployee [a]ttrition [c]laims." Spruce Report at 35. Short seller or analyst reports that include interviews with employees have been found to be based on non-public information. *See Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020) (finding a short seller report a sufficient basis for pleading loss causation where the report included "numerous interviews" with former employees, analysis of filings in a different language, and Chinese court judgments); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *7 (finding a stock-analyst report based on, *inter alia*, statements from management to be a corrective disclosure). Here, the statements attributed to the former executive suggested that TaskUs was misrepresenting its attrition rate, including whether the rate was in fact "low": the former TaskUs executive thought attrition was "significantly worse" than what the company was reporting. Spruce Report at 36.

Defendants argue that Plaintiffs cannot rely on these statements from the former TaskUs executive regarding the company misstating its attrition rate because Plaintiffs do not allege that the Spruce Report's recitation of those statements drove the stock price down. Reply at 11. Defendants maintain that Plaintiffs only alleged that the 46% attrition rate calculated in the Spruce Report is what triggered the stock drop. *Id.* (citing Am. Compl. ¶ 258). But the very paragraph of the Amended Complaint that Defendants cite also notes that the Spruce Report "quoted a former TaskUs Executive who broadly stated that 'the attrition is significantly worse' than TaskUs had publicly reported." Am. Compl. ¶ 258.

According to the Spruce Report, this former executive also stated, however, that TaskUs's alleged problems with attrition were "not worrisome from a competitive standpoint because I think that that's pretty much standard across the business." Spruce Report at 36. This suggests that the information revealed by this portion of the Report, at least from the former executive's perspective,

may not have driven any stock drop. But resolving whether the revelation from the former executive in fact drove the stock drop, and if so to what extent, is not appropriate on a motion to dismiss. *Cf. Lentell*, 396 F.3d at 174 (noting that assessing whether the alleged loss "was caused by an intervening event, like a general fall in the price of internet stocks . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion" (internal quotation marks omitted)). Indeed, it is possible the market disagreed with the former executive's view that high attrition was not a competitive problem. The Spruce Report noted that other companies in the BPO industry were reporting increased attrition, whereas TaskUs was reporting decreased attrition. Spruce Report at 37 ("Industry bellwether Cognizant Technology is calling out rising voluntary attrition to 33% and increased costs. Is TASK immune from industry trends?"). If TaskUs were, in fact, in line with the industry trend asserted in the Spruce Report, that might suggest that its business was weaker than disclosed, which plausibly could result in a drop in the stock price. At this stage, that is sufficient.

Accordingly, the Court finds that the Amended Complaint sufficiently alleges loss causation with respect to the statements that TaskUs had "low attrition," but not as to the statements regarding the company's Glassdoor rating.

## C.   Sections 15 of the Exchange Act, Section 20 of the Securities Act, and Section 20A of the Securities Act Claims

Plaintiffs also allege control person liability under Section 15 of the Securities Act against the Board Defendants, the Officer Defendants, and BCP, Am. Compl. ¶¶ 210-217, and control person liability under Section 20(a) of the Exchange Act against the Officer Defendants, *id.* ¶¶ 269-270, and Oklahoma Firefighters allege insider trading liability under Section 20A of the Exchange Act against Maddock and Weir, *id.* ¶¶ 271-277. The control person provisions impose liability on those who "control" a primary violator of the Securities Act and the Exchange Act*, see* 15 U.S.C. § 77o (Section 15); 15 U.S.C. § 78t(a) (Section 20(a)), and Defendants do not dispute the named

Defendants' control, *see* Motion at 25.  Section 20A requires a predicate violation of the Exchange Act. 15 U.S.C. § 78t-1(a) (Section 20A); *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 703 (2d Cir. 1994) ("[T]o state a claim under § 20A, a plaintiff must plead a predicate violation of the '34 Act or its rules and regulations.").

Because Plaintiffs have established a primary violation of Section 11 of the Securities Act, *see supra* III.A, which serves as a predicate primary violation for Section 15, Plaintiffs' Section 15 claims survive.  Because Plaintiffs' Exchange Act claims against Weir are dismissed for lack of scienter, their Section 20(a) and Section 20A claims against him necessarily fail.  *See Evoqua Water Techs. Corp.*, 450 F. Supp. 3d at 429.  Plaintiffs have, however, sufficiently pleaded Section 10(b) claims as to Maddock and Sekar with respect to the "low attrition" statement, so their Section 20(a) claims against Maddock and Sekar and their Section 20A claim against Maddock survive, subject to the same limitation.

## D.      Leave to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Plaintiffs have asked the Court for leave to amend their Amended Complaint should the Court rule in Defendants' favor.  Opposition at 30. Because the Amended Complaint is the first complaint submitted by Oklahoma Firefighters, and the first following Lozada's appointment as Lead Plaintiff, the Court grants leave to amend.  The Court emphasizes that Plaintiffs should only file a Second Amended Complaint if they are able to remedy the pleading deficiencies identified herein.

## IV.   Conclusion

For the stated reasons, Defendants' motion to dismiss is granted in part and denied in part. To recap:

- Count I (Section 11 of the Securities Act claims against TaskUs, Maddock, Weir,

Sekar, Dixit, Mehta, Kumar, and Reses) survives only with respect to the statements in the registration statements of the Offerings SEC Filings that the company had "low attrition" and regarding the company's Glassdoor rating.

- Count II (Section 12(a)(2) of the Securities Act claims against TaskUs, Maddock, Weir, and BCP) is dismissed without prejudice.

- Count III (Section 15 of the Securities Act claims against Maddock, Weir, Sekar, Dixit, Mehta, Kumar, Reses, and BCP) survives subject to the confines of Count I described above.

- Count IV (Section 10(b) of the Exchange Act and SEC Rule 10b-5 claims against TaskUs, Maddock, Weir, and Sekar) is dismissed without prejudice as to Weir.  Count IV survives as to TaskUs, Maddock, and Sekar, but only with respect to the statements in each of the Offerings SEC Filings that the company had "low attrition."

- Count V (Section 20(a) of the Exchange Act claims against Maddock, Weir, and Sekar) is dismissed without prejudice as to Weir, but survives as to Maddock and Sekar subject to the confines of Count IV described above.

- Count VI (Section 20A of the Exchange Act claims against Maddock and Weir and only brought by Oklahoma Firefighters) is dismissed without prejudice as to Weir, but survives as to Maddock subject to the confines of Count IV.

In the event Plaintiffs decide to file another amended complaint, they must file it within thirty days of this Opinion and Order.  The parties are also hereby ordered to appear for an Initial Pretrial Conference in accordance with Rule 16 of the Federal Rules of Civil Procedure on February 16, 2024, at 2:00 p.m., in Courtroom 12D at Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007.  No later than seven days prior to the conference, the parties shall submit a proposed case management plan and scheduling order, a

template of which can be found here: https://www.nysd.uscourts.gov/hon-john-p-cronan.   The

Clerk of Court is respectfully directed to close the motion pending at Docket Number 32.

SO ORDERED.

Dated: January 5, 2024
New York, New York

_____
JOHN P. CRONAN
United States District Judge