```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK
           ------------------------------:
           HUMBERTO LOZADA, Individually : Case No.: 22-cv-1479
           and on Behalf of all others   :
           similarly situated, et al.,    :
                         Plaintiffs,      :
                  v.                      :
           TASKUS, INC. et al.,           : New York, New York
                         Defendants.      : June 18, 2024
           ------------------------------:
```

                 TRANSCRIPT AND STATUS CONFERENCE HEARING

                  BEFORE THE HONORABLE GARY STEIN

                  UNITED STATES MAGISTRATE JUDGE


           APPEARANCES:

           For Plaintiff:       BLEICHMAR, FONTI & AULD LLP
                                BY: Joseph A. Fonti, Esq.
                                    Evan Kubota, Esq.
                                    Thayne Stoddard, Esq.
                                    Sasha Slayton, Esq.
                                    Benjamin Burry, Esq.
                                300 Park Avenue - Suite 1301
                                New York, New York 10022


           For Defendants:      SIMPSON THATCHER & BARTLETT LLP
                                BY:  Jonathan K. Youngwood, Esq.
                                     Janet Gochman, Esq.
                                     Jared Meyer, Esq.
                                425 Lexington Avenue
                                New York, New York 10017


           Proceedings recorded by electronic sound recording;
           Transcript produced by transcription service

              AMM TRANSCRIPTION SERVICE - 631.334.1445

THE DEPUTY CLERK:  In the matter of 22-cv-1479; Lozada v. TaskUs, Inc., et al., Counsel, would you please state your name for the record, starting with the plaintiff.

MR. FONTI:  Good morning, Your Honor. Joseph Fonti, Bleichmar Fonti & Auld, here for the plaintiffs.  And with me today are my colleagues, Evan Kubota, Thayne Stoddard, Sasha Slayton and Benjamin Burry.

THE COURT:  Good morning to all of you.

MR. YOUNGWOOD:  Good morning, Judge Stein. Jonathan Youngwood for the defendants.  With me in my office, but not separately logged in, are Janet Gochman and Jared Meyer.

THE COURT:  Good morning to all of you as well.

Okay.  We are here for a conference on a discovery dispute.  I have received and read the letters dated May 31st, June 5th and June 7th from the parties.

My initial question is, given that the last letter is dated June 7th, do you have any updates for me?  Have any of the issues that were still extant as of the time of June 7th now been resolved, or are all those issues still in dispute?

MR. FONTI:  I believe all those are still in dispute, Your Honor.

MR. YOUNGWOOD:  I don't mean to disagree at the outset, but, Your Honor, we have now produced the ELT spreadsheets for the time period, full time period that's been requested.  That should resolve at least some of that part of the dispute.

THE COURT:  So not just for 2021, but also for 2020 and the first couple months of 2022?

MR. YOUNGWOOD:  That's correct, Your Honor. I will say there are links embedded in them.  I expect the plaintiffs to make requests for some of those links, and we will satisfy those requests if they are reasonable, as required by the ESI protocol.  So they don't have everything they want. I'm sure of that.

But we have produced the -- I wanted to say spreadsheets, but I understand, at least for some months, there were documents, so I don't want to be sloppy with my words, but we've produced the Core material for the full time period.

THE COURT:  Your June 5th letter indicated that you were aiming to produce the links associated with the 2021 spreadsheet by June 7th.  Did you do that or you did not do that?

MR. YOUNGWOOD:  And we have done that.

THE COURT:  Okay.

MR. FONTI:  Your Honor --

MR. YOUNGWOOD:  We have not produced all the links for 2020 or for 2022.  And, Your Honor, the reason for that is, first, it's a heck of a lot of work; and second, pursuant to ESI protocol, we're not required to automatically produce links.  We're required to entertain reasonable requests.  I will say that I think a request for the links within the ELT spreadsheets, as long as it's for response material, I would think would be reasonable and we'll satisfy it.

So I'm not trying to be cute, but we wanted to get what we could get out as quickly as we could.  So I believe they have all the responsive links for 2021.  They have all the spreadsheets or Word documents that lead to links for '20 and 2022.  I'm sure they'll make a request for links to follow, and we'll satisfy it as quickly as we possibly can.

THE COURT:  Mr. Fonti, do you make a request now for the links associated with the 2020 and 2022 spreadsheets, or do you need to review them first before deciding what to request?

MR. FONTI:  I think as a fundamental basis,

AMM TRANSCRIPTION SERVICE - 631.334.1445

we would say that, yes, we need all of the documents that are relevant to the case that went to the ELT, so --

THE COURT:  I understand you're raising a question as to whether the defendants need to go beyond the spreadsheets and the links in the spreadsheets, but I'm asking now about the links.

MR. FONTI:  Yeah.  So we are making that request.  And I believe if Mr. Youngwood is referring to a correspondence we got about 50 minutes ago representing that the production was made, I've not seen it.  It has been uploaded.  It's something that is, if that's what he's referring to, we have no way -- or, obviously, I take his representations as good faith, but we haven't assessed any of it.  It hasn't even been uploaded.  It was produced less than an hour ago.

But, yes, I think we have stated our position as to the Excel spreadsheet that represents what went to the ELT.  All of that information is relevant and responsive, should be produced without further requests or delay, and that's a standing request.  And then, obviously, we have the next-level question of going beyond that.

THE COURT:  Okay.  All right.  Well, let's

reach the next-level question, since that is the first one, in any event, raised in all the letters.

I'm a little unclear as to what else it is that you're asking for, Mr. Fonti.  The request, as you described in your original letter, was for relevant and responsive ELT materials during this timeframe.  I'm sorry.

Your request, as reflected in your May 31st letter, was for the contemporaneous reporting that existed and was circulated to the executive leadership team, but your letter now suggests that you're also asking for notes and perhaps other materials, not just the materials that were circulated to the executive leadership team; is that correct?

And my initial question is, have you actually asked for that material in an actual document request?

MR. FONTI:  We have, Your Honor.  We find ourselves in a position of, kind of, being on a little bit of a slippery slope.  So excuse ourselves for having a little bit of a shift in the language between the letters.

What we are very much concerned about is that the defendants are really slicing their

language very precisely.  And what we expect and believe is required under the rules is a representation that we do receive all relevant responsive materials that went to the executive leadership team.  And that's Request Number 4, our document Request Number 4.

THE COURT:  That went to the executive leadership team.  That's what your request is, correct?

