**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HUMBERTO LOZADA and OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> TASKUS, INC., BRYCE MADDOCK, JASPAR WEIR, BALAJI SEKAR, AMIT DIXIT, MUKESH MEHTA, SUSIR KUMAR, JACQUELINE D. RESES, and BCP FC AGGREGATOR L.P., <br><br> Defendants. | Case No. 1:22-cv-01479 JPC-GS <br><br> <u>CLASS ACTION</u> <br><br> Judge John P. Cronan |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ..................................................................................................................... 4

ARGUMENT ........................................................................................................................... 6

I.      CLASS CERTIFICATION SHOULD BE DENIED FOR THE EXCHANGE ACT
        CLASS BECAUSE PLAINTIFFS DO NOT SHOW CLASS-WIDE RELIANCE ........... 7

        A.      Plaintiffs Fail to Demonstrate Market Efficiency ..................................................... 7

                1.      Mr. Coffman's Event Study Does Not Demonstrate Market
                        Efficiency ...................................................................................................... 8

                2.      There Was No Analyst Coverage at the Start of the Class Period ............ 13

        B.      Even if Plaintiffs Could Invoke the Basic Presumption, That Presumption is
                Rebutted Because the Low Attrition Statement Had No Price Impact ................. 14

                1.      There is No Direct Evidence of Front-End Price Inflation ....................... 14

                2.      There is No Indirect Back-End Evidence of Price Impact ........................ 15

                        a.      The Low Attrition Statement Does Not Match The Alleged
                                Corrective Disclosure ..................................................................... 16

                        b.      The Stock Drop Was Not Due to The Low Attrition
                                Statement ......................................................................................... 19

                3.      Investors Did Not Rely On The Low Attrition Statement During
                        The Class Period ........................................................................................ 21

II.     PLAINTIFFS HAVE NOT PROFFERED A METHODOLOGY FOR
        MEASURING CLASS-WIDE EXCHANGE ACT DAMAGES ..................................... 22

III.    THE SECURITIES ACT CLASS FOR THE SPO SHOULD NOT BE CERTIFIED
        BECAUSE OKLAHOMA CANNOT BE A CLASS REPRESENTATIVE ................... 23

IV.     THE PROPOSED CLASS DEFINITIONS ARE FAIL-SAFE ...................................... 25

CONCLUSION ...................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)......................................................................................................... 7

*Amberber v. EHang Holdings Ltd.*,
No. 21CIV1392, 2022 WL 409096 (S.D.N.Y. Feb. 10, 2022)................................................ 15

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)........................................................................................................... 6

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ("*Goldman II*")................................................................... 15

*Berwecky v. Bear,*
*Stearns & Co.,* 197 F.R.D. 65 (S.D.N.Y. 2000) ........................................................... 23

*Brokop v. Farmland Partners Inc.*,
No. 18CV02104, 2021 WL 4913970 (D. Colo. Sept. 30, 2021) ................................... 12

*Cammer v. Bloom,*
711 F. Supp. 1264 (D.N.J. 1989) ................................................................................ 8

*Cassie v. JB Sec.,*
No. 17CIV6587, 2018 WL 11449903 (S.D.N.Y. Nov. 16, 2018)................................. 25

*Charrons v. Pinnacle Grp. NY LLC,*
69 F.R.D. 221 (S.D.N.Y. 2010)................................................................................... 25

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013)........................................................................................... 3, 6, 22

*Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.,*
301 F.R.D. 116 (S.D.N.Y. 2014) ................................................................................ 23

*Goldman Sachs Grp., Inc. v Ark. Teacher Ret. Sys.,*
141 S. Ct. 1951 (2021) *("Goldman")*................................................................. passim

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ("*Halliburton II*")............................................................. 7, 8, 14

*IBEW Local 98 Pension Fund v. Best Buy Co.,*
818 F.3d 775 (8th Cir. 2016) ............................................................................. 15, 19

*IBEW v. Deutsche Bank AG,*
No. 11CV4209, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ........................... 8, 10

*In re Bank of Am. Corp. Secs*,
   281 F.R.D. 134 (S.D.N.Y. 2012) ................................................................................... 24

*In re ConAgra Foods, Inc.,*
   302 F.R.D. 537 (C.D. Cal. 2014) .................................................................................. 23

*In re Fed. Home Loan Mortg. Corp.,*
   281 F.R.D. 174 (S.D.N.Y. 2012) ............................................................................... 8, 9

*In re IMAX Sec. Litig.,*
   272 F.R.D. 138 (S.D.N.Y. 2010) ................................................................................... 23

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) ....................................................................................... 7, 13

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
   No. 20-CV-4953 (JPO), 2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024)................................... 17

*In re Select Comfort Corp. Sec. Litig.,*
   2000 WL 35529101 (D. Minn. Jan. 27, 2000), *report and*
   *rec. adopted in relevant part,* 2000 WL 36097395 (D. Minn. May 12, 2000)......................... 25

*Krogman* v. *Sterritt,*
   202 F.R.D. 467 (N.D. Tex. 2001) ................................................................................... 8

*Mandala* v. *NTT Data, Inc.,*
   975 F.3d 202 (2d Cir. 2020) .......................................................................................... 9

*Rocco v. Nam Tai Elecs., Inc.,*
   245 F.R.D. 131 (S.D.N.Y. 2007) ................................................................................... 24

*Slack Techs., LLC v. Pirani,*
   598 U.S. 759 (2023)..................................................................................................... 24

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,*
   546 F.3d 196 (2d Cir. 2008) ..................................................................................... 8, 13

*Waggoner v. Barclays PLC,*
   875 F.3d 79 (2d Cir. 2017) ........................................................................ 7, 8, 14, 23

*Ward v. Apple Inc.,*
   784 F. App'x 539 (9th Cir. 2019) ................................................................................ 22

**Statutes**

15 U.S.C. § 77z-1(a)(3)....................................................................................................... 25

15 U.S.C. § 78u-4(a)(3) ..................................................................................................... 25

Rule 23(a)..................................................................................................................... 6

Rule 23(b)(3).............................................................................................................. 6

**Other Authorities**

Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 Law and Contemporary Problems 105-122 (2000) ............................. 14

Defendants respectfully submit this memorandum of law and the Declaration of Jonathan K. Youngwood in opposition to Plaintiffs' Motion for Class Certification.[1]

**PRELIMINARY STATEMENT**

Plaintiffs seek to certify two classes: an Exchange Act Class and a separate Securities Act Class in connection with the Company's Initial Public Offering ("IPO") and its later Secondary Public Offering ("SPO"). It is Plaintiffs' burden to demonstrate strict compliance with all requirements under Federal Rule 23(a) and 23(b)(3). Plaintiffs fail to do so. Specifically, with respect to the Exchange Act Class, Plaintiffs have not met the significant evidentiary hurdle to establish class-wide reliance or damages. With respect to the Securities Act Class, Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma")—the only proposed class representative for the Securities Act Class in connection with the SPO—does not satisfy Rule 23 and cannot represent investors who purchased in or traceable to the SPO. Finally, both the Exchange Act and the Securities Act Class (for the IPO and the SPO) are impermissibly fail-safe and for this reason too Plaintiffs' motion should be denied in its entirety. If the Court were to reject Defendants' fail-safe argument, however, then, at most, it should certify a Securities Act Class, represented by Plaintiff Lozada, and limited to putative members who purchased shares pursuant or traceable to the IPO (not the SPO).

