# EXHIBIT 6

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

HUMBERTO LOZADA and OKLAHOMA

FIREFIGHTERS PENSION AND

RETIREMENT SYSTEM Individually and

on Behalf of All Others Similarly

Situated,                          Case No.

            Plaintiffs,        1:22-cv-01479

      v.                           (JPC)

TASKUS, INC., BRYCE MADDOCK,

JASPAR WEIR, BALAJI SEKAR, AMIT

DIXIT, MUKESH MEHTA, SUSIR KUMAR,

JACQUELINE D. RESES, and BCP FC

AGGREGATOR L.P.,

            Defendants.

-----------------------------------x


            DEPOSITION OF CHAD COFFMAN

                  June 20, 2024


Reported by:

MARY F. BOWMAN, RPR, CRR

Page 2

June 20, 2024

9:20 a.m.

Deposition of CHAD COFFMAN, held at Simpson Thacher & Bartlett LLP, 425 Lexington Avenue New York, New York, before Mary F. Bowman, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the States of New Jersey and New York.

Page 3

APPEARANCES:

BLEICHMAR FONTI & AULD LLP

Attorneys for Plaintiffs, Humberto Lozada

and Named Plaintiff Oklahoma Firefighters

Pension and Retirement System

      7 Times Square, 27th Floor

      New York, New York 10036

BY:   EVAN A. KUBOTA, ESQ.

      JOSEPH FONTI, ESQ. (Remote)

      THAYNE STODDARD, ESQ. (Remote)

SIMPSON THACHER & BARTLETT LLP

Attorneys for Defendants, TaskUs, Inc., BCP FC

Aggregator L.P, Bryce Maddock, Jaspar Weir,

Balaji Sekar, Amit Dixit, Mukesh Mehta, Susir

Kumar, and Jacqueline D. Reses

      425 Lexington Avenue

      New York, NY 10017

BY:   JONATHAN K. YOUNGWOOD, ESQ.

      JANET A. GOCHMAN, ESQ.

Also Present:

      Robert Rudis, Videographer

Page 4

C. Coffman

(Exhibit 1, Expert Report of Chad Coffman, marked for identification, as of this date.)

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:20 a.m., June 20, 2024.

Please note that the microphones are sensitive and may pick up whispering and private conversations.  Please mute your mobile phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Chad Coffman taken by counsel for defendant in the matter of Humberto Lozada and Oklahoma Firefighters Pension and Retirement System, et al., versus TaskUS, Inc., et al., filed in the United States District Court, Southern District of New York, Case Number 1:22-cv-01479 (JPC).

The location of the deposition is Simpson Thacher & Bartlett LLP,

Page 5

C. Coffman

425 Lexington Avenue, New York, New York.

My name is Robert Rudis, and I'm the videographer.  The court reporter is Mary Bowman.  And we represent the firm Veritext Legal Solutions.

I'm not related to any party in this action nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now please state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. YOUNGWOOD:  Good morning.  This is Jonathan Youngwood, Simpson Thacher, for the defendants.

With me today, also from Simpson Thacher, are Janet Gochman, and we have a summer associate, Ophelia Bonar, who is sitting in to observe.

MR. KUBOTA:  Evan Kubota of

Page 6

C. Coffman

Bleichmar Fonti & Auld for plaintiff and the witness.

THE VIDEOGRAPHER:  Could the people on Zoom please announce yourselves.

(Whereupon, counsel on Zoom placed their appearances on audio record.)

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness and then counsel may proceed.

CHAD COFFMAN,
called as a witness by the defendant, having been duly sworn, testified as follows:

EXAMINATION BY
MR. YOUNGWOOD:

Q.    Thank you.

Good morning, Mr. Coffman.  Nice to see you.

A.    Good morning.

Q.    You have been put in front of you Exhibit 1 to your deposition.  It's a copy of your report in this case, or I'll represent that it is that.

If you could just look at it though

Page 7

C. Coffman

and confirm that it does appear to be your report, it does appear to be complete, and let us know when you're done and comfortable.

A.    It does appear to be a copy of my report.

I think the front page is something that was not produced by me, it's just a title page.  But other than that, it looks to be a copy of my report, including the appendices and exhibits.

Q.    Okay.  So if we look at the top of the pages, on the upper right of each page, it says page 1 of -- well, it says page "X" of some number.  It says X of 67.

Your report starts on page 2 of 67?

A.    That's correct, yes.

Q.    And you sign your report -- I'm now going to use actually the numbers on the bottom of the page -- on page 39?

A.    Yes.

Q.    Okay.  I assume you've rereviewed your report in preparation for today?

A.    I have, yes.

Q.    And in doing so, did you identify

Page 8

C. Coffman

anything that is incorrect, anything you would want to change or amend in any way?

A.    No.

Q.    How was the report prepared?  What was the process?

MR. KUBOTA:  Objection, vague.

A.    I was asked to evaluate the questions that I was -- that I was asked that are summarized at the beginning of the report.

So the process was I began performing analysis or having staff members at my direction prepare analyses to evaluate the questions and then the report was prepared through a combination of myself and people working at my direction.

Q.    The questions you are referring to are in paragraph 1 of the report?

A.    Yes.

Q.    Okay.  They're phrased as tasks you have been asked to do rather than questions, fair to say?

MR. KUBOTA:  Objection to form and misstates the document.

A.    It's fair that it is stated -- it

Page 9

C. Coffman

said I've been asked to opine on whether, so that was a question in my mind, but it is stating what I was asked to evaluate.

Q.    Okay.  You now work for something called Peregrine Economics?

A.    Yes.

Q.    And that's a firm that you formed, according to your report, in January of 2024?

A.    That's when I began being employed by the firm.  It was technically incorporated sometime in 2023, with me and several other partners.

Q.    Who are the others?

A.    Peter Hickey, Candice Rosevear and Scott Walster.

Q.    Are these people you worked with previously at Global Economics?

A.    Yes.

Q.    And what caused you to leave Global Economics and form Peregrine?

A.    It was really a business decision of a direction that some of the partners at Global Economics Group were going, I didn't feel fit with what I wanted to do and thought there was

Page 10

C. Coffman

increased financial risk in and I didn't want to be a part of.

So I felt it was better for me and my other partners and my staff for me to exit Global Economics Group.

Q.    Do you have an ownership interest in Peregrine?

A.    I do.

Q.    What percentage?

A.    In terms of voting, it's 50 percent. In terms of my economic interest, it is higher than that, probably closer to 80 percent.

Q.    Paragraph 2 of your report, you explain that Peregrine is compensated for your time at 950 per hour?

A.    That's correct.

Q.    And that others, between 260 and 475?

A.    That's correct, yes.

Q.    Okay.  Who are the others being referred to there?

A.    The staff that were assisting me on the project.

Q.    And for this project, who is that?

C. Coffman

A.    It was Mark Hedstrom, and I believe it was Guillermo Rodriguez and Mary Kubik.

Q.    Do you know what the rates of Mr. Hedstrom's, Rodriguez and Ms. Kubik?

A.    Mr. Hedstrom's are somewhere in the 400s.  The other two are, I believe, in the high 200s or low 300s.  I don't know their exact rates as I sit here.

Q.    And let's just take Mr. Hedstrom. Let's assume it's about 400.

That's the hourly rate that your firm charges for his time, correct?

A.    That's correct, yes.

Q.    I assume he is compensated at a lower rate than that?

A.    Yes.

Q.    And so there is some overhead you must have for Peregrine?

A.    Yes, of course.

Q.    But somewhere in there, there is a profit being made on each hour he works, fair to say?

A.    At the -- once you take into account all the hours, yes, that's the way I think about

C. Coffman

it.

Q.    And that profit in some way would flow to you as the 80 percent economic owner of the firm?

A.    Eventually, yes.

Q.    It might be timing, you might not take it out immediately, et cetera, but eventually, that would be to your benefit.

A.    Yes.

Q.    Okay.  And so your work on this in terms of your personal compensation is likely higher than the 950 per hour that's charged for your time?

MR. KUBOTA:  Objection, relevance, compound.

A.    Yeah, I don't see -- receive the 100 percent of the 950 myself, but net-net probably would be higher than 950, yes.

Q.    Okay.  Do you receive a percentage of the 950 or is the economic structure different than that?

A.    I'm entitled to 80 percent of the 950.

Q.    So you are entitled to 80 percent of

Page 13

C. Coffman

the 950 and then you have an 80 percent overall economic interest in the firm?

A.      In the profits of the firm, yes.

Q.      Profits of the firm.

Do you know how many hours you've worked on this matter as of this morning?

A.      Not an exact number, no.

Q.      Do you have an approximation?

A.      Probably more than 20, less than 50 would be my -- the best guess I could give you.

Q.      And for the three individuals who comprise the staff that you listed, do you know collectively how many hours they have spent?

A.      I don't know a specific number, no.

Q.      Okay.  And you don't know for any of the individual ones, what their hours would be?

A.      Not what their specific number of hours, no.

Q.      What's the billing frequency for this matter?

A.      Standard for our firm, monthly.

Q.      And so do you believe you have billed current up through the end of May?

MR. KUBOTA:  Objection to form.

C. Coffman

A.    Certainly through the end of April. I know the process of getting May invoices out is happening.  Whether they have actually gone out, I actually don't know yet.

Q.    Do you know through May what the total billing has been for this engagement?

A.    No.

Q.    How many people work for Peregrine?

A.    In terms of full-time equivalence, it's about 25, I think, somewhere between 25 and 30.

Q.    Do other individuals affiliated with Peregrine testify other than you?

A.    Yes.

Q.    Who are they?

A.    The people I mentioned before, Peter Hickey, Candice Rosevear, Scott Walster and then there are affiliates of the firm, but those are the only employees that regularly testify other than me.

Q.    You indicated that you probably spent between 20 and 50 hours.

If we could break that up, how much of that time do you believe was spent drafting,

Page 15

C. Coffman

researching, preparing the report?

MR. KUBOTA:  Objection to form.

As opposed to what?

A.    I think virtually all of my time spent on this case has been either in preparing this report or preparing for this deposition.

Q.    That's what I was trying to separate.

A.    Okay.

Q.    Can you separate between preparing -- so perhaps the way to say it is before May 10 and after May 10?

A.    I mean, the bulk of it would be before May 10.  I don't know, I would estimate I've probably spent four or five hours preparing for deposition.

Q.    The prep was with Mr. Kubota?

MR. KUBOTA:  Objection to form.

A.    I had a meeting with Mr. Kubota and Mr. Fonti.

Q.    When was that?

A.    Yesterday.

Q.    And other than that, is there any work you have done to prepare for this

C. Coffman

deposition?

A.   Well, I reviewed some things on my own, yes.

Q.   Okay.  So when you say the four to five hours, that includes the meeting you referred to that took place yesterday plus any work you did on your own?

A.   Yes.

Q.   How long was the meeting yesterday?

A.   About two hours, two-and-a-half hours would be my guess.

Q.   Have you previously worked with Mr. Kubota and Mr. Fonti's firm?

A.   Yes.

Q.   On how many occasions?

A.   I don't know an exact number, probably a handful of times.

Q.    If we look at the list of matters you -- I want to make sure I get the word right -- you listed as testimony, testimony in the last four years, which appears in Appendix B to your report -- here, I will refer to the page numbers on the top of the page -- page 58 of 67 and then going on to page 59, where you list

C. Coffman

testimony, do you know how many of these cases involved Mr. Kubota or Mr. Fonti's firm?

A.    There is one that I remember off the top of my head, but the others, frankly, I don't recall the specific cases.

Q.    We could obviously check if we choose to, they are all public, or they're mostly public cases, I think.

A.    Yes.

Q.    Can you identify for me any of the cases that you've listed as testimony in the last four years that were federal securities -- federal court securities cases in which you've testified on behalf of a defendant?

A.    I don't think there is any on the list.

Q.    Okay.

The drafting of your report, who did the first draft?

A.    There would have been a first draft prepared at my direction by staff and then I would have worked on it from there.

Q.    And that's the general way you prepare reports such as these, you direct your

Page 18

C. Coffman

staff to prepare a first draft?

MR. KUBOTA:  Objection to form.

A.    Well, it varies from report to report.

For a market efficiency report, like this, which I have filed a fair number of these types of reports, there is a -- you know, there is a lot of language I drafted originally that now serves essentially as a template for it.

So I would ask staff to start from that template, which, you know, I've -- I had drafted and approved over time, and have them work from that.

Q.    So let's talk about the template.

So I take it from that there is at least some language in this report that if I went and pulled some of the other market efficiency reports that you list in Appendix B, I would probably find word for word the same?

MR. KUBOTA:  Objection to form, misstates prior testimony.

A.    There are parts of it where I describe the general factors and what the factors are and why I analyzed them and the

Page 19

C. Coffman

context that would be the same.

Any of the case-specific descriptions or numbers, obviously, would be things that were drafted anew for this particular case.

Q.    So, for example, let's turn to page 7, and now using the numbers on the bottom, Section 5, Discussion of Reliance Element.

Do you see that heading?

A.    Yes.

Q.    And that section continues to page 10 or the bottom of 9.

I take it this is a section that likely in reasonably similar form has appeared in other reports?

A.    Yes.

Q.    Okay.  And going on to page 10, where you discuss the Cammer factors, at least this Section 6 on page 10 and 11 likely in similar form appears in other reports?

A.    Yes.

Q.    If we go to the back of the report, the damages section, and I'm looking at Section 8, starting on page 35, going through

C. Coffman

39, I do see references to TaskUS itself, but I take it much of this section could apply and has applied equally in other reports that you've done?

A.   A lot of the language is the same, yes.  I don't recreate the language from a blank slate because the -- a lot of the ideas are exactly the same from case to case.

But in terms of whether this section applies and whether I'm willing to testify to this section requires a case-specific analysis that I undertook for this case.

Q.   Well, let's talk about the damages part.

Have you -- have you had any class certification associated reports in which you were asked to discuss the potential for a classwide damages methodology where you've concluded that no such methodology would be possible?

MR. KUBOTA:  Objection.

Are you asking him about opinions he rendered?

A.   There have been cases that have been

C. Coffman

brought to me where I was asked to participate in the case where I believed the entire economic logic of the case didn't make much sense, and I refused to take the engagements.

Q.    Okay.

A.    For those that I've been engaged in and asked whether there is a classwide damages methodology and it's a class action securities case, I believe in those, I -- there was not a time I was not willing to give this opinion.

Q.    Okay.  And as you say in footnote 88, you have not done a loss causation analysis for this case, correct?

A.    I have not.

I have reviewed plaintiffs' claims and their complaint, I have reviewed what they allege is a corrective disclosure in this case. I analyzed for myself whether I thought that the logic of their case was economically coherent, and the standard methodology used in these types of case, classwide methodology that would be used in -- that is used in these types of cases would be applicable to their claims and concluded that it would.

Page 22

C. Coffman

Q.    But you could not, for example, give me your opinion on the inflation -- the artificial inflation per share of TaskUS stock on any given day in the class period --

MR. KUBOTA:  Objection to form.

Q.    -- based on the work you've done so far?

MR. KUBOTA:  Objection to form.

Are you asking him whether he has formed an opinion on that?

Could not is a misleading and vague --

MR. YOUNGWOOD:  You are talking too much.

MR. KUBOTA:  I am entitled to state my objections, Jonathan.

MR. YOUNGWOOD:  Objection is sufficient.

MR. KUBOTA:  The question does not make sense.

A.    I have not performed a loss causation analysis, so I'm not offering an opinion on whether there was or what quantum of artificial inflation there is in this particular

Page 23

C. Coffman

case.

Q.     For any given day in the class period?

A.     That's correct.

Q.     Why don't we go through a few more questions on this section.

Let's go to paragraph 79.

The last sentence, you write, "Therefore, there is a well-accepted method to compute damages in Section 10b matters, such as this."

Do you see that?

A.     Yes.

Q.     There is no citation for that sentence or anything in that paragraph, correct?

A.     There is not, that's correct.

Q.     What -- where -- strike that.

What are you relying on to reach the conclusion that there is a well-accepted method, as you write in that sentence?

A.     My over 25 years of experience in working on these -- on cases with these types of claims, both as a -- or spanning being a consultant for both plaintiffs and defendants,

C. Coffman

working as a neutral expert for mediators related to cases of this type, and my years of performing analyses and testifying in this area as well.

Q.    None of your Federal securities cases -- well, let me ask you, have any of the Federal securities cases that you've served as an expert in gone to trial?

A.    No.

Q.    And so there's not been a jury that's adopted a damages calculation methodology that you've used --

MR. KUBOTA:  Objection to form.

Q.    -- in any -- in one of your cases?

A.    I don't think it's ever gone to a jury.  There have been courts that have accepted it at the summary judgment phase.  But I -- there has not been a case that's gone to a jury, that's correct.

Q.    When you say courts have accepted it at the summary judgment stage, you mean that they haven't excluded it based on a Daubert motion?

MR. KUBOTA:  Objection.  The witness

Page 25

C. Coffman

is not an attorney.

A.     That's what I am referring to, is that it survived challenge as to whether it was the appropriate method or not.

Q.     Okay.  You've also had your opinions excluded on Daubert motions, correct?

MR. KUBOTA:  Objection to form.

A.     Never in their entirety, no.

Q.     Okay.  In Valiant, you had 4 of the 16 corrective disclosure dates excluded by the court, correct?

MR. KUBOTA:  Objection to form.

Do you want to show him a document?

MR. YOUNGWOOD:  He knows the case.

A.     I forget the specific number of -- that was a case in which there was, yeah, a fair number of corrective disclosures, and the court ruled that certain of the events were not corrective disclosures.

But the overall out-of-pocket methodology that I've described here was -- is also being employed in that matter and was not -- either not subject to challenge or was -- survived that process.

Page 26

C. Coffman

Q.    Let's go to paragraph 80.

Last sentence, "Whatever the method for determining the artificial inflation per share, it would be common to all class members."

Do you see that?

A.    Yes.

Q.    Now, artificial inflation in a securities case needs to be determined on a day-by-day basis throughout a class period, correct?

MR. KUBOTA:  Objection to form.

A.    Typically, yes, that's the way I understand it works.

Q.    Okay.  And whether or not an individual class member would suffer damages would, among other things, be dependent on when that investor purchased securities?

MR. KUBOTA:  Objection to form.

A.    Sure, yeah.  I'm not saying that the damage number itself, the amount of damages, for each class member would necessarily be the same or common across all class members.

I'm saying that there would be a formulaic way of calculating it across all class

Page 27

C. Coffman

members.

Q.    It would also -- damages per individual investor would be dependent on when that investor sold the securities, correct?

A.    If they sold it prior to the end of the class period or during the 90-day look-back period, yes, their -- the timing of their sale could matter for their quantum of damages.

But it wouldn't change the -- that there is a formulaic way of computing damages for them.

Q.    It might depend on what other positions the investor held in the stock, for example, if they had both a long and a short position, that might affect the investor's damages?

MR. KUBOTA:  Objection to form, compound, vague.

A.    I don't know if that's the case or not.  That sounds like a legal question to me that I'm not offering an opinion on.

Q.    Okay.  It certainly would affect whether or not they suffered economic damage --

MR. KUBOTA:  The same objections.

Page 28

C. Coffman

Q.    -- whether they held long and short positions?

MR. KUBOTA:  Same objections, calls for a legal opinion.

A.    Again, that's the -- I -- it's not clear to me whether the other positions are legally relevant to calculating damages.

Q.    And I'm trying to take the legal part out.  I'm trying to talk about simply whether or not somebody made or lost money.

Whether or not you have both the long and a short or only the long might affect whether or not you lost money on a stock trade?

MR. KUBOTA:  Objection, compound, incomplete hypothetical.

A.    It's possible for other positions in the same security to impact the overall economic gain or loss from the totality of investments in a particular stock.

Whether that's relevant for damages or whether that's -- is a question I don't know.

Q.    Okay.  Let's go to 82 -- paragraph 82.

First sentence, "The loss causation

Page 29

C. Coffman

analysis would also require analysis of how inflation per share may have evolved over the class period."

Do you see that?

A.    Yes.

Q.    And are you saying there, sir, that inflation per share could change day to day over a class period depending on the facts of the individual case?

MR. KUBOTA:  Objection to form.

A.    That's possible, yes.

Q.    And the inflation per share could grow over time?  That's one possibility, correct?

MR. KUBOTA:  Objection to form, vague.

A.    It could.

Q.    And it could lessen over time, too?

MR. KUBOTA:  Same objections.

A.    It could, yes.

Q.    And as you write in the next sentence, "The nature of this analysis is intentionally factual, case specific and may depend on information learned through

C. Coffman

discovery."

A.     Yes.

Q.     You would agree with me that not all investors are similarly situated in terms of their level of investing sophistication?

MR. KUBOTA:  Objection, irrelevant, outside the scope of the report.

A.     I would say that that's a fair characterization of my understanding of the market, yes.

Q.     And so, for example, some investors put their money into broad index funds and don't make individual decisions about individual stocks?

MR. KUBOTA:  Objection.

Are you asking for his personal knowledge of that?

He is not offering any expert opinion about index funds.

A.     I'm aware that individuals can have different investment strategies and some are passive and some are active, yes.

Q.     Okay.  And so a hedge fund, for example -- at least there -- I know there are

Page 31

C. Coffman

different models for hedge funds, but they will, in many cases, seek to have deep understandings of companies and make decisions based on every piece of information they can find, correct?

MR. KUBOTA:  Objection to form, compound, outside the scope of the report.

A.    It's possible.  There is some hedge funds that -- at least from my understanding and my experience, there is some hedge funds that are algorithmic and don't look into the details of companies.  There are some hedge funds that look very deep into companies.  There are individual investors that are the same way and other institutional investors that are the same way.

So there is a lot of heterogeneity amongst investors and their strategies, yes.

Q.    And there are some hedge funds that will even go to the length of trying to talk to industry insiders, hire private investigators, seek to get information, you know, that is beyond what's in analyst reports and the newspaper and SEC filings, correct?

MR. KUBOTA:  Objection to form,

Page 32

C. Coffman

compound, way outside the scope of any opinion Mr. Coffman has offered and irrelevant.

A.   I'm certainly aware of examples of that.  The extent to which that occurs is not something I have any specific knowledge of.

Q.   In your report, really, on pages -- on the bottom of the page, pages 8 and 9, you discuss -- and I always want to pronounce this wrong, but Dr. Fama's work?

A.   Fama.

Q.   Fama.  Thank you.

Right, that's where you discuss Dr. Fama's work?

A.   Yeah, I don't know if I make reference in other places, but yes, this is certainly one area I do.

Q.   I didn't -- I didn't mean that to be a trick.

And you've discussed his work in other cases, correct?

A.   I've discussed his general theories of market efficiency, yes.

Q.   Okay.  And those -- and the

Page 33

C. Coffman

categories of market efficiency that he discusses and you repeat in your report are weak form, semi-strong form and strong form?

A.    Yes.

Q.    Okay.  Did you develop an opinion as to whether at any time the market for TaskUS securities fell into any one of these three categories?

A.    Well, I analyze this in the context of whether or not TaskUS securities conformed with semi-strong form efficiency.

Q.    What's the difference between semi-strong and strong?

A.    Semi-strong posits that all widely distributed -- widely disseminated public information is incorporated into the market price of the stock -- or the security rapidly.

Strong form suggests that all information, including inside information, is fully impounded into the price of the security.

Q.    And this example we discussed a few minutes ago of a hedge fund who hires private investigators, talks to industry experts, goes beyond the SEC filings, the analyst reports, the

Page 34

C. Coffman

news reports, that information that they might gain, how does that fit into semi-strong versus strong?

MR. KUBOTA:  Objection to form, assumes facts not in evidence.

