# EXHIBIT 20

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PLUMBERS & PIPEFITTERS NATIONAL PENSION FUND and JUAN FRANCISCO NIEVES, as Trustee of the Gonzalez Coronado Trust, Individually and on Behalf of All Others Similarly Situated, | Case No.: 1:16-CV-3591-GHW |
| Plaintiffs, | |
| v. | |
| KEVIN DAVIS and AMIR ROSENTHAL, | |
| Defendants. | |

## EXPERT REPORT OF CHAD COFFMAN, CFA

**December 18, 2020**

### M. ADDITIONAL FACTOR: LACK OF ARBITRAGE OPPORTUNITY

79.     During the Class Period, PSG's Common Stock was dual-listed on the NYSE and the TSX.[84] In an efficient market, one would expect related securities such as these to move in tandem in the marketplace after taking into account the conversion ratio and exchange rate. If, by contrast, the securities did not, there would be opportunities for arbitrage. Arbitrage is defined as the "exploitation of security mispricing in such a way that risk-free economic profit may be earned."[85] It involves the simultaneous purchase and sale of equivalent securities in order to profit from discrepancies in their price relationship. As shown in **Exhibit 14**, however, it is quite clear there was very little divergence between the price of PSG's Common Stock on the NYSE and on the TSX during the Class Period. This further supports my view that PSG Common Stock traded in an efficient market.

## VIII. DAMAGES

80.     Counsel for the Lead Plaintiff also asked me to opine on whether per share damages could be measured for all Class members under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Lead Plaintiff's theory of liability. There is a standard and well-accepted method for calculating class-wide damages in cases under Section 10(b) of the Exchange Act.  This method, typically referred to as the "out-of-pocket" method, states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a

---

[84] Performance Sports Group Ltd. SEC Form 10-K for the fiscal year ended May 31, 2015, p. 42.

[85] Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments*, Fourth Edition, Irwin McGraw-Hill, 1999, p. 307.

formulaic limit on damages that also can be applied class-wide).[86] The out-of-pocket method has been applied in virtually every matter in which I have observed or participated in as a consulting, testifying, or neutral expert.

81.     Once the inflation per share has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Therefore, there is a well-accepted method to compute damages in Section 10(b) matters such as this.

82.     Separate and apart from whether there is a common method for computing damages is the question of how to quantify the artificial inflation per share that is an input to the damages methodology. The quantification of the artificial inflation per share requires a detailed loss causation analysis.[87]   Nevertheless, whatever the method for determining the artificial inflation per share, it would be common to all class members.

83.     For example, the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations (*i.e.*, a "corrective disclosure").[88] Such an event study would also need to consider whether and to what extent any

---

[86] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See* 15 U.S.C. § 78u-4(e)(1).

[87] I have not been asked to conduct a loss causation analysis at this time. In my experience, loss causation analyses are often informed by information learned in discovery.

[88] The event study I have performed for this report is for purposes of determining market efficiency and is not an attempt to value artificial inflation.

35

non-fraud related information (*i.e.*, "confounding information") contributed to the observed price movement.  If there is such confounding information, disaggregating the price impact of corrective disclosures from confounding information may utilize valuation techniques and may depend on information learned through discovery. Determining the specific valuation approach necessary to perform a loss causation analysis that reasonably disaggregates corrective and confounding information is an inherently case-specific question that depends on specific facts and circumstances. Examples of such techniques include, but are not limited to, fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods (*i.e.*, price to earnings multiples, price to EBITDA multiples, price to revenue multiples, etc.), use of academic studies regarding the value of certain types of information, and other available valuations whether from securities analysts or made available through discovery. Regardless of the technique used, it is performed on a class-wide basis – in other words, the specific methodology applies regardless of the identity or circumstances of any individual class member.

