```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK
        -------------------------------:

        HUMBERTO LOZADA, Individually : Case No.: 22-cv-1479
        and on Behalf of all others   :
        similarly situated, et al.,    :
                       Plaintiffs,    :
                v.                     :
        TASKUS, INC. et al.,           : New York, New York
                       Defendants.     : August 20, 2024

        -------------------------------:
```

TRANSCRIPT AND STATUS CONFERENCE HEARING

BEFORE THE HONORABLE GARY STEIN

UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:       BLEICHMAR, FONTI & AULD LLP
                     BY: Joseph A. Fonti, Esq.
                         Thayne Stoddard, Esq.
                         George Bauer, Esq.
                         Benjamin Burry, Esq.
                     300 Park Avenue - Suite 1301
                     New York, New York 10022


For Defendants:      SIMPSON THATCHER & BARTLETT LLP
                     BY:  Jonathan K. Youngwood, Esq.
                          Janet Gochman, Esq.
                          Kelsey Vickery, Esq.
                          Craig Scott Waldman, Esq.
                     425 Lexington Avenue
                     New York, New York 10017


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

    AMM TRANSCRIPTION SERVICE - 631.334.1445

THE COURT:  Good morning, everyone. Mr. Aurora, will you call the case, please.

THE DEPUTY CLERK:  Yes, Judge.

In the matter of 22-cv-1479, Lozada v. TaskUs, Inc., et al.

Counsel, would you please state your name for the record, starting with the plaintiff.

MR. FONTI:  Good morning, Your Honor.

Joseph Fonti, Bleichmar Fonti & Auld, for the plaintiff and proposed class.  With me today are my colleagues, Ben Burry, Thayne Stoddard and George Bauer.  I'll be doing the talking, so they'll be shutting off their cameras, but wanted to introduce them.

THE COURT:  Very well.  Good morning to you.

MR. YOUNGWOOD:  Good morning, Your Honor. Good morning, Counsel.

Jonathan Youngwood, for the defendants. With me in my office, but off camera, are Ms. Vickery, Ms. Gochman and Mr. Waldman.

THE COURT:  Good morning to all of you as well.

So we are here.  Initially, this was scheduled for status conference, but some discovery

AMM TRANSCRIPTION SERVICE - 631.334.1445

disputes have arisen, so we will address those.

I'll start out by asking whether there have been any developments in terms of the parties' own discussions and efforts to resolve or narrow these issues beyond what I have received in the correspondence, which I should state, for the record, includes letters from Mr. Fonti dated August 6th.  They're Document Numbers 97 and 99.

There is an October 7th letter from Mr. Youngwood, Document 100.  There are documents dated August 9th from Mr. Youngwood, Documents 102 and 103.  And there are letters from Mr. Fonti, dated August 12th, Document Numbers 106 and 108.

I don't know if I missed anything, but that's what I seem to have before me.  Obviously, there were some things that were filed which I skipped, which are redacted versions of the same documents that I just --

MR. YOUNGWOOD:  How many meet and confers were there?

THE COURT:  Excuse me?

MR. YOUNGWOOD:  Sorry, Your Honor.  I didn't mean to speak.  Sorry.

THE COURT:  First of all, is that everything I should have?

And, secondly, to get back to my original question, have there been any developments since, I guess, August 12th, in terms of the parties' efforts to work on these issues?

MR. FONTI:  Thank you, Your Honor.  I'll begin.  Joseph Fonti, for plaintiffs.

I believe you summarized what's submitted accurately.  Perhaps one way to look at it is our submission, Docket 99, was responded to by defendants in their submission, which is 102.  And then they made a submission on ECF 100, which we responded in 108.

While we've had communications on other issues, open items that are beyond the scope of the letters, there's no progress made on these disputed issues at this time.

THE COURT:  All right.  Very well.

All right.  I propose we take them up in order; in other words, we first discuss the disputes raised by plaintiffs, which are the issues outlined in Document Number 99, as Mr. Fonti just mentioned and responded to by defendants in Document Number 102.  And I propose we just go through them in the order in which they are presented, starting with the first one, which relates to missing ELT materials.

I have to confess, that's the one I'm having the greatest difficulty wrapping my head around in terms of what the issue is and what the parties' respective positions are.  The other issues seem more clear cut, but this one I'm a little bit at sea on, so I would appreciate guidance from both counsel.

And I'll ask you to go first, Mr. Fonti, I think, at least, for this one, if not for the others.  Why don't you say what you have to say on this only; that is to say on this, this first issue of missing ELT materials.  And then I'll turn to Mr. Youngwood to get the defense perspective.

MR. FONTI:  Thank you, Your Honor.

So this issue with the ELT materials, the executive leadership team materials, is one that's been recurring going back to May.  We actually presented on the same issue before Judge Cronan on May 15th, and then had submissions at the end of May, which resulted in the referral to Your Honor, and then further submissions in June and the hearing on June 18th.

So what is at issue here are the communications that transmitted information to the executive leadership team, attaching reporting, the

reporting itself, so the communications defendants have admitted by e-mail and by chat.  And they made that admission in their ECF 81 back in June.  So we know there were transmission of materials to the ELT members by e-mail and chat.  We know that there were also what are called discussion threads and, presumably, calendar invitations that relate to the ELT's ordinary business, the meetings and communications among the members as members of the ELT.

We also know that there were centralized -- or I don't want to use the word "overly precise," but there were folders maintained on the network at TaskUs that contained reporting.  We provided, and I could walk you through, the exhibits because they're probably the most concrete way to demonstrate what we're talking about.  But they were, at a minimum, what are called ELT monthly metrics.  So those are the metrics that were transmitted to the ELT, and the attrition metrics in particular.

As Your Honor knows, the attrition at TaskUs is central to our case.  It's also central to the company's business, right?  The company makes money by putting people in seats and billing them, not unlike a law firm billing the time that the

people work.  So the attrition of their personnel, the training cost, the hiring cost, the replacement cost, is central to the business and central to customer relationships and to maintaining those customers.  So this is information that went to the ELT.  We allege it.

And if I could walk you through -- if Your Honor has the exhibits in front of you, I could spend a minute just flipping through, showing more concretely exactly what we're talking about.  And I'll say --

THE COURT:  I do have them in front of me.

MR. FONTI:  Good.

And so I do say that there was no dispute that those documents exist, and I believe there's no dispute that they have not been produced.  So those are two things that I don't think we need to argue about.

If I could direct you to ECF 99-2, Exhibit 2 of our submission, you see what might look like a kind of list of short messages.

THE COURT:  Yeah.  Your letter says that -- there's a reference in here to an ELT chat, but you didn't provide a page number, and it's a long document.

MR. FONTI:  I realized that, and it, kind of, sparked my thought that we could go through it quickly together.

But page 13 of 24, you see the fourth message down from Mr. Stephan Daoust.  He's the COO of the company, chief operating officer.  He makes reference there, "I may not" --

THE COURT:  Hold on.  Hold on.  Hold on.

MR. FONTI:  Sure.  Yeah.  13 of --

THE COURT:  I'm on page 13.  Where am I looking on page 13?

MR. FONTI:  The fourth chat down.

THE COURT:  "I may not be able to get everyone on a call, so maybe I will just provide an update in our ELT chat."

MR. FONTI:  Yep.  Correct.

So the indication that there's a ELT chat that exists.

THE COURT:  So you do not -- defendants have not produced any ELT chats?

MR. FONTI:  No, they have not.

When Your Honor is ready, you could turn to the next exhibit, Exhibit 3.

This is from Gretchen Barker, who we understand is effectively the administrative

assistant or chief-of-staff-type person for the CEO. What this document, to our understanding, is, is an automated, automatically generated e-mail that gets sent when Ms. Barker added an item to this, the folder that's indicated, so the ELT Monthly Metrics 2021, with a little icon next to it.  We understand that that's a Google Drive folder.  So there's a folder out there that has the ELT metrics in it, is our presumption.  And if you look at --

THE COURT:  Do you have that document, the ELT --

MR. FONTI:  No, we do not.

THE COURT:  -- Monthly Metrics?

MR. FONTI:  We do not.  We've asked for it.

THE COURT:  In any fashion?

MR. FONTI:  We do not, no.

We do not have the content of the folder. We don't have any documents that purport to be this ELT Monthly Metrics.  And if you look at the bottom -- sorry.  If you look at the next page with the Bates number ending in 0 --

THE COURT:  No.  It's ELT.  This is ELT Monthly Metrics.

MR. FONTI:  Right.

THE COURT:  What reason do you have to

believe that that contains information relevant and responsive to your discovery request; namely, information that relates to attrition or some of the other issues?

MR. FONTI:  We allege that the ELT received monthly reports or periodic reports about attrition, and alleged specifically how the reports are generated and what those reports actually showed at the time.

THE COURT:  Do you have any of those reports?

MR. FONTI:  We do not.  We had it based on former employee information and the fact that, you know, people up the chain provided the reporting up to the ELT.

THE COURT:  Hold on.  Is that --

MR. FONTI:  Excuse me, Your Honor?

THE COURT:  I'm finding it difficult to understand what you're saying.

You don't have any documents reflecting what was provided to the ELT in terms of attrition statistics?  I find that hard to believe.

MR. FONTI:  We do not have the monthly metric reports.  We have some disparate documentation, some e-mails that shows various --

you know, what the attrition numbers were in various contexts, but we do not have the reporting that went to the ELT.  So we have, kind of, some piecemeal communications, kind of as -- by way of analogy, if you said, okay, you know, here is an inventory in the warehouse, well, let's get the inventory list. We don't have the list.  We might have an e-mail saying, hey, the inventory is X, Y, Z for this client.  So we have some disparate data embedded in e-mails that have been produced, but we do not have the reporting that was sent to the ELT.

THE COURT:  You don't have any presentations made to the ELT?

MR. FONTI:  We do not.

THE COURT:  Okay.  Keep going.

MR. FONTI:  At the -- and just as an informational point, how we know that there are discussion threads, which is another kind of Google-specific way of communicating -- if you look at the second page of Exhibit 3, ending in 006, the footer that's generated, we understand automatically, but don't know for certain -- you have received this e-mail because you are a participant in the updated discussion thread.  So there is --

THE COURT:  Which document are you referring to?

MR. FONTI:  This is now still Exhibit 3.

THE COURT:  Uh-huh.

MR. FONTI:  That second page, ending in 006.  There's an automated footer.  And, I apologize, we should have --

THE COURT:  I see it.

MR. FONTI:  -- highlighted this for you off the bat, but didn't have the forethought on that.

Exhibit 4 is, again, another type of -- 99-4 is another one of what we understand is generated by the system.  So Ms. Barker, again, adds something, action item, into the ELT Monthly Metrics 2021 folder or workspace, what have you.

And if you see the note from, as I understand it -- and, again, we haven't questioned anybody on this, but my understanding is Ms. Barker puts in a note to Mr. Sinha and says, "Please, add in the annual attrition here and anything else you'd like to include."  And above that, there's a line, says, "Annual Attrition: Monthly, Year-to-Date Attrition, 35 percent."

So we don't know whether that's a response or that's some other data point, but, clearly,

annual attrition, attrition numbers are part of this conversation and we don't have that.

If you look at Exhibit 5 -- this may be another one of those --

THE COURT:  Okay.

MR. FONTI:  -- one of those automated messages.

So you have -- the subject line says, "Presentation shared with you, 'Attrition Analysis Summary,' last updated 6-23."

And, again, Mr. Sinha shares a presentation, and he has a note to the team, all right?  It says, "The ETF team has started to share some great data on analytics.  My team" -- it's cut off, but "get this weekly and, now, use this to understand attrition better."

Clearly, responsive to attrition.  And he concludes --

THE COURT:  So you don't have this attrition analysis summary in any form?

MR. FONTI:  No, we do not.

So there's -- again, there's an icon with what we understand to be a slide deck.  We don't have that.  The very bottom of the footer, again, says, "You received this because Mr. Sinha has

shared the presentation from Google Slides," at the very bottom. We don't have that either. Yeah.

And we don't have this one. We may have, sort of, as I said, disparate information, disparate slides, but we don't have what's attached here, and we don't have a collection what seems to be in the folders that are stored. And it makes sense, right? This is a big company. They have to have a system for storing, reporting and metrics and analysis and share it among the executive team. And this is confirmatory to the fact that there are places at TaskUs where this information is stored that we don't have a complete collection of -- in many respects, don't have any of it, but certainly don't have a complete collection of the reporting and the presentations.

So that is what we're talking about. We don't have the e-mails. So, again, ECF 81, Footnote 1, defendants say the information was shared with the ELT by e-mail and chat. Don't have those. We don't have calendar invites reflecting meetings.

What they did produce was Excel files, tables that are not what we're searching for and are not a contemporaneous record of what was transmitted

to the ELT.  Those Excels, best I could explain them -- and I'm happy to show them to Your Honor if appropriate or helpful -- it looks like somebody's after-the-fact annotation of various meetings, but not all of the ELT meetings.  And we know there are ELT meetings that are not categorized.

Actually, Exhibits 6 through 9 of our submission are reflective of ELT meetings that are not in the Excel file, and the Excel file does not contain, nor have they provided, a complete body of the presentations, the slides, the reporting, the data that went to ELT.

