# EXHIBIT 1

# Expert Reply Report of Chad Coffman, CPA dated August 23, 2024

## (Unredacted Version Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

HUMBERTO LOZADA and OKLAHOMA
FIREFIGHTERS PENSION AND
RETIREMENT SYSTEM Individually and on
Behalf of All Others Similarly Situated,

      Plaintiffs,

      v.                         No. 1:22-cv-01479

TASKUS, INC., BRYCE MADDOCK,
JASPAR WEIR, BALAJI SEKAR,
AMIT DIXIT, MUKESH MEHTA,
SUSIR KUMAR, JACQUELINE D. RESES,
and BCP FC AGGREGATOR L.P.,

      Defendants.

_____

**EXPERT REPLY REPORT OF CHAD COFFMAN, CFA**

**August 23, 2024**

# Table of Contents

**Page**

I.   **INTRODUCTION** ......................................................................................................3

II.  **SUMMARY OF OPINIONS**....................................................................................4

III. **MR. DEAL FAILS TO ESTABLISH A LACK OF PRICE IMPACT AND THERE IS EVIDENCE SUPPORTING PRICE IMPACT IN THIS MATTER**.....................................8

    A.   MR. DEAL DOES NOT ADDRESS FRONT-END PRICE IMPACT FROM THE ALLEGED MISSTATEMENT......................................................................................11

    B.   THE ALLEGED MISSTATEMENT IS NOT A "GENERAL" STATEMENT .....................12

    C.   THERE IS A CAUSAL CONNECTION BETWEEN THE ALLEGED MISSTATEMENT AND THE ALLEGED CORRECTIVE DISCLOSURE .........................................14

    D.   THE ANALYST REPORTS AND NEWS ARTICLES CITED BY MR. DEAL SUPPORT PRICE IMPACT ......................................................................................16

    E.   MR. DEAL IGNORES EVIDENCE FROM DISCOVERY ██████████████ ████████████████████████.........................................23

    F.   MR. DEAL DOES NOT DEMONSTRATE AN ALTERNATIVE EXPLANATION FOR THE PRICE DECLINE IN THE WAKE OF THE SPRUCE REPORT .................................25

IV.  **MR. DEAL'S DISCUSSION OF THE ALLEGED MISSTATEMENT DOES NOT SUPPORT THE ABSENCE OF PRICE IMPACT** ...............................................28

V.   **MR. DEAL PRESENTS NO EVIDENCE TO DISTURB MY CONCLUSION THAT TASKUS COMMON STOCK TRADED IN AN EFFICIENT MARKET THROUGHOUT THE CLASS PERIOD**..................................................................31

    A.   CAMMER FACTOR 5 (CAUSE-AND-EFFECT RELATIONSHIP) ...................................34

    B.   CAMMER FACTOR 2 (ANALYST COVERAGE) .................................................44

## I.    INTRODUCTION

1.    My name is Chad Coffman.  I am the President of Peregrine Economics, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, litigation.

2.    On May 10, 2024, I submitted an expert report (the "Coffman Report" or my "Report") in this matter, in which I opined on the efficiency of the market for TaskUs, Inc. ("TaskUs" or the "Company") Class A common stock ("TaskUs Common Stock")[1] and the availability of a class-wide damages methodology in this matter.[2]  In my Report, I concluded that the market for TaskUs Common Stock was efficient during the Class Period and that consistent with Plaintiffs' theory of liability, damages in this action can be calculated on a class-wide basis using a common methodology.[3]

3.    Following the submission of my Report, Plaintiffs' Counsel provided me with a copy of the July 19, 2024 Expert Report of Mr. Bruce Deal (the "Deal Report").  I have been asked by Plaintiffs' Counsel to review and respond to the Deal Report.  My responses are set forth in this document (my "Reply Report").  In sum, the Deal Report does not affect any of the opinions expressed in my Report.

4.    In formulating my opinions set forth in this Reply Report, I have relied upon the analyses already described in the Coffman Report, as well as my knowledge, experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts set

---

[1] TaskUs also had Class B common stock, which is convertible to Class A common stock, but is not listed on any stock exchange nor traded on any public market.  (*See* TaskUs, Inc. SEC Form 10-K for the fiscal year ended December 31, 2021, p. 53).

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings given to them in the Coffman Report.  Throughout this report the term "efficiency" refers to "semi-strong market efficiency" as defined in the Coffman Report (¶¶ 17 – 18).  Unless otherwise noted, all emphasis in this Reply Report is added.

[3] Coffman Report (¶¶ 6 – 7).

forth in this lawsuit.  All of the materials I considered in forming my opinions are identified in **Appendix A** to this report in addition to the similar Appendix to the Coffman Report.

5.    My qualifications and rate of compensation for work in this matter were identified in the Coffman Report and I do not repeat them here.  I have attached an updated version of my curriculum vitae as **Appendix B**.

6.    I reserve the right to amend this Reply Report, including to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

## II.    SUMMARY OF OPINIONS

7.    Mr. Deal opines that there is a lack of price impact in this matter, but his analysis is flawed, incomplete, and ignores strong evidence of price impact.  Specifically, he claims that: (1) there is no evidence that the alleged misstatement impacted TaskUs's Common Stock price during the Class Period;[4] and (2) the Spruce Report did not correct the alleged misstatement and there is no evidence that the price decline following its release was driven by the attrition-related discussions in the Spruce Report.[5]

8.    First, Mr. Deal does not meaningfully address front-end price impact of Defendants' misstatements, given that TaskUs's stock price increased 35%—or $8.09 per share—on the first day of trading after the IPO.  Moreover, Mr. Deal does not dispute that there is a statistically significant price decline at the 95% confidence level (as well as beyond the 99% confidence level)

---

[4] Deal Report ¶ 10 and Section V.

[5] Deal Report ¶ 9 and Section IV.

on the alleged corrective disclosure date, January 20, 2022, in response to the Spruce Report.[6, 7] Nor does he dispute that following the publication of the Spruce Report, there was market discussion in analyst reports and news articles about the alleged corrective information contained in the Spruce Report. And while Mr. Deal speculates that two other factors were "potential drivers of the price decline," he does not determine that these two factors actually caused any of the decline (much less all of it) or quantify their impact, if any.[8]

9. There is also a clear economic connection between the alleged misstatement related to TaskUs's "culture" and claimed "advantage on key people metrics," including "low attrition," and the alleged corrective information. Indeed, Mr. Deal's report entirely ignores the Spruce Report's disclosure that "TASK's claim of a superior corporate culture evidenced by below industry standard workforce attrition appear to be highly exaggerated."[9]

10. Furthermore, Mr. Deal attempts to prove a lack of price impact by claiming that analysts during the Class Period did not consider the alleged misstatement to be value relevant because analyst reports supposedly do not contain the exact words of the misstatement. Setting aside the flawed framework of this analysis, at least two analyst reports do contain the exact words

---

[6] At 9:30 AM on January 20, 2022, Spruce Point Capital Management issued an investment opinion on TaskUs. *See* "Spruce Point Capital Management Announces Investment Opinion: Releases Report and Strong Sell Research Opinion on TaskUs, Inc. (NASDAQ: TASK)," *Business Wire,* January 20, 2022, 9:30 AM; "Moderating The Bull Case Content," *Spruce Point Capital Management*, January 20, 2022 (the "Spruce Report"). All times in this Reply Report are cited in Eastern Time unless otherwise noted.

[7] *See* Deal Report ¶ 24: ("On January 20, 2022, the Spruce Report was released, which is associated with a 15.3 percent decline in TaskUs's stock price. According to the event study conducted by Mr. Coffman, expert for the Plaintiffs, this decline is statistically significant after accounting for market and industry movements.");

[8] *See* Deal Report ¶52;

[9] Complaint ¶¶170, 257.

of the misstatement, citing "culture" and "low attrition," and Mr. Deal also ignores Class Period

analyst reports that while not verbatim, use very similar language and discuss TaskUs's attrition

as validating Defendants' claim of a superior corporate culture.

11.    Mr. Deal also opines that I have not demonstrated market efficiency.[10] ███████

███████████████████████████████████████████████████████████████████

███████[11]  Instead, he criticizes my analysis with respect to two (*i.e.*, *Cammer* Factor 2 and *Cammer*

Factor 5) of the eleven efficiency factors I analyzed.[12]  While Mr. Deal criticizes my analyses of

these two factors, he does not even address the other nine factors, and he does not dispute the

results I presented for *Cammer* Factor 2 or *Cammer* Factor 5, ██████████████████

████████████████████[13]

12.    Mr. Deal's critique regarding *Cammer* Factor 2 is restricted to just 16 trading days

during the 154-trading day Class Period when TaskUs was subject to a short-term regulatory

period following its IPO (the standard for all initial public offerings) when no analyst reports could

be published (the "Quiet Period").[14]  This is not indicative of market inefficiency and Mr. Deal

████████████████████████████████████████████████████████████████████

████████████████[15]

---



[10] Deal Report ¶ 11 and Section VI.

[11] ████████████████████████████████████████████████████████████████
████████████████

[12] Deal Report ¶ 11 and Section VI and Coffman Report Section VII.

[13] *See* Deal Tr. 299:2-6 █████████████████████████████████████████
██████████████████████████████████
████████████████████████████

[14] "However, [quiet period] is used to refer to the period of time surrounding the filing of a registration statement during which an issuer of securities must ensure that its offering-related communications comply with the federal securities laws."  *See* "Quiet Period," Investor.gov, available at https://www.investor.gov/introduction-investing/investing-basics/glossary/quiet-period.

[15] ████████████████████████████████████████████████████████████████
████████████████████████████████████

6

13.    Meanwhile, Mr. Deal's criticism of *Cammer* Factor 5 hinges entirely on changing the test design in a way to deliberately dilute the statistical test.  I focused on earnings announcements as events where there is clearly value-relevant firm-specific news that contains the type of information that the economic literature has suggested would often (but not always) be expected to impact securities prices.  Mr. Deal's alternative tests based on including many more events where there was not clearly value-relevant news, as well as a subjective reclassification of days between "news" and "no news" events, does nothing to rebut the results of my test that empirically demonstrates a cause-and-effect relationship.  Mr. Deal does not dispute my finding that statistically significant price reactions followed 91% of TaskUs's earnings announcements.[16]

14.    Finally, Mr. Deal does not address my opinion regarding the availability of a Class-wide damages methodology.  In my Report, I described how the standard and well-accepted out-of-pocket damages methodology can be applied uniformly, formulaically, and class-wide in this matter.[17]  Mr. Deal does not address this conclusion or proposed methodology.[18]  Thus, there is no dispute that damages in this action are subject to a well-settled, common methodology that can be applied to all Class Members.

15.    As a result of the foregoing, nothing in the Deal Report establishes a lack of price impact from the alleged misstatement or disturbs my opinions that the market for TaskUs Common Stock was efficient throughout the Class Period or that economic damages in this matter can be calculated on a class-wide basis based on a common approach and methodology consistent with Plaintiffs' theory.

---

[16] Coffman Report Exhibit 8.

[17] Coffman Report Section VIII.

[18] *See* ████████████████████████████████████████████████

### III.   MR. DEAL FAILS TO ESTABLISH A LACK OF PRICE IMPACT AND THERE IS EVIDENCE SUPPORTING PRICE IMPACT IN THIS MATTER

16.    Plaintiffs allege that the following statement made in TaskUs's Registration Statements was false and misleading:

> The culture and focus on people allows us to retain talent, continuously improve, and gives us an advantage on key people metrics of efficiency, client satisfaction, and low attrition.[19],[20]

17.    Plaintiffs further allege that the false and misleading nature of the statement ultimately became known through a corrective disclosure at the end of the Class Period.[21] Specifically, at 9:30 AM on January 20, 2022, Spruce Point Capital Management issued the Spruce Report.[22]  The Spruce Report contained information about TaskUs's culture and claimed advantage of low attrition, including that "TASK's claim of a superior corporate culture evidenced by below industry standard workforce attrition appear to be *highly exaggerated*" and that a former TaskUs executive stated "the attrition is *significantly worse* [than the Company's claims]."[23]

18.    There is no dispute that the market price of TaskUs Common Stock declined in a statistically significant manner on January 20, 2022.  As I noted in my Report, the event study I

---

[19] Complaint ¶ 170.  *See also* TaskUs, Inc. SEC Form S-1 filed April 12, 2021, p.133; TaskUs, Inc. SEC Form S-1/A filed May 6, 2021, p.140; TaskUs, Inc. SEC Form S-1/A filed June 2, 2021, p. 140; TaskUs, Inc. SEC Form S-1/A filed June 10, 2021, p. 140; TaskUs, Inc. SEC Form 424B4 filed June 14, 2021, p. 143; TaskUs, Inc. SEC Form DRS filed September 17, 2021, p. 139; TaskUs, Inc. SEC Form S-1 filed October 18, 2021, p.138; TaskUs, Inc. SEC Form 424B4 filed October 22, 2021, p. 138.

[20] I understand that "the Court finds that the Amended Complaint sufficiently alleges loss causation with respect to the statements that TaskUs had 'low attrition,'" but dismissed all other alleged false and misleading statements.  *See* OPINION AND ORDER filed January 5, 2024, in HUMBERTO LOZADA and OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM Individually and on Behalf of All Others Similarly Situated v. TASKUS, INC., BRYCE MADDOCK, JASPAR WEIR, BALAJI SEKAR, AMIT DIXIT, MUKESH MEHTA, SUSIR KUMAR, JACQUELINE D. RESES, and BCP FC AGGREGATOR L.P., Case No.: 1:22-cv-01479-JPC., ("Order") p. 59.

[21] Complaint ¶¶ 254 – 260.

[22] "Spruce Point Capital Management Announces Investment Opinion: Releases Report and Strong Sell Research Opinion on TaskUs, Inc. (NASDAQ: TASK)," *Business Wire*, January 20, 2022, 9:30 AM.

[23] Spruce Report pp. 6 and 36.

8

performed (the "Coffman Event Study") indicates that TaskUs Common Stock declined by 14.11%, or $5.02, after controlling for market and industry effects, which is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) with a t-statistic of -2.84.[24]  Mr. Deal agrees, stating: "[o]n January 20, 2022, the Spruce Report was released, which is associated with a 15.3 percent decline in TaskUs's stock price.  According to the event study conducted by Mr. Coffman, expert for the Plaintiffs, this decline is statistically significant after accounting for market and industry movements."[25]  Mr. Deal testified: ████████████████

████████████████████████████████████████████████████████████████

████[26]  Mr. Deal does not dispute the results of the Coffman Event Study.[27]

19.    Furthermore, Mr. Deal performs four of his own alternative event studies (the "Deal Event Studies"), which assume different estimation windows than the Coffman Event Study.[28] The Deal Event Studies end on the day prior to the alleged corrective disclosure, but when I replicate the Deal Event Studies and extend them one day further to January 20, 2022, I find that January 20, 2022 is still statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) under all scenarios (see **Exhibit 1**).

---

[24] Coffman Report footnote 91.

[25] Deal Report ¶ 24.

[26] Deal Tr. 131:9-132:3.

[27] Again, while Mr. Deal makes certain statements regarding the estimation window, he does not go as far as claiming the Coffman Event Study is flawed.  *See*, Deal Report ¶¶ 74 and 77.

[28] In my Report, I explained how for each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (roughly six months).  (*See*, Coffman Report ¶ 50).  While Mr. Deal states that "a shorter estimate window could have been used," he stops short of claiming that the standard and well-accepted 120-day estimation window is inappropriate.  (*See*, Deal Report ¶ 77).

