**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HUMBERTO LOZADA and OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>TASKUS, INC., BRYCE MADDOCK, JASPAR WEIR, BALAJI SEKAR, AMIT DIXIT, MUKESH MEHTA, SUSIR KUMAR, JACQUELINE D. RESES, and BCP FC AGGREGATOR L.P.,<br><br>Defendants. | Case No. 1:22-cv-01479 JPC-GS<br><br><u>CLASS ACTION</u><br><br>Judge John P. Cronan |

**DEFENDANTS' SUR-REPLY IN FURTHER OPPOSITION TO PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS**
**REPRESENTATIVES AND CLASS COUNSEL**

**TABLE OF CONTENTS**

**Page**

ARGUMENT ........................................................................................................................ 1

I.       PLAINTIFFS FAIL TO DEMONSTRATE MARKET EFFICIENCY ............................ 1

         A.       Mr. Coffman's Event Study Does Not Demonstrate Market Efficiency ................ 1

         B.       There Was No Analyst Coverage at the Start of the Class Period .......................... 2

II.      THE LOW ATTRITION STATEMENT HAD NO PRICE IMPACT .............................. 3

         A.       There is No Evidence of Front-End Price Inflation ................................................ 3

         B.       The Low Attrition Statement Is Generic and Does Not Match the Alleged
                  Corrective Disclosure ............................................................................................ 5

         C.       The Spruce Report Did Not Correct (or Match) The Low Attrition
                  Statement ................................................................................................................ 7

III.     OKLAHOMA CANNOT BE A CLASS REPRESENTATIVE ........................................ 9

IV.      PLAINTIFFS HAVE NOT PROFFERED A DAMAGES METHODOLOGY ............... 10

V.       THIS COURT SHOULD ORDER THE PAYMENT OF REASONABLE
         EXPENSES ................................................................................................................... 10

CONCLUSION .................................................................................................................. 11

## TABLE OF AUTHORITIES

**Cases**

*Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.*,
  301 F.R.D. 47 (S.D.N.Y. 2014) ................................................................................. 10

*Ark Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  77 F.4th 74 (2d Cir. 2023) *("Goldman II")*................................................... 3, 7, 8, 9

*Berwecky v. Bear, Stearns & Co.*,
  197 F.R.D. 65 (S.D.N.Y. 2000) .................................................................................. 9

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
  2023 WL 2932485 (D. Conn. Apr. 13, 2023)............................................................. 8

*Cosby v. KPMG, LLP*,
  2020 WL 3548653 (E.D. Tenn. June 29, 2020).......................................................... 1

*Crews v. Rivian Auto., Inc.*,
  2024 WL 3447988 (C.D. Cal. July 17, 2024)............................................................. 2

*Goldman Sachs Grp., Inc. v Ark. Teacher Ret. Sys.*,
  141 S. Ct. 1951 (2021) *("Goldman")*............................................................... 3, 5, 8

*Hoi Ming Michael Ho v. Duoyuan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012) ..................................................................... 10

*In re Apache Corp. Sec. Litig.*,
  2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ............................................................... 6

*In re Fed. Home Loan Mortg. Corp. Secs*,
  281 F.R.D. 174 (S.D.N.Y. 2012) ............................................................................... 1

*In re IPO Sec. Litig.*,
  227 F.R.D. 65 (S.D.N.Y. 2004) ............................................................................... 10

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
  2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ........................................................... 4

*In re SCOR Holding (Switzerland) AG Litig.*,
  537 F. Supp. 2d 556 (S.D.N.Y. 2008) ....................................................................... 2

*Waggoner v. Barclays PLC,* 875 F.3d 79 (2d Cir. 2017)............................................... 10

Defendants respectfully submit this Sur-Reply and the Sur-Reply Declaration of Jonathan K. Youngwood in further opposition to Plaintiffs' Motion for Class Certification.[1]

