# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**HUMBERTO LOZADA and OKLAHOMA      )**
**FIREFIGHTERS PENSION AND          )**
**RETIREMENT SYSTEM,                )**
**Individually and on Behalf of    )**
**All Others Similarly Situated,    )**
**                                  )**
**          Plaintiffs,             )**
**                                  ) Case No.**
**     vs.                          ) 1:22-CV-01479**
**                                  )**
**TASKUS, INC., BRYCE MADDOCK,      )**
**JASPAR WEIR, BALAJI SEKAR,        )**
**AMIT DIXIT, MUKESH MEHTA,         )**
**SUSIR KUMAR, JACQUELINE D.        )**
**RESES, and BCP FC AGGREGATOR LP,)**
**                                  )**
**          Defendants.             )**

**CHAD COFFMAN, CPA**

**Volume II**

**      The continued videotaped deposition of**
**CHAD COFFMAN, CPA, taken before Maria S. Winn,**
**CSR, RPR and CRR, pursuant to the Federal Rules of**
**Civil Procedure for the United States District**
**Courts pertaining to the taking of depositions, at**
**Veritext, One North Franklin Street, Suite 2100,**
**Chicago, Illinois, commencing at 8:30 a.m. CDT on**
**Friday, September 13, 2024.**

PRESENT:

BLEICHMAR FONTI & AULD

By MR. EVAN KUBOTA

300 Park Avenue - Suite 1301

New York, NY 10022

ekubota@bfalaw.com

212-789-1347

appeared on behalf of the Plaintiff;

Simpson Thacher & Bartlett LLP

BY MR. JONATHAN K. YOUNGWOOD

MS. JANET GOCHMAN

425 Lexington Avenue

New York, NY 10017

jyoungwood@stblaw.com

212-455-3539

appeared on behalf of the Defendant;

ALSO PRESENT:

MR. KEVIN DUNCAN, Legal Videographer.

**Page 134**

I N D E X

WITNESS:                                          PAGE:
CHAD COFFMAN
   Examination by Mr. Youngwood             136
   Examination by Mr. Kubota                276
   Further Examination by Mr. Youngwood     288


EXHIBIT              DESCRIPTION                  PAGE
Exhibit 1    Market Efficiency Report           146
             (Previously marked)

Exhibit 8    Report                             136

Exhibit 9    Event Studies                      156

Exhibit 10   Spruce Point Report                176

Exhibit 11   JPMorgan Report                    189

Exhibit 12   Baird Report                       193

Exhibit 13   The-Fly-on-the-wall Document       205

Exhibit 14   Benzinga.com posting               208

Exhibit 15   Article by Mr.Fernandez            226

Exhibit 16   Goldman Sachs Document             244

Exhibit 17   Presentation Dec                   247

Exhibit 18   Deal Exhibit 9                     251

Exhibit 19   Analyst Report                     258

Exhibit 20   Mr. Deal's Report                  269

THE VIDEOGRAPHER:  Good morning.  We are going on the video record at 8:31 a.m. on September 13, 2024.

Here continues the video-recorded deposition of Mr. Chad Coffman, taken on behalf of the defendants in the case matter of Humberto Lozada, et al., versus TaskUs, Inc., et al., filed in the Southern District of New York, bearing Case Number 1:22-CV-01479.

Today's deposition is being held at Veritext Legal Solutions, One North Franklin, Chicago, Illinois.

My name is Kevin Duncan, and I am a legal videographer representing Veritext Legal Solutions.

The court reporter today is Ms. Maria Winn.

Counsel, will you please identify yourselves and affiliations, starting with the noticing party.

MR. YOUNGWOOD:  Jonathan Youngwood, Simpson Thacher, along with Janet Gochman, Simpson Thacher, for the defendants.

MR. KUBOTA:  Evan Kubota, of Bleichmar Fonti & Auld, for plaintiffs, Mr. Lozada and

**Page 136**

Oklahoma Firefighters Pension and Retirement System.

THE VIDEOGRAPHER:  Thank you, Counsel.

Will the court reporter please swear in the witness.

(Witness sworn.)

THE VIDEOGRAPHER:  You may proceed.

MR. YOUNGWOOD:  Thank you.

CHAD COFFMAN, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. YOUNGWOOD:

Q    Good morning, Mr. Coffman.

A    Good morning.

Q    By agreement, and then by -- well, by court order, I guess I should say, we're going to keep this to four hours or less.  I hope it will be a bit less.

(Document marked as Exhibit No. 8 for identification.)

BY MR. YOUNGWOOD:

Q    In front of you has been -- what's marked as Coffman Exhibit 8.  If you could please identify it.

A    This appears to be a copy of my report. The cover page is not something I prepared.

And there's highlighting in here, which I understand represents potential redactions.

That highlighting is not mine, but the report itself is mine.

Q    Okay.  Page 47.  That's your signature, or an image of your signature?

A    Yes, it is.

Q    Okay.  At the back of the report is exhibit -- sorry -- Appendix B, which is your CV?

A    Yes.

Q    Okay.  At the end, I see you've added three cases that postdate your deposition and your initial report in this case -- sorry -- three cases: the Schneider, Stadium, and Barclay's?

A    Yes.

Q    Is there any additional -- this was filed on the 23rd of August.

If you were finalizing this today, would you add anything else?

A    Not that I recall.  I can let you know, check my records if there were any other reports or -- I have not been deposed since then.  I don't think I've filed any other reports since then,

but I -- not that I'm aware of, as I sit here.

Q    And I didn't notice any other changes between this version of your CV and the one that came with your May 10 report.  I'm not going to hold you to it.  We obviously could scan it.

But do you recall updating this in any other way?

A    No.

Q    Attached as Appendix A is your documents considered.  And that runs from, looking to the pages at the top of the document, 56 through 59.

Is there anything else that you considered in preparing your August 23rd report?

MR. KUBOTA:  Objection to form.

A    No, not that I'm aware of.

BY MR. YOUNGWOOD:

Q    In terms of the case filings, you reference the complaint.  You don't reference the plaintiffs' motion for class certification.

Did you review that at any time?

MR. KUBOTA:  Object to form.

A    I don't believe so.

BY MR. YOUNGWOOD:

Q    Okay.  Or how about the defendants' opposition to that motion?

A    I don't remember -- I don't specifically recall reviewing that.  Give me just a moment.

I don't believe I reviewed that, no.

Q    And have you seen the plaintiffs' reply brief, filed along with your report on August 23rd?

A    No.

Q    When were you asked to draft the August 23rd report marked as Exhibit 8?

A    It would have been a short time after my receipt of Mr. Deal's report.  So I received his report, I think, shortly after July 19th, 2024, which is when it was -- my understanding of when it was filed.  So it would have been a short time after that.

Q    Okay.  And how much time did you spend drafting it?

A    Well, I had assistance from staff members.  But I -- personally, I don't know an exact number how much time I spent on it.  I have records of that, but I don't know as I sit here right now.

Q    Can you give me an estimate?

A    Probably around -- more than 15 hours, less than 40 hours, would be my estimate.

Page 140

Q    And who are the staff folks that helped you?

A    Mark Hedstrom, Guillermo Rodriguez, Kathryn Donnermeyer, and I believe Mary Kubik may have helped as well.

Q    And do you have a sense of how much time they spent?

A    Not as I sit here, no.  I have records that reflect that, but I don't -- I don't recall.

Q    Is it safe to say they collectively spent more time on this than you would have?

MR. KUBOTA:  Object to form.  No foundation.

That's not what he said.

A    Collectively, they would have spent more time than me, yes.

BY MR. YOUNGWOOD:

Q    And did you spend more time, do you know, drafting this report or drafting your original report in the case?

A    I believe a similar amount of time.  I don't know one way or another.

Q    Continuing with Appendix A, you, under Court Decisions and Orders, refer on the top to a decision in this case.  But I want to ask you:

Toward the bottom, for example, of page 56, you refer to a case up in the Northern District of California with the defendant as Granite Construction.

For what purpose did you consider the decision in that case?

A    I believe I cite to that at one point in my report, when I talk about use of an analysis period that's longer than the class period.

But just to let me refresh my recollection, let me turn to that portion.

So the footnote I was referring to is Footnote 134, and I see a reference to several cases there:  Tivity, Geron and SanDisk.

This is the point in the report I remember analyzing other decisions for.

Q    Okay.

A    So I may have looked at that decision, but ended up not using it in that footnote for some reason.  I just don't recall.

Q    And you're using this -- and this is the last sentence of paragraph 87 on -- I'll use the pages on the bottom -- page 37 of your report -- as examples of other cases you were involved in?

A    Yes.  Where I'd used an expanded analysis

period beyond just the class period for evaluating cause and effect.

Q    Okay.  So you considered your own prior work in those cases to reach the conclusions you reached in that sentence that begins with the word "Additionally"?

A    Right.  Because the point I was making is that the use of the analysis period in those cases was either not challenged at all or did not result in a denial of class certification.

Q    Okay.

MR. YOUNGWOOD:  I don't know if those reports are all publicly filed with the docket.  If they are, we'll pull them.  If not, I'm going to request them as material that the witness relied on.

A    Well, just to be clear, I didn't go back to the original.

MR. KUBOTA:  Yeah.  I think, Mr. Youngwood, the footnote that you reference cites decisions by courts in those cases.

I don't see any reason why you can't provide those.  And in fact, we may have already provided them with Mr. Coffman's backup materials.  I just don't recall.

MR. YOUNGWOOD:  We'll check.  But I think it's pretty clear that he's -- and as by his testimony, he's saying that he's relying on work he did in prior cases, so we're going to ask for copies of it.  It may be on the docket, so not a big deal.

BY MR. YOUNGWOOD:

Q    Let's go back to page 57.  Now, I'm back on the top.  This is in your Appendix A.

Under the Class A common stock -- TaskUs, Inc., Class A Common Stock heading, I want to understand the different data sources here and what you used them for.

So historical data for TaskUs, Inc., common stock was obtained from S&P Capital IQ.

What history data?  Was that price or something else?

A    It would be price and volume by -- for each date.  It may have also included a number of shares outstanding and market cap information.

I think it also includes the amount of short interest.  I may be forgetting something. But basically, the primary thing it was used for was for price and volume and other statistics about the company.

Page 144

Q    And did you gather that on a daily basis or intraday data?  Tell me what the level of -- like how far down you went.

A    "Daily" is what this is referring to.

Q    Daily means one snapshot a day or more than one snapshot a day?  Like its closing, its opening?  What...

A    Yeah.  The data I think this is referring to is -- would be daily information.

Q    Okay.

A    Daily-level information.

Q    And at what -- daily closing?  Daily opening?

A    It would usually -- my understanding of the data, or my recollection of what the data contains, is it would have the date -- one line for each day, and it would show the date, the closing price, the opening price, the volume.  It might show a high and a low price as well.

And I think that data also -- although it doesn't update on a daily basis, also shows things like shares outstanding and short interest and things of that nature.

But I know it shows the daily prices.

Q    Okay.  Can one get from S&P Capital IQ

**Page 145**

intraday pricing information?

A    I think you can look at intraday for certain historical time periods.  When I perform intraday analysis, I usually get it from another source, which is Tick Data.

Q    I don't see Tick Data under this -- well, I don't see it anywhere in this report, but certainly not under this TaskUs Class A common stock data.

A    Well, I don't think I would have looked at any intraday analysis, other than what I already had from the market efficiency report.

So at the beginning of this documents considered, I say market efficiency -- I reference my market efficiency report, including all documents, analysis, and backup materials provided in connection with that report.

So I may have gone back and looked at intraday data, to the extent I had it, but I didn't download any new intraday data for this report.

MR. YOUNGWOOD:  Can I have that report?  What was it marked at as?

MS. GOCHMAN:  7.

Page 146

(Document previously marked as

Exhibit No. 1 for identification.)

BY MR. YOUNGWOOD:

Q    I will give you what was marked at your

prior deposition as Exhibit 1.

Perhaps flipping to the -- you tell me

the most efficient way of doing this, but maybe

the documents considered, starts at page 54.

Would you be able to tell from looking at

this if you looked at intraday data for your

original report?

A    Yes.  Under security data, the second

bullet point, it says:

"Trade and quote data for TaskUs common

stock during the class period and 100 randomly

selected companies trading on the New York Stock

Exchange and NASDAQ for September 2021 were

obtained from Tick Data."

Q    And what did you use intraday data, or

intraday trading data, for in your original

report?

A    For the bid/ask spread analysis when

evaluating market efficiency.

Q    Okay.  For any other purpose?

A    I don't think so, but let me double

Page 147

check, just to make sure.

I don't believe so, no.

Q    Okay.  If you could turn to page 11 of Exhibit 8, and go to paragraph 22, please.

A    Okay.

Q    In the middle of that paragraph, middle sentence, you note that TaskUs common stock was priced at $23.00 per share in the IPO.  And on the first day of trading, June 11, 2021, TaskUs common stock opened at $27.55 and reached $31.09 at the close of trading.

Do you see that?

A    Yes.

Q    Where would you have gotten that data?

I'm looking to the footnote.  I just want to...

A    It would have been from the Cap IQ data. It may have also been referenced in that news article I was referencing.

But if I was going to go check the data to verify those numbers, I believe I would have looked at -- the Cap IQ data would have given me what was necessary to provide that.

Q    Okay.  And then the calculation, the next sentence of the 35 percent and the $8.09, that's

Page 148

just arithmetic.  And you did that yourself, or your staff did?

A    Yes.

Q    In looking -- I think you've already said this, but I want to make sure.

In looking at the S&P Cap IQ data, it would have given you the opening and closing that you have in there, but would not have given you intraday, throughout the day, data.  Right?

A    That data would not have, no.

The Cap IQ data, I don't -- again, I think you can see Cap I- -- intraday data through Cap IQ, but not the file I'm referring to.

Q    Okay.  And you have not studied the intraday trading of the TaskUs common stock on June 11, 2021?

MR. KUBOTA:  Object to form.  Vague.

A    I may have looked at it at some point, but not in a formal way, no.

BY MR. YOUNGWOOD:

Q    And you haven't reached any conclusions regarding that?

A    I have not, no, other than calculating the bid/ask spread on that day and incorporating that into the analysis of bid/ask spread.  But

I didn't study the pattern of the price or anything.

Q   And in terms of the bid/ask spread, it wasn't just that day you studied it.  You studied it, you said, every day of the...

A   Yes, every day.

Q   So you don't know, for example, if TaskUs stock, on June 11 at some point, went above 31.09 and came down, or if it was just a gradual climb to 31.09?

A   Again, I may have seen that or looked at it at some point, but I don't recall.  And it's not a basis of any opinion I'm giving in my report.

Q   Are you aware of any news that came out during the trading hours of June 11, 2021, that caused the stock to climb from an open of 27.55 to a close of 31.09?

A   I have not formed any opinion about that.

Q   Okay.  Sticking with Exhibit 8.

A   And again, I interpreted -- just to be clear, I interpreted your question about -- to be about any news event that occurred on that day, other than it being the first day that they traded.  And so it would reflect -- it would be

the first time the market had a chance to reflect all information about TaskUs.

But I took your question to mean, Did I identify any specific news event that occurred on that specific day?

And the answer is, I haven't formed any opinion about that.

Q    Correct.  You're not aware of any new additional company-specific information that came to the market after the market opened and the stock was at 27.55, through the time period when the trading day closed that afternoon, about TaskUs?

A    Again, while that information might be reflected in my backup materials, because we did do news searches and things like that, I didn't study that specific issue beyond reviewing what was in Mr.- -- certainly not before my opening report.  And then I -- I reviewed some information about that day based on reviewing Mr. Deal's report.

But I didn't seek to ascertain exactly what events occurred after the opening on that day.

Q    Okay.  You don't know why the price rose

Page 151

from 27.55 at opening to 31.09 at close?

MR. KUBOTA:  Object to form.

A    I'm not offering an opinion about that, no.

BY MR. YOUNGWOOD:

Q    Going further into your Appendix A, Exhibit 8, page 59.  It says "Bates stamped documents."  I see three of them.

A    Yes.

Q    Those are from the production in this case.  Right?

A    That's my understanding, yes.

Q    Okay.  There were no other documents that you understand to have been produced in this case -- sorry, that's not a fair question.

There are no other documents with Bates numbers that you understand to be produced in this case that you considered in preparing your August 23rd report?

MR. KUBOTA:  Object to form.

I think the Materials Considered cites deposition exhibits and other documents.

A    Yeah.  That's what I was going to say is, I believe I reference a number of exhibits from Mr. Deal's deposition that are Bates stamped.

Page 152

BY MR. YOUNGWOOD:

Q    Okay.

A    And probably came from production.  I don't recall anything beyond that.

Q    Okay.  So anything marked at Mr. Deal's deposition, and then these three documents that are on page 59?

A    Correct.  Yes.

Q    Okay.  Going to the front of your report --

A    Unless -- and just to be clear, unless there were other things I'm not remembering off the top of my head that were referenced by Mr. Deal in his report.

I or my staff would have reviewed anything referenced there.  I don't recall there being Bates-stamped documents, off the top of my head.

Q    Yeah.  I think this might be a null set.

But you're saying that, for example, if Mr. Deal cited a Bates-stamped number, but it wasn't marked as an exhibit at his deposition, your staff, you believe, would have asked counsel for it and reviewed it?

A    Correct.  Yes.

Page 153

Q    Okay.  Let's go to the table of contents on your report.

So it begins with an introduction section.

What's the purpose of the introduction section?

MR. KUBOTA:  Object to form.

A    Really, just to set the stage for what the report is about.

BY MR. YOUNGWOOD:

Q    Okay.

A    And to provide some of the background of the timing of the reports I had -- the report I had already issued, and then the timing of when I received Mr. Deal's report.

Q    And what's the purpose of the second section, "Summary of Opinions," that begins on page 4, and continues through page 7?

MR. KUBOTA:  Objection, speaks for itself.

A    Really, just to provide a summary of the opinions I'm offering in response to Mr. Deal's report.

BY MR. YOUNGWOOD:

Q    Okay.  You don't -- there's no opinions

Page 154

in the summary that are not later covered in more detail in the body.

Is that fair to say?

MR. KUBOTA:  Object to form.  The document speaks for itself.

A    I believe that's correct.  That's the way it was intended to be organized.  But -- so, yeah. I believe the bases for these overall opinions are provided throughout the report.

BY MR. YOUNGWOOD:

Q    You're trying to help the reader have a guide to your report?

A    And to state, in summary fashion, the opinions I'm -- I formed.

Q    Okay.

When we met previously in this case, we discussed June 11, and you confirmed that you did not include in your event study June 11 as a date because it was the -- because you didn't have a -- you didn't have a prior close.

A    Well, I think what you're referring to is the spreadsheet I produced as part of the event study analysis.  And in that particular sheet, I didn't construct a return from the IPO price to the first day's trading price, if that's what

Page 155

you mean.

But I was certainly aware that there was an increase from the IPO price to the closing price on the first day.

Q    Okay.  And there was also an increase from the open to the close on the first day?

A    Yes.

Q    And you could have studied that.  You could have studied what happened that day to explain that change from the open to the close?

MR. KUBOTA:  Objection, misleading.  And object to form.

A    It was not necessary to do that to perform the analyses I was doing to reach the -- to answer the questions I had been given in the opening report.

If you're asking if I'm capable of analyzing that and evaluating what things may have contributed to that price increase, I'm certainly capable of that.  But that was not a focus of my work in the opening report, and needed to form the opinions I did.

BY MR. YOUNGWOOD:

Q    You did a further event study in conducting the work that led to your August 23rd

Page 156

report.  Correct?  Or perhaps a series of further event studies?

A    I performed additional event studies to evaluate, and in response to Mr. Deal's claim that the results of my cause and effect tests were not robust to different estimation windows, and other things that he articulated.

And so yes, I performed alternative event studies using the estimation window periods that he referenced to show that my results are robust to differences in event window lengths -- I'm sorry, not event window -- estimation window.

Throughout that answer I was referring to estimation window.

Q    Okay.

MR. YOUNGWOOD:  Can I mark this as 9, I guess.

(Document marked as Exhibit No. 9 for identification.)

BY MR. YOUNGWOOD:

Q    So, Mr. Coffman, this is a hard copy version of files we -- or your counsel provided us at the time they provided us with your report.

If needed, I think Ms. Gochman has the electronic versions on a computer.  But if you

Page 157

need to look at them, there's no trick here.  I think we printed them accurately.  I'm hoping you can identify them from the hard copy.

A     Sure.  This appears to be the event study output for the various different estimation windows that I referred to in my prior answer.

So there's an estimation window -- a 120-day estimation window, which is consistent with my opening report.  And then the additional runs were a 60-day estimation window, a 45-day estimation window, a 30-day estimation window, and a 15-day estimation window.

And those are, again, in response to alternative estimation windows proposed by Mr. Deal in his report.

Q     Okay.  And for none of these alternative runs do I see the 11th of June 2021 as a date.  Correct?

A     Correct.  That was a date that was not included as a -- as a date -- a date on which I considered a return for these event studies.

Q     And I assume, for the same reasons you described at your prior deposition, then at least briefly today, which is you didn't have a prior trading day?

A     A prior closing price from trading.
Correct.

Q     Was there a way to have a prior closing price from trading, if you didn't have a prior trading day?

A     No.  No, I'm agreeing with you.  I'm just trying to make it clear.

Q     Okay.

We discussed this a bit last time.  The 120, that's the same analysis you did for the original report?

A     Yes.

Q     Okay.  And so the alterations are the 60, 45, and 15?

A     I think it's 60, 45, 30, and 15.

Q     Sorry.  I skipped one.

And did you try to study for a smaller period than 15?

MR. KUBOTA:  Objection, vague.  What do you mean by "a smaller period"?

MR. YOUNGWOOD:  Shorter.

A     I did not run any alternatives shorter than 15 days.

BY MR. YOUNGWOOD:

Q     Did you run any alternatives other than

the four we see here in Exhibit 3?

A     No, because these were the periods that Mr. Deal -- at least suggested -- could be reasonable to look at.

Q     Have you heard of something called an IPO price pop phenomena?

A     Yes.  I mean, I've heard it referred to in a number of different ways.  But I think I know what you're referring to, yes.

Q     What do you understand that to be?

A     Well, there's a literature that -- that makes clear that you often see a price increase on the first trading day after an IPO.  It's not universal.  It's not always, but it's often observed that you see a fairly substantial increase in price from the IPO price to the first closing price.

Q     And --

A     And there's a whole host of potential reasons for that.

Q     What are -- what are the potential reasons?

A     One is that the IPO price is set with an eye towards not having a major price decline on the first day.

I believe there's other speculated reasons.  I don't recall what all of those are, as I sit here.

Q    Okay.  Did you make any attempt in this case to determine if the IPO price pop phenomena applied to TaskUs stock on June 11, 2021?

A    I didn't specifically analyze that question.  It's certainly possible, but I didn't analyze the factors one would need to analyze to have an opinion on that.

Q    So you don't know why -- although the IPO pricing was 23, you don't know why it opened at 27?

A    I'm not offering an opinion about that, no.

Q    And you did no, for example, valuation of TaskUs stock price at the time of the IPO?

MR. KUBOTA:  Objection, vague.

BY MR. YOUNGWOOD:

Q    You didn't attempt to value the company and what a proper price would be for it?

MR. KUBOTA:  Same objection.

A    Independent of observing the market trading prices after the IPO, no.  In other words, in my view, the markets, the secondary market for

Page 161

TaskUs trading stock is efficient; and, therefore, the trading prices on the first day and immediately after the IPO would be a -- the most reliable value for the company that's available.

But I didn't perform any fundamental valuation analysis to try to independently verify what the IPO price, or what the opening price should have been.

BY MR. YOUNGWOOD:

Q    If you would go to paragraph 69 of your August 23rd report, Exhibit 8.  It's on page 29.

A    Okay.

Q    Your last sentence, I'll read starting after the semicolon:

"As explained above in Section III, there is empirical evidence of back-end price impact and also potential front-end price impact."

What is "back-end price impact"?

A    Meaning evidence that the alleged misstatement had an effect on the market price of TaskUs stock, because when that alleged misstatement was allegedly at least partially corrected, there was a statistically significant decline in the market price of TaskUs common stock.

Q    Okay.  And so you're referring to the -- at the time the Spruce report came out, there was a contemporaneous drop in the market price of the stock?

A    Yes.

Q    You just used the word "partially" corrected.

Is it your understanding of the allegations that the Spruce Point report partially corrected a statement or corrected a statement?

A    Well, at least partially.  I don't know that I formed a specific opinion about whether it fully or partially informed the market.

I mean, this was a third party coming out and telling the market that it believed that the company's claims about its culture and low attrition were highly exaggerated.  And my understanding is plaintiffs are alleging that the market moved closer to the relevant truth.

Whether there could have been more than that, if the company had also, in addition to that, admitted something on that day, you know, that -- I'm just -- I haven't drawn a conclusion about that.  I'm just saying there's -- that they're at least alleging a partial corrected

disclosure on that day.

Q    You said there's a third party coming out and telling the market that it believed the company's claims about its culture and lower attrition were highly exaggerated.

Are beliefs of a third party corrective?

MR. KUBOTA:  Objection, vague.

A    In my view they certainly can be, if they're supported by evidence.

BY MR. YOUNGWOOD:

Q    They would need to be supported by evidence?

MR. KUBOTA:  Same objection.

A    Or supported by -- or provide the market some information to support that belief, yes.

BY MR. YOUNGWOOD:

Q    Some new information?

MR. KUBOTA:  Same objection.

Are you asking him questions about TaskUs, Mr. Youngwood?  I just want to make sure the record is clear.

A    I would say information that had not been previously widely disseminated to the market is -- and in the context that it was -- that it was revealed in the Spruce Point report, if we're

Page 164

talking about this case, or about -- that's true for corrective disclosures generally.

I mean, third parties can -- can take and summarize and synthesize information in ways that the market may not have been exposed to before and may bring to light information that wasn't previously widely disseminated in places that a normal investor would look for information, or that a typical investor would look for information.

BY MR. YOUNGWOOD:

Q    Okay.  I'm not sure we're going to spend a lot of time on this.

But you believe that TaskUs operates in a semi-strong market?  Like that would be your description of the market that TaskUS stock traded in?

A    That it traded in a semi-strong efficient market, yes.

Q    And is it a prerequisite of a semi-strong efficient market that -- that new information be widely disseminated?

MR. KUBOTA:  Objection, vague.

A    I think widely disseminated is part of what I'm considering when I'm saying the market

Page 165

price reflects information, yes.

BY MR. YOUNGWOOD:

Q   Okay.  Let's park that one.  I may or may not come back to it.

Sticking with paragraph 69, that sentence we've been looking at refers to empirical evidence of back-end impact.

What do you mean by the word "empirical"?

A   The event study analysis I performed.

Q   Okay.

A   As well as just the facts of what occurred on that day, coupled -- so my event study analysis, the totality of my event study analysis.

Q   Okay.  And that event study analysis all ties to the back-end impact aspect of your work.  Correct?

MR. KUBOTA:  Objection, vague.

A   If you're -- in this sentence, when I'm referring to back-end price impact, that's referring to my event study analysis.

When I say potential front-end price impact, I'm not referring to a specific -- well, I am -- so I'm also referring to the IPO price in itself and the -- and the price increase on -- on the IPO date, when I'm talking about potential

front-end price impact.

I think I've demonstrated price impact on the back end.  I'm saying there's potential price impact on the front end.

Q    Right.  And I'm asking you -- well, I haven't asked you yet.

When you say "empirical evidence of back-end price impact," you have a comma.  And then you say "and also potential front-end price impact."

I did not read that description of potential front-end price impact to be tied to empirical evidence in the earlier part of your sentence.

Did I read that correctly?

A    You've read it correctly, but there is some empirical evidence that is at least consistent with front-end price impact.

But I'm not offering an opinion that there was front-end price impact or that there -- or that there's -- let me take a step back.

I'm not opining that there's evidence of front-end price impact, and that that -- that's sufficient to establish front-end price impact. But that the back-end price impact is sufficient

to show that there's at least some price impact in this -- of the misrepresentation in this case -- the alleged misrepresentation in this case.

Q    Okay.  You're aware of something called the price maintenance theory?

A    Yes.

Q    Does that apply to this case?

A    I would --

MR. KUBOTA:  Yeah.  Before you answer, Mr. Coffman.

I would object to the extent that we're not at the stage of damages reports.  And so I think your question has embedded in it some effort to get a preview of loss causation and damages issues that are not due for several months under the schedule.

A    To the extent there are repetitions of the alleged false statement after the start of trading, my understanding is that that would be consistent with a price maintenance theory.

To the extent -- what we mean by "price maintenance theory" is that by making the alleged false statement they did, defendants prevented the price from falling at that point, rather than causing the price to go up on that day as a result

Page 168

of the misrepresentation.

That might apply from the very beginning of the class period. But I think it's -- also can't be ruled out that the price increase we see on the first day could also reflect an increase in the price due specifically to the alleged misstatement.

So I'm saying as of the first day, it's not clear that it's purely a price maintenance theory, to me.

BY MR. YOUNGWOOD:

Q    Okay. And that -- let me try it this way.

When's the first alleged misstatement during the class period, or during the proposed class period?

MR. KUBOTA:  Object to form.

A    I would have to go back and review which documents contained the alleged misstatement, just to remember exactly what date that was.

BY MR. YOUNGWOOD:

Q    Okay. The prospectus was not during the class period. Correct?

MR. KUBOTA:  Objection.

A    My understanding is there were versions

Page 169

of the prospectus before the class -- beginning of the class period that had the alleged misstatement.

BY MR. YOUNGWOOD:

Q    Okay.  And I think my terminology probably was off.  I probably should have said registration statement.  I assume you would give me the same answer.

A    That's how I was interpreting it, yes.

Q    Thank you.

I want to quickly go back to our discussion of semi-strong markets.

And I was able to locate in your opening report, which is Exhibit 1, where you discussed that.  It's in paragraph 18, page 9.

A    Okay.

Q    This description of different types of markets, semi-strong -- strike that.  Let me start this again.

This description of semi-strong form efficiency, that you give in paragraph 18, you think that's an accurate description of it. Correct?

MR. KUBOTA:  Let me just object to questioning about Mr. Coffman's

Page 170

opening report.

You already deposed him on this.  It hasn't been reopened.

A     I'm describing, in that sentence, Dr. Fama's sort of idealized form of what semi-strong form efficiency is.

BY MR. YOUNGWOOD:

Q     Okay.  Do you disagree with Dr. Fama?

MR. KUBOTA:  Same objection.

A     No.  I just think, in real world markets, it doesn't conform to all of the assumptions that are made for the idealized version, which includes that obtaining information is costless, that all members of the public have the exact same information set, that there are no transaction costs, lots of things that aren't true in the real world.

And so when I'm talking about the standard I'm applying, and I apply generally throughout my work, is that security prices adjust to new widely disseminated publicly available information rapidly; that there can be gray areas about the degree to which certain information is widely disseminated in the market.

BY MR. YOUNGWOOD:

Q    You don't say any of that in paragraph 18 or Footnote 19 to the opening report, the caveats, the exceptions?