MR. FONTI:  The materials that --

THE COURT:  So if members of the team took notes, those would not be responsive, as I understand it, because those would not have been materials that were sent to them.

MR. FONTI:  Well, that's an additional component, right.  So we have other materials --

THE COURT:  But have you asked for that in a document request?

MR. FONTI:  Yes, we have, Your Honor.

THE COURT:  In a document request?

MR. FONTI:  Yes.

THE COURT:  I haven't seen the document request, so I don't know.

MR. FONTI:  I appreciate that.  We realized that yesterday, but, yes.  So our document requests

do capture -- and are you having a hard time hearing me?  I don't --

THE COURT:  No, not at all.

MR. FONTI:  Okay.  They do capture the relevant responsive materials that pertain to the ELT, including what was sent to them and what notes they may have developed.  We have various ways of getting to that information, whether it's by search terms and custodians.

What has been the focus of this dispute, at least initially -- now, it's broadened a bit -- is the notion that we need defendants to represent that they independently have identified the relevant sources, have collected it, and have produced it. We have gotten very much piecemeal disclosure throughout this process, beginning with this Excel spreadsheet, which, when it was produced to us, indicated it was created after the fact.  None of the links were included.  We have gotten piecemeal disclosure over time.

I don't want to micromanage Mr. Youngwood's production, but I need for him to tell me that he has searched for, collected and produced the relevant ELT materials, and we will accept, of course, that representation as an officer of the

court, and be satisfied with it.

We do not want this slippery slope of, here's a spreadsheet, here's another spreadsheet, here's some links, here's some more links.  We need them to make sure that they've spoken to their clients, they interviewed their clients, they know how the materials were assembled, collected, distributed, what notes exist, relevant information to the claims, and that all be produced, and they fulfill their responsibility to do that.

So that's our broad issue here.

THE COURT:  Mr. Youngwood?

MR. YOUNGWOOD:  Your Honor, I think it's probably easiest for me to tell you what we have done because I'm never going to be able to give you a representation that we found everything that one could find.  That's not what the rules require.  But I think what we've done, largely in cooperation with Mr. Fonti and his team, is quite extensive.

So first, focusing on ELT, which is what I think we're focusing on, we've now identified and given them the Core spreadsheet or Word files for the full time period that they asked for, even though I don't personally think the full time period is relevant, but we gave that to them.

We will pull the links for the documents that we've just produced today as quickly as we can. We're not going to just automatically give links for every file. That's not what ESI protocol calls for. Paragraph 4 of it makes it very clear that we don't have to give every link; we have to give reasonable requests. And, as I said, I'll deem these requests to be reasonable. So they'll get all of that as soon as we can possibly muster it. There are dozens and dozens of links in these documents, so finding the links is burdensome.

In addition to that, we have asked, and we will ask again, whether there are any recordings. I think Mr. Fonti means video or audio of the meetings. As of this moment, I am not aware of any, but I will ask that question again. I doubt it, but I'll ask.

And then in terms of notes, some of the individuals who sat on the ELT do have notes. We are in the process of gathering them if they are responsive to the request regarding ELT and not privileged -- although I doubt they'll be privileged, but having not reviewed them, I can't represent that yet -- we will produce them. Or if they are responsive to any other request, we will

produce them.  So I'm not trying to be cute about that.

          The other source of Core -- so those are kind of centralized files that we are aware of after numerous interviews.  And I think the most centralized files here --

          THE COURT:  Can I just stop you there, because I don't understand that.

          MR. YOUNGWOOD:  Yeah.

          THE COURT:  How are individual ELT members' notes in a centralized file?  I mean, I would think that would be something they have in their office.

          MR. YOUNGWOOD:  Well, that's a fair point, Your Honor.  I think it goes beyond centralized. And all I'm saying is that for the individuals, as part of our document-collection protocol, we have asked them if they have handwritten or other notes. I find these days most people don't, but to the extent they do, we will not ignore them.  We will not ignore them.

          THE COURT:  Okay.  Even if they are not in the so-called centralized file?

          MR. YOUNGWOOD:  Even if they are not.  And, again, I think -- I'm not quite sure that the requests call for it, but I'm not -- we're not

trying to be cute here, Your Honor. We're trying to do everything without having completely undue burden on what is already a very expensive matter, you can imagine, for the defendants.

And then the other category, which is a huge category, is other electronic collection and review, which was subject of literally weeks to months of back-and-forth with Mr. Fonti and his colleagues. And as a result of that, for the TaskUs defendants -- and I separate that because they're the Blackstone defendants, which I'm not covering in this conversation, and I don't think is subject of what's in front of you right now -- we agreed with them to 18 custodians. Seven of those 18 custodians are or were on ELT. For all 18 of the custodians, we've agreed to 32 different search strings. Several of them specifically reference ELT, but many of them, of course, reference the other issues at stake in the case, be it Glassdoor or attrition or whatever.

The time period for those searches ranges per search. And I don't think going through each of the 18 is productive. But if the Court wants it, the parties could provide it. But they range in time, at the most extreme from -- I think I've added

this right -- January 2020 to late February of 2022, so the same timeframe for which we're producing the ELT materials. And we will apply those search terms across all of those custodians.

That yielded roughly 170,000 raw e-mails to review. We will review those e-mails. We are reviewing them, and we will produce anything that's responsive, be it to ELT requests, attrition requests, Glassdoor requests or any of Mr. Fonti and his colleagues' other requests, all subject to the objections. But, basically, if it's responsive and it has hit on those terms, he will get them.

And I'm not sure there's any other way to do this. And, frankly, it's what we all agreed to in terms of e-mail production. And we did that after this request, after our objections, and so that's what we're doing. And, no doubt, that will yield additional material that Mr. Fonti will find useful or not useful -- will find useful or not useful. Whatever it is, we'll produce it, subject only to privilege and to responsiveness.

THE COURT: So, Mr. Fonti, as I understand this dispute from the letters, you took issue with the statement in Mr. Youngwood's June 5th letter, to the effect of -- and I don't have the words in front

of me -- we're going to give you the centralized files and anything else we happen to stumble across. And you felt it was appropriate and required for him to actually talk to the ELT members to see if they had any responsive documents rather than just wait for something to arise.

MR. Youngwood has now said that they -- I think he said they have talked, or at least are talking to the ELT members to see what responsive documents they have. Does that satisfy your concern, or is there anything else beyond what Mr. Youngwood laid out that you feel the defendants need to do with respect to this category of documents?