**The Exchange Act Class (Reliance).** To show that common issues predominate, as required under Rule 23(b), Plaintiffs must establish class-wide reliance on the sole remaining misstatement alleged for the Exchange Act claims—*i.e.*, the Company's reference to "low attrition" in its registration statements. To do this, Plaintiffs invoke the fraud on the market

---

[1] Unless otherwise noted, all emphasis within quotes is in the original, and citations, quotations and internal quotation marks have been omitted. "¶__" refers to paragraphs of the Amended Complaint, ECF 26, and "Ex.__" refers to the Exhibits accompanying the Declaration of Jonathan K. Youngwood.

doctrine (also referred to as the *Basic* presumption), the premise of which is that investors presumptively rely on a purported misrepresentation reflected in a stock's market price. Defendants, in turn, may rebut this presumption and defeat class certification by showing that an alleged misrepresentation did not, in fact, impact the price. Here Plaintiffs cannot rely on the *Basic* presumption and, as such, fail to show class-wide reliance for two reasons:

*First*, the *Basic* presumption can only be invoked if the market for TaskUs stock was efficient. In their attempt to show efficiency, Plaintiffs rely on a proposed expert witness, Chad Coffman, who conducts an event study to demonstrate a correlation between unexpected news and market price (an analysis critical to market efficiency). But Mr. Coffman's work is fatally flawed and cannot support market efficiency. Plaintiffs also rely on the existence of analyst reports throughout the Class Period, but ignore that for the first 25-days of the Class Period, no such reports existed. It is Plaintiffs burden to demonstrate when (if at all) following the Company's IPO the market became efficient, as courts have recognized that markets are not efficient during an IPO. Plaintiffs fail to satisfy this burden and cannot invoke *Basic*.

*Second,* even if Plaintiffs are able to invoke the presumption, a preponderance of the evidence demonstrates that the "low attrition" alleged misstatement—the only one remaining for Plaintiffs' Exchange Act claims—did not have any impact on TaskUs's stock price. The Supreme Court directs that to determine price impact, this Court must conduct a rigorous analysis assessing "all probative evidence" aided by "a good dose of common sense" to determine if it is "more likely than not" that an alleged misrepresentation, in fact, had an impact on the price of the stock at the time it was made. *Goldman Sachs Grp., Inc. v Ark. Teacher Ret. Sys.,* 141 S. Ct. 1951, 1960,1963 (2021) *("Goldman").* The probative evidence (and common sense) demonstrate that there was no price impact here because, among other reasons:

2

- The low attrition statement was generic and aspirational (and made in disclosures that included specific data about attrition);

- The alleged corrective disclosure was an attack by a short seller (the fact of which alone can cause a price decline) asserting wide-ranging allegations;

- The attrition discussion in the Spruce Report was related to the Disclosed Attrition Rates (specific attrition rates disclosed by TaskUs for > 180 days that are no longer in the case) and industry wide trends and did not reference the low attrition statement.  It was also based on or derivative of public information;

- Analyst reports and news articles post corrective disclosure did not discuss or reference Spruce as correcting low attrition;

- The majority of analyst reports and news articles that discussed Spruce focused on other elements, and made no mention of attrition.  The few that did mention attrition did so mainly in the context of the specific Disclosed Attrition Rates;

- Following Spruce, analysts continued to discuss and refer to TaskUs's low attrition rate, indicating that they did not view Spruce as corrective.

Taken together, this powerful evidence rebuts price impact and defeats the *Basic* presumption.

**Exchange Act Class (Damages).**  Certification should also be denied for the Exchange Act Class for the separate reason that Plaintiffs have not proffered a methodology to measure class-wide damages.  In *Comcast,* the Supreme Court held that plaintiffs must establish "that damages are capable of measurement on a class-wide basis" using a methodology consistent with a the theory of liability. *See Comcast Corp. v. Behrend,* 569 U.S. 27, 33-35 (2013).  Here Plaintiffs fail to meet this standard.  Their proposed expert does not develop any model for calculating such damages (or even explain how specifically—based on the facts of this case—he would go about doing so).  Instead Mr. Coffman proffers the same speculative form language that he's used time and again in other cases, an approach that cannot satisfy *Comcast* or Rule 23.

**Securities Act Class (SPO).**  Oklahoma—the only Plaintiff alleged to have purchased stock pursuant and/or traceable to the SPO—does not meet the typicality requirement of Rule 23.  Oklahoma purchased TaskUs stock after the alleged corrective disclosure, subjecting it to a unique

defense and rendering it atypical. Further there is no contemporaneous evidence that Oklahoma purchased shares in or traceable to the SPO, as required for standing to bring its claims. At most, if the Court should find standing, the class should be limited to investors who purchased in the SPO, not traceable to the SPO (which raises individualized issues). Oklahoma also is not a proper class representative because it failed to participate in the PSLRA-mandated lead plaintiff process.

**Exchange Act and Securities Act Classes (Fail-Safe).** Finally, Plaintiffs define both their Exchange Act and Securities Act Classes to include only putative class members who "were damaged thereby," rendering both class definitions impermissibly fail-safe and not certifiable.

## BACKGROUND

TaskUs is a business process outsourcing ("BPO") company that provides third party companies with outsourced employees to perform tasks such as customer support. ¶¶ 2, 40. TaskUs launched its IPO and went public on June 11, 2021. ¶ 114-115. Plaintiffs bring claims under Sections 11, 12 and 15 of the Securities Act of 1933 ("Securities Act") and under Section 10(b) and 20 of the Exchange Act of 1934 and Rule 10b-5 ("Exchange Act") in connection with statements made in the registration statements for the IPO and later SPO. ¶¶ 192-217; 264-277. The statements at issue fall into two categories. The first concerns attrition. Plaintiffs claimed that TaskUs misleadingly disclosed voluntary attrition >180 days for 2019 of 26.6% and for 2020 of 14.9% (the "Disclosed Attrition Rates"), rather than a total attrition number of over 40%. ¶ 73. Plaintiffs also more generally allege that TaskUs stated it had "low attrition", which was also misleading for the same reason. ¶¶ 72-73. The second set of statements concern TaskUs's high Glassdoor ratings, which Plaintiffs claim were misleading because TaskUs had a policy requiring new employees to submit reviews during training. ¶ 54.