A.    Again, I think that gets into a little bit of a gray area.  I think it -- when I'm evaluating semi-strong market efficiency, I'm really evaluating whether widely disseminated public information is impounded into the price.

Whether there are some people with particular knowledge that goes beyond what's widely disseminated is something where, I think in those circumstances, it requires careful evaluation of whether there is evidence that it's impounded into the price or not.

Q.    Let's go back to your appendices, hopefully briefly.

You've listed on the first page of Appendix B, the top of the page, page 58 of Exhibit 1, this is a full list of your employment and education, is that right?

A.    Everything above high school for

Page 35

C. Coffman

education, yes, and any employment since I graduated college.  There are -- there was employment before that.

Q.    Excluding employment before college, excluding education prior to high school graduation, this is your complete list?

A.    Yes.

Q.    Okay.

So no additional degrees, for example, other than the MA and the MPP?

A.    Correct.

Q.    Okay.  And then you're -- you have a license and you are a chartered financial analyst?

A.    I would not call it a license, but I hold the -- a chartered financial --

Q.    Okay.

A.    -- analyst designation, yes.

Q.    Okay.  Your BA was in economics at Knox?

A.    Correct, yes.

Q.    And then you went to Chicago immediately for a two-year master's program?

A.    Yes.

Page 36

C. Coffman

Q.    Okay.   And we've traced your employment -- or you trace your employment here, and we discussed your current employer and firm, which is Peregrine, correct?

A.    I don't think we had talked about Chicago Partners or Market Platform Dynamics, but we had talked a bit by Global Economics Group and Peregrine, yes.

Q.    You started at Chicago Partners while you were at the University of Chicago?

A.    I started there actually before I started at the University of Chicago.  I started there the summer before I started at University of Chicago.

Q.    You don't teach at all?

A.    Not formally, no.

Q.    Okay.  You may teach your staff or something, but you don't teach students in a classroom or anything like that?

A.    Correct.

Q.    And with the exception of I think two articles that you may list -- yes, on page 9 of 10, you've not written in your field at all?

MR. KUBOTA:  Objection to form,

Page 37

C. Coffman

vague.

Q.    Written for publication in your field?

A.    In terms --

MR. KUBOTA:  Same objection.

A.    In terms of for publication, that's correct.

Q.    Okay.  And so the last publication you have is this 2010 publication?

A.    In terms of formal publications, yes.

Q.    Let's go to Appendix A.

You list these as documents considered -- I'm looking at page 54 of 67 of Exhibit 1.

A.    Yeah, give me just a second --

Q.    Yup.

A.    -- to get there.

Okay.

Q.    What does that mean to you, "documents considered"?

MR. KUBOTA:  Objection to form.

A.    Documents that I or my staff reviewed or collected in preparation of the

Page 38

C. Coffman
report.

Q.    Okay.  So some of these, you may not have personally looked at?

MR. KUBOTA:  Objection to form, misstates prior testimony.

A.    There are some materials listed here that I would not have personally reviewed, that's correct.

Q.    Okay.  I would like to look at the academic articles, which starts on page 55.

A.    Okay.

Q.    Have you either directly in connection with this report or previously read all of these articles?

A.    Yes.  Many of them, it would not have -- it may not have been a while because I cite to these, you know, regularly in reports --

Q.    Right.

A.    -- but yes, at some point in time, I reviewed each one of these articles.

Q.    Okay.  There is a section on analyst reports, immediately above, on page 55.  And you say, "Analyst reports supplied by counsel and S&P Capital IQ for the period June 11, 2021

Page 39

C. Coffman

through January 19, 2024."

Do you see that?

A.    Yes.

Q.    Explain to me what that means, "supplied by counsel and S&P Capital IQ"?

A.    So one source of analyst reports is to go to a third-party data provider, like S&P Capital IQ.

So I queried that service for whatever analyst reports they had on TaskUS and then I also asked counsel to send me any analyst reports they had collected in their process of reviewing the case.

Q.    Okay.  And you say for the period June 11, 2021 through January 19, 2024, right?

A.    Yes.

Q.    There were no analyst reports in June of 2021 related to TaskUS, correct?

MR. KUBOTA:  Objection to form.

A.    I'm not aware of an analyst report before -- during the month of June 2021, that's correct.

Q.    The first time there is an analyst report is in July of that year for TaskUS,

Page 40

C. Coffman

correct?

A.    That's consistent with my recollection, yes.

Q.    You have a section above related to TaskUS news.

How are these -- well, maybe you're telling me but let's do it this -- that way.

First line, "News headlines and select articles downloaded from Factiva for the class period."

Do you see that?

A.    Yes.

Q.    And then you talk about 239 unique articles and you give searches.

Who ran those searches?

A.    One of my staff members would have run those searches, but I directed the nature of those searches.

Q.    Okay.  Are those articles sitting somewhere?

MR. KUBOTA:  Objection to form.

Q.    The 239, how would I find them?

A.    I believe there is a spreadsheet that's created, which then has -- you can click

Page 41

C. Coffman

through to see the -- there is links in the spreadsheet that you can click through to see or download the articles.

I don't believe we downloaded all the articles.

Q.   Do you believe you produced that spreadsheet to us?

A.   I don't see why it would not have been produced.

I wasn't personally involved in the production.  I asked my staff to turn over whatever was requested, but that list of articles should be part of my regular backup, yes.

Q.   Okay.  And then the 1,020 is where you expand the date range of the query past January 19, 2022 to January 19, 2024?

A.   Correct.

Q.   Okay.  Would your staff have read all 239 of the articles in the class period?

A.   No.  That would not be necessary for -- to complete the task that I requested.

Q.   Well, what was the purpose of identifying the 239 articles?

Page 42

C. Coffman

A.    One was to just count the number of news articles.  And the second was for purposes of my cause and effect analysis.  I wanted to determine days on which there was no TaskUS news.

And so it was really a process of eliminating days that had news articles in order to find days that did not have news articles.

Q.    And the significance of there being days that did not have news articles is what, sir?

A.    I was trying to create a control group of days for my cause and effect analysis where I was like trying to identify days in which there was clearly no value-relevant specific news.

Q.    Going back to page 54, you list five cases.  Actually, you don't list five cases.  You list four cases under Court Decisions and Securities Law.

Do you see that?

A.    Yes.

Q.    Basic, Cammer, Halliburton -- one of the Halliburton decisions, and Krogman?

C. Coffman

A.   Yes.

Q.   Who selected those cases for you to consider?

A.   Those would be cases I'm familiar with and have been aware of for many years.

Q.   You don't, for example, list the Supreme Court's decision in Goldman here?

A.   I don't, no.

Q.   Or the Second Circuit's decision in Goldman?

A.   No, I don't list those there.

Q.   Okay.  And there is nothing in your report that would evidence to me, for example, that you considered Goldman in drafting your report?

MR. KUBOTA:  Objection to form.

A.   You're referring to the Supreme Court case --

Q.   Sure.

A.   -- in Goldman?

Q.   Sure.

A.   I did not consider that case specifically in the context of this case.

Q.   Okay.  Have you read the complaint

Page 44

C. Coffman

in this case?

And let me be clearer, the amended complaint?

A.   I don't know that I've read the entire thing word for word.  I've read large -- a large percentage of it and I've reviewed it multiple times, yes.

Q.   Okay.  And how about the court's decision on -- in January on the motion to dismiss?

A.   I recall having read that a while ago.  I have not read it recently.

I actually looked at the very beginning of it recently just to remind myself of it, but I have not read the whole thing in a while.

Q.   When were you retained to do your May 10 report?

A.   I don't recall a specific date.

Q.   Before or after January 5, 2024?

That's the date of the motion to dismiss decision.

A.   Oh.  Yeah, I think it was -- give me just a second.

C. Coffman

Yeah, I don't recall being retained prior to that date.  I believe it was sometime in 2024 that I was first contacted.

Q.    Do you know what alleged misstatements are in this case for purposes of the 10b-5 claim?

MR. KUBOTA:  Objection, outside the scope of the report.

A.    I believe I do based on having reviewed the complaint as well as the order on the motion to dismiss.

Q.    Let me give you a copy of the complaint.

(Exhibit 2, amended class action complaint, marked for identification, as of this date.)

Q.    And if you need time to look through it, take your time.  I want to direct you to paragraph -- page 55.

Tell me when you're ready.

A.    Yes, I'm ready.

Q.    I want to direct you to the bottom of the page, paragraph 170, that reads, "Each registration statement contained the following

C. Coffman

statement:  The culture and focus on people allows us to retain talent, continuously improve and gives us an advantage on key people metrics of efficiency, client satisfaction and low attrition."

Do you see that?

A.    Yes.

Q.    Do you know whether or not that statement is in the 10b-5 aspect of this case?

A.    My understanding is that it is.

Q.    Okay.  And where it says "each registration statement" in the pleading, do you have an understanding as to what the complaint means by each registration statement?

A.    Well, I believe there was a registration statement associated with the IPO and a registration statement associated with the secondary offering.

And that's what that's -- that's what those are -- it's generally referencing.  I know there were different versions of the registration statements at different times, but I believe these are referring to the final ones, but that's -- that detail, I'm not as familiar

C. Coffman

with.

Q.    And that's what I -- and, again, I'm happy to show you the footnotes and earlier in the complaint that define it, I'm not trying to trick you, not with this question or any other question today.

Do you -- and I think you've actually perhaps made it easy to get the question answered I was hoping to cover here.

Do you know whether or not this statement in paragraph 170 was in each version of both the -- well, let's start with the IPO -- was in each version of the IPO draft and final registration statements?

MR. KUBOTA:  Objection to form, compound, outside the scope of the report.

A.    That's not something I specifically studied.

Q.    Okay.  Do you know when this statement first appeared in a version of the registration statement?

MR. KUBOTA:  Same objections.

A.    That's not something I specifically studied.

Page 48

C. Coffman

Q.     For purposes of your work, did you need to make an assumption as to when the first time this statement appeared in a registration statement associated with -- let's just go to the IPO -- with the IPO?

A.     Not for the opinions I'm giving, no.

Q.     And if I asked you -- and I will -- I'll just do it -- for the secondary public offering, first, do you know whether or not this statement appeared in the secondary public offering document?

MR. KUBOTA:  Objection, asked and answered.

Q.     Registration statement?

A.     I'm aware it is alleged to have.  I have not gone back and checked myself.

Q.     Okay.  Do you believe there is any material difference between the statement as it appeared in the IPO document versus the SPO document?

MR. KUBOTA:  Same objections.

A.     I have not specifically studied that.

Q.     And --

Page 49

C. Coffman

A.    And just to be -- let me -- can I go back to one of my prior answers?  Because I just want to --

Q.    Of course.

A.    -- make sure it's entirely clear.

With respect to my opinion about market efficiency, it has nothing to do with plaintiffs' claims in the sense of looking at misstatements or corrective disclosures or anything.  I can look at -- if I were asked if any public company was traded in an efficient market, it doesn't depend in any way about when there was or wasn't a misstatement or where it appeared or anything like that.  That's completely and totally divorced from any even allegation of fraud.

For my opinion about damages, I did, like I said, generally review what the allegations were and what the alleged false statements were and what the alleged corrective disclosure was and thought about whether it was economically coherent, but I didn't test myself whether -- the accuracy of claims that are made in the complaint.

Page 50

C. Coffman

Q.    For purposes of 10b-5 on damages, if, as the complaint alleges, this statement appeared in each registration statement, which includes both the SPO and the IPO, when the SPO occurred, would there be new damages in addition to whatever damages existed after the IPO?

MR. KUBOTA:  Objection, incomplete hypothetical, calls for a legal conclusion.

A.    Well, your question is a little bit confusing to me because when you say, "new damages," are you referring to additional artificial inflation, additional damages because of later purchasers?  Like there could be lots of things to -- that that could mean, so I just wanted you to clarify your question.

Q.    Fair point to clarify.

Let's go additional artificial inflation.

A.    That's not something I've assessed.

Q.    I'm going back to your report, Exhibit 1.

So Cammer is a District of New Jersey case from 1989, correct?

Page 51

C. Coffman

It is footnote 21, page 10.

MR. KUBOTA:  Are you just asking him to read footnote 21 of his report?

MR. YOUNGWOOD:  Well, I'm asking him to agree with me that when he refers to Cammer throughout this document, that's what he is referring to?

A.    Well, I'm referring to the decision that's in footnote 21.  It was from 1989.

DNJ you are saying is District of New Jersey?  I wouldn't have even recalled that that's what that means, but --

Q.    Okay.  And you are not in any way assuming that Cammer is the law in the Second Circuit, right?

MR. KUBOTA:  Objection, calls for a legal conclusion.  The witness is not an attorney.

A.    I'm not making any judgment about that, no.

Q.    Okay.  Well, why did you rely -- strike that.

Did counsel instruct you to rely on the Cammer factors?

Page 52

C. Coffman

A.   No.  I've been aware of the Cammer factors and their role in market efficiency analysis in this context for many years.

Q.   Many experts who do the type of work you do use the Cammer factors to evaluate market efficiency?

A.   Yes, and many go beyond the Cammer factors as well, but -- including myself, but yes, I've seen many experts look at the Cammer factors.

Q.   Okay.  And you've looked at the Cammer factors in many other reports, correct?

A.   I have, yes.

Q.   You are not aware of any peer-reviewed academic research that validates the Cammer factors, right?

MR. KUBOTA:  Objection to form, vague.

A.   What do you mean by "validates the Cammer factors"?

Because there is certainly literature out there that focuses on some of the elements of the Cammer factors in terms of evaluating and thinking about market efficiency,

C. Coffman

but -- so I just want to be clear what your question is.

Q.    You are not aware of any -- so there are articles that talk about trading volume, for example, which is in part 1 of the Cammer factors, right?

A.    There are many articles that talk about trading volume and its relationship with market efficiency, yes.

Q.    But you are not aware of any peer-reviewed academic articles that say -- to determine whether or not a market is efficient, go use the five Cammer factors?

MR. KUBOTA:  Objection to form.

A.    I'm not aware of a peer-reviewed academic article that says it in so many words, no.

But, again, there are certainly plenty of academic articles that talk about some of the factors that the Cammer factors are evaluating.

Q.    Let's go to footnote 31, page 15.

And I just want to make sure if there is discrepancy.  I understand that there

Page 54

C. Coffman

may or may not be.

Footnote 31 says you obtained the analyst reports from plaintiffs' counsel.

You see that?

A.    I do.

Q.    And when we were looking at Exhibit B to your report, page -- top of page 57, you wrote, "A TaskUS analyst report supplied by counsel and S&P Capital IQ."

Did you obtain any analyst reports that were not given to you by counsel?

A.    Well, I think this footnote is making clear that there were other analysts that were on conference calls and that information was taken from S&P Capital IQ.  I may not have gotten any additional analyst reports themself from Capital IQ -- S&P Capital IQ.

Q.    Okay.  So it may be that all the analyst reports you received were from plaintiffs' counsel?

A.    Yes.

MR. KUBOTA:  Objection to form.

A.    That's possible, yes.

Q.    Do you know if they gave you a

Page 55

C. Coffman

complete set of all that existed?

MR. KUBOTA:  Objection to form.

The report describes the parameters of the reports.

A.    My understanding -- I asked them for all the reports they had without any limitation.

My experience is it's very difficult to obtain every single report in existence because some reports require subscriptions to different services to be able to get them.

So my assumption is, it's not the absolute complete set of all analyst reports because that's -- there are some reports that are difficult to obtain.

So --

Q.    Difficult or just costly?

MR. KUBOTA:  Objection to form.

Q.    Or let me strike that.

Difficult or just with cost?

MR. KUBOTA:  Same objection.

A.    Again, it could be both.  Some, you certainly just have to pay for.  Others, you may -- may require subscription services that have other requirements.  I don't know all the

Page 56

C. Coffman

details.

Q.    Do you know what methodology plaintiffs' counsel used to identify and provide analyst reports to you?

MR. KUBOTA:  Objection to form.

A.    Other than providing all that they had, no, I don't.

Q.    Do you know they provided all that they had?

A.    I haven't performed any investigation beyond simply asking them for all the analyst reports they had and receiving a set of analyst reports, no.

Q.    Paragraph 33 on page 15 refers to Exhibit 4.

You say, "Exhibit 4 shows there are at least 32 reports issued during the class period and list eight separate firms that had equity analyst issue reports on TaskUS, including major firms such as Morgan Stanley, JP Morgan and Wells Fargo."

Do you see that?

A.    Yes.

Q.    And then let's look at Exhibit 4.

Page 57

C. Coffman

That's toward the back, I guess, of your report.

A.    Okay.

Q.    And you list here by analyst firm name the reports that you were provided by class plaintiffs' counsel, correct?

A.    At least for during the class period, yes.

Q.    Okay.  And you list -- you count number per entity, so -- right -- Morgan Stanley, six?

A.    Yes.

Q.    You don't tell us when in the class period any of these individual reports were issued?

MR. KUBOTA:  Objection to form.

Are you just asking about Exhibit 4?

A.    Exhibit 4 does not list the specific date of each analyst report, no.

Q.    Okay.

A.    I believe all the reports were provided in my backup, but I don't list out the dates here.

Q.    And we already covered this, but you were aware that none of these reports were

Page 58

C. Coffman

issued in the month of the IPO, correct?

A.    That's correct.  I think the first report I recall seeing was around the first week of July of 2021.

Q.    You're of the view that the existence of analyst coverage is important in determining whether or not a securities market for a particular name is efficient, correct?

A.    It's my view that the existence of analyst reports provides an important signal about whether there is a market for information, whether firms are actually spending time and resources and money to disseminate information and investment advice about firms and that that helps support market efficiency, yes.

Q.    Okay.  The Thomas and Cotter article that you list in your materials considered from 2000, that's one of the academic articles that you read either in preparation for this assignment or for other similar assignments you have had as an expert, correct?

A.    Give me just a moment.

Yes, there is a Thomas and Carter -- or, I'm sorry, Thomas and Cotter article that I

Page 59

C. Coffman

regularly reference.

MR. YOUNGWOOD:  I'm going to mark that as 3.

(Exhibit 3, article entitled "Measuring Securities Market Efficiency in the Regulatory Setting," marked for identification, as of this date.)

Q.    We are going to give you a copy of it.

You have in front of you, marked as Exhibit 3, an article titled "Measuring Securities Market Efficiency in the Regulatory Setting," by Thomas and Carter.

This is the article you reference in your materials considered, correct?

A.    Yeah.  I think you said "Thomas and Carter."  It's Cotter.

Q.    Cotter, sorry, C-O-T-T-E-R.

A.    Yes.

Q.    Okay.  And you've reviewed this document before -- or this article I should call it before?

A.    It's been some time, but yes, I have reviewed it in the past.

Page 60

C. Coffman

Q.  I want to refer you to page 111 of it.

The page numbers are on the top.

There is a Section C, "Analyst Coverage as a Method of Measuring the Efficiency of Securities Markets."

I'm just going to read the first sentence or two of the first paragraph, but I welcome you to read the whole paragraph if you wish.

"Analyst coverage is the most widely accepted method of measuring when securities markets are efficient at processing information. Academic commentators have agreed that analyst coverage is an important mechanism for disseminating information to the market."

Do you see that?

A.  I see that.

Do you mind if I read the rest of the section?

Q.  Of course.

A.  Give me just a second.

Okay.

Q.  You generally agree with the two

C. Coffman

sentences I read?

A.    I agree generally with the second sentence.

I don't think I necessarily agree with the first sentence, that -- that there is a widely accepted method of determining when securities markets begin to be efficient, if that's how one reads that sentence.

The second sentence, I certainly agree with.  The first, I -- is not entirely clear to me.

Q.    Okay.  And if -- is it the words "most widely" that you're struggling with in that first sentence or some other aspect of it?

A.    Both "most widely" as well as the idea that when markets are efficient -- like the time element of when, it's not clear what they mean by that to me, and so I don't --

Q.    What's the relevance of analyst reports to whether or not a market is efficient.

A.    Well, I think it --

Q.    In your view?

A.    It's -- I think it's an important -- as it is described in that second sentence, that

Page 62

C. Coffman

academic commentators have agreed that analyst coverage is an important mechanism for disseminating information to the market.

And I think it's a reflection of -- it's also a reflection of interest in information related to the market of a security.

So, for example, like I said before, it's showing that investment firms are devoting time, resources and effort to produce analyst reports for their clients and shows that there is a demand for information about that market as well.

Q. If we go to the first sentence of the next paragraph, it refers to several empirical studies that examine the analyst's role as an information producer and conduit for company information.

Would you agree that analysts serve a role as an information producer and conduit for company information?

A. I would say yes, although that role has probably declined over time, especially with the advent of the internet and people's ability to get information directly for free.

Page 63

C. Coffman

Back at the time a number of these articles were written, to get an SEC filing, you would have to effectively request a fax, and I know that because we had to do it at the time I first started at Chicago Partners, whereas now, through the Edgar service, any individual with an internet connection can go get company filings for free and almost instantaneously.

So I would say their role as information distributor has probably lessened substantially over time.

Q. You continue to cite this article in reports such as this one on market efficiency in a class certification context, correct?

MR. KUBOTA: Objection, vague.

A. I do because I think it supports some of the points I make, yes.

Q. There is, from my observation, no article on the topic that this articles covers that you've used to supersede this article in the academic material that you review when you're preparing market efficiency studies?

MR. KUBOTA: Objection to form, compound, vague.

Page 64

C. Coffman

A.    I apologize, I think I'm a little confused by your question, so I -- maybe just ask it again or rephrase it.

Q.    Is there a modern version of this article that says different things that takes us forward that you now cite in your materials considered on the topic of analysts and their role as conduits for company information?

MR. KUBOTA:  Same objection.

A.    No.  But, again, I think it goes beyond conduit for information.  I think there is value added in the analysis they provide as well, and I think there has been numerous academic studies that have shown that analyst coverage provides more than just a conduit of information.

It's a way of synthesizing information and giving investment advice and analysis and contextualizing some of the information that can also independently provide value to the market that enhances its efficiency.

Q.    Do you cite any of those studies in Exhibit -- I'm sorry, Appendix A?

Page 65

C. Coffman

A.   Well, I -- give me just a second.

Well, I think this article talks about some of those articles and the role and effect that analysts can have on the market.  So that's -- those articles are certainly subsumed in this one.

Give me just a moment.

I don't cite any specific articles beyond this one.

I do talk generally in my report about some of the factors I just described though, about how much easier it is to get information than at the time the Cammer decision was rendered and focused on analysts.

Q.   Let's go back to the body of your report, Exhibit 1, page 17, the Cammer Factor 3, market makers.

At the end of this section, or toward the end, paragraph 40, you write on page 18, "Therefore, the number of market makers itself is not a particularly relevant metric in this case."

Do you see that?

A.   I'm sorry, at the end of

Page 66

C. Coffman

paragraph 40?  Yes, yes.

Q.    Okay.  And why do you write that, sir?

A.    Because the TaskUS traded on one of the major exchanges.  The Cammer decision was focused on a stock that was over-the-counter, and so if you go to paragraph 37, I provide the language from the Cammer decision where it says, "For over-the-counter markets without volume reporting," which is not the case for TaskUS.  It is not over-the-counter.  It's an exchange-traded stock where there is volume reporting and electronic trading and specialists, et cetera.

There, it says the number of market makers is probably the best single criterion and then it gives some numbers about what they would presume was an efficient market based on the number of market makers, but as I describe in this section, because TaskUS trades on one of the major exchanges, that that's -- the number of market makers isn't particularly relevant.

Q.    Let's go on to Cammer Factor 4 on page 19.

Page 67

C. Coffman

As you quote Cammer in paragraph 42, "It would be helpful to allege the company was entitled to file an S-3 registration statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock price set forth in the instructions to Form S-3 were not met."