84.    The loss causation analysis would also require an analysis of how inflation per share may have evolved over the class period. Again, the nature of this analysis is intensely factual, case-specific, and may depend on information learned through discovery. For example, an often-used method is to assume "constant dollar inflation," which implies that the artificial inflation was the same dollar amount throughout the class period. In certain circumstances, it may be more reasonable to apply "constant percentage inflation," which implies the price was inflated by a consistent percentage in the absence of additional disclosures. In other cases, the artificial inflation has evolved based upon the nature and timing of specific misstatements or the inflation varied on a daily basis as a result of information contained in internal documents obtained in discovery. To summarize, the determination of how artificial inflation evolved over

the class period is also a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above. Once again, however, all of these loss causation methodologies are class-wide in nature and do not depend on the identity or circumstance of any specific investor.

85.    Accordingly, although I have not been asked to calculate class-wide damages in this report, and such calculations would likely depend, in part, on the completion of discovery and full development of the case record, based on my expertise and experience in dozens of similar matters and understanding of the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole.

## IX.   CONCLUSION

86.    In sum, every factor analyzed supports my opinion that PSG Common Stock traded in an efficient market during the Class Period. Furthermore, class-wide damages in this matter can be calculated on a class-wide basis using a common methodology.

87.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Chad Coffman

Executed on December 18, 2020.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE APHRIA, INC. SECURITIES LITIGATION | Case No. 18 CIV. 11376 (GBD) |
| | Class Action |

**<u>EXPERT REPORT OF CHAD COFFMAN, CFA</u>**

**January 28, 2022**

## IX.  DAMAGES

84.     Counsel for the Lead Plaintiffs also asked me to opine on whether per share damages could be measured for all Class members under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Lead Plaintiffs' theory of liability. There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act. This method, typically referred to as the "out-of-pocket" method, states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[95, 96] The out-of-pocket method has been applied in virtually every matter in which I have observed or participated in as a consulting, testifying, or neutral expert.

85.     Once the inflation per share has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process (*i.e*., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide

---

[95] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." See, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

[96] For sellers of put options, the formula should focus on the change in artificial "deflation" rather than "inflation," but the economic concept that the damages are based on the change in the distortion of the price caused by the misrepresentations or omissions is precisely the same.

evidence of securities transactions). Therefore, there is a well-accepted method to compute damages in Section 10(b) matters such as this.

86. Separate and apart from whether there is a common method for computing damages is the question of how to quantify the artificial inflation per share that is an input to the damages methodology. The quantification of the artificial inflation per share requires a detailed loss causation analysis.[97] Nevertheless, whatever the method for determining the artificial inflation per share, it would be common to all class members.

87. For example, the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations (*i.e.* a "corrective disclosure").[98] Such an event study would also need to consider whether and to what extent any non-fraud related information (*i.e.* "confounding information") contributed to the observed price movement. If there is such confounding information, disaggregating the price impact of corrective disclosures from confounding information may utilize valuation techniques and may depend on information learned through discovery. Determining the specific valuation approach necessary to perform a loss causation analysis that reasonably disaggregates corrective and confounding information is an inherently case-specific question that depends on specific facts and circumstances. Examples of such techniques include, but are not limited to, fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods (*i.e.* price to earnings multiples, price to EBITDA multiples, price to revenue multiples, etc.), use of

---

[97] I have not been asked to conduct a loss causation analysis at this time. In my experience, loss causation analyses are often informed by information learned in discovery.

[98] The event study I have performed for this report is for Market Efficiency purposes and is not an attempt at valuing artificial inflation.

academic studies regarding the value of certain types of information, and other available valuations whether from securities analysts or made available through discovery. Regardless of the technique used, it is performed on a class-wide basis – in other words, the specific methodology applies regardless of the identity or circumstances of any individual class member.

88. The loss causation analysis would also require an analysis of how inflation per share may have evolved over the class period. Again, the nature of this analysis is intensely factual, case-specific, and may depend on information learned through discovery. For example, an often-used method is to assume "constant dollar inflation", which implies that the artificial inflation was the same dollar amount during the class period. In certain circumstances, it may be more reasonable to apply "constant percentage inflation", which implies the price was inflated by a consistent percentage in the absence of additional disclosures. In other cases, the artificial inflation has evolved based upon the nature and timing of specific misstatements or the inflation varied on a daily basis as a result of information contained in internal documents obtained in discovery. To summarize, the determination of how artificial inflation evolved over the class period is also a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above. Once again, however, all of these loss causation methodologies are class-wide in nature and do not depend on the identity or circumstance of any specific investor.