So I hope that's helpful to explain how fundamental the information is, and the fact that we don't have it and it's the same dispute, unfortunately, that we've been raising since May. At this juncture, I think we need the Court's order on what exactly needs to be produced and when, because Mr. Youngwood said last time that they were interviewing ELT members, they were speaking to people, and that they were going to seek to produce it, and that's over two months ago and it hasn't materialized, nor have we made any progress on finding where this information is and securing it, despite the substantial completion date, now, being

nearly a month away behind us.  So I could pause there for a moment.

One further point, which is, in their letter responding to us, they make the point that they produced 6,500 documents from centralized ELT records or collected from members of the ELT.  That "or" is very material.  Of the 6,500 documents, only, roughly, a little bit more than 200 -- by our count, about 215 documents even mention ELT.  The bulk of that production is best -- we don't know exactly how they came to 6,500, but, by some rough math on our end, are just custodial e-mails of people who are on the ELT.  But, again, those are not -- those e-mails do not provide the information that I just discussed, right?  The monthly metrics, the attrition metrics, the slide presentations, the minutes, the notes, et cetera.

So it is true only so far as the vast bulk of that 6,500 is e-mails of people who are on the ELT, but not the ELT materials.  So we don't want there to be any confusion there.  But I can pause.

THE COURT:  But what do you have by way of ELT materials?  I thought the Excel spreadsheets included hyperlinks, if I am remembering correctly, and you were going to go through and identify some,

or maybe all -- I don't remember -- of the hyperlinks.  And that has happened, I assume, by this point.

And what's in those hyperlinks?  Isn't that presentations made -- doesn't it include presentations made to the ELT?

MR. FONTI:  We have not gotten all the hyperlinks.  We have asked for them.  There are discussions about -- we made those requests.

THE COURT:  Well, there is or is not a dispute over whether they're going to be producing those hyperlinks?

MR. FONTI:  I'm sorry, Your Honor?  Is there a dispute?

THE COURT:  Are they refusing to produce any of the hyperlinks?

MR. FONTI:  I don't know if there's a dispute over producing them, they just haven't all been produced.

THE COURT:  All right.  So they haven't all been produced, but what are they?  What is it?

MR. FONTI:  So those are links to documents.  Again, this Excel file, as I best describe it, seems to be an after-the-fact kind of inventory of some, but not all, meetings, and

somebody's attempt to --

THE COURT:  Some, but not all, of the what?

MR. FONTI:  Some, but not all, of the ELT meetings.  And the hyperlinks are some, but not all, of --

THE COURT:  What do you mean, an "inventory" of the meetings?  Just has a date of the meeting?  That's not what you mean, right?

MR. FONTI:  It has --

THE COURT:  It has material, doesn't it?

MR. FONTI:  It has the date of the meeting, some description of what was discussed, some notation on follow-up items, and, in some occasions, links to documents that pertain to that meeting.  But it is --

THE COURT:  Including presentations?

MR. FONTI:  Again, we don't have all of the links, so some of them may be presentations.  I don't -- can't say for sure.

THE COURT:  But in terms of what you do have, you --

MR. FONTI:  May I just ask my partner, Ben Burry, to make clear whether we have -- what we do and do not have in this respect because I don't want to misstate.

MR. BURRY:  Yeah.  Good morning, Your Honor.

THE COURT:  Good morning, Mr. Burry.

MR. BURRY:  What we have are primarily hyperlinks to things like agendas, you know, Word documents and PDFs, a general list of company goals, things like that.

THE COURT:  Word documents and PDFs; that can be presentations, substantive reports about attrition and other subjects.

MR. BURRY:  But they're not, unfortunately.

THE COURT:  Is that what they are?

MR. BURRY:  They are not, unfortunately. They're not -- they do not include, for example, the ELT Monthly Metrics, which we know from Exhibit 4 includes attrition data.  That's the kind of thing we really want.  There --

THE COURT:  Okay.  But I'd really appreciate it if you described -- don't describe the format of the document: a Word document, a PDF.  I'm trying to get a handle over the content of the material that is in these links, and I'm not getting that so far.

MR. BURRY:  Understood.

A good example is an agenda list of the

meeting, so general topics to be covered at the meeting that, in some cases, are submitted by the ELT members in advance. There's lists of company goals for the year, general company goals, that reference things like being a top Glassdoor company or having a particular attrition rate.

Those are among the company goals that are listed, but there's not further detail about what the metrics and reports the ELT is receiving on the progress towards those goals. For example, Exhibit 4 indicated that Mr. Sinha was uploading specific attrition data to the ELT Monthly Metrics and their progress towards their year goal. So that's the kind of more substantive reporting that we do not have.

THE COURT: Okay. All right. Thank you.

MR. FONTI: And we do not have -- you know, if we are correct, which we think we are, that there's a place -- let's call it a folder -- on the network where the attrition analysis or the monthly metrics are being stored and uploaded, we do not have the content, full content, of those folders and locations, which is how we understand the company maintain those files.

So, again, we have the Excel spreadsheet,

which has what Mr. Burry described, but we don't have the collection that is actually at the company. And there's no dispute that it's at the company and they have it and that it exists and it existed at the time. It's also not in dispute that we don't have it. So I hope that helps clarify.

THE COURT: Okay. Thank you very much.

Mr. Youngwood?

MR. YOUNGWOOD: Thanks, Your Honor. It's difficult, actually, to know where to start. And if you'll forgive me, I'm just going to start broad and then go as narrow as I can to some of these specific things.

Your Honor, as we wrote to you -- and I do these cases for a living -- this case, given its size, has just been stunningly disproportionate in the amount of work we've done. We have logged 10,000 hours responding to discovery requests. There have been 60 exchanges of meet and confer e-mails, 14 meet and confer calls with counsel. We have searched 25 custodians, many over a two-year period, using the search terms that we negotiated and that counsel agreed to, which resulted in the review of more than 300,000 documents.

That's just really high level what we've

done.  And then on top of that, we've, in an iterative fashion, tried to meet plaintiffs more than halfway to give them things that this protocol hasn't pulled.  But we've gotten to a point where the things they're looking for -- and I'll get to the links and everything in a second.  Just because there's an ELT meeting doesn't mean that there's a 50-page PowerPoint.  We've given them what there is and what we're able to reasonably locate.  I think on the last call there was discussions of notes, so we went back to the custodians and we got notes.  We've tried to do everything above and beyond what is already really quite extensive.

Now, some of the issue here relates to how this company and, frankly, today, many companies store their material, which is not designed for future litigation.  So much of the way this ELT material is gathered is through these links.  And Your Honor will recall at the last conference -- and, frankly, it also came up at the conference with Judge Cronan -- the focus was on these spreadsheets and the links.  And we produced the spreadsheets, and then we were asked to produce the links.

Now, under paragraph 4 of the ESI Protocol, in language -- not that it matters.  It's both

sides' language, and it's been so ordered by the Court. But I will say, in language proposed by the plaintiff, to get a link, they need to ask because if we were to produce every single possible link in every e-mail, this would be years and years, and I wouldn't be telling you about 10,000 hours, I'd be telling you about 200,000 hours.

But we have, up to now, notwithstanding the fact that there really needs to be a reasonable requirement on -- reasonableness requirement on what they ask for, we have not said no to producing any hyperlinks that they've asked for, and the only ones we have not produced is when the link itself is purely irrelevant to this case -- and I don't think we have any dispute about that -- or, obviously, if there was privilege in a link. Although, I'm not sure any of the links have led to privilege.

We have produced 225 hyperlinks as of this minute. There is a queue that we are working --

THE COURT: How many?

MR. YOUNGWOOD: 225.

THE COURT: Go ahead.

MR. YOUNGWOOD: There is a queue that we are working through daily to satisfy additional requests. I now float into the more specific, but,

for example, the document Mr. Fonti identified that's Exhibit 3 to his letter and that ELT Monthly Metrics, that's something they asked us for at the very end of July.  It's in line to be produced, but each production requires handwork by the vendor that they charge us more than $100 for each one, but it's also a physical, you know, human-power activity, and you can't just ask for it and get it the next day.  So it's in the queue.

What I will also say, though, about the -- while we're on this specific ELT Monthly Metrics 2021 -- and this is the fundamental, I think, place where we're just missing each other -- that something is called ELT Monthly Metrics 2021 does not mean there is a document like this created weekly, monthly, yearly, or anything.  This is that document.  Mr. Fonti reads it as saying, if you have one thing called ELT Monthly Metrics 2021, that must mean each month you create a new one, or something like that.  That's not the case.  We've looked.  And we will give him this link, but there is no shelf somewhere where the next month's or the prior month's metric -- that's not how it was done.  In fact, if you look at the chain, you can see it's, kind of, coming up iteratively, and somebody's

attaching some data that somebody thinks might be useful to the conversation.

So we have entertained production of every link they've asked for, and we will continue to do it. I mean, not if they ask us for thousands and thousands, but we will continue to do it as long as it's of the pace that it's being done, but there's no shelf to go to. We've gone to the shelf. The shelf, frankly, was the Excel spreadsheets, and that's what's led to production of other things. The e-mails that have hit on search terms have led to identification of other things, and we have never said no. It's just, it takes a little time for each one, and they've sent it to us iteratively.

So that's, kind of, the high level. We have produced most of it, I think, since the last conference; as Mr. Fonti referred to, 6,500 documents that are part of this ELT discussion. The fact that they don't include giant PowerPoints or whatever means they don't exist. It doesn't mean that we've, like, held them back. It's the ELT meeting. As was read to you, we've produced agendas, links to items in agendas, and other stuff.

Separately, Your Honor, we have produced attrition data, like, we've produced raw information

and data on what they believe is a core issue in the case, attrition.  The fact that it doesn't, then, come through an ELT PowerPoint doesn't mean we failed to look for or find the PowerPoint.  So --

THE COURT:  But a critical issue in the case, Mr. Youngwood, and I assume from your perspective, very much as from Mr. Fonti's perspective, is what did the ELT members know about attrition?

MR. YOUNGWOOD:  I understand it's a critical issue for Mr. Fonti, whether -- I think there's a lot of defenses, Your Honor.  But we've followed every step of every -- and I'm not hiding behind a protocol, Your Honor.  I mean, I understand things can start at the beginning of a case and change.  We're trying to be reasonable.  But here's what I cannot do:  I cannot search every hard drive, every centralized file.

We did, for this, do -- we asked our vendor if we, as plaintiffs have asked us, search the entire, like, iCloud-based system, to download it onto a vendor would cost $10 million.  It would cost $800,000 for each month just to hold it, and that doesn't even provide for the cost to search it.  So searching under every rock, we -- let me try to fix

my analogy.

Your Honor, we've searched under the central rocks.  They want us to go and look under rocks that there's no reason to believe has anything.  And we've searched using the terms that they've asked us to do.  And to double-check, we are in the process now -- there is an ELT central drive.  We are searching that to see if there's anything on that that didn't come up through the e-mails and the links and everything else.  And I will tell you, up to now, Your Honor, all we're finding is duplicates.  There's nothing new there.  So they are imagining that there was work being done at this company in a format that wasn't being done.

In terms of the -- Your Honor, I want to make sure I go through the specific points he read.

Oh, the discussion threads.  It's a misunderstanding --

THE COURT:  Well, let's --

MR. YOUNGWOOD:  Yeah.  Wherever you want to go, Your Honor.

THE COURT:  Yeah, because I'm -- why don't we stay on the reports that went to the ELT, is the way I'll characterize this, perhaps, not completely accurately.

How often were there ELT meetings?  Was it, roughly, every month or --

MR. YOUNGWOOD:  Well -- and that is part of the problem, Your Honor.  I think they were, roughly, every two weeks, but they weren't always every two weeks.

THE COURT:  Okay.  Regular meeting.

MR. YOUNGWOOD:  And so one thing I think counsel has asked about is, occasionally, there has been an e-mail or an exchange, a chat, something that says, let's get the ELT on the phone.  Okay.  Your Honor, that may not show up on a spreadsheet because it's not a -- I mean, think of anything in your life.  You could have a group of people who meet regularly and then say, let's get the gang together to have something special.  You might not record that in the same manner or at all, right?  It's an informal, impromptu, ad hoc meeting; you wouldn't necessarily expect it to be on the spreadsheet.  We're not hiding it because counsel can point to the exchange that said it might take place, but the company wasn't sitting there, thinking, someday I'm going to be sued and I have to document every meeting, so I better create a formal record.  It's just not the way any business

operates.

So there are going to be things where ELT members spoke to each other that are not going to be, obviously, on the spreadsheet, but we've given what was contemporaneously created, without any regard to a discovery protocol, and it lists the things it lists.

THE COURT:  Were there regularly scheduled ELT meetings, putting aside the impromptu ones that may have occurred in addition?

MR. YOUNGWOOD:  I'm struggling a little bit over the word "regularly" in the sense, like, was it every Tuesday at 10?  I don't know that.  But they were scheduled frequently, it seems, for much of the year and much of the time period once every -- I'm sorry -- twice every month.

THE COURT:  Okay.  And there were seven members; am I right in thinking that?

MR. YOUNGWOOD:  Hold on one second.

(Discussion held off the record.)

No, Your Honor.  Seven of the original 18 custodians were members.  I think there may have been more members than the seven.

THE COURT:  Okay.  But it includes senior management?

MR. YOUNGWOOD:  Yes.

THE COURT:  And from time to time -- maybe not at every meeting, but from time to time, presentations and reports were presented to the ELT?

MR. YOUNGWOOD:  Thank, Your Honor.