Mr. Deal employs the same parameters as the Coffman Event Study (e.g., exclude dates, rolling estimation, market and industry control factors) in performing the Deal Event Studies; however, his four event studies each assume a 15-day, 30-day, 45-day, and 60-day estimation window compared to the 120-day estimation window I utilized.  I understand that Mr. Deal classifies different news and no-news days in critiquing my analysis of *Cammer* Factor 5, which I address below in Section V.

20.    Despite the foregoing, Mr. Deal argues that the Spruce Report did not correct the alleged misstatement and there is no evidence that the price decline following its release was driven by the attrition-related discussions in the Spruce Report.[29]  To support this claim, Mr. Deal presents four underlying arguments:

(1) the alleged misstatement is a general statement that lacks specificity;[30]

(2) the corrective disclosure does not correct the alleged misstatement;[31]

(3) analyst reports and news articles did not consider the attrition-related information in the Spruce Report as new or value-relevant;[32] and

(4) other confounding factors may have driven the price decline following the Spruce Report.[33]

21.    I understand that it is Mr. Deal's burden to demonstrate that there was no price impact from the alleged misstatement, and he has not done so.  Mr. Deal does not address potential front-end price impact when TaskUs stock began to trade after the IPO.  Mr. Deal's arguments are also flawed because the alleged misstatement concerned key aspects of TaskUs's business, *i.e.*, a purportedly superior corporate "culture" that gave TaskUs an "advantage" of "low attrition." Because of the importance of these issues to investors, analysts, and Defendants themselves, from an economic standpoint, Defendants' misstatement is not "general."[34]  There is also a clear economic connection between the alleged misstatement and the alleged corrective information related to higher attrition and exaggerated claims about TaskUs's superior culture and below-

---

[29] Deal Report ¶ 9 and Section IV.

[30] Deal Report Section IV.A.

[31] Deal Report Section IV.B.

[32] Deal Report Section IV.C.

[33] Deal Report Section IV.D.

[34] Mr. Deal does not even articulate what it means for a statement to be "general" or "generic" as he uses it, but in my view as a financial economist, the statement conveys firm-specific and value-relevant information about TaskUs, and I would not classify it as "general" in my understanding of what that word connotes.

industry-average attrition.   Mr. Deal mischaracterizes the analyst reports and news articles following the Spruce Report that clearly demonstrate that the market was reacting to relevant issues on the alleged corrective disclosure date.   Moreover, he ignores evidence from discovery ███████████████████████████████████.   Finally, Mr. Deal does not establish any alternative explanation for the undisputed statistically significant price decline on the alleged corrective disclosure date, nor does he demonstrate or quantify the impact of the two other factors that he speculates may potentially have driven the stock price decline.   I address these issues in detail below.

### A.   MR. DEAL DOES NOT ADDRESS FRONT-END PRICE IMPACT FROM THE ALLEGED MISSTATEMENT

22.    Defendants made the alleged misstatement in TaskUs's IPO Registration Statement, which became effective at 4:00 PM on June 10, 2021.[35]   While TaskUs Common Stock was priced at $23.00 per share in the IPO, on the first day of trading, June 11, 2021, TaskUs Common Stock opened at $27.55 and reached $31.09 at the close of trading.[36]   This amounts to an increase of $8.09 per share, or 35%, from the $23.00 IPO price.

23.    However, Mr. Deal does not address or analyze the price increase on June 11, 2021, and therefore cannot conclude there was no front-end price impact from the alleged misstatement. Mr. Deal testified ████████████████████████████████████████████:



---

[35] Notice of Effectiveness of Form S-1 filed by TaskUs, Inc. (filed June 11, 2021 12:16 AM, effective June 10, 2021 4:00 PM) https://www.sec.gov/Archives/edgar/data/1829864/999999999521002298/xslEFFECTX01/primary_doc.xml.

[36] "TaskUs, Inc. Announces Pricing of Initial Public Offering," *GlobeNewswire*, June 10, 2021 and S&P Capital IQ.



.[37]

24.    Despite performing no analysis, Mr. Deal testified ██████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ ████[38] But

Mr. Deal ignores that TaskUs Common Stock first publicly traded on June 11, 2021, which was

the first time its market price could react to and fully impound the information contained in the

Registration Statement.  On that date, TaskUs Common Stock opened at $27.55 (19.8% higher

than its $23.00 IPO price), then increased to close at $31.09 (35% higher than the IPO price).[39]

25.    In addition, as detailed below, there is evidence that ██████████████████



████████████████████████████████. Mr. Deal did not analyze this evidence and

how it may have contributed to the $23.00 IPO price and/or the price increase on June 11, 2021.

26.    Thus, Mr. Deal cannot conclude there was no front-end price impact from the alleged

misstatement.

**B.    THE ALLEGED MISSTATEMENT IS NOT A "GENERAL" STATEMENT**

27.    Mr. Deal attempts to claim that the alleged misstatement is "a general and vague

statement that lacks specificity."[40]  He does not offer any specific economic definition of what

constitutes a "general" statement or any economic analysis to characterize the alleged

---

[37] Deal Tr. 118:2-4; 119:11-16.

[38] Deal Tr. 121:7-122:2.

[39] "TaskUs, Inc. Announces Pricing of Initial Public Offering," *GlobeNewswire*, June 10, 2021 and S&P Capital IQ.

[40] Deal Report ¶ 9.

misstatement as such. In fact, Mr. Deal does not opine on what the implications are of a "general" statement; he stops short of arguing that this supposed vagueness indicates a lack of price impact. Nonetheless, I understand that Mr. Deal is likely suggesting that the alleged misstatement made in the Company's Registration Statements is so "general" that it would fall under the *Goldman* opinion. As economists, neither Mr. Deal nor I are in a position to evaluate this claim.

28. While I do not offer a legal opinion, from the point of view of a financial economist, an alleged misstatement that masked the true nature of TaskUs's culture, attrition, and claimed advantage over its business process outsourcing ("BPO") peers, which served as a key differentiator driving a premium valuation for the Company,[41] is not a "general" statement as I understand what that word connotes. Indeed, because TaskUs is in the BPO industry and provides human capital services to its clients, the rate at which employees are leaving TaskUs directly impacts the Company's financials and prospects.[42] Additionally, the BPO industry is known to be plagued by high attrition,[43] meaning TaskUs's claim of low attrition stood in contrast to the norm.

29. As discussed further below, analysts also ascribed "tangible business value" to TaskUs's "culture" and said it drove "lower attrition, and results in higher-quality work and

---

[41] *See*, for example, Complaint ¶ 45: ("Headcount and attrition are key business metrics that are highly material to investors and analysts because they directly impact TaskUs's revenues, profits, and growth prospects. Indeed, the IPO Registration Statement recognized that TaskUs's 'success depends to a significant extent on our ability to attract, hire, train and retain skilled employees' and that the failure to do so 'could have a material adverse effect on our business, financial condition, results of operations and prospects.'"). *See also*, TaskUs, Inc. SEC Form 10-K for the fiscal year Ended December 31, 2021, p. 34: ("***Our business depends on maintaining large numbers of employees to service our clients' business needs***.")

[42] *See*, for example, Complaint ¶ 5: ("Further, profitability depends on retaining employees long enough to recoup the substantial costs of training and onboarding them. In TaskUs's words, 'a significant increase in the turnover rate among trained employees could increase our costs and decrease our operating profit margins.' Confirming that attrition is inherently linked to TaskUs's financial performance, TaskUs listed the Company's ability to 'manage attrition' among its 'Risks Related to Finance and Accounting.'").

[43] *See*, for example, "A Derivative Play on Tech Disruption; Initiate at Overweight," *J.P. Morgan*, July 6, 2021 ("customer care work is typically associated with high attrition rates").

customer satisfaction,"[44] ███████████████████████████████

██████████████[45] ███████████████████████████████████

████████████████████████████████████████████████[46]

30.    In this context, the alleged misstatement that TaskUs had a superior "culture" and "advantage" of "low attrition" provided investors with meaningful information that related to a key business metric, which Plaintiffs claim elevated TaskUs above its BPO peers, and drove a premium valuation for the Company.  In turn, the alleged corrective disclosure specifically noted that "TASK's claim of a superior corporate culture evidenced by below industry standard workforce attrition appear to be highly exaggerated," which has a direct relationship with the alleged misstatement.[47]

31.    Thus, Mr. Deal's claim that the alleged misstatement is supposedly "general" fails from an economic perspective and does not disturb my opinions.

## C.    THERE IS A CAUSAL CONNECTION BETWEEN THE ALLEGED MISSTATEMENT AND THE ALLEGED CORRECTIVE DISCLOSURE

32.    Mr. Deal argues that nothing in the Spruce Report corrected the alleged misstatement. Specifically, he claims:

> [T]he Spruce Report raises three specific attrition-related issues (referred to as "Attrition-Related Issues #1-3"). However, these discussions are either based on information previously disclosed by the Company or other BPO companies, or are not directly connected to the alleged misstatement due to its vague nature and, as such, none of the attrition-related discussions in the Spruce Report correct the alleged misstatement, in which TaskUs referenced metrics and "low attrition."[48]

---

[44] "Pure-Play Disrupting the CX Market; Initiating With an Outperform Rating," *William Blair*, July 6, 2021.

[45] TASK_0016576 at -16585.

[46] Deal Deposition Ex. 4 at -39042, -39045, -39049.

[47] Complaint ¶ 257.

[48] Deal Report ¶ 24.

14

33.    Mr. Deal's assertions regarding how specific quotes from the Spruce Report supposedly did not correct the alleged misstatement do not establish a lack of price impact. As an initial matter, Mr. Deal advances arguments related to loss causation, which I understand is a merits issue that is not to be decided at this stage of the litigation. Moreover, it is undisputed that the Spruce Report contained issues related to TaskUs's attrition rate (Mr. Deal himself defines "Attrition-Related Issues #1-3"). In addition, Mr. Deal does not mention, much less discuss, a fourth disclosure in the Spruce Report: that "TASK's claim of a *superior corporate culture* evidenced by below industry standard workforce attrition appear to be *highly exaggerated*."[49] In light of the Spruce Report's contents, it is economically reasonable to conclude that the Spruce Report reflects new information contradicting the Company's claim of a "culture" that gave TaskUs an "advantage" of "low attrition."

34.    From an economic perspective, the causal connection between the misstatement, the Spruce Report's disclosures, and the resulting stock price decline is clear and logical: Plaintiffs allege that Defendants, in an attempt to secure a premium valuation for TaskUs compared to other BPO companies, touted a "culture" that gave TaskUs an "advantage" of "low attrition." The Spruce Report revealed these statements were false in disclosing that Defendants' claims of a "*superior corporate culture* evidenced by below industry standard workforce *attrition*" were "*highly exaggerated*," and that a former TaskUs executive stated "the attrition is *significantly worse* [than the Company's claims]."[50]

35.    The undisputed statistically significant price decline on January 20, 2022 coupled with the commentary in analyst reports and news articles (further discussed in **Section III.D.**), and

---

[49] Spruce Report p. 6.

[50] Spruce Report pp. 6 and 36.

direct evidence that investors focused on and emphasized these issues, (discussed below in **Section III.E.**), demonstrate clear economic evidence of price impact from the alleged misstatement.

### D. THE ANALYST REPORTS AND NEWS ARTICLES CITED BY MR. DEAL SUPPORT PRICE IMPACT

36.    Evidence from analyst reports, news articles, and event study analysis further indicate that the market reacted to the correction of the alleged misstatements in the Spruce Report.  Mr. Deal asserts that analyst reports and news articles did not find the alleged attrition disclosures in the Spruce Report "new or value relevant."[51]  He attempts to support this with a review of the analyst reports issued from the date of the Spruce Report until the end of the first quarter of 2022, along with a set of Factiva articles from the date of the Spruce Report until two business days after.[52]  Mr. Deal asserts three conclusions from his review:

> a) that most of these analyst reports and articles did not mention the attrition-related claims of the Spruce Report;
>
> b) that none discussed the alleged misstatement;
>
> c) and that none of the analysts revised their evaluation of TaskUs's attrition following the Spruce Report.[53]

37.    Below I explain why Mr. Deal fails to demonstrate that the market did not find the Spruce Report's attrition claims new and value relevant.

38.    The set of reports and articles Mr. Deal analyzes consists of 18 analyst reports and 33 news articles.[54]  Evidence from these reports and articles clearly demonstrates the value of the attrition information in the Spruce Report.  First, Mr. Deal admits that six of the post-Spruce Report

---

[51] Deal Report Section IV.C.

[52] Deal Report ¶¶ 39 and 49.

[53] Deal Report ¶ 40.

[54] Deal Report ¶¶ 39 and 49.

analyst reports discuss the Spruce Report, and two of them specifically discussed the attrition-related information in the Report.[55]  For example, a Baird report from January 20, 2022 comments on several issues, including attrition, raised by the Spruce Report:

> We like TASK a lot on the ***near 10% pullback today triggered by a short report.*** The ***items raised like client concentration, attrition,*** free cash flow generation (weak due to fast growth) are all well known…Several items are quite well known -- Facebook has been ~27% of revenue, FCF dynamics are weak due to fast growth (ramping receivables), ***attrition may be high*** and can be hard to calculate (which is true across the industry).[56]

39.    Similarly, a J.P. Morgan report from January 25, 2022 provided their view on certain issues from the Spruce Report:

> In light of recent investor worries that pushed the stock down 19% since January 19 (vs. SPX down 4%), we maintain our TASK's estimates, and reiterate our investment thesis and OW rating. We dug deeper into various concerns highlighted in the short report, and believe the stock weakness seems overdone as headwinds aren't necessarily incremental to our prior views…***Employee retention. We agree that excluding certain employees from the definition doesn't offer a full picture of employee attrition***, but TASK's definition is consistent with 3 out of 4 BPO peers in our coverage.[57]

40.    The JPMorgan report also noted the "Concern" that "Actual attrition rate, including all employees, would be much higher than reported numbers . . . ."[58]

41.    Regardless of whether these particular analysts thought the market was overreacting to the attrition-related claims in the Spruce Report, they point out that investors did indeed react to the Spruce Report, and specifically mentioned the attrition claims as one of the notable issues from the Spruce Report.

---

[55] Deal Report ¶ 41.

[56] "TaskUs, Inc. (TASK): Short Report Creates Big Pullback; We Like the Stock," *Baird*, January 20, 2022.

[57] "Our Detailed Views on Recent Concerns," *JPMorgan*, January 25, 2022.

[58] *Id*.

42.    Mr. Deal also points to two Factiva articles mentioning the attrition-related claims in the Spruce Report, that further demonstrates that the market *did* react to this disclosure.[59]  He cites a January 20, 2022 Benzinga.com article titled "Why Are TaskUs Shares Trading Lower Today?" which points out that "Spruce highlighted poor financial reporting, including the omission of annual contract value during the IPO process and ***the use of a non-standard definition of annual employee attrition rate, possibly understating the actual turnover***," before stating that shares were trading lower by 17.5%.[60,61]  Mr. Deal also cites a Theflyonthewall.com article that "paraphrased the attrition-related discussions in the Spruce Report." [62,63]  Thus, Mr. Deal's own examples provide evidence of the market reacting to the attrition-related claims in the Spruce Report, contrary to his opinions.

43.    Additionally, while according to Mr. Deal the remaining analyst reports and articles do not mention the Spruce Report specifically, it is still clear that analysts found attrition important. According to Mr. Deal, 15 of the 18 post-Spruce Report analyst reports (over 80%) *do* mention attrition.[64]  Moreover, during the Class Period, beginning with the first day TaskUs analyst reports were available, analysts continuously mention TaskUs's attrition.  Mr. Deal does not dispute this and, in fact, he points out that 26 of 41 (over 63%) analyst reports during the Class Period mention attrition.[65]

---

[59] Deal Report ¶ 50.