## ARGUMENT

### I.    PLAINTIFFS FAIL TO DEMONSTRATE MARKET EFFICIENCY

#### A.    Mr. Coffman's Event Study Does Not Demonstrate Market Efficiency

Proof of a cause-and-effect relationship between disclosures and movements in stock price (*Cammer* 5)—typically shown by an event study—is the most important factor to demonstrate market efficiency.  Defs' Opp. Br. ("Opp.") at 8.  Plaintiffs' expert, Mr. Coffman, agrees. SR Ex. 2 (Coff. SR Tr. at 261-62) (testifying that he could not recall providing a market efficiency opinion without doing an event study).  Plaintiffs argue that *Cammer* 5 does not need to be satisfied where other factors support efficiency.  Reply at 4.  But, in both cases Plaintiffs cite, *all* other factors indisputably pointed to efficiency (which is not the case here) and neither entailed an efficiency analysis in the context of an IPO.  *Id.*  Since Plaintiffs' event study is flawed and they fail to refute Mr. Deal's critiques, this Court should not find efficiency.  *See In re Fed. Home Loan Mortg. Corp. Secs*, 281 F.R.D. 174, 179-182 (S.D.N.Y. 2012).

To illustrate the flaws in Mr. Coffman's study, Mr. Deal ran an alternative test that adjusted the estimation window from 120 trading days to 15, 30, 45 and 60 trading days, to account for the short Class Period,[2] and analyzed the Class Period only. Ex. 1 (Deal Rpt. ¶ 88-92); SR Ex. 1 (Deal SR Rpt. ¶ 92-93).  Mr. Deal also compared news days against non-news

---

[1] Unless otherwise noted, citations, quotations and internal quotation marks have been omitted.  "Ex." refers to the Exhibits to the Declaration of Jonathan K. Youngwood (ECF 95) filed with Defendants' Opposition Brief and "SR Ex." refers to the Exhibits to the accompanying Sur-Reply Declaration of Jonathan K. Youngwood.

[2] Mr. Coffman's use of a 120 day "rolling" window resulted in ~80% of the dates in the Class Period utilizing an inferior fixed window.  Opp. at 10.  Plaintiffs cite a single case, *Cosby v. KPMG, LLP,* 2020 WL 3548653 (E.D. Tenn. June 29, 2020), where the court certified a class based on Mr. Coffman's use of a 120 day window.  But *Cosby* is inapposite—the class period was ~50 months rather than the seven months here, resulting in a far fewer percentage of dates using a fixed window and defendants in *Cosby* did not challenge the 120 window as too long.

days (instead of comparing earnings and pre-earnings days against non-news days like Mr.

Coffman) because, as Mr. Deal explained, the latter approach introduces statistical biases as

earnings days by their nature have a higher likelihood of triggering changes in investors'

decisions. *Id.* For each of the four scenarios tested under Mr. Deal's more robust design, there

was no showing of market efficiency. *Id.;* Opp. at 13. Mr. Coffman argues, *inter alia,* that

earnings days rather than the broader category of all news days, are "well-suited" for event

studies and the use of earnings dates reduces subjectivity. ECF 117-1 at ¶ 94. But neither

Plaintiffs nor Mr. Coffman have a response to Defendants' critique that the use of earnings days

only introduces statistical biases. Nor do they refute that non-earnings news days can contain

value-relevant information. Further, Plaintiffs cite no authority to support Mr. Coffman's use of

earning days versus Mr. Deal's broader news sample. *Id.* at ¶ 94-99; Reply at 5. Plaintiffs also

argue that three of 153 total days in Mr. Deal's study were incorrectly categorized as "news"

days. ECF 117-1 at ¶ 96. This criticism, however, is not meaningful—Mr. Deal has re-run his

tests changing the three days from "news" days to "non-news" days, and, not surprisingly, the

results are the same. SR Ex. 1 (Deal SR Rpt. at ¶ 92-93).