MR. KUBOTA:  Same objection.  This is -- you could have asked these questions last time you deposed the witness.

A    Give me just a second.

I think in paragraph 14, when I'm describing, I say "the fraud on the market theory is based on the fact that in an efficient market," and I have in parens, "one in which widely public available market is quickly incorporated into the market price of a security."

So this idea of public information being widely available was part of my report, and my definition of what an efficient market is.

BY MR. YOUNGWOOD:

Q    The information -- strike that.

You're aware that there are allegations in the complaint concerning the specific -- the disclosure of specific attrition rates that the Court dismissed from the case?

A    I'm aware of that, yes.

Q    Okay.  And so the attrition statement

Page 172

that you've looked at is the generic low attrition statement that remains in the case?

MR. KUBOTA:  Object to form.  Misleading. And I object to counsel's characterization and incomplete recitation of the misstatement at issue.

A     I made clear which statement I'm focused on.  I don't -- I don't characterize it as generic.

Let me find the statement itself, just so we're being clear what we're talking about.

It's at page 8 of my report, paragraph 16.  That's the statement I was considering.

BY MR. YOUNGWOOD:

Q     I'm sorry.  Which report are you looking at?

A     I'm looking at the August 23rd report, my rebuttal report, at paragraph 16.

Q     You would agree with me that referring to the words "low attrition" are less specific than referring to specific statistics regarding attrition?

MR. KUBOTA:  Object to form.

A     Well, to the extent it's not providing an

exact number, yes.

To whether or not it's providing important information to investors, I don't know that I agree with that.  Because here, they're providing a reasoning about their culture and their focus, and how it gives them an advantage.

So to an economist thinking about valuation, or an investor thinking about valuation, they're making a statement here that goes beyond a specific number and is telling the market that this actually gives them an advantage in competing in the market.

Q    What does "low attrition" mean?

MR. KUBOTA:  Objection.  In what context?

A    Well, the way I -- I don't know how to characterize "low attrition" independent of context.

But certainly here, the context is they're saying it's sufficiently low that it gives them an advantage in their markets.

BY MR. YOUNGWOOD:

Q    What number would be a low attrition number?

MR. KUBOTA:  Objection.  The witness is not being offered as a merits expert, and

exceeds the scope of the opinions in this report.

You're asking him to answer from personal knowledge?

A    That may be different in different contexts for different firms.

BY MR. YOUNGWOOD:

Q    Well, in the context of TaskUs, what does "low attrition" mean?

MR. KUBOTA:  Same objection.  It's outside the scope of his report.  He's not being offered as a merits expert.  You know that.

A    That's not something I've studied.

BY MR. YOUNGWOOD:

Q    You don't know what "low attrition" means?

MR. KUBOTA:  That's not what he said. Misstates prior testimony.

A    I understand what it means in the context of this statement.  It's a statement that's giving the impression that the company's culture and focus on people gives it an advantage by resulting in low attrition.

BY MR. YOUNGWOOD:

Q    Lower than something?

A    Sufficiently low to give them that advantage, is how I interpret it.

MR. KUBOTA:  Jonathan, when you get to a convenient point, we've been going for an hour.

MR. YOUNGWOOD:  That's fine.  We can stop.

THE VIDEOGRAPHER:  We're going off the record at 9:28 a.m.

(WHEREUPON, a recess was taken, after which the following proceedings were held:)

THE VIDEOGRAPHER:  We are back on record at 9:40 a.m.

You may proceed.

MR. YOUNGWOOD:  May I have Tab 3, please?

MS. GOCHMAN:  It must have been from Deal.  That must be the Deal number.  It just says P-12.

MR. YOUNGWOOD:  I'm going to -- does that make sense?

MS. GOCHMAN:  It could be --

MR. YOUNGWOOD:  If there's any ambiguity,

I'll just remark it.

Why don't I just remark it?

MR. KUBOTA:  Yeah.  Probably --

MS. GOCHMAN:  We had to, because we know there were depositions -- it went up to 8, but it's a P.  Yeah.

MR. YOUNGWOOD:  Yes.  It's just not a very helpful sticker, because it doesn't have the case or anything.

(Document marked as Exhibit No. 10 for identification.)

BY MR. YOUNGWOOD:

Q   So, Mr. Coffman, we're marking as Exhibit 10 to your deposition a document -- let's skip the first page.

Do you know what I've handed you, or --

A   Yes.  This appears to be the Spruce Point -- what's referred to as the Spruce Point report.

Q   And it's the Spruce Point report concerning views of Spruce Point regarding TaskUs?

MR. KUBOTA:  Object to form.

A   Yeah.  It's a report issued by Spruce Point Capital Management giving their views on TaskUs.

Page 177

BY MR. YOUNGWOOD:

Q    Okay.  Have you reviewed it?

A    I have reviewed this in the past, yes.

Q    The entire document?

A    The vast majority of it, yes.  Maybe not every single word, but the vast majority of it, yes.

Q    Are there particular sections you would have reviewed versus others or...

A    No.  I pretty much reviewed the whole thing.  I may not have focused on, like, the numbers and all the tables and some of the quotes and things like that later in the document, but I have a -- I gave this a thorough read.

Q    Okay.  And I'm assuming you've seen similar reports to the Spruce Point, either by Spruce Point or other short sellers, in cases you've worked on?

MR. KUBOTA:  Object to form.  Vague.

A    To the extent you're asking if I've seen other short reports or reports by short sellers, yes, I have.

BY MR. YOUNGWOOD:

Q    And you'll note on page 2, for example, second sentence -- well, let's start with the

first sentence.

First sentence states:

"The research presentation expresses our research opinions."

Do you see that?

A    Yes.

Q    It doesn't say it expresses our research facts or something.  It says "opinions."

That's the first sentence they put in?

MR. KUBOTA:  Objection.  You're just asking him to read the document?

A    That's -- that seems to be part of their legal disclaimer, yes.  Obviously, they -- they -- there are purported facts reported in this report.  But yes, they're characterizing this as their opinion --

BY MR. YOUNGWOOD:

Q    Okay.

A    -- in their legal disclaimer.

Q    Okay.  The first section after the legal disclaimer -- well, and after, it looks like a page about themselves, then a table of contents.  There's an executive summary.

Do you see that?

A    Yes.

Q    And that spans pages 6 through 11. Correct?

A    It certainly goes through 10, because through 10 has -- all has the same title as the beginning.

But then page 11 has a different title. So --

Q    Okay.

A    -- I don't -- it appears to be part of the executive summary, but it does appear to be under a slightly different heading, so it's confusing.

Q    Fair enough.  And their table of contents doesn't really help us, because they don't tell us what pages any sections begin on.

Within it, I was able to identify one sentence that references "attrition," which is on page 6.

I didn't miss any, did I?

MR. KUBOTA:  Object to form.

A    I think that's the only sentence that uses the word "attrition," but it's clearly the same concept that's clearly being talked about on page 8.

(Discussion off the record.)

Page 180

BY MR. YOUNGWOOD:

Q    That's the only one that, to take your testimony, references "attrition."

Let's go --

A    Give me just one more second, if you don't mind, just to complete my review of this.

Right.  So I think the only sections that directly address attrition is the one sentence on page 6.

And then there's a section on employees and turnover on page 8.  To what extent their attrition and turnover is affecting some of the other statistics about the company that are being mentioned here, I don't know.

But in terms of direct mentions of what I understand is related to attrition is the statement on page 6, and then the second bullet point on page 8.

Q    If we go into the document, there are three pages that appear to talk about attrition, starting on page 35, 36, and 37.

A    Those are the pages I'm most familiar with, but I don't know if those are the only places it's mentioned.

Q    Okay.  Let's look at page 36.

Is this a page you looked at?

A    Yes.

Q    Is it your view that this is an alleged corrective disclosure in this case?

MR. KUBOTA:  Just so the record is clear, Jonathan, you're talking about 36 --

MR. YOUNGWOOD:  36.

MR. KUBOTA:  -- on the bottom right?

MR. YOUNGWOOD:  Yeah.  I think -- yeah. On the page numbers, yes.

MR. KUBOTA:  Okay.  Thank you.

MR. YOUNGWOOD:  It says 37 at the top, yes.

It says just -- "Former TaskUs executive interviewed by Spruce," is the heading.

A    My understanding is this information on this page is part of what's corrective of the alleged misstatement.

BY MR. YOUNGWOOD:

Q    Okay.

A    I believe there's statements in the executive summary as well, as well as page 35 and 37.

But I understand this is part of what the alleged -- what the plaintiffs are alleging

Page 182

is corrective.

Q    There's a question asked on page 36:

"What do you make of the company's claims of attrition being below the industry standard of 30 percent and how they qualify it to include only employees greater than 180 days?"

Do you see that?

A    Yes.

Q    And then the answer, first sentence, refers to "industry number of 30 to 35 that you quoted."

Do you see that?

A    Sorry.  Give me just a second.

The TASK executive makes reference to a 30 to 35 percent that it says "you quoted."  I assume that means that Spruce Point quoted.

Q    Where does Spruce Point quote that?

A    I don't know.  I don't know if there's other questions.  I don't know if there's -- I've never seen the entire -- a transcript of the entire interview.

So I don't know if that 30 to 35 is referenced somewhere besides the 30 percent that's in the question.

Q    Do you know who the TASK executive

Page 183

interviewed by Spruce Point is?

A    Not off the top of my head, no.  I don't know if that's been identified.

Q    Do you know if there is such a person?

A    Personally?  I mean, I -- I'm reading this document and assuming it's accurate and truthfully saying that they talked to a former TASK executive.

I have not personally validated whether this interview took place or that person exists or who it is.

Q    Okay.  You can put that document aside.

Let's go back to your report.

I want to focus on the section of your report on -- and then -- I'm sorry.  By "your report," I'm referring to Exhibit 8 today, the August 23rd.

Starting at page 16 on the bottom.  The section -- let's see.

Section 3D, paragraph 36.

A    Okay.

Q    And in here, you, among other things, discuss -- and by "here," I mean Section D, Mr. Deal's analysis of analyst reports and news articles.

Page 184

Let's start with the analyst reports.

You don't dispute Mr. Deal's conclusion that only 6 of the 18 analyst reports he reviewed mentioned Spruce?

A    I don't dispute that there are 6 analyst reports that discuss the Spruce report.

What I'm trying -- the reason I'm pausing is I'm trying to remember how exactly he drew the sample of 18 and how long after the event that that was drawn from.

But I'm certainly not disputing that there were 6 that discussed the Spruce report.

Q    Do you think there were more than 6 of the 18?

A    No.  Not that I'm aware of.

Q    Okay.  And if we go to your Appendix A, you have a section on TaskUs analyst reports.

I think these are not the ones that he reviewed for this part of the analysis, right, because these are all dated earlier.

A    Correct.  I think these are the ones that I specifically reference in the report in one way or another.

But I clearly list, as part of the materials considered, all the material that I

considered in my opening report, which would have included any analyst reports I had, and then the reports that were produced along with Mr. Deal's report.

Q    Okay.

MR. KUBOTA:  So just for the record, Jonathan, I don't think your description of the analyst reports and in Mr. Coffman's Appendix A is accurate.  There are reports at the bottom that are from January 2022.

MR. YOUNGWOOD:  Okay.  I'll --

A    Oh.  Yeah.  What I was answering is this isn't the list of 18.

BY MR. YOUNGWOOD:

Q    That's my question.  This is not the list of 18?

A    This is not the list of 18.  It includes, I believe, 2 of the 18, or maybe 3 of the 18 that I -- that I cite specifically in the report.

So it doesn't even include all 6 that necessarily mention the Spruce report.

Q    Did you review the 18 that he reviewed?

A    I and my staff -- between me and my staff, yes, we reviewed those 18 reports.

Q    Okay.  And in doing so, you were not able

Page 186

to identify additional reports on top of the 6 he identified that mentioned Spruce?

A     I don't recall having identified additional reports that mention the Spruce report.

As I sit here right now, I don't recall them mentioning the Spruce report.

Q     Okay.  And --

A     But again, to be clear, it's not consistent with my prior answer.

I don't recall what his criteria was for selecting those 18.  So whether -- what I'm cautioning against is saying that 6 out of 18, implying only a third of them mentioning the Spruce report.

I'm not necessarily agreeing that 18 is the right denominator, that those -- that that would be the relevant set to review, if you were going to do a calculation of that nature.

Q     You didn't come up with a different set of criteria than he came up with, that you thought would be better than his criteria?

A     That was not part of what I was doing, no.

Q     All right.  And you note on page 17, at the top of Exhibit 8, that of those 6, 2 of them

Page 187

specifically discussed the attrition-related information?

A    Correct.

Q    You did not find any others of those 6 that discussed attrition-related information?

A    I don't believe so.

Q    And you did not find any others -- I think it probably must follow -- of the 18 that discussed both Spruce and attrition-related information?

A    I think that's correct, as long as you're saying "both."  They may have discussed attrition-related information separate from the Spruce report, but I think I would have noted if they discussed both.

Q    Okay.  And you don't note any others that solely discuss attrition information, at least not in your report?

MR. KUBOTA:  Objection, vague.

A    Again, I wouldn't -- again, I wouldn't draw any specific conclusion from that, because I -- this section is really focused on analyst reaction to the Spruce report.  So I wouldn't draw any conclusion from that.

Page 188

BY MR. YOUNGWOOD:

Q    Um --

A    Well, I'm -- again going back to one of the answers -- or one of the questions you asked me, which was, of the 18, how many mention, sort of, attrition, separate from the Spruce report?

Paragraph 43 addresses that.  And Mr. Deal noted that as well, that 15 of the 18 discuss attrition in one form or another.

Q    Okay.  But those 15 of the 18 -- well, I'm not sure if the 2 are included.

Other than the 2 we've discussed, and that you identify as the Baird report and the JPMorgan report in 38 and 39, there are no other ones that discuss both attrition and what Spruce says about it?

A    I believe that's correct.

Q    Okay.  And it was, for example, the view of the JPMorgan report that there wasn't necessarily anything incremental regarding what was in the Spruce report.

A    Let me reread the quote, just to be sure.

Well, it seems that when it says "aren't necessarily incremental," it seems to be referencing headwinds, which I think might be

Page 189

something other than the attrition issue, because

it separately talks about employee retention.

Q    Well, the first sentence -- and maybe let

me just give you a copy of the report.

A    Yeah.  That would be helpful.

MR. YOUNGWOOD:  This will be 11, I think.

(Document marked as Exhibit No. 11

for identification.)

BY MR. YOUNGWOOD:

Q    Okay.  So the first sentence, "In light

of recent investor..." -- I'm sorry.

I marked as Exhibit 11 what I believe is

the JPMorgan report that you referred to in

paragraph 38 -- I'm sorry -- 39 of Exhibit 8; is

that right?

A    Yes.

Q    The first sentence:

"In light of recent worries that pushed

the stock down 19 percent since January 19 (versus

SPX down 4 percent), we maintain our TASK's

estimates, and reiterate our investment thesis and

OW rating."

That's included in your report.  Right?

A    Yes.

Q    So JPMorgan, notwithstanding anything in

Page 190

the Spruce report or market reaction, has not changed its estimates and its investment thesis. Correct?

A     That seems to be what they're conveying, yes.

Q     Okay.  And then there is the next sentence that we're looking at in part:

"We dug deeper into various concerns highlighted in the short report and believe the stock weakness seems overdone, as headwinds aren't necessarily incremental to our prior views."

So that, again, is a confirmation that nothing in the report changes their substantive view of the company?

MR. KUBOTA:  Objection to form and your characterization.

You can ask JPMorgan.

A     Yeah.  I mean, I don't -- I mean, they're pretty vague in using the term "aren't necessarily."  So it's hard to know exactly what they mean by that.

BY MR. YOUNGWOOD:

Q     Okay.  But the bottom line for them is they aren't changing their rating, and they aren't -- in fact, they're reiterating their

investment thesis?

MR. KUBOTA:  Object to form.

A     That seems to be what they're doing, yes.

BY MR. YOUNGWOOD:

Q     Okay.  And when it comes to employee retention, which is in the second bullet point after the introduction, what they write on that is:

"We agree that excluding certain employees from the definition doesn't offer a full picture of employee attrition, but TASK's definition is consistent with 3 out of 4 BPO peers in our coverage."

Looking at the first half of that sentence, that's a reference to the specific attrition statistics that TaskUs gave in its securities filings that the Court dismissed from the case because it did not find them -- the pleading to have identified any inaccuracies. Correct?

MR. KUBOTA:  Objection.  The witness didn't author this report, which is from JPMorgan.  You're just asking him to read words in the document?

A     Well, I think they're making reference to

Page 192

that what TaskUs reports, and the definition they use, doesn't offer a full picture of employee attrition.

I mean, that's what I understand.  I don't know if it's referencing a specific number or a specific statement, but it seems to be referencing their definition of how they calculate attrition.

BY MR. YOUNGWOOD:

Q    Okay.  They don't reference the phrase "low attrition" that you and I looked at during our first session today, that's the attrition statement that remains in the case.

MR. KUBOTA:  Objection.  And object to counsel's characterization, vague.  Objection to form.

A    It doesn't specifically use the words "low attrition," if that's what you're asking me.

BY MR. YOUNGWOOD:

Q    Okay.  And I think you were looking at page 6 of the exhibit.  And we don't need to go through each sentence, but this is where there's a deeper discussion of the issues of attrition?

A    There is a deeper discussion here with more detail, yes.

Q    Okay.  And included within the detail is specific reference to some of the specific statements regarding attrition that were originally in the case but have been excluded?

MR. KUBOTA:  Objection.  You're just asking him to read the document?

A    I recall certain statements being excluded.  I don't know if this is in reference to those specific statements or numbers.  I just don't have a specific recollection.

BY MR. YOUNGWOOD:

Q    Okay.  Let's take a brief look at the Baird report, which was the other one of 2 of the 18 that referred to both Spruce and attrition, according to your report.

MR. YOUNGWOOD:  I'm going to mark that -- hold on, actually, one second, before I do that.

MR. KUBOTA:  And for the record, I object to counsel's characterization.  If you're going to mark the Baird report, we don't need the commentary.

(Document marked as Exhibit No. 12 for identification.)

BY MR. YOUNGWOOD:

Q   Sir, I believe you can confirm for me this is a copy of the analyst report that you reference and part quote in paragraph 38 of Exhibit 8.

A   Yes, it is.

Q   Okay.  You quote -- I see what you did.

I think what you did was you quote, in part, from the very first paragraph and then, in part, from the second bullet point in 38.

Why don't we just look at Exhibit 12, where all the text is.

A   Okay.

Q   In the first paragraph -- well, the very first sentence says:

"We like TaskUs a lot on the near 10 percent pullback today triggered by a short report."

You understand that to be likely a reference to the Spruce Point report?

A   Yes.

Q   Okay.

"The items raised like client concentration, attrition, free cash flow generation (weak due to fast growth) are all

well-known."

Do you see that?

A    I see that.

Q    Okay.  So they're describing whatever was raised in the Spruce Point report regarding attrition as already previously known?

MR. KUBOTA:  Objection.  The document speaks for itself.  The witness didn't write this document.

A    Yeah.  I don't know if they're referring to that all the information in the short report had been previously disclosed or just that attrition is a relevant issue for these types of companies, and that that's well-known.

So I don't think it's entirely clear.

BY MR. YOUNGWOOD:

Q    Okay.  In the -- I'm going to get back to the first paragraph in a moment.

But in the second bullet point that you also quote in part, they write:

"Several items are quite well-known."

And later in that paragraph, they refer to attrition.

Do you see that?

A    I do.

Q    I'm curious, sir.  How did you decide what to bold and highlight in your report, as compared from the original source?

A    Because those are the portions that are specifically mentioning attrition.

Q    Okay.  But you took out the highlighting that was in the original.

MR. KUBOTA:  Objection.  I don't even know what that means.

BY MR. YOUNGWOOD:

Q    Do you understand what I'm asking you?

A    I think you're saying that it appears, at least, that the first sentence was bolded in the original, and it's not bolded -- the entire thing is not bolded in my report.  That's true.

Q    Okay.  And you don't actually, in your report, tell us that you've changed the emphasis.  Right?

MR. KUBOTA:  Is that really a question?

A    I think at Footnote 2 of my report, I say:

"Unless otherwise noted, all emphasis in this reply report is added."

BY MR. YOUNGWOOD:

Q    Okay.  So --

A     So I think I -- I did make clear that I was highlighting portions of it, based on my view as to what I was trying to draw attention to.

Q     Where do you tell us that you removed emphasis of things that you're trying not to draw attention to?

MR. KUBOTA:  Object to the characterization of counsel.

A     I was not trying to not draw attention to it.  The entire sentence is shown, and a portion of it is bolded.

BY MR. YOUNGWOOD:

Q     Okay.  But if what you're studying is whether or not information in the Spruce Point report was new information in the market that led to a corrective disclosure, wouldn't the fact -- for example, the second bullet point that we just looked at -- that the items were already -- and now to quote, "quite well-known," be something you should draw the reader's attention to?

MR. KUBOTA:  Object to form.  I don't even know what that means.

A     Again, the way I read that is that the issue of attrition generally is well-known.  I don't think this is necessarily a claim that every

single thing in the report, in the Spruce Point report, was well-known.

BY MR. YOUNGWOOD:

Q    Let's look at the -- back to the first paragraph -- third sentence.

You don't include this, I think -- I don't want to misstate.  No, you don't.

You see the sentence that begins, "A new item..."?

A    Yes.

Q    And a fair reading of that would be they're trying to contrast what follows with the things that come before, which were not new items.  Right?

MR. KUBOTA:  Object to form.  The witness didn't write this document.  You're just asking him to read the words?

A    I think they're characterizing the information in that sentence as new.  Whether -- again, by "new item," I think they mean a new -- they could mean a new issue or area of concern.

It's just whether they're meaning to say that everything that was in the Spruce report about attrition was already well-known, and these are the only new things, I think that reads too

much into this document.

BY MR. YOUNGWOOD:

Q   Why didn't you include this sentence in your paragraph 38?

A   I didn't think it was necessary.  I'm not trying to say that the attrition issues are the only thing that was in the Spruce Point report.

Q   Or the only things that might have contributed to a change in stock price that day.  Right?

MR. KUBOTA:  Object to form.

A   Correct.  I am not in any way opining or suggesting there weren't other things in the Spruce report that may have contributed to the stock price decline.

BY MR. YOUNGWOOD:

Q   And you don't actually know that the attrition contributed to the change in the stock price?

MR. KUBOTA:  Objection.  Just for the record, Mr. Coffman has not issued a damages report in this case, and those deadlines are several months away.

So I just want to avoid any misleading implication that he's testifying about loss

Page 200

causation or damages issues that are not at play in class certification.

A    I think, given the totality of the evidence that I've provided in my report, it's a reasonable conclusion that the new informa- -- that the information in the Spruce report about attrition likely caused at least part of the stock price decline.

But I haven't definitively attempted to disaggregate all the different causes and how much each contributed.

BY MR. YOUNGWOOD:

Q    You haven't even proximately disaggregated or identified the causes that contributed?

MR. KUBOTA:  Objection, compound.  Seeks premature testimony.  Improper at the class certification stage.

A    Again, based on the totality of the evidence I've presented in my report, I think it is reasonable to conclude that some portion of the stock price decline on -- in the wake of the Spruce report -- was caused by information in the report about attrition.

I have not ruled out in any way, or tried

to quantify, the extent to which other things may have also contributed.

BY MR. YOUNGWOOD:

Q    And so you -- these allegations regarding a senior executive at the company that's in this sentence that begins, "A new item," you've not considered what role, if any, they played in the change in value of the stock price?

A    Well, I've considered it --

MR. KUBOTA:  Object to form.

A    -- and thought about whether those items may or may not have.

I haven't done any analysis to evaluate the degree to which they may have.

BY MR. YOUNGWOOD:

Q    Well, have you -- for that item we're talking about, have you even concluded that it did contribute, or that it didn't contribute?

MR. KUBOTA:  Same objection as before.  I think this seeks premature testimony on loss causation and damages, that is several months in advance of the deadline set by the Court.

A    I have not reached a conclusion either way on that.

It's -- I've reached the conclusion that

it's possible that it may have contributed.  But I have not reached a conclusion that it either did or didn't.

BY MR. YOUNGWOOD:

Q    Let's go on and discuss the portion of this Section E that looks at the news articles.

So Mr. Deal, correct, identified 33 news articles?

MR. KUBOTA:  Can you give the paragraph cite?

MR. YOUNGWOOD:  He references it -- Mr. Coffman references it, at least initially, in paragraph 38 of Exhibit 8.

33 news articles, Footnote 54, referring to Mr. Deal.

A    Yeah.  I said he looked at 33 news articles.

And then in paragraph 42, I mention that he points at two Factiva articles that mention the attrition-related claims in the Spruce report, as well as The-Fly-on-the-Wall article.

BY MR. YOUNGWOOD:

Q    Okay.

A    Or I think this may be one of the two. Hold on a second.

Yeah.  Those are two examples I point to that Mr. Deal acknowledges.

Q    And a similar question to when we identified the 2 out of the 18 analyst reports.

You don't dispute Mr. Deal's, at least categorization, counting that of the 33 news articles, only 2 of them mention both Spruce and attrition?

A    I don't know that I validated that. Yeah.  I don't -- I don't think I explicitly validated that.

He certainly mentions these two, and I reference those in my report.  And again, I don't recall, as I sit here, the methodology for how he identified those 33 articles and whether they would all be the right sort of denominator to consider in such a calculation.

But as I sit here, I'm not aware of any beyond these two.

Q    Okay.  Whether you -- so you don't even know if you rechecked the 33?

MR. KUBOTA:  Objection.  For what?

A    I did not explicitly ask my staff to evaluate the accuracy of that.

BY MR. YOUNGWOOD:

Q    Okay.  I thought I had asked this about the analyst reports.  Maybe I didn't.

I know you told me you didn't dispute the counting of the 6 and then 2 of the 18.

Did you ask your staff to validate it, or is it just you didn't -- you don't dispute it because you didn't check?

A    No.  For the analyst reports, I remember specifically looking at all of the analyst reports.

Q    Okay.  For the articles, it's possible you or your staff didn't actually --

A    I just don't have a specific recollection.

Q    It's possible they did, it's possible they didn't?

A    Correct.

Q    Let's talk about the two that Mr. Bruce identifies, and then you reference.

What is theflyonthewall.com?

A    It's a website where articles related to investments and companies can be posted, is my understanding.

I don't know -- I don't recall if they

have their own reporters as well.  So I don't know a lot of the details about what the -- like, the entire scope of what theflyonthewall.com does.

Q    So if I asked you if they have subscribers, would you know the answer?  Like how does one get access to their site?

A    I believe you can access them through a Factiva search.

Q    Okay.

A    So they're a source that's included in Factiva, is what I recall as I sit here.

Q    Okay.  And do you know how widely read they are?

A    Not off the top of my head.  I've seen their -- I've seen reports from that website numerous times in prior cases I've been involved in, but I don't know what their circulation is or how many people look at them.

MR. YOUNGWOOD:  Can we have 7, please?

(Document marked as Exhibit No. 13 for identification.)

BY MR. YOUNGWOOD:

Q    Have you seen this before, what's been marked as 13?

A    Yes.

Page 206

Q    And this is The-Fly-on-the-Wall document we've just been discussing?

A    I believe that's right, yes.

Q    Okay.  And the first thing that The-Fly-on-the-Wall document mentions about the Spruce Point report refers to certain allegations of Mr. Maddock.  Correct?

A    That's correct.  Yes.

Q    And then the second thing refers to the disclosure of an annual contract value?

A    That's what's in the second sentence, yes.

Q    And did you consider whether or not whatever Spruce Point had to say about the contract value played a role in the change of the stock price, when the Spruce Point report came out?

A    I have not studied that in depth.  I have not ruled out that it could have.

Q    And the reason you didn't study it in depth is because it's not a basis of the alleged misstatements in the case, so you weren't asked to do so?

MR. KUBOTA:  Object to form.

I don't even know what that means.

Page 207

A    No.   The purpose of my analysis was to respond to Mr. Deal's opinion that there wasn't evidence of price impact, and that there wasn't -- on the back end.

And so my analysis was to evaluate whether the evidence -- the economic evidence was consistent with that.

In order to reach a conclusion about that, I needed to evaluate whether there was potentially new value-relevant information that was part of the corrected disclosure.

There could have also been other non-fraud-related components of the corrective disclosure that could have contributed to the price decline.

But evaluating the value of those things wasn't part of what I was being asked to do.  It was really just evaluating whether Mr. Deal's opinion that there was no evidence of price impact is consistent with the economic evidence or not.

BY MR. YOUNGWOOD:

Q    Price impact tied to the allegations of material misstatements in the case?  That's what you're looking at?

A    Yes.

Page 208

MR. KUBOTA:  Objection.  Calls for a legal opinion.

BY MR. YOUNGWOOD:

Q    Okay.  And you don't understand anything regarding disclosure of the annual contract to relate to alleged material misstatements in the case?

MR. KUBOTA:  Same objection.

A    Based on my understanding of the case, as I sit here, I don't understand the disclosures about annual contract value were a part of the corrective information that was disclosed as part of the Spruce report.

MR. YOUNGWOOD:  Tab 6.

(Document marked as Exhibit No. 14 for identification.)

BY MR. YOUNGWOOD:

Q    Mr. Coffman, you have Exhibit 14 to your deposition in front of you.

Do you recognize this?

A    I do, but just give me one second.

Q    Yes, sure.  Sure.

A    Yes, I recognize this document.

Q    And am I correct, this is a hard copy of the Benzinga.com posting that -- let me see if I

can find it -- that's one of the two articles of the 33 that Mr. Deal identified as referencing both Spruce and attrition?

A    Yes.

Q    Do you know what Benzinga is?

A    Again, it's a news source that I've seen frequently in many cases.  I don't know a lot of details about what Benzinga is or what the scope of their work is.

Q    It summarizes, it looks like, four different items in the Spruce report that could be seen as critical of the company?

MR. KUBOTA:  Objection.  You're just asking him to read the document?

A    Well, there's five different bullet points, and a couple of the bullet points have different items --

BY MR. YOUNGWOOD:

Q    Okay.  So it may be more than four?

A    Possibly, yes.

Q    Okay.  The four I was focusing on were actually 2 through 5, which seem to be the four bullet points at least that refer directly to the substance of things in the Spruce report.

So that's what I was looking at.

Page 210

A    I mean, that's a fair characterization.

Q    Okay.

A    Is that those four bullet points --

Q    Because the first one is just kind of an overview, and the last one doesn't seem to refer to the Spruce Point report, by my reading.

A    That's consistent with my reading as well.

Q    So the last one, to the extent it's negative news, is not associated with the Spruce Point?

A    You're talking --

MR. KUBOTA:  Objection to form.

BY MR. YOUNGWOOD:

Q    -- the one that says "additionally."

A    "Additionally, new industry reports." That one?

Q    Yes.

A    Yeah.  I'm not absolutely certain what that's referencing.  But I do believe -- and whether that could be part of what's in the Spruce report, I don't think it's the main point of the Spruce report.  But I actually don't know as I sit here right now.

Q    Okay.  Okay.