MR. FONTI: Thank you, Your Honor.

I think it's a very good start. And it's information we didn't have prior to this call, so I'm glad they're doing it. We're very much at the early stages of the production that -- we're just about five weeks out. Production has been pretty minimal to date. So I think, given the steps he's described, those are the steps we think need to be taken. What the output of those steps are might reveal that further steps need to be taken, but we want to be assured that we will get the fruit of

this effort, and this seems to be in line with what should be done, and we'll see what the consequences are.

But, yes, we were very much at a loss about what does it mean to, you know, produce what you come upon and how are they coming upon it when you have a case.

And then I think, for the record, it's worth quoting Request 4 because we've been focused on, sort of, the centralized files or the reporting. Request 4 is all documents, including any records, recordings concerning TaskUs, TaskUs' executive leadership team meetings, including those regarding employee attrition, Glassdoor rating, Glassdoor reviews, policies and practices. And I'm paraphrasing a little bit there.

So it's really everything that touched on it. So I think we're making some progress with the Court's assistance here, and we appreciate that.

THE COURT: All right. Well, I don't think there's anything for me to rule on, given the colloquy that we just had with respect to the ELT materials. Obviously, if, following your review of the materials, a dispute does arise, you'll let me know.

MR. FONTI:  Thank you, Your Honor.

THE COURT:  All right.  Turning to the next item, which is the Jobvite requirements or systems requirements in 2018 and 2019.

So, Mr. Youngwood, the complaint does allege that there was a policy change implemented in October 2018 with respect to when new employees were required to submit Glassdoor reviews.  I have reviewed Judge Cronan's decision on the motion to dismiss.  He does mention this policy, and the change in policy factors into his analysis in terms of allowing the case to proceed with regard to alleged misstatements relating to TaskUs' Glassdoor reviews.

Your position seems to be that you should only have to go back to the beginning of January 2020 for the job-site system requirements, but in light of the allegations and Judge Cronan's ruling with respect to the policy change in 2018, why isn't plaintiff's request here one that is for relevant and proportionate material?

MR. YOUNGWOOD:  Yeah.  So, Your Honor, I'll give you a few answers to that.  First, we, again, agreed on a full protocol for e-mail review.  It included dates.  They agreed.  It's not that we

insisted.  They agreed that we could start in January of 2020, and so this is a whole revisiting of that agreement, which was a negotiation because what do I care about as a defendant?  I care about being forthright and honest and producing material that I'm required to, but I do care about costs, right.

I need to care about costs.  And this yielded 170,000 documents that our team has to review in order to produce responsive stuff.  Obviously, some of that stuff -- maybe much of that won't be responsive.  So this is just a kind of a renegotiation of the whole deal.

I'm not sure what it is we're going to go look for.  As we said, the company doesn't use Jobvite anymore.  It stopped using Jobvite before the amended complaint.  And the original complaint didn't concern these issues, didn't mention Jobvite.  Original complaint was largely focused on attrition issues, not on issues associated with Glassdoor and Jobvite, so that the case changed over the year.

If they'd like to subpoena Jobvite, they can subpoena Jobvite.  I don't know exactly what it is they want us to look for, but we don't have access at this time to the raw Jobvite -- I'm

reading their letter -- Jobvite system requirements in 2018, 2019. I honestly am not sure where I would look for those.

And it is -- Your Honor, if the answer is go do a giant e-mail search, I think that's inconsistent with the course of negotiations here and would pose a significant burden on us that I don't think should be imposed on us at this time.

THE COURT: Well, let me let Mr. Fonti try to explain it. I will note, and I did note, that he's not asking for all documents relevant to the system requirements in 2018 and 2019. It's a sufficient-to-show request, so it is limited in that regard. But, perhaps, we need some better explanation of what it is exactly that you're looking for, Mr. Fonti.

MR. FONTI: Thank you, Your Honor.

So this ties to Request Number 11, which expressly specified a time period apart from the rest of the request. It requests starting October 1, 2018, as specified, and we have narrowed it to be sufficient to show.

You know, Jobvite, as we understand it, is a system that was in place. It was an interface that employees could use as part of their onboarding

AMM TRANSCRIPTION SERVICE - 631.334.1445

and job performance and function.  So we allege specifically, as you noted, Judge Cronan notes it, that in 2018, the system requirements changed.  We imagine that there are documents that pertain to that, whether they're manuals, instructions, handbooks, HR directions, that might be -- if Jobvite is not accessible at this time, which hasn't been clearly said, but that's, kind of, what's being alluded to -- specific searches to the administrative function of the system that would show what was in place at the time, beginning in 2018, when we have alleged specifically that the specifications changed.

The complaint he's referring to is a complaint that my firm -- that was the initial complaint.  Our firm filed the amended complaint as well.  And the amended complaint supercedes --

THE COURT:  You don't have to get into that.  It's irrelevant.  The amended complaint has it as an issue.

MR. FONTI:  Thank you.

THE COURT:  Judge Cronan upheld that aspect of the complaint.  It doesn't matter what the original complaint says.

MR. FONTI:  Thank you, Your Honor.

So I think we could work toward something that isn't as broad as an e-mail -- broad e-mail search of every custodian. Maybe there is a particular custodian or two or three that pertain to this. That might be one avenue. And then we would expect that the HR function and the onboarding function that was using Jobvite has records of what the specifications were, and that's what we're really getting at.

MR. YOUNGWOOD: Your Honor, I can make this easy. As long as we can really focus it, that's fine. If they're manuals and we can find them, that's fine. I'm hoping that by "custodians," we mean one, not three, and we can narrow the time period, but we can try to do that.

And, Your Honor, the only reason I raised the difference between the two complaints and the timing is there's a statement in the response letter that suggests there was a preservation issue, and I just want to make it clear there was no preservation issue.

THE COURT: Well, no preservation issue because you didn't preserve the documents because the original complaint didn't get into this. Is that what you're saying?

MR. YOUNGWOOD:  That is what I'm saying, that there was no reason at the time of the original complaint to preserve documents related to Jobvite, and that there's no issue that the fact the company changed the system between the two complaints because Jobvite wasn't at issue in the original complaint in any way.  That is the only reason I mentioned it, not -- for no other purpose.

THE COURT:  You're not saying that you've inquired and you know these records don't exist anymore.