Defendants moved to dismiss the Amended Complaint and, on January 5, 2024, this Court issued its Opinion narrowing the case significantly. ECF No. 51 (the "Opinion"). The Court

4

dismissed, *inter alia*: (i) Plaintiffs' Exchange and Securities Act claims based on the Disclosed Attrition Rates because those statements "were transparent as to the restricted time period of employee attrition being disclosed" (Opinion at 24); and (ii) the Exchange Act claims relating to Glassdoor because the alleged corrective disclosure did not discuss Glassdoor (*id.* at 56).

The only remaining alleged fraudulent (Exchange Act) misstatement is a general statement referencing low attrition: "The culture and focus on people . . . gives us an advantage on key people metrics of efficiency, client satisfaction, and low attrition." *Id.* at 23. This statement was first publicly made in TaskUs's IPO registration statement filed April 12, 2021 and repeated, verbatim, in other registration statements including the final filed June 10, 2021. Exs. 2; 3. The same statement was also made in the SPO registration statement filed October 18, 2021. Ex. 4.

The sole alleged corrective disclosure is an inflammatory report published by short seller Spruce Point Capital on January 20, 2022 (the "Spruce Report" or "Spruce"). ¶ 257; Ex. 5. As this Court noted (Opinion at 15) Spruce asserted a litany of accusations against TaskUs. These include that TaskUs (1) was "[o]bfuscating [p]roblems" with Facebook, its largest client; (2) experienced "unusual fluctuations in unbilled revenues and difficulty with cash collections"; (3) "cherry-picked data to avoid showing that its market was both smaller and projected to slow"; and (4) made aggressive, if not "outright incorrect" assumptions to calculate EBITDA. *Id.* at 6-9.

With respect to attrition, the Spruce Report includes various allegations which, as the Court recognized, were based on publicly available information. Opinion at 57. The Report also includes a question to an alleged former TaskUs executive about the Disclosed Attrition Rates: "What do you make of the Company's claims of attrition being below the industry standard of 30% and how they qualify it to include only employees greater than 180 days?" Ex. 5 (Spruce at 36). And quote his purported response, which is about the BPO industry overall:

Attrition is first off, a tricky business in BPO.  I'll start by saying that I certainly do not trust the industry number of 30%-35% that you quoted.  It's B.S.  **I'll just start by saying that whenever I talk to people about their attrition, it is just classic that they understate it in many, many ways.  It's not just TaskUs, it's every company I've ever worked for in the BPO sphere**.  What they did was they would not include 180 days.  They would not include what they consider to be voluntary resignations.  Right.  They would remove internal promotions for that number.  If they were on leave, they wouldn't include them. Right.  There's just a lot of different ways to manipulate it.  And I think because it is so impactful to BPO businesses bottom line.  They're just kind of pushed in the direction to lie.  **So number one, I would just say, I think that the attrition is significantly worse**.

*Id.*  It is not until after this initial response that the alleged executive discusses TaskUs, purportedly stating that after TaskUs "became a public company, then they decided to start looking at only a hundred eighty days or greater.  . . . that would be worrisome, but it's not worrisome from a competitive standpoint because I think that that's pretty much standard across the business."  *Id.*

Following the publication of the Spruce Report, TaskUs's stock price fell from $35.39 on January 19, 2022 to $28.79 at the close of trading on January 21, 2022.  ¶ 260.  Significantly, this Court noted that although information based on a former employee can be non-public and corrective, here such information "may not have driven any stock drop."  Opinion at 58-59.  But the Court found it not appropriate to make such a determination on a motion to dismiss.  *Id.*

## ARGUMENT

A party seeking class certification must "affirmatively demonstrate his compliance with Rule 23."  *Comcast,* 569 U.S. at 33.  The party must prove "*in fact*" that the four Rule 23(a) prerequisites are met: (1) numerosity, (2) commonality, (3) typicality, and (4) adequate representation.  *Id.*  Under Rule 23(b)(3) , Plaintiffs must also establish that "questions of law or fact [common to class members] predominate," a requirement "far more demanding" than the commonality requirement of Rule 23(a).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613, 622-24 (1997).  To insure that certification is proper, a court must conduct a "rigorous analysis," which may require "overlap with the merits[.]"  *Comcast,* 569 U.S. at 33-34.

6

## I.   CLASS CERTIFICATION SHOULD BE DENIED FOR THE EXCHANGE ACT CLASS BECAUSE PLAINTIFFS DO NOT SHOW CLASS-WIDE RELIANCE

Plaintiffs seek to certify the Exchange Act Class by invoking the *Basic* presumption, which requires a plaintiff to show "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*").[2] A defendant may rebut the presumption "at the class certification stage" by showing that "the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock," or, in other words, that it "had no price impact." *Id.* at 279-281.  Without the presumption, reliance must be proved individually and there is no predominance. *Id. at* 281-82.

Plaintiffs cannot rely on the *Basic* presumption for two independent reasons.  First, Plaintiffs cannot invoke the presumption because they have failed to demonstrate an efficient market.  The market during an IPO is inefficient and Plaintiffs fail to show which date, if any, the market for TaskUs stock became efficient. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006), decision clarified on denial of reh'g, 483 F.3d 70 (2d Cir. 2007).  Second, even if, at some point,  the market is deemed efficient, the alleged generic low attrition statement did not impact TaskUs's stock, thus rebutting *Basic* and defeating class certification.

### A.   Plaintiffs Fail to Demonstrate Market Efficiency

To invoke the *Basic* presumption, Plaintiffs must affirmatively show that TaskUs stock

---

[2] Although Plaintiffs alleged a "[c]lass-wide presumption of reliance is also appropriate in this action under . . . *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972)" (¶ 263), they have abandoned this theory on class certification.  Regardless, *Affiliated Ute* does not apply where, as here, "[p]laintiffs . . . allege[] [an] affirmative misstatement[]" and "focus their claims" on that alleged "affirmative misstatement[]". *Waggoner v. Barclays PLC,* 875 F.3d 79, 95-96 (2d Cir. 2017).

traded in an efficient market. *Halliburton II*, 573 U.S. at 268. "Plaintiffs bear the burden of proving market efficiency—defendants do not." *IBEW* v. *Deutsche Bank AG,* No. 11CV4209*, 2013 WL 5815472, at \*20-21 (S.D.N.Y. Oct. 29, 2013) (to defeat the presumption, "defendants . . . must demonstrate that plaintiffs' proffered proof of market efficiency falls short[.]"). To show market efficiency, Plaintiffs' proposed expert Mr. Coffman considers various factors including those identified in *Cammer v. Bloom,* 711 F. Supp. 1264 (D.N.J. 1989), and *Krogman* v. *Sterritt,* 202 F.R.D. 467 (N.D. T2

01).[3]   But the proof proffered by Mr. Coffman "falls short" and Plaintiffs fail to demonstrate when, if at all, the market for TaskUs stock became efficient.