Do you see that?

A.    Yes.

Q.    You agree that for much of the class period, TaskUS was not eligible to file an S-3 registration statement?

A.    Because of timing factors, correct.

Q.    That's -- but you do agree with me that it was not eligible, correct?

A.    Correct, for -- because of timing factors.

Q.    And you discuss that in paragraph 44?

A.    Correct.

Q.    Your analysis period includes the -- includes much of the class period and then two years beyond, correct?

Page 68

C. Coffman

A.    Well, I think it includes the entire class period plus two years beyond.

Q.    Okay.  Does it include the first day of a class period?

A.    Yes.

Q.    We will discuss that maybe in a bit.

But why do you go two years beyond?

A.    So for my cause and effect analysis, my standard methodology is to look at price movements on earnings announcement dates versus days where there was no news.

So it's effectively a treatment group where there is clearly firm-specific material news versus a control group of days where there is no value-relevant, firm-specific material news.  And it is asking whether we see differences in the movement of prices as well as the volume on days with that firm-specific news and days without that firm-specific news.

In order to perform that statistical test of looking at earnings dates versus days with no news, I wanted to have a robust set of earnings dates -- number of earnings dates so that the statistical power of that test would be

Page 69

C. Coffman

sufficiently high.

Given that the class period is -- would only have three earnings announcements in it, I wanted to have a larger data set of earnings announcements with which to work.

I've done this in many other cases where in those circumstances, I selected an analysis period of an additional year before the class period and an additional year after the class period.

Here, because the firm just had an IPO, that year before was not available.  So I selected a two-year period after the class period.

Q.    Is it possible -- step away from TaskUS, sir -- for the market for a particular security to be efficient at one point in time and inefficient in another point in time?

MR. KUBOTA:  Objection, vague, incomplete hypothetical.

A.    Theoretically possible.

In that circumstance, I would say one would expect to see some major change in the underlying characteristics of the security in

Page 70

C. Coffman

some way.

But theoretically possible.

Q.    Did you run any analysis on -- that focused only on the class period rather than this class period plus two years?

A.    Well, I think for all of my -- all of the other factors, I looked at the class period.  For cause and effect and I believe auto correlation, I looked, because I had the data, over the entire analysis period.

I didn't run a separate analysis of just the class period for the cause and effect because I determined, before I even started the analysis, I wanted to use a broader analysis period.

So I just simply didn't run the test just over the class period.

Q.    So you don't know what would happen if you ran that same what you're calling cause and effect just over the class period?

MR. KUBOTA:  Objection, vague, misstates prior testimony.

A.    Well, now that I've seen the results and I see what actually happened, my intuition

C. Coffman

is that if you ran it just over the class period, it would still support the ultimate conclusion and show a statistically significant difference between the news -- the earnings announcement dates and the no news dates, but I haven't actually run that test, no.

Q.    By cause and effect, tell me exactly what test or what analysis we are talking about, right?

I think I know, but I want to be sure.

A.    Well, again, my approach to the cause and effect test is to ask whether you can observe statistically significant differences between a treatment group of days where there was clear firm-specific material news released versus what happens on a control set of days when there is no firm-specific new news identified and look at three different metrics to see if there is a statistically significant difference.

One is the proportion of those days that are statistically significant themselves. One is just looking at the average magnitude of

Page 72

C. Coffman

the stock price movement on those days.  And the third is whether there is a difference in volume between those two groups of days.

So that's how I designed the methodology, and by showing that there is a statistically significant difference between the results from those two groups, I'm able to conclude that on earnings announcement days, there is a clear scientific evidence of TaskUS' stock price moving in reaction to news.

Q.    Why the focus on earnings announcement days?

A.    Because the academic literature has identified earnings announcement days as days on which there is clearly new firm-specific information that's relevant to valuation of the firm.  It's something that every company is required periodically to report earnings, and so it provides a good objective set of days to identify to run the test.

Q.    How about other company-specific news, such as the issuance of a secondary offering, did you look at that?

A.     There are -- there are certainly

Page 73

C. Coffman

other types of news you could theoretically look at.  I'm not saying earnings is the only thing could you look at.  I think that's -- earnings reports are a good test design for the reasons I gave.

That doesn't preclude that you could look at other types of things.

Your specific reference to a secondary offering, again, I think how the market would react to a -- to the -- either the announcement or the completion of a secondary offering could depend a lot more on context as to whether that would even be information you would expect to move the price or what direction it would expect to move the price.

So it's -- in my view, it would be a lot less clear what you would even expect in that scenario and could differ substantially from firm to firm.

And you wouldn't even have examples of that in many cases.  So it would be, I think, difficult to be consistent from case to case in analyzing that as a type of news event.

Q.    If we look at paragraph 55, in here,

Page 74

C. Coffman

you refer to your analysis of cause and effect, which is at least some of what we have just been talking about, correct?

A.   I'm referencing it there, yes.

Q.   Okay.  And then you refer us to Exhibit 7, so I would like to look at Exhibit 7.

A.   Okay.

Q.   And this is the list of earnings, or in one case, a pre-announcement for TaskUS that took place during your analysis period --

A.   Yes.

Q.   -- correct?

A.   That's correct.

Q.   And only the first three took place during the class period?

A.   That's correct, yes.

Q.   None of them took place prior to August 10, correct?

A.   Correct.  August 10 of 2021, just to be clear, yes.

Q.   Thank you.

And at least during the class period, none of them took place any later than November 10, correct?

Page 75

C. Coffman

A.    Correct.  I mean, that's when the event themselves occurred.  The market reaction for each of those is really on the next day, but I'm -- you're correct in when the announcements were made.

Q.    And so I want to actually try to understand that.

Let's take, for example, the first one, August 10.  What is -- I understand August 10, 2021.

What does the time refer to?

A.    The time references when the press release actually was released with that earnings information.

Q.    Okay.  And then "market date" means what?

A.    That means the date I am actually evaluating for a price response because on August 10, 4:05 is after market hours, after the close of the trading session for regular trading, and so when analyzing the price impact of that information release, I'm actually looking at the next calendar day.

Q.    So to keep with our example, the Q2

Page 76

C. Coffman

2021 earnings are released after market on August 10 and then you measure stock change on August 11?

A.    From the close on August 10 to the close on August 11, yes.

Q.    Okay.  And so for this one, where you refer to closing price, that's the closing price on the 11th or on the 10th?

A.    On the 11th.

Q.    The return indicates the stock went up 22 percent that day?

A.    From the close on the prior day, yes.

Q.    From 4 p.m. to 4 p.m.?

A.    Yeah, closing can be slightly off from 4 p.m., but yes, from the closing price to the closing price.

Q.    Well, we'll -- as I keep telling you, I'm not trying to trick you in anything. But "close to close," we will stick with those words.

Abnormal return is taking TaskUS and comparing it to what, the S&P 500 or some other index?

Page 77

C. Coffman

A.    A combination of the S&P 500 Index as well as the -- a peer index that I constructed.

So it's after having run a regression model to remove the effects of those indices and so the abnormal return is interpreted as the firm-specific price movement after taking out those effects.

Q.    Okay.  Did you do any analysis on any of these dates, but we can stick with August 10, to see if there was other company-specific news or industry-specific news that might have affected the TaskUS stock price on the date listed?

MR. KUBOTA:  Objection to form.

A.    No.  That wasn't necessary.

So I'm effectively testing the entire mix of information that was released about TaskUS that day including the earnings announcement, but I'm not somehow trying to separate other firm-specific news out.

Q.    And so, for example, you're not -- you're also not trying to disaggregate what about the firm-specific announcement affected

Page 78

C. Coffman

the stock price on the date you're looking at, right?

A.   Correct, I'm not ascribing a particular dollar value to any particular piece of information on that day.

Q.   Not to the earnings announcement verse other company-specific news, you are not disaggregating those, right?

A.   That's correct.

Q.   Or even individual information within the earnings announcement, you are not disaggregating the first page from the second page?

A.   Correct, I'm not doing that.

Q.   Okay.  And same for August -- sorry. Same for October 18, 2021, there, you list a pre-announcement that come out at 4:27 p.m. There, the stock drops do I understand?

A.   On that day, yes.

Q.   The next day --

A.   On the next day, yes.

Q.   On the next day, or through close to close.

And you're not, through this

C. Coffman

analysis, able -- in order to try to attribute what about that news or any other company-specific news caused it to drop?

MR. KUBOTA:  Objection to form.

A.    I'm not attributing it to any particular piece of information.

I did review and analyze whether the direction of the price movement was obviously inconsistent with market efficiency and found that it was not.

So, for example, I did go through on each of these days and look -- so, for example, for the second day, was there at least an indication that there was at least some negative news on that day that could rationally explain why the stock price declined on that day?  Yes.

But did I try to analyze what particular piece of information caused it or by how much?  No.

Q.    What was the negative news that came out after market on the 18th of October that you think could plausibly have explained the drop in stock close to close over the next day?

A.    I have not committed to memory all

Page 80

C. Coffman

of the information that was released on each of these days.

Certainly, by looking at the analyst reports from immediately after that, it was clear that there was some news that was interpreted negatively.

When we get to a natural stopping point, can we take a break?

Q.   We can stop right now.

THE VIDEOGRAPHER:  Off the record at 10:48, marking the end of Media Unit Number 1.

(Recess.)

THE VIDEOGRAPHER:  On the record at 11:04, beginning Media Number 2.

BY MR. YOUNGWOOD:

Q.   Mr. Coffman, I want to direct to you paragraph 14 of your report, Exhibit 1.

Now, in the second -- sorry, third sentence, you write, "The fraud on the market" --

A.   I'm sorry, give me just a second --

Q.   Yeah, yeah, yeah.

A.   -- I was looking at the wrong

Page 81

C. Coffman

document for this.

Okay.

Q.    "The fraud-on-the-market theory is based on the fact that in an efficient market, one in which widely available public information is quickly incorporated into the market price of a security, all purchasers implicitly rely on any material misrepresentations or admissions since the value of those misrepresentations or admissions is incorporated into each class members' purchase price."

My question relates to the parenthetical, which begins with "The one in which," and you say, "quickly."

What does "quickly" mean?

A.    "Quickly" to me means within one day or within a small number of days.  That's the standard for "quickly" I've consistently used.

Q.    Why is it as long as a day?

A.    Because I think there is -- I've certainly seen substantial evidence that it can take that long for markets to fully impound information.

Many of the -- I think the standard

Page 82

C. Coffman

approach in this -- when people in this context are analyzing stock price movements, the standard approach is to look at daily event studies. There's plenty of academic literature out there that uses daily event studies to analyze stock price movements in efficient markets or in markets that are presumed to be efficient.

So I think it's a standard size event window in this context.

Q.    One day?

A.    Or even a small number of days beyond one day.

In a number of -- in a number of cases, there has been clear evidence, in my view, that there was -- the market continued to fully impound certain information on a second day.

Q.    Okay. You in your prior answer used the phrase -- you said you've seen substantial evidence that it can take that long -- my question was about one day there -- that long for markets to fully impound information.

What's the substantial evidence you

Page 83

C. Coffman

are referring to?

A.    I've seen many instances where there is continued coverage of new firm-specific information continued both in the news and analyst coverage as well as heightened volume and stock price volatility that can continue not only through an entire day but on to a second day.

So that that implies as well that it took at least the first full day for the market to react, if not some time on a second day.

Q.    What's the relevance of continued coverage of an event?

MR. KUBOTA:   Objection to form.

Q.    And let me -- by "continued coverage," you mean additional news stories, additional analyst reports, is that what you would expect to read?

I don't know what you mean by it first.

A.    Yes, both, it can be both.  But in particular, with analyst coverage, they can -- analysts often take time to review, analyze, write about and contextualize information -- new

Page 84

C. Coffman

information that's provided to the market in such a way that they're providing a -- valuable information to the market about how to -- how to view and think about the information that's been disclosed.

Q.    I see.  So what an analyst says about new information can itself be useful information to the market?

MR. KUBOTA:  Objection to form.

A.    In many circumstances, yes.

Q.    In your work for this case, you did not do intraday -- any study of intraday trading, correct?

A.    That's correct, other than, when analyzing the bid ask spread, I did look at intraday quotes.

So if you're talking about for cause and effect, no, I did not.

Q.    Okay.

A.    In looking at the business spread, I did look at intraday and trading information.

Q.    So that's Krogman Number 2, bid/ask?

A.    I believe -- give me just a second.

Q.    Yeah.

Page 85

C. Coffman

A.    Yes.

Q.    Okay.  But the cause and effect, that's Cammer 5, right?

A.    Correct.  Yes.

Q.    So for Cammer 5, you didn't look at any intraday?

A.    I don't recall looking at any intraday data for Cammer 5, that's correct.

Q.    I'm going to hand you a document which is a printout of an Excel spreadsheet your counsel provided to us on your behalf.

MR. YOUNGWOOD:  Let's mark it as number 4.

(Exhibit 4, Excel spreadsheet, marked for identification, as of this date.)

Q.    There is also an electronic version that I believe Ms. Gochman has put into the -- whatever one puts things into.

If that's easier, I find this easier.  I want to just explain one modification we made --

A.    Okay.

Q.    -- which I hope you will find

Page 86

C. Coffman

helpful.

It is so wide that even on the wide paper we could not print out every column, and so we repeat it -- so to look at any given date, you're going to need to look at two pages, an odd page and an even page, the odd page being the A through B of your spreadsheet and the even page being the remainder.

The modification we did is we repeated column A on both pages because it's the date.

A.    Makes sense.

Q.    Other than that, we certainly did not advertently create any other changes.  I don't think we did so inadvertently.

A.    Okay.

Q.    So if the hard copy works for you, great, if not --

A.    I'm fine with the hard copy.

Q.    Okay.

MR. KUBOTA:  Jonathan, before you get into it, I would just state for the record, the file name of this does not appear to be what we provided.  I don't

Page 87

C. Coffman

know if it was changed in some way or exactly what the modifications are, but it says "legal" at the end.

I don't think we provided a document with that name.

MR. YOUNGWOOD:  Let's figure that out.  I don't know why that's the case.

MS. GOCHMAN:  I'm looking at what was provided, so give me one second.

MR. KUBOTA:  I don't think you need to do it right now, I'm just pointing it out.

MR. YOUNGWOOD:  No, no, I want to -- it may be we renamed it when we added the column, but I have no idea.  I didn't do it.

MS. GOCHMAN:  The file you provided was called "Task Event Study."

MR. KUBOTA:  Okay.  So the name is in the right -- the bottom right is not what we provided.

MR. YOUNGWOOD:  Why is it?

MS. GOCHMAN:  I don't know.  That's the way -- the file you provided was

Page 88

C. Coffman

called "Task Event Study."

MR. YOUNGWOOD:  Okay.  Can we put that file into the -- whatever one puts it into so the witness can see that and at least confirm that substantively --

MS. GOCHMAN:  Yeah, we can use --

MR. YOUNGWOOD:  -- other than the adding the date, they're the same?

MS. GOCHMAN:  Yeah, we can do that.

Can we go off the record for a second?  Because I have to figure out how to do that.

THE VIDEOGRAPHER:  Off the record at 11:12.

(Recess.)

(Exhibit 5, electronic version of Exhibit 4, stamped marked for identification, as of this date.)

THE VIDEOGRAPHER:  On the record at 11:24.

Please proceed.

BY MR. YOUNGWOOD:

Q.    Mr. Coffman, there is now an Exhibit 4 and Exhibit 5 that have been

C. Coffman

electronically marked.  There is a hard copy of Exhibit 4 that you have in front of you.

I believe that Exhibit 4 and Exhibit 5 are identical other than the file name before the word "legal" and 5 does not, and as we discussed before the break, before -- to aid us in looking at the hard copy, we added -- we didn't add, we repeated column A on both the even pages and the odd pages so that it's easier just to track.

A.    Okay.

Q.    Do you recognize this document, sir?

A.    Yes.  It appears to be a spreadsheet that would be produced as part of my event study analysis.

Q.    And this is the event study that you describe in your discussion in your report in the context of Cammer Factor 5, correct?

A.    Yes.

Q.    And what was the purpose of the event study?

A.    To provide the data necessary to perform the cause and effects test I described in my earlier testimony.

Page 90

C. Coffman

Q.   Looking at the version that's Exhibit 4, column A is a date, right?  That's what those -- so, for example, line 2, 2021/6/14, so that's June 14 -- sorry, I misread.  Let me start that again.

Column A, row 2 represents a data from June 14, 2021.

A.   That's correct, yes.

Q.   And so on down the page, line 3 is June 15, 2021?

A.   Correct.

Q.   And then there is a column B through S for each of the entries?

A.   Yes.

Q.   And you -- if we go to the end of the document, it appears that you go through March 6, 2024.

A.   That's the last day on the document, right.

Q.   That's actually beyond your analysis period, isn't it?

A.   It is, yes.

Q.   Because you ended your analysis period in January of 2024?

Page 91

C. Coffman

A.    That's correct.

Q.    Okay.  Why did -- why does this spreadsheet go beyond?

A.    I think we probably collected the data -- the stock price data around this time, and that's the date that it -- we collected through to the present, and I just don't think we ever deleted, you know, the portions that were irrelevant after the analysis period.

Q.    So does your analysis period run through March of 2024 or January of 2024?

A.    January of 2024.

I specified that I wanted to look at two calendar years after the end of the class period.

Q.    So even though the data is in this spreadsheet, you didn't use it to do your analysis beyond January?

A.    The data beyond January -- the date in January 2024 that signifies the end of my analysis period, that's correct.

Q.    And the first date is June 14, 2021, correct?

A.    Give me just a second.

Page 92

C. Coffman

I believe that's the first date on which I was able to calculate a return, so there was trading -- there might have been trading on a prior day, but this is the first date for which there is actually a return that can be calculated.

Q.    Okay.  When did the TaskUS stock start trading?

A.    I believe it was on the 11th --

Q.    And --

A.    -- which I believe, if memory serves, was a Friday, and so there's two days that would be a weekend and then the 14th, I think, is the second trading day, and that's the first day on which I would have a close-to-close price to calculate a return.

Q.    Because you were looking at the second trading day because there was no close before there was a first trading day, is that what you are saying?

A.    I -- that's -- as I sit here, that's my recollection as to why we wouldn't have included the 11th as a day on here, but that's -- again, to be absolutely certain, I

Page 93

C. Coffman

would have to go back and look at my records.

But the reason you wouldn't necessarily see the first trading day is that's the first closing price, and you need two closing prices to calculate a close-to-close return.

Q.    What was the IPO price?

A.    I believe it was 23.

I'm doing that off of memory.  If you want me to go back and look, I believe I specified in my report at some point, but I believe it was 23 dollars a share.

Q.    And would you say that was an efficient price for the security?

MR. KUBOTA:  Objection to form.

A.    I have not evaluated that.

Q.    Well, how was the 23 set?

MR. KUBOTA:  Objection, outside the scope of the report.

A.    My understanding of how IPO prices are set is that there is a process by which the underwriters go to potential purchasers of the security and assess the demand for that security at potential prices, and they probably also

Page 94

C. Coffman

incorporate their own valuation models into what they think a price of the security might be.

And then there may be some process by which the underwriters -- or there is a process by which the underwriters assess whether there is sufficient demand at different prices and then ultimately set a price.

Q.    It's not set through trading, the 23?

A.    No.

Q.    Looking at --

A.    Not -- let me be clear.  Not typically.  I don't know if there is exceptions to that rule, but in my understanding of how IPO prices are generally set, it's not through trading.

Q.    It wasn't set through trading in the case of TaskUS?

MR. KUBOTA:  Objection.  He is not an underwriter or a fact witness.  Outside the scope of the report.

A.    I have not seen any reference to it, but I didn't investigate exactly how the price was set in this case.

Page 95

C. Coffman

Q.    Let's go back to Exhibit 4.

We discussed column A is the date.

Tell me what column B is?

A.    That's the closing price on that date.

Q.    And C, Vol. Task, is that the volume?

A.    That's the volume quoted in millions of shares traded.

Q.    During that day?

A.    During that day, correct.

Q.    And the next, Short Interest Task?

A.    That's from another source.  We get a report of the -- how many shares are being -- are reported as -- have been -- being shorted in the security as of that date.

And so that updates, I believe, once every two weeks or so.  There is a report that's available that shows how many shares are shorted.

Q.    So if we look, for example, on the 24th of June of 2021, it says .13104.

What does that mean?

A.    That's -- again, my understanding of

Page 96

C. Coffman

that is that's quoted in millions.  So that would mean there is roughly 131,000 shares that are being reported as short sold.

Q.    I see.  And it might vary between, in this example, the 24th of June to the 9th of July, but you don't get it updated until the 12th of July?

A.    Correct.  I think it is only updated once every two weeks from the data source we have.

Q.    Okay.  Okay.

Shares Out Task?

A.    That's a measure of, on that date, based on the information we have, of the number of shares outstanding of class A stock of TaskUS.

Q.    In what unit?

A.    Millions.  Sorry, millions of shares.

So this would indicate 15.18 million shares.

Q.    "Market Cap Task" means what?

A.    That's just the multiplication of shares out and the closing price.

Page 97

C. Coffman

Q.    This is in hundreds of millions?

A.    No, it's in millions.

Q.    It's in millions.

So 475 million?

A.    Correct.

Q.    Okay.

Is this -- this is a measure of the traded A shares?

A.    Correct.

Q.    And --

A.    Oh, wait, let me take a step back. I don't think that's right actually.  Let me -- or actually, I think it is.  Let me...

Correct, this is of the A shares.

Q.    Okay.  And there were other economic interests in the company at this time, at the time of the IPO, right?

MR. KUBOTA:  Objection.  He is not a fact witness.  Vague.

A.    By "economic interest," could you be more specific?

Because, I mean, I'm sure there were other economic interests in the firm in terms of --

Page 98

C. Coffman

Q.    Funds affiliated with Blackstone had an investment in TaskUS as of the IPO, correct?

MR. KUBOTA:  Objection.  He is not a fact witness.  Outside the scope of the report.

A.    I think you're talking about other equity interests.  Like I just want to be very clear what you're talking about.  Because there can be --

Q.    Sure.  People in contracts or something -- fair point.

Yes, equity interests.

A.    My understanding is there were other equity interests besides the class A stock.

Q.    And the complaint describes allegations regarding those interests, correct?

A.    I'm not sure what's alleged with respect to those particular interests.

Q.    Well, do you know what the complaint alleges funds affiliated with Blackstone held with respect to TaskUS equity after the IPO?

MR. KUBOTA:  Objection, outside the scope.

A.    I can look at the complaint.  I'm

Page 99

C. Coffman

generally aware that --

Q.   Paragraph 157.

A.   Okay.  I'm generally aware that Blackstone held an equity interest after the IPO, if that's what you are asking.

Yes, I see at paragraph 157 of the complaint, there is a claim that BCP, which I understand is -- references some Blackstone entity, maintained ownership of at least 50 percent of the outstanding stock prior to the secondary offering.

Q.   And that ownership, that's not reflected in column F, is that right?

A.   I'm not certain whether or not Blackstone held any A shares, but my understanding is that they were holding at least the vast majority of their ownership in class B shares.

Q.   G, what is G?

A.   So G is the percentage change in the market price after taking into account any dividends that were paid on that day.

So it is a dividend-adjusted return of TaskUS stock on that day from the prior

Page 100

C. Coffman

close.

Q.    So for 6/14, what does .00739 mean?

A.    It means that the stock price -- the closing price went up 0.7 -- I'm going to round this -- 0.74 percent.

Q.    Okay.  Percent.  It's not dollars, it's percent?

A.    Correct.

Q.    H?

A.    H is the close-to-close return of the S&P 500 Index -- Total Return Index.

Q.    And then is I some comparison of G to H?

A.    No.  Column I is the close-to-close return of the peer index I constructed.

Q.    I understand.  Okay.

Going to page 2, at least in the printed version of 4, J, Intercept?