89. Accordingly, although I have not been asked to calculate class-wide damages in this report, and such calculations would likely depend, in part, on the completion of discovery, and full development of the case record, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this

action are subject to a well-settled, common methodology that can be applied to the Class as a whole.

## X.   CONCLUSION

90.   In sum, every factor analyzed supports my opinion that Aphria Common Stock traded in an efficient market during the Class Period. Furthermore, class-wide damages in this matter can be calculated on a class-wide basis using a common methodology.

91.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 28, 2022

_____
Chad Coffman

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PERRIGO COMPANY PLC SECURITIES LITIGATION | No. 1:19-cv-00070-DLC<br><br>Class Action |

**EXPERT REPORT OF CHAD COFFMAN, CFA**

**July 10, 2020**

contingencies that are covered by the market.[85]  Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks.[86]  Thus, this factor also supports that Perrigo Common Stock traded in an efficient market throughout the Class Period.

## VIII. DAMAGES

79.    Counsel for the Lead Plaintiffs also asked me to opine on whether per share damages could be measured for all Class members under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Lead Plaintiffs' theory of liability. There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act.  This method, typically referred to as the "out-of-pocket" method, states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[87]  The out-of-pocket method has been applied in virtually every matter in which I have observed or participated in as a consulting, testifying, or neutral expert.

---

[85] Stephen A. Ross, *Options and Efficiency*, 90 Q. J. ECON. 75 (1976).

[86] Raman Kumar, Atulya Sarin & Kuldeep Shastri, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, 53 J. FIN. 717 (1998).

[87] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." See, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

80.     Once the inflation per share has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions).  Therefore, there is a well-accepted method to compute damages in Section 10(b) matters such as this.

81.     Separate and apart from whether there is a common method for computing damages is the question of how to quantify the artificial inflation per share that is an input to the damages methodology.  The quantification of the artificial inflation per share requires a detailed loss causation analysis.[88]  Nevertheless, whatever the method for determining the artificial inflation per share, it would be common to all class members.

82.     For example, the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations (i.e. a "corrective disclosure").[89]  Such an event study would also need to consider whether and to what extent any non-fraud related information (*i.e.* "confounding information") contributed to the observed price movement.  If there is such confounding information, disaggregating the price impact of corrective disclosures from confounding information may utilize valuation techniques and may depend on information learned through discovery.  Determining the specific valuation approach necessary to perform a loss causation analysis that reasonably disaggregates corrective and

---

[88] I have not been asked to conduct a loss causation analysis at this time. In my experience, loss causation analyses are often informed by information learned in discovery.

[89] The event study I have performed for this report is for Market Efficiency purposes and is not an attempt at valuing artificial inflation.

confounding information is an inherently case-specific question that depends on specific facts and circumstances. Examples of such techniques include, but are not limited to, fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods (i.e. price to earnings multiples, price to EBITDA multiples, price to revenue multiples, etc.), use of academic studies regarding the value of certain types of information, and other available valuations whether from securities analysts or made available through discovery. Regardless of the technique used, it is performed on a class-wide basis – in other words, the specific methodology applies regardless of the identity or circumstances of any individual class member.

83. The loss causation analysis would also require an analysis of how inflation per share may have evolved over the class period. Again, the nature of this analysis is intensely factual, case-specific, and may depend on information learned through discovery. For example, an often-used method is to assume "constant dollar inflation," which implies that the artificial inflation was the same dollar amount during the class period. In certain circumstances, it may be more reasonable to apply "constant percentage inflation," which implies the price was inflated by a consistent percentage in the absence of additional disclosures. In other cases, the artificial inflation has evolved based upon the nature and timing of specific misstatements or the inflation varied on a daily basis as a result of information contained in internal documents obtained in discovery. To summarize, the determination of how artificial inflation evolved over the class period is also a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above. Once again, however, all of these loss causation methodologies are class-wide in nature and do not depend on the identity or circumstance of any specific investor.