I'm going to use the word "material" because "presentation" and "reports" might have special meaning.  But material was shared with the ELT, yes.  And we have done everything we can to search for that, you know --

MR. FONTI:  Well, that's what I wanted to --

MR. YOUNGWOOD:  -- short of Your Honor looking at, for example, every e-mail all seven of those people ever sent.  We have not done that.

THE COURT:  Yeah.  Well, that's what I do want to press you on because Exhibit 4 talks about an annualized attrition, monthly, year-to-date attrition information being added in -- annual attrition information being added into the -- appears to be added into the ELT Monthly Metrics.

MR. YOUNGWOOD:  So --

THE COURT:  That seems relevant to the case, yes?

MR. YOUNGWOOD:  Well, two things,

Your Honor -- again, this is the same link that we are in the process of pulling and producing.

THE COURT:  I understand that.  I understand that.  But what --

MR. YOUNGWOOD:  And then below that, Your Honor, I think those are just words typed in by somebody.  I don't think the "Annualized Attrition: Monthly, Year-to-Date Attrition, 35 percent" -- those are just -- I think those are -- they may be important words, they may be unimportant words, but they're just words.

THE COURT:  Well, I'm more focused on the words underneath, "Please add in the annual attrition here," okay, being added to an ELT monthly report.  And my question, my concern is, are you telling me that the only way the plaintiffs know that there was this attrition information presented, you know, at this meeting of the ELT was a result of the happenstance of them getting this particular -- I apologize.  I don't know what the communication is, if it's a chat or an e-mail, or what the nature of this communication is.

But whatever this communication is from Ms. Barker, yes, it refers to attrition information being included in a report that went to -- or

metrics that went to ELT, or material, if we use your word.  And, yes, I hear you, that Mr. Fonti can and has asked you for this information.  You're going to go look for it.

But it does seem to me that -- and I'm having a hard time understanding why this is not the case -- that you should be able to locate and produce information like that, irrespective of the happenstance of it being referenced in this particular communication from Ms. Barker.

MR. YOUNGWOOD:  One moment, Your Honor.  I want to make sure I give you the right answer.

(Discussion held off the record.)

MR. YOUNGWOOD:  Here's the answer.  So, first, this document is not in those spreadsheets.  You would not have gotten it through a link.  Those spreadsheets are the most centralized organization that this company kept of this material.  You can think they should have done something different, but that is what they did.  That's their library.  That's their index.  That's it.

This e-mail is an impromptu discussion of data where somebody attaches a file, the ELT Monthly Metrics 2021 that we've been discussing.  As I said, we'll pull it.  I do not believe, and nobody on my

team believes, that there is some centralized collection of documents identical to this on a monthly basis; however, we are in the process now to make sure I'm being as, you know, cooperative as we can, of searching -- I want to make sure I get the name of it right -- the ELT centralized what -- the ELT centralized folder, which, so far, we have not found anything that is not duplicative. If we do, we'll produce it. Assuming the burden isn't too much, we'll double-produce it. They can get the same thing twice.

THE COURT: Is this document, this --

MR. YOUNGWOOD: But no -- I don't know if this document is on that drive or not. I'm just saying if there's --

THE COURT: Because that wouldn't be duplicative. You're not disputing Mr. Fonti's representation that he doesn't have this document. He had to ask for it based on this communication.

MR. YOUNGWOOD: I think what I meant by that, Your Honor, is since we have already agreed to give it to him, he will probably get it faster from the queue it's already in than from creating a new queue. So by the time I do the second thing, it will be duplicative. But he does not have it. I'm

AMM TRANSCRIPTION SERVICE - 631.334.1445

not disputing that.

THE COURT:  But you think he would have gotten it even if there hadn't been this communication from Ms. Barker that referenced it and prompted him to ask specifically for it?

That's what you said.

MR. YOUNGWOOD:  No, I don't know that, Your Honor.

THE COURT:  That's what you just said. That's what I understood you to just say.

MR. YOUNGWOOD:  No.  Well, no.  No, Your Honor, then I misspoke, and I apologize.

High level, on ELT, here's what we've done. We've produced the spreadsheets and we're following the links in the spreadsheets.  And, by the way, Your Honor, apparently some of the links have links, so that creates part of the issue.  So that's all been done.

We have applied to the custodians -- I want to repeat the numbers and the search term protocols -- everything that we agreed to do.  And in this document, it worked because we found it.  We will now produce the link to this.  But I am not aware, Your Honor, of another place that I know I could find it because it is possible, Your Honor,

that this is on that ELT folder.  It's also possible somebody just sat and created it and threw it in the link.  There's no requirement at the company that everything ELT go in one place any more than there's a requirement at this law firm that everything I work on go in one place.

So what I think I'd say to Your Honor is, even though the third part of this is beyond what we agreed to do in discovery, there are three ways Mr. Fonti and I, both -- because I'd like to see this stuff, too -- have a chance of finding this document.  One was by the spreadsheets.  We've done that.  Two is by producing e-mails that hit on search terms.  We've produced the e-mails.  We are now working as fast as we can run to satisfy requests for links.  And the third, which we had not earlier agreed to do, but I am representing to you we will do, is I will search this ELT centralized -- please.  I don't want to say the wrong word --

MS. VICKERY:  Folder.

MR. YOUNGWOOD:  -- centralized folder to see if there's anything at all.  I don't want to say anything else because if we find it twice, we'll just produce it twice.

And is that a problem?  I don't -- hold on,

Your Honor.

MS. VICKERY:  If you want to send it twice, we can.  We can also de-duplicate it.

MR. YOUNGWOOD:  Okay.  Thank you.

We will try not to burden the plaintiff with paper that the computer can say is a duplicate, just like we don't produce two e-mails, you know, we don't produce two copies of the same e-mail if we can avoid it.  So we will apply our standard dedup procedures, but if there's anything that is new through this search that wasn't found through anything else, he'll get that too.  Since we haven't completed it, I can't tell you what it will be.

THE COURT:  Can you describe what this ELT centralized folder is?  Is that the same thing as the Google folders that have been referenced?

MR. YOUNGWOOD:  It is.  It is a Google folder.

THE COURT:  It is a Google folder.  But it's --

MR. YOUNGWOOD:  It is a Google folder, but the Google folders for the company, you know, is the great universe in the sky.  So it is a place -- it is a Google folder, not the Google folders.  It's a Google folder.

AMM TRANSCRIPTION SERVICE - 631.334.1445

THE COURT:  And there's just one folder that is ELT related?

MR. YOUNGWOOD:  It is.  It is one folder that we have identified that is ELT related.

THE COURT:  And how are you searching that?  Search terms?

MR. YOUNGWOOD:  With the search terms, Your Honor.  I mean, I don't -- it's not small.  I don't know how else to do it other than with search terms.

THE COURT:  Okay.  But it includes the agreed-upon search terms?

MR. YOUNGWOOD:  Yes.

THE COURT:  And, remind me, where are you in the -- you've, sort of, just started that process, or you haven't started it yet?

MR. YOUNGWOOD:  No.  We've started it because it's why I'm able to tell you that a lot of it we've already seen before.

THE COURT:  All right.  Well --

MR. YOUNGWOOD:  Your Honor, I'm told we are dead in the middle of it.  It should be fully processed by the end of the week.  I don't know if fully processed will be sufficient for us to have identified everything, and I know it will not be

sufficient for us to have produced everything, but we will know more by the end of the week than we know on Tuesday.

THE COURT:  Now, I certainly think that should be done, but you're doing it, so there's no dispute about that.  I'm not exactly sure why that would not have been done initially, but it gets back to my broader concern, which remains -- which is, are you telling me, in effect, that there are -- there is material that went to the ELT during this time period that includes information about attrition and other issues that are at issue in this dispute, but that given the way the company stores information, it is likely or essentially a certainty that a significant amount of that material is not going to be produced to the plaintiffs because you are constrained by the things that you can search and the things that you can't search.

MR. YOUNGWOOD:  Your Honor, I cannot agree with that statement.  I cannot rule out that there is something.  I cannot agree with the part where you said "significant."  I have no reason to believe that.

THE COURT:  Well, if there are -- and, again, maybe the search of the centralized folder

will bear more fruit, but it doesn't seem right, as a general matter, that documents like the kind that are referenced in Exhibits 3 and 4 will only be provided due to happenstance.

MR. YOUNGWOOD: Your Honor, I guess I respectfully disagree. It's not due to happenstance. It's due to applying search terms.

Take it out of the attachment realm. If you're in any case and you're doing a search over 25 people, over two years, you're going to apply search terms, and the search terms are going to hit on, if you've done it right, most of the relevant documents. They are never going to hit on all of them. It's impossible because sometimes human beings will find ways to describe things that the search terms didn't pick up.

THE COURT: I understand that. But the actual underlying document here, the Monthly Metrics document, as I understand what you're saying, didn't hit on any search terms, even though it probably has the word "attrition" or other search terms because you have no way of searching those documents.

MR. YOUNGWOOD: The way we have of searching those documents is only to search the centralized folder, which we are now doing. And the

plaintiffs have known this all along, Your Honor.

THE COURT:  Where else would they be; could they be?

MR. YOUNGWOOD:  They could be -- somebody could have created something on their computer and simply attached it and sent it.  They might have temporarily saved it locally.  I mean, Your Honor, it's like -- I hate to keep using the analogy of my law firm or me, but I create documents all the time. I send them to people, and the only place they exist are in the e-mails.

THE COURT:  Yeah.  And if you want to find it, you do a search.

MR. YOUNGWOOD:  You do a search of my e-mails.  That's correct.

THE COURT:  Yeah.  Okay.  And if it hits on a search term, you get the document; if it doesn't, you don't.  Absolutely, sometimes there are cases where, you know, there's responsive material, but the search term is not in it, for whatever reason, or the word was misspelled and it doesn't come up, and that's, sort of, the hazards of document production in our age.

But I do want to get back to the point that I thought I understood you to be saying that there

are -- and this is what I want to make sure I understand -- that there are documents -- there's a universe of documents out there that really aren't being searched through search terms that may have responsive material because if that wasn't the case, this Monthly Metrics document should have triggered. Not Ms. Barker's, you know, e-mail commenting about it, but the Monthly Metrics document itself should have been in the universe of documents you were applying the search terms to, but it sounds like that's not the case.

MR. YOUNGWOOD:  Your Honor, it's no more or less the case than if somebody linked to a news article or linked to something on somebody else's site.  I mean, it happens today all the time.  It is an artifact of using this -- which, you know, not all businesses use, but increasingly many businesses, you know, operate by links.  It's not designed, you know, so that you can have securities litigation three years later.

THE COURT:  That's not really an excuse.

MR. YOUNGWOOD:  It's not an excuse. There's no excuse, Your Honor.

Your Honor, we've searched using the tools that are available to us, at great expense.

THE COURT:  Well, let me ask Mr. Fonti before we move on to -- still on this first issue, but things like ELT chats and discussion materials.

In terms of the material that went to the ELT, Mr. Fonti, having heard what you've heard, including, importantly, that there is an ELT centralized folder, a Google folder, which is now going to be encompassed by the defendants' search, what else would you like them to do?

MR. FONTI:  Your Honor, kind of, processing what we've heard in real time because it's the first time we've heard about an ELT centralized folder.  I think they've succeeded in turning this discovery process on its head.  Rather than defendants fulfilling their obligation to search -- speak to their clients, figure out where the stuff is, and search for the stuff, to put it in very simple terms, they've turned it on us.

And Mr. Youngwood, I think, gave the right example.  When you have ESI Protocol that says, links should be identified and produced on request, you're talking about news articles or links to the website.  We did not know, and they never told us during the ESI negotiations, that TaskUs operated in this Google environment, where -- unlike the

Microsoft environment, where just about everything gets attached to an e-mail, the way that the company operated was through links. So just as a threshold matter, you know, they are now using this protocol as a sword when we were not told that that is how the documents were circulated among people at TaskUs.

And today, Google has a tool to extract links seamlessly so that -- also to use one of Mr. Youngwood's phrases -- they can comport with modern-day litigation and produce. So I just want to make that point. But they have turned the discovery process on its head.

You're absolutely right, that the way we got to this is through happenstance, but also through persistence in that, since May, this very same issue has been raised with the Court. And each time, Mr. Youngwood has made representations to the Court that they're doing searches and they're looking here and looking there. And today, four months after we started this dialogue, we find out for the first time that there's this ELT centralized folder.

And you know what? It's a bit shocking. It's the first time we hear it. But it makes

complete sense because TaskUs, like every other company, is going to have a place where it keeps their important information. And now, suddenly, it is searchable and it can be collected, despite the fact that the discovery cutoff substantial completion was just about a month ago.

So I'm very concerned, right, that they have not looked where they should have looked. They've tried to turn the tables and make it a -- put the burden on us to identify things in a piecemeal fashion rather than fulfill their obligation. And the things like the chats, which we'll get to in a moment, things like the attrition reporting and the monthly reporting, you know, it's yet to be seen what exists and what doesn't.

And what I think we need right now is a court order specifically instructing the defendants to search centralized files. One thing they refuse to do is to search the personal Google Drives of the custodians. So I don't know how the Court operates, but every law firm that I'm familiar with and company I'm familiar with, having done this for over two decades, individual users have a folder. So there's a Joseph Fonti folder on the network at the firm, and those documents are where -- that's where

I store my personal documents.  They have not searched there.  They refuse to.

What other centralized files --

THE COURT:  What about -- go ahead.