[60] *Id*.

[61] "Why Are TaskUs Shares Trading Lower Today?" *Benzinga.com*, January 20, 2022.

[62] Deal Report ¶ 50.

[63] "$26.70 per share. Spruce Point finds evidence that CEO and co-founder Bryce..." *Theflyonthewall.com*, January 20, 2022.

[64] Deal Report ¶ 47.

[65] Deal Report ¶ 63.

44.     Furthermore, Mr. Deal does not dispute the economic importance and value relevance of TaskUs's claimed "advantage" of a superior "culture" and "low attrition." Indeed, Mr. Deal himself states that "analysts viewed TaskUs's employee attrition using a broader framework, which includes . . . building a good corporate culture."[66] Analysts are clear that TaskUs's differentiated culture and low attrition are a key factor in their valuation of TaskUs.

45.     For instance, William Blair notes the "tangible business value" of TaskUs's "culture" and "lower attrition," stating that these factors "differentiate the company" and "will enable TaskUs to capture market share over the long term":

> We believe that TaskUs's employee-centric and start-up–like culture has tangible business value, driving higher attendance, more engaged employees, and lower attrition, and results in higher-quality work and customer satisfaction. Ultimately, we believe that TaskUs's start-up–like culture and desire to disrupt the status quo differentiate the company from other CX service providers and will enable TaskUs to capture market share over the long term.[67]

46.     Another analyst, BTIG, describes how TaskUs's culture and low attrition improve quality, minimize cost, and drive better profitability:

> TaskUs' focus on culture has also led to an increased ability to attract talent, as well as low attrition relative to the industry average. As a result, TaskUs' team of tenured and engaged employees deliver better and more consistent results, minimizing employee cost and improving profitability.[68]

47.     Yet another analyst, RBC Capital Markets, explains that TaskUs's low attrition rate is a "key attribute" to the Company's success in their view:

> We believe **TASK's success will be underpinned by several key attributes,** including its: (1) large and growing TAM, (2) deeply embedded and growing client relationships, (3) cohesive, simple, and reinforcing growth strategy, including geographic expansion and M&A, (4) **leadership in talent**

---

[66] Deal Report ¶ 68.

[67] "Pure-Play Disrupting the CX Market; Initiating With an Outperform Rating," *William Blair*, July 6, 2021.

[68] "Help Me, Help You. Initiating Coverage of TaskUs, Inc. with a Buy Rating and $45 Price Target," *BTIG*, July 8, 2021.

*acquisition with low voluntary attrition rates,* and (5) attractive underlying financial model designed to drive profitability.[69]

48.    Mr. Deal points out that none of the reports after the Spruce Report discuss the alleged "low attrition" misstatement; however, this is completely irrelevant.[70]   Whether analysts tie allegedly corrective information back to the alleged misstatement in a matter such as this is neither a necessary nor standard way of evaluating price impact and Mr. Deal cites to no authority suggesting otherwise.  This is for good reason.  The roles and responsibilities of analysts are to be forward-looking – they largely focus on how newly-released information might change their valuation and forecast of a company's future cash flows to provide investment recommendations to their clients.[71]   Their role is not to evaluate or catalog potential economic causal links between new disclosures and past company statements.

49.    To be clear, I am not opining that analyst commentary is wholly irrelevant, or that it is inconceivable that an analyst might anecdotally refer to prior company statements.  However, Mr. Deal's observation that analysts, in the wake of the alleged corrective disclosure, did not discuss the alleged "low attrition" misstatement verbatim—although they did repeatedly discuss the attrition-related disclosures in the Spruce Report—is neither surprising nor affirmative economic evidence suggesting a lack of price impact.  Analysts are not the arbiters of whether new

---

[69] "Driving the consumer experience in the Digital Economy; initiate at Outperform," *RBC Capital Markets*, July 6, 2021.

[70] Deal Report ¶ 40.

[71] Fernandez, Frank, "The Roles and Responsibilities of Securities Analysts," *Securities Industry Association – Research Reports*, Vol. II, No. 7, August 22, 2001 ("A securities analyst, generally employed by a brokerage firm, bank or investment institution, has the principal task of performing diligent and thorough investigations of specific securities, companies and industries. The results of these investigations are presented as a research report, which serves as a basis for making an investment recommendation. Analysts examine all aspects of the current and prospective financial condition of certain publicly traded companies. These examinations should cover all pertinent publicly available information about the company and its businesses. […] All analysts begin their work by engaging in what is largely a descriptive function: gathering and assessing all meaningful qualitative and quantitative information about a company's past and present, and presenting it in a coherent, readily intelligible manner. After completing what is principally an objective evaluation, *an analyst must then go further, prognosticating and expressing specific judgments of his own about a company's and a security's future prospects*.").

information relates back to prior misstatements, and Mr. Deal's views about the extent to which analysts specifically recited the precise words of the alleged misstatement are not a reliable test for economic evidence of back-end price impact.

50.    In addition, Mr. Deal ignores that analysts may be biased toward crediting the explanations of management and downplaying the impact of short seller reports, like the Spruce Report, which call into question the analysts' prior investment theses and valuations of the company. The literature relied upon by Mr. Deal alludes to this issue: Ljungqvist and Qian note the "well-known tendency among analysts to avoid annoying the top management at the companies they cover."[72]

51.    For their part, companies may seek to respond to short-seller reports by using analysts as advocates in their own defense. ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████[73]  ███████████████████████████

████████████████████████████████████████████████████[74]

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████[75]

---

[72] Alexander Ljungqvist and Wenlan Qian, *How Constraining are Limits to Arbitrage?*, The Review of Financial Studies, August 2016, Vol. 29, No. 8, 1975, 1986.

[73] Deal Deposition Ex. 11 at -148281.

[74] *Id.*

[75] TASK_0148553 at -148563.

52.    Mr. Deal also introduces the point that analysts do not revise their evaluation of TaskUs's attrition after the Spruce Report.[76]  This sort of forecast change is also unnecessary for establishing a price impact, and Mr. Deal does not make the claim that it is necessary.  Indeed, Ljungqvist and Qian note that analysts can be "slow to update their recommendations" in the face of a short report.[77]  That said, I note that one analyst firm (Baird) significantly reduced its price target for TaskUs, from $74 to $45, on January 31, 2022, citing, in part, "the recent pullback caused by short report."[78]  The report added that "[e]mployee attrition" and "comments on recent short report" were "[i]nteresting items to look for" on the upcoming earnings call.[79]

53.    Ultimately, Mr. Deal narrowly focuses on analyst reports, while ignoring the most relevant and scientifically sound test of price impact, which is to evaluate whether (1) there was a release of information that revealed the relevant truth that was allegedly concealed by the misstatement; and (2) whether there was a statistically significant price reaction to the information. As described in more detail in **Section III.C**, the Spruce Report contained novel information economically connected to the misstatement by revealing that TaskUs's claims of a superior culture and below-industry-average attrition were highly exaggerated.  Additionally, as discussed in **Section III**, TaskUs Common Stock experienced a statistically significant price decline following the Spruce Report, which is not disputed, or reliably attributed to anything other than the alleged corrective information, by Mr. Deal.

54.    Simply put, TaskUs's superior culture and the resulting low attrition were key business differentiators and value drivers for TaskUs, the Spruce Report contained new

---

[76] Deal Report Section IV.C.i.c.

[77] Alexander Ljungqvist and Wenlan Qian, *How Constraining are Limits to Arbitrage?*, The Review of Financial Studies, August 2016, Vol. 29, No. 8, 1975, 1986.

[78] "TaskUs, Inc. (TASK): Q4 Earnings and Initial 2022 Guidance Preview," *Baird*, January 31, 2022.

[79] *Id.*

information that contradicted TaskUs's previous statements on those issues, TaskUs Common Stock immediately experienced a statistically significant price decline, and there is thus evidence that investors tied at least some of that decline to the Spruce Report's relevant disclosures. Therefore, Mr. Deal has not established a lack of price impact from the alleged misstatement. Instead, there is strong affirmative evidence of price impact.

### E.   MR. DEAL IGNORES EVIDENCE FROM DISCOVERY ███████████ ███████████████████████████

55.   Mr. Deal also ignores evidence from discovery ███████████████████

████████████████████████████████████████████████████████

█████████

56.   For example, ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████[80] ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████"[81]

57.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████"[82] ██████████████████████

---

[80] TASK_0038945 at -38950, -38967.

[81] Deal Deposition Ex. 4 at -39042, -39045, -39049.

[82] Deal Deposition Ex. 6 at -37521.

23



58.

59.    TaskUs itself also noted the importance of culture and attrition to its business, explaining in SEC filings that its "focus" on culture "leads to lower employee attrition levels" and positively affects client satisfaction and retention, costs, and productivity:

>We seek to retain sufficient employees to serve our clients' increasing business needs and position ourselves for growth. We believe our focus on *employee culture leads to lower employee attrition levels*. Apart from driving

---

[83] Deal Deposition Ex. 7 at -157975.

[84] TASK_0016576 at -16585, -16597.

[85] Deal Deposition Ex. 8 and 9.

[86] Deal Deposition Ex. 9 at -146856.

[87] Deal Deposition Ex. 9 at -146861.

our high client satisfaction and retention metrics, ***lower employee attrition leads to lower hiring and training costs and higher employee productivity.***[88]

60.   Given the importance of TaskUs's culture and low attrition ███████████ ██████████████████████████████████████, it follows that a disclosure that the Company's claims about culture and low attrition were highly exaggerated would negatively impact investors' perception of the Company's value, and likely generate a market reaction.  Yet Mr. Deal provides no analysis of ███████████████████████████████, further confirming that he has not established a lack of price impact.

### F.   MR. DEAL DOES NOT DEMONSTRATE AN ALTERNATIVE EXPLANATION FOR THE PRICE DECLINE IN THE WAKE OF THE SPRUCE REPORT

61.   Mr. Deal asserts that the alleged corrective information did not cause the price decline on the alleged corrective disclosure date yet fails to demonstrate any alternative explanation for the statistically significant price decline at beyond the 99% confidence level on January 20, 2022. Instead, he merely states that other factors "must have," and "were more likely"[89] to have caused the price decline but does not go as far as providing an affirmative opinion on what actually did. Indeed, he explicitly warns: "…I am not offering a comprehensive analysis of which specific factors drove the price decline and to what extent…"[90]  At deposition, Mr. Deal specifically testified ███████████████████████████████████████████:



---

[88] TaskUs, Inc. SEC Form 10-K for the fiscal year Ended December 31, 2021, p. 57.

[89] Deal Report Section IV.D and ¶ 52.

[90] Deal Report ¶ 52.



62.    Mr. Deal speculates that there were "two potential drivers" of the stock price decline on January 20, 2022.  First, he discusses that the release of reports by short sellers can cause price declines.[92]  However, Mr. Deal's reference to academic articles about short seller reports *on the whole* in no way establishes what caused the *specific* price decline in TaskUs Common Stock on January 20, 2022, and it certainly does not prove that TaskUs Common Stock declined that day due to the mere fact of the Spruce Report, as opposed to its relevant content.  Mr. Deal ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[93]

63.    To the extent Mr. Deal does attempt to suggest that short seller reports can drive share price declines merely by repeating information that is already public or not value-relevant, Mr. Deal's own cited literature contradicts that notion.  For example, Ljungqvist and Qian found that short reports "contain relevant and novel information, which investors take seriously," and that "investors ignore reports that do not contain new, hard information."[94]  Moreover, Mr. Deal cites an academic article that specifically analyzed 42 Spruce Point reports and found that 93% of them contained "New Evidence," *i.e.*, new, value-relevant information about the company that was the subject of the report.[95]  This figure was the fourth-highest among the 24 short seller firms

---

[91] Deal Tr. 138:8-17.

[92] Deal Report ¶¶ 53 – 54.

[93] Deal Tr. 142:13-144:17.

[94] Alexander Ljungqvist and Wenlan Qian, *How Constraining are Limits to Arbitrage?*, The Review of Financial Studies, August 2016, Vol. 29, No. 8, 1975, 1991, 2022-23.

[95] Janja Brendel and James Ryans, *Responding to Activist Short Sellers: Allegations, Firm Responses, and Outcomes*, J. of Accounting Research Vol. 50, No. 2 (May 2021), 487, 499.

analyzed.[96]  This further undermines any claim that the Spruce Report here did not reveal new, value-relevant information.

64.    Second, Mr. Deal claims that analyst reports and news articles following the Spruce Report discussed "elements that were unrelated to attrition," such as: "TaskUs's cash flow dynamics, the education backgrounds of TaskUs's CEO and CFO, as well as the client concentration issue faced by TaskUs."[97]  However, Mr. Deal ████████████████████████████ ███████████████████████████████████████████████████████████████████.[98] As a result, he has no reliable basis to attribute any of the decline to these factors.

65.    Moreover, Mr. Deal conveniently omits part of a quote in trying to make his point. Specifically, he includes *only* the bold language shown below but leaves out the first portion more broadly citing "exaggerated and inflated business claims":

> On January 20, 2022, Spruce Point Capital Management, LLC published a report alleging, among other things, that TaskUs "has a pattern of exaggerated and inflated business claims, including revenue, and is covering-up financial strain with reduced disclosures, cherry-picked market data, and non-standard key performance metrics." ***Regarding the financial strain, the report alleged that "28% of sales [are related] to Facebook and related to the controversial area of 'Content Moderation,'" which has "requir[ed] more labor to fill tasks, but that it is not translating into additional revenue."***
>
> On this news, TaskUs's stock fell $5.46, or 15.3%, to close at $30.13 per share on January 20, 2022, thereby injuring investors.[99]

66.    In doing so, Mr. Deal is attempting to make it appear as though the article claims the price decline on January 20, 2022 was strictly due to "financial strain" related to Facebook.[100]

---

[96] *Id.*

[97] Deal Report ¶ 55.

[98] Deal Tr. 152:5-154:18.

[99] "Press Release: Glancy Prongay & Murray LLP, a Leading Securities Fraud Law Firm, Announces Investigation of TaskUs, Inc. (TASK) on Behalf of Investors," *Dow Jones Newswires*, January 24, 2022.

[100] Deal Report ¶ 57.

However, when read in full context, this article (a law firm press release) actually states that the Spruce Report contributed to the price decline and makes reference to "non-standard key performance metrics." This article, along with the others cited by Mr. Deal, which purportedly discuss "elements that were unrelated to attrition," does not establish that the relevant information in the Spruce Report did not cause the price decline on January 20, 2022.

67. Ultimately, Mr. Deal makes no attempt to disaggregate the price decline on January 20, 2022 between attrition and culture-related information and the supposed "non-fraud-related factors" he raises. He speculates that there were two other potential drivers impacting the price of TaskUs Common Stock, but he does not offer any analysis to clearly link that information to the price decline. Mr. Deal, without analysis or support, is asking the court to ignore the evidence of the statistically significant price decline on January 20, 2022 in reaction to the Spruce Report, as well as the analyst reports and news articles I discussed at length above in **Section III.D** reacting to relevant information, and to instead believe that the price decline "must have" been caused by something unrelated to the alleged misstatement. This is a far cry from proving a complete lack of price impact.

## IV.   MR. DEAL'S DISCUSSION OF THE ALLEGED MISSTATEMENT DOES NOT SUPPORT THE ABSENCE OF PRICE IMPACT

68. In addition to his arguments related to the alleged corrective disclosure addressed above in **Section III**, Mr. Deal "examine[s] whether there is evidence that TaskUs's 'low attrition' alleged misstatement impacted TaskUs's stock price during the Proposed Class Period."[101]  Mr. Deal relies on analyst commentary to determine whether the market relied on the alleged misstatement prior to the alleged corrective disclosure. This approach is flawed for two reasons:

---

[101] Deal Report ¶ 60.