**B.      There Was No Analyst Coverage at the Start of the Class Period**

The Second Circuit has held that the lack of analyst reports during a "quiet period" (here

until July 6, 2021) indicates that the market was inefficient. Opp. at 13; *see also In re SCOR*

*Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 577 n.32 (S.D.N.Y. 2008) ("[T]he IPO

and immediate post-IPO quiet period should be considered an unlikely candidate for the

application of the fraud-on-the-market doctrine."). The two out of circuit cases Plaintiffs cite—

to argue that courts have found efficiency during quiet periods—in fact recognize that the

Second Circuit presumes *inefficiency* during the quiet period. *See e.g., Crews v. Rivian Auto.,*

2

*Inc.*, 2024 WL 3447988, at *9 (C.D. Cal. July 17, 2024) ("[N]or does the Court embrace the Second Circuit's presumption that a market remains inefficient throughout the quiet period . . .").

## II.    THE LOW ATTRITION STATEMENT HAD NO PRICE IMPACT

Contrary to Plaintiffs' Reply, the proper standard by which to analyze price impact is set forth in *Goldman Sachs Grp., Inc. v Ark. Teacher Ret. Sys.,* 141 S. Ct. 1951 (2021) *("Goldman")* and *Ark Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023) ("*Goldman II*") (recent Second Circuit authority that Plaintiffs fail to even cite). Under these cases, a court must "assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman,* 141 S.Ct. at 1963. This includes a careful analysis of market commentary (parsing statements that may pertain to the same subject matter) as well as an assessment of any "mismatch" between the alleged misstatement and corrective disclosure. *Id.* at 1961; *Goldman II*, 77 F.4th at 103-04.

### A.    There is No Evidence of Front-End Price Inflation

Plaintiffs do not dispute that Mr. Coffman calculated no statistically significant abnormal returns for TaskUs stock from June 14, 2021, the second day of trading post-IPO through August 10, 2021 (the first earnings release), nor do they dispute that there was no statistically significant abnormal positive return on October 19, 2021, after the filing of the SPO registration statement. Opp. at 15. Instead, Plaintiffs' Reply only addresses June 11, 2021, the first day TaskUs stock traded publicly. Although on that day, the stock increased from $27.55 (at open) to $31.09 (at close), Plaintiffs do not demonstrate (or even claim) that this was a statistically significant return nor do they offer any explanation for the price increase. In fact, at his first deposition, Mr. Coffman confirmed that he could not calculate a close-to-close return for June 11, 2021, since it was the first day of trading (Ex. 6 (Coff. Tr. at 92-93)), and, at his second deposition, he testified that he did no formal analysis of intraday trading data for June 11, 2021 and had no opinion as to

3

why the stock price increased.  SR Ex. 2 (Coff. SR Tr. at 148-51).

Given this, Defendants easily demonstrate that there is no evidence of a front end price impact.[3]  As an initial matter, the alleged low attrition misstatement was first publicly made on April 12, 2021, when TaskUs filed its draft registration statement, two months prior to the first day of trading.  Opp. at 5.  As such, it was known to the market well in advance of June 11 and already "baked into" the opening stock price.[4]  SR Ex. 1 (Deal SR Rpt. at ¶ 19 n.29).  The typical price impact analysis—which, assuming an efficient market, examines the impact of a statement immediately after it is made—is not applicable here.  This also is consistent with the fact that Plaintiffs have failed to show an efficient market on June 11.  Among other things, none of Mr. Coffman's event studies or analyses include June 11 as a date he studied.  *See e.g.*, Ex. 7 (Event Study).  Further, as Mr. Coffman acknowledges, it is a well-known phenomenon that stock prices often "pop" following an IPO, irrespective of the total mix of information available.  *See* SR Ex. 1 (Deal SR Rpt. at ¶ 17); SR Ex. 2 (Coff SR Tr. at 159) ("it's often observed that you see a fairly substantial increase in price from the IPO price to the first closing price" which may be caused by the fact that "the IPO price is set with an eye towards not having a major price decline on the first day.").  That said, even if assuming an efficient market and statistically significant price increase, Mr. Deal's analysis of news reports on June 11 and the following four days, demonstrates a lack of price impact (of the 24 articles on those days, none made any reference to attrition).  SR Ex. 1 (Deal SR Rpt. at ¶ 19).  Similarly, analyst reports from the Class Period, the first of which were not issued until July 6, 2021, also demonstrate that there was no price impact