The second bullet point, the first one -- well, the second bullet point, this refers to the CEO.  We've discussed that already in the context of at least the prior article.

A    We have talked about that, yes.

Q    Yeah.  And the second one, do you see this as referring to the same reference to a contract that was also discussed in the fly posting?

MR. KUBOTA:  Objection to form.  You're just asking him to read the document?

BY MR. YOUNGWOOD:

Q    Or do you see it referring to additional issues?

MR. KUBOTA:  Same objection.

A    Well, it generally is talking about exaggeration of the size of its business and concealing growing financial strains.  So I think that might be more than just contract value.

So I don't know that it's referring to exactly the same thing as in the other article.

BY MR. YOUNGWOOD:

Q    Okay.  So it may be different things or even more things?

A    That's possible, yes.

Page 212

Q    Okay.

The third one refers to attrition.  In fact, I may have misspoke, because this one also seems to refer to, in addition to attrition, to annual contract value.

A    Correct.  That's -- yeah.  This refers to multiple things.  And whether the prior one has anything to do with the contract value claims in the Spruce report, I just don't know for sure.

Q    Okay.  So the reference here to attrition seems to be in the second line, perhaps carried over to the third line of this fourth bullet, where it says:

"The use of a non-standard definition of annual employee attrition rate, possibly understating the actual turnover."

A    Yes.

Q    Okay.

MR. KUBOTA:  Objection.

You're just asking him to read the document?

BY MR. YOUNGWOOD:

Q    And that you understand to be a reference, again, to some of the statements originally in the case that have now been

dismissed, the definitional issues?

MR. KUBOTA:  Objection to form.

A    No.  I don't -- I'm not drawing that conclusion, no.

BY MR. YOUNGWOOD:

Q    Okay.  It does not specifically refer to the, quote, low attrition statement that is the only attrition statement left in the case. Correct?

MR. KUBOTA:  Objection to form.  Vague.

THE WITNESS:  Could I have that read back, please?

(Question read.)

A    I don't think it makes specific reference to it.  It does talk generally about understatement of actual turnover, but it doesn't make specific reference to the low attrition -- the sort of culture and low attrition statement that's the alleged misstatement.  I don't think it's making specific reference to that.

BY MR. YOUNGWOOD:

Q    Okay.  Back to your report, Exhibit 8.

In paragraph 43, you again refer to Mr. Deal's analysis and write in the second sentence that:

"15 of the 18 post-Spruce report analyst reports do mention attrition."

Do you see that?

A    Yes.

Q    Okay.  Did you read those 18 -- sorry -- those 15 reports?

A    I reviewed many of them.  I don't know that I reviewed all of them.

Q    Okay.  And you don't contest that none of those 15 tie any statements, corrective or otherwise, about attrition to whatever Spruce said in its report?

MR. KUBOTA:  Objection to form.  Vague. I don't know what you mean by "tie."

A    Well, I think the two I mention in paragraphs 38 and 39 are probably included in that 15.

BY MR. YOUNGWOOD:

Q    Okay.  So let's talk about the other 13, if that's correct.  We've discussed those probably more than we needed to today, so let's go to the other 13.

Any of those other 13, you would agree with me, none of them tie any of their discussion of low attrition to the Spruce report?

MR. KUBOTA:  Same objection.

A     Again, I don't know that they even all mention low attrition.  I think they talk about attrition.  And they -- I'm not aware of them also discussing the Spruce report.

BY MR. YOUNGWOOD:

Q     Okay.

A     I think that's the best way I can say it.

Q     Okay.  So some of them may not have even discussed -- used the word "low" or a semblance to it?

A     Possibly not.  That's not what I was looking at them for.  I was looking at them to evaluate whether they viewed attrition as an important component of the company's -- or the extent to which they describe attrition as important to the company's profitability.

Q     And in fact, with potentially one exception, none of them changed their view of TaskUs in terms of their targets or their investment thesis following Spruce?

MR. KUBOTA:  Objection, no foundation.
Object to form.

A     I don't recall if there was only one of the 18 that changed their views.  I just don't

recall, as I sit here.

BY MR. YOUNGWOOD:

Q   You don't know how many changed their views?

A   That was not something I computed, no.

Q   Okay.

MR. KUBOTA:  Jonathan, I don't know if you're changing topics, but we've been going an hour --

MR. YOUNGWOOD:  Yeah, that's fine.

THE WITNESS:  Yeah, I was actually just about to say I wouldn't mind taking a break.

THE VIDEOGRAPHER:  Please stand by.

We're going off the record at 10:42 a.m.

(WHEREUPON, a recess was taken, after which the following proceedings were held:)

THE VIDEOGRAPHER:  We are back on record at 10:59 a.m.

You may proceed.

BY MR. YOUNGWOOD:

Q   Mr. Coffman, I want to continue in the section that we've been in, which was Section D that began on page 16 of Exhibit 8, and ask you some questions about paragraph 48, which is on

page 20, if you want to reorient yourself.

A    Okay.

Q    You have a sentence toward the middle of the paragraph that begins "The roles and responsibilities of analysts..."

A    Yes.

Q    "...are to be forward-looking.  They largely focus on how newly-released information might change their valuation and forecast of a company's future cash flows to provide investment recommendations to their clients."

Do you see that?

A    Yes.

Q    And you write that after addressing the fact, at the top of the paragraph, that Mr. Deal has pointed out that none of the reports, after the Spruce report, discuss the alleged low attrition misstatement, and you say that's irrelevant.

A    Yes.

Q    Okay.  You don't dispute his factual conclusion regarding what the reports do and don't discuss?

A    Well, I agree that they don't use the word "low attrition" or cite specifically back to

Page 218

the alleged misstatements.

I don't know if I agree with other points of how he characterizes it.  But certainly with that, I agree he doesn't -- those articles don't specifically point back to the alleged misstatement.

Q    And have you been involved in misstatements where analysts do discuss the alleged misstatement in a case in which you've been retained as a class cert or damages expert?

A    I believe there have been some, but it's very infrequent.  Normally, they're just reporting on what is new and how it is affecting the value on that day, without making -- without necessarily making reference to any prior statement about the company.

But I've certainly seen examples where that's occurred.

Q    Well, what about a case with a restatement, a company restates its financials? Would you expect analysts to discuss the restatement of the financials?

A    Yes.

Q    It would be quite surprising if they didn't.  Right?

A    Correct.  Those are more obvious -- that's a more obvious case of them changing a particular number.

Q    Well -- and in fact, this case doesn't involve changing any number.  Right?

MR. KUBOTA:  Object to form.  I don't know what that means.

A    If you're saying that they -- that there is an admission that a previously reported attrition number was miscalculated and they're reporting a new number, I agree they weren't doing that, or that's not what occurred here.

BY MR. YOUNGWOOD:

Q    Okay.  Or what if a CEO or CFO on a -- you know, on a quarterly analyst call were to, you know, indicate that some prior statement made by the company was no longer accurate?  You would expect analysts to discuss that.  Right?

MR. KUBOTA:  Objection, incomplete hypothetical.

A    I think that's speculative.  It would depend on context and what it was and whether it was value relevant and like -- it could depend on a number of things.

BY MR. YOUNGWOOD:

Q    Because one thing analysts will want to focus on is what is value relevant?

MR. KUBOTA:  Objection.  Object to form.

A    I would think to the -- they would -- they would tend to focus on things that is value relevant.

BY MR. YOUNGWOOD:

Q    And what does "value relevant" mean?

A    Meaning that somehow the information influences the expectations of the company's value in terms of the cash flows it will generate in the future, and what the value of those cash flows are.

Q    Okay.  For the sentence I began this discussion with, the one that begins with "Roles and responsibilities," you cite to an article by Frank Fernandez.  It's in Footnote 71, I think.

A    Yes, I cite to that.  But that -- that sentence is also -- I mean, yes, I make reference to that, but that's just consistent with my understanding after having reviewed probably literally tens if not hundreds of thousands of analyst reports over my career.

So I think I -- just as a personal

Page 221

experience, also, understand what the role of analysts are and what the role of their reports are.

But yes, I also cite the article in Footnote 71.

Q   And you can't be forward-looking until you know what the past and the present are. Right?

MR. KUBOTA:  Objection to form.

A   Well, I think it depends on context again.

BY MR. YOUNGWOOD:

Q   Well, what --

A   I've seen, in some contexts, that the past would matter a lot, or the current situation would matter a lot.  And in other situations, it might not.

BY MR. YOUNGWOOD:

Q   Well, is there any context to look forward, where you wouldn't need to know the present?

MR. KUBOTA:  Objection.  Is this a philosophy class?  I don't even know what that means.

A   Again, it depends on what we're talking

Page 222

about, and the question is pretty vague.

For most companies, their current situation is a highly relevant fact when trying to perform a valuation.  I'm sure I could construct a simple example where only -- the only thing that's relevant is looking forward to whether something is going to happen.

So for example, when you're valuing a bond or -- you know, the question is, you know, can the company make the future payments?  And that may depend a lot more on what happens in the future than what the current status is.

So it's -- again, I think it could, in theory, be context specific.  But for most companies, the current condition of the company is an important fact to consider.

BY MR. YOUNGWOOD:

Q    Well, how about in the context of looking at a company's attrition?  Wouldn't the current state be important if you're looking to the future?

MR. KUBOTA:  Objection, incomplete hypothetical.

Are you asking about TaskUs in this case?

A    Well, technically, attrition is measured

Page 223

over a period of time.  So to even think about attrition at a moment in time, I'm not sure it's consistent with how it's reported.

BY MR. YOUNGWOOD:

Q    And in fact, exactly to talk about attrition, you'd have to look into the past to determine what your attrition was over a period of time leading to the present.

A    Yes.

Q    Okay.  And if you want to talk about what you hoped your attrition would be in the future, you'd still have to come up with a time period that -- if you want to say from now on you want better attrition, you'd have to start from somewhere in the past, or at least today?

MR. KUBOTA:  Object to form.  Incomplete hypothetical.  It has nothing to do with this case.  Incomprehensible.

A    Yeah.  I'm not sure I understand your question.  I mean, the primary reason an investor would look at attrition is to evaluate the expected profitability of the company, based on what they -- what the company's attrition rate has been and whether that provides them -- and what that says about their -- and whatever the

company -- whatever statement the company makes about that attrition to evaluate, you know, what level of attrition to expect and how that might influence their profitability going forward.

BY MR. YOUNGWOOD:

Q    And to evaluate whether or not your attrition is better or worse than a competitor, you would have to know what the competitor's attrition was using precise definitions and what your attrition was using precise definitions. Correct?

MR. KUBOTA:  Objection.  Incomplete hypothetical.  Compound.

A    Can I have that read back, please?

(Question read.)

MR. KUBOTA:  Same objections.

A    Well, I think you can perform numerical comparisons.  I think part of your question is saying to do some sort of apples-to-apples comparison, you would have to have some understanding of how it's calculated and what those numbers are.

But I don't know that -- I would be speculating to say that that's the only way to compare them.

But you can certainly make comparisons that are not necessarily apples to apples. Whether it's economically meaningful or not is a separate question.

BY MR. YOUNGWOOD:

Q    And now, take the context of looking at one company's attrition at one point in time versus another point in time -- I'll try to borrow from your answer.

You would need to know what the metrics were that you were comparing on.  Whether it was apples to apples, or apples to some other fruit, you'd need to know what the measurement is of at each time to be able to hope to compare them at all?

MR. KUBOTA:  Object to form.  Incomplete hypothetical.  Also unrelated to the opinions in Mr. Coffman's report.  So I'm not sure what the basis is for the question.

A    Yeah.  I mean, you can compare any two numbers.  Right?  But to have some meaning, there would have to be some at least meaningful comparison between the numbers for them to be relevant.

But you know, I don't know what relevance

Page 226

this question has at this point.

MR. YOUNGWOOD:  Okay.  Why don't we mark that.

(Document marked as Exhibit No. 15 for identification.)

BY MR. YOUNGWOOD:

Q    I think the first page of this is the cover of this publication.  And then within it, we have this article by -- I don't know what his title is, but by Mr. Fernandez, I'll say.

It seems his title is -- at the time he wrote this -- was senior vice president and chief economist and director of research of the Securities Industry Association.  But I don't know if he has a doctorate or anything.

A    Okay.

Q    So do you know who Mr. Fernandez is?  I mean, have you come across him before?

A    No.

Q    Okay.  And how did you come across this -- in fact, just -- I'm sorry.  Not to muddle up the record, it actually looks like his article is only pages 3 through 10.  So we'll just focus on 3 through 10.

How did you come across his work?

**Page 227**

A    I thought this was a -- I asked my staff -- I basically had written the sentence that was in paragraph 48.  And then I said to my staff, I'd like to find a good synopsis of, in the literature, that supports this view that I knew was true.

And I thought this -- they brought this to me, and I thought it provided a good summary.

Q    Okay.  You quote a passage of it at some length in the Footnote 71.  You see that?

A    Yes.

Q    Although you have some ellipsis and you do show that, so you don't quote it all sequentially.

I want to turn you to the pages in the article that these quotes come from.  It's on page 3, and it is under the heading role -- the roles, plural, of analysts.

A    Yes.

Q    And you read this whole section, or the whole article, before you agreed -- or before you made the decision to rely on it?

A    I did, yes.

Q    Okay.  And was there anything in the article that you didn't agree with?

Page 228

MR. KUBOTA: Objection, vague.

A    I was looking at it more for whether it provided a good summary of analyst roles.

I didn't necessarily focus on everything they say and whether or not it could be refuted in some -- I don't recall seeing something and said, Wow, I disagree with that.

But that was not really why I was -- how I was looking at this.

BY MR. YOUNGWOOD:

Q    Okay. So in the beginning of the paragraph, "Roles of the Analyst":

"A securities analyst, generally employed by a brokerage firm, bank, or investment institution, has the principal task of performing diligent and thorough investigations of specific securities, companies, and industries."

That sounds right to you?

A    Yes.

Q    "The results of these investigations are presented as a research report, which serves as the basis for making an investment recommendation."

Do you see that?

A    Yes.

Q    Now, the investigations that they're talking about must be either present-looking or past-looking.  Right?  You can't investigate the future?

MR. KUBOTA:  Object to form.

Mr. Coffman didn't write this article.  You can ask Mr. Fernandez.

A    Well, investigations could include -- I mean by definition, it would have to be of information that's available at the time the investigation is being done.

But that could certainly include many forward-looking things, including, you know, company guidance.  It could include other research analyst reports.  It could include looking at other forecasts of how certain industries are going to perform.

So it would certainly -- investigations would certainly include looking at forecasts of what's going to happen in the industry and the economy, and with the company specifically.

BY MR. YOUNGWOOD:

Q    But all based on information that's available either -- no later than the date that the analyst is writing?

Page 230

A    Like I say, by definition, that has to be true.

Q    By definition.

And in fact, the next sentence, I think, mirrors what you just said:

"Analysts examine all aspects of the current and prospective financial condition of certain publicly traded companies."

A    Yes.

Q    Okay.  If you go to the second column, this is -- I'm going to read the passage that you end your quote with, and you bold.

There is a sentence that says:

"After completing what is principally an objective evaluation..."

A    Hold on.  Give me just a second to find it --

Q    Yeah, sure.

A    -- because it's a little...

Q    And you know what?  Let's not -- let me not skip so much.  Let's -- I'll skip some, but let's start with the beginning of that paragraph, at least.

"All analysts begin their work by engaging in what is largely a descriptive

Page 231

function:  Gathering and assessing all meaningful qualitative and quantitative information about a company's past and present, and presenting it in a coherent, readily intelligible manner."

Do you see that?

A    Yes.

Q    And you include that quote in your footnote?

A    Yes.

Q    And you agree with it?

MR. KUBOTA:  Objection, vague.

A    I agree with it for what are the traditional securities analysts that work for investment firms.

I think you now see other types of analyst reports that fall outside this -- this sort of group.

But I agree, that's generally consistent with the approach I've seen securities analysts take that are employed by brokerage firms, banks, or investment institutions that are assigned to a company and producing traditional analyst reports.

Yes, I agree with that.

Page 232

BY MR. YOUNGWOOD:

Q    And the analyst reports that you and Mr. Deal studied for this matter, would you put them in the category of the traditional analyst reports that you just described?

A    Most of them are.  I think some might fall outside that.  But most of them are, yes.

Q    Are you thinking of any specifically that fall outside that?

A    Again, I look at so many analyst reports that it's hard for me to recall all of them from memory from this case.

Give me just a second.

Q    Yeah.  Why don't we look -- tell me what you want to look at.  We can look at your Appendix A or we can go to Mr. Deal's report.  If you need a copy of that, I can get it.

A    Give me just -- yeah.  Give me just a second.

All right.  So the one that falls outside of that, I would say on a --

Q    Please just tell us where you're looking.

A    Sure.  I'm looking at Exhibit 4 of my initial report --

Q    Okay.

**Page 233**

A    -- where I'm looking at the summary of securities analyst reports that I had at the time I was performing my market efficiency analysis. And I list eight different firms --

Q    Oh, okay.

A    -- that have analysts.

Q    Seeking Alpha?

A    Seeking Alpha, the last one, I would say falls outside of that.  The others fall, I would say, generally within what are considered traditional securities analysts.

Q    And I don't know if anyone would call Spruce Point an analyst, but you certainly wouldn't put them in the concept of traditional analysts.  Right?

A    I think that could vary from company to company, and also which companies they're covering.

I've seen a lot of different short reports as well, some of which follow more along the traditional analyst report format, and some which are -- which don't.

And so I think it's hard to characterize them all in one particular way.

Q    Why did you -- let me -- let me maybe go

Page 234

to the one you identified as different, Seeking Alpha.

Why did you identify them as different?

A    Because Seeking Alpha is a website where I think a lot of different participants can post what is analysis of firms, but they're not necessarily employed by a firm that's doing --

Q    Okay.

A    -- investment research.  And often, their work is not as thorough as what would traditionally be a securities analyst report.

But again, even on there, it varies.  But those typically fall outside sort of the formal guidelines that are being -- or you know, characteristics that are being described here.

Q    Is Seeking Alpha published anonymously?

A    No, it's not anonymous.

Q    But there are some short seller reports that are by anonymous authors.  Right?  Fuzzy Panda, for example?

MR. KUBOTA:  Objection.  What does Fuzzy Panda have to do with this case?

A    I haven't necessarily come -- I have not dealt with one of those in my work.

Page 235

BY MR. YOUNGWOOD:

Q    Okay.  To the sentence after the one we just read fully:

"After completing what is principally an objective evaluation, an analyst must then go further, prognosticating and expressing specific judgments of his own about a company's and a security's future prospects."

Do you see that?

A    Yes.

Q    Okay.  So after you do the work in the first sentence of the paragraph, that you then go further and prognosticate about the future.

MR. KUBOTA:  Objection.  You're just asking him to read those words from the article?

A    I think -- yeah.  I mean, they're -- it's describing that there's -- the way I read it is there's sort of a collection of information, and then turning that information into -- turning it into an investment recommendation, which is more forward looking.

BY MR. YOUNGWOOD:

Q    If we go back to your report, Exhibit 8, paragraph 50 -- let's start with 51.

Page 236

But I'm going to ask you about 50 and 51, if you want to refresh yourself.

A     Sure.  Okay.

Okay.  I'm ready for your question.

Q     Okay.  So you cite a document from the Joele Frank firm -- or memo, it looks like, from the Joele Frank firm -- talking about "analysts are eager to help because the short is essentially saying they got it wrong."

Do you see that?

A     Yes.

Q     Do you know if anyone tried, from the company, to influence any analysts following the Spruce report?

A     No, I don't.

Q     Okay.  And in 50 you say:

"Mr. Deal ignores that analysts may be biased toward crediting the explanations of management and downplaying the impact of short seller reports, like the Spruce report..."

And the sentence continues.

Do you see that?

A     Yes.

Q     Are you accusing any of the analysts that covered TaskUs of being biased?

Page 237

MR. KUBOTA:  Object to form.

A    They may have the potential to be biased. But the extent to which they were biased at all, no, I'm not.

BY MR. YOUNGWOOD:

Q    You have no evidence to indicate they were biased?

MR. KUBOTA:  Objection.

Have you produced TaskUs' communications with all of the analysts, Jonathan?

A    I'm not aware of any evidence that provides specific indication of them being biased.

BY MR. YOUNGWOOD:

Q    Okay.  And there are many safeguards that are now present in the securities industry to safeguard against any inappropriate behavior or bias by analysts.  Correct?

MR. KUBOTA:  Objection.  Calls for a legal and regulatory opinion.  Irrelevant.

A    I don't have enough information to opine on the extent to which that's true or the effectiveness of those.

BY MR. YOUNGWOOD:

Q    Well, the articles -- the Fernandez article talks about those topics.  Right?

Page 238

MR. KUBOTA:  Same objection.

A    It mentions it, yes.

BY MR. YOUNGWOOD:

Q    So for example, page 4, the first full paragraph begins with a sentence that says:

"The preparation of research reports..."
But I want to refer you to the middle of it.

A    Okay.

Q    It says:

"Analysts are expected to conform to individual firm and industry guidelines for the preparation and dissemination of these reports as well as to codes of professional conduct."

Do you see that?

A    Yes.

Q    You agree with that.  Correct?

A    I agree, generally, that that's -- that there are attestations that that occurs.  And -- but to the extent -- the extent to which those are actually effective, I just don't want to speculate.

Q    Okay.  The next sentence:

(Reading) Internal monitoring of quality and compliance standards is contemplated by supervisory and regulatory efforts of the

Page 239

self-regulatory organizations, all of which come under the purview of the Securities and Exchange Commission.

You understand that to be correct and true as well.  Yes?

MR. KUBOTA:  Same objections. Irrelevant.

A    I think you actually misread one word in there.

BY MR. YOUNGWOOD:

Q    I'm sorry.

A    It is "complemented" instead of "contemplated," is what you said.

Q    Thank you.  Yes, it is.

A    But let me read it again.  Just a second.

Again, I'm not an expert on what these compliance standards are or their effectiveness. So I don't think I can speculate about the extent to which they're effective or not.

Q    Finally, let me refer you to --

A    And just -- I think there's -- yeah. I'll leave my answer there.  That's fine.

Q    Okay.  Going to page 8 of this article, there's a heading that says:

**Page 240**

"Dealing with possible conflicts of interest."

Just the beginning of it:

"Many people in every profession, including analysts, encounter potential conflicts of interest and confront and successfully resolve them in the course of daily activities. These exist" -- sorry. I misread.

"The existence of possible conflicts of interest is not misconduct."

You would agree with that. Correct?

A    I'd agree that many people in every profession, including analysts, encounter potential conflicts of interest.

I agree that it's probably true that, largely, they confront and successfully resolve them in the course of daily activities.

But I'm sure there are exceptions to that. And I don't want to speculate as to how often those exceptions do or don't occur, when it comes to analysts.

I agree that the existence of possible conflicts is not in and of itself misconduct.

Q    If we go to page 52 -- sorry, that's wrong.

Page 241

Page 22 of Exhibit 8.  And we covered this in part, the one analyst that produced its price target.

I want to go up higher in paragraph 52.

And you talk about analysts being -- or you're quoting:

"Ljungqvist and Qian note that analysts can be slow to update their recommendations in the face of a short report."

First, this is an article from nearly 30 -- 40 years ago.  Correct?

I'm sorry.  I misread it.  It's from eight years ago.  I misread the date as the last number.  So skip that.

What does "slow" mean?

MR. KUBOTA:  Object to form.

A    I don't think it's quantified in the article what they mean exactly by "slow."

BY MR. YOUNGWOOD:

Q    Well, do you have a view?

A    I don't have a general view, no.

Q    But would a month be slow?

A    I think it would depend on the context of whatever company and industry you're looking at and what the issue is.

Q    So you're not --

A    In the context --

Q    Sorry.  Sorry, sir.  I don't mean to speak over you.  Go ahead.

A    Yeah.  Give me just a second.

Yeah.  I'll leave my answer as it is.

Q    Okay.  Well, what would be slow or fast in the context of TaskUs?

MR. KUBOTA:  Object to form.  Vague.

A    That's not something I've evaluated.  I don't know.

BY MR. YOUNGWOOD:

Q    Okay.  And Baird was able to do an update, it looks like, within weeks.

A    Well, I don't think it's a question of "was able to."  I think it's their -- Ljungqvist and Qian are suggesting that they have certain incentives not to.  So I don't think it's a matter of whether they can or can't.

Q    Okay.  But you've not identified any analyst in this case that acted improperly on an incentive not to be truthful in their belief regarding recommendations regarding targets or their investment outlook for TaskUs?

MR. KUBOTA:  Object to form.

Page 243

Again, Jonathan, have you produced management's communications with those analysts?

A    I'm not aware of any definitive evidence on that -- on that point as to whether it occurred or not.

BY MR. YOUNGWOOD:

Q    Let's go to page 23 of your August 23 report, Exhibit 8, under the Section E that has the heading that:

"Mr. Deal ignores evidence from discovery confirming the value relevance of the alleged misstatements."

Do you see that?

A    Yes.

Q    And the alleged misstatements we're talking about here are the low attrition statement we've already discussed that gets repeated some number of times.

A    Yes.  That discusses the culture and how it gives an advantage to them in terms of attrition.

Q    And you cite some number of documents.  I promise here I won't go through all of them.

But Footnote 81, you discuss Deal

Page 244

Exhibit 4, which is a Goldman Sachs document, which I'm going to give you.

A    Okay.

(Document marked as Exhibit No. 16 for identification.)

BY MR. YOUNGWOOD:

Q    I'm handing you a document that's been marked as Exhibit 16.

I believe this is what you are citing in Footnote 81, but if you could confirm.

A    Yes.  This appears to be the document I cite in paragraph 81 -- sorry -- Footnote 81.

Q    Okay.  And you refer to a few pages of it, which I think we can locate.

The first one is ending with Bates Number 42, so this is page 30.

And you note that -- you're citing it for the notion that "Culture Drives Outsized Performance and TaskUs is Well-Positioned"?

A    Yes.

Q    This doesn't discuss attrition, though. Correct?

MR. KUBOTA:  Objection.  Are you just asking him if the word "attrition" appears?

A    Well, I think to read it in context --

there's several pages here.  I mean, they're saying "culture drives outsized performance and TaskUs is well-positioned."

And then in the "Valuation Perspective" section, which starts on the next page, especially at page 45, it says --

MR. KUBOTA:  Do you want him to go there?

MR. YOUNGWOOD:  Yes.

A    -- the title says "Differentiated companies demand a premium."

BY MR. YOUNGWOOD:

Q    And this doesn't discuss attrition. Right?

MR. KUBOTA:  The witness was in the middle of an answer, Jonathan.

A    And then the document then ties the premium valuation that it's talking about to specific TaskUs characteristics -- on page 37 of the document, or Bates stamp ending 49, which includes, the fifth bullet point down, the focus on culture and employee quality of life, and then also reports the attrition rate below that.

BY MR. YOUNGWOOD:

Q    Right.  But it reports a specific attrition rate.  Correct?

Page 246

A    Well, again, I think it's tying together the focus on culture and that attrition rate.  But it is reporting a specific number there as well.

Q    Is this 24 percent a high attrition rate, low attrition rate, medium attrition rate?

MR. KUBOTA:  Objection.  Mr. Coffman is offering opinions on class certification.  Jonathan, you're several months too early for those types of questions.

A    That's not something I've evaluated.  I don't know.

BY MR. YOUNGWOOD:

Q    Okay.  And any reason to believe that this 24 percent given there is inaccurate?

MR. KUBOTA:  Same objections.  And he's not a fact witness.

A    Not as I sit here, no.

It's not exactly clear from the page itself how it's measured.  I don't know if there's somewhere else in the document that makes that clear.  But I'm not aware of any reason to believe it's inaccurate.

BY MR. YOUNGWOOD:

Q    Let's look at one more, at least.

You can put that aside.  I'm going to

Page 247

give you another dec.

This is what I believe you cite in Footnote 82.

(Document marked as Exhibit No. 17 for identification.)

BY MR. YOUNGWOOD:

Q    I hope I'm correct that this is the document that you cite in Footnote 82.

A    It appears to be, yes.

Q    Okay.  And you cite, I think, page -- you only cite 37521.  Correct?

A    Yes.

Q    Did you read the whole presentation before putting it in your report?

A    I paged through the whole thing, yes.

Q    Okay.  I think what you're referring to on page 37521 is Item 4?

A    Yes.

Q    And you're referring to something called unique employee-centric models.  Or the document refers to that, and you're pointing to that section of it?

A    Yes.

Q    Okay.  And is there a place in this dec where the dec gives more detail on what it means

Page 248

by unique employee-centric models?

A    I believe more detail is being provided on page 18.  At least that's my understanding of, like, when it's talking about taking an employee centered -- having an employee-centered culture and some of the things they do to attempt to achieve that.

I don't know if that's the only place. Give me just a second.

MR. KUBOTA:  Do you want to just direct him to a page, Jonathan?

A    I think it's -- more is described on page -- what is it -- page 21 of the document, or Bates ending 31, is talking about their employee-centric model as well.

BY MR. YOUNGWOOD:

Q    And if we look at Number 4 on page 21, I think you point out that there's a reference to low attrition there, the words "low attrition."

A    Yes.

Q    And when we turn to 31, we can determine -- we can quantify what they mean under a unique employee-centric model to be low attrition.  Correct?

MR. KUBOTA:  Objection.  The witness is

Page 249

not a -- is not a mind reader and didn't author the document.  How would he know what they mean?

MR. YOUNGWOOD:  I hope that the standard you've set for improper objections is one that you will live with when we are defending the depositions.

MR. KUBOTA:  Jonathan, your question had no foundation.  It's improper.  Mr. Coffman is not a fact witness, and he didn't author this presentation.

So your question about what the author meant is improper.

MR. YOUNGWOOD:  You have set the rules for how defense -- how people defending depositions will behave in the course of this. We will use this transcript as an example as we move forward in depositions.

MR. KUBOTA:  I'm entitled to state my objections, and that's what I'm doing.  And you're the one who's engaging in colloquy.

MR. YOUNGWOOD:  And you feel that all of your objections today have been of an appropriate type?

We'll live with that.

**Page 250**

A     So I mean, I see the comparison that's being made there, if that's your question.

BY MR. YOUNGWOOD:

Q     And the numbers given in the lower right-hand corner is 23 percent attrition rate for 2019, versus industry average greater than 35 percent for agents terminated greater than 180 days.

Do you see that?

A     I think it says "tenured," not "terminated."  But other than that...

Q     Thank you.  Let me make it clear.

"23 percent attrition rate for 2019 (for industry average of greater than 35 percent for agents tenured greater than 180 days)."

A     I see that comparison being made.

Q     Okay.  And you see the tie of this page to Number 4 on 21.  Correct?

MR. KUBOTA:  Objection to form.  Vague.

A     What do you mean by "tie"?  I just want to be clear.

BY MR. YOUNGWOOD:

Q     That the pages tie together.  That Number 4, which refers to unique employee-centric model, that concept is elaborated on page 20,

Page 251

Bates number ending 31.

MR. KUBOTA:  Same objection.

A    That seems to be how the document is organized, yes.