MR. YOUNGWOOD:  I am not.  Correct, Your Honor.  I am not saying that.

What I am saying is that we don't have Jobvite anymore, and so, to some degree, something doesn't exist that would have existed five years ago.

THE COURT:  Okay.  I understand that.

You were really responding to the suggestion that there's a document preservation issue.

MR. YOUNGWOOD:  Correct.  Thank you, Your Honor.

MR. FONTI:  So my part, Your Honor -- I'm sorry.  Go ahead, Jonathan.

MR. YOUNGWOOD: Please. Please. I'm sorry. I don't mean to talk over you, Mr. Fonti. Go ahead.

MR. FONTI: Not at all. I think I was the one talking over, so I apologize.

But I was just going to say, for my part, you know, this is the first we, kind of, hear this colloquy on preservation.

The Jobvite -- the first complaint maybe didn't have the word "Jobvite" in it, but it obviously dealt with attrition and how the Glassdoor ratings and all that was functioning. So we reserve our rights on this issue. This is the first we're engaging on it, so -- but to be determined whether there's any issues with preservation.

MR. YOUNGWOOD: Your Honor, I don't want to beat this, but I don't think, actually, the first complaint concerned Glassdoor.

THE COURT: Okay. I understand you disagree about that, but I also understand that there is no issue, or I don't believe there is an issue before me at the moment, with regard to any alleged failure to preserve documents.

MR. FONTI: That's correct.

THE COURT: So you're both just staking out

positions in case that arises later down the road.

MR. FONTI:  Thank you, Your Honor.

THE COURT:  And with regard to the merits of this issue, I don't think there's anything for me to decide, that there isn't a dispute that these documents are relevant and the defendants are willing to undertake a reasonable search to locate them.  There may or may not be a difference of opinion as to what that reasonable search would entail and the extent to which it would impose an additional burden on the defendants to conduct an e-mail search beyond the scope of the agreed-upon e-mail protocol.  But unless you tell me otherwise, I feel I should leave this to the parties to have additional meet and confer sessions on rather than make a ruling at this time.

MR. FONTI:  I think that's correct, Your Honor.

From our vantage point, I do think, given that the cutoff is only five weeks out, that the Court order us to confer in short order and either, you know, resolve it or have a dispute to you within the next ten days or so because these meet and confers have been going on for quite a while.  This process, Your Honor, is very productive because a

lot gets done.  I know it burdens the Court to some extent, but we're making a lot of progress, and I think if we had a hard deadline of maybe next Friday, we'd make even more progress.

THE COURT:  I'm not going to impose a hard deadline.  There's a lot of different issues I understand that are going on, you're meeting and conferring on.  I don't see any reason why I should impose a deadline for that.  Mr. Youngwood has indicated his receptivity to conducting a search, you know, after you indicated that it could be somewhat limited in terms of its scope.

Yes, I agree, you should move promptly to meet and confer on that.  And, certainly, if it seems like the defendants drag their heels on meeting and conferring on it, that would be a factor I would take into account if there was a later dispute, but I'm not going to order them to meet and confer by any particular date.

Turning to the next issue, headcount and attrition data, and specifically the data from the Oracle HCM system.

Here, again, Mr. Fonti, I have an initial question as to whether you asked for this material. Your letter says that you asked for documents

sufficient to show certain attrition-related data.

Did you or did you not specifically ask for the attrition-related data from the Oracle system?

MR. FONTI:  We did, Your Honor, and that's Request 7.  So documents sufficient to show employee headcount, new hires, departures, so forth, including documents generated by or maintained in electronic databases, including Oracle HCM system, are referenced in the complaint with specific references.

And that one, we actually had a specific request starting January 1, 2019.  I think we've been in discussions about it for a good bit.  It really is our view that we're entitled to the original source.  That is the source that was available to the company and defendants, you know, apart from any specific reports.  And in cases that deal with analysis of data, it's important that the original source be produced and that experts and witnesses are able to testify about it and analyze it.

THE COURT:  Am I understanding you to say that you are getting, or maybe you've already gotten the data, but you don't have the original source of the data, and that's what you want?

But if you have the data and it's the same, why do you need the original source?

MR. FONTI:  We don't believe we've gotten the data, and we want it in the form as it existed at the time.  That's what we're going for.  We understand there might be some change in systems in this context as well, so perhaps that data is resident someplace else.  But the data that existed at the time should be provided to us in its native form so that it could be analyzed and reviewed, just as defendants had the ability to do so at the time.

MR. YOUNGWOOD:  So, Your Honor, a few responses.

We haven't produced it yet.  We can't produce it from Oracle.  Company migrated from Oracle to something called Workday in November of 2021 before any complaint was filed.  So anything we produce is going to come from Workday.  My understanding is Workday works with something called Power BI.  And we're now getting beyond my technical knowledge.

So we will use those systems to generate what they ask.  But you can't make a request that says "sufficient to show," and then tell us how to show it.  I mean, we're not trying to be cute or

anything, but we're going to produce it in a way that the systems generate it for us.  If they don't like how we do it, we're happy to meet and confer with them further on it, but I can't do what they're asking.  I can't give it from Oracle.  We don't have Oracle.  We will give it from Workday, and let us have a chance to give it to them, and then they can tell us that there's something about it that they don't like.

But, respectfully, you can't say "sufficient to show," and then say you need all raw data.  Those are different things.  Their request, "sufficient to show," I think, is reasonable.  All raw data would be troublesome and difficult, which is, I think, why they made it this way.  So I don't know that we yet have a dispute here.

THE COURT:  I don't know that we do either, although we might well have a dispute -- I'm not sure we don't have a dispute because of the documents sufficient to show a business -- I agree with you generally that when somebody asks for documents sufficient to show, they're not entitled, necessarily, to any specific type of document.

Ultimately though, if they really believe they need the Oracle data, they would just propound

a separate request specifically for the Oracle data. More important to me is your representation that you don't have the Oracle data anymore.

MR. YOUNGWOOD:  You know, I probably spoke too loosely, Your Honor.  My understanding is the Oracle data was put into Workday.  We can't turn on Oracle again, so I don't -- I'm not aware of any --

THE COURT:  You're providing the Workday. You're providing the data that's in Workday.

MR. YOUNGWOOD:  That's the only data -- that's the interface we have today.

THE COURT:  And you cannot provide the Oracle, the raw Oracle data as it originally existed in the Oracle system.