> **1.   Mr. Coffman's Event Study Does Not Demonstrate Market Efficiency**

Plaintiffs rely on an event study conducted by Mr. Coffman to "establish the cause-and-effect relationship between TaskUs's disclosures and movements in stock price." Pls Br. at 21. Although Mr. Coffman did consider other "indirect" factors (such as weekly trading volume or the number of market makers), the event study is the only analysis he performed that directly tests for efficiency. *In re Fed. Home Loan Mortg. Corp.,* 281 F.R.D. 174, 182 (S.D.N.Y. 2012). The Second Circuit has recognized that proof of cause-and-effect is "the most important" factor and "the essence of an efficient market and the foundation for the fraud on the market theory." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,* 546 F.3d 196, 207 (2d Cir. 2008). *See also In re Fed. Home,* 281 F.R.D. at 181-82 ("Without evidence of the prompt effect of unexpected news on market price . . . the market cannot be called efficient.").[4] Disregarding this authority and

---

[3] As Plaintiffs acknowledge, the Second Circuit has not adopted the the tests set forth in either the *Cammer* or *Krogman* cases as the proper test for determining market efficiency.  Pls Br. at 16.

[4] Although the *Waggoner* recognized that an event study (*Cammer* 5) is not always necessary to establish market efficiency, it emphasized that "*Cammer* 5 has been considered the most important *Cammer* factor in certain cases" and that defendants had only challenged the event study because the other factors for

that Mr. Coffman devotes many pages of his report to the event study, Plaintiffs attempt to downplay its significance. *See* Pls.' Br. at 20-21. But Plaintiffs cannot avoid that the event study, critical to Mr. Coffman's opinion, is fundamentally flawed and does not provide convincing evidence of market efficiency.

**The Analysis Period is Too Long.** Mr. Coffman analyzes a period—from June 14, 2021 to January 19, 2024—that extends two full years beyond the seven-month Class Period. In doing so he looks at the price impact of eleven earnings releases, only three of which were issued during the Class Period. Coff. Rpt. at Ex. 7. Mr. Coffman claims to use this extended period to "have a larger data set of earnings announcements with which to work". Ex. 6 (Coff. Tr. at 68:21-69:6). But as Defendants' expert Bruce Deal demonstrates, by extending the study for two years post Class Period, he employs an unsound methodology. *See* Ex. 1 (Deal ¶¶ 75-77); *see also In re Fed. Home*, 281 F.R.D. at 179 ("serious errors" where, *inter alia*, expert improperly included a date "as a news date, even though it is not within the class period."). In fact, Mr. Coffman concedes that he never directly tested the Class Period to determine whether his Analysis Period is even representative. Ex. 6 (Coff. Tr. at 70:19-71:7; 117:6-12) ("Q. So you don't know what would happen if you ran that same what you're calling cause and effect just over the class period? . . . A. . . . I haven't actually run that test, no."); ("I did not run any statistical test over any subperiods.").

Mr. Coffman's failure to tailor his event study to the Class Period means that his study draws from a non-representative time sample. *See Mandala* v. *NTT Data, Inc.,* 975 F.3d 202, 211-12 (2d Cir. 2020) ("error" to presume that broad-level statistics "will accurately describe subgroups" and "statistical inferences" cannot be drawn from a "[non]representative" sample);

---

market efficiency "weighed so clearly in favor" of plaintiffs. *Waggoner*, 875 F.3d at 97-98. By contrast, here, Defendants do challenge another critical aspect of market efficiency (analyst reports), and the market at the start of the Class Period (following the IPO) was inefficient.

*Deutsche Bank AG,* 2013 WL 5815472, at *22 (that the stock "may have traded at many other points in time in an efficient market is irrelevant" to show "market efficiency during the Class Period"). Indeed, it is widely accepted that a stock may be efficient during some time periods but not others; thus, empirical investigation of efficiency should be tailored to the Class Period. Ex. 1 (Deal ¶ 75 n.142); Ex. 6 (Coff. Tr. at 69:16-22).

**Flawed Estimation Window.** Mr. Coffman's use of a 120 day "rolling" estimation window in his event study is flawed given the length of the Class Period. As part of the event study, Mr. Coffman "estimat[ed] a regression model over [a] period of time (an "estimation window") to observe the typical relationship between the market price of [TaskUs stock] and broad market factors." Coff. Rpt. ¶ 49. He uses a "rolling" estimation window to "allow[] for the relationship between TaskUs Common Stock, industry and market factors, as well as firm-specific volatility to update over time[.]" *Id.* ¶ 50. For the first 120 days, however, a rolling window could not be calculated, and, instead, Mr. Coffman used a "fixed estimation window" for those days. Ex. 6 (Coff. Tr. at 103:20-104:4) ("for the first 120 days, I'm estimating what's called a fixed regression, which is essentially over that period, it's just one regression model that's applied to each of those days[.]"). But as Mr. Coffman testified, using a fixed window is generally inferior to one using a rolling window. *Id.* at 104:17-21. Thus, since the Class Period is only 154 trading days, approximately 80% of the dates utilize a fixed window, an inferior methodology that does not allow for "firm-specific volatility to update over time." Coff. Rpt. ¶ 50; Ex. 1 (Deal ¶¶ 76-77).

**Failure to Assess Non-News Days.** Using his event study to assess cause and effect, Mr. Coffman compares the statistically significant price movements following the eleven earnings releases with what he calls "non-news days," days where he "identified no TaskUs-related news from the Factiva database and when there were no analyst reports or SEC filings issued." Coff.

10

Rpt. ¶¶ 57-59. Mr. Coffman posits that the higher proportion of days showing statistically significant price movements in the former data set is evidence of a cause and effect relationship. *Id*. at ¶ 59. But to determine whether a date is a non-news day, Mr. Coffman simply evaluates whether any TaskUs-related news was released, without analyzing its content. *Id*. at Ex. 8. And to determine whether there was news on a given day, he just runs the term "TaskUs" and applies a basic exclusion. *Id.;* Appdx. A at 2. Days with news that mentions TaskUs but contain no new value-relevant information, however, should be deemed non-news days; Mr. Coffman's cursory exclusion of such days introduces bias and is not methodologically sound. Ex. 1 (Deal Rpt. ¶ 84-86).

**Failure to Analyze First Two Months of The Class Period.** Mr. Coffman's event study analysis fails to study cause and effect for the first two months of the Class Period. In the back-up for his report, Mr. Coffman provides the regression, which he ran for the period of June 14, 2021 through March 6, 2024 (beyond his "Analysis Period"). Ex. 7. Although the model begins on June 14, 2021, the first date that Mr. Coffman examines to determine a correlation between new company-specific events and TaskUs's stock price is August 11, 2021—two months after the start of trading and the Class Period. Coff. Rpt. Ex. 7. On this day he finds a statistically significant abnormal return with a t-statistic of 4.501 (the first date his model shows any such return at all). Ex. 7. Prior to August 11, Mr. Coffman does no work to examine the relationship (or lack thereof) between a company specific event and the price of TaskUs stock.