A.    So this is an output from the regression analysis that was performed.  So it's referred to as the intercept parameter of the regression where I run a regression that -- a linear regression that controls where the dependent variable is the return of TaskUS stock

C. Coffman

and the independent variables are the returns of the S&P 500 and the peer index.

Q. So it incorporates data in G, H and I?

A. Yes. So it's a regression parameter that comes from running a regression of data in G, H and I.

Q. Well, are there any other variables in that or just those three variables?

A. Just those three variables.

Q. K?

A. K is, again, a parameter that comes out of the regression I just described, and it -- the way to interpret it is -- it's often referred to as the beta with respect to that index of the stock.

So the way to interpret is, on average, over the estimation period of the regression, any time the S&P 500 Total Return Index went up 1 percent, TaskUS stock went up 1.82 percent.

So it's the average relationship between the S&P Total Return Index and the TaskUS stock.

Page 102

C. Coffman

Q.    Okay.  Let me ask you about L and M and then I think I have a joint question for all of these columns that we just looked at.

But L is what?

A.    L is the same thing but with respect to the peer index instead of the S&P Total Return Index.

Q.    And M?

A.    M is a measure of the volatility of the stock after controlling for the market and peer index.

So it's a measure of the standard deviation of -- to be technical, it's the standard deviation of the residual returns, which is the difference between the expected return and the actual return on the -- on dates within the estimation window.

It's referred to as the "root mean squared error" and is described in my report, and there is an exhibit that shows that variable in my report.

Q.    So if I read these correctly, if we carry through to page 8, which puts us in October and November of 2021, J, K, L, M all

Page 103

C. Coffman

remain the same number for each date all the way through the bottom of page 8, which is December 1.

You can check me on that, but I think I'm correct.

A. Yes, that's correct.

Q. And actually, if we go to page 10, they stay there until December 2, 2021, and then they change. And then they seem to change daily.

A. Yes.

Q. Why are they identical for the first -- well, from the period from June 14 through December 2?

A. So my approach generally is for every day I'm testing, to run a regression for the prior 120 trading days. That's the estimation window for the regression.

Obviously, since TaskUS was an initial IPO, there is no trading data prior to the IPO, so the first -- for the first 120 days, I'm estimating what's called a fixed regression, which is essentially over that period, it's just one regression model that's applied to each of

Page 104

C. Coffman

those days, and then after that initial 120-day period, the data reflect a regression over the most recent 120 days prior to that date.

Q.    Why do you go to this rolling 120-day period?

A.    The purpose of the rolling regression is to take into account that the relationship of TaskUS to the market and the peer index and the volatility of the stock can change over time for a variety of reasons.

And so I -- it's my standard practice to use this, what I call a rolling regression, so that I'm always performing an event study with the most recent 120 days of data to estimate the regression parameters.

Q.    So you find the rolling analysis to be more useful than a fixed analysis?

MR. KUBOTA:  Objection to form, vague.

A.    In most cases, yes.

For obvious reasons, there are times that either can't be done because there is not sufficient data available or, for example, in this case, the first 120 days, you'll -- my

Page 105

C. Coffman

preference is to always use past data over a recent time period as the most relevant period with which to estimate this type of regression model.

There are times that can't be done for a variety of reasons.  But that's my general standard approach.

Q.    Why 120 instead of 90, 150 or some other number?

A.    Sure.  Well, there is a trade-off between -- when you're running a regression analysis of this type between more data, which all else equal is always good, versus looking further back in time, which runs a potential risk of looking at time periods that are no longer relevant.

So the further you go back in time, the -- there is more that could have changed about the company or its relationship with the index or its relationship with the -- or it's general business conditions and the return generating process in general.

So there is always a trade-off between more data and data going further back in

Page 106

C. Coffman

time.  I think the 120 days, which I cite one article that specifically mentions that as a -- one potential method, is a reasonable balance between those in -- for running this type of regression.

Q.    Let's continue on the columns.  I think we are up to N.

What's N?

A.    So N is the expected returns.  So what that is, is after you -- after I've run this regression and have these regression parameters, based on the movement of the control indices, this is the expected return for that day.

So if they just behave -- if TaskUS stock was -- behaved just like you would expect from its historical relationship with those indices, this is the return you would expect to see.

Q.    And this is in percentage, I think?

A.    Yes, it's a percentage.

Q.    Okay.  Abnormal Return?

A.    So Abnormal Return is the difference between the actual observed return and the

Page 107

C. Coffman

expected return.  So it's just a subtraction of -- it's column G minus column N.

Q.   And P, you're converting the Abnormal Return into -- from percentages to dollars?

A.   That's correct.

Q.   Okay.  And Abnormal Return T, is that a T statistic or something else, or is there a cutoff from TaskUS?  I don't know what that is.

A.   That is a T statistic.

Q.   And then you also in R calculate a p-value?

A.   Correct.  So that's the -- performing a hypothesis test of what's the probability you would see that large of an abnormal return by chance alone.  And these are different from zero.  Like what's the probability of seeing an abnormal return that large by chance alone.

Q.   Okay.  And then S is sort of the punchline, but it's whether or not the -- any abnormality observed is significant to the -- I think to a threshold of 95 percent confidence?

Page 108

C. Coffman

A.    Yeah, I don't know if I'd call it the punchline.  I mean, R is really the more specific value, but yeah, S is a categorization of whether the day is statistically significant -- it's labeled "Sig. 95" but in reality, it's -- the data there is more specific than that.

If you look on page 4, for example, you will see sometimes there is one character and sometimes there is two characters?

Q.    I was going to ask about that, yup.

A.    So if, for example, the date where you see 1 plus symbol, that means it was positive and statistically significant at the 90 percent level.  If you see 2 pluses, like in row 48, that means it was positive and statistically significant at the 95 percent level.  And if there is three characters there, it means it is significant to the 99 percent level, I believe, if that's -- we should see examples of that, but I want to make sure.

Q.    I'm not sure if there are examples of that or not, but that's what it means, if we find them.

Page 109

C. Coffman

And then sometimes you use the plus and then sometimes you use the negative.  I assume plus means it went up and negative, it means it -- well, "up" is probably not right word.

Why don't you tell me what negative and positive mean.

A.    Sure.  Yes, I'm looking -- sorry, I'm going back to my prior answer.  I just want to look at something.

Yeah, so it does not appear that this includes three, if it is significant at the 99 percent level.  So there's -- I certainly see examples of days that are significant at the 99 percent level that only have the two characters.  So it's really 90 and 95 are the thresholds.

And then, yeah, when it's a plus symbol, that means the abnormal return was positive and the stock price went up more -- or went up in a statistically significant way or increased in value.

And a negative sign means the stock price decreased relative to expectation in a

C. Coffman

statistically significant way.

Q.    So, for example, if we go to line 91, which for these columns shows up on page 6 -- and I'm happy to look at it again, but it says October 19 -- this is the first day -- this is the close-to-close period after that prerelease that we discussed that was on your other chart, which, again, you can just check me, but it's your Exhibit 7?

A.    Yeah.  So this would -- this date would correspondent to event 2 from Exhibit 7.

Q.    Yeah.  And so it's a negative because it moved, per your analysis, in a statistically significant manner to the 95 percent confidence level but in a negative way?

A.    Yes, the stock price declined in a statistically significant negative way.

Q.    Okay.

In what way -- well, strike that.

You conducted this analysis in support of your review of Cammer Factor 5 for this class certification stage of the case, correct?

C. Coffman

A.    It was constructed for the purposes of evaluating Cammer Factor 5.  So to evaluate the metrics I described before in comparing news dates versus no news dates.

Q.    If you were to later conduct -- be asked to conduct a price impact analysis to identify whether or not the prices of this stock moved in relation to company-specific news, you're starting point would be the same type of analysis, am I correct?

MR. KUBOTA:  Objection to form, incomplete hypothetical.

A.    It would likely involve some form of event study analysis, whether it would be exactly this one or a refined one in some way.

And when I say, "refined," I mean, whenever I'm doing a price impact or a loss causation analysis, there is a lot more things to take into account in terms of timing.  You know, would intraday information or data be potentially useful?  Is there confounding information released at a particular time before or after or contemporaneously that would also be relevant to think about?

Page 112

C. Coffman

So I think would an event study of this type generally be useful?  Probably.  But I think, if I were asked a more specific question about a particular day or a particular news release, I would want to perform more analysis than this.

Q.    And that's why I said, "starting point."

A.    Yes.  But it might even be a different event window than just a daily event window.  That's my point, is I would have to evaluate.

Q.    Understood.

Now, did you, as part of this analysis, make any effort -- other than for the days identified in your Exhibit 7, did you make any effort to try to figure out what company-specific news might have contributed to any day registering as significant according to column S?

MR. KUBOTA:  Objection to form, vague.

A.    Well, on the earnings announcement days --

C. Coffman

Q.    Yes.

A.    -- I reviewed the earnings announcements.  I reviewed the conference call transcripts.  I reviewed analyst reports that were issued in the wake of those dates to evaluate whether the price movement on any of those days was obviously inconsistent with the nature of the news.

But beyond that, no.

Q.    And I meant beyond those 11 dates.

A.    I think I have a footnote in my report that notes that the alleged corrective disclosure date is statistically significant, but I didn't perform any specific analysis beyond -- beyond that to evaluate what exactly moved the price.

Q.    Okay.  And the alleged corrective disclosure date, based on your understanding, is the date of the Spruce report?

A.    I think Spruce Point Capital is the official name or something like that.  But let me -- I just want to remind --

Q.    Yup.

A.    -- myself of the exact date.

Page 114

C. Coffman

Yeah, it's footnote 91 to my report, I note that there is a statistically significant movement on the date of the Spruce Point Capital Management report.

Q.   Okay.  So maybe that's a 12th date then?

A.   Where I analyze additional information?

Q.   Yes.

A.   Again, I looked at that -- well, I also looked at all the -- I also had a process for identifying the absence of news on all the no news dates, right?  So I was also, you know, evaluating the extent to which there was firm-specific news on other dates besides those that are in Exhibit 7.

But given the absence of news, I didn't study, you know, what was on those dates. There was an absence of news.

But I think your question was, did I go beyond any of those dates in terms of analyzing what caused the price to move.  No.

Q.   I'm going to give you --

(Exhibit 6, spreadsheet entitled

Page 115

C. Coffman

"TASK Exclude Dates.xlsx", marked for identification, as of this date.)

Q.    This is an Excel spreadsheet that was produced to us I believe on your behalf.

Do you recognize it?

A.    Yeah, give me just a second.

Yes.  This is a spreadsheet that flows into the process that identifies dates that are to be left out of the estimation of the regression itself because there is clear firm-specific news on those days that was impacting the price.

And I believe it should be the earnings announcements, the first day of trading and the alleged corrective disclosure.

Q.    Let's look at Exhibit 8 to your report.

Now, tell me what this describes.

A.    Sure.  So this is the summary of the cause and effect test, again, where the first column, Earnings Announcements, describes data for the -- effectively, the treatment group, which is the earnings announcements.

And then the second column reflects

Page 116

C. Coffman

data for the days with no news, analyst reports or SEC filings.  So that's in effect the control group, and I'm performing a comparison of these two groups to evaluate cause and effect.

And I'm using the three metrics I described before.  The proportion of dates that are statistically significant, that's the middle row.  The average magnitude of the change in price after controlling for market effects, that's the second-to-last row.  And then the volume on these dates, which is the final row.

And then I have footnotes reflecting that the differences between the treatment group and control group are statistically significant at beyond the 99 percent confidence level.

And so from that, I draw the conclusion that there is scientific evidence of a cause and effect relationship between new firm-specific information and changes in the market price of the stock.

Q.   Okay.  How many of the days on which there was no news, analyst reports or SEC filings take place before the secondary offering?

Page 117

C. Coffman

A.    That's obviously a knowable number, but I don't know it off the top of my head.

Q.    Did you try to do this analysis just looking at, for example -- strike that.

Did you do any analysis of the type on Exhibit A other than for the full analysis period, which includes the two years post class period?

MR. KUBOTA:  Objection to form.

A.    No, I did not run any statistical tests over any subperiods.

Q.    Did you do anything that attempted to determine whether there were days or months in which trading in TaskUS securities was less efficient or more efficient than other days or months?

MR. KUBOTA:  Objection to form, vague, incomplete hypothetical.

A.    Well, certain of the metrics I provide data over time.

So, for example, Exhibit 3, which is the average weekly trading volume, I -- so each bar there is essentially a week of trading and shows that throughout the class period on every

Page 118

C. Coffman

single week, the trading volume exceeded the thresholds that are identified in Cammer.

Q.    That's Cammer Factor 1, am I right?

A.    That's correct.

Q.    I'm trying to limit my question to Cammer Factor 5 right now.

A.    Okay.

I think Exhibit 5, which shows the regression parameters, shows that the -- there was a positive correlation between TaskUS and the control variables consistently throughout the analysis period, including during the class period.

Q.    Well, let me ask you about that.

I mean, the first 120 days -- I think it's the first 120 -- you have a flat line for both indices, right?

A.    Correct.  That's to reflect that the first 120 days is just the one fixed regression for the first 120 days.

Q.    You only get to your rolling analysis on day 121, I assume?

A.    Yes.

Q.    And that's the same on Exhibit 6,

C. Coffman

right, that's why it's flat up until sometime in December?

A.    For the standard deviation of the errors, yes.

(Reporter seeks clarification.)

A.    Errors, which is the same thing as what's referred to as the root mean squared error in the spreadsheet that we looked at earlier.

I certainly saw in Exhibit 7 that the statistical significance of the events I was testing, there wasn't any particular time correlation to it, that all three during the class period were statistically significant, and there was only one that was not statistically significant during the analysis period.

If your question is restricted to Cammer Factor 5, then I believe that's it. There are other tests, obviously, I performed that have a time element to them where I looked at subperiods.

Q.    Let's move forward, sir.  I want to discuss just for a few minutes the bid/ask spread analysis you did for Krogman number 2,

Page 120

C. Coffman

which I think you start to do around page --

sorry, paragraph 69 of your report.

A.     Okay.

Q.     That's on page 31.

A.     Yes.

Q.     And Exhibit 11 is the graphical

depiction I think of what you did here?

A.     It's a summary, yes.

Q.     So -- well, let me -- the summary

goes month by month, correct?

A.     The summary is month by month, yes.

Q.     Okay.  Is there something in this

exhibit or elsewhere in the report where you do

a bid/ask spread day by day or week by week or

anything other than month by month?

A.     Well, I calculate the bid/ask spread

on a daily basis.  I believe that's reflected in

my backup.  I, for summary purposes for the

exhibit, turned it into a monthly comparison.

Q.     Now, let's talk about what you list

as additional factor auto correlation.

Tell us what auto correlation is?

You discuss it a bit starting in paragraph 73.

A.     So auto correlation refers to if a

Page 121

C. Coffman

time series variable is -- if there is predictive power from past values of that variable.

So, for example, if yesterday's abnormal return was somehow predictive of today's abnormal return, and in an efficient market, you would not expect past values of the same return variable to have predictive power into the future.  That would violate an assumption of market efficiency.

Q.    You -- Exhibit 13 relates to this aspect of your work?

A.    Yes.

Q.    You display it here by quarter, correct?

A.    Quarter and for the class period as a whole.

Q.    You don't do it in -- you do not display it based on shorter time periods?

A.    I do not.

Q.    Did you run auto correlation tests for shorter time periods than quarters?

A.    I don't believe so, no.  No.  I don't recall seeing any test of that kind.  And

Page 122

C. Coffman

I didn't ask for one.

Q.    Why don't we take five minutes, or ten, if you prefer.  I'm either done or very nearly done.  I just want to confer.

A.    Sure.  Five minutes is fine.

THE VIDEOGRAPHER:  Off the record at 12:08, marking the end of Media Unit Number 2.

(Recess.)

THE VIDEOGRAPHER:  On the record at 12:15, marking the beginning of Media Unit Number 3.

(Exhibit 7, spreadsheet entitled "TASK News Import.xls," marked for identification, as of this date.)

Q.    We are marking a document as number 7.  It's a spreadsheet that was produced to us.

I will tell you in printing it, we added blue sheets between the tabs in the spreadsheet.  So the first section has -- it's labeled "AR" is a tab.

And, again, we can put this in the share, if helpful.

Page 123

C. Coffman

The second is "News."  The third is "Earnings."  And the last is "SEC."

Do you recognize this?

A.    Yes.

Q.    What is it?

A.    I believe this is the input file that's used by our computer programs to evaluate which day -- which trading days on which there was news.

The first tab, this AR tab, are the dates on which there were analyst reports.

The next tab, News, is the dates on which there were news headlines from the Factiva search we described earlier.

And then the last tab, "SEC," is dates on which there were company SEC filings.

And so this was used to then create a -- this was used by a program to then identify days on which there was no news.

Q.    As part of that process, was the news itself analyzed?

MR. KUBOTA:  Objection to form.

A.    Not for this purpose, no.

Q.    And so take a news article, it could

Page 124

C. Coffman

have been that TaskUS appears in a news

article -- I'm trying to think of something

simple -- you know, simply mentioned in passing

in a news article or it could have been that

TaskUS appears in news articles because it

released earnings, they would both be treated

the same in this analysis?

MR. KUBOTA:  Objection, vague.

A.    Give me just one second.

This is designed -- so, in essence,

the answer is yes, but there are -- I did --

there is part of the design of this to try to

mitigate that to a certain extent.

In my appendix where I describe the

search terms, Factiva --

Q.    Show us where you are, please?

A.    Sure.  It's page 55 of 67, if you

look at the numbers at the top.

Q.    Yup.

A.    So I described the search terms that

I use and the -- for the bulk of the search, I

relied on Factiva having tagged the article as

being about TaskUS, so there is a field in

Factiva that is -- that is meant to flag if a

Page 125

C. Coffman

news article is effectively about a company.

Okay?

And so when I'm searching all sources, I rely on that field being tagged.

And then I also excluded specifically where they were just mentioned in a list of NASDAQ new highs and lows.

So I would not have flagged an article that just mentioned TaskUS for that reason.

And then where -- and then the second search is for the term TaskUS in major news and business sources.

So, again, I'm trying to mitigate the possibility of that by only looking for where they're mentioned in major news and business sources, where that word just shows up, but, in essence, yes, there was no requirement that -- or evaluation of the degree of materiality of the news on any given day.

Q. And, in fact, on the overwhelming majority of the days, your regression analysis did not find an abnormal stock price movement for TaskUS on the days in which there was

Page 126

C. Coffman

news --

MR. KUBOTA:  Objection, no --

Q.    -- about TaskUS?

MR. KUBOTA:  -- no foundation.

A.    That's not true with respect to earnings announcements, as my study definitely shows --

Q.    Of which there were 11.

A.    Of which there were 11 during the analysis period, and for --

Q.    And three during the class period?

A.    And three during the class period.

And for the remainder of days with some form of news, I have not done a test of how many of those were statistically significant or not.

So I would be speculating to try to -- to say whether that's true or not.

Q.    But -- and I won't ask you to do it here -- I could take Exhibit 4 and Exhibit 7 and count the days where you showed a statistically significant stock price movement and compare it to days where there was news?

A.    Yes.

Page 127

C. Coffman

Q.    I mean, that would be a lot of hand work, but one could do it?

I suppose one could do it without hand, but you can probably do it -- you probably could do it by computer, I would do it by hand?

A.    Correct, there are easy, programmatic ways to do that.

Q.    Easy for you, sir, not for me.

I think with that, I can let you go. I promised you out by lunch, unless your counsel has any questions.

MR. KUBOTA:  No questions at this time.

THE VIDEOGRAPHER:  This concludes today's testimony given by Chad Coffman as stipulated by all parties.

The total number of media units used was three and will be retained by Veritext Legal Solutions.

Off the record at 12:22.

**Page 128**

HUMBERTO LOZADA, et al. vs. TASKUS, INC., et al.

6/20/2024 - CHAD COFFMAN

ACKNOWLEDGEMENT OF DEPONENT

I, CHAD COFFMAN, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____   _____

CHAD COFFMAN                            Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20____.

_____

NOTARY PUBLIC

Page 129

INDEX:

| WITNESS | EXAM BY: | PAGE: |
|---|---|---|
| Chad Coffman | Mr. Youngwood | 6 |


EXHIBIT INDEX:

| NUMBER | DESCRIPTION | PAGE: |
|---|---|---|
| Exhibit 1 | Expert Report of Chad Coffman, | 4 |
| Exhibit 2 | amended class action complaint, | 45 |
| Exhibit 3 | article entitled "Measuring Securities Market Efficiency in the Regulatory Setting," | 59 |
| Exhibit 4 | Excel spreadsheet, | 85 |
| Exhibit 5 | electronic version of Exhibit 4, stamped | 88 |
| Exhibit 6 | spreadsheet entitled "TASK Exclude Dates.xlsx", | 114 |
| Exhibit 7 | spreadsheet entitled "TASK News Import.xls," | 122 |

Page 130

CERTIFICATE

STATE OF NEW JERSEY )

)ss:

COUNTY OF UNION     )

I, MARY F. BOWMAN, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public within and for the State of New Jersey, do hereby certify:

That CHAD COFFMAN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 26th day of June, 2024.

_____

MARY F. BOWMAN, RPR, CRR

Page 131

HUMBERTO LOZADA, et al. vs. TASKUS, INC., et al.