84.     Accordingly, although I have not been asked to calculate class-wide damages in this report, and such calculations would likely depend, in part, on the completion of discovery, and full development of the case record, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole.

## IX.   CONCLUSION

85.     In sum, every factor analyzed supports my opinion that Perrigo Common Stock traded in an efficient market during the Class Period.  Furthermore, class-wide damages in this matter can be calculated on a class-wide basis using a common methodology.

86.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on July 10, 2020


_____
Chad Coffman

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

IN RE NIELSEN HOLDINGS
PLC SECURITIES LITIGATION                    No. 18-CV-07143-JMF

_____

**EXPERT REPORT OF CHAD COFFMAN, CFA**

**July 14, 2021**

## VIII. DAMAGES

80.     Counsel for the Lead Plaintiff also asked me to opine on whether per share damages could be measured for all Class members under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Lead Plaintiff's theory of liability. There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act.  This method, typically referred to as the "out-of-pocket" method, states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[88] The out-of-pocket method has been applied in virtually every matter in which I have observed or participated in as a consulting, testifying, or neutral expert.

81.     Once the inflation per share has been quantified on each day during the Class Period, the computation of damages for each class member is formulaic based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Therefore, there is a well-accepted method to compute damages in Section 10(b) matters such as this.

---

[88] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See* Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(e)(1).

82.     Separate and apart from whether there is a common method for computing damages is the question of how to quantify the artificial inflation per share that is an input to the damages methodology. The quantification of the artificial inflation per share requires a detailed loss causation analysis.[89]   Nevertheless, whatever the method for determining the artificial inflation per share, it would be common to all class members.

83.     For example, the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations (i.e., a "corrective disclosure").[90] Such an event study would also need to consider whether and to what extent any non-fraud related information (i.e., "confounding information") contributed to the observed price movement.  If there is such confounding information, disaggregating the price impact of corrective disclosures from confounding information may utilize valuation techniques and may depend on information learned through discovery. Determining the specific valuation approach necessary to perform a loss causation analysis that reasonably disaggregates corrective and confounding information is an inherently case-specific question that depends on specific facts and circumstances. Examples of such techniques include, but are not limited to, fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods (i.e., price to earnings multiples, price to EBITDA multiples, price to revenue multiples, etc.), use of academic studies regarding the value of certain types of information, and other available valuations whether from securities analysts or made available through discovery. Regardless of

---

[89] I have not been asked to conduct a loss causation analysis at this time. In my experience, loss causation analyses are often informed by information learned in discovery.

[90] The event study I have performed for this report is for Market Efficiency purposes and is not an attempt at valuing artificial inflation.

the technique used, it is performed on a class-wide basis – in other words, the specific methodology applies regardless of the identity or circumstances of any individual class member.

84. The loss causation analysis would also require an analysis of how inflation per share may have evolved over the Class Period. Again, the nature of this analysis is intensely factual, case-specific, and may depend on information learned through discovery. For example, an often-used method is to assume "constant dollar inflation," which implies that the artificial inflation was the same dollar amount during the Class Period. In certain circumstances, it may be more reasonable to apply "constant percentage inflation," which implies the price was inflated by a consistent percentage in the absence of additional disclosures. In other cases, the artificial inflation has evolved based upon the nature and timing of specific misstatements or the inflation varied on a daily basis as a result of information contained in internal documents obtained in discovery. To summarize, the determination of how artificial inflation evolved over the Class Period is also a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above. Once again, however, all of these loss causation methodologies are class-wide in nature and do not depend on the identity or circumstance of any specific investor.

85. Accordingly, although I have not been asked to calculate class-wide damages in this report, and such calculations would likely depend, in part, on the completion of discovery, and full development of the case record, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole.

## IX.  CONCLUSION

86.    In sum, every factor analyzed supports my opinion that Nielsen Common Stock traded in an efficient market during the Class Period. Furthermore, class-wide damages in this matter can be calculated on a class-wide basis using a common methodology.

87.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on July 14, 2021.