MR. FONTI:  What other centralized files exist?  We now know there's an ELT centralized file.  Is there -- we asked for a listing of centralized files.  They refused to do that as well.  So we're learning things in real time, and it's time that the Court, you know, really require these defendants to do what they should have been doing over the last eight months.  This is Discovery 101.

You have ELT reporting.  It's been the core of this case.  It's in the complaint.  It was a focus of the motion to dismiss.  It was key to the scienter allegations.  It was key to their motion to dismiss.  It's not rocket science.  There's a folder.  You look at it.  And, frankly, you should search every -- you should read -- they say they've reviewed 300,000 documents.  Well, I can't imagine there's that many documents in this folder.  And every one of those documents should be reviewed for responsiveness independent of search terms.  They can't hide behind search terms and protocols when they know they have a trove of documents that are

highly relevant to this case.

THE COURT:  Well, that's like making "ELT" a search term.  I'm not going to do that.

MR. FONTI:  It is a search term, Your Honor.  That's how we got these documents.  It is a search term, and they agreed to that search term.  But --

THE COURT:  ELT?

MR. FONTI:  ELT is --

THE COURT:  In and of itself, without a connector to something else?

MR. FONTI:  Well, with connectors, but it is how we got these documents.

THE COURT:  All right.  So they have an ELT folder.  And now, they're doing the connectors.  They're doing the search terms.  That seems perfectly reasonable to me.

But in terms of what Mr. Fonti said with regard to a search of the personal Google documents for individual custodians, is that something you're prepared to do, Mr. Youngwood?  And why not?

MR. YOUNGWOOD:  Well, Your Honor, I don't have a great sense of what the volume is, so it's hard for me to agree to it.  I'm happy to -- if you are suggesting it -- and I will tell my client you

AMM TRANSCRIPTION SERVICE - 631.334.1445

have suggested it -- we can look into it.  Hold on one second.

(Discussion held off the record.)

MR. YOUNGWOOD:  I'm sorry, Your Honor, I've been corrected.

We have looked into the cost to process -- I'm looking at a document -- to collect, process and review each custodian's Google Drive.  And the rough estimate is we think it will cost a million dollars.

So, Your Honor, I have had this in other cases where plaintiffs have asked for more and more, and the costs -- the Court has ordered that the cost be shifted to the plaintiffs.  If they would like to pay that cost, that would, I'm sure, be more convincing to my client. Perhaps they can narrow it. Perhaps they want to pick one custodian or something like that.  But I can't sit here and simply agree to it.

That is a rough estimate.  I'm happy to dig into it more, but I would ask, before you order that, that we make sure we're not imposing an additional million dollars of cost on the client.

THE COURT:  Is that for all of the custodians?

MR. YOUNGWOOD:  That was an estimate for

all.

THE COURT:  And that's 18 or some other number?

MR. YOUNGWOOD:  I don't know if the person who did the estimate was thinking 18, 19, or we're now up to 21.  And I assume we're not -- we're only talking about the TaskUs people, not the Blackstone people because they don't have an ELT folder.

I'm sorry.  I was told it was done for 17 people, that estimate.

THE COURT:  Okay.  And not all of those people are on the ELT?

MR. YOUNGWOOD:  That might be a way to narrow, Your Honor.

THE COURT:  All right.  I would like you and Mr. Fonti to discuss --

MR. YOUNGWOOD:  That's fine.

THE COURT:  -- if there is a reasonable way of getting, at least, some of that material.

MR. YOUNGWOOD:  Okay.  And, Your Honor, I'm sure you don't want counsel going back and forth. I'm not going to try to rebut everything Mr. Fonti said, but the idea that we've hid the ball or anything -- we have been debating the ELT spreadsheets which draw their material from a

centralized folder, whether it was named or not, in April -- since April, since May. It is not a mystery that there are shared folders. And the suggestion that, honestly, Your Honor, we've done anything other, here, than go above and beyond what we've agreed to do is not correct. I'll leave it at not correct.

THE COURT: All right. Let's stay focused on the future.

MR. YOUNGWOOD: Yup.

THE COURT: All right. Is there such a thing as an ELT chat? And can that be -- does that still exist? Can that be searched?

MR. YOUNGWOOD: Yes. So let's do that. And I think it's two related things.

So I think Your Honor is referring to Exhibit 2 and to page 13 that Mr. Fonti referred to. There is nothing that we are aware of called an ELT chat. It is no different, Your Honor, than if I was speaking with my family and we were planning -- I don't know -- a birthday party for my father, and I said to my wife, let's discuss it on the birthday chat, because different people were on it.

It is simply a chat. Again, the search terms have been applied to the chats the custodians

participated in.  If it hit on something, it hit on something.  The fact that says "in our ELT chat" does not mean there's something called the ELT chat.

THE COURT:  What was there -- and forgive my ignorance.

MR. YOUNGWOOD:  Yes.

THE COURT:  You think this does -- you're saying this does refer to an electronic chat of some sort.  You're not saying he means "chat" in the more old-fashioned sense of, you know, when we chat around the conference table.

MR. YOUNGWOOD:  Your Honor, I can't rule out it refers to something more casual.  I think it refers to some sort of electronic communication.

THE COURT:  Okay.  And are you saying those electronic communications have been searched, to the extent you're referring to --

MR. YOUNGWOOD:  Your Honor, they use something called G Chat, and it has been searched for the custodians.

THE COURT:  Okay.  Is it possible, the way I have on my text messages, and everybody else, that there is, like, a group chat that, in this case, may consist of some or all of the ELT members?

MR. YOUNGWOOD:  Well, hold on one second,

Your Honor.

(Discussion held off the record.)

MR. YOUNGWOOD:  So, Your Honor, I think I'm going to give you the same answer I gave.

Yes, it's possible that the ELT members, or some of them, probably changing over time, use the G Chat feature, but there is nothing that we are aware of -- and I only use those words because I've been doing this long enough to know you sometimes learn things, but we have looked.  We have asked.  There's nothing called the ELT chat.

Again, like with me on my phone, my family, you know, we have something, like, labeled "family chat."  I am not aware of a ELT chat.  And, again, this isn't your phone.  It's a different function.  You know, we were able to -- this is not searched from phones.  This was searched from centralized -- well, I want to be careful on that word, given this conversation, but it was searched through G Chat.

THE COURT:  Okay.  Well --

MR. YOUNGWOOD:  But, Your Honor, if I could add --

THE COURT:  Yes.

MR. YOUNGWOOD:  -- even if there was such a thing and one of those seven custodians was on it --

and it's hard to imagine it would be important if one of them wasn't -- we would have captured that in our G Chat search.

THE COURT:  Well, that's what I was just about to ask you about because, while I don't doubt your representation that you've made some inquiries and been told there is no ELT chat, it's a little hard to accept that, given that --

MR. YOUNGWOOD:  Your Honor, I --

THE COURT:  -- this individual referring to an ELT chat.

But to take the point you just made, if any such ELT-specific chat would be embraced by the broader universe of chats that you have searched for the relevant custodians, then it doesn't really seem to matter to me.

MR. YOUNGWOOD:  That's my understanding, Your Honor.  And, again, I am not disputing that people on the ELT chatted with each other.  I'm just telling you what protocols we did, and I don't know a different protocol to follow.

THE COURT:  Okay.

MR. YOUNGWOOD:  The other --

THE COURT:  The other issue related to --

MR. YOUNGWOOD:  The other issue -- well, I

think it relates, Your Honor -- is Mr. Fonti referred to, which appears in some of the exhibits that he referenced, discussion threads.

THE COURT:  Right.

MR. YOUNGWOOD:  The discussion -- there is no separate discussion thread.  If you look at the thing, it's like a footnote.  I don't know if "footnote" is the right word.  But under "Google," it says, "You've received this e-mail because you are a participant in the updated discussion threads."

That's the list that this computer is keeping to decide who gets the e-mails.  It's not saying, you're getting this because you're part of some secret, separate discussion thread that we didn't search.  You're getting this e-mail, Your Honor, because you're part of the mail-group list, would be a different word.

MR. FONTI:  The e-mail group?

MR. YOUNGWOOD:  The e-mail, right.  Those would be words I would use.  Right.  Here, at the firm, we have e-mail group lists.  Your Honor, Google, in their wisdom, calls it discussion threads.

THE COURT:  Okay.  I understand what you're

saying.  Let me stop you there and ask for Mr. Fonti's feedback on the ELT chat and discussion thread issues.

MR. FONTI:  Thank you, Your Honor.

I, kind of, have the same concern, right? We see documents that refer to the ELT chat.  We see documents refer to discussion threads.  We are not putting words in anybody's mouth.  ECF 81, this is the June 5th letter from Mr. Youngwood to the Court, says, "Defendants can now confirm that documents in connection with ELT meetings were transmitted to ELT members via e-mail or G Chat."

The fact that none exist today raises questions that I think we need answers to of why they don't exist today, right, if there was communications.  And that's something that we'll have to explore.

It is concerning that we're getting one snapshot.  You know, Exhibit 3 is an example to one person who's on this discussion thread, and not the other people that are on the discussion thread.  And there just seems to be a real absence of a production of what I think we all know is documents that existed at one point in time.

So, you know, take Mr. Youngwood's

representation they did the search of the G Chats, nothing came back.  But I think this raises other questions why nothing came back.  What happened to the documents if that's, in fact -- if their letter from June 5th is correct, that that's how information was circulated?

But I don't have more to say than this only creates new questions, not really resolving old ones.

THE COURT:  Mr. Youngwood, is that true, that no responsive documents were found in the G Chats?

MR. YOUNGWOOD:  Hold on.

(Discussion held off the record.)

MR. YOUNGWOOD:  We've produced G Chat documents, Your Honor.

THE COURT:  Okay.  And maybe I asked it too broadly.  I don't know if you answered the more narrow question, I guess, which would be, did you produce any G Chats relating to the ELT or materials that went to the ELT?

MR. YOUNGWOOD:  I would have to confirm that, Your Honor.

THE COURT:  Well, yeah.  All right.

Well, as you said before, as far as you

know, there is no ELT chat specifically.  But, you know, it would be of interest whether -- I go back to what Mr. Daoust said, "I may not be able to get everyone on call, so maybe I'll just provide an update in our ELT chat."

But it's -- I can't tell what he's talking about, whether he's talking about attrition, you know, or something else relevant to the lawsuit, or he's just talking about something unrelated.

MR. YOUNGWOOD:  And, Your Honor, that's, sort of, the -- I mean, that's a very large point here.  You know, with the hindsight of a lawsuit, the most important thing in the world to plaintiffs is attrition.  That may not have -- that's an assumption that all the company was doing was talking about attrition.  It's a complicated company.  It may be there isn't a lot on this.  And there's an assumption that all the ELT cared about was attrition, and that's just not true.  So that --

THE COURT:  Yeah.  Well, I understand that. Nobody --

MR. YOUNGWOOD:  The idea that there isn't a lot that hits on this shouldn't be that surprising.

THE COURT:  Yeah, I just wanted to see if this particular comment did relate to, say,

attrition, such that you would expect to have seen a chat on the subject of attrition, but I don't take that from the context of the conversation.

But Mr. Fonti was, you know, I think, absolutely correct to note that it refers to an ELT chat -- same thing with the discussion thread -- to ask about it.  You've now provided answers.

MR. YOUNGWOOD:  I have no issue whatsoever with the questions Mr. Fonti is asking or raising.  My overall issue is, to be honest, Your Honor, the tremendous disproportionate burden that this is creating for my client.  We're not trying to hide anything, Your Honor.  We're just trying to get through this.

THE COURT:  All right.  What else is there to discuss with regard to the ELT materials?

Well, I will raise one thing that I'm still a little bit foggy in my mind, which is, Mr. Fonti seems to be complaining that he can't tell from the documents that have been produced what material was communicated to specific ELT members or ELT members in general.  That does seem like something of importance --

MR. YOUNGWOOD:  So yeah.

THE COURT:  -- to know, you know, what was

received and when.

Is it correct that that information is not in the production?

MR. YOUNGWOOD:  Your Honor, I don't think it's consistently in the production.  I will say that we have search calendars.  So, again, we're searching calendars to look -- although, I don't know that the dates of the meetings are that unclear because the spreadsheet largely tells you.  So I don't know that searching calendars more is the number one goal.

I think Mr. Fonti has expressed a concern that, even though we have produced the underlying materials, he would like the cover note or something by which they might have been circulated, assuming that they were circulated in a way.  And I don't dispute that sometimes they were.

Your Honor, to state the obvious, all the e-mails went through the search terms and they didn't get flagged because they didn't hit on search terms, which, again, points to the fact that what the ELT does and what the company does is so much broader than what this case is about; that's why you're not hitting on everything.

Your Honor, we have come up with something

that I think will be productive, if expensive, but we can look into the cost, and it is this, Your Honor.  Since we have, we believe, identified the documents that relate to the ELT, be it through link or otherwise, and that those documents have unique Google Doc ID numbers, we may be able to search the e-mails with some of those Google Doc ID numbers.  And if all the e-mail says is, you know, e-mail from me to Mr. Fonti, "See link," which is conceivable that it's all it says, but the link is to a Google Document that we know to be associated with a meeting, we may be able to identify e-mails that way, and that might give him what he's looking for.

So we are prepared to look into the -- to work with him.  If he has a better idea, we're open to it.  What we're not going to be open to is a hand search of everyone's e-mail over any period of time because it will -- for reasons that should be obvious.