(1) it is not necessary for the alleged misstatement to cause a price reaction when made or during the Class Period as Mr. Deal suggests, and (2) the categorization of analyst reports performed by Mr. Deal is flawed, as he fails to recognize reports that while they may not be verbatim, use language extremely similar to the alleged misstatement when referring to Task's claims about "culture" and its "advantage" of "low attrition." Below I respond in detail to each opinion.

69.    First, front-end price impact is not required since a misstatement may merely maintain an already inflated stock price. Indeed, Mr. Deal testified ████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████[102] Thus, the only reliable way to evaluate price impact requires examining the change in price when the relevant truth is disclosed (as it occurred here in reaction to the Spruce Report). Indeed, as a matter of economics, to demonstrate a lack of price impact one would have to show no price change to *both* the alleged misstatement and alleged corrective disclosure event. Mr. Deal fails to do so; as explained above in **Section III**, there is empirical evidence of back-end price impact, and also potential front-end price impact.

70.    Second, a number of sources selected by Mr. Deal include language that resonates with the alleged misstatement made by the Company. As I have already described above, according to Plaintiffs' claims, each Registration Statement contained the misstatement of:

> The ***culture*** and focus on people allows us to retain talent, continuously improve, and gives us an ***advantage*** on ***key people metrics*** of efficiency, client satisfaction, and ***low attrition***.[103]

---

[102] Deal Tr. 42:13-43:3.

[103] Complaint ¶ 170; TaskUs, Inc. SEC Form S-1 filed on April 12, 2021, p. 133; TaskUs, Inc. SEC Form S-1/A filed May 6, 2021, p. 140; TaskUs, Inc. SEC Form S-1/A filed on June 2, 2021, p. 140; TaskUs, Inc. SEC Form S-1/A filed June 10, 2021, p. 140; TaskUs, Inc. SEC Form 424B4 filed June 14, 2021, p. 143; TaskUs, Inc. SEC Form DRS filed September 17, 2021, p. 139; TaskUs, Inc. SEC Form S-1 filed October 18, 2021, p. 138; and TaskUs, Inc. SEC Form 424B4 filed October 22, 2021, p. 138.

71. While I am not a legal expert, nor is Mr. Deal, I can observe the similarity in language between the alleged misstatement and language used in certain Class Period reports collected by Mr. Deal. For example, the William Blair report on July 6, 2021 stated:

> We believe that TaskUs's **employee-centric and start-up–like culture** has **tangible business value,** driving higher attendance, more engaged employees, and **lower attrition**, and results in higher-quality work and customer satisfaction. Ultimately, we believe that TaskUs's start-up–like culture and desire to disrupt the status quo differentiate the company from other CX service providers and will enable TaskUs to capture market share over the long term.[104]

72. Likewise, a report from Wells Fargo on July 6, 2021 said the following:

> Managements' commitment to its front line workers across the globe, and the success they've had building and scaling their strong **culture** is reflected in some of the **industry's lowest levels of attrition** rates…[105]

73. Mr. Deal himself acknowledges that one report—from RBC on July 6, 2021—contained the same language as the alleged misstatement:

> TaskUs has achieved multiple certifications and compliance standards including SOC 2 Type 2, HIPAA, and PCI, which have helped in retaining talent and continuous improvement, while **providing an advantage on metrics of efficiency, client satisfaction, and low attrition**.[106]

74. Likewise, a July 8, 2021 BTIG report tracks the alleged misstatement:

> TaskUs' focus on **culture** has also led to . . . **low attrition relative to the industry average**.[107]

75. Moreover, Mr. Deal ████████████████████████████████████

██████████████████████████████████████████████████████

---

[104] "Pure-Play Disrupting the CX Market; Initiating With an Outperform Rating," *William Blair*, July 6, 2021; Deal Report Exhibit 3.

[105] "TASK: Secular Play on Digitizing the Consumer Drives Strong Growth Profile; Initiating at Equal Weight Given Valuation," *Wells Fargo*, July 6, 2021; Deal Report Exhibit 3.

[106] Deal Report Exhibit 3 at 4 of 10.

[107] "Help Me, Help You. Initiating Coverage of TaskUs, Inc. with a Buy Rating and $45 Price Target," *BTIG*, July 8, 2021; Deal Report Exhibit 3.

█████████████████████████[108] Unsurprisingly, given the lack of objective criteria, Mr. Deal's classifications of attrition-related statements in these analyst reports is subjective and at times erroneous. For example, he did not classify the July 8, 2021 BTIG report quoted above as mentioning the alleged misstatement—even though it uses identical words ("culture" and "low attrition")—███████████████████████████████████████

███████████████████████████████████████████[109] Further, he does not classify the July 6, 2021 William Blair and Wells Fargo reports quoted above as mentioning the alleged misstatement, even though they refer to "culture" and "lower attrition," and "lowest levels of attrition," respectively, closely tracking the "low attrition" statement.

76.    Setting aside Mr. Deal's unreliable classifications of the analyst reports, there is no dispute that at least *seven* analyst reports during the Class Period noted the misstatement itself or used nearly identical language.[110]

77.    Mr. Deal's misguided discussion of Class Period analyst commentary therefore does not establish a lack of price impact.

## V.    MR. DEAL PRESENTS NO EVIDENCE TO DISTURB MY CONCLUSION THAT TASKUS COMMON STOCK TRADED IN AN EFFICIENT MARKET THROUGHOUT THE CLASS PERIOD

78.    Mr. Deal never purports to claim that the market for TaskUs Common Stock was *inefficient* during the Class Period. At deposition, █████████████████████████████

---

[108] Deal Tr. 198:13-15.

[109] Deal Tr. 214:5-24.

[110] (1) "Driving the consumer experience in the Digital Economy; initiate at Outperform," *RBC Capital Markets*, July 6, 2021; (2) "Help Me, Help You. Initiating Coverage of TaskUs, Inc. with a Buy Rating and $45 Price Target," *BTIG*, July 8, 2021; (3) "TASK: Secular Play on Digitizing the Consumer Drives Strong Growth Profile; Initiating at Equal Weight Given Valuation," *Wells Fargo*, July 6, 2021; (4) "Pure-Play Disrupting the CX Market; Initiating With an Outperform Rating," *William Blair*, July 6, 2021; (5) "Strong upside in first quarter as a public company," *RBC Capital Markets*, August 10, 2021; (6) "Strong revenue growth continues," *RBC Capital Markets*, November 10, 2021; (7) "Adjusting revenue growth estimates," *RBC Capital Markets*, December 7, 2021.

██████████████████████████████████████████ [111] Nor does he dispute most of the factors indicating market efficiency. Indeed, he testified ███████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████ [112]

79.    Instead, the Deal Report is limited to flawed attempts to discredit portions of my opinions on just two efficiency factors (*Cammer* Factor 2: Analyst Coverage and *Cammer* Factor 5: Price Reaction to New Information) versus the eleven factors I analyzed in my Report, that are standard and established factors considered to determine whether a stock traded in an efficient market. As I explain further below, none of the arguments from Mr. Deal disturb the opinions I expressed in my Report.

80.    In my Report, I empirically analyzed the specific eleven factors related to market efficiency that courts have previously examined during the Class Period for TaskUs Common Stock. Specifically, my Report describes in detail that: (1) the average weekly trading volume of TaskUs Common Stock during the Class Period was 5.15 million shares which represents 26.78% of shares outstanding, easily exceeding the *Cammer* threshold and compared favorably against other exchange-traded securities (*Cammer* Factor 1);[113] (2) there was consistent analyst coverage during the Class Period (at least 32 reports from eight different firms) as well as substantial press coverage among other sources of publicly available information regarding the Company (*Cammer* Factor 2);[114] (3) TaskUs Common Stock traded on the NASDAQ, fulfilling the "market maker"

---

[111] Deal Tr. 286:23-287:1.

[112] *See* Deal Tr. 292:10-294:13.

[113] Coffman Report ¶¶ 26 – 30.

[114] Coffman Report ¶¶ 31 – 36.

factor (*Cammer* Factor 3);[115] (4) aside from a timing requirement during the Class Period, TaskUs had fulfilled all the requirements to be eligible to file Form S-3, supporting a finding of market efficiency (*Cammer* Factor 4);[116] and (5) there was a clear cause-and-effect relationship between new Company-specific information and the market price of TaskUs Common Stock during the Analysis Period, which includes the Class Period (*Cammer* Factor 5).[117]  The analyses in my Report also demonstrate that (6) TaskUs Common Stock had a large market capitalization relative to all other firms that traded on the NYSE and NASDAQ (*Krogman* Factor 1);[118] that (7) TaskUs Common Stock had an average bid-ask spread below the average bid-ask spread of a random sample of 100 companies trading on the NYSE and NASDAQ (*Krogman* Factor 2);[119] and that (8) only 0.41% of all outstanding exchange-traded shares were held by insiders (*Krogman* Factor 3).[120] Additionally, my Report further shows that (9) TaskUs Common Stock was traded by sophisticated traders, with an average of 89% of its public float held by institutions during the Class Period (Additional Factor 1);[121] and that (10) there was no evidence of autocorrelation for TaskUs Common Stock during the Class Period (Additional Factor 2).[122]  Lastly, (11) there was considerable option trading in TaskUs Common Stock during the Class Period (Additional Factor 3).[123] Due to the empirical evidence described above, I reached the conclusion that the market was efficient for TaskUs Common Stock. The flawed attacks from Mr. Deal focus on only portions of

---

[115] Coffman Report ¶¶ 37 – 41.

[116] Coffman Report ¶¶ 42 – 44.

[117] Coffman Report ¶¶ 45 – 64.

[118] Coffman Report ¶¶ 65 – 68.

[119] Coffman Report ¶¶ 69 – 70.

[120] Coffman Report ¶ 71.

[121] Coffman Report ¶ 72.

[122] Coffman Report ¶¶ 73 – 76.

[123] Coffman Report ¶ 77.

two of the eleven factors I analyzed and do not change my opinion on market efficiency, particularly considering that he does not challenge the remaining nine factors.

81.    Nevertheless, below I explain in detail why the opinions from Mr. Deal regarding my assessments for *Cammer* Factor 2 and *Cammer* Factor 5 are flawed and incorrect.

## A.    CAMMER FACTOR 5 (CAUSE-AND-EFFECT RELATIONSHIP)

82.    My analysis of *Cammer* Factor 5 – empirical evidence of a cause-and-effect relationship between new, unexpected, company-specific information and the price of TaskUs Common Stock – provides scientific evidence of a cause-and-effect relationship between new firm-specific news and changes in the market price of TaskUs Common Stock.  There are key elements of my *Cammer* Factor 5 that Mr. Deal does not challenge, including my selection of market and peer indices for which to control, my identification of earnings announcement and pre-announcement days, and how I calculated the unexpected or abnormal firm-specific return on each day.  Indeed, Mr. Deal makes the same assumptions himself in conducting the Deal Event Studies.  These elements and the overall event study methodology I employed for my Report follow the economic literature and are a standard approach accepted by courts for purposes of establishing *Cammer* Factor 5.

83.    As I have done in numerous other expert reports in which the class was certified, to analyze *Cammer* Factor 5 in my Report, I compared the price response to TaskUs earnings announcements and pre-announcements during the Analysis Period to the price movements on days during the Analysis Period where I identified no TaskUs-related news ("no news" days).[124,]

---

[124] As described in my Report, no news days are days where I identified zero articles through the Factiva database, and no analyst reports or SEC filings were issued to my knowledge.  *See* Coffman Report **Exhibit 8**.

[125] I found that the earnings announcement and pre-announcement days have a greater percentage of significant price movements, higher daily trading volume on average, and statistically significantly larger price changes than those found on days with no news.[126] Mr. Deal does not reliably dispute this finding.

84.    Mr. Deal does not challenge, given the methodology I have chosen, (1) that I accurately identified the earnings announcements; (2) that academic literature and professional experience both support that earnings announcements contain important firm-specific news[127]; (3) that I accurately conducted an event study that measured the magnitude of abnormal returns on earnings announcements, pre-announcements, and "no news" days and computed each day's corresponding statistical significance; and (4) that I accurately assessed whether there was a statistically significant difference in the prevalence of statistically significant returns and the magnitude of abnormal returns on earnings announcement and pre-announcement days versus the "no news" days.[128]    In other words, Mr. Deal does not challenge that I accurately conducted a

---

[125] *See*, *for example*, Memorandum Decision and Order Granting Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel filed December 27, 2023, *Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago, Individually and on behalf of all others similarly situated, v. Pluralsight, Inc., Aaron Skonnard, and James Budge*, Case No.: 1:19-cv-00128-DBB-DAO, United States District Court, District of Utah; and Order Certifying Class, Appointing Class Representative, and Appointing Class Counsel filed January 21, 2021, *The Police Retirement System of St. Louis, v. Granite Construction Incorporated, James H Roberts, Jigisha Desai, and Laurel J Krzeminski*, Case No.: 3:19-cv-04744-WHA, United States District Court, Northern District of California.

[126] Coffman Report ¶¶ 58 – 63.

[127] *See* Beaver, William H. "The Information Content of Annual Earnings Announcements: New Insights from Intertemporal and Cross-Sectional Behavior," *Empirical Research in Accounting: Selected Studies*, 1968, supplement to the *Journal of Accounting Research* 6, (1968): 67-92; May, Robert G. "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies*, 1971, supplement to the *Journal of Accounting Research* 9, (1971): 119-163; Aharony, Joseph & Swary, Itzhak, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance* 35, no. 1, (1980): 1-12.

[128] *See* ████████████████████████████████████████████████

cause-and-effect test that has been accepted numerous times by courts as scientific evidence supporting a finding of market efficiency.

85.    While Mr. Deal claims my analysis for *Cammer* Factor 5 is supposedly flawed and cannot reliably assess whether TaskUs Common Stock traded in an efficient market, his criticisms are unfounded and do not disturb my opinions.  Mr. Deal presents the following four arguments for his conclusion that my analysis of *Cammer* Factor 5 does not establish market efficiency:

> a) that findings of market efficiency during the Analysis Period do not necessarily validate market efficiency during the Class Period subset;
>
> b) that a shorter estimation window should be used to account for varying volatility during the Class Period;
>
> c) that I failed to account for the impact of confounding news and the directionality of the price reactions on the earnings dates;
>
> d) and that my analysis of news days versus non-news days is flawed because I used earnings and pre-announcement dates as a test group rather than all news days; because I did not consider the content of the news on each day; and because my results supposedly do not hold under different assumptions.[129]

86.    Below, I explain why all of Mr. Deal's arguments related to *Cammer* Factor 5 are flawed and do not disturb my opinion that there was a strong cause-and-effect relationship between new Company-specific information and the market price of TaskUs Common Stock during the Class Period.

87.    First, Mr. Deal takes issue with my use of an Analysis Period in my Report.  He argues that "even if [my] findings may suggest market efficiency over the 31-month Analysis Period, they do not necessarily validate market efficiency during the seven-month Proposed Class Period subset."[130]  Mr. Deal offers no statistical or economic rationale for restricting a cause-and-

---

[129] Deal Report Section VI.A.