---

[3] *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *6 (S.D.N.Y. Mar. 29, 2024) (plaintiff's theory was price maintenance, not inflation, where no "misrepresentations caused a statistically significant increase[.]").

[4] That the stock opened higher than the IPO price does not indicate price impact as the IPO price is set based on various factors, independent of an efficient market.  Ex. 6 (Coff. Tr. at 93-94).

4

attributable to the alleged misstatement.  *See infra* at 6; Opp. at 21-22.

> **B.**    **The Low Attrition Statement Is Generic and Does Not Match the Alleged Corrective Disclosure**

The single alleged misstatement that remains with respect to Plaintiffs' 10b-5 claim—*i.e.*, "The culture and focus on people . . . gives us an advantage on key people metrics of efficiency, client satisfaction, and low attrition"—is plainly generic in nature.  This is apparent from its face and when comparing it to the specific, quantitative disclosures on the exact same topic, made at the very same time.  *See, e.g.,* SR Ex. 3 (April 12 Reg. St. at 92) (stating, in the context of TaskUs's focus on culture leading to lower attrition, "[t]he voluntary attrition rate for employees who were employed by TaskUs for more than 180 days was 14.9% and 26.6% for the years ended December 31, 2020 and 2019, respectively") (the "Disclosed Attrition Rates"). Both sets of statements pertain to TaskUs's culture and its impact on attrition, but the alleged misstatement generally references "low attrition," while the Disclosed Attrition Rates statements quantifies a category of annual attrition and offers a basis for comparison with peers and industry averages. This distinction matters.  *See Goldman,* 141 S. Ct. at 1960 (2021) (agreeing "as a rule of thumb, 'a more-general statement will affect a security's price less than a more-specific statement on the same question.'").

Plaintiffs argue that because the Court referred at the motion to dismiss stage to "low attrition" as a "more concrete assertion," it has found that the alleged misstatement is not generic. Reply at 7.  The Court's reference, however, was made by way of comparison to the beginning of the sentence stating "culture and focus on people," in the context of determining whether the alleged misstatement could survive the motion to dismiss.  ECF 51 ("Opinion") at 25.  This does not equate to a finding that the statement is not generic for purposes of a *Goldman* analysis.  Opp. at 16-17.  Plaintiffs also argue that because attrition at 40% or higher "was not 'low' under any definition", the alleged misstatement is not generic (Reply at 7), but whether 40% attrition would

be deemed high or low in the BPO industry has nothing to do with the statements' generic nature.

Finally, Plaintiffs cite to analyst reports and a handful of internal documents to argue that the alleged misstatement "about 'culture' and 'low attrition'" mattered to investors. Reply at 7-9. With respect to analyst reports, Plaintiffs say that seven (four of which are published by RBC) of the 41 Class Period reports analyzed by Mr. Deal, discuss "culture" and "low attrition" or contain similar language. But Plaintiffs (and their expert) entirely ignore that each of the seven discuss attrition and culture in the larger context of the specific Disclosed Attrition Rates. *See* Ex. 1 (Deal Rpt. ¶ 60-70 and Ex. 3); SR Ex. 1 (Deal SR Rpt. at ¶ 70-71). For example, they cite a July 6, 2021 Wells Fargo report that states TaskUs's "strong culture is reflected in some of the industry's lowest levels of attrition rates . . ." but omit the parenthetical "(<15% attrition in 2020)," which directly follows the reference to "lowest level of attrition rates." *See* ECF 117-1, ¶ 72; SR Ex. 4 at 10. With respect to the internal documents cited (Reply at 8), like the analyst reports, they discuss low attrition always in the larger context of the specific Disclosed Attrition Rates.[5] *See, e.g.,* ECF 117-1 at ¶ 29 (quoting title of a slide from a Goldman Sachs pitch deck which states, "Positioning TaskUs for a Premium Valuation" but ignoring that, under the heading, "[f]ocus on culture and employee quality of life", it states "24% Attrition rate."). SR Ex. 1 (Deal SR Rpt. at ¶ 50-65).