MR. YOUNGWOOD:  Okay.  You can put that aside.

Let's now mark this.  It's Tab 18.

(Document marked as Exhibit No. 18 for identification.)

BY MR. YOUNGWOOD:

Q    So we're now looking at your report at Footnotes 85 to 87, which are going to be on the next page, in paragraph 58, if you want to refresh yourself on that.

A    Yeah.  Give me just a second.

Okay.

Q    And what's the reason that you -- in what way does this paragraph in your analysis of this dec support any conclusions you've reached in this case?

MR. KUBOTA:  Objection to form.

A    That there's evidence that the content of the alleged misstatement was viewed as relevant by potential investors.

Page 252

BY MR. YOUNGWOOD:

Q    So let's take a look at the dec.  Am I correct?  Did I find the right document?  This is the dec that you're discussing in this paragraph?

A    I think I reference a couple of different documents.  But this is one of them, yes.

This is Deal Exhibit 9.  I think I reference 8 and 9 in one of the footnotes.  But yes, this is what I understand is Deal Exhibit 9 that I'm referencing.

Q    And one second.

I'm just going to represent to you 8 is a cover e-mail attaching 9.

A    Okay.

And then you give two examples.  Correct?

A    Yes.  Yes.

Q    And you gave two examples, because there are only two examples in the dec.  Correct?

MR. KUBOTA:  Object to form.

A    Give me just a moment.

Page 253

The two I cite are the two I'm aware of in the document.

BY MR. YOUNGWOOD:

Q    Okay.  And that's Investor C and Investor H?

A    Yes.

Q    And do you know what information Investor C or H had regarding TaskUs attrition at the time these interviews were conducted?

MR. KUBOTA:  Objection.

Jonathan, have you produced that information?

A    That's not something that I'm aware of, no.

MR. YOUNGWOOD:  And the fact that your expert wanders into tangents about things that don't seem to be all that relevant to the case doesn't create discovery obligations on us.

MR. KUBOTA:  I'm just trying to avoid your creation of a misleading record.

You can't legitimately expect an expert to have an understanding of information that you haven't disclosed.

MR. YOUNGWOOD:  Yes.  But it does demonstrate that his opinion isn't based

Page 254

on anything.

MR. KUBOTA:  You're 100 percent wrong, but please continue.

MR. YOUNGWOOD:  Well, the judge will let us know.

We're done with that document.

MR. KUBOTA:  We've been going about another hour, Jonathan.  It's up to you.

MR. YOUNGWOOD:  Okay.

THE VIDEOGRAPHER:  Please stand by.

We're going off the record at 11:56 a.m.

(WHEREUPON, a recess was taken, after which the following proceedings were held:)

THE VIDEOGRAPHER:  Good afternoon.  We are back on record at 12:10 p.m.

Please proceed.

MR. YOUNGWOOD:  Thank you.

BY MR. YOUNGWOOD:

Q    Mr. Coffman, I want to move to page 29, and a few of the pages that follow in your August 23rd report.

We've already, I think, discussed the paragraphs that come before this.  Certainly, I know we've discussed paragraph 69.

Page 255

I want to go to 70.  And you write:

"A number of sources selected by Mr. Deal include language that resonates with the alleged misstatement made by the company."

Do you see that?

A     Yes.

Q     Okay.  And then you identify -- well, you give the statement you're talking about in the registration statement.

A     Correct.

Q     That's at the bottom of page 29.

And then I think on page 30, you give us one, two, three, four examples of language that you think resonates with the alleged misstatements.  Right?

A     Yes.

Q     Did you find others?

A     I don't recall identifying any others.

Q     Okay.

A     That's -- I meant to give examples, but I -- there could be others, but I'm not aware of any as I sit here.

Q     And these are four analyst reports, I believe.  Yes?

A     That's my recollection, but let me

doublecheck that.

Yes.

Q    Four out of how many?  How many did you come up with before?

MR. KUBOTA:  Objection.  Objection, vague.

A    I don't recall the specific total number.

BY MR. YOUNGWOOD:

Q    And I'm not going to go through all four of them, but let's just take the last one, paragraph 74.

You refer to a BTIG report.  And at least as you quote it, with an ellipses:

"TaskUs' focus on culture has also led to... low attrition relative to the industry average."

Do you see that?

A    Yes.

Q    The alleged misstatement you refer to doesn't say anything about being relative to the industry average or anything else.

A    It's not --

MR. KUBOTA:  Objection.  Just for the record, you're asking him to compare the words?

Page 257

A     It doesn't specifically mention the industry average.  It says that it gives them an advantage, I believe is the language that's used.

BY MR. YOUNGWOOD:

Q     Let's look at the Wells Fargo report, which is paragraph 72.

A     Um-hm.

Q     Now here, you give a portion of a sentence and you say:

"Management's commitment to its frontline workers across the globe, and the success they've had building and scaling their strong culture is reflected in some of the industry's lowest levels of attrition rates."

Do you see that?

A     Yes.

Q     Again, so that's by comparison to others in the industry?

A     That's what the analyst is doing, yes.

Q     Okay.

A     But it's, again, tying together their -- how their -- the assertion that their culture is resulting in low attrition.

Q     Do you know if that analyst had a specific measure of attrition in mind when they

Page 258

wrote that portion of the report?

MR. KUBOTA:  Objection.  No foundation outside personal knowledge.

A    I don't recall if that report mentions a specific rate that they're focused on.  I would have to look at the report.  I just don't remember off the top of my mind.

BY MR. YOUNGWOOD:

Q    Well -- and you see there's an ellipsis.  Right?

A    Yes.

Q    Would it surprise you to learn that what you cut out of your report was the specific rate that the analyst was referring to?

MR. KUBOTA:  Objection to form.

A    It would not surprise me, no.

MR. YOUNGWOOD:  Mark this.

A    My purpose in putting together this sentence -- or highlighting this, is to show how the analyst, like the alleged misstatement, is drawing a link between culture and the company's purported low attrition.

(Document marked as Exhibit No. 19 for identification.)

Page 259

BY MR. YOUNGWOOD:

Q   So this is the analyst report that you're referring to in paragraph 72?

A   It appears to be, yes.

Q   If you turn to page 10 of that, I think you're going to find the first full paragraph on the page is where you pulled those words from.

And you'll see right after you put the ellipsis in your report, there's a parenthetical telling us exactly what attrition rate they were looking at.

A   Okay.  I see that.

MR. KUBOTA:  Is that a question?

BY MR. YOUNGWOOD:

Q   You're not aware of any allegation, are you, that the numbers in that parenthetical are inaccurate, are you?

MR. KUBOTA:  Object to form.

A   Well, I'm aware that plaintiffs are alleging that the company misrepresented by saying that they had low attrition.  Whether this particular number, like all the elements that -- or all the evidence that may support that or not support that, I'm not aware of.

BY MR. YOUNGWOOD:

Q    Well -- and in fact, the judge has dismissed from the case the specific attrition statements that had actual numbers and parameters. Correct?

MR. KUBOTA:  Objection, asked and answered.

A    I'm aware of certain statements being no longer in the case as potential misstatements.

How any other statements related to attrition relate to the misstatement that's still in the case, I would be speculating about.

BY MR. YOUNGWOOD:

Q    You've prepared -- I'll guess, I don't know -- dozens of class certification reports in your career?

A    Yes, that would be accurate.

Q    And in each of them, have you included a market efficiency section of it?

A    I'm often asked to opine about market efficiency.  So in -- I think in all those reports, market efficiency is at least a topic I've addressed, yes.

Q    And you've looked at the Cammer factors in, if not each of those, probably almost each

Page 261

of those?

MR. KUBOTA:  Objection to form.

A    I think it depends.

Sometimes there's securities that don't lend themselves to analysis with the Cammer factors, like options and things of that nature.

But when looking at a common stock, yes.

BY MR. YOUNGWOOD:

Q    Okay.  And you've, in those circumstances, always done a Cammer 5 analysis.  Yes?

MR. KUBOTA:  Objection.  Misstates prior testimony.

This also seems like deja vu from a few months ago, Jonathan.

A    I mean, my standard practice, when evaluating market efficiency for a common stock, is to look at a cause and effect analysis.

I'm trying to remember if there's ever been a circumstance under which I didn't do that as part of my analysis.  I can't think of one off the top of my head.

BY MR. YOUNGWOOD:

Q    Why do you always do one, or almost always, if it's almost?

Page 262

A    Well, it's a Cammer factor.  And it's a -- I think from an economic point of view -- a good, fairly direct test of whether or not the market is efficient or not.

Q    Have you ever been an expert in a case in which you were not able to satisfy Cammer 5 in which the class got certified, common stock?

MR. KUBOTA:  Object to form.  Vague. Incomplete hypothetical.

A    None that come -- could I have that question read back, actually?

(Question read.)

A    I don't know.

There have been cases where the Cammer Factor 5 analysis was less compelling than some of the other factors.

And I just -- when you say "satisfied," it's not clear whether you're asking about whether it satisfied the Court or satisfied my statistical test, so it's a little vague.

But I'm not aware of a specific case, as I sit here, where I opined the common stock was efficient and it didn't meet the Cammer 5 test in one way or another.

Page 263

BY MR. YOUNGWOOD:

Q    You call it, or perhaps Cammer does as well, cause and effect.  Right?  You refer to it as cause and effect?

A    Yes.  And that's how Cammer refers to it as well, as a cause and effect between new information and changes in the security price.

Q    Okay.  But like -- and the analysis that you do, if I understand it, is non-news days, other days, and you see if there's a difference in -- statistically significant difference in how the stock reacts?

I know that's a gross oversimplification.  If you'd rather rephrase it, go ahead.

A    Yeah.  It's not other days.  It's a more specific test, which is there's a treatment group, which is where there's clear value-relevant news, or at least the potential for value-relevant news in earnings announcements, which have been studied by many, probably hundreds of academics as relevant information, you know, potentially value-relevant information about a company.  So I look at those days.  It's an objective set of days to look at.

And I compare that against a control

Page 264

group, which is the days in which I didn't identify any news, either analyst reports, SEC filings, et cetera.

So it's really the no-news days, which is a control group against specifically the earnings announcements.

Q    Okay.  And you see how they correlate with each other.  Is that fair to say?

MR. KUBOTA:  Object to form.

A    Well, no.  It's really saying there's really three metrics I look at.

One is the prevalence of statistically significant price movement, so that's one metric. And so I compare the treatment group against the control group on that metric.

I also look at the absolute size of the price movement.  So without regard to whether it's statistically significant or not, just saying, Do you see bigger price movements on the treatment date than the control date?

And then, Is there higher volume on the treatment days versus the control days?

Q    Okay.

And you assume that a day -- that if, for example, the stock moves on a particular day that

Case 1:22-cv-01479-JPC-GS   Document 129-2   Filed 09/20/24   Page 135 of 216

Page 265

there's news, that it's the news that caused the movement?  That's the cause effect?

MR. KUBOTA:  Objection to form. Incomplete hypothetical.

A    Well, yes, generally.  I mean, you have to leave some possibility that you can see a statistically significant movement by chance alone.  So looking at a large sample, you expect to see that once in a while.

But yes.  The idea is that if there's days where there's clear company-specific news on earnings announcements, there's clear company-specific news being issued, and then you're asking, Is there evidence that that moves the stock price more than days when there is no news?

BY MR. YOUNGWOOD:

Q    But isn't it possible that on some days, the stock price move is what generates the news?

MR. KUBOTA:  Objection, incomplete hypothetical.

A    That's not how one approaches an event study analysis.  I mean, it's theoretically possible that could happen.

But obviously, with earnings

Veritext Legal Solutions

212-267-6868            www.veritext.com            516-608-2400

Page 266

announcements, these are objective announcements that the company is making, that it's really required to make, describing the performance of the company on a quarterly basis.

So I think -- you know, I think what you're suggesting, I guess in theory, could happen.  But it's -- it's not how financial economists think about approaching an event study or what typically moves stock prices.

BY MR. YOUNGWOOD:

Q    Okay.  But statistics can't move causation.  Right?

MR. KUBOTA:  Object to form.

BY MR. YOUNGWOOD:

Q    It can only prove association and correlation.

MR. KUBOTA:  Object to form, and the use of terminology that is not being defined.

A    Well, no.  I think the event study methodology, the event study approach that's well accepted in the academic literature, says that based on the statistics, you can conclude with a certain degree of confidence that the new news on that day moved the stock price.

BY MR. YOUNGWOOD:

Q    What if the news on that day was that the stock price moved, and no other company-specific news?

MR. KUBOTA:  Objection.  Incomplete hypothetical.

A    Well, first, you would have to see those things in reverse order of what I'm talking about. Right?

So you would have to see the price move before the news occurs.

BY MR. YOUNGWOOD:

Q    Okay.

A    And that's not what's happening on the dates I'm testing.  On the dates I'm testing, I'm looking at the price change that's occurring, clearly, immediately after the release of the company-specific information.

So it wouldn't make sense that the price move can't generate an earnings announcement. That's not --

Q    So you're leaning that answer to the earnings announcements?

A    Well, I thought that was the context in which you were asking.

Page 268

Q    Well, but how about all other days on which there's news or not news?

Do you look at intraday trading to see whether the stock moved first or the web posting came first?

A    When you say "web posting," I guess, are you --

MR. KUBOTA:  Object to form.

BY MR. YOUNGWOOD:

Q    Whatever form the news takes.

A    I haven't, for -- at least in this case -- haven't analyzed specifically an occurrence of what you're talking about.

So you know, did I do intraday analysis of all the other days?  No, I didn't.  That falls outside of what's necessary to perform the cause and effect test that I'm doing.

I mean, the event study methodology and cause and effect test that I've performed provides clear scientific evidence that there is a causal link between new value-relevant news, and movements and TaskUs' stock price.

Whether what you're hypothetically saying could occur is -- is not something I've directly observed.

Page 269

Q    I want to direct you to the section of your report in which you -- sorry, your most recent report, August 23rd -- in which you discuss Cammer 5.

And specifically to the criticism of your analysis that Mr. Deal performs, which I believe you start to discuss on page 42, paragraph 95.

A    Okay.

Q    And I'm going to give you a copy of Mr. Deal's report, just so we don't have to debate describing what it is he did.  We'll just go to a page.

A    Okay.

(Document marked as Exhibit No. 20 for identification.)

BY MR. YOUNGWOOD:

Q    20.  Great.

Okay.  So you have Exhibit 20.  I'm just going to refer you to page 53.

A    Okay.

Q    You -- or I guess your staff, but you tell me.  You went through and tried to replicate his classification of days as news days or non-news days as depicted on page 53 in this Figure 6, where he classified them as 44 news days

Page 270

and 109 non-news days?

MR. KUBOTA:  Objection to form.  I'm not sure what that means.

A    I wouldn't say that we replicated them. I mean, it was made available to us, and I observed what he was doing and some of the judgments he was making and, you know, developed my criticism of why I didn't think that was appropriate.

I didn't necessarily determine whether what he was doing -- I didn't replicate his -- his classifications, and I don't know that I would even necessarily agree with his classifications.

And I give examples of dates where I think I pretty clearly disagree with his classifications.

BY MR. YOUNGWOOD:

Q    You do identify, as you just said -- and it's in paragraph 96 -- three days that you disagree with his classifications.

A    I think I say those are examples, yes.

Q    Did you see any others?

A    I thought there were others that could be used, but I thought these were the three best examples.

Page 271

Q    Okay.  Can you tell me the others?

A    Not off the top of my head.  I don't recall them.

Q    How could I -- it's not in any of your work product or in your report.  Right?

A    No, it's not.

Q    Okay.  So if you changed these three examples, this chart on page 53 of his report marked as Exhibit 20, the 44, absent any other changes, would become a 41, and the 109 would become 112.

You'd move them over?

A    If that was the only problem with the analysis, yes.  I think my criticism of his analysis is far broader than that.  These are just three examples.

Q    Did you rerun his analysis moving those three reports from one column to the other?

A    No.  I don't think his analysis is reflective of a meaningful way to test for cause and effect, given how many of the news days would not likely have value-relevant information that would come even close to where you would expect to observe a stock price movement, especially one that was statistically significant.

Page 272

Q    So you didn't --

A    So I didn't run that test.  But I didn't -- there was no need to, because in no way am I saying these three dates are the only problem I see with his analysis.

Q    Okay.  The other problems you see you put into paragraphs 97, 98 -- I think that's where you put them in your report.  And there are other footnotes where you explain it, or at least you give citations for it?

MR. KUBOTA:  Objection to form. Compound.

A    I think I reiterate, also in paragraph 94, why my approach to cause and effect is an appropriate way to analyze cause and effect.

And then yes, I describe in 97 and 98 how the design of his test is simply diluting the news days to things -- to include things that would be not nearly as value relevant as earnings announcements.

Q    Okay.  And where did you, in your work, classify -- I'm looking at paragraph 96 -- July 29, 2021, the November 3rd -- I don't mean the date, I mean the article citing of the date --

A    Uh-huh.

Page 273

Q    -- July 29, November 3, December 30?

A    They didn't fall into either the treatment group or the control group.

Because again, my methodological design was to create the control group by looking for days that had literally no news that was identified in searches.

So these -- on these days, there were the articles, or disclosures that he's talking about.  So they would not have qualified as a non-news day under my methodology.

Q    Okay.  So it would not be a non-news day.  So in that sense, he also said, at least in his prior report, that they were non-news days.

In that sense you would agree with him, even if you think, under his methodology, he made a mistake.  Right?

A    Well, no.

MR. KUBOTA:  Objection to form.

A    No.  He has them as news days.

BY MR. YOUNGWOOD:

Q    I'm sorry.  He has them as news days.  You would have them as not non-news days, though?

MR. KUBOTA:  Objection to form.

A    Under my methodology, they would not fall

**Page 274**

into either the treatment group or the control groups that I've described.

So it's not an earnings announcement, and it's not a day with no news.

BY MR. YOUNGWOOD:

Q    Okay.  They would get to a third category of news, but not significant enough news to be in an earnings announcement?

A    I don't know what you mean by "not significant enough."  But they are not earnings announcements, so they don't qualify for the treatment group.

Q    Because the only thing you thought was worthy of the treatment group was the earnings announcements?

A    That's the design of my test, is to look at earnings announcements versus non-news days.

MR. YOUNGWOOD:  Why don't we take a short break, and we're very close to done.

THE VIDEOGRAPHER:  Please stand by.  We're going off the record at 12:38 p.m.

(WHEREUPON, a recess was taken, after which the following proceedings were held:)

THE VIDEOGRAPHER:  We are back on record

Page 275

at 12:49 p.m.

You may proceed.

BY MR. YOUNGWOOD:

Q    Okay.  I just have a few final questions.

Is there any work, Mr. Coffman, that you're currently undertaking for this case?

MR. KUBOTA:  Objection.  I don't think you're entitled to ask him about work that has not led to the issuance of a report, Jonathan.

MR. YOUNGWOOD:  I'll modify it.

BY MR. YOUNGWOOD:

Q    Is there any work that you're currently undertaking that relates to class certification relating to this case?

A    No.

Q    And is there anything that you were asked to do, in preparing the reply report dated August 23rd, that you did not put within the report?

A    No.

Q    Okay.  I think we marked some number of exhibits that are designated confidential, so we'll mark the transcript confidential, although I think most of it isn't.

And we'll try to work with you to

Page 276

streamline that in advance of filing the papers next Friday.

With that, we can go off the record.

MR. KUBOTA:  I have a few questions.

EXAMINATION

BY MR. KUBOTA:

Q    Mr. Coffman, you say in your report that there's clear economic evidence, or strong affirmative evidence, of price impact in this case.

You use both of those phrases.  Correct?

A    I believe so, yes.

Q    And can you summarize, at a high level, what that is?

A    Yeah.  It's really a combination of a few things.

It's the fact that in some of the company's roadshow materials they are highlighting the -- that they -- that their culture purportedly leads to low attrition, and that's something that they're putting forward to investors as a reason the company deserves a premium valuation.

We observe a couple examples of -- at least a couple examples of potential investors reacting to that information and reiterating that

Page 277

that would be positive information for them in considering an investment.

We see Mr. Deal does not eliminate the possibility that the alleged misleading statement impacted the IPO price itself, and doesn't eliminate the possibility that it could have led to at least part of the increase we observe on the first day in the class period.

We then also see analyst reports during the class period that reiterate the -- essentially what was contained in the alleged misleading statement, which is that the -- TaskUs' culture led to lower attrition and potentially superior valuation.

And then we see an obvious stock price decline that's statistically significant, both according to myself and not disputed by Mr. Deal, when a report comes out that calls that very thing into question by saying that they find that the claims of a superior culture leading to low attrition are highly exaggerated, and the stock price clearly declines immediately thereafter.

So I think taking all those things together provides -- and Mr. Deal doesn't eliminate the possibility, even though he points

Page 278

to some potentially confounding information, doesn't eliminate the possibility that the portion of the Spruce Point report that addresses the link between culture and attrition as being potentially highly exaggerated contributed to the stock price decline that we both agree occurred.

So in my view, all of that taken together provides evidence of price impact in this case.

MR. YOUNGWOOD:  I move to strike the last answer.

You can't use this to, like, bolster his report.  It's either in the report or not.  That wasn't in response to anything.

MR. KUBOTA:  I'm entitled to ask him questions, Jonathan.  So --

MR. YOUNGWOOD:  Because his report is inadequate, no.

MR. KUBOTA:  Please don't interrupt.

MR. YOUNGWOOD:  Okay.  Well, move to strike.

BY MR. KUBOTA:

Q    Mr. Coffman, you were asked earlier about paragraph 58 of your report.  Please turn to that.

A    (Witness complies.)

Q    Paragraph 58 is describing the April 1,

Page 279

2021 Goldman Sachs presentation.

Do you see that?

A    Yes.

Q    Mr. Youngwood asked you questions about the sentence that starts "For example..." and the rest of that paragraph.

Do you recall that?

A    Yes.

Q    Please turn to the Goldman Sachs presentation, which was marked as Exhibit 18.

A    Okay.

Q    Mr. Youngwood asked you if there were any other examples of investor comments on attrition beyond what was quoted in paragraph 58.

Do you recall that?

A    Yes.  I recall him asking me if that's --

MR. YOUNGWOOD:  That's not what I asked. Objection.

A    Yeah.  My recollection was a question along the lines of, you know, were there any other mentions of attrition in this document.

And I tried to peruse it quickly.  But not to waste time, I said that I wasn't aware of any, after reviewing a number of pages.

MR. YOUNGWOOD:  Objection, form.  That

Page 280

wasn't the question.  Foundation.

BY MR. KUBOTA:

Q    Well, let's go back to the question, so we can have a sufficiently clear record.

MR. YOUNGWOOD:  And the fact that counsel finds additional things that the witness didn't rely on or find doesn't --

MR. KUBOTA:  Move to strike speeches.

MR. YOUNGWOOD:  -- doesn't help -- doesn't help your failing class certification.

MR. KUBOTA:  Move to strike the speeches.

You asked the witness to review what I think is a 50 -- or 49-page document with small font, you know, during the deposition.  And I just don't want you to create a misleading record as to what is in the document.

MR. YOUNGWOOD:  You're accusing me of ethical violations?

MR. KUBOTA:  No.  I'm asking the witness appropriate questions in response to yours.

Just give me a moment here.

So you stated, Mr. Youngwood -- and this is from the rough:

"You gave two examples because there were

Page 281

only two examples in the dec.  Correct?"

Mr. Coffman testified --

MR. YOUNGWOOD:  Yes.  At the start of the prior sentence -- of the prior sentence in paragraph 58, he gave two examples of what he found and summarized.

MR. KUBOTA:  I'm not going to engage in colloquy with you.  I'm just reading what's in the transcript.

You asked:

"And you gave two examples, because there were only two examples in the dec.  Correct?"

I objected to form.

Mr. Coffman said:

"Give me just a moment.

"The two I cite are the two I'm aware of at the moment -- the two I'm aware of in the document.

"Question:  And that's Investor C and Investor H?

"Answer:  Yes."

BY MR. KUBOTA:

Q    So I would direct the witness, in Exhibit 18, to the page ending 866.

A    Okay.

**Page 282**

Q    At the top, this says:

"Consolidated Investor Questions:

██████████████

Do you see that?

A    Yes.

Q    Approximately nine bullets down, there's a question that says:

████████████████████████████████████

████████████████████████████████████

████████████

Do you see that?

A    I do.

Q    You agree that's a question from a potential investor related to attrition at TaskUs?

MR. YOUNGWOOD:  Objection, leading.

Can you ask a question without leading your own witness?

MR. KUBOTA:  You can answer.

A    It appears to be making reference to attrition and an investor seeking additional information about attrition.

BY MR. KUBOTA:

Q    Please turn to the page ending 868.

██████████████████████████████

Do you see that?

Page 283

A    I see that.

Q    The third point here asks:

████████████████████████████████

████████████

Do you see that?

A    I do.

Q    You understand "churn" to be related to the employees that are leaving TaskUs?

MR. YOUNGWOOD:  Objection, leading.

A    My understanding is --

MR. YOUNGWOOD:  And beyond the scope.

A    -- "churn" has some relevance to attrition rate.  I don't know always, but "churn" might be used.  But I believe that's referencing an input to what would be part of attrition.

BY MR. KUBOTA:

Q    Turn to the page ending 869.

A    (Witness complies.)

██    █    ████████████████████████████

Do you see that?

A    Yes.

Q    The first question is:

██        ████████████████  ████████████

██    ██████████  ██████████████████████

██    ████████████████████

Page 284

Do you see that?

A    I see that.

Q    Do you understand this question to relate to TaskUs' total attrition?

MR. YOUNGWOOD:  Objection, leading. Beyond the scope.

MR. KUBOTA:  It's not leading.

You can answer.

A    Yes.

MR. YOUNGWOOD:  It's leading.

BY MR. KUBOTA:

Q    Turn to the next page ending 870.

A    Okay.

███    ████████████████████████████████

Do you see that?

A    Yes.

Q    The fourth question is:

████████████████████████████████████

█████████████████████████

Do you see that?

A    Yes.

███    ████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

two that are quoted in paragraph 58.  Correct?

Page 285

MR. YOUNGWOOD:  Objection, form.
Foundation.  Leading.  And not what the
examples are in paragraph 58.

MR. KUBOTA:  You can answer, sir.

A    Yes.

BY MR. KUBOTA:

Q    Please turn to paragraph 76 of your
report.

A    (Witness complies.)

Q    And in paragraph 76 you state:

"Setting aside Mr. Deal's unreliable
classifications of the analyst reports, there is
no dispute that at least seven analyst reports
during the class period noted the misstatement
itself or used nearly identical language."

Do you see that?

MR. YOUNGWOOD:  Objection, scope.  I
didn't ask him about this paragraph.

MR. KUBOTA:  That's exactly my point.

But you can answer, sir.

MR. YOUNGWOOD:  No, no.  You can't do
this.

MR. KUBOTA:  I'm entitled to ask
questions of the witness.  I'm entitled to ask
questions of the witness.

MR. YOUNGWOOD:  About things that I didn't ask him about?

MR. KUBOTA:  You didn't ask him because you're trying to create a misleading record.  And you also asked him, I think, whether --

MR. YOUNGWOOD:  Your paragraph's in the record.  When we have oral argument, argue all you want.

MR. KUBOTA:  So expert reports are admissible.  Is that your -- is that your understanding, Mr. Youngwood?

MR. YOUNGWOOD:  You guys -- you've already submitted the report to him.

MR. KUBOTA:  I'll continue with my questioning.  It's necessary to correct the misleading impression given by your --

MR. YOUNGWOOD:  You're accusing me of another ethical violation.  Stop it.

MR. KUBOTA:  No, I'm questioning the witness --

MR. YOUNGWOOD:  Stop it, or I will raise it.  I will raise it.

MR. KUBOTA:  I'm entitled to question the witness, and you're disrupting --

MR. YOUNGWOOD:  You just called me

Page 287

misleading.

MR. KUBOTA:  No.  I said it's necessary that I ask these questions to correct the record, because you didn't ask him about this.

MR. YOUNGWOOD:  No.  I had a four-hour limit.  I didn't ask him about this.

BY MR. KUBOTA:

Q    Mr. Coffman, paragraph 76.

Is what you say there correct, that at least seven analyst reports during the class period noted the misstatement itself or used nearly identical language?

A    Yes.

Q    And does paragraph 110 of your report identify those seven analyst reports?

A    I think you meant to say Footnote 110?

Q    I'm sorry.  Footnote 110, yes.

A    Yes.

Q    And so if you turn to paragraphs 71 through 74 of your report, those are the four reports that Mr. Youngwood asked you about earlier.  Correct?

A    Yes.

Q    And Footnote 110 in paragraph 76 are providing three additional reports on top of

Page 288

those.  Correct?

MR. YOUNGWOOD:  Objection, form.
Foundation.  Misleading.  Beyond the scope.

A    Yes.

MR. KUBOTA:  No further questions at this
time.

FURTHER EXAMINATION

BY MR. YOUNGWOOD:

Q    Did you get a chance to consult with
counsel before answering these questions about
what he was going to ask you?

MR. KUBOTA:  Objection.

You're not entitled to ask questions
about breaks, Mr. Youngwood, unless you're
saying we can do the same for your witnesses.

MR. YOUNGWOOD:  Are you going to instruct
him not to answer?

MR. KUBOTA:  On privilege grounds, of
course.  We're in New York.

MR. YOUNGWOOD:  You're going to instruct
him not to answer?

MR. KUBOTA:  Discussions with counsel
during breaks are privileged.

MR. YOUNGWOOD:  Yes or no?

MR. KUBOTA:  See if you can ask a

better question.

MR. YOUNGWOOD:  Nope.  That's my question.

MR. KUBOTA:  Object to form.  I don't even know what that means.

MR. YOUNGWOOD:  Okay.  So you don't know if you're instructing him not to answer?

MR. KUBOTA:  I'm objecting to your question because I don't know what it means, and I offered you the chance to ask a different question.

MR. YOUNGWOOD:  Are you going to instruct him not to answer my question?

MR. KUBOTA:  Why don't you -- why don't you repeat the question, so it's clear?

MR. YOUNGWOOD:  You can read it.

This is an expert.  He's not -- he's not your client.

MR. KUBOTA:  So you're going to allow -- excuse me, Jonathan.

So you're going to allow your experts to answer questions about discussions with you during breaks?  I doubt it.

**Page 290**

(Question read as follows:

"QUESTION:  Did you get a chance to consult with counsel before answering these questions about what he was going to ask you?)

MR. YOUNGWOOD:  Would you like to allow him to answer it or not?

MR. KUBOTA:  Are you going to ask a question that's not seeking privileged information?

MR. YOUNGWOOD:  That's my question.

Do you want him to answer it or not?

MR. KUBOTA:  Instruction not to answer.  Privileged.

MR. YOUNGWOOD:  Okay.

MR. KUBOTA:  You can ask a different question if you like.

MR. YOUNGWOOD:  Just let the record reflect that counsel -- well, the record reflects it quite fine.

I want to take a five-minute break and see if I have any other questions.

THE VIDEOGRAPHER:  Please stand by.

We are going off the record at 1:04 p.m.