MR. YOUNGWOOD:  Your Honor, I can't represent that to you either.  I could ask.

What I do know is since we don't use the system, it would be very hard to interface with something that you no longer pay for and use.  So the right place to look is the system we do use, not the system we no longer use.

And as I said, Your Honor, we're going to give stuff that comes out of Workday.  I don't plan to give a whole dump of everything in Workday.  I don't think that's what the request calls for, nor

do I think it would be responsive or -- it certainly wouldn't be responsive to the request.  I don't think it would be relevant to the case, every piece of data that's in Workday.

THE COURT:  Do you have an understanding as to whether or not the data that was in the system when it was the Oracle system is or is not the same as the data that is now in the Workday system?

MR. YOUNGWOOD:  Your Honor, I don't have a full understanding of how the transformation -- I don't want to make a misrepresentation.  My hunch is the answer is yes and no because they're different systems and they may have different fields, but I don't know.

THE COURT:  Okay.  But you are also raising an issue or advancing the argument that you don't believe you should be required to produce literally all of the raw data that is now in the Workday system, whether or not it's the same as what it was under the Oracle system.  That's too much.

MR. YOUNGWOOD:  I'm certain, Your Honor, if that had been the request, I would argue burden and scope and relevance.  I'd also talk to you about how it probably has individual personal identifying information that isn't relevant or necessary.

But I also would go off of Request Number 7, which obviously says "sufficient to show." We've covered that. And then even that's modified, documents generated by or maintained in. So they're even giving us a choice of generated by versus maintained in.

So, for example, Your Honor, there could be reports that were generated, and those reports are sufficient to show. I don't think that then calls on us to give every piece of data that went into generating those reports if they are, in fact, sufficient to show employee headcount, new hires, departures and attrition. Those are the things they ask for.

THE COURT: All right.

Mr. Fonti?

MR. FONTI: Thank you, Your Honor.

I think where the problem lies in this exchange just observed is the defendants need to do the legwork, or we ask that they do the legwork to be able to tell us what exists, what form it exists, and what they can do to satisfy the request. I think to date they've, kind of, been sparring over the semantics of whether Oracle database is up and running or not, and whether they can turn and give

us something from the Oracle database, given that it doesn't run.

So I think we could punch through this, but, as was the case on these other issues that we've gone through, the legwork that's required to satisfy the requests and put everybody at ease, including the Court, needs to get done. And on this one, it seems like we're just further behind.

We're not trying to be unreasonable. We crafted a pretty narrow request. We wanted the data that existed at the time. And from what I'm hearing is they need to do the legwork to talk to their client and their systems people to discern what data is available for the time period and is it the same as what existed at the time of the class period? And that's what we're entitled to, and that's what we should get. So we would like to get disclosure on that as soon as possible.

MR. YOUNGWOOD: Your Honor, just, again, I think we're heading in the right direction, but I do respectfully disagree that when you make a sufficient-to-show request, that gives the person you're propounding the request on some license to figure out how it's most efficient to sufficiently show it. And that's what we're doing. It doesn't

require a full forensic analysis of everything that existed prior to the complaint even being filed, full stop.

So we are working to do this as we're working to do everything else. And we will get it to Mr. Fonti as soon as we can, given all the other requests that we're dealing with. I'm not trying to delay it. And, frankly, I'd probably rather get it to him sooner rather than later so if he doesn't like it, we can resolve it. We're not trying to delay the case at all.

THE COURT: Yeah, it does seem that it would be useful if Mr. Fonti could see the production so he can make a better informed decision as to whether he needs to push for additional material or not.

I don't hear you, Mr. Fonti, saying that you necessarily believe you do need all the raw data, whether it's from the Worksite system, if I remember the name correctly, which I probably don't, or from the Oracle system. But you do want to see what you get in terms of what the data is.

MR. FONTI: Yeah.

THE COURT: Is that correct?

MR. FONTI: That's correct, Your Honor.

AMM TRANSCRIPTION SERVICE - 631.334.1445

We're trying to be reasonable and work with the other side.

And I think Mr. Youngwood is correct. From our vantage point, we're not trying to micromanage how he does it, but we do believe we're entitled to know what we're getting, how they're doing it, and know whether that satisfies the request. So it's not carte blanche, but it also requires a dialogue and the legwork that precedes it.

So, yeah, and I think we'd like to see that production as soon as possible. As I said, you know, despite how long we've been at discovery, we're only a few thousand documents in, in terms of production, with a cutoff five weeks out. So we're very concerned about being dumped on and having to manage through that. So the quicker we can get this kind of data, the quicker we can get looking at it.

THE COURT: All right.

Well, yes, Mr. Youngwood, I do think, even if you can produce an example or two or three of the data, rather than waiting until everything responsive to that request is assembled, that could be helpful.

MR. YOUNGWOOD: Okay. I understand.

THE COURT: All right. Here, again, I

AMM TRANSCRIPTION SERVICE - 631.334.1445

think I have talked myself out of doing my job, which is making rulings, because it sounds like the parties are working to resolve this issue as well, and hopefully will be able to do so.  Okay.

Turning to the next item, which is the text and WhatsApp messages for four individual defendants who I understand are outside directors; is that correct?

MR. YOUNGWOOD:  Yes, Your Honor.

MR. FONTI:  Yes.

THE COURT:  Okay.  All right.

So, Mr. Young, when you indicated that defendants first want to produce the text and WhatsApp messages for defendants, Maddock, Weir and Sekar and then sit down and meet and confer about the other four, what is the status of that?

Have you produced the text and WhatsApp messages for Maddock, Weir and Sekar?

MR. YOUNGWOOD:  No, but we have gathered them, and we have begun to apply search terms.  And I believe we can produce those messages.  I don't want to say "all" because we haven't done it yet, but we can produce them this month.

I think this was the exact conversation we had with Judge Cronan last month, which was -- he

understood it would take some time to do it.  He understood we'd do it.  I think it might be indicative whether or not any of these texts actually go to the four outside directors.  I don't think we should minimize the burden that it places on them.

In addition to their responsibilities to TaskUs, they had many, many, many other responsibilities, right.  They're simply outside directors.  It's important.  But you're going to be talking about going through phones that -- it's not like they had a TaskUs phone, right.  They had one phone, or maybe they had two.  Some people have personal and non-personal phones.