This is true even though Mr. Coffman's back-up materials show at least 22 days in which there was company specific news between June 11, 2021 and August 11, 2021. *See* Ex. 8. Mr. Coffman performed no analysis of those 22 news days and made no attempt to understand why his model found no abnormal price reaction following the news events on those days. Mr. Coffman

11

instead simply ignores this two month time period.  Ex. 6 (Coff. Tr. at  126:9-17) (other than the 11 event dates, "for the remainder of days with some form of news, I have not done a test of how many of those were statistically significant or not.").  Thus, at a minimum, this lack of analysis precludes a finding of market efficiency until August 11, 2021, the first company specific event date studied.  *Brokop v. Farmland Partners Inc.,* No. 18CV02104, 2021 WL 4913970, at *4-5 (D. Colo. Sept. 30, 2021) (efficiency after first event date showing statistically significant cause-and-effect relationship).

**Failure to Consider Confounding News**.  Mr. Coffman's event study is also flawed because he fails to consider the impact of any confounding news that coincides with the 11 earnings releases in his study, and fails to evaluate the directionality of the price reactions to the earnings releases.  As discussed, Mr. Coffman compares statistically significant price movements on the 11 earnings days to the "non-news days" as evidence of a causal relationship between new disclosures and changes in TaskUs stock price.  *Supra* at I.A.1.  However, as Mr. Deal explains,  Ex. 1 (Deal ¶ 78-79), Mr. Coffman fails to analyze whether there was confounding news, unconnected to the earnings announcement, that may have caused the excess returns, thus breaking the chain of causation.  Further, to show a causal relationship between TaskUs's disclosures and movements in stock price, Plaintiffs must show that the direction of statistically significant abnormal returns aligns with the nature of the news (*e.g*, that positive earnings led to positive abnormal returns).  *Id*. ¶ 79.  Mr. Coffman studies this for one earnings date, but ignores the others.  Coff. Rpt. ¶ 56.

Notably, to illustrate the flaws in Mr. Coffman's analysis, Mr. Deal ran alternative tests adjusting the rolling estimation window from 120 trading days to 15, 30, 45 and 60 trading days respectively, to account for the short Class Period, and he analyzed the Class Period only, not the two years that followed. Ex. 1 (Deal ¶¶ 88-92).  Mr. Deal also reviewed the actual content of news

articles published, to properly determine which days should be characterized as non-news days to use in a comparison set. *Id.* ¶ 89. Ultimately, the results of Mr. Deal's tests are telling—for each of the four scenarios tested, there is no statistically significant difference between the ratio of earnings days showing statistically significant price movements and the ratio of "non-news days" showing statistically significant price movements. *Id.* ¶ 91. Thus, Mr. Deal's model shows no correlation between new TaskUs information and its stock price, suggesting Mr. Coffman's methodology is not rigorous to prove market efficiency.

### 2. There Was No Analyst Coverage at the Start of the Class Period

In his report Mr. Coffman states that there was "consistent analyst coverage for TaskUs" and refers to analyst coverage for the entire Class Period ("6/11/2021-1/19/2022"). Coff. Rpt. ¶ 33 & Ex. 4. But this is not accurate and his characterization glosses over the fact that the first analyst reports regarding TaskUs were not published until July 6, 2021, 25 days after the start of the Class Period. This is no small matter. The Second Circuit has recognized that "a lack of analyst coverage indicate[s] that the market was inefficient." *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,* 546 F.3d 196, 205 (2d Cir. 2008); *In re Initial Pub. Offerings,* 471 F.3d at 43 (25-day quiet period following the IPO, which, like here, precludes "the contemporaneous 'significant number of reports by securities analysts'" is one example of why an efficient market "cannot be established with an IPO"). Mr. Coffman agrees, relying in his report (at ¶¶ 27, 65) on a paper which explains, "[a]nalyst coverage is the most widely-accepted method of measuring when securities markets are efficient" and that "the SEC indicates that . . . adequate analyst coverage must exist to ensure an efficient market." Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 Law and Contemp. Problems 105-122 (2000); Ex. 6 (Coff. Tr. at 61:24-62:4) ("analyst coverage is an important mechanism for disseminating information to the market"). Ex. 1 (Deal ¶ 93 n.164).

13

Given the lack of analyst reports following the IPO—taken together with the myriad flaws in Mr. Coffman's event study—Plaintiffs have failed to carry their burden to demonstrate market efficiency during the Class Period. For this reason class certification should be denied. *Waggoner,* 875 F.3d at 97–98 & n.29 (class certification may be denied where "plaintiffs' event study was flawed" and there is evidence "suggest[ing] the inefficiency of the market.")

**B.** **Even if Plaintiffs Could Invoke the *Basic* Presumption, That Presumption is Rebutted Because the Low Attrition Statement Had No Price Impact**

In *Halliburton II*, the Supreme Court reaffirmed that, "*[a]ny showing* that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption of reliance." *Halliburton II,* 573 U.S. at 281. More recently, in *Goldman,* it gave clear direction as to what that means: when assessing whether a defendant has rebutted the *Basic* presumption, courts "should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman*, 141 S. Ct. at 1960 (2021). "[A] court cannot conclude that Rule 23's requirements are satisfied without considering *all* evidence relevant to price impact," regardless of whether "that requires inquiry into the merits." *Id*. at 1960-61. While defendants "bear the burden of persuasion to prove a lack of price impact by a preponderance of the evidence", such a burden "should rarely be outcome determinative." *Id. at* 1958. This Court's "task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id*. at 1963. Here both direct and indirect evidence demonstrate that it is "more likely than not" that the low attrition statement had no price impact.

**1.** **There is No Direct Evidence of Front-End Price Inflation**

Plaintiffs allege that the price of TaskUs stock was artificially inflated and maintained by the low attrition statement. Am. Compl ¶ 267. But the record in this case provides direct and

14

definitive evidence that the low attrition statement did not and could not cause a positive price reaction (or artificially inflate the price of TaskUs stock). *IBEW Local 98 Pension Fund v. Best Buy Co.,* 818 F.3d 775, 782 (8th Cir. 2016) ("[T]he absence of . . . price impact" at the time an alleged misstatement is made—often described as "front-end" impact—is "direct evidence that investors did not rely" on that statement.). According to Mr. Coffman's own regression model, there was no statistically significant abnormal returns on TaskUs stock from June 14, 2021, the second day of trading (and first day he studied), through August 10, 2021 (Ex. 7), thus demonstrating that there was no inflation. *See Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 83 (2d Cir. 2023) ("*Goldman II*") (no price inflation where "the challenged statements did not cause statistically significant increases in . . . price.").[5] This is also true with respect to the repeat of the alleged misstatement after-market closed on October 18, 2021 (in a draft registration statement for the SPO). Ex. 4. Not only was there no associated price inflation, but Mr. Coffman's event study shows the opposite—there was a statistically significant *decline* in stock price on October 19, 2021. Ex. 7. Further the October 18, 2021 low attrition statement was identical to the statement first made in April 2021, and the repeat of this months-old statement could not have caused a change in stock price. *Amberber v. EHang Holdings Ltd.,* No. 21CIV1392, 2022 WL 409096, at *4 (S.D.N.Y. Feb. 10, 2022).