6/20/2024 - CHAD COFFMAN

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____   _____

CHAD COFFMAN                            Date

**[& - 37]**

**&**

**&** 2:10 3:4,14 4:25 6:2

**0**

**0.7** 100:5
**0.74** 100:6
**00739** 100:3
**01479** 1:10 4:23

**1**

**1** 4:2,15 6:22 7:14 8:18 34:23 37:16 50:23 53:6 65:17 80:13,19 101:21 103:4 108:14 118:4 129:9
**1,020** 41:16
**1.82** 101:22
**10** 15:13,13,15 19:13,18,20 36:24 44:19 51:2 74:19,20 74:25 75:10,11 75:20 76:3,5 77:12 103:8
**100** 12:18
**10017** 3:20
**10036** 3:9
**10:48** 80:12
**10b** 23:11 45:7 46:10 50:2

**10th** 76:9
**11** 19:20 38:25 39:16 76:4,6 113:11 120:7 126:9,10
**111** 60:2
**114** 129:18
**11:04** 80:16
**11:12** 88:15
**11:24** 88:21
**11th** 76:9,10 92:10,24
**120** 103:18,22 104:2,4,6,15,25 105:9 106:2 118:16,17,20 118:21
**121** 118:23
**122** 129:20
**12:08** 122:8
**12:15** 122:12
**12:22** 127:21
**12th** 96:8 114:6
**13** 121:12
**131,000** 96:3
**13104** 95:23
**14** 80:19 90:5,8 91:23 103:14
**14th** 92:14
**15** 53:23 56:15 90:11
**15.18** 96:21
**150** 105:9
**157** 99:3,7

**16** 25:11
**17** 65:17
**170** 45:24 47:12
**18** 65:21 78:17
**18th** 79:22
**19** 39:2,16 41:18,18 66:25 110:6
**1989** 50:25 51:10
**1:22** 1:10 4:23

**2**

**2** 7:16 10:14 45:15 80:16 84:23 90:4,7 100:18 103:9 103:15 108:16 110:12 119:25 122:9 129:10
**20** 1:21 2:5 4:7 13:10 14:23 128:15
**2000** 58:19
**200s** 11:8
**2010** 37:10
**2021** 38:25 39:16,19,22 58:5 74:20 75:11 76:2 78:17 90:8,11 91:23 95:23 102:25 103:9
**2021/6/14** 90:5

**2022** 41:18
**2023** 9:12
**2024** 1:21 2:5 4:7 9:9 39:2,16 41:18 44:21 45:4 90:18,25 91:12,12,13,21 130:21
**21** 51:2,4,10
**22** 76:12
**23** 93:9,13,18 94:10
**239** 40:14,23 41:21,25
**24th** 95:23 96:6
**25** 14:11,11 23:22
**260** 10:18
**26th** 130:21
**27th** 3:8

**3**

**3** 59:4,5,12 65:17 67:4,9 67:13 90:10 117:22 122:13 129:12
**30** 14:12
**300s** 11:8
**31** 53:23 54:3 120:5
**32** 56:18
**33** 56:15
**35** 19:25
**37** 66:8

**[39 - active]**

**39** 7:20 20:2

**4**

**4** 25:10 56:16 56:17,25 57:17 57:18 66:24 76:15,15,17 85:14,15 88:18 88:25 89:3,4 90:3 95:2 100:19 108:9 126:21 129:9 129:15,17
**40** 65:20 66:2
**400** 11:11
**400s** 11:7
**42** 67:2
**425** 2:10 3:19 5:2
**44** 67:21
**45** 129:10
**475** 10:19 97:5
**48** 108:17
**4:05** 75:20
**4:27** 78:18

**5**

**5** 19:9 44:21 45:7 46:10 50:2 85:4,6,9 88:17,25 89:5 89:6,19 110:23 111:3 118:7,9 119:19 129:16
**50** 10:11 13:10 14:23 99:11

**500** 76:24 77:2 100:12 101:3 101:20
**54** 37:15 42:18
**55** 38:11,23 45:20 73:25 124:18
**57** 54:9
**58** 16:24 34:22
**59** 16:25 129:12

**6**

**6** 19:20 90:18 110:5 114:25 118:25 129:5 129:18
**6/14** 100:3
**6/20/2024** 128:2 131:2
**67** 7:15,16 16:24 37:15 124:18
**69** 120:3

**7**

**7** 3:8 19:8 74:7 74:7 110:10,12 112:17 114:17 119:11 122:14 122:18 126:21 129:20
**73** 120:24
**79** 23:8

**8**

**8** 19:25 32:9 102:24 103:3 115:17
**80** 10:13 12:4 12:23,25 13:2 26:2
**82** 28:23,24
**85** 129:15
**88** 21:13 129:16

**9**

**9** 19:13 32:9 36:23
**90** 27:7 105:9 108:16 109:17
**91** 110:4 114:2
**9329** 130:23
**95** 107:25 108:6,18 109:17 110:16
**950** 10:16 12:13,18,19,21 12:24 13:2
**99** 108:20 109:14,16 116:16
**9:20** 2:6 4:6
**9th** 96:6

**a**

**a.m.** 2:6 4:6
**ability** 62:24
**able** 55:11 72:8 79:2 92:3

**abnormal** 76:23 77:7 106:23,24 107:5,8,18,20 109:20 121:6,7 125:24
**abnormality** 107:24
**above** 34:25 38:23 40:5
**absence** 114:13 114:18,20
**absolute** 55:13
**absolutely** 92:25
**academic** 38:11 52:16 53:12,17 53:20 58:19 60:15 62:2 63:22 64:15 72:14 82:5
**accepted** 23:10 23:20 24:17,21 60:13 61:7
**account** 11:24 99:22 104:8 111:20
**accuracy** 49:24
**acknowledge...** 128:3
**action** 5:8 21:9 45:15 129:10 130:17
**active** 30:23

**[actual - announcements]**

**actual** 102:17
  106:25
**actually** 7:19
  14:4,5 36:12
  42:19 44:14
  47:9 58:13
  70:25 71:7
  75:7,14,18,23
  90:21 92:6
  97:13,14 103:8
**add** 89:9
**added** 64:13
  87:15 89:8
  122:21
**adding** 88:9
**addition** 50:6
**additional**
  35:10 50:13,14
  50:19 54:17
  69:9,10 83:17
  83:18 114:8
  120:22
**additions** 128:6
**adjusted** 99:24
**admissions**
  81:9,11
**adopted** 24:12
**advantage** 46:4
**advent** 62:24
**advertently**
  86:15
**advice** 58:15
  64:19
**affect** 27:16,23
  28:13

**affected** 77:14
  77:25
**affiliated** 14:13
  98:2,21
**affiliates** 14:19
**affiliations**
  5:15
**aggregator**
  1:16 3:16
**ago** 33:23
  44:13
**agree** 4:13 30:4
  51:6 60:25
  61:3,5,11
  62:19 67:12,16
**agreed** 60:15
  62:2
**aid** 89:7
**al** 4:20,21
  128:1,1 131:1
  131:1
**algorithmic**
  31:11
**allegation**
  49:17
**allegations**
  49:20 98:17
**allege** 21:18
  67:3
**alleged** 45:5
  48:16 49:20,21
  98:18 113:13
  113:18 115:16
**alleges** 50:3
  98:21

**allows** 46:3
**amend** 8:3
**amended** 44:3
  45:15 129:10
**amit** 1:13 3:17
**amount** 26:21
**analyses** 8:13
  24:4
**analysis** 8:12
  20:12 21:14
  22:23 29:2,2
  29:23 42:4,14
  52:4 64:13,20
  67:23 68:9
  69:9 70:4,11
  70:12,15,15
  71:9 74:2,11
  77:10 79:2
  89:16 90:21,24
  91:10,11,19,22
  100:21 104:17
  104:18 105:13
  110:14,22
  111:7,11,15,19
  112:6,16
  113:15 117:4,6
  117:7 118:13
  118:23 119:17
  119:25 124:8
  125:23 126:11
**analyst** 31:23
  33:25 35:15,19
  38:22,24 39:7
  39:11,12,18,21
  39:24 54:4,9

  54:11,17,20
  55:13 56:5,13
  56:14,20 57:4
  57:19 58:7,11
  60:5,12,15
  61:20 62:2,10
  64:15 80:4
  83:6,18,23
  84:7 113:5
  116:2,23
  123:12
**analyst's** 62:16
**analysts** 54:14
  62:19 64:8
  65:5,15 83:24
**analyze** 33:10
  79:8,18 82:7
  83:24 114:8
**analyzed** 18:25
  21:19 123:22
**analyzing**
  73:24 75:22
  82:3 84:16
  114:23
**anew** 19:5
**announce** 6:5
**announcement**
  68:11 71:6
  72:9,13,15
  73:12 74:10
  77:21,25 78:7
  78:12,18
  112:24
**announcements**
  69:4,6 75:5

113:4 115:15
115:22,24
126:7
**answer** 82:20
109:10 124:12
**answered**
47:10 48:14
**answers** 49:3
**apologize** 64:2
**appear** 7:2,3,5
86:25 109:12
**appearance**
5:12
**appearances**
3:2 5:15 6:7
**appeared** 19:15
47:21 48:4,11
48:20 49:15
50:4
**appears** 16:22
19:21 89:14
90:17 124:2,6
**appended**
128:7
**appendices**
7:10 34:19
**appendix** 16:22
18:19 34:22
37:13 64:25
124:15
**applicable**
21:24
**applied** 20:4
103:25

**applies** 20:11
**apply** 20:3
**approach**
71:13 82:2,4
103:16 105:8
**appropriate**
25:5
**approved**
18:13
**approximation**
13:9
**april** 14:2
**ar** 122:23
123:11
**area** 24:4 32:18
34:8
**article** 53:17
58:17,25 59:5
59:12,15,22
63:13,20,21
64:6 65:3
106:3 123:25
124:3,5,23
125:2,10
129:12
**articles** 36:23
38:11,15,21
40:10,15,20
41:4,6,14,21,25
42:3,8,9,11
53:5,8,12,20
58:19 63:3,20
65:4,6,9 124:6
**artificial** 22:4
22:25 26:4,8

50:14,19
**ascribing** 78:4
**asked** 8:8,9,21
9:2,4 20:18
21:2,8 39:12
41:12 48:8,13
49:11 55:6
111:7 112:4
**asking** 20:23
22:10 30:17
51:3,5 56:12
57:17 68:17
99:6
**aspect** 46:10
61:15 121:13
**assess** 93:24
94:6
**assessed** 50:21
**assignment**
58:21
**assignments**
58:21
**assisting** 10:23
**associate** 5:23
**associated**
20:17 46:17,18
48:5
**assume** 7:22
11:11,15 109:4
118:23
**assumes** 34:6
**assuming** 51:15
**assumption**
48:3 55:12
121:11

**attempted**
117:13
**attorney** 5:17
25:2 51:19
**attorneys** 3:5
3:15
**attribute** 79:2
**attributing**
79:6
**attrition** 46:6
**audio** 4:11 6:7
**august** 74:19
74:20 75:10,11
75:20 76:3,4,5
76:6 77:12
78:16
**auld** 3:4 6:2
**auto** 70:9
120:22,23,25
121:22
**available** 69:13
81:6 95:20
104:24
**avenue** 2:11
3:19 5:2
**average** 71:25
101:19,23
116:9 117:23
**aware** 30:21
32:5 39:21
43:6 48:16
52:2,15 53:4
53:11,16 57:25
99:2,4

**[b - c]**                                                             Page 5

**b**

**b**  16:22 18:19 34:22 54:8 86:8 90:13 95:4 99:18
**ba**  35:20
**back**  19:23 27:7 34:19 42:18 48:17 49:3 50:22 57:2 63:2 65:16 93:2,11 95:2 97:12 105:15,18,25 109:10
**backup**  41:14 57:22 120:19
**balaji**  1:13 3:17
**balance**  106:4
**bar**  117:24
**bartlett**  2:10 3:14 4:25
**based**  22:7 24:23 31:4 45:10 66:19 81:5 96:15 106:13 113:19 121:20
**basic**  42:24
**basis**  26:10 120:18
**bcp**  1:15 3:15 99:8
**began**  8:11 9:10

**beginning**  5:16 8:10 44:15 80:16 122:12
**begins**  81:14
**behalf**  1:8 17:15 85:12 115:5
**behave**  106:16
**behaved**  106:17
**believe**  11:2,7 13:23 14:25 21:10 40:24 41:5,7 45:3,10 46:16,24 48:18 57:21 70:9 84:24 85:19 89:4 92:2,10 92:12 93:9,11 93:13 95:18 108:21 115:5 115:14 119:19 120:18 121:24 123:7
**believed**  21:3
**benefit**  12:9
**best**  13:11 66:17
**beta**  101:16
**better**  10:4
**beyond**  31:23 33:25 34:14 52:8 56:12 64:12 65:10 67:25 68:3,8

82:14 90:21 91:4,19,20 113:10,11,16 113:16 114:22 116:16
**bid**  84:16,23 119:24 120:15 120:17
**billed**  13:24
**billing**  13:20 14:7
**bit**  34:8 36:8 50:11 68:7 120:24
**blackstone** 98:2,21 99:5,9 99:16
**blank**  20:7
**bleichmar**  3:4 6:2
**blood**  130:17
**blue**  122:21
**body**  65:16
**bonar**  5:23
**bottom**  7:19 19:8,13 32:9 45:23 87:21 103:3
**bowman**  1:24 2:12 5:5 130:5 130:24
**break**  14:24 80:9 89:7
**briefly**  34:20

**broad**  30:13
**broader**  70:15
**brought**  21:2
**bryce**  1:12 3:16
**bulk**  15:14 124:22
**business**  9:22 84:21 105:22 125:14,18

**c**

**c**  4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1,19 60:1,5 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1

**[c - chance]**

79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1,7
96:1 97:1 98:1
99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1
**calculate** 92:3
  92:17 93:6
  107:13 120:17
**calculated** 92:7
**calculating**
  26:25 28:8
**calculation**
  24:12
**calendar** 75:24
  91:15
**call** 35:16
  59:22 104:13
  108:2 113:4

**called** 6:12 9:6
  87:19 88:2
  103:23
**calling** 70:20
**calls** 28:4 50:9
  51:17 54:15
**cammer** 19:19
  42:24 50:24
  51:7,15,25
  52:2,6,8,10,13
  52:17,21,24
  53:6,14,21
  65:14,17 66:6
  66:9,24 67:2
  85:4,6,9 89:19
  110:23 111:3
  118:3,4,7
  119:19
**candice** 9:15
  14:18
**cap** 96:23
**capital** 38:25
  39:6,9 54:10
  54:16,18,18
  113:21 114:4
**careful** 34:16
**carry** 102:24
**carter** 58:24
  59:14,18
**case** 1:9 4:22
  6:23 15:6 19:3
  19:6 20:9,9,12
  20:13 21:3,4
  21:10,14,18,20
  21:22 23:2

24:19 25:15,17
  26:9 27:20
  29:10,24 39:14
  43:19,23,24
  44:2 45:6
  46:10 50:25
  65:23 66:11
  73:23,23 74:10
  84:12 87:8
  94:19,25
  104:25 110:24
**cases** 17:2,6,9
  17:12,14 20:25
  21:23 23:23
  24:3,7,8,15
  31:3 32:22
  42:19,19,20
  43:3,5 69:7
  73:22 82:16
  104:21
**categories** 33:2
  33:9
**categorization**
  108:4
**causation**
  21:13 22:23
  28:25 111:19
**cause** 42:4,14
  68:9 70:9,13
  70:20 71:8,14
  74:2 84:18
  85:3 89:24
  115:21 116:5
  116:19

**caused** 9:20
  79:4,19 114:23
**certain** 25:19
  82:18 92:25
  99:15 117:20
  124:14
**certainly** 14:2
  27:23 32:5,18
  52:22 53:19
  55:23 61:10
  65:6 72:25
  80:4 81:22
  86:14 109:14
  119:11
**certificate**
  130:2
**certification**
  20:17 63:15
  110:24
**certified** 2:13
  130:6
**certify** 130:9,15
**cetera** 12:8
  66:15
**chad** 1:20 2:9
  4:2,16 6:11
  127:16 128:2,4
  128:12 129:5,9
  130:10 131:2
  131:24
**challenge** 25:4
  25:24
**chance** 107:18
  107:21

**change** 8:3 27:10 29:8 69:24 76:3 99:21 103:10 103:10 104:11 116:9 131:4,7 131:10,13,16 131:19

**changed** 87:2 105:19

**changes** 86:15 116:20 128:6

**character** 108:10

**characteristics** 69:25

**characterizati...** 30:10

**characters** 108:11,19 109:17

**charged** 12:13

**charges** 11:13

**chart** 110:9

**chartered** 35:14,17

**check** 17:7 103:5 110:9

**checked** 48:17

**chicago** 35:23 36:7,10,11,13 36:15 63:6

**choose** 17:8

**circuit** 51:16

**circuit's** 43:10

**circumstance** 69:23

**circumstances** 34:16 69:8 84:11

**citation** 23:15

**cite** 38:18 63:13 64:7,24 65:9 106:2

**claim** 45:7 99:8

**claims** 21:16,24 23:24 49:9,24

**clarification** 119:6

**clarify** 50:17,18

**class** 20:16 21:9 22:5 23:3 26:5,10,16,22 26:23,25 27:7 29:4,9 40:11 41:21 45:15 56:18 57:5,7 57:13 63:15 67:12,24 68:3 68:5 69:3,10 69:11,14 70:5 70:6,8,13,18,21 71:2 74:16,23 81:11 91:15 96:16 98:15 99:18 110:24 117:8,25 118:13 119:15 121:17 126:12

126:13 129:10

**classroom** 36:20

**classwide** 20:19 21:8,22

**clear** 28:7 49:6 53:2 54:14 61:12,18 71:17 72:10 73:18 74:21 80:6 82:16 94:13 98:9 115:11

**clearer** 44:3

**clearly** 42:16 68:14 72:16

**click** 40:25 41:3

**client** 46:5

**clients** 62:11

**close** 75:21 76:5,6,13,21,21 78:23,24 79:24 79:24 92:16,16 92:19 93:6,6 100:2,11,11,15 100:15 110:7,7

**closer** 10:13

**closing** 76:8,8 76:16,17,18 93:5,6 95:5 96:25 100:5

**coffman** 1:20 2:9 4:1,3,16 5:1 6:1,11,18 7:1 8:1 9:1 10:1 11:1 12:1

13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1,3 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 80:18 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1,24 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1

109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1,16 128:2 128:4,12 129:5 129:9 130:10 131:2,24

**coherent** 21:20 49:23

**collected** 37:25 39:13 91:5,7

**collectively** 13:14

**college** 35:3,5

**column** 86:4,11 87:16 89:9 90:3,7,13 95:3 95:4 99:14 100:15 107:3,3 112:21 115:22 115:25

**columns** 102:4 106:7 110:4

**combination** 8:15 77:2

**come** 78:18

**comes** 101:7,13

**comfortable** 7:4

**commentators** 60:15 62:2

**committed** 79:25

**common** 26:5 26:23

**companies** 31:4 31:12,13

**company** 49:12 62:18,21 63:8 64:9 67:3 72:18,22 77:13 78:8 79:4 97:17 105:20 111:9 112:19 123:17 125:2

**compare** 126:23

**comparing** 76:24 111:4

**comparison** 100:13 116:4 120:20

**compensated** 10:15 11:15

**compensation** 12:12

**complaint** 21:17 43:25 44:4 45:11,14 45:16 46:14 47:5 49:25 50:3 98:16,20 98:25 99:8 129:11

**complete** 7:3 35:7 41:23 55:2,13 128:9

**completely** 49:16

**completion** 73:12

**compound** 12:16 27:19 28:15 31:7 32:2 47:17 63:25

**comprise** 13:13

**compute** 23:11

**computer** 123:8 127:6

**computing** 27:11

**conclude** 72:9

**concluded** 20:20 21:25

**concludes** 127:15

**conclusion** 23:20 50:10 51:18 71:4 116:18

**conditions** 105:22

**conduct** 111:6 111:7

**conducted** 110:22

**conduit** 62:17 62:20 64:12,16

**conduits** 64:9

**confer** 122:5

**conference** 54:15 113:4

**confidence** 107:25 110:16 116:16

**confirm** 7:2 88:6

**conformed** 33:11

**confounding** 111:22

**confused** 64:3

**confusing** 50:12

**connection** 38:14 63:8 67:5

**consider** 43:4 43:23

**considered** 37:15,22 43:15 58:18 59:16 64:8

**consistent** 40:3 73:23

**consistently** 81:19 118:12

**constructed** 77:4 100:16 111:2

**consultant** 23:25

**[contacted - damage]**

| | | | |
|---|---|---|---|
| contacted 45:4 | conversations | 110:25 111:11 | county 130:4 |
| contained | 4:10 | 118:5,19 | course 11:20 |
| 45:25 | converting | 120:11 121:16 | 49:5 60:22 |
| contemporan... | 107:4 | 127:7 128:8 | court 1:2 4:22 |
| 111:24 | copy 6:22 7:5 | corrections | 5:4 6:8 17:14 |
| context 19:2 | 7:10 45:13 | 128:6 | 25:12,18 42:20 |
| 33:10 43:24 | 59:9 86:18,20 | corrective | 43:19 |
| 52:4 63:15 | 89:2,8 | 21:18 25:11,18 | court's 43:8 |
| 73:13 82:2,11 | correct 7:17 | 25:20 49:10,21 | 44:9 |
| 89:19 | 10:17,20 11:13 | 113:13,18 | courts 24:17,21 |
| contextualize | 11:14 21:14 | 115:16 | cover 47:10 |
| 83:25 | 23:5,16,17 | correctly | coverage 58:7 |
| contextualizing | 24:20 25:7,12 | 102:23 | 60:6,12,16 |
| 64:20 | 26:11 27:5 | correlation | 62:3 64:16 |
| continue 4:12 | 29:15 31:5,24 | 70:10 118:11 | 83:4,6,14,17,23 |
| 63:13 83:7 | 32:22 35:12,22 | 119:14 120:22 | covered 57:24 |
| 106:7 | 36:5,21 37:8 | 120:23,25 | covers 63:20 |
| continued | 38:9 39:19,23 | 121:22 | create 42:13 |
| 82:17 83:4,5 | 40:2 41:19 | correspondent | 86:15 123:18 |
| 83:13,16 | 50:25 52:13 | 110:12 | created 40:25 |
| continues | 57:6 58:2,3,9 | cost 55:20 | criterion 66:17 |
| 19:12 | 58:22 59:16 | costly 55:17 | crr 1:24 130:24 |
| continuously | 63:15 67:15,17 | cotter 58:17,25 | culture 46:2 |
| 46:3 | 67:18,22,25 | 59:18,19 | current 13:24 |
| contracts 98:11 | 74:4,13,14,17 | counsel 4:17 | 36:4 |
| contributed | 74:19,20,25 | 5:13 6:6,10 | cutoff 107:10 |
| 112:19 | 75:2,5 78:4,10 | 38:24 39:6,12 | cv 1:10 4:23 |
| control 42:13 | 78:15 84:14,15 | 51:24 54:4,10 | |
| 68:15 71:18 | 85:5,9 89:19 | 54:12,21 56:4 | **d** |
| 106:13 116:3 | 90:9,12 91:2 | 57:6 85:12 | d 1:15 3:18 |
| 116:15 118:12 | 91:22,24 95:12 | 127:11 | daily 82:4,6 |
| controlling | 96:9 97:6,10 | count 42:2 57:9 | 103:11 112:11 |
| 102:11 116:10 | 97:15 98:3,17 | 126:22 | 120:18 |
| controls 100:24 | 100:9 103:6,7 | counter 66:7,10 | damage 26:21 |
| | 107:7,15 | 66:12 | 27:24 |

**damages** 19:24 20:14,19 21:8 23:11 24:12 26:16,21 27:3 27:9,11,17 28:8,21 49:18 50:2,6,7,13,14

**data** 39:8 69:5 70:10 85:9 89:23 90:7 91:6,6,17,20 96:10 101:4,7 103:21 104:3 104:16,24 105:2,13,25,25 108:7 111:21 115:22 116:2 117:21

**date** 4:4 41:17 44:20,22 45:3 45:17 57:19 59:8 75:16,18 77:15 78:2 85:17 86:5,12 88:9,19 90:3 91:7,20,23 92:2,5 95:3,6 95:17 96:14 103:2 104:4 108:13 110:11 113:14,19,20 113:25 114:4,6 115:3 122:16 128:12 131:24

**dates** 25:11 57:23 68:11,22 68:24,24 71:6 71:6 77:11 102:17 111:5,5 113:6,11 114:14,16,19 114:22 115:9 116:7,12 123:12,13,17

**dates.xlsx** 115:2 129:19

**daubert** 24:23 25:7

**day** 22:5 23:3 26:10,10 27:7 29:8,8 68:4 75:4,24 76:12 76:13 77:20 78:6,20,21,22 78:23 79:14,16 79:17,24 81:17 81:20 82:12,14 82:19,23 83:8 83:9,11,12 90:19 92:5,15 92:16,19,20,24 93:4 95:11,12 99:23,25 103:17 104:2,6 106:15 108:5 110:6 112:5,20 115:15 118:23 120:15,15 123:9 125:21

128:15 130:21

**days** 42:5,8,9 42:11,14,15 68:12,15,19,20 68:22 71:16,18 71:23 72:2,4,9 72:13,15,15,20 79:13 80:3 81:18 82:13 92:13 103:18 103:22 104:2,4 104:15,25 106:2 109:15 112:17,25 113:8 115:12 116:2,22 117:14,16 118:16,20,21 123:9,20 125:23,25 126:14,22,24