_____
Chad Coffman

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

_____

MAYUKO HOLWILL, Individually and on
Behalf of All Others Similarly Situated,

       Plaintiff,

     v.

ABBVIE INC., RICHARD A. GONZALEZ,
and WILLIAM J. CHASE,

       Defendants.

Case No. 1:18-cv-6790

_____

## EXPERT REPORT OF CHAD COFFMAN, CFA

**February 1, 2021**

are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks.[89] Thus, this factor also supports that AbbVie Common Stock traded in an efficient market throughout the Class Period.

## VIII. DAMAGES

81.    Counsel for the Plaintiffs also asked me to opine on whether per share damages could be measured for all Class members under Section 10(b) using a common methodology that is consistent with Plaintiffs' theory of liability. There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b).  This method, typically referred to as the "out-of-pocket" method, states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[90] The out-of-pocket method has been applied in virtually every matter in which I have observed or participated in as a consulting, testifying, or neutral expert.

82.    Once the inflation per share has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security,

---

[89] Raman Kumar, Atulya Sarin & Kuldeep Shastri, *The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis*, 53 J. FIN. 717 (1998).

[90] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See* Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Therefore, there is a well-accepted method to compute damages in Section 10(b) matters such as this.

83. Separate and apart from whether there is a common method for computing damages is the question of how to quantify the artificial inflation per share that is an input to the damages methodology. The quantification of the artificial inflation per share requires a detailed loss causation analysis.[91] Nevertheless, whatever the method for determining the artificial inflation per share, it would be common to all class members.

84. For example, the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations (i.e., a "corrective disclosure").[92] Such an event study would also need to consider whether and to what extent any non-fraud related information (i.e., "confounding information") contributed to the observed price movement. If there is such confounding information, disaggregating the price impact of corrective disclosures from confounding information may utilize valuation techniques and may depend on information learned through discovery. Determining the specific valuation approach necessary to perform a loss causation analysis that reasonably disaggregates corrective and confounding information is an inherently case-specific question that depends on specific facts and circumstances. Examples of such techniques include, but are not limited to, fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods (i.e., price

---

[91] I have not been asked to conduct a loss causation analysis at this time. In my experience, loss causation analyses are often informed by information learned in discovery.

[92] The event study I have performed for this report is for Market Efficiency purposes and is not an attempt at valuing artificial inflation.

to earnings multiples, price to EBITDA multiples, price to revenue multiples, etc.), use of academic studies regarding the value of certain types of information, and other available valuations whether from securities analysts or made available through discovery. Regardless of the technique used, it is performed on a class-wide basis – in other words, the specific methodology applies regardless of the identity or circumstances of any individual class member.

85.     The loss causation analysis would also require an analysis of how inflation per share may have evolved over the class period. Again, the nature of this analysis is intensely factual, case-specific, and may depend on information learned through discovery. For example, an often-used method is to assume "constant dollar inflation," which implies that the artificial inflation was the same dollar amount during the class period. In certain circumstances, it may be more reasonable to apply "constant percentage inflation," which implies the price was inflated by a consistent percentage in the absence of additional disclosures. In other cases, the artificial inflation has evolved based upon the nature and timing of specific misstatements or the inflation varied on a daily basis as a result of information contained in internal documents obtained in discovery. To summarize, the determination of how artificial inflation evolved over the class period is also a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above. Once again, however, all of these loss causation methodologies are class-wide in nature and do not depend on the identity or circumstance of any specific investor.

86.     Accordingly, although I have not been asked to calculate class-wide damages in this report, and such calculations would likely depend, in part, on the completion of discovery, and full development of the case record, based on my expertise and experience in dozens of similar

matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole.

## IX. CONCLUSION

87.    In sum, every factor analyzed supports my opinion that AbbVie Common Stock traded in an efficient market during the Class Period. Furthermore, class-wide damages in this matter can be calculated on a class-wide basis using a common methodology.

88.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 1, 2021.