So we think we can try that, and, you know, frankly, starting with the agendas, right?  You would think that if somebody's getting something, it's including the agenda.  So that is our proposal, Your Honor, that we came up with in preparing for this conference because I understand how it would be

preferable to have a cover e-mail.  Although, do recognize the reason it wasn't produced is because it is nothing that hit on a search term, which means the chances that it actually has substantive information related to the case is low.

THE COURT:  I understand that, by "substantive information," you mean referring to the contents of the e-mail, but it is of substantive consequence that a particular ELT member, or the ELT group in general, did or did not receive a particular document.

MR. YOUNGWOOD:  I agree, Your Honor.

THE COURT:  Mr. Fonti's going to be deposing these witnesses.  He's going to want to lay a foundation that they received a particular document.

MR. YOUNGWOOD:  Yes, I agree with Mr. Fonti.  I agree with you.

THE COURT:  Okay.  All right.

MR. YOUNGWOOD:  So we will try that, Mr. Fonti, and see if it works.

We just -- Your Honor, really, we're trying.  If only I had clients that only did things the easy way in terms of storing stuff for litigation, this would be easier.

THE COURT:  Yeah.  Well, look.  I mean, I'm sure you've been doing a lot of work.  I don't want to get into abstract questions.  But, you know, if there is material, that is at the heart of this case, that exists somewhere in the company, the fact that your client chose to store things in a way that presumably was cheaper, where they can't readily locate it, I don't know that that's an excuse to not producing relevant information.

MR. YOUNGWOOD:  Your Honor, I don't know that it's cheaper.  I think it's a technology company that uses things where they're focused on the business.  I don't know that it's cheaper. It's, I think, in many ways, more dynamic and more useful that you have links to things.

So I don't -- sorry to challenge you on that.  I don't think that's necessarily correct.

THE COURT:  Well, all right, so it wasn't cheaper.  They still have responsive information in their care, custody and control.  And, yes, it doesn't mean that every single scrap of paper needs to be located and produced.  That's not how it works or worked in any era, but it can't be that -- and I'm not saying this is true here -- that the key documents in the case, because of the way a

particular defendant chose to store them, are, you know, unfindable, or unfindable without significant expense.  That means they don't have to meet their discovery obligations.

MR. YOUNGWOOD:  Your Honor, anyway, I think you've said we should look to the future, and I'm happy to look to the future.

Your Honor, the discovery rules have a proportionality and a reasonableness, and we all know that.  And I think I also -- Your Honor, I'm not sure I can accept the assumption that the key documents in the case haven't already been produced.  I think the key documents in the case --

THE COURT:  Yeah.  And I'm not stating that as a fact.  I'm stating that as a hypothetical.

All right.  Mr. Fonti, on the terms of, you know, what was received, documentation reflecting what was received by whom, is there anything you would like to add or request?

MR. FONTI:  Thank you, Your Honor.

Yes.  This is the same request we've been making since May, which is the transmittal communications, whatever form that is, whether it's e-mail, chat, or what have you, the calendar invites that are -- the calendar invites that presumably

were also sent, agendas that were circulated and so forth.

You know, I just don't want to leave unsaid, Mr. Youngwood has repeatedly made points about proportionality, about cost, about work. You know, we have been trying to have a discussion to search for these very core documents that, in my view, are where you start, not where you finish. And to learn today on a call, after months of raising this issue and trying to confer, that they are now finally engaged in looking at that ELT folder, are going to consider the Google Drives, the individuals, and have a mechanism to find the correspondence that transmitted the information, now, in August, when this should have been step one, is quite frustrating. And whatever costs that they've incurred and burden is self-inflicted. They've chosen to go about this in a way that was contrary to what we were trying to achieve, in a way that hasn't been commonsensical or productive.

And proportionality, you know, when you talk about proportionality, it's relative to the needs of the case. And this is a case where the insiders profited almost a billion dollars in offering securities to the class. This is not some

small contract dispute in the hundreds of thousands or even low millions of dollars.  This is a securities class action affecting thousands of people who lost hundreds of millions of dollars.

So I don't think all that rhetoric gets very far, and it, kind of, avoids the point, which is, we're late in the game.  We need to start depositions and would like the Court to order a sequence of events so that we ensure that we stay on track for the November 8th cutoff, and that we start those depositions quickly.  And we'll get to the depositions in a moment, but that we're in a position to start depositions quickly.

THE COURT:  All right.  Thank you.

With regard to calendar invites, is that an issue?

MR. YOUNGWOOD:  Yes, Your Honor.

We have searched by search terms.  The only other choice would be to go by hand.  I am hoping you're not going to order us to do that.  I don't have a great -- and I'm actually not even sure what benefit he's getting out of the calendar invites.  Calendar invite doesn't tell somebody that -- doesn't tell you if somebody attended something, right?  And he already has the list -- the agendas

from the meetings.  So I just don't know -- I don't know how to look for it and I don't know why he needs it.

THE COURT:  Can I just ask, the search for calendar invites, did that include "ELT" as a standalone term?

MR. YOUNGWOOD:  It did not, Your Honor.  It had the same, you know, joinders.  I suppose we could -- I'm just looking at the -- we'll do that, Your Honor.

THE COURT:  Seems simple enough, not that burdensome.

MR. YOUNGWOOD:  Sure.  We can do that.  We can do that.

And, Your Honor, I'm hoping Mr. Fonti doesn't make another speech like the one he made, and I'm not going to rebut it, but I don't agree in any way with his characterization.  I'm sorry to be unpleasant.  I can't have a transcript where I don't say how completely wrong I think he was.

THE COURT:  Okay.

MR. YOUNGWOOD:  Full stop, Your Honor.

About every single thing.  About his characterization of the size of the case, about our behavior.  It was just wrong.

THE COURT:  I probably lead us down a rabbit hole by talking too abstractly.  Let's stay focused on this issue.  But you both stated your positions.  I think the record will be clear.

All right.  Moving on, perhaps, to text and WhatsApp messages, or is there more to discuss on the ELT materials?

MR. YOUNGWOOD:  There's nothing from us further on the ELT, Your Honor.

THE COURT:  All right.

MR. FONTI:  Your Honor, I think it might be helpful just to recap what it is -- a lot has happened, so maybe it might be worth recapping what exactly defendants are committing to do so we have a clear record on that, on the ELT materials.

THE COURT:  It's not a bad idea.

Mr. Youngwood, do you want to give it a shot?

MR. YOUNGWOOD:  I'll try, Your Honor.

I think perhaps going in somewhat reverse order, we will see if there's some technological solution to looking for e-mails or other communication that might have included links to ELT materials as a mechanism of finding the way those materials were distributed.  I want to just say on

that, Your Honor, since I don't know if it creates a huge burden, I want to say, subject to me not discovering that it does.

We are going to search the ELT folder we've been discussing here, the centralized folder. We are going to look into and have -- I think this is a further meet and confer with defense counsel and plaintiffs' counsel, whether we could come to some agreement on a subset of the custodians and whether or not we could search their personal drives using search terms.

One second, Your Honor.

(Discussion held off the record.)

MR. YOUNGWOOD:  That's what this room has, Your Honor.

THE COURT:  There's the calendar invites. You'll do a search for ELT, right?

MR. YOUNGWOOD:  Yes.  And just for the record to be clear, which is not the current search protocol.  We will search for "ELT" alone.

THE COURT:  Right.

Anything else, Mr. Fonti?

MR. FONTI:  I believe that's everything, but let me just confer with my colleagues for a moment.

(Discussion held off the record.)

MR. FONTI:  I think, on the ELT, we would ask that "ELT" be searched as well, as long as, in addition to that, search for the "executive leadership team" spelled out, "executive leadership team" as a term.

MR. YOUNGWOOD:  For the calendar invites?

MR. FONTI:  The calendar invites.

MR. YOUNGWOOD:  That's fine.

MR. FONTI:  On G Chats, was there an additional step going to be taken there?

MR. YOUNGWOOD:  I don't know what that was --

MR. FONTI:  To confirm that there weren't any -- in fact, any responsive G Chats.

I think there's some ambiguities whether -- we don't have responsive G Chats on ELT.  But you made some representations that I think were subject to confirming, so we'd just like to confirm that.

MR. YOUNGWOOD:  Sorry to have a colloquy with Counsel, Your Honor.

I thought what I said to His Honor is -- he asked me, have we produced any G Chats related to ELT?  I responded, we've produced G Chats, and I didn't know if we'd produced them related to ELT.

AMM TRANSCRIPTION SERVICE - 631.334.1445

So we've produced whatever we've produced. I will certainly go back and confirm we've looked everywhere we've told you we would look, if that is helpful.

MR. FONTI:  Okay.  That would be helpful. Thank you.

MR. YOUNGWOOD:  Okay.

THE COURT:  All right.  Thank you, both.

All right.  The text and WhatsApp messages. Am I correct that there is no longer a dispute with regard to Mr. or Ms. Reses?

MR. FONTI:  I think, Your Honor, they have produced -- they did the searches and have confirmed the extent of production with respect to Ms. Reses.

MR. YOUNGWOOD:  Okay.  So --

MR. FONTI:  The dispute lies with the others.

MR. YOUNGWOOD:  So, Your Honor, if helpful, I can give you an update on where we are here.  Some of it, frankly, updated as of yesterday.

With respect to Mr. -- so we have produced responsive messages for Weir and Sekar.  We've confirmed that there were none for Reses.  We have located messages for Mr. Maddock.  We are running search terms.  We believe there are at least some

responsive messages.  And I don't know if we can produce those this week or next week, but we can produce them in August.

The three remaining are the Indian-based individuals: Kumar, Dixit and Mehta.  As I have told counsel and told Your Honor, retaining a vendor in connection with this was, for reasons I can't fully articulate, but related to the nature of it, time consuming.  We have now reached agreement with a vendor.  We will move expeditiously, assuming availability of the individuals this week and next week to collect from their devices.  And I would anticipate, if that goes well -- and I really do -- perhaps more than anything else, I am caveating here because none of this has gone smoothly or quickly. We would expect to be able to produce those messages, if any, for the first week of September.

THE COURT:  Are there hit reports that you have already for those three and --

MR. YOUNGWOOD:  No.  I don't actually -- the vendor has been engaged.  We have not -- the vendor has not yet analyzed the phones, so I don't have those hit reports yet.  I certainly have them for Weir and Sekar.  Reses, the answer is zero. Maddock, I don't know if we have the hit reports

yet, but we would by the end of the week.

THE COURT:  All right.  On Maddock -- so, as I understood it, I think, from Mr. Fonti's letter, he had been told at one point that those -- there were none because they were lost or destroyed. Now, you're saying, what, that some were lost and destroyed, but you found some others?  Or --

MR. YOUNGWOOD:  No.  Well, we were able to find a different device that was -- you're getting beyond my ability, Your Honor, but through a different device.  The device has material from the time period.  I cannot represent to you that it has the whole time period.  The analysis will show that. I do believe it has material predating the IPO.

THE COURT:  Predating the?

MR. YOUNGWOOD:  IPO.

THE COURT:  Oh.  But there was some other device or source of messages that was lost or destroyed?

MR. YOUNGWOOD:  Your Honor, again, I want to be careful not to testify for Mr. Maddock or reveal anything, but, like most of us, he has multiple devices, and they have different settings on them.  And we have located a device that had a setting that has enabled us to recover material, as

opposed to some other devices he had that didn't permit that technologically. So we -- I cannot tell you if the stuff's going to be responsive. I can't tell you it exists.

Do we know at least some of it's responsive?

We believe at least some of it's going to be responsive. And the only reason I hesitate, Your Honor, because the truth is -- and this, again, gets to the burden, and it gets to some other stuff we're going to have to discuss, maybe -- Your Honor, for Weir and Sekar and Reses, we collected 13,000 messages. 100 of them were produced because only 100 of them hit on the search terms and were responsive. And so it may well be that Mr. Maddock, as well as Kumar, Dixit and Mehta -- even once we do this very time-consuming, very invasive, very expensive exercise, I don't think we're going to find much because, again, they weren't texting daily about attrition.

THE COURT: All right. It'll be what it'll be, but you're just describing the normal process of looking through electronic devices. So, of course, you collect loads of materials, and then you run search terms. There isn't necessarily a huge

expense associated with the collection.  In any event, it is what it is.  That's the only way to do it.

MR. YOUNGWOOD:  Of course, Your Honor.

THE COURT:  You're not winning too many brownie points with me by saying you collected 13,000 messages.  I don't understand the relevance of it.

MR. YOUNGWOOD:  Well, Your Honor, I actually misspoke.  We collected many more than 13,000.  13,000 hit on the search terms, and we had to read each of the 13,000 to produce the 100.

THE COURT:  Ah.  That's different.

All right.  That's different.  That's not what you said.

MR. YOUNGWOOD:  But, Your Honor, this does relate, perhaps, to other discussions because I will say, Your Honor, in a securities case, pulling people's phones is reasonably unheard of, and it's because it is highly unlikely to lead to discoverable or admissible or relevant information, and I actually think the exercise we've pursued here has shown that.

And one of the issues here is they want to now have us search phones of people who they've now

decided to serve subpoenas on and who are either current in one case and former in others. And that is a renegotiation of something that we presented both to Judge Cronan and to you.

And so I don't know if we're going to get there now because that's one of our issues, but it is an issue, and it is why I raise it, Your Honor, even if I didn't win brownie points.