[130] Deal Report ¶ 75.

effect analysis to the Class Period, and there is none. As I described in my Report[131] and at my deposition,[132] the use of the Analysis Period as opposed to the Class Period allows me to increase the power of my statistical tests. From the standpoint of financial economics, there is no reason to believe (and Mr. Deal offers none) that the efficiency of the market for TaskUs Common Stock is any different during or after the Class Period.[133] Additionally, I have used expanded Analysis Periods in a number of other cases; in those cases, where the courts ruled on class certification, the class was certified and my use of an "Analysis Period" that extended beyond the Class Period was either not challenged at all or any challenges did not result in a denial of class certification.[134]

88.    Nonetheless, restricting my cause-and-effect analysis to the Class Period does not alter my conclusions. In fact, 100% of the earnings days during the Class Period (both earnings announcement days and the one pre-announcement day) had a statistically significant price reaction at least at the 95% level, while 0% (none) of the no news days did.[135] *See* **Exhibit 2**.

---

[131] Coffman Report fn. 23 ("I analyzed the broader time period of the Analysis Period to enhance the power of my statistical tests. By analyzing and applying the methodologies described herein to the longer period, of which the Class Period is a subset, I conclude that the evidence supports efficiency during the Class Period. The Analysis Period was selected to capture two full calendar years after the Class Period. In this case, this resulted in a total of 10 earnings announcements and 1 pre-announcement to evaluate and analyze (as opposed to what would have just been 3 during the Class Period itself).").

[132] Coffman Deposition 68:21 – 69:15 ("In order to perform that statistical test of looking at earnings dates versus days with no news, I wanted to have a robust set of earnings dates -- number of earnings dates so that the statistical power of that test would be sufficiently high. Given that the class period is -- would only have three earnings announcements in it, I wanted to have a larger data set of earnings announcements with which to work. I've done this in many other cases where in those circumstances, I selected an analysis period of an additional year before the class period and an additional year after the class period. Here, because the firm just had an IPO, that year before was not available. So I selected a two-year period after the class period.").

[133] In my Report I analyzed *Cammer* Factors 1-4, *Krogman* Factors 1-3, and the three "additional factors" over the Class Period (and *Cammer* 5 over the Analysis Period). *See* Coffman Report Section VII.

[134] *See*, for example, Memorandum Opinion filed January 29, 2020, *Weiner v. Tivity Health, Inc.*, Case No.: 3:17-cv-01469, United States District Court, Middle District of Tennessee Nashville Division; Order Re Motion to Certify Class, Appoint Class Representatives, And Appoint Class Counsel filed April 2, 2022, *Junge v. Geron Corp.*, C 20-00547-WHA, United States District Court, Northern District of California; Order Granting Motion for Class Certification filed September 4, 2018, *In Re: SanDisk LLC Securities Litigation*, Case 3:15-cv-01455-VC, United States District Court for the Northern District of California.

[135] The difference between 100% and 0% is itself statistically significant beyond the 99% confidence level.

Additionally, the average change in price of TaskUs Common Stock, after controlling for market and industry factors, was 14.3% on earnings and pre-announcement days, while only 2.9% on no news days.[136]  In other words, the average magnitude of stock price movement on earnings and pre-announcement days during the Class Period was almost 5 times higher than on no news days. Finally, the average daily trading volume on the earnings and pre-announcement days was 2 million, while the average daily trading volume on no news days was 0.9 million.[137]  These analyses continue to demonstrate strong-evidence of a cause-and-effect relationship between company-specific news and changes in the price of TaskUs Common Stock, and thus an efficient market, when looking only at the Class Period.  For these reasons, Mr. Deal's opinions regarding my use of an Analysis Period are meritless.

89.    Furthermore, Mr. Deal further argues that "[t]o examine short-term fluctuations in volatility during the Proposed Class Period, a shorter estimate window could have been used."[138] Mr. Deal presents the results of his cause-and-effect tests under four estimation window scenarios, including 15-day, 30-day, 45-day, and 60-day windows.[139]  Mr. Deal describes these as merely "illustrative" and provides no evidence that these alternative estimation windows are more appropriate than the 120-day window I used; nor does he claim that a 120-day estimation window is inappropriate.  Indeed, ██████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████[140]  Still, the results of my cause-and-effect tests are robust under these various

---

[136] The difference between 14.3% and 2.9% is itself statistically significant beyond the 99% confidence level.

[137] The difference between 2 million and 0.9 million is itself statistically significant beyond the 99% confidence level.

[138] Deal Report ¶ 77.

[139] Deal Report Figure 6.

[140] Deal Tr. 324:13-20.

estimation window scenarios.  **Exhibits 3a-e** show that whether I conduct my cause-and-effect test using a 120-day window, as I did in my Report, or any of the windows Mr. Deal proposed in his Report, the results demonstrate powerful scientific evidence of a cause-and-effect relationship between new publicly released information concerning the Company and changes in the price of TaskUs Common Stock.  For example, when I use a 60-day estimation window, 81.82% of the earnings and pre-announcement days during the Analysis Period had a statistically significant price reaction, while only 3.40% of the no news days had a statistically significant reaction at the 95% level.[141]  Further, using the 60-day estimation window, the price reactions on earnings and pre-announcement days had an average magnitude of 17.08% compared to a magnitude of only 2.49% on no news days, after controlling for market and industry effects.[142]  The differences in the percentage of days with significant price reactions, and the average magnitudes of those price reactions after controlling for market and industry effects, were significant beyond the 99% level under each of these estimation window scenarios. As such, Mr. Deal's argument that a shorter estimation window for *Cammer* 5 is more appropriate does not disturb my opinions of efficiency.

90.    Mr. Deal continues to critique my analysis of *Cammer* Factor 5 by claiming that I fail to consider the impacts of confounding news on the earnings dates.  Mr. Deal points to an example of a date when preliminary earnings information was released on the same market date of an announcement about TaskUs's secondary public offering (SPO), arguing that the abnormal price decline on this date could be attributed to the SPO rather than the earnings news.[143]  But he himself did not attempt to disaggregate the impact from these two events.[144]

---

[141] The difference between 81.82% and 3.40% is itself statistically significant beyond the 99% confidence level.

[142] The difference between 17.08% and 2.49% is itself statistically significant beyond the 99% confidence level.

[143] Deal Report ¶ 78.

[144] ████████████████████████████████████████████

91.    To begin, the potential presence of confounding news on the earnings and pre-announcement dates has no impact on the conclusions of my cause-and-effect tests.  Whether the market was reacting to the news in the earnings announcement or the other news, the test still shows a clear cause and effect relationship between news and stock price.

92.    Additionally, Mr. Deal argues that for a cause-and-effect analysis to be valid, the direction of the stock price movements must "align[] with the nature of the underlying news."[145] He further states that "[my] analysis fails to verify whether the abnormal returns predicted by [my] market model exhibit directional consistency with the content of the relevant disclosures in the earnings announcements during the Proposed Class Period."[146]  But Mr. Deal did not identify any actual event where the direction of price movement did not align with the nature of the underlying news.[147]

93.    Mr. Deal's argument is also flawed because it assumes (incorrectly) that I did not consider the directionality of the price movement.  In fact, I did not identify any directionally inconsistent price movements on the earnings or pre-announcement dates.  I considered the direction of price movements on the earnings announcement and pre-announcement dates to confirm that the price movement observed on each date was not in obvious conflict with the nature of the information released.  For example, TaskUs made its first earnings announcement after hours on August 10, 2021; according to the Coffman Event Study, on August 11, 2021,[148] TaskUs

---

[145] Deal Report ¶ 79.

[146] Deal Report ¶ 79.

[147] ████████████████████████████████████████████

[148] Because this earnings announcement was released after the market closed on August 10, 2021, the news would impact the market price of TaskUs Common Stock on the following market date, August 11, 2021.

Common Stock increased by 21.86%, or $7.05 per share, after controlling for market and industry effects. This abnormal price movement is associated with a t-statistic of 4.50 and thus is statistically significant at the 95% level (as well as beyond the 99% confidence level).[149] In the press release issued by TaskUs on August 10, 2021, the Company announced revenue growth of 57.4%, an EBITDA margin of 24.5%, and provided revenue guidance for fiscal year 2021 of $705 - $709 million.[150] Analysts viewed this information positively, noting that "results that were well above expectations for revenue and margins;"[151] "TASK delivered a solid revenue and EBITDA performance in its first quarter as a public company;"[152] and "[s]hares should trade higher on blowout F2Q results/guide."[153] The price increase on August 11, 2021 is directionally consistent with the information released and analysts' reactions, and thus consistent with a finding of market efficiency.

94. Finally, Mr. Deal argues that my consideration of "News Days" versus "Non-News Days" is flawed, and that under different assumptions, my analyses no longer hold. Mr. Deal claims that analyzing earnings announcements and pre-announcements as the test group for my cause-and-effect tests is inappropriate, as it "does not solely reflect the impact of Company-specific news," but rather "conflates the inherent expected larger effect of earnings announcements with the intended effect of other news on non-earnings announcement days, leading to biased and overstated conclusions."[154] I discuss in my Report how earnings announcements are uniquely

---

[149] Coffman Report Exhibit 7.

[150] "TaskUs Announces Fiscal Second Quarter 2021 Results," *Dow Jones Institutional News*, August 10, 2021, 4:05 PM.

[151] "Major 2Q Beat & Raise In First Quarter Out of the Gate. Reiterate Buy," *BTIG,* August 10, 2021.

[152] "Strong upside in first quarter as a public company," *RBC Capital Markets*, August 10, 2021.

[153] "Impressive first post-IPO print; maintain Buy," *Bank of America*, August 10, 2021.

[154] Deal Report ¶ 81.

well-suited to the purpose of these tests.[155]  Namely, because all public companies are required to periodically report earnings, they provide an objective set of dates to test, and the academic literature is replete with evidence that such events often move market prices because they often provide new, value-relevant, firm-specific information that impacts market prices.[156]  There is a long history of evaluating market efficiency by testing earnings announcements.[157]  I have undertaken this methodology of analyzing earnings announcements across cases in which I am asked to opine on market efficiency precisely to avoid the argument that I am selecting events in an arbitrary or subjective manner.

95.    As an alternative to the earnings dates, Mr. Deal presents an analysis that compares all of the news days with all non-news days, after "adjusting [the non-news days] for additional days where 'news' appears to be non-substantive."[158]  Mr. Deal states that under his alternative test design, my results "materially change."[159]  However, Mr. Deal's analysis is flawed for several reasons and he is fundamentally changing the nature and statistical power of the methodology.

96.    First, some of the days he considers "news" days clearly do not contain any value-relevant news.  For example:

> a. **July 29, 2021**: The only news on this day concerns a press release stating that TaskUs will be announcing their second quarter 2021

---

[155] Coffman Report ¶ 56.

[156] *See* Beaver, William H. "The Information Content of Annual Earnings Announcements: New Insights from Intertemporal and Cross-Sectional Behavior," *Empirical Research in Accounting: Selected Studies*, 1968, supplement to the *Journal of Accounting Research* 6, (1968): 67-92; May, Robert G. "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies*, 1971, supplement to the *Journal of Accounting Research* 9, (1971): 119-163; Aharony, Joseph & Swary, Itzhak, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance* 35, no. 1, (1980): 1-12.

[157] Coffman Report ¶ 56.

[158] Deal Report ¶ 88.

[159] Deal Report ¶ 88.

financial results soon.[160]  It is not a surprise that a newly public company will release earnings shortly after quarter-end, and there was no other information contained in that press release.

b. **November 3, 2021**: The only news on this day is an SEC Form SC 13G/A (Statement of Beneficial Ownership by Certain Investors). This filing simply states that Massachusetts Financial Services no longer holds 5% or more of TaskUs's Class A shares.[161]

c. **December 30, 2021**: One of the articles on this day mentions that TaskUs was named a SABJ Business of the Year finalist, but it says that they already previously announced it.[162] Another article simply reports that an SEC Form 4 was filed weeks prior.[163] The final piece of news this day is a list of fastest growing stocks.[164]

97.    Mr. Deal does not explain how any of these examples constitute value-relevant information or why he would expect this information to potentially impact the value of the Company.  By including dates such as these, and many other dates with far less value-relevant news than an earnings announcement, in his approach, he is diluting the power of the test.  His test is simply ill-suited to evaluate cause and effect in a meaningful way.

98.    Mr. Deal performs his cause-and effect tests using various different assumptions and argues that the results of these tests suggest that "there is no robust evidence that TaskUs's stock price reacts more strongly on news days compared to non-news days."[165]  Again, these tests are flawed.  Mr. Deal uses his diluted set of news days to compare to non-news days, along with

---

[160] "TaskUs Inc. to Announce Second Quarter 2021 Financial Results on August 10, 2021," *GlobeNewswire*, July 29, 2021; "Press Release: TaskUs Inc. to Announce Second Quarter 2021 Financial Results on August 10, 2021," *Dow Jones Institutional News*, July 29, 2021.

[161] TaskUs, Inc. SEC Form SC 13G/A filed November 3, 2021.

[162] "A sneak preview of SABJ's Business of the Year finalists (part 3 of 3)," *San Antonio Business Journal*, December 30, 2021 ("As previously reported, the Business Journal unveiled the 15 finalists for the awards who will each be recognized and a winner crowned at a gala on Jan. 26 at the McNay Art Museum.").

[163] "Taskus Inc. Taskus, Inc. [sic] Files SEC Form 4, Statement of Changes in Beneficial Ownership of Securities: (Dec. 16, 2021)," *Computer Weekly News*, December 30, 2021.

[164] "Who Joins GOOGL Stock Among 28 Of Today's Fastest-Growing Stocks?" *Investor's Business Daily*, December 30, 2021.

[165] Deal Report ¶ 91.

43

various shorter estimation windows, and he shows results during the Class Period only. As previously discussed, my test that focuses on earnings announcements is robust when limited to the Class Period, and also robust for each of Mr. Deal's proposed estimation windows. Thus, the only factor that appears to be driving the "materially change[d]"[166] results is using Mr. Deal's diluted set of "news days" for the test group, as opposed to the earnings and pre-announcement dates. Mr. Deal is suggesting that instead of testing an objective set of dates (the identification of which he does not dispute) that are typically associated with new, value-relevant information, I should have considered a much larger set of dates that are not necessarily associated with new, value-relevant information. Mr. Deal has no basis in economics for making this claim and the results of his alternative approach are irrelevant. Rather, the analysis of *Cammer* Factor 5 I presented in my Report provides direct scientific evidence of a cause-and-effect relationship between new firm-specific news and changes in the market price of TaskUs Common Stock.

99.    As such, my cause-and-effect tests are robust and Mr. Deal's arguments against my *Cammer 5* analysis do not disturb my opinions.

## B.    CAMMER FACTOR 2 (ANALYST COVERAGE)

100.    Mr. Deal further disputes the second *Cammer* factor for a small portion of the Class Period because "analyst coverage for TaskUs did not commence until July 6, 2021, nearly one month after the Company's stock began trading on June 11, 2021."[167]  This opinion is flawed.

101.    The period between the IPO and July 5, 2021 (the "Quiet Period") includes 16 trading days, or 10% of the 154-trading day Class Period. Importantly, Mr. Deal does not argue that the market was inefficient in the Quiet Period, nor does TaskUs's temporary lack of analyst coverage

---

[166] Deal Report ¶ 87.

[167] Deal Report ¶ 93.