At bottom, Plaintiffs (and their expert) fail to address the interplay between the two categories of statements and make no effort to parse out whether the generic reference to low attrition had any meaning whatsoever other than in the context of the specific Disclosed Attrition Rates. This failure is fatal under *Goldman*, which held that a more-general statement is less likely

---

[5] Moreover, the relevance of these internal documents, which all pre-date the IPO, to determine the market impact of a disclosure is minimal at best. *See In re Apache Corp. Sec. Litig.,* 2024 WL 532315, at *6 n.1 (S.D. Tex. Feb. 9, 2024) ("[O]nly information known to the market is relevant under the fraud-on-the-market theory of class wide reliance . . . non- public documents are simply not relevant evidence in assessing price impact.").

to affect the stock price (*see supra* at 5), and under *Goldman II* which recognized the importance of carefully parsing the evidence because just touching on the "same subject matter," is not necessarily enough to provide insight as to "the kind of information investors would rely on." *See Goldman II*, 77 F.4th at 104; *id* at 103 (explaining commentary suggesting that the management of conflicts of interest was important "does not suggest that the market relied *on the conflicts statements* [alleged to be misleading] to assess Goldman's conflict procedures").

Here, based on the evidence proffered, it is much more likely that the specific Disclosed Attrition Rates mattered to investors as opposed to the more generic alleged misstatement that remains in Plaintiffs' 10b-5 case (which, standing alone—without the context provided by the specific attrition rates—has little meaning).  This is especially true as other BPO companies (Telus and TDCX) made nearly the same generic disclosures regarding their culture leading to lower attrition.  SR Ex. 1 (Deal SR Rpt. at ¶ 23).  As Mr. Coffman testified, investors look at attrition which is "measured over a period of time" to evaluate the expected profitability of the company based on "what the company's attrition rate has been".  Sr. Ex. 2 (Coff. SR Tr. at 222-24)

**C.      The Spruce Report Did Not Correct (or Match) The Low Attrition Statement**

Notably, with respect to Defendants' arguments about the substance of the Spruce Report—*i.e.,* that its attrition allegations contained no new information, pertained to the Disclosed Attrition Rates and, was, in relevant part, about the BPO industry overall—neither Plaintiffs nor their expert have much, if anything, to say.  Instead, Plaintiffs argue that whether Spruce corrected the low attrition statement is a premature loss causation argument that the Court has already held is a "matter of proof of trial."  Reply at 9.  But, the Court did not hold this, instead it held that determining if Spruce "in fact drove the stock drop" is "not appropriate on a motion to dismiss." Opinion at 59. Defendants' arguments are not premature now that the case is at the class certification stage.  Further, under *Goldman*, implying front-end inflation based on a back-end

7

drop (what Plaintiffs seek to do), requires examination of whether there is a "mismatch between the contents of the misrepresentation and the corrective disclosure." 141 S.Ct. at 1961; *Goldman II*, 77 F.th at 99 (plaintiffs may link the alleged misstatement to the corrective disclosure).[6]