Page 291

(WHEREUPON, a recess was taken,

after which the following

proceedings were held:)

THE VIDEOGRAPHER:  We are back on record at 1:10 p.m.

You may proceed.

MR. YOUNGWOOD:  Thanks.  I have no questions for you, Mr. Coffman.  Thank you.

Off the record.

MR. KUBOTA:  The witness will read and sign.

THE VIDEOGRAPHER:  Thank you.  Please stand by.

We are going off the video record at 1:10 p.m.  This concludes today's testimony.

Master media will be retained by Veritext Legal Solutions.  Thank you.

(WITNESS EXCUSED)

**Page 292**

STATE OF ILLINOIS )

) SS:

COUNTY OF C O O K )

The within and foregoing deposition of the aforementioned witness was taken before MARIA S. WINN, CSR, RPR and CRR, at the place, date and time aforementioned.

There were present during the taking of the deposition the previously named counsel.

The said witness was first duly sworn and was then examined upon oral interrogatories; the questions and answers were taken down in shorthand by the undersigned, acting as stenographer; and the within and foregoing is a true, accurate and complete record of all of the questions asked of and answers made by the aforementioned witness, at the time and place hereinabove referred to.

The signature of the witness was not waived, and the deposition was submitted, pursuant to Rule 30(e) and 32(d)4 of the Rules of Civil Procedure for the United States District Courts, to the deponent per copy of the attached letter.

**Page 293**

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

In witness whereof, I have hereunto set my hand and seal of office this day, September 16, 2024.

CSR No. 084-003784 - Expiration Date: May 31, 2025

**Page 294**

Evan Kubota, Esq.

ekubota@bfalaw.com

September 16, 2024.

RE:    Lozada, Humberto, Et Al v. Taskus, Inc., Et Al

9/13/2024, Chad Coffman , Vol. II (#6907877)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 295

Lozada, Humberto, Et Al v. Taskus, Inc., Et Al

Chad Coffman , Vol. II (#6907877)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Chad Coffman , Vol. II                              Date

**Page 296**

Lozada, Humberto, Et Al v. Taskus, Inc., Et Al

Chad Coffman , Vol. II (#6907877)

                    ACKNOWLEDGEMENT OF DEPONENT

    I, Chad Coffman , Vol. II, do hereby declare that I

have read the foregoing transcript, I have made any

corrections, additions, or changes I deemed necessary as

noted above to be appended hereto, and that the same is

a true, correct and complete transcript of the testimony

given by me.


_____    _____

Chad Coffman , Vol. II                        Date

*If notary is required

                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

                        _____ DAY OF _____, 20___.




                        _____

                        NOTARY PUBLIC

**[& - 23rd]**

| **&** | **112** 271:11 | **17** 134:20 | **20** 134:23 |
|---|---|---|---|
| **&** 133:3,13 135:25 | **11:56** 254:11 | 186:24 247:4 | 217:1 250:25 |

**&**

**&** 133:3,13
135:25

**0**

**01479** 132:8
135:9
**084-003784**
293:11

**1**

**1** 134:10 146:2
146:5 169:14
278:25
**10** 134:13
138:4 176:10
176:14 179:3,4
194:17 226:23
226:24 259:5
**100** 146:15
254:2
**10017** 133:17
**10022** 133:6
**109** 270:1
271:10
**10:42** 216:14
**10:59** 216:19
**11** 134:14
147:3,9 148:16
149:8,16
154:17,18
160:6 179:1,6
189:6,7,12
**110** 287:14,16
287:17,24

**112** 271:11
**11:56** 254:11
**11th** 157:17
**12** 134:15
175:21 193:23
194:11
**120** 157:8
158:10
**12:10** 254:16
**12:38** 274:21
**12:49** 275:1
**13** 132:24
134:16 135:3
205:20,24
214:19,22,23
**1301** 133:5
**134** 141:13
**136** 134:4,11
**14** 134:17
171:9 208:15
208:18
**146** 134:10
**15** 134:18
139:24 157:12
158:14,15,18
158:23 188:8
188:10 214:1,6
214:10,17
226:4
**156** 134:12
**16** 134:19
172:13,19
183:18 216:24
244:4,8 293:5
294:3

**17** 134:20
186:24 247:4
**176** 134:13
**18** 134:21
169:15,21
171:2 184:3,9
184:14 185:13
185:16,17,18
185:18,22,24
186:11,12,15
187:8 188:5,8
188:10 193:14
203:4 204:5
214:1,5 215:25
248:3 251:7,8
279:10 281:24
**180** 182:6
250:8,15
**189** 134:14
**19** 134:22
171:3 189:19
189:19 258:23
**193** 134:15
**19th** 139:12
**1:04** 290:24
**1:10** 291:5,15
**1:22** 132:8
135:9

**2**

**2** 177:24
185:18 186:25
188:11,12
193:13 196:20
203:4,7 204:5
209:22

**20** 134:23
217:1 250:25
269:14,17,18
271:9 296:15
**2019** 250:6,13
**2021** 146:17
147:9 148:16
149:16 157:17
160:6 272:23
279:1
**2022** 185:10
**2024** 132:24
135:3 139:12
293:6 294:3
**2025** 293:11
**205** 134:16
**208** 134:17
**21** 248:13,17
250:18
**2100** 132:22
**212-455-3539**
133:19
**212-789-1347**
133:8
**2176** 293:9
**22** 147:4 241:1
**226** 134:18
**23** 160:12
243:8,8 250:5
250:13
**23.00** 147:8
**23rd** 137:19
138:13 139:6,9
151:19 155:25
161:11 172:18

**[23rd - 76]**                                                        Page 2

183:17 254:22
269:3 275:18
**24** 246:4,14
**244** 134:19
**247** 134:20
**251** 134:21
**258** 134:22
**269** 134:23
**27** 160:13
**27.55** 147:10
149:17 150:11
151:1
**276** 134:5
**288** 134:6
**29** 161:11
254:20 255:11
272:23 273:1

### 3

**3** 159:1 175:18
185:18 191:12
226:23,24
227:17 273:1
**30** 157:11
158:15 182:5
182:10,15,22
182:23 241:11
244:16 255:12
273:1 292:20
294:16
**300** 133:5
**31** 248:14,21
251:1 293:11
**31.09** 147:10
149:8,10,18
151:1

**32** 292:20
**33** 202:7,14,16
203:6,15,21
209:2
**35** 147:25
180:21 181:22
182:10,15,22
250:7,14
**36** 180:21,25
181:6,7 182:2
183:20
**37** 141:23
180:21 181:12
181:23 245:18
**37521** 247:11
247:17
**38** 188:14
189:14 194:4
194:10 199:4
202:13 214:16
**39** 188:14
189:14 214:16
**3d** 183:20
**3rd** 272:23

### 4

**4** 153:18
189:20 191:12
232:23 238:4
244:1 247:17
248:17 250:18
250:24 292:20
**40** 139:25
241:11
**41** 271:10

**42** 202:18
244:16 269:7
**425** 133:16
**43** 188:7
213:23
**44** 269:25
271:9
**45** 157:10
158:14,15
245:6
**47** 137:7
**48** 216:25
227:3
**49** 245:19
280:13

### 5

**5** 209:22
261:10 262:6
262:15,23
269:4
**50** 235:25
236:1,16
280:13
**51** 235:25
236:1
**52** 240:24
241:4
**53** 269:19,24
271:8
**54** 146:8
202:14
**56** 138:11
141:1
**57** 143:8

**58** 251:13
278:23,25
279:14 281:5
284:25 285:3
**59** 138:11
151:7 152:7

### 6

**6** 179:1,18
180:9,17 184:3
184:5,12,13
185:20 186:1
186:12,25
187:4 192:21
204:5 208:14
269:25
**60** 157:10
158:13,15
**69** 161:10
165:5 254:25
**6907877** 294:5
295:2 296:2

### 7

**7** 145:24
153:18 205:19
**70** 255:1
**71** 220:18
221:5 227:10
287:19
**72** 257:6 259:3
**74** 256:11
287:20
**76** 285:7,10
287:8,24

**[8 - affecting]** Page 3

**8**

**8** 134:11 136:20,24 139:9 147:4 149:20 151:7 161:11 172:12 176:5 179:24 180:11,18 183:16 186:25 189:14 194:5 202:13 213:22 216:24 235:24 239:23 241:1 243:9 252:8,12
**8.09** 147:25
**81** 243:25 244:10,12,12
**82** 247:3,8
**85** 251:12
**866** 281:24
**868** 282:23
**869** 283:17
**87** 141:22 251:12
**870** 284:12
**8:30** 132:23
**8:31** 135:2

**9**

**9** 134:12,21 156:16,18 169:15 252:7,8 252:9,13
**9/13/2024** 294:5

**94** 272:14
**95** 269:7
**96** 270:19 272:22
**97** 272:7,16
**98** 272:7,16
**9:28** 175:11
**9:40** 175:16

**a**

**a.m.** 132:23 135:2 175:11 175:16 216:14 216:19 254:11
**able** 146:9 169:13 179:16 185:25 225:14 242:13,16 262:6
**above** 149:8 161:15 294:6 296:7
**absent** 271:9
**absolute** 264:16
**absolutely** 210:19
**academic** 266:21
**academics** 263:20
**accepted** 266:21
**access** 205:6,7
**accuracy** 203:24 294:9

**accurate** 169:22 183:6 185:9 219:17 260:17 292:14
**accurately** 157:2
**accusing** 236:24 280:18 286:17
**achieve** 248:7
**acknowledged** 252:16
**acknowledge...** 296:3
**acknowledges** 203:2
**acknowledg...** 294:12
**acted** 242:21
**acting** 292:13
**activities** 240:7 240:17
**actual** 212:16 213:16 260:4
**actually** 173:11 193:17 196:16 199:17 204:13 209:22 210:23 216:11 226:22 238:20 239:8 262:11
**add** 137:21
**added** 137:13 196:23

**addition** 162:21 212:4 284:24
**additional** 137:18 150:9 156:3 157:9 186:1,4 211:13 280:6 282:20 284:22 287:25
**additionally** 142:6 210:15 210:16
**additions** 296:6
**address** 180:8
**addressed** 260:23
**addresses** 188:7 278:3
**addressing** 217:14
**adjust** 170:20
**admissible** 286:10
**admission** 219:9
**admitted** 162:22
**advance** 201:22 276:1
**advantage** 173:6,11,20 174:23 175:4 243:21 257:3
**affecting** 180:12 218:13

**affiliations**
  135:19
**affirmative**
  276:9
**aforemention...**
  292:5,7,16
**afternoon**
  150:12 254:15
**agents**  250:7,15
**aggregator**
  132:11
**ago**  241:11,13
  261:15
**agree**  172:20
  173:4 191:9
  214:23 217:24
  218:2,4 219:11
  227:25 231:10
  231:12,18,24
  238:16,17
  240:11,12,15
  240:22 270:13
  273:15 278:6
  282:13
**agreed**  227:21
**agreeing**  158:6
  186:15
**agreement**
  136:16
**ahead**  242:4
  263:14
**al**  135:7,8
  294:4,4 295:1
  295:1 296:1,1

**allegation**
  259:15
**allegations**
  162:9 171:20
  201:4 206:6
  207:22
**alleged**  161:19
  161:21 167:3
  167:18,22
  168:6,14,19
  169:2 181:3,18
  181:25 206:21
  208:6 213:19
  217:17 218:1,5
  218:9 243:12
  243:16 251:23
  255:3,14
  256:19 258:20
  277:4,11
**allegedly**
  161:22
**alleging**  162:18
  162:25 181:25
  259:20
**allotted**  294:19
**allow**  289:19
  289:21 290:6
**alpha**  233:7,8
  234:2,4,16
**alterations**
  158:13
**alternative**
  156:8 157:14
  157:16

**alternatives**
  158:22,25
**ambiguity**
  175:25
**amit**  132:10
**amount**  140:21
  143:21
**analyses**
  155:14
**analysis**  141:8
  141:25 142:8
  145:4,11,16
  146:22 148:25
  154:23 158:10
  161:6 165:9,13
  165:13,14,20
  183:24 184:19
  201:13 207:1,5
  213:24 233:3
  234:6 251:18
  261:5,10,18,21
  262:15 263:8
  265:23 268:14
  269:6 271:14
  271:15,17,19
  272:5
**analyst**  134:22
  183:24 184:1,3
  184:5,17 185:2
  185:8 187:22
  194:3 203:4
  204:3,9,10
  214:1 219:15
  220:24 228:3
  228:12,13

  229:15,25
  231:16,22
  232:2,4,10
  233:2,13,21
  234:11 235:5
  241:2 242:21
  255:23 257:19
  257:24 258:14
  258:20 259:2
  264:2 277:9
  285:12,13
  287:10,15
**analysts**  217:5
  218:8,21
  219:18 220:2
  221:2 227:18
  230:6,24
  231:13,19
  233:6,11,15
  236:7,13,17,24
  237:10,17
  238:10 240:5
  240:13,21
  241:5,7 243:3
**analyze**  160:7,9
  160:9 272:15
**analyzed**
  268:12
**analyzing**
  141:16 155:18
**announcement**
  267:20 274:3,8
**announcements**
  263:19 264:6
  265:12 266:1,1

267:23 272:20 274:11,15,17

**annual** 206:10 208:5,11 212:5 212:15

**anonymous** 234:17,19

**anonymously** 234:16

**answer** 150:6 155:15 156:13 157:6 167:9 169:8 174:3 182:9 186:9 205:5 225:9 239:22 242:6 245:15 267:22 278:10 281:21 282:18 284:8 285:4,20 288:17,21 289:7,13,22 290:7,12,13

**answered** 260:7

**answering** 185:12 288:10 290:3

**answers** 188:4 292:12,16

**appear** 179:10 180:20

**appeared** 133:10,21

**appears** 137:1 157:4 176:17 179:9 196:12 244:11,24 247:9 259:4 282:19

**appended** 296:7

**appendix** 137:11 138:9 140:23 143:9 151:6 184:16 185:9 232:16

**apples** 224:19 224:19 225:2,2 225:12,12,12 283:25,25

**applicable** 294:8

**applied** 160:6

**apply** 167:7 168:2 170:19

**applying** 170:19

**approach** 231:19 266:20 272:14

**approaches** 265:22

**approaching** 266:8

**appropriate** 249:24 270:9 272:15 280:21

**approximately** 282:6

**april** 278:25

**area** 198:21

**areas** 170:22

**argue** 286:7

**argument** 286:7

**arithmetic** 148:1

**article** 134:18 147:19 202:21 211:4,21 220:17 221:4 226:9,22 227:16,21,25 229:6 235:16 237:25 239:23 241:10,18 272:24

**articles** 183:25 202:6,8,14,17 202:19 203:7 203:15 204:12 204:22 209:1 218:4 237:24 273:9

**articulated** 156:7

**ascertain** 150:22

**aside** 183:12 246:25 251:6 285:11

**asked** 139:8 152:23 166:6 171:6 182:2 188:4 204:2 205:4 206:22 207:17 227:1 260:6,20 275:16 278:22 279:4,12,17 280:12 281:10 286:5 287:21 292:15

**asking** 155:17 163:19 166:5 174:3 177:20 178:11 191:23 192:18 193:6 196:11 198:17 209:14 211:11 212:20 222:24 235:15 244:24 256:24 262:18 265:14 267:25 279:16 280:20 284:23

**asks** 283:2

**aspect** 165:15

**aspects** 230:6

**assertion** 257:22

**assessing** 231:1

**assigned** 231:21

**assistance** 139:18

**associated**
  210:10
**association**
  226:14 266:15
**assume** 157:22
  169:7 182:16
  264:24
**assuming**
  177:15 183:6
**assumptions**
  170:11
**attached** 138:9
  292:22 294:11
**attaching**
  252:13
**attempt** 160:4
  160:20 248:6
**attempted**
  200:9
**attention** 197:3
  197:6,9,20
**attestations**
  238:18
**attorney**
  294:13
**attrition**
  162:17 163:5
  171:22,25
  172:1,21,23
  173:13,16,22
  174:9,16,24
  179:17,22
  180:3,8,12,16
  180:20 182:4
  187:1,5,9,13,17

188:6,9,15
189:1 191:11
191:16 192:3,8
192:11,12,18
192:23 193:3
193:14 194:24
195:6,13,23
196:5 197:24
198:24 199:6
199:18 200:7
200:24 202:20
203:8 209:3
212:2,4,10,15
213:7,8,17,18
214:2,11,25
215:3,4,14,16
217:18,25
219:10 222:19
222:25 223:2,6
223:7,11,14,21
223:23 224:2,3
224:7,9,10
225:7 243:17
243:22 244:21
244:24 245:12
245:22,25
246:2,4,5,5
248:19,19,24
250:5,13
252:18 253:8
256:15 257:14
257:23,25
258:22 259:10
259:21 260:3
260:11 276:20

277:13,21
278:4 279:13
279:21 282:9
282:14,20,21
283:13,15,23
283:24 284:4
284:18,24
**august** 137:19
  138:13 139:6,9
  151:19 155:25
  161:11 172:18
  183:17 243:8
  254:22 269:3
  275:18
**auld** 133:3
  135:25
**author** 191:22
  249:2,10,12
**authors** 234:19
**available** 161:4
  170:21 171:13
  171:16 229:10
  229:24 270:5
  294:6
**avenue** 133:5
  133:16
**average** 250:6
  250:14 256:16
  256:21 257:2
**avoid** 199:24
  253:19
**aware** 138:1,15
  149:15 150:8
  155:2 167:4
  171:20,24

184:15 203:18
215:4 237:11
243:4 246:21
253:1,13
255:21 259:15
259:19,24
260:8 262:21
279:23 281:16
281:17

**b**

**b** 137:11
**back** 137:10
  142:17 143:8,8
  145:18 161:16
  161:18 165:4,7
  165:15,19
  166:3,8,21,25
  168:18 169:11
  175:15 183:13
  188:3 195:17
  198:4 207:4
  213:12,22
  216:18 217:25
  218:5 224:14
  235:24 254:16
  262:11 274:25
  280:3 291:4
**background**
  153:12
**backup** 142:25
  145:16 150:15
**baird** 134:15
  188:13 193:13
  193:21 242:13

**balaji** 132:9
**bank** 228:14
**banks** 231:20
**barclay's**
  137:16
**bartlett** 133:13
**based** 150:20
  171:11 197:2
  200:19 208:9
  223:22 229:23
  253:25 266:22
**bases** 154:8
**basically**
  143:23 227:2
**basis** 144:1,21
  149:13 206:21
  225:19 228:22
  266:4
**bates** 151:7,16
  151:25 152:17
  152:21 244:15
  245:19 248:14
  251:1
**bcp** 132:11
**bearing** 135:9
**began** 216:24
  220:15
**beginning**
  145:13 168:2
  169:1 179:5
  228:11 230:22
  240:3
**begins** 142:5
  153:3,17 198:8
  201:6 217:4

220:16 238:5
**behalf** 132:5
  133:10,21
  135:6
**behave** 249:16
**behavior**
  237:16
**belief** 163:15
  242:22
**beliefs** 163:6
**believe** 138:22
  139:3 140:4,21
  141:7 147:2,21
  151:24 152:23
  154:6,8 160:1
  164:14 181:21
  185:18 187:6
  188:17 189:12
  190:9 194:2
  205:7 206:3
  210:20 218:11
  244:9 246:13
  246:21 247:2
  248:2 255:24
  257:3 269:6
  276:12 283:14
**believed** 162:15
  163:3
**benzinga** 209:5
  209:8
**benzinga.com**
  134:17 208:25
**best** 215:8
  270:24

**better** 186:21
  223:14 224:7
  289:1
**beyond** 142:1
  150:17 152:4
  173:10 203:19
  279:14 283:11
  284:6 288:3
**bfalaw.com**
  133:7 294:2
**bias** 237:17
**biased** 236:18
  236:25 237:2,3
  237:7,12
**bid** 146:22
  148:24,25
  149:3
**big** 143:6
**bigger** 264:19
**bit** 136:19
  158:9
**blackrock**
  282:3
**bleichmar**
  133:3 135:24
**body** 154:2
**bold** 196:2
  230:12
**bolded** 196:13
  196:14,15
  197:11
**bolster** 278:11
**bond** 222:9
**borrow** 225:8

**bottom** 141:1
  141:23 181:8
  183:18 185:10
  190:23 255:11
**bpo** 191:12
**break** 216:12
  274:19 290:21
**breaks** 288:14
  288:23 289:23
**brief** 139:5
  193:12
**briefly** 157:24
**bring** 164:6
**broader** 271:15
**brokerage**
  228:14 231:20
**brought** 227:7
**bruce** 204:19
**bryce** 132:9
**btig** 256:12
**building**
  257:12
**bullet** 146:13
  180:17 191:6
  194:10 195:19
  197:17 209:15
  209:16,23
  210:3 211:1,2
  212:12 245:20
**bullets** 282:6
**business**
  211:17 282:10

| c | case 132:7 | category 232:4 | certainly 145:8 |
|---|---|---|---|
| c 253:4,8 | 135:6,9 137:15 | 274:6 | 150:18 155:2 |
| 281:19 292:2 | 138:17 140:20 | causal 268:20 | 155:19 160:8 |
| calculate 192:7 | 140:25 141:2,6 | causation | 163:8 173:18 |
| calculated | 151:11,15,18 | 167:14 200:1 | 179:3 184:11 |
| 224:21 | 154:16 160:5 | 201:21 266:12 | 203:12 218:3 |
| calculating | 164:1 167:2,3 | cause 142:2 | 218:17 225:1 |
| 148:23 | 167:7 171:23 | 156:5 261:18 | 229:12,18,19 |
| calculation | 172:2 176:9 | 263:3,4,6 | 233:13 254:24 |
| 147:24 186:18 | 181:4 191:18 | 265:2 268:16 | certification |
| 203:17 | 192:13 193:4 | 268:19 271:20 | 138:19 142:10 |
| california | 199:22 206:22 | 272:14,15 | 200:2,18 246:7 |
| 141:3 | 207:23 208:7,9 | caused 149:17 | 260:15 275:13 |
| call 219:15 | 212:25 213:8 | 200:7,23 265:1 | 280:10 |
| 233:12 263:2 | 218:9,19 219:2 | causes 200:10 | certified 262:7 |
| called 159:5 | 219:4 222:24 | 200:14 | cetera 264:3 |
| 167:4 247:19 | 223:18 232:12 | causing 167:25 | cfo 219:14 |
| 286:25 | 234:22 242:21 | cautioning | chad 132:14,18 |
| calls 208:1 | 251:20 253:17 | 186:12 | 134:3 135:5 |
| 237:18 277:18 | 260:3,9,12 | caveats 171:3 | 136:9 294:5 |
| cammer 260:24 | 262:5,21 | cdt 132:23 | 295:2,24 296:2 |
| 261:5,10 262:1 | 268:12 275:6 | centered 248:5 | 296:4,12 |
| 262:6,14,23 | 275:14 276:10 | 248:5 | challenged |
| 263:2,5 269:4 | 278:8 293:2 | centric 247:20 | 142:9 |
| cap 143:20 | cases 137:14,16 | 248:1,15,23 | chance 150:1 |
| 147:17,22 | 141:14,24 | 250:24 | 265:7 288:9 |
| 148:6,11,12,13 | 142:4,8,21 | ceo 211:3 | 289:10 290:2 |
| capable 155:17 | 143:4 177:17 | 219:14 | change 155:10 |
| 155:20 | 205:16 209:7 | cert 218:10 | 199:9,18 201:8 |
| capital 143:15 | 262:14 | certain 145:3 | 206:15 217:9 |
| 144:25 176:24 | cash 194:24 | 170:23 191:9 | 267:16 295:4,7 |
| career 220:24 | 217:10 220:12 | 193:7 206:6 | 295:10,13,16 |
| 260:16 | 220:13 | 210:19 229:16 | 295:19 |
| carried 212:11 | categorization | 230:8 242:17 | changed 190:2 |
|  | 203:6 | 260:8 266:23 | 196:17 215:19 |

215:25 216:3 271:7

**changes** 138:2 190:13 263:7 271:10 283:3 294:10 296:6

**changing** 190:24 216:8 219:2,5

**characteristics** 234:15 245:18

**characterizati...** 172:4 190:16 192:15 193:20 197:8 210:1

**characterize** 172:8 173:16 233:23

**characterizes** 218:3

**characterizing** 178:15 198:18

**chart** 271:8

**check** 137:23 143:1 147:1,20 204:8

**chicago** 132:23 135:12

**chief** 226:12

**churn** 282:8 283:3,7,12,13 284:24

**circulation** 205:17

**circumstance** 261:20

**circumstances** 261:10

**citations** 272:10

**cite** 141:7 185:19 202:10 217:25 220:17 220:19 221:4 236:5 243:23 244:12 247:2,8 247:10,11 253:1 281:16

**cited** 152:21

**cites** 142:21 151:21

**citing** 244:9,17 272:24

**civil** 132:20 292:21

**claim** 156:4 197:25

**claims** 162:16 163:4 182:3 202:20 212:8 277:20

**class** 138:19 141:9 142:1,10 143:10,11 145:8 146:15 168:3,15,16,23 169:1,2 200:2 200:17 218:10 221:23 246:7

260:15 262:7 275:13 277:8 277:10 280:10 285:14 287:10

**classification** 269:23

**classifications** 270:12,13,16 270:20 285:12

**classified** 269:25

**classify** 272:22

**clear** 142:17 143:2 149:22 152:11 158:7 159:12 163:21 168:9 172:7,11 181:5 186:8 195:15 197:1 246:18,21 250:12,21 262:18 263:17 265:11,12 268:20 276:8 280:4 289:15

**clearly** 179:22 179:23 184:24 267:17 270:15 277:22

**client** 194:23 289:18

**clients** 217:11

**climb** 149:9,17

**close** 147:11 149:18 151:1

154:20 155:6 155:10 271:23 274:19

**closed** 150:12

**closer** 162:19

**closing** 144:6 144:12,18 148:7 155:3 158:1,3 159:17

**codes** 238:13

**coffman** 132:14 132:18 134:3 135:5 136:9,14 136:24 156:21 167:10 176:13 199:21 202:12 208:18 216:22 229:6 246:6 249:9 254:20 275:5 276:7 278:22 281:2 281:14 287:8 291:8 294:5 295:2,24 296:2 296:4,12

**coffman's** 142:24 169:25 185:8 225:18

**coherent** 231:4

**collection** 235:19

**collectively** 140:10,15

**colloquy** 249:21 281:8

[column - conclusion]                                              Page 10

column   230:10
  271:18
combination
  276:15
come   165:4
  186:19 198:13
  223:12 226:18
  226:20,25
  227:16 234:23
  239:1 254:24
  256:4 262:10
  271:23
comes   191:5
  240:21 277:18
coming   162:14
  163:2
comma   166:8
commencing
  132:23
commentary
  193:22
comments
  279:13
commission
  239:3
commitment
  257:10
common
  143:10,11,15
  145:8 146:14
  147:7,9 148:15
  161:24 261:7
  261:17 262:7
  262:22

communicati...
  237:9 243:2
companies
  146:16 195:14
  204:23 222:2
  222:15 228:17
  230:8 233:17
  245:10
company
  143:25 150:9
  160:20 161:4
  162:21 180:13
  190:14 201:5
  209:12 218:16
  218:20 219:17
  222:10,15
  223:22 224:1,1
  229:14,21
  231:22 233:16
  233:17 236:13
  241:24 255:4
  259:20 263:22
  265:11,13
  266:2,4 267:3
  267:18 276:22
company's
  162:16 163:4
  174:22 182:3
  215:15,17
  217:10 220:11
  222:19 223:23
  225:7 231:3
  235:7 258:21
  276:18

compare
  224:25 225:14
  225:20 256:24
  263:25 264:14
  283:25
compared
  196:3
comparing
  225:11
comparison
  224:20 225:23
  250:1,16
  257:17
comparisons
  224:18 225:1
compelling
  262:15
competing
  173:12
competitor
  224:7
competitor's
  224:8
complaint
  138:18 171:21
complemented
  239:12
complete   180:6
  292:15 296:8
completed
  294:16
completing
  230:14 235:4
compliance
  238:24 239:17

complies
  278:24 283:18
  285:9
component
  215:15
components
  207:13
compound
  200:16 224:13
  272:12
computed
  216:5
computer
  156:25
concealing
  211:18
concentration
  194:24
concept   179:23
  233:14 250:25
concern   198:21
concerning
  171:21 176:21
concerns   190:8
conclude
  200:21 266:22
concluded
  201:17
concludes
  291:15
conclusion
  162:23 184:2
  187:21,24
  200:5 201:23
  201:25 202:2

**[conclusion - correct]**

207:8 213:4 217:22
**conclusions** 142:4 148:21 251:19
**condition** 222:15 230:7
**conduct** 238:13
**conducted** 253:9
**conducting** 155:25
**confidence** 266:23
**confidential** 275:22,23
**confirm** 194:2 244:10
**confirmation** 190:12
**confirmed** 154:17
**confirming** 243:12
**conflicts** 240:1 240:5,9,14,23
**conform** 170:11 238:10
**confounding** 278:1
**confront** 240:6 240:16
**confusing** 179:12

**connection** 145:17
**consider** 141:5 203:17 206:13 222:16
**considered** 138:10,13 142:3 145:14 146:8 151:18 151:21 157:21 184:25 185:1 201:7,9 233:10
**considering** 164:25 172:14 277:2
**consistent** 157:8 166:18 167:20 186:9 191:12 207:7 207:20 210:7 220:21 223:3 231:18
**consolidated** 282:2
**construct** 154:24 222:4
**construction** 141:4
**consult** 288:9 290:3
**contained** 168:19 277:11
**contains** 144:16

**contemplated** 238:24 239:13
**contemporan...** 162:3
**content** 251:22 282:9 284:19
**contents** 153:1 178:22 179:13
**contest** 214:9
**context** 163:24 173:14,17,18 174:8,20 211:3 219:22 221:10 221:19 222:14 222:18 225:6 241:23 242:2,8 244:25 267:24
**contexts** 174:6 221:14
**continue** 216:22 254:3 286:14
**continued** 132:17
**continues** 135:4 153:18 236:21
**continuing** 140:23
**contract** 206:10,15 208:5,11 211:8 211:19 212:5,8
**contrast** 198:12

**contribute** 201:18,18
**contributed** 155:19 199:9 199:14,18 200:11,15 201:2 202:1 207:14 278:5
**control** 263:25 264:5,15,20,22 273:3,5 274:1
**convenient** 175:6
**conveying** 190:4
**copies** 143:5 294:14
**copy** 137:1 156:21 157:3 189:4 194:3 208:24 232:17 269:9 292:22
**corner** 250:5
**correct** 150:8 152:8,25 154:6 156:1 157:18 157:19 158:2 165:16 168:23 169:23 179:2 184:21 187:3 187:11 188:17 190:3 191:20 199:12 202:7 204:18 206:7,8 208:24 212:6