But it is burdensome.  They're broad.  That adds to the complication, either because, if you're on Android, it can't be done remotely.  And even if you're not on Android, if you're on iPhone, it can be done remotely.  But my experience with outside directors is they often want it to be done in their presence.  So it's not an easy switch to turn on, and so I think proper order is the order that Judge Cronan suggested, and we're following.  And it may well be that Mr. Fonti says, no, I absolutely have to have these, and then we have to make a decision

whether we force you to make that decision on those four people or not. I just don't know that we're up to that yet.

THE COURT: Have you taken steps to preserve the text and WhatsApp messages of these four outside directors?

MR. YOUNGWOOD: We've given instructions to preserve, yes, but we haven't -- Your Honor, it would be one and the same. We haven't captured the phones. I can't represent that for this case we've captured those phones.

THE COURT: I understand. But the directors have been instructed that they need to preserve those materials.

MR. YOUNGWOOD: Correct. And not just the directors, but yes.

THE COURT: What are you hoping to find, or perhaps not find, in the text messages for the other three that Mr. Fonti will then regard as obviating, either in whole or in part, the need to collect text and WhatsApp messages from the outside directors.

MR. YOUNGWOOD: Well, I suppose Mr. Fonti would have things he might hope to find. In other words, lots of texts between the executives and the directors. I think that would undercut some of my

argument, so I suppose the absence of that would be useful to me.  I don't know.  We haven't read them yet.

I do think, Your Honor, there's an underlying burden argument as applied to outside directors.  I find that Mr. Fonti -- look, we have agreed on some things.  We've agreed on seven, so that's helpful.  We had proposed a different four.  We had proposed, actually, current employees, or then current at least employees because we thought management is going to have a lot more here than outside directors.

If you think about it, Your Honor, at least in the normal course, if the company knows something, the outside directors might then learn it, but they can't learn it if the company didn't know it.  The outside directors aren't going to have, if you take the allegations here, superior knowledge about Glassdoor or attrition.  Where would they have gotten it from?  They could only get it from management.

So our focus had been if you want seven phones, why don't you choose seven phones that are likely to be more relevant and, at least from our perspective, less burdensome?  I mean, my issue -- I

don't want to tell him what's most important.

That seemed like a reasonable proposal. They rejected it. And they want the four. As I said, if I can't convince Mr. Fonti that he's better off going somewhere else, I, with my client, will have to make a decision whether I ask you to make a decision. And I am hopeful that I can convince him otherwise.

Mr. Fonti, I find to be a very, very reasonable man. I think he finds me to be somewhat reasonable. And sometimes we actually do convince each other of things.

THE COURT: Well, Mr. Fonti, are you prepared to await the production of the text and WhatsApp messages from the three other defendants, and then sit down, as Mr. Youngwood said he is willing to do, and meet and confer about the other four?

MR. FONTI: Well, I just want to appreciate Mr. Youngwood's kind words, and the feeling is mutual. We've been able to make some progress.

I don't think, in all candor, that the production of the three is in any way tied to whether you order the production of the other four. These four defendants are individual defendants

under Section 11.  They signed the registration statement.  They're tied to BCP and Blackstone, which, together with the CEO and CFO, profited about a billion dollars from the offerings that are at stake.

Their motivation, their, you know, motivation in a colloquial sense, their interactions, what they were communicating at the time is highly relevant to them as individuals, what their understanding of the company's true performance was.

So whether or not, you know, the first three defendants are texting the other four defendants isn't really the point.  It's what communications are these BCP individuals having?  They're not your typical outside directors that we think of a retired executive who sits on the board and has a relatively low-impact experience.  These are the directors driving the transactions.

THE COURT:  These are the Blackstone people?

MR. FONTI:  Right.  These are the Blackstone people.  So they're the ones driving it.  They're the major shareholder.  This is not a -- they're not outside and passive.  They are outside

and quite invested.

So we think, given where we are in the schedule -- we're five weeks out. As I said before, the concern that we have only a few thousand documents to date and that we will certainly receive tens of thousands more, possibly. This is the time to make the decision.

The point about burden has not been substantiated. Yes, being in litigation is burdensome to some degree, but is that a burden that warrants not collecting their phones? I don't think so.

In the past, privacy issues have been raised. Those have not been substantiated or advanced privacy issues under the Indian law. These are highly sophisticated business people, top business people on the entire planet. This is something that, by virtue of their roles, they have to do. I think it's more than reasonable to get a collection from their phones in whatever manner we can, whether that's remote or in person.

They were the central players in these offerings, so I think we're entitled to them independent of whatever comes out of -- and just to advance the tape, if there are a ton of texts

between the first three and the last four, that will be one argument.  If there are no texts, that will be another argument.  So we're going to be where we are today, you know, because there's an independent reason for it.

THE COURT:  I take it on that point, you might be interested and believe there could well exist texts between and among the Blackstone directors themselves --

MR. FONTI:  Exactly.

THE COURT:  -- in which management was not a party, or with others at the Blackstone mother ship.

MR. FONTI:  Exactly.  Exactly.  So it's really quite independent.

THE COURT:  And do I understand, from what Mr. Youngwood said, correctly, that there was an agreement as to -- that there would be seven phones at play in the discovery, and it was agreed that these would be the seven individuals?  Or did I misunderstand that?

MR. FONTI:  The way I see it -- I don't want to speak for Mr. Youngwood because I don't think we had an agreement on much here.  We asked of the seven individual defendants for their phones to

AMM TRANSCRIPTION SERVICE - 631.334.1445

be collected and the texts to be produced.  That's why it's seven.

It's nothing magical about seven.  It wasn't, sort of, trying to fill the seven.  It was, these are the defendants.  Were entitled to their texts, period.  And they offered alternatives, and we've rejected that because we're entitled to the individual defendants' texts, the people who --

THE COURT:  Okay.  But they haven't agreed to produce text and WhatsApp messages for these four --

MR. FONTI:  They agreed to three.

THE COURT:  Yeah.

MR. FONTI:  And from what he said, they agreed to seven in total.  The disagreement is the material part, which is the remaining four individual defendants.

THE COURT:  Mr. Youngwood.

MR. YOUNGWOOD:  Your Honor, I completely agree with that summary, actually.  I think they asked for seven.  We agreed to three.  We proposed four alternatives.  They have not agreed to those four alternatives instead of the -- as alternatives, not in addition.

And, Your Honor, again, I guess maybe it's

an issue of timing as to when you need to make this decision, but I'm just -- again, you're obviously not bound by what Judge Cronan suggested in May, but his suggestion was we do this initial production and revisit the issue.  And we're working on the production, and I hope to complete it this month.