## 2.    There is No Indirect Back-End Evidence of Price Impact

Plaintiffs also cannot succeed under a price inflation maintenance theory. Under this theory, the alleged misrepresentation "prevents preexisting inflation . . . from dissipating, but does not cause a price uptick." *Goldman II*, 77 F.4th at 80. Therefore, plaintiffs must rely on the stock

---

[5] As Mr. Coffman also explained, it is not possible to measure front-end inflation on the first day of trading. Ex. 6 (Coff. Dep Tr. at 92-93) (explaining that he did not calculate a return for June 11, 2021, the first day of trading, because "you need two closing prices to calculate a close-to-close return."). The same holds true for any day that the market might first be deemed efficient. Ex. 1 (Deal ¶ 92).

drop following a corrective disclosure to infer front-end inflation. *Id.* (explaining that the "back-end price drop—what happens when the truth is finally disclosed—operates as an indirect proxy for the front-end inflation, or the amount that the misrepresentation fraudulently propped up the stock price."). But where "there is a mismatch between the contents of the misrepresentation and the corrective disclosure . . . there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Goldman,* 141 S. Ct. at 1961.

a.     **The Low Attrition Statement Does Not Match The Alleged Corrective Disclosure**

**The Low Attrition Statement Was Generic.**  The low attrition statement—the only misstatement at issue for Plaintiffs' Exchange Act claims—is generic by nature, which is "important evidence of a lack of price impact[.]" *Id.* at 1960-61 ("a more-general statement will affect a security's price less than a more specific statement on the same question.'"). The reference to "low attrition" is made in a sentence stating: "The culture and focus on people . . . gives us an advantage on key people metrics of efficiency, client satisfaction, and low attrition." *Supra* at []. In its decision, this Court recognized that the initial part of the sentence—"culture and focus on people"—"would arguably be non-actionable puffery standing alone" but that the reference to low attrition is a "more concrete assertion." Opinion at 25.  That the words "low attrition" may be more concrete does not mean they are not generic, especially given the larger context of puffery (and aspiration)—*i.e.,* the benefits of TaskUs's culture giving an advantage on certain metrics including low attrition.  It is not a detailed statement as to attrition, it provides no numbers or percentages, makes no comparison to competitors or industry wide statistics and, in fact, when read in context does not even say TaskUs had low attrition, just that its culture gives an advantage on low attrition.  When compared to the Disclosed Attrition Rates, the difference is stark and the low attrition statement easily qualifies as generic. *In re Kirkland Lake Gold Ltd. Sec. Litig.*, No.

16

20-CV-4953 (JPO), 2024 WL 1342800, at *8 (S.D.N.Y. Mar. 29, 2024) (misrepresentations "more specific in character than the Supreme Court's prototype" still generic).

**The Alleged Corrective Disclosure Did Not Correct "Low Attrition."** As to a comparative analysis, the Spruce Report does not match (or correct) the low attrition statement, especially given the dismissal of claims based on the Disclosed Attrition Rates statements. Opinion at 24, 60-61. *See Goldman,* 141 S. Ct. at 1961. The 80-page Spruce Report, published by a short seller, contains wide-ranging accusations about TaskUs and does not directly reference the low attrition statement. Instead, it contains three pages that include a discussion of attrition which is focused on the Disclosed Attrition Rates statements and general industry practices. *See* Ex 5 (Spruce at 35-37). This Court held that to the extent the Spruce Report is based on prior public statements, it cannot be corrective. Opinion at 57. In fact, the only portion of the attrition discussion that, on the pleadings, the Court referred to as non-public (and therefore could be corrective) is the statement attributed to a former executive of TaskUs that says, *inter alia,* "I think that the attrition is significantly worse." Opinion at 57-58.[6] We respectfully submit that, as analyzed by Mr. Deal and when read in context, the alleged executive's statement, however, is not, in fact, corrective. Ex. 1 (Deal ¶¶ 24-39). The statement was made at the end of an answer provided to a question about "the Company's claims of attrition being below the industry standard of 30%" and "how they qualify it to include only employees greater than 180 days[.]" Ex. 5 (Spruce at 36).[7] In response, the former executive purportedly expresses skepticism about attrition

---

[6] The remainder of the Spruce discussion about attrition is based upon previously disclosed public information, including, for example, that Spruce also estimates that TaskUs total attrition for 2019 was 46% based on previous public information (utilizing simplistic math to calculate a percentage), and as the Court held is not corrective. Opinion at 58; Ex. 5 (Spruce at 37). See Ex. 1 (Deal ¶ 35).

[7] The 30% industry number referenced by Spruce is not, as Spruce states, an industry total attrition number. Instead it comes from the prospectus filed by BPO company, TDCX, which refers to a 30-34% number for the Asia Pacific region or "APAC" only, not world-wide attrition. Ex. 9 (TDCX Prosp. at

17

statistics from all BPO firms. *Id*. He then explains that, when discussing attrition, BPO companies do not include, *inter alia*, the first 180 days, voluntary resignations, or internal promotions, purportedly stating: "there's just a lot of different ways to manipulate it. And I think because it is so impactful to the BPO businesses bottom line. They're just kind of pushed in the direction to lie. So number one, **I would just say, I think that the attrition is significantly worse**." *Id*. Ultimately he concludes that TaskUs "looking at only a hundred eighty days or greater" was "not worrisome from a competitive standpoint" because "that's pretty much standard across business." *Id*. This discussion is not corrective.

*First*, the question posed to the alleged executive about the "Company's claim of attrition" referred to the Disclosed Attrition Rates (which were below the 30% referenced) and the fact that they were qualified to include only employees greater than 180 days. His response is in the context of these specific rates as he discusses the entire industry similarly qualifying reported attrition numbers (*e.g.,* reporting > 180 days only), and his ultimate conclusion that TaskUs using these metrics "is not worrisome" as it's the standard across the industry. This conclusion is bolstered by Mr. Deal's analysis which shows that other BPO companies did report attrition using similar metrics and, although based on a non-public interview, when examined carefully, the information provided, in substance, was public information, known to the market. Ex. 1 (Deal ¶ 30).

*Second*, the alleged former executive's statements are not corrective because they offer a general critique of the industry as a whole (in the context of firms utilizing various measurements to report attrition). That he purportedly said, "I think that the attrition is significantly worse" expressed an opinion about the BPO industry (as demonstrated by the context of this part of his

---

126); Ex. 1 (Deal ¶¶ 27). Thus, Spruce's question, which references the low range only of this incorrect metric, misleadingly results in an apples-to-oranges comparison, not surprisingly eliciting skepticism from the former executive.

answer—including the preceding sentence—which was about the industry overall) and not TaskUs specifically. Ex. 5 (Spruce at 36). The executive simply stated the obvious—*i.e.*, such a number (a subset of the total), whether disclosed by TaskUs or its peer, is less than total attrition which he views as significantly worse. That did not mean that TaskUs did not have "low attrition" when making an apples-to-apples comparison (using the same metric) to its peers.