**december** 103:4,9,15 119:3

**decision** 9:22 43:8,10 44:10 44:23 51:9 65:14 66:6,9

**decisions** 30:14 31:4 42:20,25

**declare** 128:4

**declined** 62:23 79:17 110:18

**decreased** 109:25

**deemed** 128:6

**deep** 31:3,13

**defendant** 4:17 6:12 17:15

**defendants** 1:17 3:15 5:20 23:25

**define** 47:5

**definitely** 126:7

**degree** 125:20

**degrees** 35:10

**deleted** 91:9

**demand** 62:12 93:24 94:7

**depend** 27:13 29:25 49:13 73:13

**dependent** 26:17 27:4 100:25

**depending** 29:9

**depiction** 120:8

**deponent** 128:3

**deposition** 1:20 2:9 4:16,24 6:22 15:7,17 16:2 130:11,12

**describe** 18:24 66:20 89:18 124:15

**described** 25:22 61:25 65:12 89:24 101:14 102:20 111:4 116:7

**[described - earlier]**

123:15 124:21
**describes** 55:4
  98:16 115:19
  115:22
**description**
  129:8
**descriptions**
  19:4
**design** 73:5
  124:13
**designation**
  35:19
**designed** 72:5
  124:11
**detail** 46:25
**details** 31:11
  56:2
**determine** 42:5
  53:13 117:14
**determined**
  26:9 70:14
**determining**
  26:4 58:8 61:7
**develop** 33:6
**deviation**
  102:14,15
  119:4
**devoting** 62:9
**differ** 73:19
**difference**
  33:13 48:19
  71:5,22 72:3,7
  102:16 106:24
**differences**
  68:18 71:15

116:14
**different** 12:22
  30:22 31:2
  46:22,23 55:11
  64:6 71:20
  94:7 107:19
  112:11
**difficult** 55:8
  55:15,17,20
  73:23
**direct** 17:25
  45:19,23 80:18
**directed** 40:18
**direction** 8:13
  8:16 9:23
  17:22 73:15
  79:9
**directly** 38:13
  62:25
**disaggregate**
  77:24
**disaggregating**
  78:9,13
**disclosed** 84:6
**disclosure**
  21:18 25:11
  49:22 113:14
  113:19 115:16
**disclosures**
  25:18,20 49:10
**discovery** 30:2
**discrepancy**
  53:25
**discuss** 19:19
  20:18 32:10,14

67:20 68:7
  119:24 120:24
**discussed** 32:21
  32:23 33:22
  36:4 89:7 95:3
  110:8
**discusses** 33:3
**discussion** 19:9
  89:18
**dismiss** 44:11
  44:23 45:12
**display** 121:15
  121:20
**disseminate**
  58:14
**disseminated**
  33:16 34:11,15
**disseminating**
  60:17 62:4
**distributed**
  33:16
**distributor**
  63:11
**district** 1:2,3
  4:21,22 50:24
  51:11
**dividend** 99:24
**dividends**
  99:23
**divorced** 49:16
**dixit** 1:14 3:17
**dnj** 51:11
**document** 8:24
  25:14 48:12,20
  48:21 51:7

59:22 81:2
  85:10 87:5
  89:13 90:17,19
  122:17
**documents**
  37:14,22,24
**doing** 7:25
  78:15 93:10
  111:18
**dollar** 78:5
**dollars** 93:13
  100:7 107:6
**download** 41:4
**downloaded**
  40:10 41:5
**dr** 32:11,15
**draft** 17:20,21
  18:2 47:14
**drafted** 18:9,13
  19:5
**drafting** 14:25
  17:19 43:15
**draw** 116:17
**drop** 79:4,23
**drops** 78:19
**duly** 6:13
  130:12
**dynamics** 36:7

**e**

**e** 59:19 131:3,3
  131:3
**earlier** 47:4
  89:25 119:10
  123:15

**[earnings - evaluate]**

**earnings** 68:11 68:22,24,24 69:4,6 71:5 72:9,12,15,19 73:3,4 74:9 75:14 76:2 77:20 78:7,12 112:24 113:3 115:15,22,24 123:3 124:7 126:7

**easier** 65:13 85:21,22 89:10

**easy** 47:9 127:7 127:9

**economic** 10:12 12:4,21 13:3 21:3 27:24 28:18 97:16,21 97:24

**economically** 21:20 49:23

**economics** 9:6 9:18,21,24 10:6 35:20 36:8

**edgar** 63:7

**education** 34:24 35:2,6

**effect** 42:4,14 65:5 68:9 70:9 70:13,21 71:8 71:14 74:2 84:19 85:3 115:21 116:3,5

116:19

**effectively** 63:4 68:13 77:18 115:23 125:2

**effects** 77:6,9 89:24 116:10

**efficiency** 18:6 18:19 32:24 33:2,12 34:9 46:5 49:8 52:3 52:7,25 53:10 58:16 59:6,13 60:6 63:14,23 64:23 79:10 121:11 129:13

**efficient** 49:12 53:13 58:9 60:14 61:8,17 61:21 66:19 69:18 81:5 82:7,9 93:15 117:16,16 121:7

**effort** 62:10 112:16,18

**eight** 56:19

**either** 15:6 25:24 38:13 58:20 73:11 104:23 122:4

**electronic** 66:14 85:18 88:17 129:16

**electronically** 89:2

**element** 19:9 61:18 119:21

**elements** 52:24

**eligible** 67:13 67:17

**eliminating** 42:8

**empirical** 62:16

**employed** 9:10 25:23

**employees** 14:20

**employer** 36:4

**employment** 34:24 35:2,4,5 36:3,3

**ended** 90:24

**engaged** 21:7

**engagement** 14:7

**engagements** 21:5

**enhances** 64:22

**entire** 21:3 44:6 68:2 70:11 77:19 83:8

**entirely** 49:6 61:11

**entirety** 25:9

**entitled** 12:23 12:25 22:16 59:5 67:4 114:25 122:14 129:12,18,20

**entity** 57:10 99:10

**entries** 90:14

**equal** 105:14

**equally** 20:4

**equity** 56:20 98:8,13,15,22 99:5

**equivalence** 14:10

**errata** 128:7

**error** 102:20 119:9

**errors** 119:5,7

**especially** 62:23

**esq** 3:10,11,12 3:21,22

**essence** 124:11 125:19

**essentially** 18:10 103:24 117:24

**estimate** 15:15 104:16 105:4

**estimating** 103:23

**estimation** 101:19 102:18 103:19 115:10

**et** 4:20,20 12:8 66:15 128:1,1 131:1,1

**evaluate** 8:8,13 9:4 52:6 111:3

112:13 113:7 113:16 116:5 123:8
**evaluated** 93:17
**evaluating** 34:9 34:10 52:25 53:22 75:19 111:3 114:15
**evaluation** 34:17 125:20
**evan** 3:10 5:25
**event** 73:24 75:3 82:4,6,11 83:14 87:19 88:2 89:15,17 89:22 104:15 110:12 111:15 112:2,11,11
**events** 25:19 119:12
**eventually** 12:6 12:9
**evidence** 34:6 34:17 43:14 72:10 81:22 82:16,22,25 116:18
**evolved** 29:3
**exact** 11:8 13:8 16:17 113:25
**exactly** 20:9 71:8 87:3 94:24 111:16 113:16

**exam** 129:4
**examination** 6:15
**examine** 62:16
**example** 19:7 22:2 27:15 30:12,25 33:22 35:11 43:7,14 53:6 62:8 75:9 75:25 77:23 79:12,13 90:4 95:22 96:6 104:24 108:9 108:13 110:3 117:5,22 121:5
**examples** 32:5 73:21 108:22 108:23 109:15
**exceeded** 118:2
**excel** 85:11,15 115:4 129:15
**exception** 36:22
**exceptions** 94:14
**exchange** 66:13
**exchanges** 66:6 66:22
**exclude** 115:2 129:19
**excluded** 24:23 25:7,11 125:6
**excluding** 35:5 35:6

**exhibit** 4:2 6:22 34:23 37:16 45:15 50:23 54:8 56:16,17 56:25 57:17,18 59:5,12 64:25 65:17 74:7,7 80:19 85:15 88:17,18,25,25 89:3,4,5 90:3 95:2 102:21 110:10,12 112:17 114:17 114:25 115:17 117:7,22 118:9 118:25 119:11 120:7,14,20 121:12 122:14 126:21,21 129:7,9,10,12 129:15,16,16 129:18,20
**exhibits** 7:11
**existed** 50:7 55:2
**existence** 55:9 58:7,10
**exit** 10:5
**expand** 41:17
**expect** 69:24 73:15,16,18 83:19 106:17 106:19 121:8
**expectation** 109:25

**expected** 102:16 106:10 106:14 107:2
**experience** 23:22 31:10 55:8
**expert** 4:2 24:2 24:9 30:19 58:22 129:9
**experts** 33:24 52:5,10
**explain** 10:15 39:5 79:16 85:22
**explained** 79:23
**extent** 32:6 114:15 124:14

**f**

**f** 1:24 2:11 99:14 130:5,24
**fact** 81:5 94:21 97:20 98:5 125:22
**factiva** 40:10 123:14 124:16 124:23,25
**factor** 65:17 66:24 89:19 110:23 111:3 118:4,7 119:19 120:22
**factors** 18:24 18:25 19:19 51:25 52:3,6,9

**[factors - form]** Page 14

52:11,13,17,21
52:24 53:7,14
53:21,21 65:12
67:7,15,19
70:8
**facts** 29:9 34:6
**factual** 29:24
**fair** 8:22,25
11:22 18:7
25:17 30:9
50:18 98:12
**false** 49:20
**fama** 32:12,13
**fama's** 32:11
32:15
**familiar** 43:5
46:25
**far** 22:8
**fargo** 56:22
**fax** 63:4
**fc** 1:15 3:15
**federal** 17:13
17:14 24:6,8
**feel** 9:24
**fell** 33:8
**felt** 10:4
**field** 36:24 37:4
124:24 125:5
**figure** 87:7
88:12 112:18
**file** 67:4,13
86:24 87:18,25
88:4 89:5
123:7

**filed** 4:21 18:7
**filing** 63:3
**filings** 31:24
33:25 63:9
116:3,24
123:17
**final** 46:24
47:14 116:12
**financial** 10:2
35:14,17
**financially** 5:8
**find** 18:20 31:5
40:23 42:9
85:21,25
104:17 108:25
125:24
**fine** 86:20
122:6
**firefighters** 1:6
3:6 4:19
**firm** 5:5 9:8,11
11:13 12:5
13:3,4,5,22
14:19 16:14
17:3 36:4 57:4
68:14,16,19,20
69:12 71:17,19
72:16,18 73:20
73:20 77:8,22
77:25 83:4
97:24 114:16
115:12 116:20
**firms** 56:19,21
58:13,15 62:9

**first** 17:20,21
18:2 28:25
34:21 39:24
40:9 45:4
47:21 48:3,10
58:3,4 60:8,9
61:6,11,15
62:14 63:6
68:4 74:15
75:9 78:13
83:11,21 91:23
92:2,5,16,20
93:4,5 103:14
103:22,22
104:25 110:6
115:15,21
118:16,17,20
118:21 122:22
123:11
**fit** 9:24 34:3
**five** 15:16 16:6
42:18,19 53:14
122:3,6
**fixed** 103:23
104:18 118:20
**flag** 124:25
**flagged** 125:9
**flat** 118:17
119:2
**floor** 3:8
**flow** 12:4
**flows** 115:9
**focus** 46:2
72:12

**focused** 65:15
66:7 70:5
**focuses** 52:23
**following** 45:25
**follows** 6:14
**fonti** 3:4,11 6:2
15:21
**fonti's** 16:14
17:3
**footnote** 21:13
51:2,4,10
53:23 54:3,13
113:12 114:2
**footnotes** 47:4
116:13
**foregoing**
128:5
**forget** 25:16
**form** 8:23 9:21
13:25 15:3,19
18:3,21 19:15
19:21 22:6,9
24:14 25:8,13
26:12,19 27:18
29:11,16 31:6
31:25 33:4,4,4
33:12,19 34:5
36:25 37:23
38:5 39:20
40:22 43:17
47:16 52:18
53:15 54:23
55:3,18 56:6
57:16 63:24
67:9 77:16

79:5 83:15 84:10 93:16 104:19 111:12 111:14 112:22 117:10,18 123:23 126:15

**formal** 37:11

**formally** 36:17

**formed** 9:8 22:11

**formulaic** 26:25 27:11

**forth** 67:8 130:11

**forward** 64:7 119:23

**found** 79:10

**foundation** 126:5

**four** 15:16 16:5 16:22 17:13 42:20

**frankly** 17:5

**fraud** 49:17 80:21 81:4

**free** 62:25 63:9

**frequency** 13:20

**friday** 92:13

**front** 6:21 7:7 59:11 89:3

**full** 14:10 34:23 83:11 117:7

**fully** 33:21 81:23 82:18,24

**fund** 30:24 33:23

**funds** 30:13,20 31:2,9,10,12,19 98:2,21

**further** 105:15 105:18,25 130:15

**future** 121:10

**g**

**g** 99:20,20,21 100:13 101:4,8 107:3

**gain** 28:19 34:3

**general** 17:24 18:24 32:23 105:7,22,23

**generally** 46:21 49:19 60:25 61:3 65:11 94:16 99:2,4 103:16 112:3

**generating** 105:23

**getting** 14:3

**give** 13:11 21:11 22:2 37:17 40:15 44:24 45:13 58:23 59:9 60:23 65:2,8 80:23 84:24 87:10 91:25 114:24 115:7 124:10

**given** 22:5 23:3 54:12 69:3 86:5 114:18 125:21 127:16 128:9 130:13

**gives** 46:4 66:18

**giving** 48:7 64:19

**global** 9:18,20 9:23 10:6 36:8

**go** 4:13 19:23 23:6,8 26:2 28:23 31:20 34:19 37:13 39:8 48:5 49:2 50:19 52:8 53:14,23 62:14 63:8 65:16 66:8,24 68:8 79:12 88:11 90:16,17 91:4 93:2,11,23 95:2 103:8 104:5 105:18 110:3 114:22 127:10

**gochman** 3:22 5:22 85:19 87:9,18,24 88:7,10

**goes** 33:24 34:14 64:11 120:11

**going** 4:6 7:19 9:24 16:25 19:18,25 42:18 50:22 59:3,9 60:8 85:10 86:6 100:5,18 105:25 108:12 109:10 114:24

**goldman** 43:8 43:11,15,21

**good** 4:5 5:18 6:18,20 72:20 73:5 105:14

**gotten** 54:17

**graduated** 35:3

**graduation** 35:7

**graphical** 120:7

**gray** 34:8

**great** 86:19

**group** 9:24 10:6 36:9 42:14 68:14,15 71:16 115:23 116:4,14,15

**groups** 72:4,8 116:5

**grow** 29:14

**guess** 13:11 16:12 57:2

**guillermo** 11:3

**[h - incorporate]**

**h**

**h** 100:10,11,14 101:4,8 131:3
**half** 16:11
**halliburton** 42:24,25
**hand** 85:10 127:2,5,6 130:21
**handful** 16:18
**happen** 70:19
**happened** 70:25
**happening** 14:4
**happens** 71:18
**happy** 47:4 110:5
**hard** 86:18,20 89:2,8
**head** 17:5 117:3
**heading** 19:10
**headlines** 40:9 123:14
**hedge** 30:24 31:2,8,10,12,19 33:23
**hedstrom** 11:2 11:10
**hedstrom's** 11:5,6
**heightened** 83:6
**held** 2:9 27:14 28:2 98:21

99:5,16
**helpful** 67:3 86:2 122:25
**helps** 58:16
**hereinbefore** 130:11
**hereto** 128:8
**hereunto** 130:20
**heterogeneity** 31:17
**hickey** 9:15 14:18
**high** 11:7 34:25 35:6 69:2
**higher** 10:12 12:13,19
**highs** 125:8
**hire** 31:21
**hires** 33:23
**historical** 106:18
**hold** 35:17
**holding** 99:17
**hope** 85:25
**hopefully** 34:20
**hoping** 47:10
**hour** 10:16 11:22 12:13
**hourly** 11:12
**hours** 11:25 13:6,14,17,19 14:23 15:16 16:6,11,12 75:20

**humberto** 1:5 3:5 4:18 128:1 131:1
**hundreds** 97:2
**hypothesis** 107:16
**hypothetical** 28:16 50:9 69:21 111:13 117:19

**i**

**idea** 61:17 87:16
**ideas** 20:8
**identical** 89:5 103:13
**identification** 4:3 45:16 59:8 85:16 88:19 115:3 122:16
**identified** 71:20 72:15 112:17 118:3
**identifies** 115:9
**identify** 7:25 17:11 42:15 56:4 72:21 111:8 123:19
**identifying** 41:25 114:13
**immediately** 12:8 35:24 38:23 80:5
**impact** 28:18 75:22 111:7,18

**impacting** 115:13
**implicitly** 81:8
**implies** 83:10
**import.xls** 122:15 129:21
**important** 58:7 58:11 60:16 61:24 62:3
**impound** 81:23 82:18,24
**impounded** 33:21 34:11,18
**improve** 46:3
**inadvertently** 86:16
**include** 68:4
**included** 92:24
**includes** 16:6 50:5 67:23,24 68:2 109:13 117:8
**including** 5:13 7:10 33:20 52:9 56:21 77:20 118:13
**incomplete** 28:16 50:8 69:21 111:13 117:19
**inconsistent** 79:10 113:8
**incorporate** 94:2

**incorporated**
  9:11 33:17
  81:7,11
**incorporates**
  101:4
**incorrect** 8:2
**increased** 10:2
  109:23
**independent**
  101:2
**independently**
  64:21
**index** 30:13,20
  76:25 77:2,3
  100:12,12,16
  101:3,17,21,24
  102:7,8,12
  104:10 105:21
  129:3,7
**indicate** 96:21
**indicated** 14:22
**indicates** 76:11
**indication**
  79:15
**indices** 77:7
  106:14,19
  118:18
**individual**
  13:17 26:16
  27:4 29:10
  30:14,14 31:14
  57:14 63:7
  78:11
**individually**
  1:7

**individuals**
  13:12 14:13
  30:21
**industry** 31:21
  33:24 77:13
**inefficient**
  69:19
**ineligibility**
  67:6
**ineligible** 67:6
**inflation** 22:3,4
  22:25 26:4,8
  29:3,8,13
  50:14,20
**information**
  29:25 31:5,22
  33:17,20,20
  34:2,11 54:15
  58:12,14 60:14
  60:17 62:4,7
  62:12,17,18,20
  62:21,25 63:11
  64:9,12,17,19
  64:21 65:14
  72:17 73:14
  75:15,23 77:19
  78:6,11 79:7
  79:19 80:2
  81:6,24 82:18
  82:24 83:5,25
  84:2,4,5,8,9,22
  96:15 111:21
  111:23 114:9
  116:20

**initial** 103:21
  104:2
**input** 123:7
**inside** 33:20
**insiders** 31:21
**instances** 83:3
**instantaneous...**
  63:9
**institutional**
  31:15
**instruct** 51:24
**instructions**
  67:9
**intentionally**
  29:24
**intercept**
  100:19,22
**interest** 10:7,12
  13:3 62:6
  95:13 97:21
  99:5
**interested** 5:8
  130:18
**interests** 97:17
  97:24 98:8,13
  98:15,17,19
**internet** 62:24
  63:8
**interpret**
  101:15,18
**interpreted**
  77:8 80:7
**intraday** 84:13
  84:13,17,22
  85:7,9 111:21

**intuition** 70:25
**investigate**
  94:24
**investigation**
  56:12
**investigators**
  31:21 33:24
**investing** 30:6
**investment**
  30:22 58:15
  62:9 64:19
  98:3
**investments**
  28:19
**investor** 26:18
  27:4,5,14
**investor's**
  27:16
**investors** 30:5
  30:12 31:14,15
  31:18
**invoices** 14:3
**involve** 111:14
**involved** 17:3
  41:11
**ipo** 46:17 47:13
  47:14 48:6,6
  48:20 50:5,7
  58:2 69:13
  93:8,21 94:15
  97:18 98:3,22
  99:6 103:21,22
**iq** 38:25 39:6,9
  54:10,16,18,18

**[irrelevant - length]**

**irrelevant** 30:7
  32:4 91:10
**issuance** 72:23
**issue** 56:20
**issued** 56:18
  57:15 58:2
  113:6

### j

**j** 100:19 102:25
**jacqueline** 1:15
  3:18
**janet** 3:22 5:22
**january** 9:9
  39:2,16 41:18
  41:18 44:10,21
  90:25 91:12,13
  91:19,20,21
**jaspar** 1:13
  3:16
**jersey** 2:14
  50:25 51:12
  130:3,8
**joint** 102:3
**jonathan** 3:21
  5:19 22:17
  86:22
**joseph** 3:11
**jp** 56:21
**jpc** 1:11 4:23
**judgment**
  24:18,22 51:20
**july** 39:25 58:5
  96:7,8
**june** 1:21 2:5
  4:7 38:25

39:16,19,22
  90:5,8,11
  91:23 95:23
  96:6 103:14
  130:21
**jury** 24:11,17
  24:19

### k

**k** 3:21 101:12
  101:13 102:25
**keep** 75:25
  76:19
**key** 46:4
**kind** 121:25
**know** 7:4 11:4
  11:8 13:6,13
  13:15,16 14:3
  14:5,6 15:15
  16:17 17:2
  18:8,12 27:20
  28:22 30:25
  31:22 32:16
  38:18 44:5
  45:5 46:9,22
  47:11,20 48:10
  54:25 55:25
  56:3,9 63:5
  70:19 71:11
  83:20 87:2,8
  87:24 91:9
  94:14 98:20
  107:10 108:2
  111:21 114:14
  114:19 117:3
  124:4

**knowable**
  117:2
**knowledge**
  30:18 32:7
  34:14
**knows** 25:15
**knox** 35:21
**krogman** 42:25
  84:23 119:25
**kubik** 11:3,5
**kubota** 3:10
  5:25,25 8:7,23
  12:15 13:25
  15:3,18,19,20
  16:14 17:3
  18:3,21 20:22
  22:6,9,16,20
  24:14,25 25:8
  25:13 26:12,19
  27:18,25 28:4
  28:15 29:11,16
  29:20 30:7,16
  31:6,25 34:5
  36:25 37:6,23
  38:5 39:20
  40:22 43:17
  45:8 47:16,23
  48:13,22 50:8
  51:3,17 52:18
  53:15 54:23
  55:3,18,21
  56:6 57:16
  63:16,24 64:10
  69:20 70:22
  77:16 79:5

83:15 84:10
  86:22 87:11,20
  93:16,19 94:20
  97:19 98:4,23
  104:19 111:12
  112:22 117:10
  117:18 123:23
  124:9 126:3,5
  127:13
**kumar** 1:14
  3:18

### l

**l** 102:2,5,6,25
**l.p** 3:16
**l.p.** 1:16
**labeled** 108:6
  122:23
**language** 18:9
  18:17 20:6,7
  66:9
**large** 44:6,7
  107:17,21
**larger** 69:5
**law** 42:21
  51:15
**learned** 29:25
**leave** 9:20
**left** 115:10
**legal** 5:6 27:21
  28:5,9 50:9
  51:18 87:4
  89:6 127:20
**legally** 28:8
**length** 31:20

**lessen** 29:19
**lessened** 63:11
**level** 30:6
108:16,19,21
109:14,16
110:16 116:16
**lexington** 2:10
3:19 5:2
**license** 35:14
35:16
**likely** 12:12
19:15,20
111:14
**limit** 118:6
**limitation** 55:7
**line** 40:9 90:4
90:10 110:4
118:17 131:4,7
131:10,13,16
131:19
**linear** 100:24
**links** 41:2
**list** 16:19,25
17:17 18:19
34:23 35:7
36:23 37:14
41:13 42:18,19
42:20 43:7,12
56:19 57:4,9
57:18,22 58:18
74:9 78:17
120:21 125:8
**listed** 13:13
16:21 17:12
34:21 38:7