Chad Coffman

39

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Civil Action No. 1:20-cv-02031-JSR |
| vs. | |
| WORLD WRESTLING ENTERTAINMENT, INC., VINCENT K. McMAHON, GEORGE A. BARRIOS and MICHELLE D. WILSON, | |
| Defendants. | |

## <u>EXPERT REPORT OF CHAD COFFMAN, CFA</u>

### October 6, 2020

underlying stocks.[97] Thus, this factor also supports that WWE Common Stock traded in an efficient market throughout the Class Period.

## VIII.   DAMAGES

79.     Counsel for the Lead Plaintiff also asked me to opine on whether per share damages could be measured for all Class members under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Lead Plaintiff's theory of liability. There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act.  This method, typically referred to as the "out-of-pocket" method, states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[98] The out-of-pocket method has been applied in virtually every matter in which I have observed or participated in as a consulting, testifying, or neutral expert.

80.     Once the inflation per share has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide

---

[97] Raman Kumar, Atulya Sarin & Kuldeep Shastri, *The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis*, 53 J. FIN. 717 (1998).

[98] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See* Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

evidence of securities transactions). Therefore, there is a well-accepted method to compute

damages in Section 10(b) matters such as this.

81.    Separate and apart from whether there is a common method for computing damages

is the question of how to quantify the artificial inflation per share that is an input to the damages

methodology. The quantification of the artificial inflation per share requires a detailed loss

causation analysis.[99]   Nevertheless, whatever the method for determining the artificial inflation

per share, it would be common to all class members.

82.    For example, the most widely-used technique to quantify artificial inflation starts

from an event study that measures price reactions to disclosures that revealed the relevant truth

concealed by the alleged material omissions and/or misrepresentations (i.e., a "corrective

disclosure or revelation of the truth").[100] Such an event study would also need to consider

whether and to what extent any non-fraud related information (*i.e.*, "confounding information")

contributed to the observed price movement.  If there is such confounding information,

disaggregating the price impact of corrective disclosures or revelations of the truth from

confounding information may utilize valuation techniques and may depend on information

learned through discovery. Determining the specific valuation approach necessary to perform a

loss causation analysis that reasonably disaggregates corrective and confounding information is

an inherently case-specific question that depends on specific facts and circumstances. Examples

of such techniques include, but are not limited to, fundamental valuation analysis such as

discounted cash flow methods, valuation multiple methods (i.e. price to earnings multiples, price

---

[99] I have not been asked to conduct a loss causation analysis at this time. In my experience, loss causation analyses are often informed by information learned in discovery.

[100] The event study I have performed for this report is for Market Efficiency purposes and is not an attempt at valuing artificial inflation.

to EBITDA multiples, price to revenue multiples, etc.), use of academic studies regarding the value of certain types of information, and other available valuations whether from securities analysts or made available through discovery. Regardless of the technique used, it is performed on a class-wide basis – in other words, the specific methodology applies regardless of the identity or circumstances of any individual class member.

83.     The loss causation analysis would also require an analysis of how inflation per share may have evolved over the class period. Again, the nature of this analysis is intensely factual, case-specific, and may depend on information learned through discovery. For example, an often-used method is to assume "constant dollar inflation", which implies that the artificial inflation was the same dollar amount during the class period. In certain circumstances, it may be more reasonable to apply "constant percentage inflation", which implies the price was inflated by a consistent percentage in the absence of additional disclosures. In other cases, the artificial inflation has evolved based upon the nature and timing of specific misstatements or the inflation varied on a daily basis as a result of information contained in internal documents obtained in discovery. To summarize, the determination of how artificial inflation evolved over the class period is also a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above. Once again, however, all of these loss causation methodologies are class-wide in nature and do not depend on the identity or circumstance of any specific investor.

84.     Accordingly, although I have not been asked to calculate class-wide damages in this report, and such calculations would likely depend, in part, on the completion of discovery, and full development of the case record, based on my expertise and experience in dozens of similar

matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole.

## IX.    CONCLUSION

85.    In sum, every factor analyzed supports my opinion that WWE Common Stock traded in an efficient market during the Class Period. Furthermore, class-wide damages in this matter can be calculated on a class-wide basis using a common methodology.

86.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on October 6, 2020


_____
Chad Coffman