THE COURT: All right. Well, let's get to that when we get to that.

All right. Mr. Fonti, what would you like to tell me in light of what Mr. Youngwood just said on the subject of text and WhatsApp messages?

MR. FONTI: I think this is another example where we think we need the Court's order as to the next steps and the timing. The June 27th agreement among counsel of ECF 92 represented and agreed -- it was agreed to by myself and Mr. Youngwood that -- for first point, that Mr. Maddock's, among others' -- his messages were going to be produced by June 28th. We got a hit report the next day indicating zero hits for Mr. Maddock. And it wasn't for our effort to try to unpack what that meant, zero hits, we would not have discovered that, at least on the device that was searched, evidence had

been destroyed, or it didn't exist anymore.  The texts didn't exist.  We now hear -- and we saw for the first time in their letter -- that they believed that there were some texts found.  Now, we just learned on the call for the first time that it was on a different device.

It's a bouncing ball, and we think we need some definitive guidance from the Court on what needs to get done and when.  Maddock's texts need to be produced immediately.

As to the directors in India, likewise, that agreement, ECF 92, said that production would have been done by July 26th.  Hasn't happened.  They just now are getting around to hiring the vendor.

THE COURT:  And the hit reports would have been provided by July 11th.

MR. FONTI:  11th.  Exactly.

THE COURT:  And you still have not received any hit report?

MR. FONTI:  No.  And I don't think Mr. Youngwood has either.  So we're really behind.

Actually, in my experience, text messages are often the very best evidence in cases like this, where communications happen a little bit less formally and among people in different -- you know,

sort of, different context than from formal e-mail, so they can be highly relevant. And you don't need hundreds of highly relevant documents, you just need a handful to make a case. So I think that the proportion numbers are not really quite -- they, kind of, miss the mark. What the content is, is what matters.

So I think a court order setting a deadline -- give them the benefit of the doubt, you know, second week of September. They said they could do the first week. Let's give them the second week of September to get the production complete for the directors: Dixit, Mehta and Kumar. And, frankly, I think Maddock's should be sooner.

And I didn't say it earlier with respect to the ELT productions, but I think some court-ordered deadlines there could help move things along. Same time frame, you know, next three to four weeks.

THE COURT: Yeah.

Do you expect any difficulty in producing the text messages and WhatsApp messages by the second week of September, Mr. Youngwood?

MR. YOUNGWOOD: I don't anticipate any difficulty with respect to Mr. Maddock. I am not the one collecting them, Your Honor; otherwise, I

had told you I thought we could do it by the first week of September.  I certainly think we can do it by the second week of September.  I'm not the one collecting them.  I don't know if there will be further technical difficulties, so it's very -- I can't agree, you know, in blood that something's going to be done that hasn't been done yet, but I think --

THE COURT:  But what is --

MR. YOUNGWOOD:  -- it's a reasonable timeline.

THE COURT:  What is the excuse for why the promise made in the June 27th letter was not kept?

MR. YOUNGWOOD:  It proved extremely difficult to retain a vendor that was satisfactory to all the security issues and other things that, you know, I think we raised that are associated with collecting things in India.

You know, the underlying point, Your Honor, is if all these things had were simple TaskUs texts, this wouldn't be that big a deal.  You're talking about people's personal phones.  You're talking about directors, in part, who have multiple lines of business.  TaskUs is a portion of what they do.  And that is personal stuff, so there was a high level of

concern over getting the right vendor and doing it correctly.  That is it, Your Honor.

THE COURT:  All right.  Well, let's try to get those by the second week of September.

MR. YOUNGWOOD:  Yes, Your Honor.

THE COURT:  Moving on to the next issue, which is the plaintiffs' request for more than ten depositions.

Mr. Fonti, it may or may not be that you have -- there would be good cause to order more than ten depositions in the securities class action, but you have to make a showing.  I don't believe you have made a showing.  I would refer you to Judge Cronan's opinion in a case called *Brunckhorst v. Bischoff*, 2022, Westlaw 6991285, October 12, 2022. That explains my view where you have fallen short, but I will hear from you on it.

MR. FONTI:  Thank you, Your Honor.

So we have presented to the defense a total of 16 names.  There are nine defendants, named defendants here, so that gets us very close to the ten limit.  We've given the defendants 16 names.  I don't understand them to be objecting to the 16 or taking issue that the 16 are necessary.  And then we said, well, we think given the scope of the case,

AMM TRANSCRIPTION SERVICE - 631.334.1445

20, given that we don't have complete production yet -- frankly, not close to it -- and likelihood that there will be some additional witnesses, we wanted to ask for 20.

We could certainly make a full showing, you know, with documentary support as to the six additional that have been currently named.  Happy to do that if necessary.  But we didn't understand the defense as objecting to the six additional that we put forth.  We named them.  They know who they are. They're key players.  Some of them are named in the complaint and so forth.

But you're correct; we didn't try to document our showing, in part, because we thought we can get 16 and live to fight another day to get the 20 if necessary, or whatever number we need in addition.  I don't think 20 is a magic number either.  So maybe it's -- maybe it's 17 or maybe it's 25, but we can make a showing at that juncture if we can't reach agreement.

But I do think 16 is a reasonable, fair number, and the defendants have the names, and, I don't think, take issue with who they are.  That's my understanding.  Not to put words in anybody's mouth, but that's my understanding of the dynamic.

THE COURT:  Mr. Youngwood?

MR. YOUNGWOOD:  Your Honor, that's incorrect.  We don't agree to the 16.  We don't agree to all the names.  We've been operating since February 20th of 2024 with a scheduling order that doesn't speak to more than 10.  Part of their argument is there are a lot of defendants, so they need more depositions.  They knew exactly how many defendants there were when we agreed to the scheduling order.

Personally, if I were limited to 10, I wouldn't take all the defendants.  I wouldn't take all the directors.  The directors are in on -- they're not in under a scienter base, so I don't even know what it is exactly they're going to be asking them that's going to advance it, other than -- and I say it respectfully, Your Honor, harassment and driving up costs.

So, no, we don't agree to the 16.  We think they're stuck with the 10.  They should have raised this in February.  There is nothing that they have learned about this case that they didn't know in February that would suggest that they have to go above 10.

THE COURT:  Well, all right, so we have a

dispute.

Mr. Fonti, you're free to make a new application with the necessary showing.  Or attempting to make the necessary showing.  I'm not going to grant it to you now.  I don't think I can on the current record.  I'm not sure I agree with Mr. Youngwood, that you should be stuck, or somehow be deemed to have waived your right to seek more than 10 depositions based on the prior scheduling order, particularly since the defendants have not exactly fully complied with the deadlines in the scheduling order.

So I'll entertain an application for you if you wish to make it.  Hopefully, you will heed what -- if you haven't already, what Mr. Youngwood said about whether it is really the case that you need to depose all nine individual defendants that you have named, but I'm sure you'll take that into account.

MR. FONTI:  Well, if defendants are willing to waive their defenses, we're happy not to take the depositions, but I don't think that's on the table.  So it's a bit out of bounds, I think, to call it harassment when these are people who signed a registration statement and made nearly a billion

dollars off of this transaction, to the detriment of the class.  So I don't have to get further than I need to, but that's not what we're going to do.

THE COURT:  All right.  That brings us to three final issues mentioned in Mr. Fonti's letter of August 6th, the first of which relates to former employee productions.

Is there a remaining dispute with regard to that, in light of Mr. Youngwood's response?

MR. FONTI:  I don't believe there is.  I think they --

THE COURT:  Okay.

MR. FONTI:  As I understand it, they've agreed to produce the custodial files.  We obviously have the issue of the Google -- personal Google Drives of the witnesses, but that's something that was to be conferred on, but I don't think there's an active dispute there.

THE COURT:  All right.  Moving on to the Jobvite issue.

As I understand it, there remains a dispute as to whether the search term should be "Jobvite and Glassdoor" or "Jobvite or Glassdoor."

Mr. Youngwood has stated that, based on their diagnostics, the broader search terms, which

would include the word "or" results in 50,000 hits.

And I wanted to ask you, Mr. Youngwood, is that 50,000 hits for the two custodians that you have expressed your willingness to produce the documents for, and during that time period of 2018 through September 2021 that you are willing to do? Or does that 50,000 pertain to the five custodians that Mr. Fonti proposed over what I take as a longer time period?

MR. YOUNGWOOD:  Your Honor, it's for the two.  And I believe I'm -- hold on one second.

(Discussion held off the record.)

MR. YOUNGWOOD:  And, Your Honor, we've actually already completed the production for those two, if you use the search term phrase that we proposed, which is "Jobvite and Glassdoor."  So we've actually -- we produced that.  It may have been subsequent to the letters going in when the conference got rescheduled.  We've produced it.

But to answer your specific question, 50,000 total would be for both, both of the two additional custodians.

THE COURT:  Do you know roughly how many -- either hit terms?  No.  I'm sorry -- how many hits you got using the "or," and also, how many documents

you wound up producing using "or"?

MR. YOUNGWOOD:  I think you mean using "and," Your Honor.

THE COURT:  I do.  Thank you.

MR. YOUNGWOOD:  Yeah.  Hold on.

(Discussion held off the record.)

MR. YOUNGWOOD:  Your Honor, the hit count was in the hundreds, not the thousands, and the production was obviously a subset of that.

THE COURT:  All right.  And -- all right.  Thank you.

Mr. Fonti, is that sufficient?  And if not, why not?

MR. FONTI:  I think it, kind of, is a bit to the side of the actual dispute.  What's at issue is the programming that was in place in the Jobvite system to promote the Glassdoor rating, right?  And we've been asking for a way to target content of what the programming was at the time.

THE COURT:  Mr. Fonti, I'm sorry to interrupt you, but can I -- just need to put you on hold --

MR. FONTI:  Sure.

THE COURT:  -- all of you on hold for just a moment.

(Pause in proceedings.)

THE COURT:  All right.  I'm back.  I apologize.

Go ahead, Mr. Fonti.

MR. FONTI:  Well, what I was saying is that the dispute over the search terms is a little bit to the side of what's actually in dispute and, kind of, a crude way of trying to get to it.

What we don't have is the programming that was in place on the Jobvite system beginning in 2018, when we allege in the complaint the programming was changed to drive people toward the Glassdoor reviews.

The five custodians that have been identified are people that have had a hand in Jobvite, to date, as far as I could tell, were under -- definitely under 100 documents produced total that hit on these terms for those custodians. So -- and we don't have that programming.

So I don't know if we need to fight over 50,000 hits versus a few-hundred hits.  I think what the heart of the matter is, is we need the company to produce the programming that was in place at the time, and that should exist.  That is the core of our dispute.  So if the search term is the best way

to get there, then they should search all 50,000. They should review all 50,000.  But perhaps there's a better way to get to it.

THE COURT:  Are you saying your team has reviewed the hundred or whatever number of -- these are e-mails?

MR. FONTI:  I believe they were produced in the last few days.  I can tell you what they -- what the count is that has come in.  I don't want to say that we reviewed them all.

THE COURT:  Yeah.  My question is, do you know for a fact, since they only came in recently, that they do not provide you the information you're looking for with regard to the programming as of 2018?

MR. FONTI:  Yes.  The 37 documents that have been produced have not -- do not contain the program.

And the other question is whether the 50,000 hits is de-duplicated against other documents that have already hit.  Is that really a net number, is another question.  But, again, the programming is what we're after.

THE COURT:  You know, one would think -- and I could be wrong about this -- that the kind of

document you're looking for would have both terms, both "Jobvite" and "Glassdoor."

MR. FONTI:  I would think so, too.

And this is, again, kind of, a boil-the-ocean type of approach to discovery.  These are people that are in the defendants' control.  They can interview them.  They can find out where, if anywhere, this program is and where would be maintained.

I don't think we need to do things in such a crude, rough way of just running search terms and reviewing documents.  This is a pretty focused search for programming that I think is at the heart of the allegation.

THE COURT:  Mr. Youngwood, is there another way of getting at this information?

MR. YOUNGWOOD:  Well, I don't think the search is going to get at this information, Your Honor.  So another way would suggest that this is a way.

Your Honor, we've asked for manuals, guidelines; all this stuff, it doesn't exist. Mr. Fonti is now asking for the computer software from 2018.  I think he can go to Jobvite, maybe, for it, but our client doesn't have it, nor do I

understand what he would possibly do with the software if he were to get it in 2024, because I'm sure it wouldn't work on any current computer. I don't have a solution to find something that doesn't likely exist.

THE COURT: Is this something that --

MR. YOUNGWOOD: No, no. You're not going to find software in people's e-mails.

THE COURT: Is this something that witnesses would be able to describe?

MR. YOUNGWOOD: I don't know, Your Honor. Possibly.

THE COURT: Well, Mr. Fonti, they've searched. Mr. Youngwood represents that they haven't found it. You've tried this other method of searching through the e-mails for the search terms. Based on your representations, that that didn't work, do you have any other ideas?

MR. YOUNGWOOD: Your Honor, I'm sorry to interrupt. I misspoke. They have subpoenaed Jobvite.

THE COURT: Okay.

MR. YOUNGWOOD: It's one of their 24 subpoenas.

THE COURT: Well, that's one idea.

MR. FONTI:  Your Honor, we know that the programming existed as late as the spring of 2022, and that they've not, they're not willing to search through April 2022, which will be kind of the most recent iteration of the program.  They cut it off, I think, in February of 2022.  So another way to get there is to maybe look at that period of time when Jobvite was decommissioned and what the state of affairs was at that point.