44

during the Quiet Period support that conclusion.  As described in my Report, there are no bright-line dispositive tests for market efficiency.[168]  The nature of the *Cammer*, *Krogman*, and other factors analyzed in my Report involves reviewing economic evidence over a substantial period of time,[169] such as the Class Period, to then consider the efficiency factors as a whole to determine whether a particular market is efficient. Therefore, the lack of analyst coverage during the Quiet Period, standing alone, by no means indicates that the market was inefficient during the Quiet Period.  At deposition, Mr. Deal ████████████████████████████████████████ ████████████████████.[170]

102.  Even if I acknowledged Mr. Deal's flawed approach of analyzing efficiency factors separately during the temporary 16-trading day Quiet Period, Mr. Deal ignores that other efficiency factors I analyzed in my Report support a finding of efficiency during the Quiet Period.  For example, during the Quiet Period, the average weekly trading volume of TaskUs Common Stock was 5.94 million shares, which represents 39.10% of shares outstanding, far surpassing the 2% threshold set by Cammer (*Cammer* Factor 1);[171] TaskUs Common Stock traded on the NASDAQ and according to Bloomberg had at least 53 market makers (*Cammer* Factor 3);[172] and TaskUs Common Stock had an average market capitalization of $481.8 million and according to Bloomberg, by July 2, 2021 the Company had a market capitalization higher than at least 41% of

---

[168] Coffman Report ¶ 22.

[169] This widely accepted practice is also supported by *Cammer*, "… one of the most convincing ways to demonstrate efficiency would be to illustrate, ***over time***, a cause and effect relationship between company disclosures and resulting movements in stock price."  *See*, *Cammer, v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[170] Deal Tr. 294:17-20 ████████████████████████████████████████████ ██████████████████████████████████████████████

[171] I calculated the average weekly trading volume as a percentage of shares outstanding by using the average daily turnover (7.82%) during the Quiet Period and multiplying by 5.  *See*, Coffman Backup "TaskUs Exhibits.xlsx" tab "Stock Data", column "daily turnover".

[172] Bloomberg RANK function.

the firms on the combined NYSE and NASDAQ exchanges (*Krogman* Factor 1).[173]  In addition, the time-weighted average percentage bid-ask spread for TaskUs Common Stock was 0.191% during the Quiet Period and 0.188% during the Class Period after the Quiet Period.[174]  In other words, the bid-ask spread was roughly the same during the Quiet Period and the remainder of the Class Period, and as I stated in my Report, a narrow bid-ask spread supports the presence of an efficient market.[175]  Lastly, there is no statistically significant evidence of autocorrelation during the Quiet Period (Additional Factor 2).[176]

103.  Furthermore, Mr. Deal relies on a standard regulatory requirement for issuing companies, which Mr. Deal states is not uncommon in the securities industry,[177] to mischaracterize my opinion that "[d]uring the Class Period there was consistent analyst coverage for TaskUs."[178]  In my Report I correctly opined on the overall volume of analyst coverage during the Class Period.  In addition, since companies only report earnings quarterly, it is not uncommon to go several days without analyst coverage.  In this case, for example, there are twenty-two trading days without analyst coverage between a report from *BTIG* two days after the end of the Quiet Period and TaskUs's first earnings announcement on August 10, 2021.[179,180]

---

[173] Bloomberg EQS function.  This does not include Class B shares.

[174] Coffman Backup "Bid-Ask – Company's Spread.sas".  For this analysis, I recreated the analysis from my Report but altered the estimation windows, that is, I find that the bid-ask spread is 0.191% from June 11, 2021 through July 2, 2021 (the last trading day during the Quiet Period) and the bid-ask spread is 0.188% from July 3, 2021 through January 19, 2022.

[175] Coffman Report ¶ 69.

[176] Coffman Backup "Autocorrelation.sas".  For this analysis, I recreated the analysis from my Report but shortened the period analyzed to June 11, 2021 through July 2, 2021.

[177] Deal Report ¶ 93.

[178] Coffman Report ¶ 33.

[179] Coffman Backup "TASK News Import.xlsx" tab "AR".

[180] "Help Me, Help You. Initiating Coverage of TaskUs, Inc. with a Buy Rating and $45 Price Target," *BTIG*, July 8, 2021, and "Press Release: TaskUs Announces Fiscal Second Quarter 2021 Results," *Dow Jones Institutional News*, August 10, 2021, 4:05 PM.

104. Finally, Mr. Deal ignores the substantial public dissemination of news and other information regarding TaskUs during the Quiet Period. As I explained in my Report,[181] the existence of SEC filings and articles available through business information and research tools such as Factiva provide evidence of an efficient market.[182]

105. For the reasons described above, the relative difference in analyst coverage between the Class Period and the Quiet Period is easily explained and does not disturb my opinion that the market for TaskUs Common Stock was efficient throughout the Class Period, including during the Quiet Period.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 23, 2024

_____

---

[181] Coffman Report ¶¶ 34 – 36.

[182] Coffman Backup "TASK News Import.xlsx" tabs "News" and "SEC". According to my research, there were at least 24 news articles and 34 SEC filings during the Quiet Period. The recollection of media I performed for this time period is most likely underestimating the actual number of articles in existence.

# Exhibit 1
## Summary of Statistics for TaskUs, Inc. Class A Common Stock on the Alleged Corrective Disclosure Date Using Various Estimation Windows

| Date | TaskUs Common Stock | | | Event Study Results [1] | | | |
|------|---------------|---------------|---------------|----------------------------------------|--------|---------|----------------|
| | Closing Price | Volume (millions) | Raw Return | Trading Days in Estimation Window | t-Stat | p-Value | Sig Level [2] |
| | | | | 120 | -2.84 | 0.01 | *** |
| | | | | 60 | -3.26 | 0.00 | *** |
| 01/20/22 | $30.13 | 10.5 | -15.34% | 45 | -3.15 | 0.00 | *** |
| | | | | 30 | -3.84 | 0.00 | *** |
| | | | | 15 | -3.07 | 0.01 | *** |

Sources: Complaint, Deal Report and S&P Capital IQ.

Notes:

(1) The results for the model assuming a 120 trading day estimation window are based on the event study described in my Report. *See* Coffman Report Section VII.F.

The results are based on a rolling regression of the previous trading days specified in the corresponding estimation window. Each regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equal-weighted index comprised of the US exchange traded companies listed in Bank of America's initial analyst report detailing key competitors (Telus International, TTEC, Accenture, and Genpact). Each of these competitors had at least three additional analyst mentions as peers or competitors for TaskUs by other analysts over the Class Period. The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements, a pre-announcement, and the alleged corrective disclosure date have been removed from estimation.

(2) *** Denotes statistical significance at the 99% confidence level or greater.

**Exhibit 2**
**Comparison of Statistical Significance and Abnormal Returns**
**for TaskUs Earnings Announcements**
**vs. Days with No News during the Class Period**
**Using a 120 Day Rolling Regression**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 3 | 57 |
| Significant Days at 95% Confidence Level | 3 | 0 |
| % Significant Days at 95% Confidence Level [2] | 100.00% | 0.00% |
| Average Absolute Abnormal Return [3] | 14.31% | 2.90% |
| Average Volume (Millions) [4] | 2.0 | 0.9 |

Notes:

(1) Results are based on the Class Period. For the purposes of this analysis, I selected the 57 days with no news. Days with no news were days that had zero news articles to my knowledge via the Factiva database, and no analyst reports or SEC filings were issued.

(2) 100% rate of statistical significance is statistically significantly different than 0.00% at the 99% confidence level using either a Chi-Square test or Fisher's Exact test.

(3) 14.31% absolute return is statistically significantly different than 2.90% based on a t-test for difference of means at the 99% confidence level.

(4) The difference between 2.0 million and 0.9 million is statistically significant at the 99% confidence level.

**Exhibit 3a**

**Comparison of Statistical Significance and Abnormal Returns**
**for TaskUs Earnings Announcements**
**vs. Days with No News during the Analysis Period**
**Using a 120 Day Rolling Regression**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 11 | 294 |
| Significant Days at 95% Confidence Level | 10 | 9 |
| % Significant Days at 95% Confidence Level [2] | 90.91% | 3.06% |
| Average Absolute Abnormal Return [3] | 17.01% | 2.41% |
| Average Volume (Millions) [4] | 2.3 | 0.5 |

Notes:

(1) Results are based on the Analysis Period. For the purposes of this analysis, I selected the 294 days with no news. Days with no news were days that had zero news articles to my knowledge via the Factiva database, and no analyst reports or SEC filings were issued.

(2) 90.91% rate of statistical significance is statistically significantly different than 3.06% at the 99% confidence level using either a Chi-Square test or Fisher's Exact test.

(3) 17.01% absolute return is statistically significantly different than 2.41% based on a t-test for difference of means at the 99% confidence level.

(4) The difference between 2.3 million and 0.5 million is statistically significant at the 99% confidence level.

**Exhibit 3b**
**Comparison of Statistical Significance and Abnormal Returns**
**for TaskUs Earnings Announcements**
**vs. Days with No News during the Analysis Period**
**Using a 60 Day Rolling Regression**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 11 | 294 |
| Significant Days at 95% Confidence Level | 9 | 10 |
| % Significant Days at 95% Confidence Level [2] | 81.82% | 3.40% |
| Average Absolute Abnormal Return [3] | 17.08% | 2.49% |
| Average Volume (Millions) [4] | 2.3 | 0.5 |

Notes:
(1) Results are based on the Analysis Period. For the purposes of this analysis, I selected the 294 days with no news. Days with no news were days that had zero news articles to my knowledge via the Factiva database, and no analyst reports or SEC filings were issued.
(2) 81.82% rate of statistical significance is statistically significantly different than 3.40% at the 99% confidence level using either a Chi-Square test or Fisher's Exact test.
(3) 17.08% absolute return is statistically significantly different than 2.49% based on a t-test for difference of means at the 99% confidence level.
(4) The difference between 2.3 million and 0.5 million is statistically significant at the 99% confidence level.

**Exhibit 3c**
**Comparison of Statistical Significance and Abnormal Returns**
**for TaskUs Earnings Announcements**
**vs. Days with No News during the Analysis Period**
**Using a 45 Day Rolling Regression**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 11 | 294 |
| Significant Days at 95% Confidence Level | 9 | 14 |
| % Significant Days at 95% Confidence Level [2] | 81.82% | 4.76% |
| Average Absolute Abnormal Return [3] | 17.28% | 2.51% |
| Average Volume (Millions) [4] | 2.3 | 0.5 |

Notes:

(1) Results are based on the Analysis Period. For the purposes of this analysis, I selected the 294 days with no news. Days with no news were days that had zero news articles to my knowledge via the Factiva database, and no analyst reports or SEC filings were issued.

(2) 81.82% rate of statistical significance is statistically significantly different than 4.76% at the 99% confidence level using either a Chi-Square test or Fisher's Exact test.

(3) 17.28% absolute return is statistically significantly different than 2.51% based on a t-test for difference of means at the 99% confidence level.

(4) The difference between 2.3 million and 0.5 million is statistically significant at the 99% confidence level.

**Exhibit 3d**
**Comparison of Statistical Significance and Abnormal Returns**
**for TaskUs Earnings Announcements**
**vs. Days with No News during the Analysis Period**
**Using a 30 Day Rolling Regression**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 11 | 294 |
| Significant Days at 95% Confidence Level | 8 | 17 |
| % Significant Days at 95% Confidence Level [2] | 72.73% | 5.78% |
| Average Absolute Abnormal Return [3] | 17.22% | 2.52% |
| Average Volume (Millions) [4] | 2.3 | 0.5 |

Notes:
(1) Results are based on the Analysis Period. For the purposes of this analysis, I selected the 294 days with no news. Days with no news were days that had zero news articles to my knowledge via the Factiva database, and no analyst reports or SEC filings were issued.
(2) 72.73% rate of statistical significance is statistically significantly different than 5.78% at the 99% confidence level using either a Chi-Square test or Fisher's Exact test.
(3) 17.22% absolute return is statistically significantly different than 2.52% based on a t-test for difference of means at the 99% confidence level.
(4) The difference between 2.3 million and 0.5 million is statistically significant at the 99% confidence level.

**Exhibit 3e**

**Comparison of Statistical Significance and Abnormal Returns
for TaskUs Earnings Announcements
vs. Days with No News during the Analysis Period
Using a 15 Day Rolling Regression**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 11 | 294 |
| Significant Days at 95% Confidence Level | 9 | 18 |
| % Significant Days at 95% Confidence Level [2] | 81.82% | 6.12% |
| Average Absolute Abnormal Return [3] | 16.53% | 2.59% |
| Average Volume (Millions) [4] | 2.3 | 0.5 |

Notes:

(1) Results are based on the Analysis Period. For the purposes of this analysis, I selected the 294 days with no news. Days with no news were days that had zero news articles to my knowledge via the Factiva database, and no analyst reports or SEC filings were issued.

(2) 81.82% rate of statistical significance is statistically significantly different than 6.12% at the 99% confidence level using either a Chi-Square test or Fisher's Exact test.

(3) 16.53% absolute return is statistically significantly different than 2.59% based on a t-test for difference of means at the 99% confidence level.

(4) The difference between 2.3 million and 0.5 million is statistically significant at the 99% confidence level.

# Appendix A
# Documents Considered

**Prior Reports and Depositions in this Matter**

- Market Efficiency Report of Chad Coffman, CFA, dated May 10, 2024, including all data, documents, analyses and back-up materials provided in connection with that report.
- Deposition of Chad Coffman, CFA, dated June 20, 2024, including all exhibits introduced in connection with that deposition.
- Export Report of Bruce Deal, dated July 19, 2024, including all documents and materials cited and the data, analyses, and back-up materials provided by Mr. Deal to counsel for Plaintiffs that Mr. Deal claims to have considered in connection with the Deal Report.
- Deposition of Bruce Deal, dated August 15, 2024, including all exhibits introduced in connection with that deposition.

**Case Filings**

- Amended Class Action Complaint for Violations of the Federal Securities Laws filed December 16, 2022, in *HUMBERTO LOZADA and OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM Individually and on Behalf of All Others Similarly Situated v. TASKUS, INC., BRYCE MADDOCK, JASPAR WEIR, BALAJI SEKAR, AMIT DIXIT, MUKESH MEHTA, SUSIR KUMAR, JACQUELINE D. RESES, and BCP FC AGGREGATOR L.P.*, Case No.: 1:22-cv-01479-JPC.

**Court Decisions and Orders**

- Opinion and Order filed January 5, 2024, in HUMBERTO LOZADA and OKLAHOMA FIREFIGHERS PENSION AND RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, v. TASKUS, INC. et al., Case No.: 1:22-cv-01479-JPC.
- *Cammer, v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).
- Memorandum Decision and Order Granting Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel filed December 27, 2023, *Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago, Individually and on behalf of all others similarly situated, v. Pluralsight, Inc., Aaron Skonnard, and James Budge*, Case No.: 1:19-cv-00128-DBB-DAO United States District Court, District of Utah.
- Memorandum Opinion filed January 29, 2020, *Weiner, v. Tivity Health, Inc*., Case No.: 3:17- cv-01469 United States District Court Middle District of Tennessee Nashville Division.
- Order Certifying Class, Appointing Class Representative, and Appointing Class Counsel filed January 21, 2021, *The Police Retirement System of St. Louis, v. Granite Construction Incorporated, James H Roberts, Jigisha Desai, and Laurel J Krzeminski*, Case No.: 3:19-cv-04744-WHA, United States District Court, Northern District of California.

- Order Granting Motion for Class Certification filed September 4, 2018, *In Re: SanDisk LLC Securities Litigation*, Case 3:15-cv-01455-VC, United States District Court for the Northern District of California.
- Order Re Motion to Certify Class, Appoint Class Representatives, And Appoint Class Counsel filed April 2, 2022, *Junge v. Geron Corp.*, C 20-00547-WHA, United States District Court, Northern District of California.

## SEC Filings
- TaskUs, Inc. SEC Form S-1 filed April 12, 2021.
- TaskUs, Inc. SEC Form S-1/A filed May 6, 2021.
- TaskUs, Inc. SEC Form S-1/A filed June 2, 2021.
- TaskUs, Inc. SEC Form S-1/A filed June 10, 2021.
- TaskUs, Inc. SEC Form 424B4 filed June 14, 2021.
- TaskUs, Inc. SEC Form DRS filed September 17, 2021.
- TaskUs, Inc. SEC Form S-1 filed October 18, 2021.
- TaskUs, Inc. SEC Form 424B4 filed October 22, 2021.
- TaskUs, Inc. SEC Form SC 13G/A filed November 3, 2021.
- TaskUs, Inc. SEC Form 10-K for the fiscal year ended December 31, 2021.