Plaintiffs argue that a bullet in the Spruce Report's Executive Summary stating, "TASK's claim of a superior corporate culture evidenced by below industry standard workforce attrition appear to be highly exaggerated" was corrective of the low attrition statement. Ex. 5 at 6. As Mr. Deal explained at his deposition, he considered this statement, but it contained no facts or new information.[7] Instead it is an obvious summary statement of opinion that characterizes and is based upon (or "evidenced by") Spruce's later attrition discussion, contained on slides 35-37, which he discusses, in depth. *See* Ex. 1 (Deal Rpt. ¶ 24-38); Opp. at 17-19. Notably, Mr. Coffman, admitted that the "highly exaggerated" executive summary statement constituted Spruce's opinion and could not, standing alone, be corrective. SR Ex. 2 (Coff SR Tr. at 162-63 (explaining that this was "a third party coming out and telling the market that it believed that the company's claims about its culture and low attrition were highly exaggerated" and that such beliefs by a third party can be corrective only "if they're supported by evidence" or "provide the market some information to support that belief[.]")). This makes perfect sense as the "highly exaggerated" statement provides no facts or information that can be analyzed, without reference to the later substantive slides.[8]

Finally, Plaintiffs also have no credible response to the fact that, in the almost ten weeks

---

[6] *Bos. Ret. Sys. v. Alexion Pharms., Inc.,* 2023 WL 2932485, at *11 (D. Conn. Apr. 13, 2023), which Plaintiffs cite, Reply at 7, holds that "defendants must show 'that the alleged misstatements caused <u>no</u> price impact,' not that defendants have the burden of showing the causes of the back-end drop. *Alexion,* at *11-12.

[7] *See* SR Ex. 5 (Deal Tr. at 251-62) (explaining that he studied the summary statement which he considered to be a "high level reference to the more detailed analysis on the three slides," not a separate allegation.). Although Plaintiffs submitted excerpts from Mr. Deal's transcript with their Reply, they failed to include this testimony.

[8] Like Mr. Deal, in considering whether, on the pleadings, the Spruce Report contained information about attrition that could be deemed corrective, the Court discussed only the three substantive slides on attrition. Opinion at 55-59.

following the Spruce Report: (i) not a single analyst attributed the stock drop to a revelation that the low attrition statement was untrue, or for that matter, made any mention at all of the low attrition statement; and (ii) multiple analysts continued to reference TaskUs as having low attrition (some even using language identical to language they used prior to Spruce and its alleged corrective disclosure) despite Plaintiffs' contention that this alleged false information had been corrected. Ex. 1 (Deal Rpt. ¶¶ 39-48; Deal Rpt. Ex. 1).[9] Mr. Coffman states in his report that "[w]hether analysts tie allegedly corrective information back to the alleged misstatement . . . is neither a necessary nor standard way" to evaluate price impact. ECF 117-1, ¶ 48. But courts disagree. *See e.g.*, *Goldman II*, 77 F.4th at 103-105 (considering analysts' discussion of the alleged corrective disclosure). And, in other cases, Mr. Coffman has relied on analyst reports to consider the nature of a corrective disclosure. SR Ex. 1 (Deal SR Rpt. at ¶ 46 n.98); SR Ex. 2 (Coff. SR Tr. at 222).[10]

## III.    OKLAHOMA CANNOT BE A CLASS REPRESENTATIVE

Oklahoma is atypical due to post-Class Period purchases of TaskUs stock. Citing no authority, Plaintiffs say Oklahoma's small amount of such purchases do not render it atypical. But courts do not set a threshold amount of post-Class Period purchases needed to find atypicality. *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 69 (S.D.N.Y. 2000). Plaintiffs also argue that their purchase at the SPO price on the SPO date from an underwriter proves Section

---

[9] Following the Spruce Report, analysts from BofA, Baird and RBC each continued to believe TaskUs's had low attrition. *Compare, e.g.*, (i) January 6, 2022 BofA report (SR Ex. 6 at 2) with January 21, 2022 BofA report (Ex. 13 at 2); (ii) November 10, 2021 Baird report (SR Ex. 7 at 8) with March 1, 2022 Baird report (SR Ex. 8 at 7-8); and (iii) December 7, 2021 RBC report (SR Ex. 9 at 3, 5) with February 28, 2022 RBC report (Ex. 10 at 3, 5).