213:9 214:20
219:1 224:11
237:17 238:16
239:4 240:11
241:11 244:22
245:25 247:7
247:11 248:24
250:18 252:3
252:20,23
255:10 260:5
276:11 281:1
281:12 284:25
286:15 287:3,9
287:22 288:1
296:8
**corrected**
161:23 162:7
162:10,10,25
207:11
**corrections**
296:6
**corrective**
163:6 164:2
181:4,17 182:1
197:16 207:13
208:12 214:10
**correctly**
166:15,16
**correlate** 264:7
**correlation**
266:16
**costless** 170:13
**costs** 170:16
**counsel** 135:18
136:3 152:23

156:22 197:8
280:5 288:10
288:22 290:3
290:19 292:9
293:2 294:14
**counsel's** 172:4
192:15 193:20
**counting** 203:6
204:5
**county** 292:2
**couple** 209:16
252:5 276:23
276:24
**coupled** 165:12
**course** 240:7,17
249:16 288:19
**court** 132:1
135:16 136:4
136:17 140:24
171:23 191:17
201:22 262:19
**courts** 132:21
142:21 292:22
**cover** 137:2
226:8 252:13
**coverage**
191:13
**covered** 154:1
236:25 241:1
**covering**
233:18
**cpa** 132:14,18
**create** 253:18
273:5 280:15
286:4

**creation** 253:20
**crediting**
236:18
**criteria** 186:10
186:20,21
**critical** 209:12
**criticism** 269:5
270:8 271:14
**crr** 132:19
292:6
**cs** 294:15
**csr** 132:19
292:6 293:11
**culture** 162:16
163:4 173:5
174:22 213:18
243:20 244:18
245:2,21 246:2
248:5 252:17
256:14 257:12
257:22 258:21
276:19 277:12
277:20 278:4
**curious** 196:1
**current** 221:15
222:2,12,15,19
230:7
**currently** 275:6
275:12
**cut** 258:13
**cv** 132:8 135:9
137:11 138:3

**d**

**d** 132:10 134:1
183:23 216:23
292:20
**daily** 144:1,4,5
144:9,11,12,12
144:21,24
240:7,17
**damages**
167:12,15
199:21 200:1
201:21 218:10
**data** 143:12,14
143:16 144:2,8
144:15,15,20
145:5,6,9,19,20
146:10,12,14
146:18,19,20
147:14,17,20
147:22 148:6,9
148:10,11,12
**date** 143:19
144:16,17
154:18 157:17
157:19,20,20
165:25 168:20
229:24 241:13
264:20,20
272:24,24
292:7 293:11
295:24 296:12
**dated** 184:20
275:17
**dates** 267:15,15
270:14 272:4

**[day - deposition]**

**day** 144:5,6,17 147:9 148:9,24 149:4,5,6,23,24 150:5,12,20,24 155:4,6,9 157:8,10,10,11 157:12,25 158:5 159:13 159:25 161:2 162:22 163:1 165:12 167:25 168:5,8 199:9 218:14 264:24 264:25 266:24 267:2 273:11 273:12 274:4 277:8 293:5 296:15

**day's** 154:25

**days** 158:23 182:6 250:8,15 263:9,10,15,23 263:23 264:1,4 264:22,22 265:11,15,18 268:1,15 269:23,23,24 269:25 270:1 270:19 271:21 272:18 273:6,8 273:14,20,22 273:23 274:17 294:16

**deadline** 201:22

**deadlines** 199:22

**deal** 134:21 143:6 152:14 152:21 157:15 159:3 175:20 175:20 188:8 202:7,15 203:2 209:2 217:15 232:3 236:17 243:11,25 252:7,9 255:2 269:6 277:3,17 277:24

**deal's** 134:23 139:11 150:20 151:25 152:5 153:15,22 156:4 183:24 184:2 185:3 203:5 207:2,18 213:24 232:16 269:10 285:11

**dealing** 240:1

**dealt** 234:24

**debate** 269:10

**dec** 134:20 247:1,24,25 251:19 252:2,4 252:23 281:1 281:12

**december** 273:1

**decide** 196:1

**decision** 140:25 141:6,18 227:22

**decisions** 140:24 141:16 142:21

**declare** 296:4

**decline** 159:24 161:24 199:15 200:8,22 207:15 277:16 278:6

**declines** 277:22

**deemed** 296:6

**deeper** 190:8 192:23,24

**defendant** 133:21 141:3

**defendants** 132:12 135:6 135:23 138:24 167:23

**defending** 249:6,15

**defense** 249:15

**defined** 266:18

**definition** 171:17 191:10 191:12 192:1,7 212:14 229:9 230:1,3

**definitional** 213:1

**definitions** 224:9,10

**definitive** 243:4

**definitively** 200:9

**degree** 170:23 201:14 266:23

**deja** 261:14

**demand** 245:10

**demonstrate** 253:25

**demonstrated** 166:2

**denial** 142:10

**denominator** 186:16 203:16

**depend** 219:22 219:23 222:11 241:23

**depends** 221:10 221:25 261:3

**depicted** 269:24

**deponent** 292:22 294:13 296:3

**deposed** 137:24 170:2 171:7

**deposing** 294:13

**deposition** 132:17 135:5 135:10 137:14 146:5 151:22 151:25 152:6 152:22 157:23 176:14 208:19

**[deposition - district]**

280:14 292:4,9 292:19

**depositions** 132:21 176:5 249:7,16,18

**depth** 206:18 206:21

**describe** 215:16 272:16

**described** 157:23 232:5 234:15 248:12 274:2

**describing** 170:4 171:10 195:4 235:18 266:3 269:11 278:25

**description** 134:9 164:16 166:11 169:17 169:20,22 185:7

**descriptive** 230:25

**deserves** 276:22

**design** 272:17 273:4 274:16

**designated** 275:22

**detail** 154:2 192:25 193:1 247:25 248:2

**details** 205:2 209:8

**determine** 160:5 223:7 248:22 270:10

**developed** 270:7

**difference** 263:10,11

**differences** 156:11

**different** 143:12 156:6 157:5 159:8 169:17 174:5,5 174:6 179:6,11 186:19 200:10 209:11,15,17 211:23 233:4 233:19 234:1,3 234:5 252:5 289:11 290:16

**differentiated** 245:9

**differentiating** 252:18

**diligent** 228:16

**diluting** 272:17

**direct** 180:15 248:10 262:3 269:1 281:23

**directly** 180:8 209:23 268:24

**director** 226:13

**disaggregate** 200:10

**disaggregated** 200:14

**disagree** 170:8 228:7 270:15 270:20

**disclaimer** 178:13,19,21

**disclosed** 195:12 208:12 253:23

**disclosure** 163:1 171:22 181:4 197:16 206:10 207:11 207:14 208:5

**disclosures** 164:2 208:10 273:9

**discovery** 243:11 253:18

**discuss** 183:23 184:6 187:17 188:9,15 202:5 217:17,23 218:8,21 219:18 243:25 244:21 245:12 269:4,7

**discussed** 154:17 158:9 169:14 184:12 187:1,5,9,12,15 188:12 211:3,8

214:20 215:10 243:18 254:23 254:25

**discusses** 243:20

**discussing** 206:2 215:5 252:4

**discussion** 169:12 179:25 192:23,24 214:24 220:16

**discussions** 288:22 289:22

**dismissed** 171:23 191:17 213:1 260:3

**dispute** 184:2,5 203:5 204:4,7 217:21 285:13

**disputed** 277:17

**disputing** 184:11

**disrupting** 286:24

**disseminated** 163:23 164:7 164:22,24 170:21,24

**dissemination** 238:12

**district** 132:1,2 132:20 135:8 141:2 292:21

**dixit** 132:10
**docket** 142:14
  143:6
**doctorate**
  226:15
**document**
  134:16,19
  136:20 138:11
  146:1 154:5
  156:18 176:10
  176:14 177:4
  177:13 178:11
  180:19 183:6
  183:12 189:7
  191:24 193:6
  193:23 195:7,9
  198:16 199:1
  205:20 206:1,5
  208:15,23
  209:14 211:11
  212:21 226:4
  236:5 244:1,4
  244:7,11
  245:16,19
  246:20 247:4,8
  247:20 248:13
  249:2 251:3,8
  252:3 253:2
  254:6 258:23
  269:14 279:21
  280:13,17
  281:18
**documents**
  138:9 145:13
  145:16 146:8

151:8,13,16,22
152:6,17
168:19 243:23
252:6
**doing** 146:7
  155:14 185:25
  186:22 191:3
  219:11 234:7
  249:20 257:19
  268:17 270:6
  270:11
**donnermeyer**
  140:4
**double** 146:25
**doublecheck**
  256:1
**doubt** 289:23
**download**
  145:20
**downplaying**
  236:19
**dozens** 260:15
**dr** 170:5,8
**draft** 139:8
**drafting** 139:17
  140:19,19
**draw** 187:21,23
  197:3,5,9,20
**drawing** 213:3
  258:21
**drawn** 162:23
  184:10
**drew** 184:8
**drives** 244:18
  245:2

**drop** 162:3
**due** 167:15
  168:6 194:25
**dug** 190:8
**duly** 136:10
  292:10
**duncan** 133:25
  135:13

**e**

**e** 134:1 202:6
  243:9 252:13
  292:20 295:3,3
  295:3
**eager** 236:8
**earlier** 166:13
  184:20 278:22
  287:22
**early** 246:8
**earnings**
  263:19 264:5
  265:12,25
  267:20,23
  272:19 274:3,8
  274:10,14,17
**economic** 207:6
  207:20 262:2
  276:8
**economically**
  225:3
**economist**
  173:7 226:13
**economists**
  266:8
**economy**
  229:21

**effect** 142:2
  156:5 161:20
  261:18 263:3,4
  263:6 265:2
  268:17,19
  271:21 272:14
  272:15
**effective**
  238:20 239:19
**effectiveness**
  237:22 239:17
**efficiency**
  134:10 145:12
  145:14,15
  146:23 169:21
  170:6 233:3
  260:19,21,22
  261:17
**efficient** 146:7
  161:1 164:18
  164:21 171:11
  171:17 262:4
  262:23
**effort** 167:14
**efforts** 238:25
**eight** 233:4
  241:13
**either** 142:9
  177:16 201:23
  202:2 229:2,24
  264:2 273:2
  274:1 278:12
**ekubota** 133:7
  294:2

**[elaborated - examples]**

**elaborated** 250:25

**electronic** 156:25

**elements** 259:22

**eliminate** 277:3 277:6,25 278:2

**ellipses** 256:13

**ellipsis** 227:12 258:9 259:9

**embedded** 167:13

**emphasis** 196:17,22 197:5

**empirical** 161:16 165:6,8 166:7,13,17

**employed** 228:13 231:20 234:7

**employee** 189:2 191:5,11 192:2 212:15 245:21 247:20 248:1,4 248:5,15,23 250:24

**employees** 180:10 182:6 191:10 283:8

**encounter** 240:5,13

**ended** 141:19

**engage** 281:7

**engaging** 230:25 249:21

**enps** 282:9

**entire** 177:4 182:20,21 196:14 197:10 205:3

**entirely** 195:15

**entitled** 249:19 275:8 278:14 285:23,24 286:23 288:13

**errata** 294:11 294:13,16

**especially** 245:5 271:24

**esq** 294:1

**essentially** 236:8 277:10

**establish** 166:24

**estimate** 139:23,25

**estimates** 189:21 190:2

**estimation** 156:6,9,12,14 157:5,7,8,10,11 157:11,12,14

**et** 135:7,8 264:3 294:4,4 295:1,1 296:1 296:1

**ethical** 280:19 286:18

**evaluate** 156:4 201:13 203:24 207:5,9 215:14 223:21 224:2,6

**evaluated** 242:10 246:10

**evaluating** 142:1 146:23 155:18 207:16 207:18 261:17

**evaluation** 230:15 235:5

**evan** 133:4 135:24 294:1

**event** 134:12 149:23 150:4 154:18,22 155:24 156:2,3 156:8,11,12 157:4,21 165:9 165:12,13,14 165:20 184:9 265:22 266:8 266:19,20 268:18

**events** 150:23

**evidence** 161:16,19 163:9,12 165:6 166:7,13,17,22 200:4,20 207:3 207:6,6,19,20 237:6,11 243:4

243:11 251:22 259:23 265:14 268:20 276:8,9 278:8

**exact** 139:20 170:14 173:1

**exactly** 150:22 168:20 184:8 190:20 211:21 223:5 241:18 246:18 259:10 285:19

**exaggerated** 162:17 163:5 277:21 278:5

**exaggeration** 211:17

**examination** 134:4,5,6 136:12 276:5 288:7

**examine** 230:6

**examined** 136:10 292:11

**example** 141:1 149:7 152:20 160:16 177:24 188:18 197:17 222:5,8 234:20 238:4 249:17 264:25 279:5

**examples** 141:24 203:1 218:17 252:20 252:22,23

255:13,20
270:14,21,25
271:8,16
276:23,24
279:13 280:25
281:1,5,11,12
284:23 285:3
**exceeds** 174:1
**exception**
215:19
**exceptions**
171:4 240:18
240:20
**exchange**
146:17 239:2
**excluded** 193:4
193:8
**excluding**
191:9
**excuse** 289:20
**excused** 291:18
**executive**
178:23 179:10
181:14,22
182:14,25
183:8 201:5
**exhibit** 134:9
134:10,11,12
134:13,14,15
134:16,17,18
134:19,20,21
134:21,22,23
136:20,24
137:11 139:9
146:2,5 147:4

149:20 151:7
152:22 156:18
159:1 161:11
169:14 176:10
176:14 183:16
186:25 189:7
189:12,14
192:21 193:23
194:5,11
202:13 205:20
208:15,18
213:22 216:24
226:4 232:23
235:24 241:1
243:9 244:1,4
244:8 247:4
251:8 252:7,9
258:23 269:14
269:18 271:9
279:10 281:24
**exhibits** 151:22
151:24 275:22
**exist** 240:8
**existence** 240:9
240:22
**exists** 183:10
**expanded**
141:25
**expect** 218:21
219:18 224:3
253:21 265:8
271:23
**expectations**
220:11

**expected**
223:22 238:10
**experience**
221:1
**expert** 173:25
174:12 218:10
239:16 253:16
253:21 262:5
286:9 289:17
**experts** 289:21
**expiration**
293:11
**explain** 155:10
272:9
**explained**
161:15
**explanations**
236:18
**explicitly**
203:10,23
**exposed** 164:5
**expresses** 178:3
178:7
**expressing**
235:6
**extent** 145:19
167:11,17,21
172:25 177:20
180:11 201:1
210:9 215:16
237:3,21
238:19,19
239:18
**eye** 159:24

**f**

**face** 241:9
**fact** 142:23
171:11 190:25
197:16 212:3
215:18 217:15
219:4 222:3,16
223:5 226:21
230:4 246:16
249:10 253:15
260:2 276:17
280:5
**factiva** 202:19
205:8,11
**factor** 262:1,15
**factors** 160:9
252:18 260:24
261:6 262:16
**facts** 165:11
178:8,14
**factual** 217:21
**failing** 280:10
**fails** 294:18
**fair** 151:15
154:3 179:13
198:11 210:1
264:8
**fairly** 159:15
262:3
**fall** 231:16
232:7,9 233:9
234:13 273:2
273:25
**falling** 167:24

**[falls - form]** Page 18

| | | | |
|---|---|---|---|
| **falls** 232:20 233:9 268:15 | **finalizing** 137:20 | 189:17 191:14 192:12 194:9 | **following** 175:13 215:21 |
| **false** 167:18,23 | **finally** 239:20 | 194:14,15 | 216:16 236:13 |
| **fama** 170:8 | **financial** 211:18 230:7 | 195:18 196:13 | 254:13 274:23 |
| **fama's** 170:5 | 266:7 | 198:4 206:4 | 291:2 |
| **familiar** 180:22 | **financials** | 210:4 211:1 | **follows** 136:11 |
| **far** 144:3 | 218:20,22 | 226:7 235:12 | 198:12 290:1 |
| 271:15 | **find** 172:10 | 238:4 241:10 | **font** 280:14 |
| **fargo** 257:5 | 187:4,7 191:18 | 244:15 259:6 | **fonti** 133:3 |
| **fashion** 154:13 | 209:1 227:4 | 267:7 268:4,5 | 135:25 |
| **fast** 194:25 | 230:16 252:3 | 277:8 283:22 | **footnote** 141:12 |
| 242:7 | 255:17 259:6 | 292:10 | 141:13,19 |
| **fc** 132:11 | 277:19 280:7 | **five** 209:15 | 142:20 147:15 |
| **federal** 132:19 | **finds** 280:6 | 290:21 | 171:3 196:20 |
| **federated** | **fine** 175:8 | **flipping** 146:6 | 202:14 220:18 |
| 282:24 | 216:10 239:22 | **flow** 194:24 | 221:5 227:10 |
| **feel** 249:22 | 290:20 | **flows** 217:10 | 231:8 243:25 |
| **fernandez** | **firefighters** | 220:12,13 | 244:10,12 |
| 220:18 226:10 | 132:4 136:1 | **fly** 134:16 | 247:3,8 287:16 |
| 226:17 229:7 | **firm** 228:14 | 202:21 206:1,5 | 287:17,24 |
| 237:24 | 234:7 236:6,7 | 211:8 | **footnotes** |
| **fidelity** 283:19 | 238:11 | **focus** 155:20 | 251:12 252:8 |
| **fifth** 245:20 | **firms** 174:6 | 173:6 174:23 | 272:9 |
| **figure** 269:25 | 231:14,20 | 183:14 217:8 | **forecast** 217:9 |
| **file** 148:13 | 233:4 234:6 | 220:3,6 226:23 | **forecasts** |
| **filed** 135:8 | **first** 136:10 | 228:4 245:20 | 229:16,19 |
| 137:18,25 | 147:9 149:24 | 246:2 256:14 | **foregoing** |
| 139:5,14 | 150:1 154:25 | **focused** 172:7 | 292:4,14 296:5 |
| 142:13 | 155:4,6 159:13 | 177:11 187:22 | **forgetting** |
| **files** 156:22 | 159:16,25 | 258:5 | 143:22 |
| **filing** 276:1 | 161:2 168:5,8 | **focusing** | **form** 138:14,21 |
| **filings** 138:17 | 168:14 176:15 | 209:21 | 140:12 148:17 |
| 191:17 264:3 | 178:1,2,9,20 | **folks** 140:1 | 151:2,20 153:7 |
| **final** 275:4 | 182:9 189:3,10 | **follow** 187:8 | 154:4 155:12 |
| | | 233:20 254:21 | 155:21 168:17 |

**[form - giving]**

169:20 170:5,6 172:3,24 176:22 177:19 179:20 188:9 190:15 191:2 192:16 197:21 198:15 199:11 201:10 206:24 210:13 211:10 213:2,10 214:13 215:23 219:6 220:4 221:9 223:16 225:16 229:5 237:1 241:16 242:9,25 250:19 251:21 252:24 258:15 259:18 261:2 262:8 264:9 265:3 266:13 266:17 268:8 268:10 270:2 272:11 273:19 273:24 279:25 281:13 285:1 288:2 289:4

**formal** 148:19 234:13

**format** 233:21

**formed** 149:19 150:6 154:14 162:12

**former** 181:14 183:7

**forward** 217:7 221:6,20 222:6 224:4 229:13 235:22 249:18 276:21

**found** 281:6

**foundation** 140:13 215:22 249:9 258:2 280:1 285:2 288:3

**four** 136:18 159:1 209:10 209:19,21,22 210:3 255:13 255:23 256:3,9 284:22 287:5 287:20

**fourth** 212:12 284:17

**frank** 220:18 236:6,7

**franklin** 132:22 135:11 284:14

**fraud** 171:10 207:13

**free** 194:24

**frequently** 209:7

**friday** 132:24 276:2

**front** 136:23 152:9 161:17 165:21 166:1,4 166:9,12,18,20

166:23,24 208:19

**frontline** 257:10

**fruit** 225:12

**full** 191:11 192:2 238:4 259:6

**fully** 162:13 235:3

**function** 231:1

**fundamental** 161:5

**further** 134:6 151:6 155:24 156:1 235:6,13 288:5,7

**future** 217:10 220:13 222:10 222:12,21 223:11 229:4 235:8,13

**fuzzy** 234:19 234:21

**g**

**gather** 144:1

**gathering** 231:1

**general** 241:21

**generally** 164:2 170:19 197:24 211:16 213:15 228:13 231:18 233:10 238:17 265:5

**generate** 220:12 267:20

**generates** 265:19

**generation** 194:25

**generic** 172:1,9

**geron** 141:14

**give** 139:2,23 146:4 169:7,21 171:8 175:3 180:5 182:13 189:4 202:9 208:21 230:16 232:13,18,18 242:5 244:2 247:1 248:9 251:15 252:20 252:25 255:8 255:12,20 257:8 269:9 270:14 272:10 280:22 281:15

**given** 147:22 148:7,8 155:15 200:3 246:14 250:4 271:21 286:16 296:9

**gives** 173:6,11 173:19 174:23 243:21 247:25 257:2

**giving** 149:13 174:21 176:24

**globe** 257:11
**go** 142:17
143:8 147:4,20
153:1 161:10
167:25 168:18
169:11 180:4
180:19 183:13
184:16 192:21
202:5 214:21
230:10 232:16
233:25 235:5
235:12,24
240:24 241:4
242:4 243:8,24
245:7 255:1
256:9 263:14
269:11 276:3
280:3
**gochman**
133:15 135:22
145:24 156:24
175:19,24
176:4
**goes** 173:10
179:3
**going** 135:2
136:17 138:4
142:15 143:4
147:20 151:6
151:23 152:9
164:12 175:6
175:10,22
186:18 188:3
193:16,21
195:17 216:8

216:14 222:7
224:4 229:17
229:20 230:11
236:1 239:23
244:2 246:25
251:12 252:12
254:7,11 256:9
259:6 269:9,19
274:21 281:7
288:11,16,20
289:12,19,21
290:4,8,24
291:14
**goldman**
134:19 244:1
279:1,9
**good** 135:1
136:14,15
227:4,8 228:3
254:15 262:3
**gotten** 147:14
**gradual** 149:9
**granite** 141:3
**gray** 170:22
**great** 269:17
**greater** 182:6
250:6,7,14,15
**gross** 263:13
**grounds** 288:18
**group** 231:17
263:16 264:1,5
264:14,15
273:3,3,5
274:1,12,14
284:19

**groups** 274:2
**growing** 211:18
**growth** 194:25
**guess** 136:17
156:17 260:14
266:6 268:6
269:21
**guidance**
229:14
**guide** 154:12
**guidelines**
234:14 238:11
**guillermo**
140:3
**guys** 286:12

**h**

**h** 253:5,8
281:20 295:3
**half** 191:14
**hand** 250:5
293:5
**handed** 176:16
**handing** 244:7
**happen** 222:7
229:20 265:24
266:7
**happened**
155:9
**happening**
267:14
**happens**
222:11
**hard** 156:21
157:3 190:20
208:24 232:11

233:23
**head** 152:13,18
183:2 205:14
261:22 271:2
**headcount**
283:4
**heading** 143:11
179:11 181:15
227:17 239:24
243:10
**headwinds**
188:25 190:10
**heard** 159:5,7
**hedstrom**
140:3
**held** 135:10
175:14 216:17
254:14 274:24
291:3
**help** 154:11
179:14 236:8
280:9,10
**helped** 140:1,5
**helpful** 176:8
189:5
**hereinabove**
292:17
**hereto** 296:7
**hereunto** 293:4
**high** 144:19
246:4 276:13
**higher** 241:4
264:21
**highlight** 196:2

**[highlighted - includes]**

**highlighted** 190:9

**highlighting** 137:3,5 196:6 197:2 258:19 276:18

**highly** 162:17 163:5 222:3 277:21 278:5

**historical** 143:14 145:3

**history** 143:16

**hm** 257:7

**hold** 138:5 193:17 202:25 230:16

**hope** 136:18 225:14 247:7 249:4

**hoped** 223:11

**hoping** 157:2

**host** 159:19

**hour** 175:7 216:9 254:8 287:5

**hours** 136:18 139:24,25 149:16

**huh** 272:25

**humberto** 132:4 135:7 294:4 295:1 296:1

**hundreds** 220:23 263:20

**hypothetical** 219:20 222:23 223:17 224:13 225:17 262:9 265:4,21 267:6

**hypothetically** 268:23

**i**

**idea** 171:15 265:10

**idealized** 170:5 170:12

**identical** 285:15 287:12

**identification** 136:21 146:2 156:19 176:11 189:8 193:24 205:21 208:16 226:5 244:5 247:5 251:9 258:24 269:15

**identified** 183:3 186:2,3 191:19 200:14 202:7 203:4,15 209:2 234:1 242:20 273:7

**identifies** 204:20

**identify** 135:18 136:25 150:4 157:3 179:16 186:1 188:13 234:3 255:7

264:2 270:18 287:15

**identifying** 255:18

**ignores** 236:17 243:11

**ii** 132:15 294:5 295:2,24 296:2 296:4,12

**iii** 161:15

**illinois** 132:23 135:12 292:1

**image** 137:8

**immediately** 161:3 267:17 277:22

**impact** 161:16 161:17,18 165:7,15,19,22 166:1,2,4,8,10 166:12,18,20 166:23,24,25 167:1 207:3,19 207:22 236:19 276:9 278:8

**impacted** 277:5

**implication** 199:25

**implying** 186:13

**important** 173:3 215:15 215:17 222:16 222:20

**impression** 174:22 286:16

**improper** 200:17 249:5,9 249:13

**improperly** 242:21

**inaccuracies** 191:19

**inaccurate** 246:14,22 259:17

**inadequate** 278:17

**inappropriate** 237:16

**incentive** 242:22

**incentives** 242:18

**include** 154:18 182:5 185:20 198:6 199:3 229:8,12,14,15 229:19 231:7 255:3 272:18

**included** 143:19 157:20 185:2 188:11 189:23 193:1 205:10 214:16 260:18

**includes** 143:21 170:12 185:17 245:20

**including**
145:15 229:13
240:5,13
**incomplete**
172:5 219:19
222:22 223:16
224:12 225:16
262:9 265:4,20
267:5
**incomprehen...**
223:18
**incorporated**
171:13
**incorporating**
148:24
**increase** 155:3
155:5,19
159:12,16
165:24 168:4,5
277:7
**incremental**
188:20,24
190:11
**independent**
160:23 173:16
**independently**
161:6
**indicate** 219:16
237:6
**indication**
237:12
**individual**
238:11
**individually**
132:5

**industries**
228:17 229:16
**industry** 182:4
182:10 210:16
226:14 229:20
237:15 238:11
241:24 250:6
250:14 256:15
256:21 257:2
257:18
**industry's**
257:13
**influence** 224:4
236:13
**influences**
220:11
**informa** 200:5
**information**
143:20 144:9
144:11 145:1
150:2,9,14,19
163:15,17,22
164:4,6,8,10,21
165:1 170:13
170:15,22,23
171:15,19
173:3 181:16
187:2,5,10,13
187:17 195:11
197:14,15
198:19 200:6
200:23 207:10
208:12 217:8
220:10 229:10
229:23 231:2

235:19,20
237:20 253:7
253:12,22
263:7,21,22
267:18 271:22
276:25 277:1
278:1 282:21
290:10
**informed**
162:13
**infrequent**
218:12
**initial** 137:15
232:24
**initially** 202:12
**input** 283:15
**institution**
228:15
**institutions**
231:21
**instruct** 288:16
288:20 289:12
**instructing**
289:7
**instruction**
290:13
**intelligible**
231:4
**intended** 154:7
**interest** 143:22
144:22 240:2,6
240:10,14
**interested**
293:1

**internal** 238:23
**interpret** 175:4
**interpreted**
149:21,22
**interpreting**
169:9
**interrogatories**
292:11
**interrupt**
278:18
**interview**
182:21 183:10
**interviewed**
181:15 183:1
**interviews**
253:9
**intraday** 144:2
145:1,2,4,11,19
145:20 146:10
146:19,20
148:9,12,15
268:3,14
**introduction**
153:3,5 191:7
**investigate**
229:3
**investigation**
229:11
**investigations**
228:16,20
229:1,8,18
**investment**
189:21 190:2
191:1 215:21
217:10 228:14

228:22 231:14
231:21 234:9
235:21 242:24
277:2
**investments**
204:23
**investor**  164:8
164:9 173:8
189:11 223:20
253:4,5,8
279:13 281:19
281:20 282:2
282:14,20
**investors**  173:3
251:24 252:16
276:21,24
284:23
**involve**  219:5
**involved**
141:24 205:16
218:7
**ipo**  147:8
154:24 155:3
159:5,13,16,23
160:5,12,17,24
161:3,7 165:23
165:25 277:5
**iq**  143:15
144:25 147:17
147:22 148:6
148:11,13
**irrelevant**
217:19 237:19
239:7

**issuance**  275:9
**issue**  150:17
172:6 189:1
195:13 197:24
198:21 241:25
**issued**  153:14
176:23 199:21
265:13
**issues**  167:15
192:23 199:6
200:1 211:14
213:1
**item**  198:9,20
201:6,16
247:17
**items**  194:23
195:21 197:18
198:13 201:11
209:11,17

**j**

**jacqueline**
132:10
**janet**  133:15
135:22
**january**  185:10
189:19
**jaspar**  132:9
**joele**  236:6,7
**jonathan**
133:14 135:21
175:5 181:6
185:7 216:7
237:10 243:1
245:15 246:8
248:11 249:8

253:11 254:8
261:15 275:9
278:15 289:20
**jpmorgan**
134:14 188:14
188:19 189:13
189:25 190:17
191:23
**judge**  254:4
260:2
**judgments**
235:7 270:7
**july**  139:12
272:23 273:1
**june**  147:9
148:16 149:8
149:16 154:17
154:18 157:17
160:6
**jyoungwood**
133:18

**k**

**k**  133:14 292:2
**kathryn**  140:4
**kaufmann**
282:24
**keep**  136:18
**kevin**  133:25
135:13
**kin**  293:2
**kind**  210:4
**knew**  227:5
**know**  137:22
139:19,21
140:18,22

142:12 144:24
149:7 150:25
159:8 160:11
160:12 162:11
162:22 173:3
173:15 174:12
174:16 176:4
176:16 180:14
180:23 182:18
182:18,19,22
182:25 183:3,4
190:20 192:5
193:8 195:10
196:9 197:22
199:17 203:9
203:21 204:4
204:25 205:1,5
205:12,17
206:25 209:5,7
210:23 211:20
212:9 214:7,14
215:2 216:3,7
218:2 219:7,15
219:16 221:7
221:20,23
222:9,9 224:2
224:8,23
225:10,13,25
225:25 226:9
226:14,17
229:13 230:20
233:12 234:14
236:12 242:11
246:11,19
248:8 249:2

**[know - likely]**

253:7 254:5,25
257:24 260:15
262:13 263:13
263:21 266:5
268:14 270:7
270:12 274:9
279:20 280:14
283:13 289:5,6
289:9
**knowledge**
174:4 258:3
**known** 195:1,6
195:14,21
197:19,24
198:2,24
**kubik** 140:4
**kubota** 133:4
134:5 135:24
135:24 138:14
138:21 140:12
142:19 148:17
151:2,20 153:7
153:19 154:4
155:11 158:19
160:18,22
163:7,13,18
164:23 165:17
167:9 168:17
168:24 169:24
170:9 171:5
172:3,24
173:14,24
174:10,18
175:5 176:3,22
177:19 178:10