I would suggest we let us complete it.  And if Mr. Fonti presses the issue, we can get back to you very quickly.  And perhaps we -- Mr. Fonti continues to press it and we have to do it, perhaps we give you more than a paragraph or two on the issue because I don't know that, with these very short letters, you've had as much detail on this as you might want.

THE COURT:  Is that an accurate summary, Mr. Fonti, of what Judge Cronan ruled, that this should be staggered, whereby the defendants would first produce the text and WhatsApp messages for the three -- I guess they're inside directors -- and then you would address --

MR. FONTI:  I did not understand him to -- certainly I don't think Mr. Youngwood is suggesting that he ordered it.  I think a month ago the question -- and quite reasonably at the time, you know, a month ago was, well -- and we had a

conference a month ago, and Judge Cronan did order that submissions go in at the end of the month, which is what triggered this process. So on May 30th, I believe. Then we had -- we conferred for ten days and then put in submissions.

It was quite reasonable, I think, at that point to say, hey, well, let's see what comes out of the first three. He was not ruling on anything. I think a month later and five weeks out from the cutoff, that's not quite the state of play. I think Mr. Youngwood hasn't yet even reviewed the texts that he's collected from the first three. The collection and production is going to take weeks of the next four.

And, as I said before, not to advance the tape too much, I just don't see this issue resolving itself by virtue of what is produced by the first three. I understood Judge Cronan's reasoning or suggestion. It was practical in sense. But as you unpack it, whether -- again, whether there was a ton of texts between all the seven defendants or there were none, both of those realities will be relevant to our need to get them from the original source.

And more importantly, as Your Honor said, what happened among and in between the Blackstone

people who, at the end of the day were calling the shots and making the ultimate decisions and profited the most out of these offerings?

So we just don't see any reason to delay and didn't understand anything that Judge Cronan said as controlling or concrete on how this should go.  I think the facts are different today.

MR. YOUNGWOOD:  Your Honor, if I could -- and, again, the transcript is more than 30 pages, so I don't mean to encapsulate a whole transcript in what I read, but page 29 of that transcript -- and if Your Honor doesn't have it, we can, obviously, forward that to you.

THE COURT:  I do not have it.

MR. YOUNGWOOD:  Okay.  We'll get that to your chambers, assuming Mr. -- I'm sure Mr. Fonti would be okay with that.

MR. FONTI:  Of course.  Of course.

MR. YOUNGWOOD:  He says on line 3 of 29 -- this is on this topic.  This is Judge Cronan:  "I'll say, Mr. Fonti, I think Mr. Youngwood made some points, at least, initially seemed reasonable here on this issue."

And then he says, "I guess my only question at this point, would it" -- it's a little garbled.

"Does it sound like there's an agreement to produce the texts in WhatsApp for Weir, Maddock and Sekar?"  And I eventually say -- I say "yes" to that.

And then skipping down on the page to line 19, he writes:  "I assume, though, that the production is going to take a little bit of time. The reason I'm asking is it might be useful for me, if I have to decide this issue, to have a sense of whether or not anything responsive was found on the devices or the messages of those three individuals when I'm looking at whether or not it should be expanded beyond them."

He then goes on to ask me how long I think it would take, and I respond, "Weeks, not days."

That's, sort of, where it leaves off, and I think that's, kind of, where we are, Your Honor. You've probably heard enough on this from us today.

THE COURT:  What was the date of that proceeding?

MR. YOUNGWOOD:  The 15th, I think, of May. Let me check.

THE COURT:  So --

MR. FONTI:  And that's totally -- I didn't have the transcript in front of me, Your Honor --

MR. YOUNGWOOD:  Yeah, 15th.

MR. FONTI:  -- but that is totally consistent with my recollection of it --

MR. YOUNGWOOD:  Yeah.

MR. FONTI:  -- that it made sense a month ago.  Today, it just doesn't make as much sense.

THE COURT:  That is a bit of a problem, Mr. Youngwood.  And even now, you're not saying that you're imminently about to produce them.  You're saying you hope you'll be able to produce them by the end of the month, at which point will be only 26 days from the discovery cutoff.

I appreciate the difficulties involved in obtaining discovery material from the personal phones of outside directors.  I do get that.  Nevertheless, given where we are in the schedule and given what seems to me the likelihood that Mr. Fonti will want to see these materials and their potential relevance, given who these outside directors are, I really don't feel we should just kick this down the road in the anticipation of a meet and confer at some undetermined date in July, which is essentially what you are proposing because you're suggesting there be a meet and confer after you made the production of the messages from the three individual

defendants. And then, of course, Mr. Fonti needs an opportunity to review those. So that doesn't work to me.

I'm all in favor of you continuing to meet and confer about it, and I don't know that you fully have, but I think if there is going to be an issue there that you want to raise based on foreign privacy laws or other things, you need to get that teed up sooner rather than later.

MR. YOUNGWOOD: So, Your Honor, perhaps I should take that back to my clients and -- well, I'm happy to accelerate that discussion and to present it to you, so I'm open to a method to do that. I'm open to a schedule or whatever to do that.

THE COURT: Yeah. On that one, I think I would like to hear back from the parties, say, by the end of next week; is that reasonable?

MR. FONTI: It is.

MR. YOUNGWOOD: That would be fine.

And, Your Honor, maybe to avoid -- why don't Mr. Fonti and I see if we can work out a way to present it to you. If it has to be briefed and decided, maybe we can put it in one letter. You get his position, my position, rather than --

Mr. Fonti, does something like that for

this narrow issue work?

MR. FONTI:  Yeah.

MR. YOUNGWOOD:  Okay.

MR. FONTI:  I think it could.

MR. YOUNGWOOD:  So why don't we take this conversation back, continue to talk.  If I can accelerate the production of what we've collected, I will.

I don't -- again, Your Honor, you've spent an hour with me.  I don't like to promise things I can't do, so that's why I use words like "hope" when I don't know.  But let me see what we can do there, if that helps.  It's in my interest to accelerate it.

THE COURT:  All right.

MR. FONTI:  Thank you.

THE COURT:  Again, the four outside directors in question, they are individual defendants in this case.  They are representatives of or associated with the majority shareholder.  And so this is not, in my view, a request that you sometimes see in these cases for all outside directors' phones, even the quintessential outside director who's independent and really has nothing to gain from the transaction in question.