### b.    The Stock Drop Was Not Due to The Low Attrition Statement

In its decision, this Court recognized that the non-public attrition information revealed by the Spruce Report "may not have driven any stock drop" but held it was not appropriate to make such a determination on a motion to dismiss. Opinion at 58-59. At class certification, however, this is the exact determination that must be made. *Goldman,* 141 S. Ct. at 1961 (at class certification, courts "must take into account *all* record evidence relevant to price impact, regardless whether that evidence overlaps with materiality or any other merits issue.'). While TaskUs's stock price declined following the publication of the Spruce Report, Mr. Deal's analysis, and the market commentary he examines, demonstrate that, the market, in fact, was not reacting to any correction to the "low attrition" statement. Ex. 1 (Deal ¶ 49-51, 55-59). *See IBEW*, 818 F.3d at 783 (8th Cir. 2016).

Following its publication, the Spruce Report was only referenced in six analyst reports. Of those six, none attributed the stock decline to a revelation that the low attrition statement was untrue, or for that matter, made any mention at all of the low attrition statement. Although two of the six mention the attrition issues reported in Spruce—J.P. Morgan and Baird—J.P. Morgan's comment concerns the Disclosed Attrition Rates (noting that using a >180-day, voluntary definition "doesn't offer a full picture of employee attrition" but that this definition is consistent with "3 out of 4 BPO peers" and that its own analysis predicts a slowdown in headcount) while Baird notes it "like[s] TASK a lot" at the lower price and that items raised in Spruce, including

19

attrition, are well known, and that it is "quite well known" that, among other factors, "attrition may be high and can be hard to calculate (which is true across the industry)." Exs. 10 at 1 and 11 at 1; Ex. 1 (Deal ¶ 44). Thus, the attrition discussion in the J.P Morgan and Baird reports (which is not the focus of either) confirm that: 1) analysts viewed Spruce as pertaining to the Disclosed Attrition Rates statements (not the generic low attrition statement); 2) analysts viewed Spruce as pertaining to industry wide reporting metrics; and 3) that total attrition would be higher than what was reported by TaskUs and other BPO companies was known to investors. And, that the other four analysts who reported on Spruce made no mention of Spruce's reporting on attrition, supports that this topic versus the myriad of accusations asserted by Spruce, was not particularly important to investors and did not drive the stock drop. Exs. 12, 13, 14, and 15. This conclusion is further supported by the fact that short seller reports typically are associated with price declines in the range here. Ex. 1 (Deal ¶ 53-54).[8]

An analysis of news coverage also shows that the attrition-related information in the Spruce Report was not new or material to investors. There were 33 articles published within two business days that mentioned the Spruce Report. Of those only two included any reference at all to the attrition discussion in Spruce. One, a January 2020 Benzinga article, was in the context of the Disclosed Attrition Rates. Ex. 16 (commenting that Spruce highlighted "a non-standard definition of annual employee attrition rate, possibly understating the actual turnover"). The other from a website called "Theflyonthewall.com", paraphrased the attrition-related discussions in the Spruce Report, but highlighted the caveat that "Spruce Point has a short position in TaskUs, Inc. and owns

---

[8] Mr. Deal extended his analysis of post-Spruce analyst reports through the first quarter of 2022. Ex. 1 (Deal ¶ 47 & Ex. 1). He found that the 12 additional reports that discuss attrition during that period, do so in connection with the Disclosed Attrition Rates (some mentioning corroborating metrics as well) or future attrition rate risks. *Id.* ¶ 40. None reference the low attrition statement or its alleged correction by Spruce.

derivative securities that stand to net benefit if its share price falls." Ex. 17; Ex. 1 (Deal ¶ 50).  Of the other 31 that discussed Spruce (including Dow Jones, Reuters and other mainstream media), 29 made no mention at all of attrition even though at least some included detailed discussions of the Spruce Report.  *Id.* ¶ 49, 55-59.

Finally, that the Spruce Report did not correct the low attrition statement is also evidenced by the fact that analysts did not revise their view of TaskUs attrition following its publication.  For example, a January 21, 2022 BofA report noted that TaskUs employee attrition "is better than the industry average" without mentioning the attrition-related discussion in the Spruce Report (Ex. 13 at 2); a March 16, 2022 RBC report discussed TaskUs's "low voluntary attrition rates" as a contributing factor to its business success (Ex. 18 at 5); and BofA maintained the same "Investment Rationale", stating in May 9, 2022  that "employee attrition is better than the industry average." Ex. 19 at 2;  *See also* Ex. 1 (Deal ¶ 45).

### 3. Investors Did Not Rely On The Low Attrition Statement During The Class Period

That price inflation cannot be inferred from the back-end stock drop, is reinforced by an analysis of analyst reports during the Class Period.  Mr. Deal reviewed 42 reports issued between July 6, 2021 and January 19, 2022.  Of the 42 reports, 26 reference attrition and, of those, only one references the low attrition statement.  That sole report, issued by RBC on July 6, 2021 (Ex. 22), quotes the low attrition statement but also discusses the Disclosed Attrition Rates as well as other factors that would positively impact attrition (*e.g.*, the Company's offices are located near its employees).  With respect to the other 25 reports that discuss attrition, the majority (18) do so with respect to the Disclosed Attrition Rates, with some also referencing corroborating evidence and metrics or evaluations of future risk.  *See* Ex. 1 (Deal ¶ 65 & Ex. 3).  That only one in 42 reports references the low attrition statement is not surprising and, as *Goldman* recognizes, consistent with

its generic nature. *Goldman*, 141 S. Ct. at 1960. It also is not surprising given the Disclosed Attrition Rates—as a matter of common sense, it is less likely that investors would rely on a more general statement when specific information—2019 and 2020 specific attrition numbers—is concurrently provided.

## II.    PLAINTIFFS HAVE NOT PROFFERED A METHODOLOGY FOR MEASURING CLASS-WIDE EXCHANGE ACT DAMAGES

Plaintiffs must establish "that damages are capable of measurement on a class-wide basis" and "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [Plaintiffs'] theory" of liability. *Comcast,* 569 U.S. at 35. Although such damage "[c]alculations need not be exact," Rule 23(b) still requires "evidentiary proof"; it does not "set forth a mere pleading standard." *Id.* at 33. *See Ward v. Apple Inc.,* 784 F. App'x 539, 540 (9th Cir. 2019) (expert cannot "merely assert[] that he would be able to develop a model at some point in the future."). Mr. Coffman does not develop a model for calculating Exchange Act damages that satisfies *Comcast*. Instead he uses stock language that is almost word-for-word identical to reports submitted in other cases. *See, e.g.,* Ex. 22; Ex. 6 (Coff. Tr. at 18:6-10; 20:2-9) (explaining that he uses a template and that for damages "a lot of the language is the same" as other reports). Specifically, according to the Coffman template, "there is a standard and well-accepted method for calculating class wide damages" but that to "disaggregate corrective and confounding information," as well as determine "how inflation per share may have evolved over a class period"—both of which are necessary for damages—are "inherently case-specific question[s] that depend[] on specific facts and circumstances." Coff. Rpt. ¶¶ 78, 81. Mr. Coffman admits that he created no damages model (well accepted or not), did no disaggregation work (nor even explain with reference to the facts how he would undertake such an analysis here) or calculate inflation over the Class Period. Coff. Rpt. ¶¶ 81, 82; Ex. 6 (Coff. Dep at 22:22-23:5).