77:15
**literature**
52:23 72:14
82:5
**little** 34:8 50:11
64:2
**llp** 2:10 3:4,14
4:25
**location** 4:24
**logic** 21:4,20
**long** 16:10
27:15 28:2,13
28:13 81:20,23
82:22,23
**longer** 105:17
**look** 6:25 7:12
16:19 27:7
31:11,13 38:10
45:18 49:11
52:10 56:25
68:10 71:20
72:24 73:2,4,8
73:25 74:7
79:13 82:4
84:16,22 85:6
86:5,6 91:14
93:2,11 95:22
98:25 108:9
109:11 110:5
115:17 124:19
**looked** 38:4
44:14 52:12
70:8,10 102:4
114:11,12
119:9,21

**looking** 19:24
37:15 49:9
54:7 68:22
71:25 75:24
78:2 80:4,25
84:21 85:8
87:9 89:8 90:2
92:18 94:12
105:14,16
109:9 117:5
125:16
**looks** 7:9
**loss** 21:13
22:22 28:19,25
111:18
**lost** 28:11,14
**lot** 18:9 20:6,8
31:17 73:13,18
111:19 127:2
**lots** 50:15
**low** 11:8 46:5
**lower** 11:16
**lows** 125:8
**lozada** 1:5 3:5
4:18 128:1
131:1
**lunch** 127:11

**m**

**m** 102:2,9,10
102:25
**ma** 35:11
**maddock** 1:12
3:16
**made** 11:22
28:11 47:9

49:24 75:6
85:23 128:5
**magnitude**
71:25 116:9
**maintained**
99:10
**major** 56:21
66:6,22 69:24
125:13,17
**majority** 99:18
125:23
**make** 16:20
21:4 22:21
30:14 31:4
32:16 48:3
49:6 53:24
63:18 108:22
112:16,17
**makers** 65:18
65:21 66:17,20
66:23
**makes** 86:13
**making** 51:20
54:14
**management**
114:5
**manner** 110:15
**march** 90:18
91:12
**mark** 11:2 59:3
85:13
**marked** 4:3
45:16 59:7,11
85:16 88:18
89:2 115:2

122:15
**market** 18:6,18
30:11 32:24
33:2,7,17 34:9
36:7 49:8,13
52:3,6,25
53:10,13 58:8
58:12,16 59:6
59:13 60:17
61:21 62:4,7
62:12 63:14,23
64:22 65:5,18
65:21 66:16,19
66:20,23 69:17
73:11 75:3,16
75:20 76:2
79:10,22 80:22
81:4,5,7 82:17
83:11 84:2,4,9
96:23 99:22
102:11 104:9
116:10,21
121:8,11
129:13
**markets** 60:7
60:14 61:8,17
66:10 81:23
82:8,8,24
**marking** 80:12
122:8,12,17
**marriage**
130:17
**mary** 1:24 2:11
5:4 11:3 130:5
130:24

**master's** 35:24
**material** 48:19
63:22 68:15,17
71:17 81:9
**materiality**
125:21
**materials** 38:7
58:18 59:16
64:7
**matter** 4:18
13:7,21 25:23
27:9 130:19
**matters** 16:19
23:11
**mean** 15:14
24:22 32:19
37:21 50:16
52:20 61:19
75:2 81:16
83:17,20 95:24
96:3 97:23
100:3 102:19
108:3 109:8
111:17 118:16
119:8 127:2
**means** 39:5
46:15 51:13
75:16,18 81:17
96:23 100:4
108:14,17,20
108:24 109:4,5
109:20,24
**meant** 113:11
124:25

**measure** 76:3
96:14 97:8
102:10,13
**measuring** 59:6
59:12 60:6,13
129:12
**mechanism**
60:16 62:3
**media** 4:15
80:12,16 122:8
122:12 127:18
**mediators** 24:2
**meeting** 15:20
16:6,10
**mehta** 1:14
3:17
**member** 26:16
26:22
**members** 8:12
26:5,23 27:2
40:17 81:12
**memory** 79:25
92:12 93:10
**mentioned**
14:17 124:4
125:7,10,17
**mentions** 106:3
**met** 67:9
**method** 23:10
23:20 25:5
26:3 60:6,13
61:7 106:4
**methodology**
20:19,20 21:9
21:21,22 24:12

25:22 56:3
68:10 72:6
**metric** 65:22
**metrics** 46:4
71:20 111:4
116:6 117:20
**microphones**
4:8
**middle** 116:8
**million** 96:21
97:5
**millions** 95:9
96:2,19,19
97:2,3,4
**mind** 9:3 60:20
**minimum** 67:8
**minus** 107:3
**minutes** 33:23
119:24 122:3,6
**misleading**
22:12
**misread** 90:6
**misrepresent...**
81:9,10
**misstatement**
49:14
**misstatements**
45:6 49:10
**misstates** 8:24
18:22 38:6
70:23
**mitigate** 124:14
125:15
**mix** 77:19

**mobile** 4:11
**model** 77:6
   103:25 105:5
**models** 31:2
   94:2
**modern** 64:5
**modification**
   85:22 86:10
**modifications**
   87:3
**moment** 58:23
   65:8
**money** 28:11
   28:14 30:13
   58:14
**month** 39:22
   58:2 120:11,11
   120:12,12,16
   120:16
**monthly** 13:22
   120:20
**months** 117:14
   117:17
**morgan** 56:21
   56:22 57:10
**morning** 4:5
   5:18 6:18,20
   13:7
**motion** 24:24
   44:10,22 45:12
**motions** 25:7
**move** 73:15,16
   114:23 119:23
**moved** 110:14
   111:9 113:17

**movement**
   68:18 72:2
   77:8 79:9
   106:13 113:7
   114:4 125:24
   126:23
**movements**
   68:11 82:3,7
**moving** 72:11
**mpp** 35:11
**mukesh** 1:14
   3:17
**multiple** 44:8
**multiplication**
   96:24
**mute** 4:10

**n**

**n** 106:8,9,10
   107:3
**name** 5:3 57:5
   58:9 86:24
   87:6,20 89:5
   113:22
**named** 3:6
**nasdaq** 125:8
**natural** 80:8
**nature** 29:23
   40:18 113:9
**nearly** 122:5
**necessarily**
   26:22 61:5
   93:4
**necessary**
   41:22 77:17
   89:23 128:7

**need** 45:18 48:3
   86:6 87:11
   93:5
**needs** 26:9
**negative** 79:15
   79:21 109:3,4
   109:7,24
   110:13,16,19
**negatively** 80:7
**net** 12:18,18
**neutral** 24:2
**never** 25:9
**new** 1:3 2:11,11
   2:14,14 3:9,9
   3:20 4:22 5:2,2
   50:6,12,24
   51:12 71:19
   72:16 83:4,25
   84:8 116:19
   125:8 130:3,8
**news** 34:2 40:6
   40:9 42:3,6,8,9
   42:11,17 68:12
   68:15,17,19,20
   68:23 71:5,6
   71:17,19 72:11
   72:23 73:2,24
   77:13,13,22
   78:8 79:3,4,16
   79:21 80:6
   83:5,17 111:4
   111:5,9 112:5
   112:19 113:9
   114:13,14,16
   114:18,20

   115:12 116:2
   116:23 122:15
   123:2,10,13,14
   123:20,22,25
   124:2,5,6
   125:2,14,17,21
   126:2,15,24
   129:21
**newspaper**
   31:24
**nice** 6:18
**notary** 2:13
   128:13,19
   130:7
**note** 4:8 114:3
**noted** 128:7
**notes** 113:13
**noticing** 5:16
**november**
   74:25 102:25
**number** 4:23
   7:15 13:8,15
   13:18 16:17
   18:7 25:16,18
   26:21 42:2
   57:10 63:2
   65:21 66:16,20
   66:22 68:24
   80:13,16 81:18
   82:13,15,15
   84:23 85:14
   96:15 103:2
   105:10 117:2
   119:25 122:9
   122:13,18

127:18 129:8
**numbers** 7:19
16:24 19:4,8
60:4 66:18
124:19
**numerous**
64:14
**ny** 3:20

**o**

**o** 59:19
**objection** 8:7
8:23 12:15
13:25 15:3,19
18:3,21 20:22
22:6,9,18
24:14,25 25:8
25:13 26:12,19
27:18 28:15
29:11,16 30:7
30:16 31:6,25
34:5 36:25
37:6,23 38:5
39:20 40:22
43:17 45:8
47:16 48:13
50:8 51:17
52:18 53:15
54:23 55:3,18
55:21 56:6
57:16 63:16,24
64:10 69:20
70:22 77:16
79:5 83:15
84:10 93:16,19
94:20 97:19

98:4,23 104:19
111:12 112:22
117:10,18
123:23 124:9
126:3
**objections** 5:10
22:17 27:25
28:4 29:20
47:23 48:22
**objective** 72:20
**observation**
63:19
**observe** 5:24
71:15
**observed**
106:25 107:24
**obtain** 54:11
55:9,15
**obtained** 54:3
**obvious** 104:22
**obviously** 17:7
19:4 79:9
103:20 113:8
117:2 119:20
**occasions** 16:16
**occurred** 50:6
75:3
**occurs** 32:6
**october** 78:17
79:22 102:25
110:6
**odd** 86:7,7
89:10
**offered** 32:3

**offering** 22:23
27:22 30:19
46:19 48:10,12
72:24 73:10,13
99:12 116:25
**offerings** 67:5
**official** 113:22
**oh** 44:24 97:12
**okay** 7:12,22
8:20 9:5 10:21
12:11,20 13:16
15:10 16:5
17:18 19:18
21:6,12 25:6
25:10 26:15
27:23 28:23
30:24 32:25
33:6 35:9,13
35:18,20 36:2
36:18 37:9,20
38:3,10,12,22
39:15 40:20
41:16,20 43:13
43:25 44:9
46:12 47:20
48:18 51:14,22
52:12 54:19
57:3,9,20
58:17 59:21
60:24 61:13
66:3 68:4 74:6
74:8 75:16
76:7 77:10
78:16 81:3
82:20 84:20

85:3,24 86:17
86:21 87:20
88:3 89:12
91:3 92:8
96:12,12 97:7
97:16 99:4
100:7,17 102:2
106:23 107:8
107:22 110:20
113:18 114:6
116:22 118:8
120:4,13 125:3
**oklahoma** 1:5
3:6 4:18
**once** 11:24
95:18 96:10
**ones** 13:17
46:24
**ophelia** 5:23
**opine** 9:2
**opinion** 21:11
22:3,11,24
27:22 28:5
30:20 32:3
33:6 49:7,18
**opinions** 20:23
25:6 48:7
**opposed** 15:4
**order** 42:8
45:11 68:21
79:2
**originally** 18:9
**outcome** 5:9
130:18

**[output - period]** Page 23

output   100:20
outside   30:8
  31:7 32:2 45:8
  47:17 93:19
  94:21 98:5,23
outstanding
  96:16 99:11
overall   13:2
  25:21 28:18
overhead   11:18
overwhelming
  125:22
own   16:4,8
  94:2
owner   12:4
ownership   10:7
  99:10,13,18

**p**

p   107:4,14
p.m.   76:15,15
  76:17 78:18
page   7:7,9,13
  7:14,14,16,20
  7:20 16:23,24
  16:24,25 19:8
  19:13,18,20,25
  32:9 34:21,22
  34:22 36:23
  37:15 38:11,23
  42:18 45:20,24
  51:2 53:23
  54:8,8 56:15
  60:2,4 65:17
  65:21 66:25
  78:13,14 86:7

86:7,7,9 90:10
  100:18 102:24
  103:3,8 108:9
  110:5 120:2,5
  124:18 129:4,8
  131:4,7,10,13
  131:16,19
pages   7:13 32:8
  32:9 86:6,11
  89:10,10
paid   99:23
paper   86:4
paragraph
  8:18 10:14
  23:8,16 26:2
  28:24 45:20,24
  47:12 56:15
  60:9,10 62:15
  65:20 66:2,8
  67:2,21 73:25
  80:19 99:3,7
  120:3,24
parameter
  100:22 101:6
  101:13
parameters
  55:4 104:16
  106:13 118:10
parenthetical
  81:14
part   10:3 20:15
  28:10 41:14
  53:6 89:15
  112:15 123:21
  124:13

participate
  21:2
particular   19:6
  22:25 28:20
  34:14 58:9
  69:17 78:5,5
  79:7,19 83:23
  98:19 111:23
  112:5,5 119:13
particularly
  65:22 66:23
parties   4:13
  127:17 130:16
partners   9:13
  9:23 10:5 36:7
  36:10 63:6
parts   18:23
party   5:7 39:8
passing   124:4
passive   30:23
past   41:17
  59:25 105:2
  121:3,8
pay   55:23
peer   52:16
  53:12,16 77:3
  100:16 101:3
  102:7,12
  104:10
pension   1:6 3:7
  4:19
people   6:4 8:15
  9:17 14:9,17
  34:13 46:2,4
  82:2 98:11

people's   62:24
percent   10:11
  10:13 12:4,18
  12:23,25 13:2
  76:12 99:11
  100:6,7,8
  101:21,22
  107:25 108:16
  108:18,20
  109:14,16
  110:16 116:16
percentage
  10:10 12:20
  44:7 99:21
  106:21,22
percentages
  107:5
peregrine   9:6
  9:21 10:8,15
  11:19 14:9,14
  36:5,9
perform   68:21
  89:24 112:6
  113:15
performed
  22:22 56:11
  100:21 119:20
performing
  8:12 24:4
  104:14 107:16
  116:4
period   22:5
  23:4 26:10
  27:7,8 29:4,9
  38:25 39:15

**[period - price]** Page 24

40:11 41:21 56:19 57:8,14 67:13,23,24 68:3,5 69:3,9 69:10,11,14,15 70:5,6,9,11,13 70:16,18,21 71:3 74:11,16 74:24 90:22,25 91:10,11,16,22 101:19 103:14 103:24 104:3,6 105:3,3 110:7 117:8,9,25 118:13,14 119:15,17 121:17 126:11 126:12,13

**periodically** 72:19

**periods** 105:16 121:20,23

**personal** 12:12 30:17

**personally** 38:4 38:8 41:11

**peter** 9:15 14:17

**phase** 24:18

**phones** 4:11

**phrase** 82:21

**phrased** 8:20

**pick** 4:9

**piece** 31:5 78:5 79:7,19

**place** 4:13 16:7 74:11,15,18,24 116:24

**placed** 6:6

**places** 32:17

**plaintiff** 3:6 6:2

**plaintiffs** 1:10 3:5 21:16 23:25 49:9 54:4,21 56:4 57:6

**platform** 36:7

**plausibly** 79:23

**pleading** 46:13

**please** 4:8,10 5:11,14 6:5,9 88:22 124:17

**plenty** 53:20 82:5

**plus** 16:7 68:3 70:6 108:14 109:2,4,19

**pluses** 108:16

**pocket** 25:21

**point** 38:20 50:18 69:18,19 80:9 93:12 98:12 111:10 112:9,12 113:21 114:4

**pointing** 87:12

**points** 63:18

**portions** 91:9

**position** 27:16

**positions** 27:14 28:3,7,17

**positive** 108:15 108:17 109:8 109:21 118:11

**posits** 33:15

**possibility** 29:14 125:16

**possible** 20:21 28:17 29:12 31:8 54:24 69:16,22 70:3

**post** 117:8

**potential** 20:18 93:23,25 105:15 106:4

**potentially** 111:22

**power** 68:25 121:3,9

**practice** 104:13

**pre** 74:10 78:18

**preclude** 73:7

**predictive** 121:3,6,9

**prefer** 122:4

**preference** 105:2

**prep** 15:18

**preparation** 7:23 37:25 58:20

**prepare** 8:13 15:25 17:25 18:2

**prepared** 8:5 8:14 17:22

**preparing** 15:2 15:6,7,12,16 63:23

**prerelease** 110:8

**present** 3:24 5:13 91:8

**press** 75:13

**presume** 66:19

**presumed** 82:8

**previously** 9:18 16:13 38:14

**price** 33:18,21 34:12,18 67:8 68:10 72:2,11 73:15,16 75:19 75:22 76:8,9 76:17,18 77:8 77:14 78:2 79:9,17 81:7 81:12 82:3,7 83:7 91:6 92:17 93:5,8 93:15 94:3,8 94:24 95:5 96:25 99:22 100:4,5 109:21 109:25 110:18 111:7,18 113:7 113:17 114:23 115:13 116:10 116:21 125:24 126:23

**prices** 68:18 93:6,21,25 94:7,16 111:8
**print** 86:4
**printed** 100:19
**printing** 122:20
**printout** 85:11
**prior** 18:22 27:6 35:6 38:6 45:3 49:3 70:23 74:18 76:13 82:20 92:5 99:11,25 103:18,21 104:4 109:10
**private** 4:10 31:21 33:23
**probability** 107:17,20
**probably** 10:13 12:19 13:10 14:22 15:16 16:18 18:20 62:23 63:11 66:17 91:5 93:25 109:5 112:3 127:5,5
**proceed** 6:10 88:22
**proceeding** 5:11
**process** 8:6,11 14:3 25:25 39:13 42:7 93:22 94:4,6

105:23 114:12 115:9 123:21
**processing** 60:14
**produce** 62:10
**produced** 7:8 41:7,10 89:15 115:5 122:18
**producer** 62:17 62:20
**production** 41:12
**professional** 2:12 130:6
**profit** 11:22 12:3
**profits** 13:4,5
**program** 35:24 123:19
**programmatic** 127:8
**programs** 123:8
**project** 10:24 10:25
**promised** 127:11
**pronounce** 32:10
**proportion** 71:23 116:7
**provide** 56:4 64:13,21 66:8 89:23 117:21

**provided** 56:9 57:5,22 84:2 85:12 86:25 87:5,10,18,22 87:25
**provider** 39:8
**provides** 58:11 64:16 72:20
**providing** 56:7 84:3
**public** 2:13 17:8,9 33:16 34:11 48:9,11 49:12 67:5 81:6 128:19 130:7
**publication** 37:3,7,9,10
**publications** 37:11
**pulled** 18:18
**punchline** 107:23 108:3
**purchase** 81:12
**purchased** 26:18
**purchasers** 50:15 81:8 93:23
**purpose** 41:24 89:21 104:7 123:24
**purposes** 42:3 45:6 48:2 50:2 111:2 120:19

**put** 6:21 30:13 85:19 88:3 122:24
**puts** 85:20 88:4 102:24

**q**

**q2** 75:25
**quantum** 22:24 27:9
**quarter** 121:15 121:17
**quarters** 121:23
**queried** 39:10
**query** 41:17
**question** 9:3 22:20 27:21 28:22 47:6,7 47:10 50:11,17 53:3 64:3 81:13 82:23 102:3 112:4 114:21 118:6 119:18
**questions** 8:9 8:14,17,21 23:7 127:12,13
**quickly** 81:7,15 81:16,17,19
**quote** 67:2
**quoted** 95:9 96:2
**quotes** 84:17

| r | reason 93:3 | 122:7,11 | reflection 62:5 |
|---|---|---|---|

**r**

**r** 59:19 107:13 108:3 131:3,3
**ran** 40:16 70:20 71:2
**range** 41:17
**rapidly** 33:18
**rate** 11:12,16
**rates** 11:4,9
**rather** 8:21 67:7 70:5
**rationally** 79:16
**reach** 23:19
**react** 73:11 83:12
**reaction** 72:11 75:3
**read** 38:14 41:20 43:25 44:5,6,12,13,16 51:4 58:20 60:8,10,20 61:2 83:19 102:23 128:5
**reads** 45:24 61:9
**ready** 45:21,22
**reality** 108:7
**really** 9:22 32:8 34:10 42:7 75:4 108:3 109:17
**realtime** 2:13 130:6

**reason** 93:3 125:11 131:6,9 131:12,15,18 131:21
**reasonable** 106:4
**reasonably** 19:15
**reasons** 73:5 104:11,22 105:7
**recall** 17:6 44:12,20 45:2 58:4 85:8 121:25
**recalled** 51:12
**receive** 12:17 12:20
**received** 54:20
**receiving** 56:13
**recent** 104:4,15 105:3
**recently** 44:13 44:15
**recess** 80:14 88:16 122:10
**recognize** 89:13 115:6 123:4
**recollection** 40:4 92:23
**record** 4:6,14 5:16 6:7 80:11 80:15 86:24 88:11,14,20

122:7,11 127:21 130:13
**recorded** 4:16
**recording** 4:12
**records** 93:2
**recreate** 20:7
**refer** 16:23 60:2 74:2,6 75:12 76:8
**reference** 32:17 59:2,15 73:9 94:23
**references** 20:2 75:13 99:9
**referencing** 46:21 74:5
**referred** 10:22 16:7 100:22 101:16 102:19 119:8
**referring** 8:17 25:3 43:18 46:24 50:13 51:8,9 83:2
**refers** 51:6 56:15 62:15 120:25
**refined** 111:16 111:17
**reflect** 104:3 118:19
**reflected** 99:14 120:18
**reflecting** 116:13

**reflection** 62:5 62:6
**reflects** 115:25
**refused** 21:5
**regarding** 98:17
**registered** 2:12 130:5
**registering** 112:20
**registration** 45:25 46:13,15 46:17,18,23 47:15,22 48:4 48:15 50:4 67:4,14
**regression** 77:6 100:21,23,23 100:24 101:6,7 101:14,20 103:17,19,23 103:25 104:3,8 104:14,16 105:4,12 106:6 106:12,12 115:11 118:10 118:20 125:23
**regular** 41:14 75:21
**regularly** 14:20 38:18 59:2
**regulatory** 59:7 59:13 129:14
**related** 5:7 24:3 39:19 40:5

**[related - return]** Page 27

62:7 130:16
**relates** 81:13
   121:12
**relation** 111:9
**relationship**
   53:9 101:23
   104:9 105:20
   105:21 106:18
   116:19
**relative** 109:25
**release** 75:14
   75:23 112:6
**released** 71:17
   75:14 76:2
   77:19 80:2
   111:23 124:7
**relevance**
   12:15 61:20
   83:13
**relevant** 28:8
   28:21 42:16
   65:22 66:23
   68:16 72:17
   105:3,17
   111:25
**reliance** 19:9
**relied** 124:23
**rely** 51:22,24
   81:8 125:5
**relying** 23:19
**remain** 103:2
**remainder** 86:9
   126:14
**remember** 17:4

**remind** 44:15
   113:23
**remote** 3:11,12
**remotely** 5:14
**remove** 77:6
**renamed** 87:15
**rendered** 20:24
   65:15
**repeat** 33:3
   86:5
**repeated** 86:11
   89:9
**rephrase** 64:4
**report** 4:2 6:23
   7:3,6,10,16,18
   7:23 8:5,10,14
   8:18 9:9 10:14
   15:2,7 16:23
   17:19 18:4,5,6
   18:17 19:23
   30:8 31:7 32:8
   33:3 38:2,14
   39:21,25 43:14
   43:16 44:19
   45:9 47:17
   50:22 51:4
   54:8,9 55:4,9
   57:2,19 58:4
   65:11,17 72:19
   80:19 89:18
   93:12,20 94:22
   95:15,19 98:6
   102:20,22
   113:13,20
   114:2,5 115:18