I don't know -- again, this is, kind of, a little bit of shifting landscape.  I don't know that an attempt was made.  I'm not hearing an attempt was made to find the programming at the company and that it doesn't exist.  If it doesn't exist, they could tell us that.  That's fine.  But I don't think that's what is being said.

MR. YOUNGWOOD:  Your Honor, I'll double-check that we don't have the programming, but even if we found the programming somewhere, I don't know what good it's going to do us.  It's like a piece of software.  It's like giving somebody Microsoft Excel.  And we're going to reverse -- I don't even know what we're going to do with it.

But I will, I think, ask again, but I will confirm that the software isn't sitting somewhere.

And remember, you're talking about the software from 2018, not 2022.

THE COURT:  All right.  Well, I think --

MR. YOUNGWOOD:  So I will go back again.

THE COURT:  I think that's a good idea. I'm not sure how burdensome it would be to produce if it exists, and it may not.  Whether Mr. Fonti can make use of it or not, we'll have to see.

MR. YOUNGWOOD:  Okay.  I will look.  I will look.  Again, I have no idea if it's extractable, if it's present, and it does have to, I think we all agree, go back to 2018.

THE COURT:  All right.

MR. YOUNGWOOD:  Okay.

THE COURT:  The next and last issue raised in Mr. Fonti's letter relates to headcount and attrition data.

Mr. Youngwood, I believe you said in your letter that you hope to complete your production early this week.  That is this week, week of August 19th.  Have you completed it?

MR. YOUNGWOOD:  We actually completed it last week, Your Honor.  It may be -- anyway, we've completed it.  "Yes" is the answer to your question.

THE COURT:  Okay.  Mr. Fonti, any issue

with regard to that?

MR. FONTI:  We've been able to analyze quickly in the last few days, what has been produced are produced not complete, does not actually contain data sufficient to calculate what the attrition rate was.  I think, the data that we've seen so far is data that only shows the names of people who've departed the company.  So it doesn't allow us -- it doesn't give us the denominator, in other words.

So I think we listed it as an ongoing issue.  It's an issue that we're going to have to tackle with defendants.  My colleague, Mr. Burry, has been in communications with the defense on the shortcomings of that data, and I'm sure you'll be hearing more about it in the near future if we can't resolve it, but hopefully we can.

THE COURT:  All right.  Very well.

All right.  We've been at this two hours.  We've now gone through the plaintiff's issues.  There are issues raised by defendants' motion as well.  I am prepared to proceed.  Just want to make sure counsel is prepared as well.

MR. FONTI:  Thank you, Your Honor.  Yes, we are.

THE COURT:  Okay.

The first issue, Mr. Youngwood, that you raised relates to nonparty subpoenas. I did review Mr. Fonti's response with regard to that, with -- the substance of which was, first, legally, he questioned whether you have standing to object. And secondly, he represented that these nonparties are -- my words -- happy as clams to be responding to the subpoenas, and that there's really no issue that they have raised.

So I'll turn the floor over to you.

MR. YOUNGWOOD:  Well, Your Honor, they don't seem that happy as clams because we receive calls, particularly from those of us who -- our clients' customers saying, Why are we getting subpoenas asking for things that we don't have.  It is imposing burden on our clients, which is not a good look for the company.  And that doesn't mean Mr. Fonti isn't entitled to serve subpoenas and relevant information as long as he does it for purposes other than harassment.

But, Your Honor, if I could read from the subpoenas that have gone to each of six of our clients, they ask --

THE COURT:  Is it the same quote that appeared in your letter?  There was a lengthy quote.

AMM TRANSCRIPTION SERVICE - 631.334.1445

MR. YOUNGWOOD:  It is the quote that includes things, Your Honor, like hiring cost and cost to train replacements.  How would a client of TaskUs know that, a Glassdoor rating relative to other BPO companies.  I suggest you ask Glassdoor that, not our clients.  TaskUs' policies and practice regarding Glassdoor reviews.  TaskUs' software platform -- I think we're talking about Jobvite -- that allegedly required new employees to submit a Glassdoor review.

Your Honor, there wasn't even an effort to tailor these subpoenas.  And it is harassment, Your Honor.  I don't want to go back through what we've gone through from the past two hours, but it is simply an effort to get the attention of senior people at my client and make them unhappy about this litigation.

And I will say no one's happy about this litigation, but it's not having the effect that Mr. Fonti and his colleagues desire.  This is harassment, and they need to withdraw these subpoenas and stop serving them.

THE COURT:  Well, that's a pretty serious charge.

There was other requests in these subpoenas

that -- at least that you didn't mention specifically -- that struck me as really non-harassing and seeking the production of potentially relevant information.

Subpoenas are often served very broadly, and then ensues a dialogue between the recipient of the subpoena and the person who served the subpoena, and the subpoenas are narrowed. You have objected so far to the subpoenas on their face.

Do you have any information indicating that when the nonparties have spoken to Mr. Fonti and tried to narrow them, he has been unreasonable in dealing with them?

MR. YOUNGWOOD: Your Honor, I am not part of those conversations, and I have not asked people to give me verbatim summaries of the conversations with Mr. Fonti's office. What I can tell you is where I started, which is, our client has had to entertain a number of phone calls from clients, people that our client relies upon to run their business, trying to understand why it is they've been brought into this litigation, and why they've been brought in with terms that are plainly not applicable to them.

And frankly, at least with the examples I

gave you, I don't think much thought was given as to why they were being sent to these types of organizations.  So I will not -- Your Honor, I cannot characterize the nature of the follow-up phone calls.  If I did, it would be several layers of hearsay and likely inaccurate.  So I don't wish to do all those things all in one statement.

THE COURT:  And do you have any case to suggest that you have standing to make this objection?

MR. YOUNGWOOD:  I don't know that I have standing to move to quash, Your Honor.  I think I do have standing to raise general behavior that does not appear designed to advance the litigation and is having a negative impact on my client.  I will not use the word "harassment" again, but I believe that 24 subpoenas is a lot of subpoenas, and I don't think they were all necessary, and I don't think the terms of them were necessary.

THE COURT:  Mr. Fonti?

MR. YOUNGWOOD:  But I recognize, Your Honor, that the role of a party in moving to quash a nonparty subpoena, absolute privilege allegation, concern which I am not raising.  I understand the limitations of that.

MR. FONTI:  Well, thank you, Your Honor.  I don't take well the accusation of harassment.  We have an obligation to prosecute this case.  Those subpoenas do just that.  The six that Mr. Youngwood seems to take the most issue with -- they keep saying 24, but that includes underwriters, auditors, consultants, BCP entities, which basically forced us to -- who are represented by Mr. Youngwood's team, claim to not have possession, custody, and control of documents held by other BCP-related entities. That's why we issued those subpoenas.

So if we narrow it down to the six customers, which seems to be what the dispute is about -- what the allegation of harassment is about, I think we've articulated it quite clearly in our submission that these clients of TaskUs are hotly focused on attrition.  The attrition directly impacted the customer's business, and that's what you see in the exhibits.  And we can walk through those if that's helpful.

But you have, you know, each of these customers that we issue subpoenas to complaining about attrition, how it's impacting their business, how the customer is removing business away from TaskUs.  So if there's any harm done to the client

relationship, it's not our subpoena, it's what we see in these e-mails, which is there was extremely high attrition cost and burden on these clients as a result of what was happening at TaskUs, and these clients have documents relevant to it.

The Glassdoor request, which is the big quote that is in their letter, is one of -- depending on the subpoena, one of ten or one of twelve requests.  It's one specific to Glassdoor. They, kind of, want to pretend that Glassdoor and attrition are two different things, but they're not. Glassdoor is the public-facing validation of the attrition numbers that are being touted in the registration statement and elsewhere.

So they go -- it's hand in glove.  They promote -- the Glassdoor numbers are in the registration statement, and we have specific allegations about it.  You know, these clients are focused on the Glassdoor rating or how the Glassdoor rating is being achieved or what they're hearing about it.  That's highly relevant to our case as well.

We have cooperation from the subpoena recipients.  We have -- productions have started. Nobody has moved to quash.  Nobody has complained.

Frankly, I don't think anybody loves being in litigation, but no one, other than Mr. Youngwood, has raised these types of complaints. And, you know, we think we're on very, very solid ground to pursue these subpoenas and any other subpoenas that, through the course of discovery, we find are necessary to cooperate.

And we just spent two hours talking about the holes that are in defendants' production. Well, we're entitled to fill those holes, if need be. And we're seeing now, actually, what could be preservation issues, and we're entitled to probe those preservation issues through third-party validation, right?

If we see text messages that are missing between insiders and third parties, well, there's a way to validate that, which is to seek the same discovery from somebody outside the company, and that's exactly what we're doing. It happens in, you know, this type of litigation. Certainly happens in many of our cases where that's an essential part of the prosecution of the case. So we stand firmly behind those subpoenas. We have no intention to withdraw them. We've seen no grounds to even complain about them, let alone ask us to withdraw

them.  So I'll leave it there.

THE COURT:  Well, I'll remind you that discovery has to be relevant and proportional.  And when we're talking about a third party, all the more so.

MR. FONTI:  And, Your Honor, to your question, not to interject, but we have narrowed the subpoenas through negotiation, ongoing discussions, to fit specific needs.  And that is an ongoing process that's been collaborative work with third parties.

THE COURT:  All right.  Well, I would expect nothing less.

All right.  I'm going to overrule this objection, or deny this request that the Court -- I don't know if I'm being asked to quash the subpoenas or exactly what I'm being asked to do.  But, at this point, I don't have a record before me indicating any harassment or impropriety in how the plaintiffs have proceeded to date.  Of course, if any of the subpoenaed nonparties wishes to raise any issues with the Court, they are free to do so after meeting and conferring with plaintiffs' counsel.

MR. YOUNGWOOD:  Your Honor, the only thing I want to just flag, and we are still in discussions

with Mr. Fonti and his colleagues, is several of the subpoenas are not true nonparty subpoenas. One goes to a current employee, Ms. Zimmerman, and three go to recent employees who the company -- and working with the company and the individuals we are representing.

I don't know that we really need to debate this, but this relates, again, to the phones and the texts and the everything. I believe we reached an agreement, with Your Honor's help, and with Judge Cronan's help before, that there would be seven phones searched. It cannot be that they serve, for example, a subpoena on a current employee and try to get around that agreement, or serve it on former employees and try and get around it.

So I'm happy to continue to talk to Mr. Fonti about that. I just don't want your order denying our request to, in some way, state that everything in the rest of the subpoenas is valid and must be produced because we've objected to those subpoenas.

THE COURT: Mr. Fonti, I did have a general recollection -- could be inaccurate -- that there was an agreement that the phone searches would be limited to these seven individuals after

negotiations on that very issue.

So I'm not sure what your current position is with regard to these additional current and/or former employees, but I'm just not inclined to go beyond the seven.

MR. FONTI:  Your Honor, the seven was, as you know, driven by the number of defendants, right? The individual defendants.  The agreement that was signed by Mr. Youngwood and myself specifically says that the parties reserve all their rights with respect to Chats and WhatsApp messages.  The agreement was about the seven individual defendants, but we reserve rights --

THE COURT:  What it says, Mr. Fonti --

MR. FONTI:  Yes.

THE COURT:  -- is, "Plaintiffs and defendants reserve all rights with respect to WhatsApp and text messages, including plaintiffs' right to seek different or additional search terms and parameters for the seven custodians' texts and WhatsApp messages, as well as certain defendants' rights."

It seems to me that if you were intending to reserve some rights to seek this information from additional custodians, you would have included that

in your including clause, and you did not.

MR. FONTI:  Your Honor, the including clause is a limitation on the reservation of rights generally as to WhatsApp and text messages.  If the sentence stopped there, that's what it reserves, the rights as to those issues.  The including was specifically asked of the subject of this agreement, but not in any way we were -- that we could not seek text or WhatsApp messages as to any other defendant or any other third party.

These are third parties.  Standard process.  Issue subpoenas in advance that they -- these are people being deposed.  They're not just third parties that we're seeking discovery from.  These are people going to be deposed, whether they have any personal documents, text, or WhatsApp messages, because they are going to be deposed.

So I think if the sentence stopped at "text messages," you know, the including clause was something helpful on the specific issue of that agreement, which was the seven, not all WhatsApp and text messages, period.  And that is certainly what I did --

THE COURT:  Did you or did you not seek more custodians than the seven from whom text

messages and WhatsApp messages would be collected, initially, initially on negotiation?

MR. FONTI:  That's correct.  Yes, we did.

THE COURT:  And you agreed on the seven?

MR. FONTI:  That negotiation was always focused on the seven individual defendants.  Correct.

THE COURT:  But you just said you sought a broader list of individuals.

MR. FONTI:  Let me ask my colleagues who were closer to those negotiations.

(Discussion held off the record.)

MR. FONTI:  So, yeah, as my reflection was, we asked for the seven individuals at the beginning.  They proposed a different subset.  They added -- rather than the four directors, they gave us four other people who were custodians.  And we said, no.  No, we want the seven individual defendants.

So this was a focus -- from our vantage point, it was always a focus on, we need the individual defendants' text messages as a limiting factor.  We're not intending to depose every custodian.  The subpoenas that are at issue here are people -- are document subpoenas that accompany testimony subpoenas.  And we, at no point, were

waiving our right to seek text messages and WhatsApp messages from people that we're going to depose. It was a different context.