## TaskUs, Inc. Class A Common Stock Data
- Historical data for TaskUs, Inc. Common Stock was obtained from S&P Capital IQ.
- TaskUs, Inc. Common Stock market makers data was obtained from Bloomberg, using the Rank function.
- TaskUs, Inc. Common Stock market capitalization percentiles were obtained from Bloomberg, using the EQS function.

## TaskUs News
- "TaskUs, Inc. Announces Pricing of Initial Public Offering," *GlobeNewswire,* June 10, 2021.
- "TaskUs Inc. to Announce Second Quarter 2021 Financial Results on August 10, 2021," *GlobeNewswire*, July 29, 2021.
- "Press Release: TaskUs Inc. to Announce Second Quarter 2021 Financial Results on August 10, 2021," *Dow Jones Institutional News*, July 29, 2021.
- "Press Release: TaskUs Announces Fiscal Second Quarter 2021 Results*," Dow Jones Institutional News*, August 10, 2021, 4:05 PM.
- "Press Release: TaskUs Announces Fiscal Third Quarter 2021 Results," *Dow Jones Institutional News*, November 10, 2021, 4:07 PM.
- "A sneak preview of SABJ's Business of the Year finalists (part 3 of 3)," *San Antonio Business Journal*, December 30, 2021.

- "Taskus Inc. Taskus, Inc. [sic] Files SEC Form 4, Statement of Changes in Beneficial Ownership of Securities: (Dec. 16, 2021)," *Computer Weekly News*, December 30, 2021.
- "Who Joins GOOGL Stock Among 28 Of Today's Fastest-Growing Stocks?," *Investor's Business Daily*, December 30, 2021.
- "Moderating The Bull Case Content," *Spruce Point Capital Management*, January 20, 2022.
- "Spruce Point Capital Management Announces Investment Opinion: Releases Report and Strong Sell Research Opinion on TaskUs, Inc. (NASDAQ: TASK)," *Business Wire*, January 20, 2022, 9:30 AM.
- "Why Are TaskUs Shares Trading Lower Today?," *Benzinga.com*, January 20, 2022.
- "$26.70 per share. Spruce Point finds evidence that CEO and co-founder Bryce...," *Theflyonthewall.com*, January 20, 2022.
- "Press Release: Glancy Prongay & Murray LLP, a Leading Securities Fraud Law Firm, Announces Investigation of TaskUs, Inc. (TASK) on Behalf of Investors," *Dow Jones Newswires*, January 24, 2022.

**TaskUs Analyst Reports**
- "A Derivative Play on Tech Disruption; Initiate at Overweight," *J.P. Morgan*, July 6, 2021.
- "Driving the consumer experience in the Digital Economy; initiate at Outperform," *RBC Capital Markets*, July 6, 2021.
- "Pure-Play Disrupting the CX Market; Initiating With an Outperform Rating," *William Blair*, July 6, 2021.
- "TASK: Secular Play on Digitizing the Consumer Drives Strong Growth Profile; Initiating at Equal Weight Given Valuation," *Wells Fargo*, July 6, 2021.
- "Help Me, Help You. Initiating Coverage of TaskUs, Inc. with a Buy Rating and $45 Price Target," *BTIG*, July 8, 2021.
- "Impressive first post-IPO print; maintain Buy," *Bank of America*, August 10, 2021.
- "Major 2Q Beat & Raise In First Quarter Out of the Gate. Reiterate Buy.," *BTIG*, August 10, 2021.
- "Strong upside in first quarter as a public company," *RBC Capital Markets*, August 10, 2021.
- "Strong revenue growth continues," *RBC Capital Markets*, November 10, 2021.
- "Adjusting revenue growth estimates," *RBC Capital Markets*, December 7, 2021.
- "TaskUs, Inc. (TASK): Short Report Creates Big Pullback; We Like the Stock," *Baird*, January 20, 2022.
- "Our Detailed Views on Recent Concerns," *J.P. Morgan*, January 25, 2022.
- "TaskUs, Inc. (TASK): Q4 Earnings and Initial 2022 Guidance Preview," *Baird*, January 31, 2022.

**Academic Articles**

- Aharony, Joseph & Swary, Itzhak, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance* 35, no. 1, (1980): 1-12.
- Beaver, William H. "The Information Content of Annual Earnings Announcements: New Insights from Intertemporal and Cross-Sectional Behavior," *Empirical Research in Accounting: Selected Studies*, 1968, supplement to the *Journal of Accounting Research* 6, (1968): 67-92.
- Janja Brendel and James Ryans, *Responding to Activist Short Sellers: Allegations, Firm Responses, and Outcomes*, J. of Accounting Research Vol. 50, No. 2 (May 2021), 487, 499.
- Fernandez, Frank, "The Roles and Responsibilities of Securities Analysts," *Securities Industry Association – Research Reports*, Vol. II, No. 7, August 22, 2001.
- Alexander Ljungqvist and Wenlan Qian, *How Constraining are Limits to Arbitrage?*, The Review of Financial Studies, August 2016, Vol. 29, No. 8, 1975, 1986.
- May, Robert G. "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies*, 1971, supplement to the *Journal of Accounting Research* 9, (1971): 119-163.

**Bates Stamped Documents**

- TASK_0016576.
- TASK_0038945.
- TASK_0148553.

**Other**

- "Quiet Period," Investor.gov, available at https://www.investor.gov/introduction-investing/investing-basics/glossary/quiet-period.
- Notice of Effectiveness of Form S-1 filed by TaskUs, Inc. (filed June 11, 2021 12:16 AM, effective June 10, 2021 4:00 PM) https://www.sec.gov/Archives/edgar/data/1829864/999999999521002298/xslEFFECTX01/primary_doc.xml.

Appendix B

**CHAD W. COFFMAN, MPP, CFA**

Peregrine Economics
125 South Wacker Drive
Suite 2610
Chicago, Illinois 60606
Mobile:          (815) 382-0092
Email:           ccoffman@peregrine-econ.com


**EMPLOYMENT:**

**Peregrine Economics**
President (2024 - Current)

Peregrine Economics provides independent economic and financial analysis. Peregrine applies big picture thinking and proven economic tools to build a clear narrative around complex problems. Practice areas include: Data Science, General Damages, Labor & Employment, Regulatory Economics, and Securities Valuation.

**Global Economics Group, LLC**
President (2008 - 2023)

**Market Platform Dynamics, LLC**
Chief Financial Officer & Chief Operating Officer (2010 – 2023)

**Chicago Partners, LLC**
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)


**EDUCATION:**

**CFA**     Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**    Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

**PROFESSIONAL EXPERIENCE:**

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters.

- Expert Consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

**Testimony in the last four years:**

- Testifying Expert in Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated, v. Esperion Therapeutics, Inc., et al., Defendants, No. 2:16-cv-10089-AJT-RSW, United States District Court for the Eastern Michigan of Michigan. Filed expert report June 6, 2019. Deposition July 26, 2019. Filed rebuttal reply report October 7, 2019. Filed expert report May 15, 2020. Deposition July 31, 2020.

- Testifying Expert in Eric Weiner, Individually and on Behalf of All Others Similarly Situated, vs. Tivity Health, Inc., Donato Tramuto, Glenn Hargreaves and, Adam Holland, Defendants, Case No.: 3:17-cv-01469 United States District Court for the Middle District of Tennessee. Filed expert report July 1, 2019. Deposition September 4, 2019. Filed rebuttal reply report December 20, 2019. Filed expert report July 30, 2020. Filed rebuttal reply report September 30, 2020. Deposition October 22, 2020.

- Testifying Expert in Peace Officers' Annuity and Benefit Fund of Georgia, Individually and On Behalf of All Others Similarly Situated, and Jacksonville Police and Fire Pension Fund, Individually and On Behalf of All Others Similarly Situated vs. DaVita, Inc. et al., No. 1:17-cv-00304-WJM-NRN, United States District Court for the District of Colorado. Filed expert report January 31, 2020. Deposition May 27, 2020.

- Testifying Expert in In Re Avon Securities Litigation, No. 19 Civ. 01420- CM, United States District Court for the Southern District of New York. Filed expert report February 13, 2020.

- Testifying Expert in In Re Allergan Generic Drug Pricing Securities Litigation, Civil Action No. 2:16-9449 (KSH) (CLW), United States District Court for the District of New Jersey. Filed expert report March 20, 2020. Deposition July 16, 2020. Filed expert reply report November 25, 2020.

- Expert Declaration in Martin Cohen, Individually and On Behalf of All Others Similarly Situated, v. Luckin Coffee Inc., Jenny Zhiya Qian, and Reinout Hendrik Schakel, Case no. 1:20-cv-01293-LJL, United States District Court for the Southern District of New York. Filed declaration May 13, 2020.

- Testifying Expert in <u>In RE Navient Corporation Securities Litigation, No. 1:17-cv-08373-RBK-AMD, United States District Court of New Jersey.</u> Filed expert report May 15, 2020. Deposition July 23, 2020. Filed declaration August 21, 2020. Filed expert report April 16, 2021. Deposition June 3, 2021.

- Testifying Expert in <u>Yellowdog Partners, LP, Individually and on Behalf of All Others Similarly Situated, vs. CURO Group Holdings Corp., *et al*., Civil Action No. 2:18-cv-02662-JWL-KGG, United States District Court for the District of Kansas, Kansas City.</u> Filed expert report May 18, 2020.

- Testifying Expert in <u>Julian Keippel, Individually and On Behalf of All Others Similarly Situated, vs. Health Insurance Innovations, Inc., Gavin Southwell, and Michael D. Hershberger, No. 8:19-CV-00421-WFJ-CPT, United States District Court Middle District of Florida Tampa Division.</u> Filed expert report May 21, 2020. Deposition June 15, 2020.

- Testifying Expert in <u>In Re Perrigo Company plc Securities Litigation, No: 1:19-cv-00070-DLC, United States District Court for the Southern District of New York.</u> Filed expert report July 10, 2020. Deposition August 4, 2020. Filed expert report October 6, 2020. Filed expert rebuttal reply report December 4, 2020. Deposition March 4, 2021.

- Testifying Expert in <u>Plymouth County Retirement System, Individually and On Behalf of All Others Similarly Situated, vs. GTT Communications, Inc., Richard D. Calder, Jr., Chris Mckee, Michael Sicoli, And Gina Nomellini, Case No. 1:19-cv-00982-CMH-MSN, United States District Court for the Eastern District of Virginia Alexandria Division.</u> Filed expert report August 7, 2020. Filed expert report September 25, 2020.

- Testifying Expert in <u>Thomas W. Luczak, Individually and On Behalf of All Others Similarly Situated, vs. National Beverage Corp., Nick A. Caporella, and George R. Bracken, Case No. 0:18-cv-61631-KMM, United States District Court for the Southern District of Florida.</u> Filed expert report September 25, 2020. Deposition November 5, 2020.

- Expert Declaration in <u>In re: PG&E Corporation – and – Pacific Gas and Electric Company Debtors, Case No. 19-30088 (DM), United States Bankruptcy Court for the Northern District of California, San Francisco Division.</u> Filed declaration September 28, 2020.

- Testifying Expert in <u>Oklahoma Police Pension Fund and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Teligent, Inc. and Jason Grenfell-Gardner, Defendants, Case No. 1:19-cv-03354-VM, United States District Court for the Southern District of New York</u>. Filed expert report September 30, 2020. Deposition March 11, 2021.

- Testifying Expert in <u>John Utesch, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Lannett Company, Inc., Arthur P. Bedrosian, and Martin P. Galvan, Defendants, Civil Action No. 2:16-cv-05932-WB, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2020. Deposition December 10, 2020. Filed expert rebuttal report on May 13, 2021. Hearing testimony July 27, 2021. Filed expert report May 8, 2024. Deposition August 6, 2024.

- Testifying Expert in <u>City of Warren Police and Fire Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios and Michelle D. Wilson, Defendants, Civil Action No. 1:20-cv-02031-JSR, United States District Court for the Southern District of New York.</u> Filed expert report on October 6, 2020. Deposition October 14, 2020.

- Testifying Expert in <u>Employees' Retirement System of the Puerto Rico Electric Power Authority, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh, Defendants, Case No. 2:19-cv-08237-SDW, United States District Court for the District of New Jersey.</u> Filed expert report on December 7, 2020. Deposition December 22, 2020.

- Testifying Expert in <u>The Police Retirement System of St. Louis, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Granite Construction Incorporated, James H. Roberts, Jigisha Desai, and Laurel J. Krzeminski, Defendants, Case No. 3:19-cv-04744-WHA, United States District Court for the Northern District of California.</u> Filed expert report on November 25, 2020. Filed declaration re: Plan of Allocation May 25, 2021.

- Testifying Expert in <u>Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as Trustee of the Gonzalez Coronado Trust, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Kevin Davis and Amir Rosenthal (Performance Sports Group Ltd.), Defendants, Case No.: 1:16-CV-3591-GHW, United States District Court for the Southern District of New York.</u> Filed expert report on December 18, 2020. Deposition February 5, 2021. Filed expert rebuttal report on April 6, 2021. Filed declaration re: Plan of Allocation January 21, 2022.

- Testifying Expert in <u>Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. AbbVie Inc., Richard A. Gonzalez, and William J. Chase, Defendants, Case No. 1:18-cv-6790, United States District Court for the Northern District of Illinois.</u> Filed expert report on February 1, 2021. Filed expert rebuttal report on September 20, 2021. Filed expert report on July 6, 2023. Filed expert rebuttal report on February 6, 2024.

- Testifying Expert in <u>Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Newell Brands Inc., Michael B. Polk, John K. Stipancich, Scott H. Garber, Bradford R. Turner, Michael T. Cowhig, Thomas E. Clarke, Kevin C. Conroy, Scott S. Cowen, Domenico De Sole, Cynthia A. Montgomery, Christopher D. O'Leary, Jose Ignacio Perez-Lizaur, Steven J. Strobel, Michael A. Todman, and Raymond G. Viault, Defendants, Case No: HUD-L-3492-18, Superior Court of New Jersey Law Division (Hudson County).</u> Filed expert report on May 3, 2021. Filed expert rebuttal report on June 15, 2021. Deposition July 21, 2021. Filed expert supplemental reply report on February 4, 2022. Deposition March 15, 2022.

- Testifying Expert in <u>Carmignac Gestion, S.A., Mason Capital L.P., et al., Pentwater Equity Opportunities Master Fund LTD., et al., First Manhattan Co., Nationwide Mutual Funds, on behalf of its series Nationwide S&P 500 Index Fund, et. al., WCM Alternatives: Event-Driven Fund, et al., Hudson Bay Master Fund LTD., et al., Schwab Capital Trust on behalf of its series Schwab</u>

S&P 500 Index Fund, et al., Sculptor Master Fund, LTD. f/k/a OZ Master Fund, Ltd., et al., Aberdeen Canada Funds – Global Equity Fund, a series of Aberdeen Canada Funds, et al., Discovery Global Citizens Master Fund, LTD., et al., York Capital Management, L.P., et al., Burlington Loan Management DAC, Universities Superannuation Scheme LTD., Principal Funds, Inc., et al., Kuwait Investment Authority et al., BlackRock Global Allocation Fund Inc., et al., Plaintiffs, vs. Perrigo Company PLC, et al, Defendants, Civil Action No(s): 17-10467 (MCA) (LDW), 18-1119 (MCA) (LDW), 18-1121 (MCA) (LDW), 18-2291 (MCA) (LDW), 18-15382 (MCA) (LDW), 18-16204 (MCA) (LDW), 18-16206 (MCA) (LDW), 19-3973 (MCA) (LDW), 19-4900 (MCA) (LDW), 19-6560 (MCA) (LDW), 19-21502 (MCA) (LDW), 19-21732 (MCA) (LDW), 20-1484 (MCA) (LDW), 20-2262 (MCA) (LDW), 20-2410 (MCA) (LDW), 20-3431 (MCA) (LDW), 20-4748 (MCA) (LDW), United States District Court for the District of New Jersey. Filed expert report on June 23, 2021. Filed expert report on September 29, 2021. Deposition October 26, 2021.