[10] Mr. Coffman argues that, following Spruce, analysts may have been biased, but, as he admits, this contention is purely speculative. SR Ex. 2 (Coff. SR Tr. at 236-38). He also cites January 2022 Baird and J.P. Morgan reports (Exs. 10 and 11) to argue that investors reacted to Spruce's attrition claims. ECF 117-1, ¶¶ 38-41. But he ignores that the reports are in the context of the Disclosed Attrition Rates and support that the attrition information provided by Spruce was already publicly known. *See* Ex. 1 (Deal Rpt. ¶ 42-44; 48); SR Ex. 1 (Deal SR Rpt. at ¶ 33-34).

11 standing.  However, they cite only to a March 2024 report to show purchases made 29 months earlier. ECF 115-5.  Further on the SPO date, TaskUs stock traded at the SPO price and thus the purchases could have been made on the open market. Opp. at 24. Additionally, courts do evaluate individualized tracing issues at class certification.  *See In re IPO Sec. Litig.*, 227 F.R.D. 65, 118 (S.D.N.Y. 2004).  And, "plaintiffs are not entitled to a presumption of traceability." *Hoi Ming Michael Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 561 (S.D.N.Y. 2012).[11]

## IV.      PLAINTIFFS HAVE NOT PROFFERED A DAMAGES METHODOLOGY

Mr. Coffman's only response to Defendants' Opposition is to summarily reiterate that the proposed damages methodology in his opening report is standard and note that Mr. Deal did not provide a damages opinion.  ECF 117-1, ¶ 14.  It is Plaintiffs' burden, however, to develop a damages model that provides evidentiary proof that the Exchange Act damages are capable of measurement on a class-wide basis.  Opp. at 22.  And Mr. Coffman's Reply (like his Opening Report) makes no attempt to do so.  *Id* at 22-23.[12]

## V.      THIS COURT SHOULD ORDER THE PAYMENT OF REASONABLE EXPENSES

This court has "the authority to order the payment of reasonable expenses, including attorneys' fees, as a consequence for filing an expert report in violation of a schedule ordered by the court." *Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.*, 301 F.R.D. 47, 52 (S.D.N.Y. 2014).  Mr. Coffman's 47-page rebuttal report was improperly submitted, ECF 122, and attorneys' fees and expert expenses incurred by Defendants in responding to it should be reimbursed, particularly given the substantial work required to respond.

---

[11] Plaintiffs' argument, that the PSLRA does not prohibit the addition of named plaintiffs, fails because additional plaintiff (Oklahoma) seeks to represent an entirely new putative class of persons with Securities Act claims based on the SPO.  *See* Opp. at 24-25. Plaintiffs' class is also impermissibly fail-safe and should not be certified.  Opp at 25.

[12] Plaintiffs cite to *Waggoner v. Barclays PLC,* 875 F.3d 79, 106 (2d Cir. 2017) to argue that they are not required to conduct any actual damages analysis such as disaggregating confounding factors. *Waggoner*, however, suggests the opposite; that disaggregation may need to be performed at class certification.  Opp. at 23.

## CONCLUSION

For the reasons set forth, the Court should deny Plaintiffs' Motion for Class Certification.

Dated: September 20, 2024

SIMPSON THACHER & BARTLETT LLP

/s/ Jonathan K. Youngwood
Jonathan K. Youngwood
Craig S. Waldman
Janet A. Gochman
Eric Yang
425 Lexington Avenue
New York, NY 10017
jyoungwood@stblaw.com
cwaldman@stblaw.com
jgochman@stblaw.com
eric.yang@stblaw.com

*Counsel for Defendants TaskUs, Inc., BCP FC Aggregator L.P, Bryce Maddock, Jaspar Weir, Balaji Sekar, Amit Dixit, Mukesh Mehta, Susir Kumar, and Jacqueline D. Reses*

11