179:20 181:5,8
181:11 185:6
187:19 190:15
191:2,21
192:14 193:5
193:19 195:7
196:8,19 197:7
197:21 198:15
199:11,20
200:16 201:10
201:19 202:9
203:22 206:24
208:1,8 209:13
210:13 211:10
211:15 212:19
213:2,10
214:13 215:1
215:22 216:7
219:6,19 220:4
221:9,22
222:22 223:16
224:12,16
225:16 228:1
229:5 231:11
234:21 235:14
237:1,8,18
238:1 239:6
241:16 242:9
242:25 244:23
245:7,14 246:6
246:15 248:10
248:25 249:8
249:19 250:19
251:2,21
252:24 253:10

253:19 254:2,7
256:5,23 258:2
258:15 259:13
259:18 260:6
261:2,12 262:8
264:9 265:3,20
266:13,17
267:5 268:8
270:2 272:11
273:19,24
275:7 276:4,6
278:14,18,21
280:2,8,11,20
281:7,22
282:18,22
283:16 284:7
284:11 285:4,6
285:19,23
286:3,9,14,19
286:23 287:2,7
288:5,12,18,22
288:25 289:4,8
289:14,19
290:8,13,16
291:10 294:1
**kumar** 132:10

**l**

**language** 255:3
255:13 257:3
285:15 287:12
**large** 265:8
**largely** 217:8
230:25 240:16
**leading** 223:8
277:20 282:15

282:16 283:9
284:5,7,10
285:2
**leads** 276:20
**leaning** 267:22
**learn** 258:12
**leave** 239:22
242:6 265:6
**leaving** 283:8
**led** 155:25
197:15 256:14
275:9 277:6,13
**left** 213:8
**legal** 133:25
135:11,13,14
178:13,19,20
208:2 237:19
291:17 294:23
**legitimately**
253:21
**lend** 261:5
**length** 227:10
**lengths** 156:11
**letter** 292:23
**level** 144:2,11
224:3 276:13
**levels** 257:13
**lexington**
133:16
**life** 245:21
**light** 164:6
189:10,18
**likely** 194:19
200:7 271:22

**[limit - making]**                                                    Page 25

| | | | |
|---|---|---|---|
| **limit** 287:6 | 223:21 232:10 | **looks** 178:21 | 295:1 296:1 |
| **line** 144:16 | 232:14,15,15 | 202:6 209:10 | **lp** 132:11 |
| 190:23 212:11 | 246:24 248:17 | 226:22 236:6 | **m** |
| 212:12 295:4,7 | 252:2 257:5 | 242:14 | **maddock** 132:9 |
| 295:10,13,16 | 258:6 261:18 | **loss** 167:14 | 206:7 |
| 295:19 | 263:23,24 | 199:25 201:20 | **made** 170:12 |
| **lines** 279:20 | 264:11,16 | **lot** 164:13 | 172:7 219:16 |
| **link** 258:21 | 268:3 274:16 | 194:16 205:2 | 227:22 250:2 |
| 268:21 278:3 | 284:18 | 209:7 221:15 | 250:16 255:4 |
| **list** 184:24 | **looked** 141:18 | 221:16 222:11 | 270:5 273:16 |
| 185:13,15,17 | 145:10,18 | 233:19 234:5 | 292:16 296:5 |
| 233:4 | 146:10 147:22 | **lots** 170:16 | **mail** 252:13 |
| **literally** 220:23 | 148:18 149:11 | **low** 144:19 | **main** 210:22 |
| 273:6 | 172:1 181:1 | 162:16 172:1 | **maintain** |
| **literature** | 192:11 197:18 | 172:21 173:13 | 189:20 |
| 159:11 227:5 | 202:16 260:24 | 173:16,19,22 | **maintenance** |
| 266:21 | **looking** 138:10 | 174:9,16,24 | 167:5,20,22 |
| **little** 230:19 | 146:9 147:15 | 175:3 192:11 | 168:9 |
| 262:20 | 148:4,6 165:6 | 192:18 213:7 | **major** 159:24 |
| **live** 249:6,25 | 172:16,18 | 213:17,18 | **majority** 177:5 |
| **ljungqvist** | 190:7 191:14 | 214:25 215:3 | 177:6 |
| 241:7 242:16 | 192:20 204:10 | 215:10 217:17 | **make** 147:1 |
| **llp** 133:13 | 207:24 209:25 | 217:25 243:17 | 148:5 158:7 |
| **locate** 169:13 | 215:13,13 | 246:5 248:19 | 160:4 163:20 |
| 244:14 | 217:7 221:6 | 248:19,23 | 175:23 182:3 |
| **long** 184:9 | 222:6,18,20 | 252:17 256:15 | 197:1 213:17 |
| 187:11 | 225:6 228:2,9 | 257:23 258:22 | 220:20 222:10 |
| **longer** 141:9 | 229:2,3,13,15 | 259:21 276:20 | 225:1 250:12 |
| 219:17 260:9 | 229:19 232:22 | 277:20 | 266:3 267:19 |
| **look** 145:2 | 232:23 233:1 | **lower** 163:4 | 283:24 |
| 157:1 159:4 | 235:22 241:24 | 175:2 250:4 | **makes** 159:12 |
| 164:8,9 180:25 | 251:11 259:11 | 277:13 | 182:14 213:14 |
| 193:12 194:11 | 261:7 265:8 | **lowest** 257:13 | 224:1 246:20 |
| 198:4 205:18 | 267:16 272:22 | **lozada** 132:4 | **making** 142:7 |
| 221:19 223:6 | 273:5 | 135:7,25 294:4 | 167:22 173:9 |

**[making - metric]**                                    Page 26

191:25 213:20
218:14,15
228:22 266:2
270:7 282:19
**management**
176:24 236:19
**management's**
243:2 257:10
**manner** 231:4
**maria** 132:18
135:16 292:6
**mark** 140:3
156:16 193:16
193:21 226:2
251:7 258:17
275:23
**marked** 134:10
136:20,23
139:9 145:23
146:1,4 152:5
152:22 156:18
176:10 189:7
189:12 193:23
205:20,24
208:15 226:4
244:4,8 247:4
251:8 258:23
269:14 271:9
275:21 279:10
**market** 134:10
143:20 145:12
145:14,15
146:23 150:1
150:10,10
160:23,25

161:20,24
162:3,13,15,19
163:3,14,23
164:5,15,16,19
164:21,25
170:24 171:10
171:11,13,14
171:17 173:11
173:12 190:1
197:15 233:3
260:19,20,22
261:17 262:4
**markets** 160:25
169:12,18
170:10 173:20
**marking**
176:13
**mary** 140:4
**master** 291:16
**material**
142:15 184:25
207:23 208:6
283:3
**materials**
142:25 145:16
150:15 151:21
184:25 276:18
**matter** 135:6
221:15,16
232:3 242:18
**mean** 150:3
155:1 158:20
159:7 162:14
164:3 165:8
167:21 173:13

174:9 183:5,23
190:18,18,21
192:4 198:20
198:21 210:1
214:14 220:9
220:20 223:20
225:20 226:18
229:9 235:17
241:15,18
242:3 245:1
248:22 249:3
250:1,20
261:16 265:5
265:23 268:18
270:5 272:23
272:24 274:9
**meaning**
161:19 198:22
220:10 225:21
**meaningful**
225:3,22 231:1
271:20
**means** 144:5
174:17,20
182:16 196:9
197:22 206:25
219:7 221:24
247:25 270:3
289:5,9
**meant** 249:13
255:20 287:16
**measure**
257:25
**measured**
222:25 246:19

**measurement**
225:13
**media** 291:16
**medium** 246:5
**meet** 262:23
**mehta** 132:10
**members**
139:19 170:14
**memo** 236:6
**memory** 232:12
**mention** 185:21
186:4 188:5
202:18,19
203:7 214:2,15
215:3 257:1
**mentioned**
180:14,24
184:4 186:2
**mentioning**
186:6,13 196:5
**mentions**
180:15 203:12
206:5 238:2
258:4 279:21
**merits** 173:25
174:12
**met** 154:16
**methodologi...**
273:4
**methodology**
203:14 266:20
268:18 273:11
273:16,25
**metric** 264:13
264:15

**metrics**  225:10 264:11
**middle**  147:6,6 217:3 238:7 245:15
**mind**  180:6 216:12 249:1 257:25 258:7
**mine**  137:5,6
**minute**  290:21
**mirrors**  230:5
**miscalculated**  219:10
**misconduct**  240:10,23
**misleading**  155:11 172:3 199:24 253:20 277:4,11 280:16 286:4 286:16 287:1 288:3
**misread**  239:8 240:8 241:12 241:13
**misrepresent...**  167:2,3 168:1
**misrepresented**  259:20
**misspoke**  212:3
**misstate**  198:7
**misstatement**  161:20,22 168:7,14,19 169:3 172:5

181:18 213:19 217:18 218:6,9 251:23 255:4 256:19 258:20 260:11 285:14 287:11
**misstatements**  206:22 207:23 208:6 218:1,8 243:13,16 255:15 260:9
**misstates**  174:19 261:12
**mistake**  273:17
**model**  248:15 248:23 250:25
**models**  247:20 248:1
**modify**  275:10
**moment**  139:2 195:18 223:2 252:25 280:22 281:15,17
**monitoring**  238:23
**month**  241:22
**months**  167:16 199:23 201:21 246:8 261:15
**morning**  135:1 136:14,15
**motion**  138:19 138:25
**move**  249:18 254:20 265:19

266:11 267:10 267:20 271:12 278:9,19 280:8 280:11
**moved**  162:19 266:24 267:3 268:4
**movement**  264:13,17 265:2,7 271:24
**movements**  264:19 268:22
**moves**  264:25 265:14 266:9
**moving**  271:17
**mr.fernandez**  134:18
**muddle**  226:21
**mukesh**  132:10
**multiple**  212:7

**n**

**n**  134:1
**name**  135:13
**named**  292:9
**nasdaq**  146:17
**nature**  144:23 186:18 261:6
**near**  194:16
**nearly**  241:10 272:19 285:15 287:12
**necessarily**  185:21 186:15 188:20,24 190:11,20

197:25 218:14 225:2 228:4 234:7,23 270:10,13
**necessary**  147:23 155:13 199:5 268:16 286:15 287:2 296:6
**need**  157:1 160:9 163:11 192:21 193:21 221:20 225:10 225:13 232:17 272:3
**needed**  155:21 156:24 207:9 214:21
**negative**  210:10
**never**  182:20
**new**  132:2 133:6,17 135:9 145:20 146:16 150:8 163:17 164:21 170:21 197:15 198:8 198:13,19,20 198:20,21,25 200:5 201:6 207:10 210:16 218:13 219:11 263:6 266:23 268:21 288:19

**[newly - objection]**

newly   217:8

news   147:18
149:15,23
150:4,16
183:24 202:6,7
202:14,16
203:6 209:6
210:10 263:9
263:17,18
264:2,4 265:1
265:1,11,13,16
265:19 266:23
267:2,4,11
268:2,2,10,21
269:23,24,25
270:1 271:21
272:17 273:6
273:11,12,14
273:20,22,23
274:4,7,7,17

nine   282:6

non   207:13
212:14 263:9
269:24 270:1
273:11,12,14
273:23 274:17

nope   289:2

normal   164:8

normally
218:12

north   132:22
135:11

northern   141:2

notary   296:13
296:19

note   147:7
177:24 186:24
187:16 241:7
244:17 294:10

noted   187:14
188:8 196:22
285:14 287:11
296:7

notice   138:2

noticing   135:20

notion   244:18

notwithstandi...
189:25

november
272:23 273:1

null   152:19

number   135:9
139:20 143:19
151:24 152:21
159:8 173:1,10
173:22,23
175:20 182:10
192:5 219:3,5
219:10,11,24
241:14 243:19
243:23 244:16
246:3 248:17
250:18,24
251:1 255:2
256:7 259:22
275:21 279:24

numbers
147:21 151:17
177:12 181:10
193:9 224:22

225:21,23
250:4 259:16
260:4

numerical
224:17

numerous
205:16

ny   133:6,17
294:15

**o**

o   292:2,2

object   138:21
140:12 148:17
151:2,20 153:7
154:4 155:12
167:11 168:17
169:24 172:3,4
172:24 176:22
177:19 179:20
191:2 192:14
193:19 197:7
197:21 198:15
199:11 201:10
206:24 215:23
219:6 220:4
223:16 225:16
229:5 237:1
241:16 242:9
242:25 252:24
259:18 262:8
264:9 266:13
266:17 268:8
289:4

objected
281:13

objecting   289:8

objection
138:14 153:19
155:11 158:19
160:18,22
163:7,13,18
164:23 165:17
168:24 170:9
171:5 173:14
173:24 174:10
178:10 187:19
190:15 191:21
192:14,15
193:5 195:7
196:8 199:20
200:16 201:19
203:22 208:1,8
209:13 210:13
211:10,15
212:19 213:2
213:10 214:13
215:1,22
219:19 220:4
221:9,22
222:22 224:12
228:1 231:11
234:21 235:14
237:8,18 238:1
244:23 246:6
248:25 250:19
251:2,21
253:10 256:5,5
256:23 258:2
258:15 260:6
261:2,12 265:3

**[objection - ones]**

265:20 267:5
270:2 272:11
273:19,24
275:7 279:18
279:25 282:15
283:9 284:5
285:1,17 288:2
288:12
**objections**
224:16 239:6
246:15 249:5
249:20,23
**objective**
230:15 235:5
263:23 266:1
**obligations**
253:18
**observe**  271:24
276:23 277:7
**observed**
159:15 268:25
270:6
**observing**
160:23
**obtained**
143:15 146:18
**obtaining**
170:13
**obvious**  219:1
219:2 277:15
**obviously**
138:5 178:13
265:25
**occur**  240:20
268:24

**occurred**
149:23 150:4
150:23 165:12
218:18 219:12
243:5 278:6
**occurrence**
268:13
**occurring**
267:16
**occurs**  238:18
267:11
**offer**  191:10
192:2
**offered**  173:25
174:12 289:10
**offering**  151:3
153:22 160:14
166:19 246:7
**office**  293:5
**oh**  185:12
233:5
**okay**  137:7,10
137:13 138:24
139:16 141:17
142:3,11
144:10,25
146:24 147:3,5
147:24 148:14
149:20 150:25
151:13 152:2,5
152:9 153:1,11
153:25 154:15
155:5 156:15
157:16 158:8
158:13 160:4

161:12 162:1
164:12 165:3
165:10,14
167:4 168:12
168:22 169:5
169:16 170:8
171:25 177:2
177:15 178:18
178:20 179:8
180:25 181:11
181:20 183:12
183:21 184:16
185:5,11,25
186:7 187:16
188:10,18
189:10 190:6
190:23 191:5
192:10,20
193:1,12 194:7
194:13,22
195:4,17 196:6
196:16,25
197:13 202:23
203:20 204:2
204:12 205:9
205:12 206:4
208:4 209:19
209:21 210:2
210:25,25
211:23 212:1
212:10,18
213:6,22 214:5
214:9,19 215:7
215:9 216:6
217:2,21

219:14 220:15
223:10 226:2
226:16,20
227:9,24
228:11 230:10
232:25 233:5
234:8 235:2,11
236:3,4,5,16
237:14 238:8
238:22 239:23
242:7,13,20
244:3,13
246:13 247:10
247:16,24
250:17 251:5
251:16 252:14
252:15 253:4
254:9 255:7,19
257:20 259:12
261:9 263:8
264:7,23
266:11 267:13
269:8,13,18,20
271:1,7 272:6
272:21 273:12
274:6 275:4,21
278:19 279:11
281:25 284:13
289:6 290:15
**oklahoma**
132:4 136:1
**once**  265:9
**ones**  184:18,21
188:15

**open** 149:17 155:6,10
**opened** 147:10 150:10 160:12
**opening** 144:7 144:13,18 148:7 150:18 150:23 151:1 155:16,21 157:9 161:7 169:13 170:1 171:3 185:1
**operates** 164:14
**opine** 237:20 260:20
**opined** 262:22
**opining** 166:22 199:12
**opinion** 149:13 149:19 150:7 151:3 160:10 160:14 162:12 166:19 178:16 207:2,19 208:2 237:19 253:25
**opinions** 153:17,22,25 154:8,14 155:22 174:1 178:4,8 225:17 246:7
**opposition** 138:25

**options** 261:6
**oral** 286:7 292:11
**order** 136:17 207:8 267:8
**orders** 140:24
**organizations** 239:1
**organized** 154:7 251:4
**original** 140:19 142:18 146:11 146:20 158:11 196:3,7,14
**originally** 193:4 212:25
**outlook** 242:24
**output** 157:5
**outside** 174:11 231:16 232:7,9 232:20 233:9 234:13 258:3 268:16
**outsized** 244:18 245:2
**outstanding** 143:20 144:22
**overall** 154:8
**overdone** 190:10
**oversimplific...** 263:13
**overview** 210:5
**ow** 189:22

**own** 142:3 205:1 235:7 282:17

**p**

**p** 175:21 176:6
**p.m.** 254:16 274:21 275:1 290:24 291:5 291:15
**page** 134:2,9 137:2,7 141:1 141:23 143:8 146:8 147:3 151:7 152:7 153:18,18 161:11 169:15 172:12 176:15 177:24 178:22 179:6,18,24 180:9,11,17,18 180:21,25 181:1,10,17,22 182:2 183:18 186:24 192:21 216:24 217:1 226:7 227:17 238:4 239:23 240:24 241:1 243:8 244:16 245:5,6,18 246:18 247:10 247:17 248:3 248:11,13,13 248:17 250:17 250:25 251:13

254:20 255:11 255:12 259:5,7 269:7,12,19,24 271:8 280:13 281:24 282:23 283:17 284:12 295:4,7,10,13 295:16,19
**paged** 247:15
**pages** 138:11 141:23 179:1 179:15 180:20 180:22 226:23 227:15 244:13 245:1 250:23 254:21 279:24
**panda** 234:20 234:22
**papers** 276:1
**paragraph** 141:22 147:4,6 161:10 165:5 169:15,21 171:2,9 172:13 172:19 183:20 188:7 189:14 194:4,9,14 195:18,22 198:5 199:4 202:9,13,18 213:23 216:25 217:4,15 227:3 228:12 230:22 235:12,25 238:5 241:4

244:12 251:13 251:18 252:4 254:25 256:11 257:6 259:3,6 269:7 270:19 272:14,22 278:23,25 279:6,14 281:5 284:25 285:3,7 285:10,18 287:8,14,24

**paragraph's** 286:6

**paragraphs** 214:16 254:24 272:7 287:19

**parameters** 260:4

**parens** 171:12

**parenthetical** 259:9,16

**park** 133:5 165:3

**part** 154:22 164:24 166:13 171:16 178:12 179:9 181:17 181:24 184:19 184:24 186:22 190:7 194:4,9 194:10 195:20 200:7 207:11 207:17 208:11 208:12 210:21 224:18 241:2

261:21 277:7 283:15

**partial** 162:25

**partially** 161:22 162:6,9 162:11,13

**participants** 234:5

**particular** 154:23 177:8 219:3 233:24 259:22 264:25

**parties** 164:3 293:3

**party** 135:20 162:14 163:2,6

**passage** 227:9 230:11

**past** 177:3 221:7,15 223:6 223:15 229:3 231:3

**pattern** 149:1

**pausing** 184:7

**payments** 222:10

**peers** 191:12 252:19

**pension** 132:4 136:1

**people** 174:23 205:18 240:4 240:12 249:15

**percent** 147:25 182:5,15,23

189:19,20 194:17 246:4 246:14 250:5,7 250:13,14 254:2

**perform** 145:3 155:14 161:5 222:4 224:17 229:17 268:16

**performance** 244:19 245:2 266:3

**performed** 156:3,8 165:9 268:19

**performing** 228:15 233:3

**performs** 269:6

**period** 141:9,9 142:1,1,8 146:15 150:11 158:18,20 168:3,15,16,23 169:2 223:1,7 223:12 277:8 277:10 285:14 287:11

**periods** 145:3 156:9 159:2

**person** 183:4 183:10

**personal** 174:3 220:25 258:3

**personally** 139:19 183:5,9

**perspective** 245:4

**pertaining** 132:21

**peruse** 279:22

**phenomena** 159:6 160:5

**philosophy** 221:23

**phrase** 192:10

**phrases** 276:11

**picture** 191:11 192:2

**place** 183:10 247:24 248:8 292:6,17

**places** 164:7 180:24

**plaintiff** 133:10

**plaintiffs** 132:7 135:25 138:19 139:4 162:18 181:25 259:19

**play** 200:2

**played** 201:7 206:15

**pleading** 191:19

**please** 135:18 136:4,24 147:4 175:18 205:19 213:12 216:13 224:14 232:22 254:3,10,17 274:20 278:18

278:23 279:9
282:23 285:7
290:23 291:12
**plural** 227:18
**point** 134:13
141:7,15 142:7
146:13 148:18
149:8,12 162:9
163:25 167:24
175:6 176:18
176:18,20,21
176:24 177:16
177:17 180:18
182:16,17
183:1 191:6
194:10,20
195:5,19
197:14,17
198:1 199:7
203:1 206:6,14
206:16 210:6
210:11,22
211:1,2 218:5
225:7,8 226:1
233:13 243:5
245:20 248:18
262:2 278:3
283:2 285:19
**pointed** 217:16
**pointing**
247:21
**points** 202:19
209:16,16,23
210:3 218:2
277:25

**pop** 159:6
160:5
**portion** 141:11
197:10 200:21
202:5 257:8
258:1 278:2
**portions** 196:4
197:2
**positioned**
244:19 245:3
**positive** 252:18
277:1
**possibility**
265:6 277:4,6
277:25 278:2
**possible** 160:8
202:1 204:12
204:16,16
211:25 240:1,9
240:22 265:18
265:24
**possibly** 209:20
212:15 215:12
**post** 214:1
234:5
**postdate**
137:14
**posted** 204:23
**posting** 134:17
208:25 211:9
268:4,6
**potential** 137:4
159:19,21
161:17 165:21
165:25 166:3,9

166:12 237:2
240:5,14
251:24 260:9
263:18 276:24
282:14
**potentially**
207:10 215:18
263:21 277:13
278:1,4
**practice** 261:16
**precise** 224:9
224:10
**premature**
200:17 201:20
**premium**
245:10,17
276:22
**preparation**
238:6,12
**prepared** 137:2
260:14
**preparing**
138:13 151:18
275:17
**prerequisite**
164:20
**present** 133:1
133:24 221:7
221:21 223:8
229:2 231:3
237:15 292:8
**presentation**
134:20 178:3
247:13 249:11
279:1,10

**presented**
200:20 228:21
**presenting**
231:3
**president**
226:12
**pretty** 143:2
177:10 190:19
222:1 270:15
**prevalence**
264:12
**prevented**
167:23
**preview** 167:14
**previously**
134:10 146:1
154:16 163:23
164:7 195:6,12
219:9 292:9
**price** 143:16,18
143:24 144:18
144:18,19
149:1 150:25
154:24,25
155:3,4,19
158:1,4 159:6
159:12,16,16
159:17,23,24
160:5,17,21
161:7,7,16,17
161:18,20,24
162:3 165:1,19
165:21,23,24
166:1,2,3,8,9
166:12,18,20

**[price - purpose]**                                               Page 33

166:23,24,25
167:1,5,20,21
167:24,25
168:4,6,9
171:14 199:9
199:15,19
200:8,22 201:8
206:16 207:3
207:15,19,22
241:3 263:7
264:13,17,19
265:15,19
266:24 267:3
267:10,16,19
268:22 271:24
276:9 277:5,15
277:22 278:5,8
**priced** 147:8
**prices** 144:24
160:24 161:2
170:20 266:9
**pricing** 145:1
160:12
**primary**
143:23 223:20
**principal**
228:15
**principally**
230:14 235:4
**printed** 157:2
**prior** 142:3
143:4 146:5
154:20 157:6
157:23,24
158:1,3,4

174:19 186:9
190:11 205:16
211:4 212:7
218:15 219:16
261:12 273:14
281:4,4
**privilege**
288:18
**privileged**
288:23 290:9
290:14
**probably**
139:24 152:3
169:6,6 176:3
187:8 214:16
214:20 220:22
240:15 260:25
263:20
**problem**
271:13 272:4
**problems** 272:6
**procedure**
132:20 292:21
**proceed** 136:7
175:17 216:20
254:17 275:2
291:6
**proceedings**
175:14 216:17
254:14 274:24
291:3
**produced**
151:14,17
154:22 185:3
237:9 241:2

243:1 253:11
**producing**
231:22
**product** 271:5
**production**
151:10 152:3
**profession**
240:4,13
**professional**
238:13
**profitability**
215:17 223:22
224:4
**prognosticate**
235:13
**prognosticati...**
235:6
**promise** 243:24
**proper** 160:21
**proposed**
157:14 168:15
**prospective**
230:7
**prospects**
235:8
**prospectus**
168:22 169:1
**prove** 266:15
**provide** 142:23
147:23 153:12
153:21 163:14
217:10
**provided**
142:24 145:16
154:9 156:22

156:23 200:4
227:8 228:3
248:2
**provides**
223:24 237:12
268:19 277:24
278:8
**providing**
172:25 173:2,5
287:25
**proximately**
200:13
**public** 170:14
171:12,15
296:19
**publication**
226:8
**publicly** 142:13
170:21 230:8
**published**
234:16
**pull** 142:14
**pullback**
194:17
**pulled** 259:7
**purely** 168:9
**purported**
178:14 252:17
258:22
**purportedly**
276:19
**purpose** 141:5
146:24 153:5
153:16 207:1
258:18

**pursuant**
132:19 292:20
**purview** 239:2
**pushed** 189:18
**put** 178:9
183:12 232:3
233:14 246:25
251:5 259:8
272:6,8 275:18
**putting** 247:14
258:18 276:21

**q**

**qian** 241:7
242:17
**qualified**
273:10
**qualify** 182:5
274:11
**qualitative**
231:2
**quality** 238:23
245:21
**quantified**
241:17
**quantify** 201:1
248:22
**quantitative**
231:2
**quarterly**
219:15 266:4
**question**
149:22 150:3
151:15 160:8
167:13 182:2
182:24 185:15

196:19 203:3
213:13 222:1,9
223:20 224:15
224:18 225:4
225:19 226:1
236:4 242:15
249:8,12 250:2
259:13 262:11
262:12 277:19
279:19 280:1,3
281:19 282:7
282:13,16
283:22 284:3
284:17 286:23
289:1,3,9,11,13
289:15 290:1,2
290:9,11,17
**questioning**
169:25 286:15
286:19
**questions**
155:15 163:19
171:6 182:19
188:4 216:25
246:9 275:4
276:4 278:15
279:4 280:21
282:2 283:19
284:14,23
285:24,25
287:3 288:5,10
288:13 289:22
290:4,22 291:8
292:12,15

**quickly** 169:11
171:13 279:22
**quite** 195:21
197:19 218:24
290:20
**quote** 146:14
182:17 188:22
194:4,7,8
195:20 197:19
213:7 227:9,13
230:12 231:7
256:13
**quoted** 182:11
182:15,16
279:14 284:25
**quotes** 177:12
227:16
**quoting** 241:6

**r**

**r** 295:3,3
**raise** 286:21,22
**raised** 194:23
195:5
**randomly**
146:15
**rapidly** 170:22
**rate** 212:15
223:23 245:22
245:25 246:2,4
246:5,5 250:5
250:13 258:5
258:13 259:10
282:8 283:13
**rates** 171:22
257:14

**rather** 167:24
263:14
**rating** 189:22
190:24
**reach** 142:4
155:14 207:8
**reached** 142:5
147:10 148:21
201:23,25
202:2 251:19
**reacting** 276:25
**reaction** 187:23
190:1
**reacts** 263:12
**read** 161:13
166:11,15,16
177:14 178:11
191:23 193:6
197:23 198:17
205:12 209:14
211:11 212:20
213:11,13
214:5 224:14
224:15 227:20
230:11 235:3
235:15,18
239:15 244:25
247:13 262:11
262:12 289:16
290:1 291:10
294:9 296:5
**reader** 154:11
249:1
**reader's** 197:20

**readily** 231:4
**reading** 183:5
  198:11 210:6,7
  238:23 281:8
**reads** 198:25
**ready** 236:4
**real** 170:10,16
**really** 153:8,21
  179:14 187:22
  196:19 207:18
  228:8 264:4,10
  264:11 266:2
  276:15
**reason** 141:20
  142:22 184:7
  206:20 223:20
  246:13,21
  251:17 276:21
  294:11 295:6,9
  295:12,15,18
  295:21
**reasonable**
  159:4 200:5,21
**reasoning**
  173:5
**reasons** 157:22
  159:20,22
  160:2
**rebuttal** 172:19
**recall** 137:22
  138:6 139:2
  140:9 141:20
  142:25 149:12
  152:4,16 160:2
  186:3,5,10

193:7 203:14
204:25 205:11
215:24 216:1
228:6 232:11
255:18 256:7
258:4 271:3
279:7,15,16
**receipt** 139:11
  294:17
**received**
  139:11 153:15
**recent** 189:11
  189:18 269:3
**recess** 175:12
  216:15 254:12
  274:22 291:1
**rechecked**
  203:21
**recitation**
  172:5
**recognize**
  208:20,23
**recollection**
  141:11 144:15
  193:10 204:15
  255:25 279:19
**recommendat...**
  228:23 235:21
**recommendat...**
  217:11 241:8
  242:23
**record** 135:2
  163:21 175:11
  175:15 179:25
  181:5 185:6

193:19 199:21
216:14,18
226:22 253:20
254:11,16
256:24 274:21
274:25 276:3
280:4,16 286:4
286:7 287:4
290:18,19,24
291:4,9,14
292:15
**recorded** 135:4
**records** 137:23
  139:21 140:8
**redactions**
  137:4
**refer** 140:24
  141:2 195:22
  209:23 210:5
  212:4 213:6,23
  238:7 239:20
  244:13 256:12
  256:19 263:3
  269:19
**reference**
  138:18,18
  141:13 142:20
  145:14 151:24
  182:14 184:22
  191:15,25
  192:10 193:2,8
  194:4,20
  203:13 204:20
  211:7 212:10
  212:24 213:14

213:17,20
218:15 220:20
248:18 252:5,8
282:19
**referenced**
  147:18 152:13
  152:16 156:10
  182:23 294:6
**references**
  179:17 180:3
  202:11,12
**referencing**
  147:19 188:25
  192:5,7 209:2
  210:20 252:10
  283:14
**referred** 157:6
  159:7 176:18
  189:13 193:14
  292:17
**referring**
  141:12 144:4,8
  148:13 154:21
  156:13 159:9
  162:1 165:19
  165:20,22,23
  172:20,22
  183:16 195:10
  202:14 211:7
  211:13,20
  247:16,19
  258:14 259:3
**refers** 165:6
  182:10 206:6,9
  211:2 212:2,6