AMM TRANSCRIPTION SERVICE - 631.334.1445

So from that standpoint on relevance, at least, there seems to be a stronger showing. I'm not making any rulings, but strikes me that there's a stronger showing of relevance here than you sometimes find with requests for discovery from outside directors. Okay.

One more issue, the privilege log. So Mr. Fonti would like a privilege log two weeks after the document production deadline of July 26th.

Do you have a problem with that, Mr. Youngwood?

MR. YOUNGWOOD: I only -- with the insertion of one word, I do not have a problem. The substantial completion deadline is July 26. I am fine with a privilege log that is a substantially complete privilege log by August 9.

THE COURT: I did take note of that.

And I think -- Mr. Fonti, I do think that point is well founded, that since the requirement is only that the production be substantially complete by July 26th, it would seem to follow that the privilege log need only be -- it's a matter of semantics.

I mean, on one hand, the privilege log need only be substantially complete by whatever date we

AMM TRANSCRIPTION SERVICE - 631.334.1445

pick.  Let's say August 9th for purposes of this discussion.  That's not quite right because it actually should be complete, Mr. Youngwood, in respect of the documents that have been produced by July 26th, in the sense that whatever material was reviewed to generate the production on July 26th, if you've withheld certain documents on privilege grounds, then the privilege log produced on August 9th should cover all of those documents, I would think.

But to the extent document production does lop over past July 26th and there are some other categories of documents that need to be reviewed and produced, you would have a corresponding additional amount of time to produce the privilege log associated with those documents.

MR. YOUNGWOOD:  Your Honor, that sounds directionally correct.

I will say, having lived through a lot of these, you make your hardest privilege calls -- if anything's complicated, you tend to make it toward the end so that you're consistent.  And that plays a factor here.  But I have no interest in delaying production of a substantially complete privilege log in -- August 9 is perfectly fine.  I'm certain there

will be production after July 26.  If not, it would be the first securities case I've ever been involved in when there isn't.

And I'm certain, to be clear, Your Honor, that there will be downgrades of privilege as we go through this because we don't want to withhold something incorrectly that isn't privileged.  So it may well -- it usually goes one direction, not the other, unless you've made an inadvertent disclosure. You tend to produce more stuff as you look at it.

So with all of those caveats -- and I know it's a lot -- we'll produce a log on the 9th.

THE COURT:  Well, I think this conference overflows with evidence that Mr. Fonti is reasonable and that you are reasonable, so I assume any issues like that will be worked out consensually.  Under Local Rule 26.2(b), a privilege log shall be furnished in writing at the time of the response to such discovery or disclosure, which here would be July 26th, unless otherwise ordered by the Court.

I will otherwise order a different deadline here pursuant to the agreement of the parties.  That deadline will be two weeks after the due date for the production, which, under the current schedule, would be August 9th.  And, as discussed, that

privilege log need only cover the documents that were the subject of the productions made as of July 26th.

MR. FONTI:  Thank you, Your Honor.

MR. YOUNGWOOD:  Thank you, Your Honor.

MR. FONTI:  We'll --

THE COURT:  Anything --

MR. FONTI:  No, no.  I just reserve for now the potential debate between what "substantially complete" means, but I think that's for another day. We'll ensure that we get a timely production of documents over the course of the next several weeks and be back to you if we're not experiencing that.

THE COURT:  All right.

Anything else we need to discuss today?

MR. YOUNGWOOD:  Thank you, Your Honor.

MR. FONTI:  I don't know if it's Your Honor's practice to set conferences apart from having active disputes, but since we're together, if that's something that Your Honor considers or routinely does, we'd be open to scheduling something between here and the cutoff, if that's amenable.

THE COURT:  Well, now that I have this case for GPT, I suppose it would be a good idea to put something else on the calendar.

Did Judge Cronan have anything on the calendar?

MR. FONTI:  No.

MR. YOUNGWOOD:  I don't believe so.

THE COURT:  Okay.

MR. FONTI:  The only thing that he said is sometime in February before the trial date, but he was having conferences with us every so often, but nothing was set at this time.

THE COURT:  I generally do like to keep track of things, even in cases where there are no disputes, which cannot be quite said of this case. So why don't we set this down for conference after the July 26th document production deadline, within a few days or week of that.  Or may have to be longer because I am on criminal duty around that time.

THE DEPUTY CLERK:  How's August 8th, Judge?

THE COURT:  August 8th would be fine with me.

MR. YOUNGWOOD:  Your Honor, I'm on trial that week, out of town in a federal court.  Could we do the next week?

THE COURT:  Yes.

MR. YOUNGWOOD:  I can do the prior week, but it sounds like you have criminal duty.  I could

do the week of the 12th.

THE COURT:  Yes, the prior week really does not work for me.

MR. YOUNGWOOD:  Yep.

THE COURT:  But the week of the 12th does.

MR. YOUNGWOOD:  I could do the 12th.

MR. FONTI:  Yeah, the 12th, 13th work.

THE COURT:  Let's do it on the -- the 13th work for you, Mr. Youngwood?

MR. YOUNGWOOD:  It does as long as it's afternoon.

THE COURT:  Perfect.  2 p.m.?

MR. YOUNGWOOD:  That's fine.

MR. FONTI:  That works for me.

THE COURT:  All right.  If everything is going along swimmingly and the two of you think there's really no point to meeting on August 13th, just drop me a letter in advance of the conference, and I'll consider that and possibly take it off calendar.

And when I say "meet," I don't mean literally in the sense of an in-person conference. I think we can schedule this for a video conference.

MR. YOUNGWOOD:  Thank you.

MR. FONTI:  Thank you, Your Honor.  I think

that works.

THE COURT:  Okay.  Very good.

Anything further?

MR. YOUNGWOOD:  No.  Thank you for your time, Your Honor.

MR. FONTI:  Nothing further, Your Honor.  Thank you for all your attention to this.

THE COURT:  All right.  Thank you, both.  Have a good day.

0o0

C E R T I F I C A T E

I, Adrienne M. Mignano, certify that the foregoing transcript of proceedings in the case of Lozada v. TaskUs, Inc., et al.; Docket #22CV1479 was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature  *Adrienne M. Mignano*

ADRIENNE M. MIGNANO, RPR

Date:      June 20, 2024

AMM TRANSCRIPTION SERVICE - 631.334.1445