22

Even though certain courts have accepted this theoretical and speculative approach to class-wide damages, it is contrary to *Comcast* and should be rejected. Indeed, in *Waggoner,* the Second Circuit held that the failure to disaggregate a regulatory action and potential fines did not preclude certification specifically because they "were a part of the alleged harm the Plaintiffs suffered." *Waggoner,* 875 F.3d 79 at 106. A reasonable extension of that reasoning is that an expert may need to disaggregate factors that *were not* part of the alleged harm suffered. *See also Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.,* 301 F.R.D. 116, 142 (S.D.N.Y. 2014); *In re ConAgra Foods, Inc.,* 302 F.R.D. 537, 577 (C.D. Cal. 2014) (no class-wide damages where expert describes the methods he would use but "does not report that he has actually employed them"). Here, the Class Period begins post-IPO when the market was inefficient for the reasons discussed above, and damages are based solely on the report of a short seller which launched a litany of accusations unrelated to the low attrition statement and material to investors. Ex. 1 (Deal ¶¶ 55-59As such, Mr. Coffman's form language cannot satisfy *Comcast* and, for this reason, class certification for the Exchange Act Class should be denied.

## III.    THE SECURITIES ACT CLASS FOR THE SPO SHOULD NOT BE CERTIFIED BECAUSE OKLAHOMA CANNOT BE A CLASS REPRESENTATIVE

As set forth below, Oklahoma—the only Plaintiff alleged to have purchased shares pursuant and/or traceable to the SPO—cannot represent a putative class for three reasons.

**Oklahoma Is Not Typical**. To satisfy typicality, potential class representatives must show, "by a preponderance of the evidence . . . that [they are] 'not subject to any unique defenses which threaten to become the focus of the litigation.'" *In re IMAX Sec. Litig.,* 272 F.R.D. 138, 147 (S.D.N.Y. 2010). Here, Oklahoma purchased TaskUs stock up until April 2022—three months following the end of the Class Period—subjecting it to a unique defense, and rendering it atypical. *See Berwecky v. Bear, Stearns & Co.,* 197 F.R.D. 65, 69 (S.D.N.Y. 2000)); *Rocco v. Nam Tai*

*Elecs., Inc.,* 245 F.R.D. 131, 135-36 (S.D.N.Y. 2007).

**Oklahoma Lacks Standing.**  "To bring a claim under § 11, the securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or misleading." *Slack Techs., LLC v. Pirani,* 598 U.S. 759, 768 (2023).  The entirely circumstantial proof proffered by Oklahoma through discovery is insufficient to demonstrate standing.  There is no contemporaneous evidence produced by Plaintiffs reflecting a purchase in the SPO.  There were, for example, no trading confirmations or communications with underwriters reflecting the purchase of SPO shares produced, even though requested.  Instead both Oklahoma and Lord Abbett produced a summary of trades, created for this litigation in March and May 2024, respectively.  These summaries, however, are not contemporaneous documents.  This is notable as intraday trading data shows that, at various times on October 21, TaskUs stock traded at a price of $63 (the SPO price) and thus Oklahoma's purchases could have been made on the open market just as well as in the SPO.  Ex. 21 (Chicago Options Data).  Alternatively, if the Court find standing, the Securities Act Class for the SPO should be limited to investors who bought shares in the SPO, not traceable to the SPO.  Tracing to a SPO is extremely difficult and raises a host of individualized issues that defeat predominance. *See In re Bank of Am. Corp. Secs*, 281 F.R.D. 134, 147 (S.D.N.Y. 2012)*.*

**Oklahoma Was Not Appointed Lead Plaintiff.**  Oklahoma is not a proper class representative because it was never appointed "lead plaintiff" after the notice and application process required by the PSLRA.  In order to encourage capable representatives, the PSLRA requires a plaintiff to publish notice of the action, including "the claims asserted therein". 15 U.S.C. § 77z-1(a)(3); 15 U.S.C. § 78u-4(a)(3).  Here, Mr. Lozada filed the original complaint alleging claims under the Exchange Act only (ECF 5) and his counsel published  notice

24

summarizing only the Exchange Act allegations, and not the Securities Act claims.  ECF 15-2. Oklahoma did not seek appointment as lead plaintiff or in any way participate in the PSLRA-mandated process, yet now purports to represent an entirely new putative class of persons with Securities Act claims based on the SPO.  This end-run around the PSLRA should not be permitted. *See Dube v. Signet Jewelers Ltd.*, 2017 WL 1379385 at *1 (S.D.N.Y. Apr. 14, 2017).

## IV.   THE PROPOSED CLASS DEFINITIONS ARE FAIL-SAFE

The definitions for both the Securities and Exchange Act Class include only members who "were damaged thereby" and thus are impermissibly fail-safe—*i.e*, "defined circularly' to require that class members have suffered legal injury"—because in such a circumstance "liability must be determined to ascertain whether an individual is a class member, [and so] the proposed class does not meet the predominance and superiority requirements."  *Cassie v. JB Sec.,* No. 17CIV6587, 2018 WL 11449903, at *1 (S.D.N.Y. Nov. 16, 2018).  Alternatively, if the phrase "and were damaged thereby" were stricken from the Class definitions, the classes would be overbroad and not certifiable.  *See Charrons v. Pinnacle Grp. NY LLC*, 269 F.R.D. 221, 228 (S.D.N.Y. 2010).

## CONCLUSION

For the reasons set forth, the Court should deny Plaintiffs' Motion for Class Certification.

Dated: July 19, 2024

**SIMPSON THACHER & BARTLETT LLP**

/s/ Jonathan K. Youngwood
Jonathan K. Youngwood
Craig S. Waldman
Janet A. Gochman
Eric Yang
425 Lexington Avenue
New York, NY 10017
jyoungwood@stblaw.com
cwaldman@stblaw.com
jgochman@stblaw.com
eric.yang@stblaw.com

*Counsel for Defendants TaskUs, Inc., BCP FC
Aggregator L.P, Bryce Maddock, Jaspar Weir, Balaji
Sekar, Amit Dixit, Mukesh Mehta, Susir Kumar, and
Jacqueline D. Reses*

26