120:3,14 129:9
**reported** 1:23
   95:16 96:4
**reporter** 2:12
   2:13 5:4 6:9
   119:6 130:6,7
**reporting**
   66:11,14
**reports** 17:25
   18:8,19 19:16
   19:21 20:4,17
   31:23 33:25
   34:2 38:18,23
   38:24 39:7,11
   39:13,18 52:13
   54:4,11,17,20
   55:5,7,10,13,14
   56:5,13,14,18
   56:20 57:5,14
   57:21,25 58:11
   61:21 62:11
   63:14 73:5
   80:5 83:18
   113:5 116:2,23
   123:12
**represent** 5:5
   6:23
**represents** 90:7
**request** 63:4
**requested**
   41:13,23
**require** 29:2
   55:10,24
**required** 72:19
   128:13

**requirement**
   125:19
**requirements**
   55:25
**requires** 20:12
   34:16
**rereviewed**
   7:22
**research** 52:16
**researching**
   15:2
**reses** 1:15 3:18
**residual** 102:15
**resources**
   58:14 62:10
**respect** 49:7
   98:19,22
   101:16 102:6
   126:6
**response** 75:19
**rest** 60:20
**restricted**
   119:18
**results** 70:24
   72:8
**retain** 46:3
**retained** 44:18
   45:2 127:19
**retirement** 1:7
   3:7 4:19
**return** 76:11,23
   77:7 92:3,6,17
   93:7 99:24
   100:11,12,16
   100:25 101:20

**[return - section]**                                                    Page 28

101:24 102:8
102:17,17
105:22 106:14
106:19,23,24
106:25 107:2,5
107:8,18,20
109:20 121:6,7
121:9
**returns**  101:2
102:15 106:10
**review**  49:19
63:22 79:8
83:24 110:23
**reviewed**  16:3
21:16,17 37:25
38:8,21 44:7
45:11 52:16
53:12,16 59:21
59:25 113:3,4
113:5
**reviewing**
39:14
**right**  7:13
16:21 32:14
34:24 38:19
39:16 51:16
52:17 53:7
57:10 71:10
78:3,9 80:10
85:4 87:12,21
87:21 90:3,20
97:13,18 99:14
109:5 114:14
118:4,7,18
119:2

**risk**  10:2
105:16
**robert**  3:25 5:3
**robust**  68:23
**rodriguez**  11:3
11:5
**role**  52:3 62:17
62:20,22 63:10
64:9 65:4
**rolling**  104:5,7
104:13,17
118:22
**root**  102:19
119:8
**rosevear**  9:15
14:18
**roughly**  96:3
**round**  100:5
**row**  90:7
108:17 116:9
116:11,12
**rpr**  1:24 130:24
**rudis**  3:25 5:3
**rule**  94:15
**ruled**  25:19
**run**  40:18 70:4
70:12,17 71:7
72:21 77:5
91:11 100:23
103:17 106:11
117:11 121:22
**running**  101:7
105:12 106:5
**runs**  105:15

**s**

**s**  67:4,9,13
90:14 107:22
108:4 112:21
131:3
**s&p**  38:25 39:6
39:8 54:10,16
54:18 76:24
77:2 100:12
101:3,20,24
102:7
**sale**  27:8
**satisfaction**
46:5
**saw**  119:11
**saying**  26:20,24
29:7 51:11
73:3 92:21
**says**  7:14,14,15
46:12 53:17
54:3 64:6 66:9
66:16 84:7
87:4 95:23
110:6
**scenario**  73:19
**school**  34:25
35:6
**scientific**  72:10
116:18
**scope**  30:8 31:7
32:2 45:9
47:17 93:20
94:22 98:5,24
**scott**  9:16
14:18

**search**  123:15
124:16,21,22
125:13
**searches**  40:15
40:16,18,19
**searching**
125:4
**sec**  31:24 33:25
63:3 116:3,23
123:3,16,17
**second**  37:17
42:3 43:10
44:25 51:15
60:23 61:3,10
61:25 65:2
78:13 79:14
80:20,23 82:18
83:8,12 84:24
87:10 88:12
91:25 92:15,19
115:7,25
116:11 123:2
124:10 125:13
**secondary**
46:19 48:9,11
72:23 73:10,12
99:12 116:24
**section**  19:9,12
19:14,20,24,25
20:3,10,12
23:7,11 38:22
40:5 60:5,21
65:19 66:21
122:22

**[securities - simply]**

**securities** 17:13 17:14 21:9 24:6,8 26:9,18 27:5 33:8,11 42:21 58:8 59:6,13 60:7 60:13 61:8 117:15 129:13
**security** 28:18 33:18,21 62:7 69:18,25 81:8 93:15,24,24 94:3 95:17
**see** 6:19 12:17 19:10 20:2 23:13 26:6 29:5 39:3 40:12 41:2,3,9 42:22 46:7 54:5 56:23 60:18,19 65:24 67:10 68:17 69:24 70:25 71:21 77:12 84:7 88:5 93:4 96:5 99:7 106:20 107:17 108:10,14,16 108:21 109:14
**seeing** 58:4 107:20 121:25
**seek** 31:3,22
**seeks** 119:6
**seem** 103:10

**seen** 52:10 70:24 81:22 82:21 83:3 94:23
**sekar** 1:13 3:17
**select** 40:10
**selected** 43:3 69:8,14
**semi** 33:4,12,14 33:15 34:3,9
**send** 39:12
**sense** 21:4 22:21 49:9 86:13
**sensitive** 4:9
**sentence** 23:9 23:16,21 26:3 28:25 29:23 60:9 61:4,6,9 61:10,15,25 62:14 80:21
**sentences** 61:2
**separate** 15:9 15:11 56:19 70:12 77:22
**series** 121:2
**serve** 62:19
**served** 24:8
**serves** 18:10 92:13
**service** 39:10 63:7
**services** 55:11 55:24

**session** 75:21
**set** 55:2,13 56:13 67:8 68:23 69:5 71:18 72:20 93:18,22 94:8 94:9,16,18,25 130:11,21
**setting** 59:7,14 129:14
**several** 9:12 62:15
**share** 22:4 26:5 29:3,8,13 93:13 122:25
**shares** 95:10,15 95:20 96:3,13 96:16,20,22,25 97:9,15 99:16 99:19
**sheets** 122:21
**short** 27:15 28:2,13 95:13 96:4
**shorted** 95:16 95:21
**shorter** 121:20 121:23
**show** 25:14 47:4 71:4 124:17
**showed** 126:22
**showing** 62:9 72:6

**shown** 64:15
**shows** 56:17 62:11 95:20 102:21 110:4 117:25 118:9 118:10 125:18 126:8
**sig** 108:6
**sign** 7:18 109:24
**signal** 58:11
**signature** 130:23
**significance** 42:10 119:12
**significant** 71:4 71:15,21,24 72:7 107:24 108:6,15,18,20 109:13,15,22 110:2,15,19 112:20 113:14 114:3 116:8,15 119:15,17 126:16,23
**signifies** 91:21
**similar** 19:15 19:21 58:21
**similarly** 1:8 30:5
**simple** 124:4
**simply** 28:10 56:12 70:17 124:4

**[simpson - statistic]**

**simpson**  2:10 3:14 4:25 5:19 5:21

**single**  55:9 66:17 118:2

**sir**  29:7 42:12 66:4 69:17 89:13 119:23 127:9

**sit**  11:9 92:22

**sitting**  5:24 40:20

**situated**  1:9 30:5

**six**  57:11

**size**  82:10

**slate**  20:8

**slightly**  76:16

**small**  81:18 82:13

**sold**  27:5,6 96:4

**solutions**  5:6 127:20

**somebody** 28:11

**sophistication** 30:6

**sorry**  58:25 59:19 64:25 65:25 78:16 80:20,23 90:5 96:19 109:9 120:3

**sort**  107:22

**sounds**  27:21

**source**  39:7 95:14 96:10

**sources**  125:5 125:14,18

**southern**  1:3 4:22

**spanning**  23:24

**specialists** 66:15

**specific**  13:15 13:18 17:6 19:3 20:12 25:16 29:24 32:7 42:17 44:20 57:18 65:9 68:14,16 68:19,20 71:17 71:19 72:16,22 73:9 77:8,13 77:13,22,25 78:8 79:4 83:4 97:22 108:4,7 111:9 112:4,19 113:15 114:16 115:12 116:20

**specifically** 43:24 47:18,24 48:23 106:3 125:7

**specified**  91:14 93:12

**speculating** 126:18

**spending**  58:13

**spent**  13:14 14:23,25 15:6 15:16

**spo**  48:20 50:5 50:5

**spread**  84:16 84:21 119:25 120:15,17

**spreadsheet** 40:24 41:3,8 85:11,15 86:8 89:14 91:4,18 114:25 115:4,8 119:9 122:14 122:18,22 129:15,18,20

**spruce**  113:20 113:21 114:4

**square**  3:8

**squared**  102:20 119:8

**ss**  130:3

**staff**  8:12 10:5 10:23 13:13 17:22 18:2,11 36:18 37:24 40:17 41:12,20

**stage**  24:22 110:24

**stamped**  88:18 129:17

**standard**  13:22 21:21 68:10 81:19,25 82:4

82:10 102:13 102:15 104:12 105:8 119:4

**stanley**  56:21 57:11

**start**  18:11 47:13 90:6 92:9 120:2

**started**  36:10 36:12,13,13,14 63:6 70:14

**starting**  19:25 111:10 112:8 120:24

**starts**  7:16 38:11

**state**  5:11,14 22:16 86:23 130:3,8

**stated**  8:25

**statement** 45:25 46:2,10 46:13,15,17,18 47:12,21,22 48:4,5,11,15,19 50:3,4 67:4,14

**statements** 46:23 47:15 49:21

**states**  1:2 2:14 4:21

**stating**  9:4

**statistic**  107:9 107:12

**statistical** 68:21,25 117:11 119:12
**statistically** 71:4,15,21,24 72:7 108:5,15 108:18 109:22 110:2,15,19 113:14 114:3 116:8,15 119:15,16 126:16,22
**stay** 103:9
**step** 69:16 97:12
**stick** 76:21 77:11
**stipulated** 127:17
**stock** 22:4 27:14 28:14,20 33:18 66:7,13 67:8 72:2,11 76:3,11 77:14 78:2,19 79:17 79:24 82:3,7 83:7 91:6 92:8 96:16 98:15 99:11,25 100:4 100:25 101:17 101:21,25 102:11 104:10 106:17 109:21 109:24 110:18 111:8 116:21

125:24 126:23
**stocks** 30:15
**stoddard** 3:12
**stop** 80:10
**stopping** 80:8
**stories** 83:17
**strategies** 30:22 31:18
**strike** 23:18 51:23 55:19 110:21 117:5
**strong** 33:4,4 33:12,14,14,15 33:19 34:3,4,9
**structure** 12:21
**struggling** 61:14
**students** 36:19
**studied** 47:19 47:25 48:23
**studies** 62:16 63:23 64:15,24 82:5,6
**study** 84:13 87:19 88:2 89:15,17,22 104:15 111:15 112:2 114:19 126:7
**subject** 25:24
**subperiods** 117:12 119:22
**subscribed** 128:14

**subscription** 55:24
**subscriptions** 55:10
**substantial** 81:22 82:21,25
**substantially** 63:12 73:19
**substantively** 88:6
**subsumed** 65:6
**subtraction** 107:2
**suffer** 26:16
**suffered** 27:24
**sufficient** 22:19 94:7 104:24
**sufficiently** 69:2
**suggests** 33:19
**summarized** 8:10
**summary** 24:18 24:22 115:20 120:9,10,12,19
**summer** 5:23 36:14
**supersede** 63:21
**supplied** 38:24 39:6 54:9
**support** 58:16 71:3 110:23
**supports** 63:17

**suppose** 127:4
**supreme** 43:8 43:18
**sure** 16:20 26:20 43:20,22 49:6 53:24 71:12 97:23 98:11,18 105:11 108:22 108:23 109:9 115:20 122:6 124:18
**survived** 25:4 25:25
**susir** 1:14 3:17
**swear** 6:9
**sworn** 6:13 128:14 130:12
**symbol** 108:14 109:20
**synthesizing** 64:18
**system** 1:7 3:7 4:20

**t**

**t** 59:19,19 107:8,9,12 131:3,3
**tab** 122:23 123:11,11,13 123:16
**tabs** 122:21
**tagged** 124:23 125:5

**take** 4:12 11:10 11:24 12:8 18:16 19:14 20:3 21:5 28:9 45:19 75:9 80:9 81:23 82:22 83:24 97:12 104:8 111:20 116:24 122:3 123:25 126:21

**taken** 4:17 54:16

**takes** 64:6

**talent** 46:3

**talk** 18:15 20:14 28:10 31:20 40:14 53:5,8,20 65:11 120:21

**talked** 36:6,8

**talking** 22:14 71:9 74:4 84:18 98:7,9

**talks** 33:24 65:3

**task** 41:23 87:19 88:2 95:7,13 96:13 96:23 115:2 122:15 129:18 129:20

**tasks** 8:20

**taskus** 1:12 3:15 4:20 20:2

22:4 33:7,11 39:11,19,25 40:6 42:5 54:9 56:20 66:5,11 66:21 67:13 69:17 72:10 74:10 76:23 77:14,20 92:8 94:19 96:17 98:3,22 99:25 100:25 101:21 101:25 103:20 104:9 106:16 107:10 117:15 118:11 124:2,6 124:24 125:10 125:13,25 126:4 128:1 131:1

**teach** 36:16,18 36:19

**technical** 102:14

**technically** 9:11

**tell** 45:21 57:13 71:8 95:4 109:7 115:19 120:23 122:20

**telling** 40:8 76:19

**template** 18:10 18:12,15

**ten** 122:4

**term** 125:13

**terms** 10:11,12 12:12 14:10 20:10 30:5 37:5,7,11 52:24 97:24 111:20 114:22 124:16,21

**test** 49:23 68:22,25 70:17 71:7,9,14 72:21 73:5 89:24 107:16 115:21 121:25 126:15

**testified** 6:13 17:15

**testify** 14:14,20 20:11

**testifying** 24:4

**testimony** 16:21,21 17:2 17:12 18:22 38:6 70:23 89:25 127:16 128:9 130:13

**testing** 77:18 103:17 119:13

**tests** 117:12 119:20 121:22

**thacher** 2:10 3:14 4:25 5:19 5:22

**thank** 6:17 32:13 74:22

**thayne** 3:12

**themself** 54:17

**theoretically** 69:22 70:3 73:2

**theories** 32:23

**theory** 81:4

**thing** 44:6,16 73:3 102:6 119:7

**things** 16:3 19:5 26:17 50:16 64:6 73:8 85:20 111:19

**think** 7:7 11:25 14:11 15:5 17:9,16 24:16 34:7,8,15 36:6 36:22 44:24 47:8 54:13 58:3 59:17 61:5,22,24 62:5 63:17 64:2,11,12,14 65:3 68:2 70:7 71:11 73:4,10 73:22 79:23 81:21,25 82:10 84:5 86:16 87:5,11 91:5,8 92:15 94:3 96:9 97:13,14 98:7 102:3 103:6 106:2,8

**[think - typically]**

106:21 107:25
111:25 112:2,4
113:12,21
114:21 118:9
118:17 120:2,8
124:3 127:10
**thinking** 52:25
**third** 39:8 72:3
80:20 123:2
**thomas** 58:17
58:24,25 59:14
59:17
**thought** 9:25
21:19 49:22
**three** 13:12
33:8 69:4
71:20 74:15
101:10,11
108:19 109:13
116:6 119:14
126:12,13
127:19
**threshold**
107:25
**thresholds**
109:18 118:3
**time** 4:11 5:11
10:16 11:13
12:14 14:10,25
15:5 18:13
21:11 29:14,19
33:7 38:20
39:24 45:18,19
48:4 58:13
59:24 61:18

62:10,23 63:2
63:5,12 65:14
69:18,19 75:12
75:13 83:12,24
91:6 97:17,18
101:20 104:11
105:3,15,16,18
106:2 111:23
117:21 119:13
119:21 121:2
121:20,23
127:14
**times** 3:8 16:18
44:8 46:23
104:22 105:6
**timing** 12:7
27:8 67:7,15
67:18 111:20
**title** 7:8
**titled** 59:12
**today** 5:21 7:23
47:7
**today's** 121:7
127:16
**took** 16:7 74:11
74:15,18,24
83:11
**top** 7:12 16:24
17:5 34:22
54:8 60:4
117:3 124:19
**topic** 63:20
64:8
**total** 14:7
100:12 101:20

101:24 102:7
127:18
**totality** 28:19
**totally** 49:16
**toward** 57:2
65:20
**trace** 36:3
**traced** 36:2
**track** 89:11
**trade** 28:14
105:11,24
**traded** 49:12
66:5,13 95:10
97:9
**trades** 66:21
**trading** 53:5,9
66:14 75:21,22
84:14,22 92:4
92:4,9,15,19,20
93:4 94:9,17
94:18 103:18
103:21 115:15
117:15,23,24
118:2 123:9
**transcript**
128:5,9
**transcripts**
113:5
**treated** 124:7
**treatment**
68:13 71:16
115:23 116:14
**trial** 24:9
**trick** 32:20
47:6 76:20

**true** 126:6,19
128:8 130:13
**try** 75:7 79:2
79:18 112:18
117:4 124:13
126:18
**trying** 15:8
28:9,10 31:20
42:13,15 47:5
76:20 77:21,24
118:6 124:3
125:15
**turn** 19:7 41:12
**turned** 120:20
**two** 11:7 16:11
16:11 35:24
36:23 60:9,25
67:25 68:3,8
69:14 70:6
72:4,8 86:6
91:15 92:13
93:5 95:19
96:10 108:11
109:16 116:5
117:8
**type** 24:3 52:5
73:24 105:4,13
106:5 111:10
112:3 117:6
**types** 18:8
21:21,23 23:23
73:2,8
**typically** 26:13
94:14

**[ultimate - want]**                                    Page 34

| u | | | |
|---|---|---|---|
| **ultimate** 71:3 | **updated** 96:7,9 | **valuation** 72:17 | **videographer** |
| **ultimately** 94:8 | **updates** 95:18 | 94:2 | 3:25 4:5 5:4 |
| **under** 42:20 | **upper** 7:13 | **value** 42:16 | 6:4,8 80:11,15 |
| **underlying** | **use** 7:19 52:6 | 64:13,22 68:16 | 88:14,20 122:7 |
| 69:25 | 53:14 70:15 | 78:5 81:10 | 122:11 127:15 |
| **understand** | 88:7 91:18 | 107:14 108:4 | **view** 58:6,10 |
| 26:14 53:25 | 104:13 105:2 | 109:23 | 61:23 73:17 |
| 75:8,10 78:19 | 109:2,3 124:22 | **values** 121:3,8 | 82:17 84:5 |
| 99:9 100:17 | **used** 21:21,23 | **variable** 100:25 | **violate** 121:10 |
| **understanding** | 21:23 24:13 | 102:21 121:2,4 | **virtually** 15:5 |
| 30:10 31:9 | 56:4 63:21 | 121:9 | **vol** 95:7 |
| 46:11,14 55:6 | 81:19 82:20 | **variables** 101:2 | **volatility** 83:7 |
| 93:21 94:15 | 123:8,18,19 | 101:9,10,11 | 102:10 104:10 |
| 95:25 98:14 | 127:18 | 118:12 | **volume** 53:5,9 |
| 99:17 113:19 | **useful** 84:8 | **varies** 18:4 | 66:10,13 68:19 |
| **understandings** | 104:18 111:22 | **variety** 104:11 | 72:3 83:6 95:8 |
| 31:3 | 112:3 | 105:7 | 95:9 116:12 |
| **understood** | **uses** 82:6 | **vary** 96:5 | 117:23 118:2 |
| 112:14 | **using** 19:8 | **vast** 99:18 | **voting** 10:11 |
| **undertook** | 116:6 | **veritext** 5:6 | **vs** 128:1 131:1 |
| 20:13 | | 127:19 | |

| | v | **verse** 78:8 | w |
|---|---|---|---|
| **underwriter** | **v** 1:11 | **version** 47:12 | **wait** 97:12 |
| 94:21 | **vague** 8:7 | 47:14,21 64:5 | **wake** 113:6 |
| **underwriters** | 22:13 27:19 | 85:18 88:17 | **walster** 9:16 |
| 93:23 94:5,6 | 29:17 37:2 | 90:2 100:19 | 14:18 |
| **union** 130:4 | 52:19 63:16,25 | 129:16 | **want** 8:3 10:2 |
| **unique** 40:14 | 69:20 70:22 | **versions** 46:22 | 16:20 25:14 |
| **unit** 4:15 80:12 | 97:20 104:20 | **versus** 4:20 | 32:10 45:19,23 |
| 96:18 122:8,12 | 112:23 117:19 | 34:3 48:20 | 49:4 53:2,24 |
| **united** 1:2 4:21 | 124:9 | 68:11,15,22 | 60:2 71:11 |
| **units** 127:18 | **valiant** 25:10 | 71:18 105:14 | 75:7 80:18 |
| **university** | **validates** 52:16 | 111:5 | 85:22 87:14 |
| 36:11,13,14 | 52:20 | **video** 4:12,16 | 93:11 98:8 |
| | **valuable** 84:3 | | 108:22 109:10 |
| | | | 112:6 113:23 |

**[want - zoom]** Page 35

119:23 122:5
**wanted** 9:25
42:4 50:17
68:23 69:5
70:15 91:14
**way** 8:3 11:25
12:3 15:12
17:24 26:13,25
27:11 31:14,16
32:2 40:8
49:13 51:14
64:18 70:2
84:3 87:2,25
101:15,18
103:2 109:22
110:2,17,19,21
111:16 130:18
**ways** 127:8
**we've** 36:2
**weak** 33:3
**week** 58:4
117:24 118:2
120:15,15
**weekend** 92:14
**weekly** 117:23
**weeks** 95:19
96:10
**weir** 1:13 3:16
**welcome** 60:10
**wells** 56:22
**went** 18:18
35:23 76:11
100:5 101:21
101:21 109:4
109:21,22

**whereof** 130:20
**whispering** 4:9
**wide** 86:3,3
**widely** 33:15
33:16 34:10,15
60:12 61:7,14
61:16 81:6
**willing** 20:11
21:11
**window** 82:11
102:18 103:19
112:11,12
**wish** 60:11
**witness** 6:3,9
6:12 24:25
51:18 88:5
94:21 97:20
98:5 129:4
130:10,14,20
**word** 16:20
18:20,20 44:6
44:6 89:6
109:6 125:18
**words** 53:17
61:13 76:22
**work** 9:5 12:11
14:9 15:25
16:8 18:14
22:7 32:11,15
32:21 48:2
52:5 69:6
84:12 121:13
127:3
**worked** 9:17
13:7 16:13

17:23
**working** 8:16
23:23 24:2
**works** 11:22
26:14 86:18
**write** 23:9,21
29:22 65:20
66:3 80:21
83:25
**written** 36:24
37:3 63:3
**wrong** 32:11
80:25
**wrote** 54:9

**x**

**x** 1:4,18 7:14
7:15

**y**

**yeah** 12:17
25:17 26:20
32:16 37:17
44:24 45:2
59:17 76:16
80:24,24,24
84:25 88:7,10
108:2,4 109:12
109:19 110:11
110:13 114:2
115:7
**year** 35:24
39:25 69:9,10
69:13,14
**years** 16:22
17:13 23:22

24:3 43:6 52:4
67:25 68:3,8
70:6 91:15
117:8
**yesterday**
15:23 16:7,10
**yesterday's**
121:5
**york** 1:3 2:11
2:11,14 3:9,9
3:20 4:22 5:2,2
**youngwood**
3:21 5:18,19
6:16 22:14,18
25:15 51:5
59:3 80:17
85:13 87:7,14
87:23 88:3,8
88:23 129:5
**yup** 37:18
108:12 113:24
124:20

**z**

**zero** 107:19
**zoom** 6:5,6

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.