MR. YOUNGWOOD: Your Honor, I don't mean to interrupt, but --

THE COURT: Hold on. Hold on. Hold on, Mr. Youngwood.

And how are they relevant and proportional?

MR. FONTI: They're relevant because these are people who were -- some of them are actually named in the complaint. They're people who received reports, created reports that went up the chain, the people who were responsible for the Jobvite program, and they are the individuals. And so it's relevant to that, and it's proportional to the needs of the case. These are the people actually doing work on the ground.

THE COURT: Do you have any basis to think they have text messages, the personal -- on their personal devices?

MR. FONTI: We are --

THE COURT: You're getting their company e-mails and documents, right?

MR. FONTI: We are, yes.

THE COURT: All right.

AMM TRANSCRIPTION SERVICE - 631.334.1445

Go ahead, Mr. Youngwood.

MR. YOUNGWOOD:  Your Honor, respectfully, I was just going to correct Mr. Fonti.  What he said, it just is not accurate.  They served document requests asking for text messages from everybody, WhatsApp messages from everybody.  We had discussions on that.  We declined.  They came back and they said, how about the seven individual defendants?  We said okay to seven.  We then had the dispute that's now finally resolved, that we said okay to the three executives.  We said, how about we substitute four other people in for the other four, the outside directors?  They said, no.  We, I will say, litigated that and lost it and ended up with the seven.

I will note that one of the four alternatives we offered was Brandy Zimmerman, who they now want to -- now, they want her.  So she was actually offered and they said, no.  We won our seven.  And you have the agreement, Your Honor, that you just read into the record.  It can't be that this gets redone.  Nothing has changed.  It's not like they're pointing to 20 texts from Brandy Zimmerman or 50 texts that are the most relevant, or she's the heart of it, and we know all she did was

AMM TRANSCRIPTION SERVICE - 631.334.1445

text.  They just want more.

And it -- truly, Your Honor, when you look at former employees or current, going to their personal phones -- these are not super high-ranking people.  It is from their perspective -- I will just say, from their perspective -- I will not use the word I used before -- it is upsetting.  I'm going to use that word.

THE COURT:  All right.

Well, go ahead, Mr. Fonti.

MR. FONTI:  Your Honor, just to make the record clear, the document requests that went to defendants went to the individual defendants and to the company, okay?  So when those document requests asked for text messages and WhatsApp messages, they were document requests served on those defendants. The negotiations around custodians was a different matter.  And, as I said before, if you read paragraph 3 and were to place a period at the end of "text messages," that's what that clause means, we reserve all our rights with respect to WhatsApp and text messages.  Period.

The including language is a modification in the context of what was being discussed, which was the defendants' not future witnesses.  So it is

relevant, and it is not very burdensome to collect documents from individuals who are going to be witnesses.  Whether they have physical documents or electronic documents or text messages, that search has to be done on their devices because the devices are going to have to be searched either way.

We have an individual subpoena out to these former employees and current employee for anything they may possess personally that is not at the company.  That is standard operating procedure for deponents, right?  Do they have anything at home?  Do they have anything that is outside the control of Mr. Youngwood and his team?

We're entitled to crosscheck that box.  So their devices need to be searched.  The question is, do they also need to search text messages and WhatsApp?

THE COURT:  Wait.  But you take the position that relevant information on Mr. Maddock's phone and director's is within the possession and control of the company, right?  That's why --

MR. FONTI:  Well, there's two Mr. Maddocks.

THE COURT:  You have an arrangement with the company, that the company is going to search those materials, right?

MR. FONTI:  Right.  Bryce Maddock, the CEO, is a client of Mr. Youngwood's, right, and a defendant.  And the other defendants are within -- yes, are parties to the case.  The third parties, you know, until after we served the subpoenas were we informed that they actually then arranged to represent these individuals, so they now represent them.  And if they have any personal information that is outside of the company's systems, we're entitled to that.  And their devices need to be searched.  And then the question is, as part of doing that search, do the WhatsApp and text messages also come over, to the extent they're relevant?

THE COURT:  I don't believe I'm being asked to rule, and I don't intend to make any ruling as to whether or not you are entitled to any documents from these additional witnesses, including, for example, hard-copy documents.  But I do have before me the issue of whether they are required to produce text messages and WhatsApp messages on their personal devices.  And I rule that you are not entitled to that information.  It is not relevant and proportionate to the issues in this case.  And it was the subject of -- although I don't rely exclusively on that ground, it was the subject of

additional negotiations where you agreed that a more limited number of custodians would have to undergo that particular aspect of discovery.

MR. YOUNGWOOD:  Thank you, Your Honor.

THE COURT:  All right.  Now, speaking of texts and WhatsApp messages, if we are done with the defendants' issues regarding non-party subpoenas, there is, in a classic example of the shoe being on the other foot, a request by defense counsel for text and WhatsApp messages of plaintiffs'.

As I understand it from Mr. Fonti's letter, both -- Mr. Lozada?

MR. FONTI:  Yes.

THE COURT:  -- and the representative of the Oklahoma Firefighters Pension Fund testified under oath that -- and maybe this is not an accurate summary, but my takeaway was they ain't got none.

In light of that sworn testimony, Mr. Youngwood, why are you pushing this request?

MR. YOUNGWOOD:  Well, Your Honor, I think that is a paraphrase, and it's not exactly what they said.  Mr. Lozada said he didn't have anything regarding his purchase or sale of the TaskUs stock. I think the case is broader than that, and he might well have other relevant communications regarding --

THE COURT:  Did he say he had other --

MR. YOUNGWOOD:  Unfortunately, Your Honor, he was not asked.  He was not asked.  He was not asked.

THE COURT:  Okay.

MR. YOUNGWOOD:  And then with respect to Oklahoma, a broad question was asked.  And you will ask me, was something else asked?  The answer is no.

They were asked whether he and everyone else there -- I'm not seeing the exact quote, so now, I am making the mistake of paraphrasing, Your Honor, but whether they used it for business, for work.  And he said, no.

I could tell you, Your Honor, I don't use text for business or work here.  It doesn't mean I've never had one.  And I think what we're simply asking is that plaintiffs' counsel confirm that they have -- I want to make sure I get the right people.

Where are the right people?  Oh.

Well, with respect to Mr. Lozada, and then for Oklahoma, with respect to Mr. Rankin, Mr. Van --

THE COURT:  Mr. Youngwood?

MR. YOUNGWOOD:  -- D-I-N-H -- that they have --

THE COURT:  Sorry.  I don't know if --

MR. YOUNGWOOD:  -- collected the phone. Sorry.

Mr. Lozada is obviously the individual. Then Oklahoma Firefighters, we identified only three people:  Rankin, Van Horn and Dinh -- or, again, I may be pronouncing his last name.  And I believe it's a man, but I'm not actually positive of that -- D-I-N-H -- that they've collected the phones. They've done what we've done.  They've applied search terms.  They've searched them.  If the hits are zero, the hits are zero.

THE COURT:  And what are you looking for exactly?

MR. YOUNGWOOD:  Your Honor, I'm going to be honest enough to tell you that, just as I think the searches on our folks have yielded reasonably close to zero, I may not get much, but if somebody is texting with their stockbroker or texting with another advisor or texting with a friend and indicating in some way that they are not making decisions based on what the theory of this class action is, which is an efficient market, et cetera, et cetera, somebody thinks they see a good deal, if somebody thinks that they have some sort of -- hopefully, not really inside information, but

something that they think is special, that could affect their role in this case at some point.

We still have merits discovery to go. We may need to depose these folks again. Your Honor, I'm going to be honest. Would we have raised this if they hadn't pursued phones? We would have thought about it, but all we're asking them to do is what they asked us to do for seven people at great difficulty. That's the request.

THE COURT: All right. I appreciate what you had to say.

I'm going to overrule the request. I don't think it's relevant and proportionate. There's nothing really to indicate that this would be a worthwhile endeavor. The witnesses have testified, at least in terms of the questions they were asked, which I assume were the important questions, that they did not communicate via text. And in the case of Oklahoma, there is a representation which, in fairness, I didn't ask Mr. Youngwood to respond to. And if he does have a response, I will hear it -- but that they weren't the decision-makers in any event. They had outsourced this to a third-party investment advisor or something like that.

And I appreciate Mr. Youngwood's candor in

acknowledging that they may not -- defendants may not have made this request absent the request for text messages and WhatsApp messages from certain of the defendants.  But I don't view the two as equal.  In a case of this nature, there's a far greater likelihood that relevant information will be found on the executive's text messages and/or WhatsApp messages.

Then with respect to defenses the defendants might raise with regard to information in the plaintiff's possession, if there was some indication, as I believe there was, that there would be relevant information -- I'm sorry -- if there was some indication before me that there were relevant text messages on these, I guess, four individuals' personal phones, that would -- or at least might be different, but I don't have that before me, and I don't think they're similarly situated to the defendants' representatives.

MR. YOUNGWOOD:  Understood, Your Honor.

THE COURT:  All right.  Anything else?

MR. FONTI:  I think we've been through all of the open issues and the letters.  Obviously, as we indicated, there's some open issues that are being discussed, including the data, the Jobvite

idea that we talked about in the Google personal drives.

Is the Court inclined to set another conference and perhaps set a target deadline for production of the text messages and ELT materials, and then maybe perhaps have another conference at some point the week of September 16th, or thereabouts?

THE COURT:  Give me one second.

(Pause in proceedings.)

THE COURT:  All right.  I'm back.  Thank you for your patience.

MR. FONTI:  Thank you.

THE COURT:  I would like to get another status update on this case.  Let's give you some time in September when, hopefully, the various issues, including the text and WhatsApp messages that are being produced will be, hopefully, produced.

So let's say by the end of September, September 30th.  Monday, September 30th, I'd like to have a status report.

God bless you, somebody.

MR. YOUNGWOOD:  Yeah.  Your Honor, I'm actually in a preliminary injunction hearing out of

town on the 30th.  If we could choose a different date ...

THE COURT:  Sure.  Well, how about the 27th?  Are you going to be an --

MR. YOUNGWOOD:  Would it be possible to do, like, the 2nd, Your Honor?

THE COURT:  Yeah, October 2nd.

MR. FONTI:  That works.  That works for me.

THE COURT:  All right.  You know, a joint status report, hopefully, describing how you were -- there were no issues.

MR. YOUNGWOOD:  Oh.  Oh, you would like status -- oh, Your Honor, I think maybe we were both responding to you at the same -- we thought you were setting a conference.

THE COURT:  Oh, yeah.  No, no, no.  Just a letter.

MR. YOUNGWOOD:  Oh, that -- well, 30th is fine, then.  Sorry.  I didn't mean to.

THE COURT:  Okay.  I was wondering, but, you know, I wanted to be respectful.

MR. YOUNGWOOD:  No, no, no, no.

MR. FONTI:  I misunderstood as well.

THE COURT:  I wanted to be respectful.

MR. YOUNGWOOD:  Yeah.  Thank you, Your

Honor.  No, I'm sure we can get a letter out.

THE COURT:  Okay.

MR. FONTI:  Thank you, Your Honor.

THE COURT:  Yes, Mr.?

MR. FONTI:  While we're together, just my colleagues wanted to clarify one thing on the ELT materials, to the extent Mr. Youngwood, disagreed. We're understanding that they're going to attempt to find the correspondence, the transmittal communication, for all of the responsive, relevant ELT materials that they find for us, right?  Not just what's in the spreadsheet.  And I don't think that's what you said, but I just want to be sure that you're going to the ELT folder and that whatever yields out of that, in addition to what's on the spreadsheet, we'd get the transmittal communication.

MR. YOUNGWOOD:  Okay.  So I think I can agree to, if it's on the spreadsheet or it otherwise comes out of this central folder, we will see if there's a corresponding something by searching the Google ID.

What I'm not agreeing to is, we've produced 6,500 documents related to ELT.  I'm not doing it for 6,500 documents.  I'm doing it in the two

AMM TRANSCRIPTION SERVICE - 631.334.1445

categories I identified.

MR. FONTI:  All right.  The 6,500, I think, is to the side of that, of this issue.

MR. YOUNGWOOD:  Just because you said ELT materials, I consider the 6,500 To be ELT, at least related materials.

Okay.  So I'll repeat, spreadsheet, or in this centralized folder that we find and produce, we will search the Google ID through the seven ELT custodians, and presumably -- and then produce to you what we find, assuming it's responsive, which I suspect it would be if we found it.

MR. FONTI:  Thank you.  That clarifies the ambiguity.

Again, thank you, Your Honor.  Appreciate all the time and effort you've put into this.

MR. YOUNGWOOD:  Thank you.

THE COURT:  All right.  Thank you, all.

MR. YOUNGWOOD:  Thanks.

THE COURT:  Enjoy the remainder of the summer.

MR. FONTI:  Yep.  You, too.

MR. YOUNGWOOD:  Bye.

MR. FONTI:  Take care.

0o0

                    C E R T I F I C A T E


     I, Adrienne M. Mignano, certify that the

foregoing transcript of proceedings in the case of

Lozada v. TaskUs, Inc., et al.; Docket #22CV1479 was

prepared using digital transcription software and is

a true and accurate record of the proceedings.



Signature   *Adrienne M. Mignano*_____

            ADRIENNE M. MIGNANO, RPR


Date:        August 23, 2024