- Testifying Expert in In Re Nielsen Holdings PLC Securities Litigation, Case No. 18-CV-07143-JMF, United States District Court Southern District of New York. Filed expert report on July 14, 2021. Deposition September 30, 2021. Filed expert report December 17, 2021.

- Testifying Expert in Allegheny County Employees Retirement System et al. v. Energy Transfer LP et al., Case No. 2:20-cv-00200-GAM, United States District Court for the Eastern District of Pennsylvania. Filed expert report on September 17, 2021. Deposition November 18, 2021. Filed expert rebuttal report on April 22, 2022. Filed expert report on September 15, 2023. Deposition December 13, 2023.

- Testifying Expert in Julia Junge and Richard Junge et al. v. Geron Corporation et al., Case No. 3:20-cv-00547-WHA, United States District Court for the Northern District of California, San Francisco Division. Filed expert report on September 30, 2021. Deposition October 15, 2021. Filed expert rebuttal report on November 4, 2021.

- Testifying Expert in In Re MINDBODY, Inc. Securities Litigation, Civil Action No. 1:19-cv-08331-VEC, United States District Court Southern District of New York. Filed expert report on October 15, 2021.

- Testifying Expert in Plymouth County Retirement System and Oklahoma Police Pension and Retirement System, Individually and On Behalf of All Others Similarly Situated, v. Evolent Health, Inc., Frank Williams, Nicholas McGrane, Seth Blackley, Christie Spencer, and Steven Wigginton, Case No. 1:19-cv-01031, United States District Court Eastern District of Virginia, Alexandria Division. Filed expert report on October 19, 2021. Filed expert report on April 8, 2022. Deposition May 9, 2022. Filed expert report on May 27, 2022. Deposition June 22, 2022.

- Testifying Expert in In re Uniti Group Inc. Securities Litigation, Case No. 4:19-cv-00756-BSM, United States District Court Eastern District of Arkansas, Central Division. Filed expert report on October 25, 2021. Deposition December 6, 2021. Filed declaration re: expert report on January 24, 2022. Filed expert rebuttal report on February 22, 2022.

- Testifying Expert in <u>David Kanefsky, Individually and On Behalf of All Others Similarly Situated, v. Honeywell International Inc., Darius Adamczyk, and Thomas A. Szlosek, Civ. No. 2:18-15536-WJM, United States District Court for the District of New Jersey</u>. Filed expert report on November 1, 2021.

- Testifying Expert in <u>In Re Pareteum Securities Litigation, No. 1:19-cv-09767-AKH-GWG, United States District Court for the Southern District of New York</u>. Filed expert report December 1, 2021.

- Expert Declaration in <u>Arkansas Teacher Retirement System and John A. Prokop, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. OSI Systems, Inc., Deepak Chopra, Alan Edrick, and Ajay Mehra, Defendants, Case No. 17-cv-08841-VAP-SKx, United States District Court for the Central District of California, Western Division.</u> Filed declaration re: Plan of Allocation and aggregate damages December 10, 2021.

- Testifying Expert in <u>Boston Retirement System, Individually and On Behalf of All Others Similarly Situated v. Alexion Pharmaceuticals, Inc., Leonard Bell, David L. Hallal, Vikas Sinha, David Brennan, David J. Anderson, Ludwig Hantson, and Carsten Thiel, Defendants, Civ. No. 3:16-cv-2127(AWT), United States District Court for the District of Connecticut</u>. Filed expert report December 15, 2021. Deposition March 8, 2022. Filed expert rebuttal report June 17, 2022.

- Testifying Expert <u>In Re Aphria, Inc. Securities Litigation, No. 1:18-cv-11376-GBD, United States District Court Southern District of New York.</u> Filed declaration January 28, 2022 re: class certification. Filed expert report January 28, 2022. Deposition May 19, 2022.

- Testifying Expert in <u>Discovery Global Citizens Master Fund, Ltd., et al., MSD Torchlight Partners, L.P., et al., Incline Global Master LP., et al., Valic Company I, et al., Okumus Opportunistic Value Fund, Ltd., The Boeing Company Employee Retirement Plans Master Trust, et al., Första Ap-Fonden, et al., GMO Trust, et al., Hound Partners Offshore Fund, LP, et al., Colonial First State Investments Limited As Responsible Entity For Commonwealth Global Shares Fund 1, et al., Bharat Ahuja, et al., Brahman Partners II, L.P., et al., The Prudential Insurance Company Of America, et al., 2012 Dynasty UC LLC, et al., BlackRock Global Allocation Fund, Inc., et al., Northwestern Mutual Life Insurance Co., et al., Bahaa Aly, et al., James M. Templeton, et al., GIC Private LTD., et al., USAA MUTUAL FUNDS TRUST On Behalf Of Its Series USAA Aggressive Growth Fund, et al., Maverick Select Fund, Ltd., et al., Plaintiffs, vs. Valeant Pharmaceuticals International, Inc. et al., Defendants, Civil Action No(s): 3:16-cv-07321-MAS-LHG, 3:16-cv-07324-MAS-LHG, 3:16-cv-07494, 3:16-cv-07496, 3:17-cv-06513-MAS-LHG, 3:17-cv-07636-MAS-LHG, 3:17-cv-12088-MAS-LHG, 3:18-cv-00089, 3:18-cv-08705-MAS-LHG, 3:18-cv-00383-MAS-LHG, 3:18-cv-00846-MAS-LHG, 3:18-00893, 3:18-cv-01223-MAS-LHG, 3:18-cv-08595-MAS-LHG, 3:18-cv-00343-MAS-LHG, 3:18-cv-15286-MAS-LHG, 3:18-cv-17393, 3:20-cv-05478, 3:20-cv-07460-MAS-LHG, 3:20-cv-07462-MAS-LHG, 3:20-02190-MAS-LHG, United States District Court for the District of New Jersey.</u> Filed expert report February 2, 2022. Filed expert rebuttal report on May 9, 2022. Deposition June 3, 2022. Filed declaration September 28, 2022 (related only to 3:20-cv-02190-MAS-LHG). Filed declaration November 10, 2022.

- Testifying Expert in <u>Roei Azar, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Grubhub Inc., et al., Defendants, Case No. 1:19-cv-07665, United States District</u>

Court Northern District of Illinois Eastern Division. Filed expert report June 1, 2022. Deposition July 14, 2022.

- Testifying Expert in In Re Peabody Energy Corp. Securities Litigation, Civil Action No. 1:20-cv-08024-PKC, United States District Court Southern District of New York. Filed expert report July 15, 2022.

- Testifying Expert in BlackRock Asset Management Canada Limited, et al., Plaintiffs, v. Valeant Pharmaceuticals International, Inc. (n/k/a Bausch Health Companies Inc.), et al. Defendants, Nos.: 500-11-054155-185, 500-17-103749-183, and California State Teachers' Retirement System, Plaintiff, v. Bausch Health Companies Inc. (f/k/a Valeant Pharmaceuticals International, Inc.), et al., Defendants, Nos.: 500-11-055722-181, 500-11-055722-181, Canada Superior Court, Province of Québec, District of Montreal. Filed expert report September 30, 2022. Filed expert rebuttal report on July 10, 2023.

- Testifying Expert in Sheet Metal Workers National Pension Fund and International Brotherhood of Teamsters Local No. 710 Pension Fund, individually and as Lead Plaintiffs on behalf of all others similarly situated, and International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware, individually and as Named Plaintiff, on behalf of all others similarly situated, Plaintiffs v. Bayer Aktiengesellschaft, Werner Baumann, Werner Wenning, Liam Condon, Johannes Dietsch, and Wolfgang Nickl, Defendants, No. 3:20-cv-04737-RS, Northern District of California, San Francisco Division. Filed expert report October 28, 2022. Deposition December 21, 2022. Filed expert rebuttal report on March 21, 2023. Filed expert report June 11, 2024.

- Testifying Expert in In Re: Maxar Technologies, Inc. Shareholder Litigation, Lead Case No.:19CV357070, Superior Court of the State of California, County of Santa Clara. Filed expert report December 12, 2022.

- Testifying Expert in In Re FibroGen Inc., Securities Litigation, Case No. 3:21-cv-02623-EMC, United States District Court Northern District of California. Filed expert report January 27, 2023. Deposition April 4, 2023.

- Testifying Expert in Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago, individually and on behalf of all others similarly situated, Plaintiffs, v. Pluralsight, Inc.; Aaron Skonnard; and James Budge, Defendants, Case No. 1:19-cv-00128, United States District Court for the District of Utah. Filed expert report March 3, 2023.

- Testifying Expert in Sothinathan Sinnathurai, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Novavax, Inc., Stanley C. Erck, Gregory F. Covino, John J. Trizzino, and Gregory M. Glenn, Defendants, Case 8:21-cv-02910-TDC, United States District Court for the District of Maryland. Filed expert report March 16, 2023. Deposition September 14, 2023. Filed expert rebuttal report November 13, 2023.

- Testifying Expert in Meysam Moradpour, Individually and On Behalf of All Others Similarly Situated, v. Velodyne Lidar, Inc., Anand Gopalan, Andrew Hamer, James A. Graf, Michael Dee,

and Joseph B. Culkin, Case No. 3:21-CV-01486-SI, United States District Court Northern District of California San Francisco Division. Filed expert report March 20, 2023.

- Testifying Expert in In Re Boston Scientific Corporation Securities Litigation, Case No. 1:20-cv-12225-DPW, United States District Court District of Massachusetts. Filed expert report April 21, 2023. Filed declaration June 22, 2023.

- Testifying Expert in In Re Okta, Inc. Securities Litigation, Case 3:22-cv-02990-SI, United States District Court Northern District of California. Filed expert report August 18, 2023.

- Testifying Expert in Carl Shupe and Matthew Pearlman, Individually and on Behalf of All Others Similarly Situated, vs. Rocket Companies, Inc., Jay D. Farner, Julie R. Booth, Robert Dean Walters, Daniel Gilbert, and Rock Holdings Inc., Civ. No. 1:21-cv-11528, United States District Court Eastern District of Michigan, Southern Division. Filed expert report August 30, 2023. Deposition November 8, 2023. Filed expert rebuttal report on January 26, 2024. Filed expert report February 12, 2024. Deposition February 22, 2024. Filed expert rebuttal report on March 8, 2024. Filed expert report April 5, 2024. Deposition June 18, 2024.

- Testifying Expert in Richard R. Weston, Individually and on Behalf of All Others Similarly Situated, Plaintiff v. DocuSign, Inc., Daniel D. Springer, Michael J. Sheridan, Cynthia Gaylor, and Loren Alhadeff, Defendants, Case No. 3:22-cv-0084-WHO, United States District Court, Northern District of California, San Francisco Division. Filed expert report September 15, 2023. Deposition January 4, 2024. Filed expert rebuttal report on April 17, 2024.

- Testifying Expert in John Brazinsky, Individually and on behalf of all other similarly situated, Plaintiff, vs. AT&T Inc., Randall L. Stephenson, John T. Stankey, Pascal Desroches, and John Stephens, Defendants, Case No. 2:23-cv-04064-KM-JBC, United States District Court for the District of New Jersey. Filed declaration October 23, 2023.

- Testifying Expert in In Re Concho Resources Inc. Securities Litigation, No. 4:21-cv-02473, United States District Court Southern District of Texas, Houston Division. Filed expert report December 7, 2023. Filed expert rebuttal report on May 8, 2024.

- Testifying Expert in Reginald T Allison, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Oak Street Health, Inc., et al., Defendants, Case No. 1:22-cv-00149, United States District Court, Northern District of Illinois. Filed expert report December 15, 2023. Deposition January 23, 2024. Filed expert rebuttal report April 22, 2024.

- Testifying Expert in Boston Retirement System, et al., Plaintiff, v. Uber Technologies, Inc., et al., Defendants, Case No. 3:19-cv-06361, United States District Court, Northern District of California. Filed expert report February 1, 2024. Filed expert rebuttal report March 12, 2024. Deposition April 12, 2024.

- Testifying Expert in In Re Plantronics, Inc. Securities Litigation, Case No. 4:19-cv-07481-JST, United States District Court Northern District of California Oakland Division. Filed expert report February 8, 2024.

- Testifying Expert in <u>Robert Ciarciello, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Bioventus Inc., Kenneth M. Reali, Mark L. Singleton, Gergory O. Anglum, and Susan M. Stalnecker, Defendants, Case No. 1:23-cv-00032-CCE-JEP, United States District Court Middle District of North Carolina.</u> Filed expert report March 7, 2024. Filed expert report March 27, 2024. Deposition April 8, 2024. Filed expert rebuttal report May 10, 2024. Filed declaration re: Plan of Allocation August 5, 2024.

- Testifying Expert in <u>Michael Pardi, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Tricida, Inc. and Gerritt Klaerner, Defendants. Case No. 4:21-cv-00076-HSG, United States District Court, Northern District of California.</u> Filed expert report April 30, 2024. Filed expert rebuttal report August 15, 2024.

- Testifying Expert in <u>Miriam Edwards, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. McDermott International, Inc., David Dickson, and Stuart Spence, Defendants. Case No. 4:18-cv-04330, United States Southern District Court, Southern District of Texas, Houston Division.</u> Filed expert report April 30, 2024.

- Testifying Expert in <u>Humberto Lozada and Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Taskus Inc., Bryce Maddock, Jaspar Weir, Balaji Sekar, Amit Dixit, Mukesh Mehta, Susir Kumar, Jacqueline D. Reses, and BCP FC Aggregator L.P., Defendants, United States District Court, Southern District of New York</u>. Filed expert report May 10, 2024. Deposition June 20, 2024.

- Testifying Expert in <u>John Harvey Schneider, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Natera, Inc., Steve Chapman, Michael Brophy, Matthew Rabinowitz, and Ramesh Hariharan, Defendants, Case No. 1:22-cv-00398-DAE, United States District Court, Western District of Texas</u>. Filed expert report June 4, 2024. Deposition July 19, 2024.

- Testifying Expert in <u>Stadium Capital LLC, on Behalf of All Others Similarly Situated, Plaintiff, v. Co-Diagnostics, Inc., Dwight H. Egan, and Brian L. Brown, Defendants, Case No.: 22-cv-6978 (AS), United States District Court, Southern District of New York.</u> Filed expert report July 26, 2024.

- Testifying Expert <u>In Re Barclays PLC Securities Litigation, Case No 1:22-cv-08172-KPF, United States District Court Southern District of New York.</u> Filed expert report August 12, 2024.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert Consultant in various class action matters regarding race, age, or gender discrimination.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert Consultant in high-profile antitrust matters in the computer and credit card industries.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

**PUBLICATIONS:**

> Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

> Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

> Associate Member CFA Society of Chicago
> Associate Member CFA Institute
> Phi Beta Kappa

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.
- Volunteer for Chicago Food Depository.
- Volunteer for Habitat for Humanity ReStore.