**[refers - report]**                                                      Page 36

247:21 250:24
263:5
**reflect** 140:9
149:25 150:1
168:5 290:19
**reflected**
150:15 257:13
**reflective**
271:20
**reflects** 165:1
290:20
**refresh** 141:10
236:2 251:13
**refuted** 228:5
**regard** 264:17
**regarding**
148:22 172:22
176:21 188:20
193:3 195:5
201:4 208:5
217:22 242:23
242:23 253:8
**registration**
169:7 255:9
**regulatory**
237:19 238:25
239:1
**reiterate**
189:21 272:13
277:10
**reiterating**
190:25 276:25
**relate** 208:6
260:11 284:3

**related** 180:16
187:1,5,9,13
202:20 204:22
207:13 260:10
282:14 283:7
**relates** 275:13
**relating** 275:14
**relative** 256:15
256:20
**release** 267:17
**released** 217:8
**relevance**
225:25 243:12
283:12
**relevant** 162:19
186:17 195:13
207:10 219:23
220:3,7,9
222:3,6 225:24
251:23 253:17
263:17,18,21
263:22 268:21
271:22 272:19
**reliable** 161:4
**relied** 142:16
**rely** 227:22
280:7
**relying** 143:3
**remains** 172:2
192:13
**remark** 176:1,2
**remember**
139:1 141:16
168:20 184:8
204:9 258:6

261:19
**remembering**
152:12
**removed** 197:4
**reopened** 170:3
**reorient** 217:1
**repeat** 289:15
**repeated**
243:18
**repetitions**
167:17
**rephrase**
263:14
**replicate**
269:22 270:11
**replicated**
270:4
**reply** 139:4
196:23 275:17
**report** 134:10
134:11,13,14
134:15,22,23
137:1,6,10,15
138:4,13 139:5
139:9,11,12
140:19,20
141:8,15,23
145:7,12,15,17
145:21,22
146:11,21
149:14 150:19
150:21 151:19
152:10,14
153:2,9,13,15
153:23 154:9

154:12 155:16
155:21 156:1
156:23 157:9
157:15 158:11
161:11 162:2,9
163:25 169:14
170:1 171:3,16
172:12,16,18
172:19 174:2
174:11 176:19
176:20,23
178:14 183:13
183:15,16
184:6,12,22
185:1,4,19,21
186:4,6,14
187:14,18,23
188:6,13,14,19
188:21 189:4
189:13,23
190:1,9,13
191:22 193:13
193:15,21
194:3,18,20
195:5,11 196:2
196:15,17,20
196:23 197:15
198:1,2,23
199:7,14,22
200:4,6,20,23
200:24 202:20
203:13 206:6
206:16 208:13
209:11,24
210:6,22,23

**[report - right]**

212:9 213:22
214:1,12,25
215:5 217:17
225:18 228:21
232:16,24
233:21 234:11
235:24 236:14
236:20 241:9
243:9 247:14
251:11 254:22
256:12 257:5
258:1,4,6,13
259:2,9 269:2
269:3,10 271:5
271:8 272:8
273:14 275:9
275:17,19
276:7 277:18
278:3,12,12,16
278:23 285:8
286:13 287:14
287:20
**reported**
178:14 219:9
223:3
**reporter**
135:16 136:4
**reporters** 205:1
**reporting**
218:12 219:11
246:3
**reports** 137:23
137:25 142:13
153:13 167:12
177:16,21,21

183:24 184:1,3
184:6,17 185:2
185:3,8,9,24
186:1,4 192:1
203:4 204:3,9
204:11 205:15
210:16 214:2,6
217:16,22
220:24 221:2
229:15 231:16
231:23 232:2,5
232:10 233:2
233:20 234:18
236:20 238:6
238:12 245:22
245:24 255:23
260:15,22
264:2 271:18
277:9 285:12
285:13 286:9
287:10,15,21
287:25
**represent**
252:12
**representing**
135:14
**represents**
137:4
**request** 142:15
**required** 266:3
296:13
**reread** 188:22
**rerun** 271:17
**research** 178:3
178:4,7 226:13

228:21 229:14
234:9 238:6
**reses** 132:11
**resolve** 240:6
240:16
**resonates** 255:3
255:14
**respond** 207:2
**response**
153:22 156:4
157:13 278:13
280:21
**responsibilities**
217:5 220:17
**rest** 279:6
**restatement**
218:20,22
**restates** 218:20
**result** 142:9
167:25
**resulting**
174:23 257:23
**results** 156:5
156:10 228:20
**retained**
218:10 291:16
**retention** 189:2
191:6
**retirement**
132:5 136:1
**return** 154:24
157:21 294:13
294:16
**revealed**
163:25

**reverse** 267:8
**review** 138:20
168:18 180:6
185:22 186:17
280:12 294:7
**reviewed** 139:3
150:19 152:15
152:24 177:2,3
177:9,10 184:3
184:19 185:22
185:24 214:7,8
220:22
**reviewing**
139:2 150:17
150:20 279:24
**right** 139:22
142:7 148:9
151:11 166:5
180:7 181:8
184:19 186:5
186:16,24
189:15,23
196:18 198:14
199:10 203:16
206:3 210:24
218:25 219:5
219:18 221:8
225:21 228:18
229:3 232:20
233:15 234:19
237:25 245:13
245:24 250:5
252:3 255:15
258:10 259:8
263:3 266:12

**[right - see]**

267:9 271:5 273:17

**roadshow** 276:18

**robust** 156:6 156:10

**rodriguez** 140:3

**role** 201:7 206:15 221:1,2 227:17

**roles** 217:4 220:16 227:18 228:3,12

**rose** 150:25

**rough** 280:24

**rpr** 132:19 292:6

**rule** 292:20

**ruled** 168:4 200:25 206:19

**rules** 132:19 249:14 292:20

**run** 158:22,25 272:2

**runs** 138:10 157:10,17

**s**

**s** 132:18 292:6 295:3

**s&p** 143:15 144:25 148:6

**sachs** 134:19 244:1 279:1,9

**safe** 140:10

**safeguard** 237:16

**safeguards** 237:14

**sample** 184:9 265:8

**sandisk** 141:14

**satisfied** 262:17 262:19,19

**satisfy** 262:6

**saying** 143:3 152:20 162:24 164:25 166:3 168:8 173:19 183:7 186:12 187:12 196:12 219:8 224:19 236:9 245:2 259:20 264:10 264:18 268:23 272:4 277:19 288:15

**says** 146:13 151:7 175:21 178:8 181:12 181:14 182:15 188:16,23 194:15 210:15 212:13 223:25 230:13 238:5,9 239:24 245:6,9 250:10 257:2 266:21 282:1,7

**scaling** 257:12

**scan** 138:5

**schedule** 167:16

**schneider** 137:16

**scientific** 268:20

**scope** 174:1,11 205:3 209:8 283:11 284:6 285:17 288:3

**seal** 293:5

**search** 205:8

**searches** 150:16 273:7

**sec** 264:2

**second** 146:12 153:16 171:8 177:25 180:5 180:17 182:13 191:6 193:17 194:10 195:19 197:17 202:25 206:9,11 208:21 211:1,2 211:6 212:11 213:24 230:10 230:16 232:13 232:19 239:15 242:5 248:9 251:15 252:11

**secondary** 160:25

**section** 153:4,6 153:17 161:15 178:20 180:10 183:14,19,20 183:23 184:17 187:22 202:6 216:23,23 227:20 243:9 245:5 247:22 260:19 269:1

**sections** 177:8 179:15 180:7

**securities** 191:17 226:14 228:13,17 231:13,19 233:2,11 234:11 237:15 239:2 261:4

**security** 146:12 170:20 171:14 263:7 282:9 284:19

**security's** 235:8

**see** 137:13 141:13 142:22 145:6,7 147:12 148:12 151:8 157:17 159:1 159:12,15 168:4 178:5,24 182:7,12 183:19 194:7 195:2,3,24

198:8 208:25
211:6,13 214:3
217:12 227:10
228:24 231:5
231:15 235:9
236:10,22
238:14 243:14
250:1,9,16,17
255:5 256:17
257:15 258:9
259:8,12
263:10 264:7
264:19 265:6,9
267:7,10 268:3
270:22 272:5,6
277:3,9,15
279:2 282:4,11
282:25 283:1,5
283:20 284:1,2
284:15,20
285:16 288:25
290:22
**seeing** 228:6
**seek** 150:22
**seeking** 233:7,8
234:1,4,16
282:20 290:9
**seeks** 200:16
201:20
**seem** 209:22
210:5 253:17
**seems** 178:12
188:23,24
190:4,10 191:3
192:6 212:4,11

226:11 251:3
261:14
**seen** 139:4
149:11 177:15
177:20 182:20
205:14,15,23
209:6,12
218:17 221:14
231:19 233:19
284:22
**sekar** 132:9
**selected** 146:16
255:2
**selecting**
186:11
**self** 239:1
**seller** 234:18
236:20
**sellers** 177:17
177:21
**semblance**
215:10
**semi** 164:15,18
164:20 169:12
169:18,20
170:6
**semicolon**
161:14
**senior** 201:5
226:12
**sense** 140:6
175:23 267:19
273:13,15
282:8

**sent** 294:14
**sentence**
141:22 142:5
147:7,25
161:13 165:5
165:18 166:14
170:4 177:25
178:1,2,9
179:17,21
180:8 182:9
189:3,10,17
190:7 191:15
192:22 194:15
196:13 197:10
198:5,8,19
199:3 201:6
206:11 213:25
217:3 220:15
220:20 227:2
230:4,13 235:2
235:12 236:21
238:5,22 257:9
258:19 279:5
281:4,4
**separate**
187:13 188:6
225:4
**separately**
189:2
**september**
132:24 135:3
146:17 293:5
294:3
**sequentially**
227:14

**series** 156:1
**serves** 228:21
**session** 192:12
**set** 152:19
153:8 159:23
170:15 186:17
186:19 201:22
249:5,14
263:23 293:4
**setting** 285:11
**seven** 285:13
287:10,15
**several** 141:13
167:15 195:21
199:23 201:21
245:1 246:8
252:16
**share** 147:8
**shares** 143:20
144:22
**sheet** 154:23
294:11
**short** 139:10,14
143:22 144:22
177:17,21,21
190:9 194:17
195:11 233:19
234:18 236:8
236:19 241:9
274:18
**shorter** 158:21
158:22
**shorthand**
292:12

**[shortly - spreadsheet]**                                   Page 40

| | | | |
|---|---|---|---|
| **shortly** 139:12 | 210:24 216:1 | 240:24 241:12 | 257:25 258:5 |
| **show** 144:17,19 | 246:17 255:22 | 242:3,3 244:12 | 258:13 260:3 |
| 156:10 167:1 | 262:22 | 269:2 273:22 | 262:21 263:16 |
| 227:13 258:19 | **site** 205:6 | 287:17 | 265:11,13 |
| **shown** 197:10 | **situated** 132:6 | **sort** 170:5 | 267:3,18 |
| **shows** 144:21 | **situation** | 188:5 203:16 | **specifically** |
| 144:24 | 221:15 222:3 | 213:18 224:19 | 139:1 160:7 |
| **sign** 291:11 | **situations** | 231:17 234:13 | 168:6 184:22 |
| 294:12 | 221:16 | 235:19 | 185:19 187:1 |
| **signature** 137:7 | **size** 211:17 | **sounds** 228:18 | 192:17 196:5 |
| 137:8 292:18 | 264:16 | **source** 145:5 | 204:10 213:6 |
| 293:9 | **skip** 176:15 | 196:3 205:10 | 217:25 218:5 |
| **signed** 294:19 | 230:21,21 | 209:6 | 229:21 232:8 |
| **significant** | 241:14 | **sources** 143:12 | 257:1 264:5 |
| 161:23 263:11 | **skipped** 158:16 | 255:2 | 268:12 269:5 |
| 264:13,18 | **slightly** 179:11 | **southern** 132:2 | **speculate** |
| 265:7 271:25 | **slow** 241:8,15 | 135:8 | 238:21 239:18 |
| 274:7,10 | 241:18,22 | **spans** 179:1 | 240:19 |
| 277:16 | 242:7 | **speak** 242:4 | **speculated** |
| **similar** 140:21 | **small** 280:14 | **speaks** 153:19 | 160:1 |
| 177:16 203:3 | **smaller** 158:17 | 154:5 195:8 | **speculating** |
| **similarly** 132:6 | 158:20 | **specific** 150:4,5 | 224:24 260:12 |
| **simple** 222:5 | **snapshot** 144:5 | 150:9,17 | **speculative** |
| **simply** 272:17 | 144:6 | 162:12 165:22 | 219:21 |
| **simpson** 133:13 | **solely** 187:17 | 171:21,22 | **speeches** 280:8 |
| 135:22,23 | **solutions** | 172:21,22 | 280:11 |
| **single** 177:6 | 135:11,15 | 173:10 187:21 | **spend** 139:16 |
| 198:1 | 291:17 294:23 | 191:15 192:5,6 | 140:18 164:12 |
| **sir** 194:2 196:1 | **sorry** 137:11,15 | 193:2,2,9,10 | **spent** 139:20 |
| 242:3 285:4,20 | 151:15 156:12 | 204:14 213:14 | 140:7,10,15 |
| **sit** 138:1 | 158:16 172:16 | 213:17,20 | **spread** 146:22 |
| 139:21 140:8 | 182:13 183:15 | 222:14 228:16 | 148:24,25 |
| 160:3 186:5 | 189:11,14 | 235:6 237:12 | 149:3 |
| 203:14,18 | 214:5 226:21 | 245:18,24 | **spreadsheet** |
| 205:11 208:10 | 239:11 240:8 | 246:3 256:7 | 154:22 |

**[spruce - strong]**

**spruce** 134:13 162:2,9 163:25 176:17,18,20 176:21,23 177:16,17 181:15 182:16 182:17 183:1 184:4,6,12 185:21 186:2,4 186:6,14 187:9 187:14,23 188:6,15,21 190:1 193:14 194:20 195:5 197:14 198:1 198:23 199:7 199:14 200:6 200:23 202:20 203:7 206:6,14 206:16 208:13 209:3,11,24 210:6,10,22,23 212:9 214:1,11 214:25 215:5 215:21 217:17 233:13 236:14 236:20 278:3
**spx** 189:20
**ss** 292:1
**stadium** 137:16
**staff** 139:18 140:1 148:2 152:15,23 185:23,24 203:23 204:6

204:13 227:2,3 269:21
**stage** 153:8 167:12 200:18
**stamp** 245:19
**stamped** 151:7 151:25 152:17 152:21
**stand** 216:13 254:10 274:20 290:23 291:13
**standard** 170:19 182:4 212:14 249:4 261:16
**standards** 238:24 239:17
**start** 167:18 169:18 177:25 184:1 223:14 230:22 235:25 269:7 281:3
**starting** 135:19 161:13 180:21 183:18
**starts** 146:8 245:5 279:5
**state** 154:13 222:20 249:19 285:10 292:1
**stated** 280:23
**statement** 162:10,10 167:18,23 169:7 171:25

172:2,7,10,13 173:9 174:21 174:21 180:17 192:6,13 213:7 213:8,18 218:15 219:16 224:1 243:17 255:8,9 277:4 277:12
**statements** 181:21 193:3,7 193:9 212:24 214:10 260:4,8 260:10
**states** 132:1,20 178:2 292:21
**statistical** 262:19
**statistically** 161:23 263:11 264:12,18 265:7 271:25 277:16
**statistics** 143:24 172:22 180:13 191:16 266:11,22
**status** 222:12
**stblaw.com** 133:18
**stenographer** 292:13
**step** 166:21
**sticker** 176:8

**sticking** 149:20 165:5
**stock** 143:10,11 143:15 145:9 146:15,16 147:7,10 148:15 149:8 149:17 150:11 160:6,17 161:1 161:21,25 162:4 164:16 189:19 190:10 199:9,15,18 200:7,22 201:8 206:16 261:7 261:17 262:7 262:22 263:12 264:25 265:15 265:19 266:9 266:24 267:3 268:4,22 271:24 277:15 277:21 278:5
**stop** 175:9 286:18,21
**strains** 211:18
**streamline** 276:1
**street** 132:22
**strike** 169:18 171:19 278:9 278:20 280:8 280:11
**strong** 164:15 164:18,20

169:12,18,20 170:6 257:12 276:8

**studied** 148:14 149:4,4 155:8 155:9 174:14 206:18 232:3 263:19

**studies** 134:12 156:2,3,9 157:21

**study** 149:1 150:17 154:18 154:23 155:24 157:4 158:17 165:9,12,13,14 165:20 206:20 265:23 266:8 266:19,20 268:18

**studying** 197:13

**submitted** 286:13 292:19

**subscribed** 296:14

**subscribers** 205:5

**substance** 209:24

**substantial** 159:15

**substantive** 190:13

**success** 257:11

**successfully** 240:6,16

**sufficient** 166:24,25

**sufficiently** 173:19 175:3 280:4

**suggested** 159:3

**suggesting** 199:13 242:17 266:6

**suite** 132:22 133:5

**summarize** 164:4 276:13

**summarized** 281:6

**summarizes** 209:10

**summary** 153:17,21 154:1,13 178:23 179:10 181:22 227:8 228:3 233:1 252:15

**superior** 277:13,20

**supervisory** 238:25

**support** 163:15 251:19 259:23 259:24

**supported** 163:9,11,14

**supports** 227:5

**sure** 147:1 148:5 157:4 163:21 164:12 188:11,22 208:22,22 212:9 222:4 223:2,19 225:18 230:18 232:23 236:3 240:18 270:3 283:24

**surprise** 258:12 258:16

**surprising** 218:24

**susir** 132:10

**swear** 136:4

**sworn** 136:6,10 292:10 296:14

**synopsis** 227:4

**synthesize** 164:4

**system** 132:5 136:2

**t**

**t** 295:3,3

**tab** 175:18 208:14 251:7

**table** 153:1 178:22 179:13

**tables** 177:12

**take** 164:3 166:21 180:2 193:12 225:6 231:20 252:2 256:10 274:18 290:21

**taken** 132:18 135:5 175:12 216:15 254:12 274:22 278:7 291:1 292:5,12

**takes** 268:10

**talk** 141:8 180:20 204:19 213:15 214:19 215:3 223:5,10 241:5

**talked** 179:23 183:7 211:5

**talking** 164:1 165:25 170:18 172:11 181:6 201:17 210:12 211:16 221:25 229:2 236:7 243:17 245:17 248:4,14 255:8 267:8 268:13 273:9

**talks** 189:2 237:25

**tangents** 253:16

**target** 241:3

targets 215:20
242:23
task 182:14,25
183:8 228:15
task's 189:20
191:11
taskus 132:9
135:7 143:10
143:14 145:8
146:14 147:7,9
148:15 149:7
150:2,13 160:6
160:17 161:1
161:21,24
163:20 164:14
164:16 174:8
176:21,25
181:14 184:17
191:16 192:1
194:16 215:20
222:24 236:25
237:9 242:8,24
244:19 245:3
245:18 252:17
252:19 253:8
256:14 268:22
277:12 282:14
283:8 284:4,24
294:4 295:1
296:1
technically
222:25
tell 144:2 146:6
146:9 179:14
196:17 197:4

232:14,22
269:22 271:1
telling 162:15
163:3 173:10
259:10
tend 220:6
tens 220:23
tenured 250:10
250:15
term 190:19
terminated
250:7,11
terminology
169:5 266:18
terms 138:17
149:3 180:15
215:20 220:12
243:21
test 262:3,20,23
263:16 268:17
268:19 271:20
272:2,17
274:16
testified 136:11
281:2
testifying
199:25
testimony
143:3 174:19
180:3 200:17
201:20 261:13
291:15 294:9
294:17 296:8
testing 267:15
267:15

tests 156:5
text 194:12
thacher 133:13
135:22,23
thank 136:3,8
169:10 181:11
239:14 250:12
254:18 291:8
291:12,17
thanks 291:7
theflyonthew...
204:21 205:3
theoretically
265:23
theory 167:5,20
167:22 168:10
171:10 222:14
266:6
thesis 189:21
190:2 191:1
215:21
thing 143:23
177:11 196:14
198:1 199:7
206:4,9 211:21
220:2 222:5
247:15 274:13
277:18
things 144:21
144:23 150:16
152:12 155:18
156:7 170:16
177:13 183:22
197:5 198:13
198:25 199:8

199:13 201:1
207:16 209:24
211:23,24
212:7 219:24
220:6 229:13
248:6 253:16
261:6 267:8
272:18,18
276:16 277:23
280:6 286:1
think 137:25
139:12 142:19
143:1,21 144:8
144:20 145:2
145:10 146:25
148:4,12
151:21 152:19
154:21 156:24
157:2 158:15
159:8 164:24
166:2 167:13
168:3 169:5,22
170:10 171:9
179:21 180:7
181:9 184:13
184:18,21
185:7 187:8,11
187:14 188:25
189:6 191:25
192:20 194:8
195:15 196:12
196:20 197:1
197:25 198:6
198:18,20,25
199:5 200:3,20

201:20 202:24
203:10 210:22
211:18 213:14
213:19 214:15
215:3,8 219:21
220:5,18,25
221:10 222:13
223:1 224:17
224:18 226:7
230:4 231:15
232:6 233:16
233:23 234:5
235:17 239:8
239:18,21
241:17,23
242:15,16,18
244:14,25
246:1 247:10
247:16 248:12
248:18 250:10
252:5,7 254:23
255:12,14
259:5 260:21
261:3,21 262:2
266:5,5,8,19
270:8,15,21
271:14,19
272:7,13
273:16 275:7
275:21,24
277:23 280:13
286:5 287:16
**thinking**   173:7
173:8 232:8

**third**   162:14
163:2,6 164:3
186:13 198:5
212:2,12 274:6
283:2
**thorough**
177:14 228:16
234:10
**thought**   186:20
201:11 204:2
227:1,7,8
267:24 270:23
270:24 274:13
**thousands**
220:23
**three**   137:14,15
151:8 152:6
180:20 255:13
264:11 270:19
270:24 271:7
271:16,18
272:4 287:25
**tick**   145:5,6
146:18
**tie**   214:10,14
214:24 250:17
250:20,23
**tied**   166:12
207:22
**ties**   165:15
245:16
**time**   138:20
139:10,14,16
139:20 140:6
140:11,16,18

140:21 145:3
150:1,11
156:23 158:9
160:17 162:2
164:13 171:6
223:1,2,8,12
225:7,8,14
226:11 229:10
233:2 253:9
279:23 288:6
292:7,17
294:18
**timeframe**
294:8
**times**   205:16
243:19
**timing**   153:13
153:14
**title**   179:4,6
226:10,11
245:9
**tivity**   141:14
**today**   135:16
137:20 157:24
183:16 192:12
194:17 214:21
223:15 249:23
**today's**   135:10
291:15
**together**   246:1
250:23 257:21
258:18 277:24
278:7
**told**   204:4

**took**   150:3
183:10 196:6
**top**   138:11
140:24 143:9
152:13,17
181:12 183:2
186:1,25
205:14 217:15
258:7 261:22
271:2 282:1
287:25
**topic**   260:22
**topics**   216:8
237:25
**total**   256:7
283:24 284:4
**totality**   165:13
200:3,19
**toward**   141:1
217:3 236:18
**towards**   159:24
**trade**   146:14
**traded**   149:25
164:16,18
230:8
**trading**   146:16
146:20 147:9
147:11 148:15
149:16 150:12
154:25 157:25
158:1,4,5
159:13 160:24
161:1,2 167:19
268:3

**[traditional - used]** Page 45

**traditional**
231:13,22
232:4 233:11
233:14,21
**traditionally**
234:11
**transaction**
170:15
**transcript**
182:20 249:17
275:23 281:9
294:6,19 296:5
296:8
**treatment**
263:16 264:14
264:19,22
273:3 274:1,12
274:14
**trick** 157:1
**tried** 200:25
236:12 269:22
279:22
**triggered**
194:17
**true** 164:1
170:16 196:15
227:6 230:2
237:21 239:5
240:15 292:14
296:8
**truth** 162:19
**truthful** 242:22
**truthfully**
183:7

**try** 158:17
161:6 168:12
225:8 275:25
**trying** 154:11
158:7 184:7,8
197:3,5,9
198:12 199:6
222:3 253:19
261:19 286:4
**turn** 141:11
147:3 227:15
248:21 259:5
278:23 279:9
282:23 283:17
284:12 285:7
287:19
**turning** 235:20
235:20
**turnover**
180:11,12
212:16 213:16
**two** 202:19,24
203:1,12,19
204:19 209:1
214:15 225:20
252:20,22,23
253:1,1 255:13
280:25 281:1,5
281:11,12,16
281:16,17
284:25
**tying** 246:1
257:21
**type** 249:24

**types** 169:17
195:13 231:15
246:9
**typical** 164:9
**typically**
234:13 266:9

**u**

**uh** 272:25
**um** 188:2 257:7
**under** 140:23
143:10 145:6,8
146:12 167:16
179:11 227:17
239:2 243:9
248:22 261:20
273:11,16,25
**undersigned**
292:13 293:1
**understand**
137:4 143:12
151:14,17
159:10 174:20
180:16 181:24
192:4 194:19
196:11 208:4
208:10 212:23
221:1 223:19
239:4 252:9
263:9 283:7
284:3
**understanding**
139:13 144:14
151:12 162:8
162:18 167:19
168:25 181:16

204:24 208:9
220:22 224:21
248:3 253:22
283:10 286:11
**understatement**
213:16
**understating**
212:16
**undertaking**
275:6,13
**unique** 247:20
248:1,23
250:24
**united** 132:1,20
292:21
**universal**
159:14
**unrelated**
225:17
**unreliable**
285:11
**update** 144:21
241:8 242:14
**updating** 138:6
**use** 141:8,22
142:8 146:19
192:2,17
212:14 217:24
249:17 266:17
276:11 278:11
**used** 141:25
143:13,23
162:6 215:10
257:3 270:24
283:14 285:15

[used - way] Page 46

287:11 294:19
**uses** 179:22
**using** 141:19
141:21 156:9
190:19 224:9
224:10
**usually** 144:14
145:4

**v**

**v** 294:4 295:1
296:1
**vague** 148:17
158:19 160:18
163:7 164:23
165:17 177:19
187:19 190:19
192:15 213:10
214:13 222:1
228:1 231:11
242:9 250:19
256:6 262:8,20
**validate** 204:6
**validated** 183:9
203:9,11
**valuation**
160:16 161:6
173:8,9 217:9
222:4 245:4,17
276:22 277:14
**value** 160:20
161:4 201:8
206:10,15
207:10,16
208:11 211:19
212:5,8 218:13

219:23 220:3,6
220:9,11,13
243:12 263:17
263:18,22
268:21 271:22
272:19
**valuing** 222:8
**varies** 234:12
**various** 157:5
190:8
**vary** 233:16
**vast** 177:5,6
**verify** 147:21
161:6 294:9
**veritext** 132:22
135:11,14
291:16 294:14
294:23
**veritext.com.**
294:15
**version** 138:3
156:22 170:12
**versions** 156:25
168:25
**versus** 135:7
177:9 189:19
225:8 250:6
264:22 274:17
**vice** 226:12
**video** 135:2,4
291:14
**videographer**
133:25 135:1
135:14 136:3,7
175:10,15

216:13,18
254:10,15
274:20,25
290:23 291:4
291:12
**videotaped**
132:17
**view** 160:25
163:8 181:3
188:18 190:14
197:2 215:19
227:5 241:20
241:21 262:2
278:7
**viewed** 215:14
251:23
**views** 176:21
176:24 190:11
215:25 216:4
**violation**
286:18
**violations**
280:19
**vol** 294:5 295:2
295:24 296:2,4
296:12
**volume** 132:15
143:18,24
144:18 264:21
**voluntary**
283:23
**vs** 132:8
**vu** 261:14

**w**

**waived** 292:19
**wake** 200:22
**wall** 134:16
202:21 206:1,5
**wanders**
253:16
**want** 140:25
143:11 147:15
148:5 163:20
169:11 183:14
198:7 199:24
216:22 217:1
220:2 223:10
223:13,13
227:15 232:15
236:2 238:7,20
240:19 241:4
245:7 248:10
250:20 251:13
254:20 255:1
269:1 280:15
283:24 286:8
290:12,21
**waste** 279:23
**way** 138:7
140:22 146:7
148:19 154:6
158:3 168:13
173:15 184:22
197:23 199:12
200:25 201:24
215:8 224:24
233:24 235:18
251:18 262:24

271:20 272:3 272:15
**ways**  159:8 164:4
**we've**  165:6 175:6 188:12 206:2 211:3 214:20 216:8 216:23 243:18 254:7,23,25 284:22
**weak**  194:25
**weakness** 190:10
**web**  268:4,6
**website**  204:22 205:15 234:4
**weeks**  242:14
**weir**  132:9
**wells**  257:5
**went**  144:3 149:8 176:5 269:22
**when's**  168:14
**whereof**  293:4
**widely**  163:23 164:7,22,24 170:21,24 171:12,16 205:12
**window**  156:9 156:11,12,12 156:14 157:7,8 157:10,11,11 157:12

**windows**  156:6 157:6,14
**winn**  132:18 135:17 292:6
**witness**  134:2 136:5,6 142:16 171:7 173:24 191:21 195:8 198:15 213:11 216:11 245:14 246:16 248:25 249:10 278:24 280:6,12,20 281:23 282:17 283:18 285:9 285:24,25 286:20,24 291:10,18 292:5,10,16,18 293:4 294:8,10 294:12,18
**witnesses** 288:15
**word**  142:5 162:6 165:8 177:6 179:22 215:10 217:25 239:8 244:24
**words**  160:24 172:21 191:24 192:17 198:17 235:15 248:19 256:25 259:7
**work**  142:4 143:4 155:21

155:25 165:15 170:20 209:9 226:25 230:24 231:13 234:10 234:24 235:11 271:5 272:21 275:5,8,12,25
**worked**  177:18
**workers**  257:11
**world**  170:10 170:17
**worries**  189:18
**worse**  224:7
**worthy**  274:14
**wow**  228:7
**write**  191:7 195:8,20 198:16 213:24 217:14 229:6 255:1
**writing**  229:25
**written**  227:2
**wrong**  236:9 240:25 254:2
**wrote**  226:12 258:1

|     x     |
| --- |
| **x**  134:1 |
|     y     |

**yeah**  142:19 144:8 151:23 152:19 154:7 167:9 176:3,6 176:23 181:9,9

185:12 189:5 190:18 195:10 202:16 203:1 203:10 210:19 211:6 212:6 216:10,11 223:19 225:20 230:18 232:14 232:18 235:17 239:21 242:5,6 251:15 263:15 276:15 279:19
**years**  241:11,13
**york**  132:2 133:6,17 135:9 146:16 288:19
**youngwood** 133:14 134:4,6 135:21,21 136:8,13,22 138:16,23 140:17 142:12 142:20 143:1,7 145:22 146:3 148:20 151:5 152:1 153:10 153:24 154:10 155:23 156:16 156:20 158:21 158:24 160:19 161:9 163:10 163:16,20 164:11 165:2 168:11,21 169:4 170:7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.