# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HUMBERTO LOZADA and OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM Individually and on Behalf of All Others Similarly Situated, <br><br> *Plaintiffs,* <br> v. <br><br> TASKUS, INC., BRYCE MADDOCK, JASPAR WEIR, BALAJI SEKAR, AMIT DIXIT, MUKESH MEHTA, SUSIR KUMAR, JACQUELINE D. RESES, and BCP FC AGGREGATOR L.P., <br><br> *Defendants.* | No. 1:22-cv-01479-JPC |

**EXPERT SUR REPLY REPORT OF BRUCE DEAL**

**September 20, 2024**

**Table of Contents**

I.    INTRODUCTION ..................................................................................................1

    A.    Background ..................................................................................................1

    B.    Assignment ..................................................................................................3

II.   SUMMARY OF OPINIONS ................................................................................3

III.  None of Mr. Coffman's Arguments Change The Opinions I Presented In My Initial Report..........................................................................................................8

    A.    Contrary to Mr. Coffman's Opinion, There is No Evidence of Front-End Price Impact ..................................................................................................8

    B.    Contrary to Mr. Coffman's Opinion, The Alleged Misstatement Is General and Vague ..................................................................................................12

    C.    Contrary to Mr. Coffman's Opinion, the Spruce Report Does Not Correct the Alleged Misstatement ..................................................................................................15

    D.    Contrary to Mr. Coffman's Opinion, Market Commentary Following the Spruce Report Does Not Show Evidence of Price Impact ..........................................20

        i.    Analyst Reports and News Commentary Released Following the Spruce Report.......................................................................................................... 21

        ii.   Mr. Coffman's Critique of My Use of Analyst Reports in Evaluating the Alleged Corrective Disclosure Is Flawed ............................................... 28

    E.    Contrary to Mr. Coffman's Opinion, Evidence from Discovery Does Not Support Price Impact ..................................................................................................30

        i.    Presentations from TaskUs's Underwriters to TaskUs..................................... 31

        ii.   "Testing the Waters" Presentation # 1 ................................................. 34

        iii.  "Testing the Waters" Presentation # 2 ................................................. 36

        iv.   Roadshow Script........................................................................................ 37

        v.    Project Sandy Desk April 1, 2021 Presentation.................................... 38

    F.    Contrary to Mr. Coffman's Opinion, I Do Not Need to Affirmatively Demonstrate an Alternative Explanation to the Decline on January 20, 2022 Because I Showed it Was Not Caused by the Alleged Misstatement........................41

    G.    Contrary to Mr. Coffman's Opinion, Market Commentary During the Proposed Class Period Showed that Analysts Did Not Rely on the Alleged Misstatement When Discussing Attrition..................................................................................................42

        i.    Price Impact During the Proposed Class Period............................... 42

        ii.   Classifications of Analyst Reports................................................. 44

            a.    William Blair (July 6, 2021)................................................. 45

            b.    Wells Fargo Securities (July 6, 2021)....................................... 45

c.    RBC Capital Markets (July 6, 2021).......................................................... 46

d.    BTIG (July 8, 2021) .................................................................................. 48

H.    Contrary to Mr. Coffman's Opinion, I Showed that Mr. Coffman's Market
Efficiency Analysis Was Flawed.................................................................................50

## I.    INTRODUCTION

### A.    Background

1.    I filed a report ("Deal Report" or "my Initial Report") on July 19, 2024.[1]  In that report, I was asked to evaluate from an economic perspective whether: (1) TaskUs's stock price decline on January 20, 2022 following the release of a short-seller report by Spruce Point Capital Management (the "Spruce Report") was caused by information that corrected the alleged misstatement, in which TaskUs referenced "low attrition;" (2) Prior to the release of the Spruce Report, there is evidence that the alleged misstatement, in which TaskUs referenced "low attrition," affected TaskUs's stock price; and (3) Mr. Coffman, the economic expert for Plaintiffs, provides sufficient evidence to demonstrate market efficiency.[2]

2.    As I summarized in my Initial Report, I found that there was no evidence of price impact because Among other things: (1) the Spruce Report did not correct the alleged misstatement;[3] (2) market commentary following the Spruce Report did not consider the attrition-related discussions in the Spruce Report new or value relevant;[4] and (3) analysts' discussion of attrition during the Proposed Class Period focused on voluntary attrition rates disclosed by TaskUs (the "Disclosed Attrition Rates"), which the Court found to not be misleading, instead of the alleged misstatement.[5]  Additionally, I found that Mr. Coffman's analyses to demonstrate market efficiency are flawed and thus he fails to demonstrate market

---

[1] Expert Report of Bruce Deal, July 19, 2024 ("Deal Report").

[2] Deal Report, ¶ 5.

[3] Deal Report, ¶ 9.

[4] Deal Report, ¶ 9.

[5] Deal Report, ¶ 10.

efficiency.[6] My opinions are described in more detail in the body of the Deal Report. Appendix A of my Initial Report contained my *curriculum vitae* and a list of my prior testimony and all publications I have authored in the previous 10 years, which has not changed.

3.     Mr. Coffman filed a reply report on August 23, 2024 ("Coffman Reply Report"),[7] where he stated that:

1. I failed to address "Front End Impact" evidenced by the increase in TaskUs's stock price on June 11, 2021;[8]

2. My characterization of the alleged misstatement as "vague" or a general statement is incorrect;[9]

3. I failed to address a disclosure in the Spruce Report that shows "a clear economic connection" between the alleged misstatement and the alleged corrective information;[10]

4. Market commentary following the Spruce Report and during the Proposed Class Period supports price impact through discussion of attrition;[11]

5. I ignored evidence from discovery that shows the value relevance in TaskUs and investors' eyes of the alleged misstatement;[12]

6. I did not demonstrate an alternative explanation for the price decline on January 20, 2022;[13]

---

[6] Deal Report, ¶ 11.

[7] Expert Reply Report of Chad Coffman, CFA, August 23, 2024.

[8] Coffman Reply Report, ¶¶ 22-26.

[9] Coffman Reply Report, ¶¶ 27-31.

[10] Coffman Reply Report, ¶¶ 32-35.

[11] Coffman Reply Report, ¶¶ 36-54.

[12] Coffman Reply Report, ¶¶ 55-60.

[13] Coffman Reply Report, ¶¶ 61-67.

7. My review of analyst coverage during the Proposed Class Period included a flawed framework that "erroneous[ly]" did not categorize analyst report commentary as including the alleged misstatement when analysts used similar language to the alleged misstatement;[14] and

8. My critiques of Mr. Coffman's market efficiency analysis are flawed.[15]

### B.     Assignment

4. I have been retained by Simpson Thacher & Bartlett LLP, counsel for Defendants ("Counsel") and asked to evaluate the opinions set forth in the Coffman Reply Report, as summarized above. **Appendix A** includes a list of all documents and data that I considered for my assignment that were not included in my Initial Report. I reserve the right to amend or supplement this report if additional relevant documents or information become available.

5. Analysis Group is being compensated at a rate of $1,100 per hour for my time. Other professional staff at Analysis Group working under my direction have assisted me in this assignment. Neither my compensation nor that of Analysis Group is contingent on the nature of my findings or the outcome of this case.

## II.     SUMMARY OF OPINIONS

6. Based on my review and analysis, nothing in the Coffman Reply Report changes the conclusions I presented in the Deal Report. Specifically, I find the following:

7. *Contrary to Mr. Coffman's opinion, there is no evidence of price impact.* Mr. Coffman's assertion that I did not address front-end impact because I did not analyze the price increase on June 11, 2021 is incorrect. Mr. Coffman implies that an IPO price increase on the

---

[14] Coffman Reply Report, ¶¶ 68-77.

[15] Coffman Reply Report, ¶¶ 78-105.

3

first day of trading (a well-established phenomenon) can be attributed to an alleged misstatement made public two months before.  But that is incorrect.  There is no new information regarding attrition released between the IPO and first day of trading and Mr. Coffman did not estimate an abnormal return on June 11, 2021 or analyze whether the stock price increase from the IPO to the end of the first day of trading was caused by the alleged misstatement.  The only way to address front-end price impact is to see if the discussion during the Proposed Class Period viewed the alleged misstatement as value relevant.  I addressed this in my Initial Report and found no evidence to support front-end price impact.  Further analysis of news reports issued between June 11 and June 15, 2021 confirm my findings.

8.      *Contrary to Mr. Coffman's opinion, the alleged misstatement is general and vague.*  As I described in my Initial Report, the alleged misstatement provides no precise metrics or benchmark which an analyst could use to determine whether TaskUs is materially different than other companies.  In fact, other Business Process Outsourcing ("BPO") companies, such as TELUS and TDCX, have similar claims to the alleged misstatement in their SEC disclosures, making it hard to distinguish between these companies based purely on the alleged misstatement. Furthermore, in the Coffman Reply Report, Mr. Coffman fails to differentiate between references to the alleged misstatement and references to the Disclosed Attrition Rates. By failing to recognize and analyze this distinction, Mr. Coffman does not address how the general and vague alleged misstatement includes any *additional* value-relevant information not captured in the Disclosed Attrition Rates, a specific, measurable metric used by TaskUs and other BPO firms and discussed widely by analysts during the Proposed Class Period.

9.      *Contrary to Mr. Coffman's opinion, the Spruce Report does not correct the alleged misstatement.*  Mr. Coffman asserts that there is a causal connection between the alleged

4

misstatement and the alleged corrective disclosure because of one bullet in the Spruce Report's "Executive Summary" section. That bullet, which, standing alone, is not based on any facts, states that "TASK's claim of a superior corporate culture evidenced by below industry standard workforce attrition appear to be highly exaggerated."[16] However, Mr. Coffman fails to address the actual analysis in the Spruce Report on which the "Executive Summary" is based. As I showed in my Initial Report, each of the three Attrition-Related Issues that the Spruce Report analyzes is either based on information available to the market prior to the Spruce Report or concerns general critiques of the BPO industry. Thus, if TaskUs's stock trades in an efficient market, as Mr. Coffman claims it does, the attrition-related disclosures in the Spruce Report do not correct the alleged misstatement.

10.    *Contrary to Mr. Coffman's opinion, market commentary following the Spruce Report does not show evidence of price impact.* Mr. Coffman's claim that market commentary supports price impact is incorrect. As I showed in my Initial Report, none of the 18 analyst reports following the Spruce Report showed evidence that its attrition-related disclosures were new and value relevant to the market. No analyst changed their evaluation of TaskUs's attrition after the Spruce Report. Mr. Coffman criticizes the use of analyst reports to assess price impact as in his view they "may be biased toward… downplaying the impact of short seller reports."[17] In my experience, it is routine to use analyst report commentary to determine whether there is economic evidence that supports the notion that an alleged misstatement is value relevant, which is consistent with finance literature, Mr. Coffman's testimony, and Mr. Coffman's own analyses,

---

[16] Moderating the Bull Case Content: Strong Sell Opinion: TaskUs, Inc.| NASDAQ: TASK," *Spruce Point Capital Management*, January 20, 2022 ("Spruce Report"), p. 6. *See also* Coffman Reply Report, ¶ 30.

[17] Coffman Reply Report, ¶ 50.

where he has treated analyst reports as potential news days.  Furthermore, Mr. Coffman ignores that fact that there are robust regulatory and internal supervision controls to minimize the effects of conflicts of interest between analysts and the companies they cover.  Mr. Coffman concedes in his testimony that he was not aware of *any* evidence that indicated analysts were biased in this matter, making his opinion speculative at best.

11.     *Contrary to Mr. Coffman's opinion, evidence from discovery does not support price impact.*  Mr. Coffman's opinion that evidence from discovery showing pre-IPO messaging of TaskUs and its underwriters shows that culture and low attrition were value relevant to investors is irrelevant.  Neither in my Initial Report nor in my testimony did I disagree that investors may have found TaskUs's culture and attrition important.  Rather, I have demonstrated that, due to the vague and general nature of the alleged misstatement, the market has focused on the Disclosed Attrition Rates and corroborating evidence when discussing TaskUs's attrition. The discovery material that Mr. Coffman cites supports my conclusion.  It shows that TaskUs and underwriters consistently flagged other metrics or qualitative evidence, including the Disclosed Attrition Rates, when discussing TaskUs's culture and attrition. Similarly, potential investors in their feedback to TaskUs noted the value of attrition rates and metrics, or asked for further detail on TaskUs's attrition.

12.     *Contrary to Mr. Coffman's opinion, I do not need to affirmatively demonstrate an alternative explanation to the decline on January 20, 2022, because I showed it was not caused by the alleged misstatement.*  Mr. Coffman's opinion that I did not affirmatively demonstrate an alternative explanation to TaskUs's price decline on January 20, 2022 is irrelevant.  Consistent with my assignment, in my Initial Report, I showed that the decline was *not caused* by the alleged misstatement.

13.    *Contrary to Mr. Coffman's opinion, market commentary during the Proposed Class Period showed that analysts did not rely on the alleged misstatement when discussing attrition.*  As I showed in my Initial Report, all of the 26 analyst reports that discussed attrition during the Proposed Class Period either discussed the Disclosed Attrition Rate (19 of 26) or discussed attrition as a future risk (seven of 26).  Furthermore, each of the seven analyst reports Mr. Coffman claims contains language similar to the alleged misstatement discuss the Disclosed Attrition Rates when referencing attrition.  As such, and as I concluded in my Initial Report, analysts focused on the Disclosed Attrition Rates, a specific, measurable metric, rather than relying on the vague alleged misstatement, which lacked sufficient substance on its own.  Therefore, there is no evidence that the alleged misstatement had a price impact during the Proposed Class Period.

14.    *Contrary to Mr. Coffman's opinion, I showed that Mr. Coffman's market efficiency analysis was flawed.*  Mr. Coffman's argument that I did not critique most of the factors he evaluates as proof that he had substantial evidence for market efficiency fails to put into context the importance of the *Cammer* Factors I did critique.  Moreover, Mr. Coffman's cause-and-effect analysis still fails to address the issue of statistical bias he introduced by excluding 94 of the 154 possible trading days during the Proposed Class Period.  When I treat the three days for which he disagrees with my categorization and thus deems as not value relevant, as non-news days, there is *still not* sufficient evidence to show that TaskUs's stock price moves more in reaction to news.  Finally, Mr. Coffman's fails to address the relevance of the observation that there was no analyst coverage for one month of a short seven month class period.

### III.    NONE OF MR. COFFMAN'S ARGUMENTS CHANGE THE OPINIONS I PRESENTED IN MY INITIAL REPORT

15.    In this section, I address each of the eight critiques of my Initial Report presented by Mr. Coffman.  For many of these responses, I refer back to the analysis and discussion in my Initial Report.  I then supplement the arguments put forth in my Initial Report with additional information as needed.

### A.    Contrary to Mr. Coffman's Opinion, There is No Evidence of Front-End Price Impact

16.    Mr. Coffman asserts that I did not address front-end price impact from the alleged misstatement because I "[did] not address or analyze the price increase on June 11, 2021 and therefore cannot conclude there was no front-end price impact from the alleged misstatement."[18] He states that I "ignore[d] that TaskUs Common Stock first publicly traded on June 11, 2021, which was the first time its market price could react to and fully impound the information contained in the Registration Statement."[19]  On that date, TaskUs Common Stock opened at $27.55 (19.8 percent higher than its $23.00 IPO price), then increased during the trading day to close at $31.09 (35.2 percent higher than the IPO price).[20]  Mr. Coffman is incorrect and wrongfully implies that a price increase on the first day of trading following an IPO (a well-established phenomenon) can be attributed to an alleged misstatement made public two months before.

---

[18] Coffman Reply Report, ¶ 23.

[19] Coffman Reply Report, ¶ 24.

[20] Coffman Reply Report, ¶ 24.

17.    As an initial matter, the 35.2 percent increase from the IPO price to the close on the first day of trading is consistent with a widely-established phenomenon described in the finance literature.[21]  For example, from 1980 to 2023 the average first-day return of IPOs was 18.9 percent.[22]  In 2021, the year of TaskUs's IPO, the average first-day return amongst 311 IPOs was 32.1 percent.[23]  While Mr. Coffman testified that he is familiar with the finance literature showing that shares often have large first-day increases following their IPOs, he makes no effort in the Coffman Reply Report to explain why the price increase on June 11, 2021 may be due to the vague and general alleged misstatement first made months prior to the IPO and not this well-recognized phenomenon.[24]

---

[21] *See e.g.*, Severini, Sabrina, "Review of IPO Primary Market Pricing Literature," *Accounting and Finance Research*, Vol. 9, No. 4, 2020, 32-43, p. 32 ("Nonetheless, the quality of issuing firms cannot easily be predicted because listing firms are often young and new to the market, and the information environment, from which investment decisions can be made, is limited; indeed, there are no secondary market performance records and the market performance records and the operating history data is short.  All these factors increase the valuation uncertainty of IPOs and could give rise to so-called secondary market pricing anomalies, such as underpricing, hot issue markets, and long run underperformance").  *See also* Neghab, Davood P., *et al.*, "Deliberate Premarket Underpricing: New Evidence on IPO Pricing Using Machine Learning," *International Review of Economics and Finance*; Vol. 88, 2023, 902-927, p. 902 ("It is well documented that Initial Public Offerings (IPOs) are, on average, underpriced on the first day of trading"); Ljungqvist, Alexander, "IPO Underpricing," in *Handbook of Corporate Finance: Empirical Corporate Finance, Volume 1*, edited by B. Espen Eckbo, First Ed., North-Holland, 2007, 375-422, p. 378 ("Early writers, notably Logue (1973) and Ibbotson (1975), documented that when companies go public, the shares they sell tend to be underpriced, in that the share price jumps substantially on the first day of trading. Since the 1960s, this 'underpricing discount' has averaged around 19% in the United States, suggesting that firms leave considerable amounts of money on the table.").

[22] Ritter, Jay R., "Initial Public Offerings: Underpricing," *Warrington College of Business*, January 19, 2024, available at https://site.warrington.ufl.edu/ritter/files/IPOs-Underpricing.pdf.

[23] Ritter, Jay R., "Initial Public Offerings: Underpricing," *Warrington College of Business*, January 19, 2024, available at https://site.warrington.ufl.edu/ritter/files/IPOs-Underpricing.pdf.

[24] In his second deposition, Mr. Coffman discusses the following "Q: Have you heard of something called an IPO price pop phenomena? A: Yes… Q: What do you understand that to be? A: Well, there's a literature that – that makes clear that you often see a price increase on the first trading day after an IPO. It's not universal. It's not always, but it's often observed that you see a fairly substantial increase in price– from the IPO price to the first closing price. […] Q. Okay. Did you make any attempt in this case to determine if the IPO price pop phenomena applied to TaskUs stock on June 11, 2021? A: I didn't specifically analyze that question. It's certainly possible, but I didn't analyze the factors one would need to analyze to have an opinion on that." Chad Coffman, CPA, Volume II, *Humberto Lozada and Oklahoma Firefighters Pension and Retirement System, v. TaskUs, et al.*, No. 1:22-cv-01479-JPC, United States District Court for the Southern District of New York, September 13, 2024 ("Coffman Deposition Vol. II"), 159:5-160:10.

18.     Mr. Coffman did no analysis to determine whether the stock price increase from the IPO to the end of the first day of trading was caused by the alleged misstatement.  As Mr. Coffman testified in his deposition, he did not estimate abnormal returns for June 11, 2021 in any of his event study analyses.[25]  Furthermore, he also did not review news on that date to see if any additional news, outside the day the stock first traded, could possibly drive the price increase on June 11, 2021.[26]

19.     In addition, as I stated in my Initial Report, it is not possible to directly examine TaskUs's stock price reaction to the alleged misstatement at the time it was first disclosed.  For a publicly traded stock, the most straightforward way to examine whether new information affected the stock price is to examine a company's stock price return following the disclosure of such new information.[27]  However, TaskUs announced its intention to go public on April 12, 2021, and on the same day, its preliminary registration statement was made publicly available.  This statement included the alleged misstatement concerning "low attrition."[28]  Therefore, the alleged misstatement was made public at least two months prior to the first day TaskUs's shares were publicly traded.  As such, one cannot use the usual event study framework (assuming an

---

[25] Coffman Deposition Vol. II, 154:16-155:4, 157:16-21 ("Q: When we met previously in this case, we discussed June 11, and you confirmed that you did not include in your event study June 11 as a date because it was the – because you didn't have a – you didn't have a prior close. A: Well I think you're referring to is the spreadsheet I produced as part of the event study analysis. And in that particular sheet, I didn't construct a return from the IPO price to the first day's trading price, if that's what you mean. But I was certainly aware there was an increase from the IPO price to the closing price on the first day. […]  Q: Okay, and for none of these alternative runs do I see the 11th of June 2021 as a date. Correct? A: Correct. That was a date that was not included as a – as a date – a date on which I considered a return for these event studies.")

[26] Coffman Deposition Vol. II 149:15 -150:24 ("Q: Are you aware of any news that came out during the trading hours of June 11, 2021, that caused the stock to climb from an open of 27.55 to a close of 31.09? A: I have not formed any opinion about that… A: Again, while that information might be reflected in my backup materials, because we did do news searches and things like that, I didn't study that specific issue… But I didn't seek to ascertain exactly what events occurred after the opening on that day.")

[27] Deal Report, ¶ 61.

[28] Deal Report, ¶ 61.

10

efficient market) to examine TaskUs's stock price reaction to the alleged misstatement to measure any potential front-end price impact. Moreover, as discussed in my deposition, because there is no new information on the first day of trading regarding attrition, none of the price increase on the first day of trading can be attributed to the alleged misstatement.[29] This conclusion is consistent with and supported by my review of the 24 news articles about TaskUs published from June 11, 2021 to June 15, 2021, two business days following the first day of trading. Not one of these articles mentions attrition or the alleged misstatement.[30] Moreover, no analyst reports were released during this time period. Therefore, contrary to Mr. Coffman's unsupported conjecture, there is no evidence of information released to the market that supports that the observed increase in TaskUs's stock price on June 11, 2021 was due to the alleged misstatement.

20.    If the fact pattern of this case were different, and the alleged misstatement had occurred subsequent to the initial trading day, then an event study analysis might be possible. But that is not the fact pattern here, and thus it is not possible to analyze front-end price impact by examining the stock price reaction following the IPO because the alleged misstatement had been part of the public information set for many months by that point. Furthermore,  my review

---

[29] As I discussed in my deposition, the change in price on June 11, 2021 from the IPO price could not be attributed to the April 12, 2021 alleged misstatement "[b]ecause it was already what I, quote, unquote, baked into the information set from the very beginning of trading. So in order to study a price effect on the front end, you have to have a revelation of new information and an observed change in a stock price… But if you don't have new information, you know, you don't expect to see any change because it's already – it's just baked into the information set that goes into the stock price." Remote Proceedings of Videotaped Deposition of Bruce Deal, *Humberto Lozada and Oklahoma Firefighters Pension and Retirement System, v. TaskUs, et al.*, No. 1:22-cv-01479-JPC, United States District Court for the Southern District of New York, August 15, 2024 ("Deal Deposition"), 124:10-21. *See also* **Appendix B**.

[30] Specifically, I reviewed the 24 articles related to TaskUs that were published from June 11, 2021 to June 15, 2021 in Factiva as result of my replication of Mr. Coffman's Factiva searches. *See* Deal Report, Note 152, Appendix B.

11

of market commentary during the Proposed Class Period demonstrated that there was no front-end price impact.[31]

## B.    Contrary to Mr. Coffman's Opinion, The Alleged Misstatement Is General and Vague

21.    Mr. Coffman criticizes my description of the alleged misstatement, which I described as vague and general.  Specifically, he states that I did not "offer any specific economic definition of what constitutes a 'general' statement or any economic analysis to characterize the alleged misstatement as such"[32] and claims that "from the point of view of a financial economist, an alleged misstatement that masked the true nature of TaskUs's culture, attrition, and claimed advantage over its ['BPO'] peers, which served as a key differentiator driving a premium valuation for the Company, is not a 'general' statement as I understand what that word connotates."[33]  He goes on to say that "the alleged misstatement that TaskUs had a superior 'culture' and 'advantage' of 'low attrition' provided investors with meaningful information that related to a key business metric, which Plaintiffs claim elevated TaskUs above its BPO peers, and drove a premium valuation for the Company."[34]  Mr. Coffman further reports that the alleged corrective disclosure via the Spruce Report specifically noted that "'TASK's claim of a superior corporate culture evidenced by below industry standard workforce attrition appear to be highly exaggerated,' which has a direct relationship with the alleged

---

[31] *See* Deal Report, ¶¶ 60-70

[32] Coffman Reply Report, ¶ 27.

[33] Coffman Reply Report, ¶ 28.

[34] Coffman Reply Report, ¶ 30.

12

misstatement."[35]  Mr. Coffman's analysis of the alleged misstatement does nothing to change my opinion that the alleged misstatement is vague and general.

22.     As I described in my Initial Report, while the alleged misstatement references "metrics" of efficiency, client satisfaction, and attrition (of which only attrition is relevant for this matter), it does not specify any precise numerical metric which an analyst could use to determine whether attrition at TaskUs is materially different than others in the market.[36]  Nor does it provide a benchmark against which "low attrition" is measured.[37]  Ultimately, the value of any stock is the discounted present value of future cash flows, which relies in part on the profitability of the company.  As Mr. Coffman described in his deposition, "the primary reason an investor would look at attrition is to evaluate the expected profitability of the company."[38]  Because there is no numerical or similar reference which analysts or investors could use to ground their understanding of TaskUs's attrition and its potential effect on future profitability, the interpretation of the statement itself is "subjective and could vary from person to person."[39]

23.     Additionally, other companies in TaskUs's industry made similar general, vague disclosures without references to precise measures or benchmarks that could be used for evaluation.  For example, TELUS disclosed in its SEC filings that "We believe our caring culture

---

[35] Coffman Reply Report, ¶ 30.  I address this criticism directly in **Section III.C** of this report.

[36] Mr. Coffman concedes that the alleged misstatement is less specific than providing numbers. In his deposition he states the following. ("Q: You would agree with me that referring to the words 'low attrition' are less specific than referring to specific statistics regarding attrition? A. Well, to the extent it's not providing an exact number, yes.") Coffman Deposition Vol. II, 172:16-173:1.

[37] Deal Report, ¶ 21.

[38] Coffman Deposition Vol. II, 223:20-224:4.

[39] Deal Report, ¶ 21.

drives higher team member engagement, which leads to lower team member attrition."[40] Similarly, TDCX disclosed in its SEC filings that "Our content moderation teams are immersed in a positive work culture and have a supportive environment focused on their health, wellbeing and resiliency, including having access to dedicated mental wellness professionals who are located onsite in our offices.  This helps ensure a higher level of employee engagement and lower levels of attrition as we remain focused on ensuring the wellbeing of our employees."[41] Given that each of these BPO companies along with TaskUs provides vague references to having low attrition, this further shows that investors would require more context, such as a metric like the Disclosed Attrition Rates, to objectively evaluate whether any of the three companies has an advantage over its BPO peer in terms of "low attrition."

24.    Furthermore, Mr. Coffman fails to explain why investors would focus on the alleged misstatement concerning "low attrition" rather than the Disclosed Attrition Rates.  As I discussed throughout my Initial Report, the framework of this case is interesting and somewhat unusual.  The question is not whether analysts or investors would have any interest in the level of employee attrition.  Via the Disclosed Attrition Rates, which was a specific, measurable metric, the company provided information that investors could evaluate and compare to other companies who reported similar measures (which several did) or compare to TaskUs itself over time.  This information, which may well have been of interest and was referenced by numerous analysts, is not at-issue.  The only question is whether the *additional* vague, general alleged misstatement

---

[40] TELUS International (Cda) Inc., "Form 20-F," February 23, 2021, available at
https://www.sec.gov/Archives/edgar/data/1825155/000110465921026450/0001104659-21-026450-index.html, p. 139.

[41] TDCX Inc., "Form F-1," September 7, 2021, available at
https://www.sec.gov/Archives/edgar/data/1803112/000119312521266469/0001193125-21-266469-index.html, p. 140.

provided *additional* value relevant information.  Mr. Coffman does not describe how such vague statements regarding "low attrition" would be used to distinguish TaskUs against another company.  In fact, in his testimony, Mr. Coffman concedes that he "[does] not know how to characterize 'low attrition' independent of context" and that low attrition "may be different in different contexts for different firms."[42]  Mr. Coffman's own inability to define an objective interpretation of "low attrition" underscores my point.  Investors need further context and evidence when making their determination of what constitutes low attrition, of which the Disclosed Attrition Rates provide.

25.    The Disclosed Attrition Rates present a real number and, as I showed in my Initial Report, numerous other BPO firms provide similar measures of attrition.[43]  Additionally, as I discuss below in **Section III.G** and in my Initial Report, market commentary during the Proposed Class Period focused on this metric when referencing attrition.  This distinction between the not-misleading Disclosed Attrition Rates (the specific rates) and the alleged misstatement (vague and general) is central to the case. Despite this fact, Mr. Coffman makes no distinction in the Coffman Reply Report between discussion of the alleged misstatement and the Disclosed Attrition Rates.

### C.    Contrary to Mr. Coffman's Opinion, the Spruce Report Does Not Correct the Alleged Misstatement

26.    Mr. Coffman claims that there is a causal connection between the alleged corrective disclosure (the Spruce Report) and the alleged misstatement.  He states that because

---

[42] Coffman Deposition Vol. II, 173:13-174:6 ("Q What does 'low attrition' mean? … A. Well the way I – I don't know how to characterize 'low attrition' independent of context. But certainly here, the context is they're saying it's sufficiently low that it gives them an advantage in their markets. Q: What number would be a low attrition number?… A: That may be different in different contexts for different firms.").

[43] Deal Report, ¶ 30.

"it is undisputed that the Spruce Report contained issues related to TaskUs's attrition rate"[44] and because a quote in the Executive Summary of the Spruce Report states "TASK's claim of a **superior corporate culture** evidenced by below industry standard workforce attrition appear to be **highly exaggerated**, "[45] [emphasis in Coffman Reply Report], "it is economically reasonable to conclude that the Spruce Report reflects new information contradicting the Company's claim of a 'culture' that gave TaskUs an 'advantage' of 'low attrition.'"[46]  I disagree.  Mr. Coffman fails to conduct any analysis of what is "economically reasonable."  Additionally, as discussed in my Initial Report and summarized below, the underlying analysis in the Spruce Report did not provide new information to the market about TaskUs's attrition.

27.    As an initial matter, in discussing my review of the Spruce Report, Mr. Coffman claims that I did not examine Spruce Report's statement that "TASK's claim of a superior corporate culture evidenced by below industry standard workforce attrition appear to be highly exaggerated."[47]  This is false.  The statement that Mr. Coffman focuses on is one of 62 bullets within the Spruce Report's six-page "Executive Summary" section.  This section is in turn meant to briefly summarize the findings from the primary analysis conducted in the remaining 67 pages of the report.  An Executive Summary by its very nature is simply an initial framing of an opinion or finding, with the actual analysis and findings found later in the report.[48]  As I stated in my deposition, I read the Spruce Report many times, including the Executive Summary, and this

---

[44] Coffman Reply Report, ¶ 33.

[45] Coffman Reply Report, ¶ 33.  *See also* Spruce Report, p. 6.

[46] Coffman Reply Report, ¶ 33.

[47] Coffman Reply Report, ¶ 9.  *See also* Spruce Report, p. 6.

[48] Mr. Coffman is familiar with this construction, as this is how he uses his "Summary of Opinions" section in the Coffman Reply Report.  He testified that the Summary of Opinions in the Coffman Reply Report is "just to provide a summary of opinions I'm offering in response to Mr. Deal's Report" and that the "bases for these overall opinions are provided throughout the report."  *See* Coffman Deposition Vol. II, 153:16-154:14.

bullet in the Spruce Report is a "high level reference to the more detailed analysis" of the three pages I reviewed in Figures 1, 3, and 4 of my Initial Report.[49]

28.    Standing alone, the summary statement contains no factual information for which an analysis would be feasible and therefore it cannot be corrective.  Mr. Coffman agrees with me on this latter point. In his testimony, when asked whether the beliefs of a third party are corrective, Mr. Coffman stated that they "certainly can be, **if** they're supported by evidence… or provide the market some information to support that belief, yes."[50] [emphasis added]  In other words, to assess whether the statements expressed in the Executive Summary of the Spruce Report are corrective, one would need to review the evidence supporting those statements. While Mr. Coffman did not do this in the Coffman Reply Report, based on my review of the actual multi-page underlying analysis and information in the Spruce Report, I found that the Spruce Report's attrition-related conclusions (1) were based on public information; (2) discussed industry practices concerning how attrition is reported rather than TaskUs-specific practices; and (3) were focused on the Disclosed Attrition Rates rather than the vague alleged misstatement concerning "low attrition."

29.    As discussed in my Initial Report, if the market were efficient – as Mr. Coffman claims it is – restating publicly-known information would not affect a company's stock price because information is quickly incorporated into the price.[51]  Mr. Coffman agrees with this

---

[49] Deal Deposition, 251:11-253:4.  *See also* **Appendix B**.

[50] *See* Coffman Deposition Vol. II, 163:2-16.

[51] Deal Report, ¶ 19.

definition of market efficiency.[52]  As such, two conditions have to be met for the information to lead to a corrective price decline: (1) the information is *correcting* the alleged misstatement, and (2) the information revealed is *new and value relevant* to the market.  Mr. Coffman also agrees with this.[53]  Mr. Coffman's statement of the "causal connection between the alleged misstatement and the alleged corrective disclosure"[54] broadly asserts the contents of the Spruce Report as new to the market but fails to put forth any analysis outside the fact that there was a stock price decline on January 20, 2022 as to why that is the case.[55]  As detailed thoroughly in my Initial Report, each of the attrition-related disclosures in the Spruce Report is based on information available in the market or is a general critique of the industry and does not correct the alleged misstatement.

30.     Attrition-Related Issue #1 in the Spruce Report does not correct the alleged misstatement on low attrition because (1) the overall industry level of attrition that the Spruce Report cites to is only for the Asia Pacific Region, whereas TaskUs operates globally;[56] (2) the question posed by Spruce Report to an alleged Former TaskUs Executive references the

---

[52] Deposition of Chad Coffman, *Humberto Lozada and Oklahoma Firefighters Pension and Retirement System, v. TaskUs, et al.*, No. 1:22-cv-01479-JPC, United States District Court for the Southern District of New York, June 20, 2024 ("Coffman Deposition Vol. I"), 33:10-19 ("A:… I analyze this in the context of whether or not TaskUS securities conformed with semi-strong efficiency…that all widely distributed – widely disseminated public information is incorporated into the market price of the stock – or the security rapidly.").

[53] Coffman Deposition Vol. II, 207:1-11. ("A. No. The purpose of my analysis was to respond to Mr. Deal's opinion that there wasn't evidence of price impact and that there wasn't—on the backend. And to do so my analysis was to evaluate whether the evidence – the economic evidence was consistent with that. In order to reach a conclusion about that, **I needed to evaluate whether there was potentially new value-relevant information that was part of the corrected disclosure**.") [emphasis added].

[54] Coffman Reply Report, § III.C.

[55] As described in my deposition, I do not dispute that there was a statistically significant price decline on January 20, 2022. *See* Deal Deposition, 130:23-131:8.  *See also* **Appendix B**.

[56] Deal Report, ¶ 27.

Disclosed Attrition Rates, rather than the alleged misstatement;[57] (3) the alleged Former TaskUs Executive does not provide any TaskUs-specific information about low attrition but instead points to the general industry practice of introducing various qualifications when reporting attrition;[58] and (4) TaskUs's practice of reporting attrition in the form of the Disclosed Attrition Rates was publicly known as BPO peers reported essentially the same metrics.[59]  This is also consistent with analyst commentary I present in my Initial Report.[60]

31.    The other two Attrition-Related Issues in the Spruce Report are based on information that was publicly disclosed by either TaskUs or another BPO company prior to the Spruce Report and do not directly contradict any general statement on "low attrition."[61] Attrition-Related Issue # 2, in the Spruce Report's discussion of TaskUs's Disclosed Attrition Rates, points to three publicly available sources that any interested investor would have access to before the publication of the Spruce Report.  Attrition-Related Issue #3 provides a straightforward alternative calculation of attrition that is also based on publicly available information disclosed before January 20, 2022.[62]  As such, as I illustrated in my Initial Report, when reviewing the analysis done in the Spruce Report related to attrition it is clear that the

---

[57] Deal Report, ¶ 28.

[58] Deal Report, ¶ 29.

[59] Deal Report, ¶¶ 30-32, Figure 2.

[60] Deal Report, ¶ 31.

[61] Deal Report, ¶¶ 33-34.

[62] Deal Report, ¶¶ 35-38.  The court also recognized that this calculation "rel[ied] on publicly available and straightforward information in a publicly filed draft prospectus concerning the total number of hires in 2019. Disclosure of that information in the Spruce Report, standing alone, is insufficient to plead loss causation."  *See* Opinion and Order, *Humberto Lozada and Oklahoma Firefighters Pension and Retirement System, v. TaskUs, et al.*, No. 1:22-cv-01479- JPC, United States District Court for the Southern District of New York, January 5, 2024 ("Motion to Dismiss Order"), p. 57.

Spruce Report did not correct the alleged misstatement and therefore there is no back-end price impact.

**D.    Contrary to Mr. Coffman's Opinion, Market Commentary Following the Spruce Report Does Not Show Evidence of Price Impact**

32.    When discussing my analysis of market commentary following the Spruce Report, Mr. Coffman points to quotes he claims, "clearly state the value of attrition information in the Spruce Report."[63] He then goes on to state that "investors did indeed react to the Spruce Report, and specifically mentioned the attrition claims as one of the notable issues from the Spruce Report."[64] In reaching this opinion, he references quotes from two analyst reports issued soon after the Spruce Report[65] and two Factiva news articles released soon after the Spruce Report.[66] In addition, he claims there is support for price impact by referencing the importance that analyst reports put on attrition and culture in the 18 post-Spruce Report analyst reports and the analyst reports released over the Proposed Class Period.[67] Finally, Mr. Coffman argues that analyst reports are potentially biased and therefore my "narro[w] focus[] on analyst reports" does not constitute an evaluation of the "the most relevant and sound test of price impact."[68] Mr. Coffman is incorrect in his evaluation of market commentary.

---

[63] Coffman Reply Report, ¶ 38.

[64] Coffman Reply Report, ¶ 41.

[65] "TaskUs, Inc. (TASK): Short Report Creates Big Pullback; We Like the Stock," *Baird*, January 20, 2022; "TaskUs: Our Detailed Views on Recent Concerns," *J.P. Morgan*, January 25, 2022. *See also* **Appendix B**.

[66] "Why are TaskUs Shares Trading Lower Today?" *Benzinga.com*, January 20, 2022; "$26.70 per Share. Spruce Point Finds Evidence that CEO and Co-Founder Bryce…" *TheFlyonTheWall.com*, January 20, 2022.

[67] Coffman Reply Report, ¶¶ 43-47. I address Mr. Coffman's discussion of analyst reports published during the Proposed Class Period in **Section III.G.** of this report.

[68] Coffman Reply Report, ¶ 53.

> *i.* ***Analyst Reports and News Commentary Released Following the Spruce Report***

33.    As discussed in my Initial Report, market commentary demonstrates that the actual attrition-related information from the Spruce Report was not new or value relevant.  The analyst reports that Mr. Coffman cites to as evidence that the market found the "Spruce Report's claims **new** and value relevant"[69] [emphasis added] illustrate this, the opposite point Mr. Coffman is trying to make.  For example, the January 20, 2022 Baird Report, the first of the two analyst reports Mr. Coffman cites, describes TaskUs's attrition discussion as "well-known," stating the following:

> We like TASK a lot on the near 10% pullback today triggered by a short report. The items raised like client concentration, **attrition**, free cash flow generation (weak due to fast growth) **are all well-known**…**Several items are quite well known** -- Facebook has been ~27% of revenue, FCF dynamics are weak due to fast growth (ramping receivables), **attrition may be high and can be hard to calculate (which is true across the industry)**.[70] [emphasis added]

34.    Similarly, the January 25, 2022 J.P. Morgan Report, the second analyst report he cites, states that "We dug deeper into various concerns highlighted in the [Spruce Report], and believe the stock weakness seems overdone as **headwinds aren't necessarily incremental to our prior views**."[71] [emphasis added]  Additionally, as I discussed in my Initial Report, the J.P. Morgan report focused on Disclosed Attrition Rates and pointed out that the Disclosed Attrition Rates are consistent with how attrition is reported in the industry.[72]  Thus, both of the reports cited by Mr. Coffman emphasize and/or discuss that the attrition-related information is "well-

---

[69] Coffman Reply Report, ¶ 37.

[70] "TaskUs, Inc. (TASK): Short Report Creates Big Pullback; We Like the Stock," *Baird*, January 20, 2022. *See also* Coffman Reply Report, ¶ 38; **Appendix B**.

[71] "TaskUs: Our Detailed Views on Recent Concerns," *J.P. Morgan*, January 25, 2022.

[72] *See* Deal Report, ¶ 42-43.

known" and consistent with industry practices, and they *do not* state that the Spruce Report corrects, modifies, or renders inaccurate the alleged misstatement.

35.    In addition to the analyst reports, Mr. Coffman argues that two news releases show that the market reacted to the Spruce Report's attrition-related discussion.  These both refer to aspects of the Spruce Report that I showed above do not correct the alleged misstatement.  The January 20, 2022 Benzinga.com article that Mr. Coffman cites states, "Spruce highlighted poor financial reporting, including the omission of annual contract value during the IPO process and the use of a **non-standard definition of annual employee attrition rate, possibly understating the actual turnover**,"[73][emphasis added]  This article's references to a "non-standard definition of annual employee attrition rate"  refers to the Attrition-Related Issue # 2 in the Spruce Report.

36.    The second article, which I also discussed in my Initial Report, the flyonthewall.com article from January 20, 2022, states the following on attrition, "Spruce Point says: '… we estimate TaskUs' 2019 annual attrition rate was 46%. In subsequent investor communications, TaskUs has referred to 'net' employee additions, which make it impossible to estimate TaskUs' true attrition rate."[74]  The article's mention of a "2019 annual attrition rate" of "46%" pertains to the Attrition-Related Issue # 3 in the Spruce Report.  As I discussed in my Initial Report and above, these issues were publicly known.  Therefore, these references in a news article simply repeating what was already public information cannot be understood to be new, value relevant information.

---

[73] "Why are TaskUs Shares Trading Lower Today?" *Benzinga.com*, January 20, 2022.

[74] "$26.70 per Share. Spruce Point Finds Evidence that CEO and Co-Founder Bryce…" *TheFlyonTheWall.com*, January 20, 2022.

37.     Additionally, Mr. Coffman claims that analysts' discussion of attrition and culture following the Spruce Report provide evidence of price impact.[75]  Neither in my Initial Report nor in my deposition testimony do I state that culture and/or attrition are not important to a BPO firm, nor was that necessary to reach my conclusion.  As I discussed earlier, because this case involves two different types of attrition statements, one that is not being disputed (the Disclosed Attrition Rates) and one that is (the alleged misstatement), one must carefully analyze any references to attrition to understand the context of what is being discussed.  What the market commentary following the Spruce Report shows, is that the attrition-related discussion within the Spruce Report was not viewed as new or value-relevant.

38.     As I discuss in my Initial Report, of the 18 analysts reports published after the Spruce Report's release:

- Only six discuss the Spruce Report at all.[76]

    o   Two of the six (those quoted above) actually reference the attrition-related discussion within the Spruce Report.[77]

    o   The remaining four of the six discuss the Spruce Report and also discuss some elements of attrition, but do not connect the two topics or make any connection that the Spruce Report provided new or value relevant information related to the alleged misstatement.[78]

---

[75] Coffman Reply Report, ¶¶ 43-44.  I understand that the Court stated that "prior parts of that third statement reference the company's 'culture and focus on people,' which would arguably be non-actionable puffery standing alone… but the statement concludes with the more concrete assertion that the company has 'low attrition.'" Motion To Dismiss Order, pp. 25-26.

[76] Deal Report, ¶ 41. Mr. Coffman does not disagree or identify any additional analyst reports that discuss the Spruce Report during this time.  *See* Coffman Deposition Vol. II, 184:3-15 ("Q. You don't dispute Mr. Deal's conclusion that only 6 of the 18 analyst reports he reviewed mentioned Spruce?  A I don't dispute that there are 6 analyst reports that discuss the Spruce Report. […]  Q. Do you there were more than 6 of the 18?  A. No, not that I am aware of.")

[77] Deal Report, ¶¶ 41-44.

[78] Deal Report, ¶ 45.

- The remaining 12 make no mention of the Spruce Report

  o Nine of the remaining 12 mention attrition, but only in the context of future risks, the Disclosed Attrition Rates, or TaskUs's future attrition.[79]

  o Three of the remaining 12 make no mention of attrition.[80]

39.     As such, despite the fact that attrition is sometimes mentioned and may be important to analysts, coverage of the Spruce Report is limited.  Additionally, none of the analyst reports discussed the attrition-related discussion from the Spruce Report as new, surprising, or different from other industry practices.  Furthermore, none of the 18 analyst reports mentioned the Spruce Report's Executive Summary statement discussed earlier that "TASK's claim of a superior corporate culture evidenced by below industry standard workforce attrition appear to be highly exaggerated."[81]

40.     Finally, Mr. Coffman argues that my point that analysts do not revise their evaluations of TaskUs's attrition is "unnecessary for establishing a price impact" and then points to one analyst who changed their target price evaluation as a potential counter to my claim.[82]  As an initial matter, my Initial Report described that analysts' evaluation of *attrition itself* did not

---

[79] Deal Report, ¶¶ 46.

[80] Deal Report, ¶ 46.

[81] In addition to the 18 analyst reports in the Deal Report, Goldman Sachs published two reports in the quarter following the Spruce Report.  These reports align with the conclusions I presented in the Deal Report. For instance, on January 23, 2022, Goldman Sachs stated the following on TaskUs's attrition: "We view healthy eNPS scores, improving attrition levels, and strong Glassdoor ratings compared to its peer group as positives as well with regard to employee satisfaction levels at the company."  *See* "TaskUs, Inc. (TASK): Strong Fundamental Profile at a Discount; Reiterating Buy Rating," *Goldman Sachs*, January 23, 2022.  In its March 1, 2022 report, Goldman Sachs wrote "TaskUs grew headcount approximately 70% y/y in the quarter which, with stable attrition rates, we expect will support strong growth ahead" and that "Voluntary attrition for the year was 15.3%, roughly in line with 15% in FY20."  *See* "TaskUs, Inc. (TASK): Solid Execution Drives Healthy Beat & Raise," *Goldman Sachs*, March 1, 2022.  *See also* **Appendix B**.

[82] Coffman Reply Report, ¶ 52.

change after the Spruce Report. [83]  This is particularly clear in the case of both BofA Global Research and RBC Capital Markets, who use nearly the same language when discussing TaskUs's attrition before and after the Spruce Report (for BofA Global Research the first analyst report after the Spruce Report was published on January 21, one day after the Spruce Report, and for RBC Capital Markets it was published on March 16, 2022, 55 days after the Spruce Report), [84]  As Mr. Coffman himself describes, analysts "largely focus on how newly-released information might change their valuation and forecasts of company's future cash flows to provide investment recommendations to their clients." [85]  Thus, analysts have an incentive to incorporate new and value relevant information to provide a strong and reliable product to their client.  As such, the fact that analysts did not update their discussion of attrition and in some cases used the same language in light of the Spruce Report shows that they did not the view the attrition-related discussion as "newly-released information [that] might change their valuation" of a company.

41.    Additionally, Mr. Coffman states that "I note that one analyst firm (Baird) significantly reduced its price target for TaskUs, from $74 to $45, on January 31, 2022, citing, in part, 'the recent pullback caused by short report.'  The report added that '[e]mployee attrition' and 'comments on recent short report' were '[i]nteresting items to look for' on the upcoming earnings call." [86]  However, Mr. Coffman wrongly attributes the target price change to be "in part" due to the Spruce Report.  When discussing the Spruce Report, Baird does not tie their valuation to it and in fact states "We **like** the stock into earnings given the recent pullback

---

[83] Deal Report, ¶ 47.

[84] *See* Deal Report, ¶ 48.

[85] Coffman Reply Report, ¶ 48.

[86] Coffman Reply Report, ¶ 52.

**caused by short report** and view valuation as attractive at ~18X 2023E EPS for likely 25%+

revenue growth over the next few years."[87] [emphasis added]  Baird's  actual discussion of their

target price methodology is not mentioned at all by Mr. Coffman, but is in fact described three

pages later, where Baird states the following:

> "Our new $45 price target reflects ~26X our 2023E EPS of $1.72. For
> perspective, the functional comps (TIXT/TEP/TTEC) all currently trade ~16-26X
> C2022E EPS while the growth comps (GLOB/EPAM/ DAVA) all trade ~42-55X
> C2022E EPS. In a year, we think TASK could trade in between these two groups.
> EV/EBITDA: Our price target also reflects ~20X our 2023E EBITDA. The
> functional comp (TIXT/TEP/ TTEC) currently averages ~13X C2022E EBITDA,
> and we think a year from now TASK could trade above the functional comps
> given the growth profile. The growth comp group (GLOB/EPAM/DAVA)
> currently average ~29-30X C2022E EBITDA.[88]

42.     As is clear from the statement above, *nowhere* in their description of their updated

target price do they tie any change in the target price to the Spruce Report, as Mr. Coffman

suggests, let alone the Spruce Report's attrition discussion.

43.     Similarly, Mr. Coffman attempts to tie the following quote as an example of Baird

tying the Spruce Report to attrition, "Interesting items to look for on the call: **Employee**

**attrition**/wage impact, Content Security growth opportunities, willingness of hyper-growth tech

clients to spend given recent valuation pullbacks, comments on recent **short report.**"[89]

[emphasis added]  However, in my Initial Report I explained why this statement does not tie the

---

[87] "TaskUs, Inc. (TASK): Q4 Earnings and Initial 2022 Guidance Preview," *Baird*, January 31, 2022, p. 1.  *See also*
**Appendix B**.

[88] "TaskUs, Inc. (TASK): Q4 Earnings and Initial 2022 Guidance Preview," *Baird*, January 31, 2022, p. 4.  *See also*
**Appendix B**.

[89] "TaskUs, Inc. (TASK): Q4 Earnings and Initial 2022 Guidance Preview," *Baird*, January 31, 2022, p. 1.  *See also*
**Appendix B**.

two together.  As I stated, "By listing attrition and the Spruce Report as separate items, Baird

makes no connection between the two topics."[90]

44.      In fact, Baird clearly was interested in attrition before and after the Spruce Report,

but its interest was in the Disclosed Attrition Rates. For example:

**Baird Discussion of Attrition Before the Spruce Report**

- **August 10, 2021:** "**Attrition:** Slight increase from 2020 levels (~14.9%), though remains well below 2019 levels (~26.6%)" and "**Attrition:** Saw slight increase in attrition from 2020 levels (~14.9%), though this remains well below 2019 levels (~26.6%)."[91] [emphasis in Baird report]

- **November 10, 2021:** "**Attrition:** Noted this remains well below the 2019 levels (~26.6%)."[92] [emphasis in Baird report]

**Baird Discussion of Attrition After the Spruce Report**

- **March 1, 2022:** "**Attrition:** Noted 15.3% attrition in Q4" and "**Attrition:** 15.3% in 2021 (up mildly from 14.9% in 2020)."[93] [emphasis in Baird report]

- **March 29, 2022:** "**Attrition:** 15.3% in 2021 (was 14.9% in 2020)."[94] [emphasis in Baird report]

45.      As such, Baird was interested in the specific numeric metric of the Disclosed

Attrition Rates both before and after the alleged corrective disclosure.  Therefore, the example

that Mr. Coffman cites here aligns with what I showed in my Initial Report, namely that (1)

analysts did not revise their evaluation of TaskUs's attrition following the release of the Spruce

Report, (2) they did not find the attrition-related discussions in the Spruce Report surprising or

---

[90] Deal Report, ¶ 45.

[91] "TaskUs, Inc. (TASK): Details on Q2 Results," *Baird*, August 10, 2021.

[92] "TaskUs, Inc. (TASK): Details on Q3 Results," *Baird*, November 10, 2021.

[93] "TaskUs, Inc. (TASK): Details on Q4 Results," *Baird*, March 1, 2022.  *See also* **Appendix B**.

[94] "TaskUs, Inc. (TASK): Hosted Meetings with Management," *Baird*, March 29, 2022.  *See also* **Appendix B**.

new information, and (3) when discussing attrition during the Proposed Class Period, analysts focused on the Disclosed Attrition Rates and other corroborating evidence, not the alleged misstatement.

> ii.    ***Mr. Coffman's Critique of My Use of Analyst Reports in Evaluating the Alleged Corrective Disclosure Is Flawed***

46.    Mr. Coffman criticizes the use of analyst report commentary following the Spruce Report to evaluate price impact. He argues that analyst reports "may be biased toward crediting the explanations of management and downplaying the impact of short seller reports" because of the "well-known tendency among analysts to avoid annoying the top management in the companies they cover."[95] Mr. Coffman's discussion regarding analysts has internal inconsistencies, in that on the one hand he states that analyst reports are a key part of a market efficiency test and that analyst reports support price impact, while at the same time implying that they are biased and not trustworthy. Even setting this inconsistency aside, in my professional experience it is routine to use analyst report commentary to help determine whether there is economic evidence that supports the notion that the alleged misstatement was value relevant. Similarly, as I highlighted in my Initial Report, the finance literature emphasizes the importance of analyst report coverage in shaping investors' beliefs of a company.[96] This is something Mr. Coffman acknowledged in his own testimony, stating that "analyst coverage is an important mechanism for disseminating information to the market."[97] Furthermore, Mr. Coffman in his

---

[95] Coffman Reply Report, ¶ 50.

[96] *See* Deal Report, ¶ 94,

[97] Deal Report, ¶ 94. *See also* Coffman Deposition Vol. I, 58:6-60:17.

own cause-and-effect analysis treated days in which an analyst report is published to be a potential news day.[98]

47.    Additionally, because analysts are generally employed by banks that do business with companies that analysts cover, there are regulations and guidelines in place to manage the risks of conflicts of interest.  As literature Mr. Coffman cites to in the Coffman Reply Report describes, "Analysts are expected to conform to individual firm and industry guidelines for the preparation and dissemination of [analyst] reports as well as to codes of professional conduct."[99] Furthermore, there exists "an extensive body of securities law and regulations and the supervision of the [Securities Exchange Commission ('SEC')] and the [Self-Regulatory Organizations], provides for [the] resolution"[100] of conflicts of interest between analysts and the companies they cover.  Finally, Mr. Coffman testifies that he "is not aware of any evidence that

---

[98] Mr. Coffman defines "Days with no news were days that had zero news articles to my knowledge via the Factiva database, and no analyst reports or SEC filings were issued." *See e.g.,* Coffman Reply Report, Exhibit 2.  I also note that in other matters, Mr. Coffman has used whether analysts comment on information as a signal of that information's value relevance to the market. *See e.g.,* " Expert Rebuttal Report of Chad Coffman, CFA, *Eric Weiner v. Tivity Health, Inc, et al.*, No. 3:17-cv-01469, United States District Court of Middle District of Tennessee, December 20, 2019,  ¶ 40 ("Dr. Gompers further asserts that that market knew of Optum Fitness Advantage through a July 10, 2017 blog post by Mercury Pharmacy Services . . . This news is not reflected in any analyst report or Factiva search. There is no evidence that this information was widely-available among the investment community or considered value relevant information to the many analysts covering the company."). *See also* Expert Rebuttal Report of Chad Coffman, CFA, *Mayuko Holwill v. AbbVie, Inc., et al.*, No: 1:18-cv-6790, United States District Court of the Northern District of Illinois, September 20, 2021, ¶ 16 ("Professor Lehn also points to a blog post from August 2013, a second *qui tam* complaint which was unsealed in March 2018, as well as a notice by the Department of Justice declining to intervene in the Suarez suit to support his contention that the alleged fraudulent information was known by the market in advance of the Corrective Disclosure Event.  None of these sources meet the criteria serious financial economists and investors or market participants look for in analyzing companies and the market overall…. Furthermore, any suggestion that the allegedly corrective information was already known to the market before the Corrective Disclosure Event is at odds with the statistically significant decline on September 18, 2018 and contemporaneous market commentary.  In fact, analysts clearly attributed the decline in AbbVie Common Stock on September 18, 2018 to the news of the CDI lawsuit.").

[99] Fernandez, Frank, "The Roles and Responsibilities of Securities Analysts," *Securities Industry Association Research Reports*, Vol. II, No. 7, August 22, 2001, p. 4.

[100] Fernandez, Frank, "The Roles and Responsibilities of Securities Analysts," *Securities Industry Association Research Reports,* Vol. II, No. 7, August 22, 2001, p. 8.

provides specific indication of [analysts] being biased," in this matter.[101]  As such, Mr.

Coffman's argument is speculative at best and ignores important regulations that banks and the

SEC put in place to minimize the role conflicts of interest may play in analyst coverage.  By

making this argument, Mr. Coffman tries to incorrectly downplay the value analyst report

coverage provides as both a strong indicator of investors' current beliefs on a company and as a

way to understand the value relevance of information released to the market.

### E. Contrary to Mr. Coffman's Opinion, Evidence from Discovery Does Not Support Price Impact

48.    Mr. Coffman claims that I "ignore[d] evidence from discovery that TaskUs's

culture and low attrition were important to investors and drove TaskUs's premium valuation and

differentiation from its BPO peers."[102]  He then goes on to discuss two presentations (pitch

decks) provided to TaskUs by underwriters in August 2020, almost 10 months before the IPO,

two "Testing the Waters" investor presentations made by TaskUs, one "roadshow script," and

one presentation made by Goldman Sachs summarizing investor feedback on April 1, 2021.[103]

He points to these as signs of the value that TaskUs, its underwriters, and (presumably) investors

assign to attrition and TaskUs's culture, and therefore to the alleged misstatement.[104]

49.    As I stated above in **Section III.D.i** I do not claim that culture and attrition are not

important for TaskUs or its investors.  Instead, I discuss that the alleged misstatement concerning

"low attrition" is vague and general and that the market focused on Disclosed Attrition Rates and

other information as a result.  As I show below, the evidence in discovery that Mr. Coffman

---

[101] Coffman Deposition Vol. II, 236:5-237:12.

[102] Coffman Reply Report, ¶ 55.

[103] Coffman Reply Report, ¶¶ 56-58.

[104] Coffman Reply Report, ¶¶ 56-58.

cites, rather than contradicting it, actually aligns with this conclusion. Additionally, Mr. Coffman omits important information within the documents.

### i.   *Presentations from TaskUs's Underwriters to TaskUs*

50.   Mr. Coffman states the following concerning presentations given by two underwriters (Bank of America and Goldman Sachs) who pitched their IPO services to TaskUS:

> For example, in presentations pitching their services for TaskUs's IPO, TaskUs's underwriters for the IPO emphasized TaskUs's purportedly differentiated culture and low attrition. Bank of America touted TaskUs's "**unique and differentiated culture**," noting TaskUs's "[u]nique people centric culture, driving employee loyalty and **managing attrition**." Goldman Sachs noted that "Culture Drives Outsized Performance and TaskUs is Well-Positioned," "Differentiated Companies Command a Premium," and TaskUs's "Focus on culture and employee quality of life" were among the factors "**Positioning TaskUs for a Premium Valuation."** [105] [emphasis in Coffman Reply Report]

51.   As an initial matter, these presentations appear to be an internal communication between underwriters and TaskUs. [106] As such, these presentations would, in my experience, not be accessible to investors, and I have seen no information that this situation is different. Therefore, any information conveyed in them would be irrelevant for showing the value relevance of the alleged misstatement because investors would not have a chance to incorporate them into their view of TaskUs.

52.   Additionally, Mr. Coffman cherry-picked the quotes from these presentations without revealing the full context within the presentation. For example, when discussing

---

[105] Coffman Reply Report, ¶ 56.

[106] Coffman described these presentations themselves as "presentations pitching [underwriter's] services for TaskUs's IPO." *See* Coffman Reply Report, ¶ 56.

TaskUs's "unique" and "differentiated" culture, Bank of America presented the following slide

in **Figure 1.**

**Figure 1: Slide 16 from Bank of America Discussing TaskUs's Culture[107] (Attrition References Boxed in Red)**

53.    **Figure 1** shows that Bank of America's view of TaskUs's "Unique, Differentiated

Culture" was not defined by vague statements such as the alleged misstatement, but rather other

---

[107] TASK_0038945-9012 ("BofA TaskUs Discussion Materials"), p. 22.

important specific evidence, such as the Disclosed Attrition Rates, TaskUs's employee Net

Provider Score (eNPS), [108] and its employee Referral Rate.

54.    Similarly, as is shown in **Figure 2** below, the Goldman Sachs presentation also

cites to, amongst other things, the Disclosed Attrition Rates, when discussing the quote that Mr.

Coffman highlights.

---

[108] According to TaskUs's IPO Prospectus, eNPS "refers to a percentage, expressed as a numerical value from -100 to 100, to gauge employee satisfaction based on our internal employee satisfaction survey, using the question 'How likely are you to recommend TaskUs to a friend or colleague?' on a 0 to 10 scale. Responses of nine or ten are considered 'promoters' and responses of six or less are considered 'detractors.'  The percentage of respondents who are detractors is subtracted from the percentage of respondents who are promoters, and the resulting percentage is the Employee Net Promoter Score. eNPS for a given period reflects all employee satisfaction survey responses received during that period."  *See* TaskUs, "Form 424B4," June 14, 2021, available at https://www.sec.gov/Archives/edgar/data/1829864/000119312521189507/0001193125-21-189507-index.html ("IPO Prospectus"), p. ii.

**Figure 2: Goldman Sachs Slide Discussing TaskUs's Premium Evaluation[109] (Attrition References Boxed in Red)**



55.     Despite the above evidence, Mr. Coffman fails to make the important distinction between the alleged misstatement and more specific metrics, such as the Disclosed Attrition Rate. As such, he is misguided in his claim that this presentation shows the *additional* value relevance of the alleged misstatement.

### ii.     *"Testing the Waters" Presentation # 1*

56.     In addition to the IPO pitch materials, Mr. Coffman highlights the first draft of a TaskUs investor presentation for "Testing the Waters" with potential investors. In the Coffman Reply Report, Mr. Coffman states, "Similarly, a draft TaskUs presentation … noted that

---

[109] Deal Deposition, Exhibit 4 ("Goldman Sachs TaskUs Discussion Materials"), p. 37.

TaskUs's '[u]nique employee centric model results in high employee satisfaction, **low attrition**, and **culture** alignment with clients,' amongst a list of TaskUs's 'Investment Highlights.'"[110] [emphasis in Coffman Reply Report]

57.    However, Mr. Coffman fails to point out that, on a following slide describing TaskUs's "Unique Employee-Centric Model," TaskUs provides more specific evidence to support its assertion of a strong culture and low attrition, as can be seen in **Figure 3**.  TaskUs's discussion of its "Unique Employee-Centric Model" not only includes discussion of qualitative evidence such as a "market-leading wellness program" and its "industry-leading employee referrals," but also cites to the quantitative evidence, such as an eNPS of 78, and its "23% Attrition rate for 2019 (vs. Industry Average of >35% for agents tenured >180 days."

---

[110] Coffman Reply Report, ¶ 57.

**Figure 3: "Testing the Waters" TaskUs Investor Presentation December 2020, Slide 21[111]**
**(Attrition References Boxed in Red)**



### iii.    *"Testing the Waters" Presentation # 2*

58.    Mr. Coffman also references that a "later version of a similar presentation stated that TaskUs had '**low attrition helping us drive better margins**.'"[112] [emphasis in Coffman Reply Report]  What Mr. Coffman fails to mention is that this reference to attrition is not contained within the slides themselves but is part of the slide notes.  Additionally, this statement is the only mention of attrition in the 76-page document.[113]  Furthermore, Mr. Coffman does not include the full quote in the slide notes showing that attrition was not the only relevant factor that TaskUs discussed, "Our unique business model results in better seat turns, low recruitment cost,

---

[111] Deal Deposition, Exhibit 6 ("Testing the Waters Presentation # 1"), p. 21.

[112] Coffman Reply Report, ¶ 57.

[113] *See* Deal Deposition, Exhibit 7 ("Testing the Waters Presentation # 2").

**low attrition helping us drive better margins**. [A]nd being completely cloud based helps us drive faster ramp."[114] [Mr. Coffman's Quote is emphasized]  Finally, when discussing TaskUs's "Employee-First Culture" that drives "Client Satisfaction," the presentation does *not* highlight attrition, but rather focuses on non-attrition measures such as its eNPS of 61 (>4.0x the average organization) and its  client Net Promoter Score ("cNPS") of 67 (>2.5x the average IT service provider).[115]  The focus on eNPS is consistent with what TaskUs describes in its IPO Prospectus, where it states that its "**primary culture-related goal metric** is eNPS, the single most important barometer we use to measure employee engagement."[116] [emphasis added]  Again, Mr. Coffman conflates any discussion of attrition and/or culture to showing that the vague alleged misstatement concerning "low attrition" is value relevant.  As is evident in both of these investor presentations, TaskUs presented more specific evidence to illustrate the value of its culture and attrition, rather than making a standalone vague statement.

### iv.    *Roadshow Script*

59.    Mr. Coffman then discusses a "draft script for TaskUs's IPO roadshow presentation," as evidence that TaskUs and investors valued low attrition and TaskUs's culture. However, Mr. Coffman cherry-picks the quotes he uses from this document without providing the full context within them.

60.    Specifically, Mr. Coffman stated, "a draft script for TaskUs's IPO roadshow presentation included statements that TaskUs's '[Roadshow Quote # 1] low attrition [was] helping us drive better margins,' and that TaskUs's '[Roadshow Quote # 2] culture' was 'so

---

[114] Testing the Waters Presentation # 2, p. 71.  *See also* Coffman Reply Report, ¶ 57.

[115] Testing The Waters Presentation # 2, pp. 20-21.

[116] IPO Prospectus, pp. 13, 146.

closely aligned with the culture of our disrupter clientele' that it 'absolutely helps us win new business.'"[117]

61.    Mr. Coffman attempts in his description above to connect these two quotes, without providing proper context.  First, the Roadshow Quote # 2 in its entirety states the following: "Our sites are a physical manifestation of our **culture, which is so closely aligned with the culture of our disruptor clientele,** so **yes, it absolutely helps us win new business,** but its main purpose is to attract the top talent that is required to deliver our sophisticated services."[118] [Mr. Coffman's Quote is emphasized]  As is evident with the full quote, attrition is not mentioned at all in the context of culture here.  The focus of the quote is instead on TaskUs's individual physical employment sites.  In fact, Roadshow Quote # 1 is the first mention of attrition in the script and appears 12 pages later in the document.[119]  Instead, TaskUs chooses to, within the same segment in the script, emphasize its "internal barometer to measure culture" of eNPS, and its cNPS as measures of its culture, rather than attrition.[120]

### v.    *Project Sandy Desk April 1, 2021 Presentation*

62.    Finally, Mr. Coffman cites to a presentation given to TaskUs by Goldman Sachs that reflected investor feedback following the "Testing the Waters" presentations.  In describing this presentation, Mr. Coffman says the following:

> This messaging resonated with potential investors. On April 1, 2021, Goldman Sachs provided Defendants Maddock, Weir, and Sekar, among others, with a presentation summarizing feedback from potential investors who had participated in [Testing the Waters] meetings. █████████████████████████████████
> █████████████████████████████████

---

[117] Coffman Reply Report, ¶ 57.

[118] TASK_0016576-614, at 0016585.

[119] TASK_0016576-614, at 0016597.

[120] TASK_0016576-614, at 0016585-586.



[121]

63.     As an initial matter, Mr. Coffman omits the fact these are only two of many comments that investors made when providing feedback to TaskUs.  The two comments Mr. Coffman references are from two of eight investors, and are only two of 32 "positive" bullets that investors discussed when providing detailed feedback.[122]  As such, Mr. Coffman attempts to overstate the value that investors put on vague statements of attrition.  Putting this aside, Mr. Coffman fails to acknowledge that, in these statements, █████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████.  As discussed above, evidence within the discovery material points to the fact that TaskUs provided more concrete evidence and numbers, such as the Disclosed Attrition Rates, when discussing its culture and attrition.  These numbers, not any vague statement of "low attrition," are what investors deemed value relevant in their feedback.

64.     Finally, Mr. Coffman in his testimony describes questions that investors asked in the "Consolidated Questions" section of the presentation as further evidence that investors were interested in attrition and by extension found the alleged misstatement value relevant.[123]  Setting aside the fact that Mr. Coffman did not present these quotes in the Coffman Reply Report, these

---

[121] Coffman Reply Report, ¶ 58.  *See also* Deal Deposition Exhibit 9 ("Investor Feedback Presentation"), pp. 19, 24.

[122] Investor Feedback Presentation, pp. 16-24.

[123] Coffman Deposition Vol. II, 282:1-285:5.

questions show that ██████████████████████████████████████

██████████    The four investors asked the following questions concerning attrition:



Thus, similar to during the Proposed Class Period, investors prior to the IPO valued additional

and concrete information on TaskUs's attrition, rather than viewing any vague descriptions of

"low attrition" like the alleged misstatement as value relevant on their own.

---

[124] Investor Feedback Presentation, p. 29.

[125] Investor Feedback Presentation, p. 31.

[126] Investor Feedback Presentation, p. 32.

[127] Investor Feedback Presentation, p. 33.

[128] *See e.g.*, "TaskUs: A Derivative Play on Tech Disruption; Initiate at Overweight," *J.P. Morgan*, July 6, 2021 ("Content moderation, which tasks team-members to ensure trust and safety standards of client content, represents ~25% of TASK's revenue and is growing at an above average rate. Such services could include identifying and removing violence, hate speech, bullying, misinformation etc.  We analogize this to police work, whereby TASK employees can be put in harm's way (e.g., mental trauma from exposure to objectionable content) or come under scrutiny from multiple stakeholders for not doing enough to safeguard users, the client, and/or TaskUs. Failure to execute could result in employee turnover, client loss, and/or reputation risk.").

**F.      Contrary to Mr. Coffman's Opinion, I Do Not Need to Affirmatively Demonstrate an Alternative Explanation to the Decline on January 20, 2022 Because I Showed it Was Not Caused by the Alleged Misstatement**

66.      Mr. Coffman states that I have failed to "demonstrate any alternative explanation for the statistically significant price decline at beyond the 99 % confidence level on January 20, 2022," and that I do "not go as far as providing an affirmative opinion on what actually did [cause the decline]."[129]  As I stated in my Initial Report, I was tasked with evaluating whether "TaskUs's stock price decline following the release of the Spruce Report was caused by information that corrected the alleged misstatement, in which TaskUs referenced 'low attrition.'"[130]  Therefore, I agree with Mr. Coffman that I did not provide an "affirmative opinion" on what specific news, which of the many allegations raised in the Spruce Report unrelated to the alleged misstatement, or simply the release of the Spruce Report absent the content in that report caused TaskUs's stock price decline on January 20, 2022.  However, this is irrelevant.  Consistent with my assignment, I demonstrated that the decline was *not caused* by the alleged misstatement.  I clearly discussed this issue in my Initial Report, where I also noted, for example, that research has found that the release of a short report can result in a decrease in the stock price of similar magnitudes to what occurred with TaskUs.[131]

---

[129] Coffman Reply Report, ¶ 61. Mr. Coffman concedes the possibility other factors may have at least partially explained the price decline on January 20, 2022. He testifies the following: "I'm not trying to say that the attrition issues are the only thing that was in the Spruce Point Report. Q. Or the only thing that might have contributed to a change in stock price [on January 20 2022]. Right? A: Correct, I am not in any way opining or suggesting there weren't other things in the Spruce report that may have contributed to the stock priced decline."  Coffman Deposition Vol. II, 199:5-15.

[130] Deal Report, ¶ 5.

[131] Deal Report, ¶¶ 53-54.

**G.     Contrary to Mr. Coffman's Opinion, Market Commentary During the Proposed Class Period Showed that Analysts Did Not Rely on the Alleged Misstatement When Discussing Attrition**

67.     Mr. Coffman takes issue with my analysis of the lack of price impact during the Proposed Class Period.  He claims that it is not necessary for the alleged misstatement to cause a price reaction when made before or during the Proposed Class Period as a whole, and that my classification of analyst reports is flawed.  As I describe below, Mr. Coffman is incorrect.

*i.     Price Impact During the Proposed Class Period*

68.     Mr. Coffman claims that, in a case where a misstatement merely maintains an already inflated stock price, "the only reliable way to evaluate price impact requires examining the change in price when the relevant truth is disclosed (as it occurred here in reaction to the Spruce Report.)"[132]  As an initial matter, if this were true, then I have already demonstrated a lack of price impact at the time of the alleged corrective disclosure, since I have shown in my Initial Report and above that the price drop following the release of the Spruce Report was not related to a correction of the alleged misstatement.

69.     As described above, it is not possible to test the stock price reaction when the initial alleged misstatement was made, well before the IPO occurred.  However, if an issue were material to investor decisions and valuation targets, one would expect to see discussions in analyst reports during the Proposed Class Period.  Mr. Coffman claims that analyst discussions of the value of attrition and culture during the Proposed Class Period also provide evidence of the price impact associated with the alleged misstatement.[133]  However, as I illustrated in my

---

[132] Coffman Reply Report, ¶ 69. Mr. Coffman testifies that price maintenance is when "by making the alleged false statement they did, defendants prevented the price from falling at that point, rather than causing the price to go up on that date as a result of the misrepresentation." *See* Coffman Deposition Vol. II, 167:4-168:10.

[133] Coffman Reply Report, ¶¶ 43-47.

Initial Report and discuss below, due to the general and vague nature of the alleged

misstatement, analysts did not rely on it when discussing TaskUs's attrition during the Proposed

Class Period.[134]  As such, there is no evidence of price impact during the Proposed Class Period.

70.     When discussing TaskUs during the Proposed Class Period, analysts referenced

the Disclosed Attrition Rates and other corroborating evidence to support their view of TaskUs's

attrition and culture.  As I state in my Initial Report:

- 26 of the 41 analyst reports during the Proposed Class Period made at least some reference to attrition.
    - 19 of these 26 reports discussed attrition in the context of the Disclosed Attrition Rates, a specific numeric metric that was not deemed to be misleading.[135]
    - Of the seven remaining analyst reports that discussed attrition, they only mention attrition as a future risk, which is unrelated to the alleged misstatement.[136]
- 15 of the 41 analyst reports do not discuss attrition.[137]

71.     Therefore, when analysts do focus on attrition, they base their opinions on the

more specific number of the Disclosed Attrition Rates, rather than the vague alleged

misstatement.  This is because the general term "low attrition" in the alleged misstatement

"lacked sufficient substance on its own and required concrete data to support any meaningful

---

[134] Deal Report, § V.

[135] Deal Report, ¶¶ 63-66, Exhibit 3, column entitled "1. Mentions the Disclosed Attrition Rates."

[136] *See* Deal Report, Exhibit 3, column entitled "3. Mentions evaluation of future attrition and risk."  Additionally, the December 13, 2021 Morgan Stanley report also discusses corroborative evidence to support their attrition-related discussion.  *See* "TaskUs, Inc.: Understood the TASK; Upgrade to Overweight," *Morgan Stanley*, December 13, 2021.

[137] Deal Report, ¶ 63.

analysis by the market."[138]  As such, there is no evidence of price impact during the Proposed

Class Period.[139]

### ii.    *Classifications of Analyst Reports*

72.     Mr. Coffman claims that "a number of sources selected by Mr. Deal include

language that resonates with the alleged misstatement made by the Company"[140] and points to

quotes from four analyst reports.[141]  Mr. Coffman fails to acknowledge that all the analyst

reports he cites to in Section IV of his report do not discuss the general and vague alleged

misstatement, but instead discuss the Disclosed Attrition Rates and other quantitative and

qualitative evidence when discussing TaskUs's culture and low attrition.  Therefore, as I made

clear in my Initial Report, these analysts "did not consider the alleged misstatement as a

standalone factor in their valuation of TaskUs's stock" and "the general and vague statement of

---

[138] Deal Report, ¶ 66.

[139] In addition to the 41 analyst reports examined in the Deal Report, Goldman Sachs published two reports during the Proposed Class Period.  These reports align with the conclusions I presented in the Deal Report. For example, in its July 6, 2021 initiation report, Goldman Sachs does not discuss TaskUs's attrition. *See* "TaskUs, Inc. (TASK): Growth Driven by Focus on Digital Economy, Initiate at Buy," *Goldman Sachs*, July 6, 2021. In its January 9, 2022 report discussing the initiation of several IT stocks, Goldman Sachs says the following concerning TaskUs's attrition, "**High employee satisfaction and lower attrition are positives**. For 2020, the company also had a strong Employee Net Promoter Score (eNPS) of 72, which measures employee satisfaction and loyalty, and healthy Client Net Promoter Score (cNPS) of 75, which measures client satisfaction. Voluntary attrition this year has been elevated from 2020 levels (14.9%), but significantly less than 2019 levels (26.6%) signaling that it is a preferred place to work,"[emphasis in original] clearly discussing the Disclosed Attrition Rates when mentioning attrition.  *See* "Americas Technology: IT Services: Initiation: Focusing on Beneficiaries of Tailwinds Ahead; Buy CTSH & TASK, Sell GIB; Upgrade TWKS to Buy," *Goldman Sachs*, January 9, 2022.

[140] Coffman Reply Report, ¶ 70.

[141] Mr. Coffman mentions that he found "at least **seven** analyst reports during the Class Period [that] noted the misstatement itself or used nearly identical language."[emphasis in Coffman Reply Report]  *See* Coffman Reply Report, ¶ 76.  Four of the seven are the analyst reports he quotes directly. The other three are the following RBC Capital Markets reports: *See* "Strong Upside in First Quarter as a Public Company," *RBC Capital Markets*, August 10, 2021.  *See also* "Strong Revenue Growth Continues," *RBC Capital Markets*, November 10, 2021; "Adjusting Revenue Growth Estimates," *RBC Capital Markets*, December 7, 2021; **Appendix B.**

metrics and 'low attrition' lacked sufficient substance on its own and required concrete data to support any meaningful analysis by the market."[142]   I discuss each below.

a.        *William Blair (July 6, 2021)*

73.    Mr. Coffman cherry-picks the following quote from the William Blair report:

"We believe that TaskUs's **employee-centric and start-up–like culture** has **tangible business value** driving higher attendance, more engaged employees, and **lower attrition**, and results in higher-quality work and customer satisfaction. Ultimately, we believe that TaskUs's start-up-like culture and desire to disrupt the status quo differentiate the company from other CX service providers and will enable TaskUs to capture market share over the long term."[143] [emphasis in Coffman Reply Report]

74.    However, Mr. Coffman omits the sentences prior to this, which points to the specific Disclosed Attrition Rate when reaching the conclusion that regarding attrition, and considers other factors that support TaskUs's culture:

"Focusing on its employee experiences **has rewarded TaskUs with high employee Net Promoter Scores (72 in 2020), being ranked 40th on Glassdoor's 2019 Best Places to work, and low voluntary attrition (12.7%).** Moreover, the company's Glassdoor rating, which currently stands at 4.7 stars, shows strong results across a variety of metrics, including culture and values, diversity and inclusion, senior management, and compensation and benefits."[144] [emphasis added]

75.    In other words, the analyst appears to be discussing the immediately above-mentioned Disclosed Attrition Rates when they describe TaskUs's attrition as "low."

b.        *Wells Fargo Securities (July 6, 2021)*

---

[142] Deal Report, ¶ 66.

[143] *See* Coffman Reply Report, ¶ 71. *See also* "Pure-Play Disrupting the CX Market; Initiating With an Outperform Rating," *William Blair*, July 6, 2021.  *See also* **Appendix B.**

[144] "Pure-Play Disrupting the CX Market; Initiating With an Outperform Rating," *William Blair*, July 6, 2021. *See also* Deal Report, Exhibit 3; **Appendix B.**

76.    Mr. Coffman again cherry-picks the following quote from the Wells Fargo

Securities report:

> "Managements' commitment to its front line workers across the globe, and the success they've had building and scaling their strong **culture** is reflected in some of the **industry's lowest levels of attrition** rates…"[145] [emphasis in Coffman Reply Report]

77.    Mr. Coffman selectively includes portions of the actual statement in the Wells

Fargo Securities report.  In fact, the three ellipses at the end of the statement rather than implying

that nothing else is relevant, instead are used as a replacement for the ongoing relevant

discussion.  As shown below, the statement used by Mr. Coffman relates to the Disclosed

Attrition Rate, which is not at-issue, along with other metrics and factors related to TaskUs's

culture.

> "TaskUs has been successful in the war for talent, thanks in large part to the company's fixation on providing a best in-class culture and employee experience. […] Management's commitment to its front line workers across the globe and the success they've had building and scaling their strong culture is reflected in some of the industry's lowest levels of attrition rates **(<15% voluntary attrition in 2020), one of the highest employee net promoter scores (eNPS was 72 in 2020), and one of the highest [G]lassdoor scores.**"[146] [emphasis added to illustrate the portion of the citation not included in Coffman Reply Report]

c.    *RBC Capital Markets (July 6, 2021)*

78.    Mr. Coffman again cherry-picks the following quote from the RBC Capital

Markets report:

> "TaskUs has achieved multiple certifications and compliance standards including SOC 2 Type 2, HIPAA, and PCI, which have helped in retaining talent and continuous improvement, while **providing an advantage on metrics of**

---

[145] *See* Coffman Reply Report, ¶ 72 . *See also* "TaskUs, Inc., (TASK): TASK:  Secular Play on Digitizing the Consumer Drives Strong Growth Profile; Initiating at Equal Weight Given Valuation," *Wells Fargo Securities*, July 6, 2021.  *See also* **Appendix B.**

[146] "TaskUs, Inc., (TASK): TASK: Secular Play on Digitizing the Consumer Drives Strong Growth Profile; Initiating at Equal Weight Given Valuation," *Wells Fargo Securities*, July 6, 2021. *See also* Deal Report, Exhibit 3; **Appendix B.**

**efficiency, client satisfaction, and low attrition.**"[147] [emphasis in Coffman Reply Report]

79.    As discussed in my Initial Report, while RBC Capital Markets made reference to the alleged misstatement, they *also* reference the Disclosed Attrition Rate, which reinforces that analysts did not rely solely on the alleged misstatement without also considering the specific numerical data.[148]  Specifically, the RBC Capital Markets report states (in multiple places):

> "We believe the company's focus on fostering employee culture has led to lower employee attrition, **as indicated by a voluntary attrition rate for those employed for over 180 days of 14.9%. We believe this is further evidenced by the high level of internal referrals, which drove 38% of new hires in 2020 and helped drive a 101% fill rate.**"[149] [emphasis added and indicates material not included in Mr. Coffman's quote]

80.    This statement was not only repeated in each of the remaining three RBC Capital Markets reports that Mr. Coffman claims "used nearly identical language" to the alleged misstatement,[150] the focus on TaskUs's Disclosed Attrition Rates is echoed by RBC Capital Markets in their February 28, 2022 report, published nearly 40 days *after* the Spruce Report.[151] The fact that RBC Capital Markets continued referencing the Disclosed Attrition Rates after the Spruce Report is strong evidence that the Spruce Report was not a corrective disclosure.

---

[147] Coffman Reply Report, ¶ 73.  *See also* "TaskUs, Inc.: Driving the Consumer Experience in the Digital Economy; Initiate at Outperform," *RBC Capital Markets*, July 6, 2021.  *See also* Deal Report, Exhibit 3; **Appendix B.**  Note, this statement is not included in any of the August 10, 2021, November 10, 2021, and December 7, 2021 RBC Capital Markets reports that Mr. Coffman claims "used nearly identical language" to the alleged misstatement.

[148] Deal Report, ¶ 64.

[149]  *See* "TaskUs, Inc.: Driving the Consumer Experience in the Digital Economy; Initiate at Outperform," *RBC Capital Markets*, July 6, 2021.  *See also* **Appendix B.**

[150] *See* "TaskUs, Inc.: Strong Upside in First Quarter as a Public Company," *RBC Capital Markets*, August 10, 2021. *See also* "TaskUs, Inc: Strong Revenue Growth Continues, *RBC Capital Markets*, November 10, 2021; "TaskUs, Inc.: Adjusting Revenue Growth Estimates," *RBC Capital Markets*, December 7, 2021;  *See also* Deal Report, Exhibit 3; Coffman Reply Report, Note 110; **Appendix B.**

[151] *See* "TaskUs, Inc.: Q4/21 Preview: Investors Looking for More Information on Revenue Growth Drivers," *RBC Capital Markets*, February 28, 2022.  *See also* **Appendix B.**

### d.    BTIG (July 8, 2021)

81.    Mr. Coffman once again selectively quotes from this analyst report, highlighting the following, "TaskUs' focus on **culture** has also led to … **low attrition relative to industry average**."[152] [emphasis in Coffman Reply Report]

82.    However, similar to an example above, the sentences prior to this, which was *not* quoted by Mr. Coffman, points to the specific Disclosed Attrition Rate when reaching its conclusion regarding attrition, and considers other factors that support TaskUs's culture:

> **TaskUs has effectively located its operations in second and third tier cities in many regions to control costs and avoid direct competition with larger BPOs. This has been critical to very high employee satisfaction scores (eNPS of 72 and <15% voluntary turnover**.) […] **In 2020, its employee net promoter score (eNPS) was 72, and 79% of employees who participated rated the company 9 or 10 on a scale of 10. Glassdoor ranked TaskUs number 40 on its 2019 Best Places to Work list among US employers with at least 1k employees.**… Alongside the customer acquisition benefits, TaskUs' focus on culture has also led to an increased ability to attract talent, as well as low attrition relative to industry average. As a result, TaskUs' team of tenured and engaged employees deliver better and more consistent results, minimizing employee cost and improving profitability."[153] [emphasis added and indicates material not included in Mr. Coffman's quote]

83.    Mr. Coffman claims that my categorization of the content of the analyst reports lack an "objective criteria."[154]  He bases this opinion on the emphasized words out of the full quote below from my Deposition Testimony:

> Q: Can you point me to anywhere in your report that describes criteria that you applied to determine whether an analyst's report mentions the alleged misstatement?
>
> A: I mean, I've not -- I don't think I can answer it any differently than I've answered it, which is, it's sort of -- it answers itself in that I've identified the alleged misstatement. I've reviewed -- I say I'm going to review the analysts' reports. The

---

[152] Coffman Reply Report, ¶ 74.

[153] "TaskUS, Inc. (TASK, Buy, $45 PT): Help Me, Help You. Initiation Coverage of TaskUs, Inc. with a Buy Rating and $45 Price Target," *BTIG*, July 8, 2021. *See also* Deal Report, Exhibit 3; **Appendix B.**

[154] Coffman Reply Report, ¶ 75.

results are very clear at what I'm doing. I can't – it's not even a sensible question to say, well, like, what are the micro things you need to look at? Did I need to find, you know, four letters of the five letters? I don't define it that way because it's not even that kind of an analysis. So there isn't kind of a, here's the instructions. It's a, you know, here's the statement. Let's review the analysts' reports. Do we see that statement, or, you know, again, the close approximation of that statement? And there's only one that even comes close and that's what I've identified. So it doesn't make sense to say, give me **the exact logic rules, if you will. It's not that kind of an analysis**.

Q: It's not that objective, in other words?

A: That's – no, I don't agree with that. I think it's quite objective. [155] [Mr. Coffman's Quote is emphasized]

84.     However, Mr. Coffman mischaracterizes my testimony as I also further expand on this point later in my deposition, stating:

> So I do think it's objective. I think it's clear from the categories themselves what it is I'm looking for. The actual categorization itself, I think, again, is – there's only one that even falls into this category. I think that one is self-evident. The other one -- any of the other statements don't. So I think you've got to consider the whole context of the analysis. It doesn't lend itself to something that would have had -- you seem to be thinking about it, like, there's got to be some, you know, logic rules if there's three words or four words. It's not that kind of a judgment. It's a categorization here. [156]

85.     As evidenced from the full context of my deposition testimony, I did an objective categorization of the analyst reports based on the whole context of the analyst report. I then also categorize these in clearly defined categories as is evidenced in Exhibit 3 of my Initial Report. Mr. Coffman appears to be looking for a hard logic rules on how "many words have to match" in order to define the analysis as objective. [157]  However, this would be an incorrect approach as it would lack the ability to assess the whole context of an analyst's discussion of attrition itself,

---

[155] Deal Deposition, 197:14-198:18.  *See also* **Appendix B.**

[156] Deal Deposition, 207:3-16.  *See also* **Appendix B.**

[157] *See e.g.* Deal Deposition, 201:7-17 ("A: ... The category's got to be in reference to the, you know, discussion of the metrics and low attrition.  That's what's at issue here, not the disclosed attrition rates. … Q: So how many words have to match the alleged misstatement to quality for Category 4? A. I've just discussed this. It's not a – it's not a, you've got to have – this is where you analyze the statement itself.").  *See also* **Appendix B**.

which often focus on Disclosed Attrition Rates and related information. Thus, Mr. Coffman's opinions do not lead me to change my classifications of analyst reports during the Proposed Class Period.

### H.    Contrary to Mr. Coffman's Opinion, I Showed that Mr. Coffman's Market Efficiency Analysis Was Flawed

86.    Mr. Coffman ends his report arguing that I present "no evidence to disturb [his] conclusion that TaskUs Common Stock traded in an efficient market."[158] However, he does not fully address the critiques I raised in my Initial Report.

87.    As an initial matter, Mr. Coffman argues that I do not "dispute most of the factors indicating market efficiency,"[159] as an attempt to justify the completeness of his market efficiency analysis. While it is true that I did not take issue with his analysis of certain *Cammer* Factors, *Cammer* Factor 5, which is Mr. Coffman's analysis of whether the market reacts to new information in ways that one would expect, is central to the concept of price impact, which is a primary topic of my Initial Report and, indeed, Plaintiffs' case. Additionally, Mr. Coffman describes it as "from an economic point of view – a good, fairly direct test for whether or not the market is efficient or not."[160]

88.    In answer to one of my critiques of Mr. Coffman's *Cammer* Factor 5 analysis (the choice of estimation period), Mr. Coffman states that I "offer[] no statistical or economic rationale for restricting a cause-and-effect analysis to the Class Period, and there is none."[161]

---

[158] Coffman Reply Report, § V.

[159] Coffman Reply Report, ¶ 78.

[160] *See* Coffman Deposition Vol. II, 262:1-4.

[161] Coffman Reply Report, ¶ 87.

This is incorrect.  As I made clear in my Initial Report, the finance literature shows that market efficiency can vary over time.[162]  Additionally, Mr. Coffman acknowledged in his deposition that it is "theoretically possible" for a market to "be efficient at one point in time and inefficient in another point."[163]  Furthermore, the first day that Mr. Coffman tests cause-and-effect for news is August 11, 2021,[164] 61 days after the start of the Proposed Class Period on June 11, 2021.  As such, a finding of market efficiency over the 31-month "Analysis Period" Mr. Coffman uses does not necessarily validate market efficiency during the entire Proposed Class Period, particularly when one did not test cause-and-effect for the first two months of the seven-month Proposed Class Period.

89.    Fundamental to all of Mr. Coffman's cause-and-effect analyses is his choice to focus on earnings announcements as days with news.  Mr. Coffman attempts to justify his continued use of earnings announcements by restating that academic articles have shown that stock markets react more often on those dates and that there is a "long history of evaluating market efficiency by testing earnings announcements."[165]  However, in this misguided argument, Mr. Coffman does not directly address the issue of statistical bias that I highlighted in my Initial Report.[166]  By only comparing earnings and pre-earnings dates to "Days with No News, Analyst Reports, or SEC filings," Mr. Coffman only includes 60 of the 154 trading days (less than 40 percent) in the Proposed Class Period.[167]  As I illustrated in my Initial Report, this level of

---

[162] *See* Deal Report, Note 135.

[163] Coffman Deposition Vol. I, 69:17-70:3.

[164] *See* Expert Report of Chad Coffman, CFA, May 10, 2014 ("Coffman Report"), Exhibit 7.

[165] Coffman Reply Report, ¶ 94.

[166] *See* Deal Report, ¶¶ 80-83.

[167] *See* Coffman Reply Report, Exhibit 2.

restricting is akin to focusing on the most reactive group in a treatment group and arguing that therefore the drug is proven to be effective for everyone.[168]  In other words, by excluding 94 of the 154 trading days from his analysis, Mr. Coffman does not assess whether TaskUs's stock price is more likely to move on trading days where value relevant information beyond earnings is disclosed.

90.    The exclusion of news-but-not-earnings-announcement days in his analysis is also important in this case given Plaintiffs' theory.  Plaintiffs allege that a corrective disclosure occurred not on an earnings announcement date, but rather on a news date.  Yet Mr. Coffman excluded every one of those types of days from his test.  The alleged corrective disclosure of the Spruce Report was not an earnings announcement, but instead would be more akin to one of the days that Mr. Coffman does not even include in his test.

91.    Mr. Coffman attempts to further undermine my critique by raising issues with certain of my categorizations.  In particular, I carefully analyzed the 61 non-earnings, non-SEC filing, and non-analyst report news days[169] and categorized nine of them as being news days and 52 of them as being non-news days.  Mr. Coffman apparently would have preferred to move two of these news days from the news category to the non-news category,[170] resulting in seven news days and 54 non-news days.  He also apparently believes that one of the 24 SEC filing days should not be considered a news day.[171]  He argues that these three days are evidence that the

---

[168] Deal Report, ¶ 82.

[169] Following Mr. Coffman's definition, these are days that Mr. Coffman did not flag as having an SEC filing, earnings announcement, or analyst report, but at least one Factiva News article. *See* Deal Report, Exhibit 4.

[170] Specifically, in the Coffman Reply Report, Mr. Coffman argues that July 29, 2021 and December 30, 2021 "do not contain any value-relevant news."  *See* Coffman Reply Report, ¶ 96.

[171] *See* Deal Report, Exhibit 4.  Specifically, in the Coffman Reply Report, Mr. Coffman also argues that November 3, 2021 "do[es] not contain any value-relevant news."  *See* Coffman Reply Report, ¶ 96.

overall analysis "dilutes" the comparison between news and non-news dates and therefore should not be used. [172]

92.    Rather than debate my decision to categorize these three days as I did, which can be done, I started with a simpler, more important baseline question: would a slightly different categorization as proposed by Mr. Coffman change my opinions and support his findings?  The answer is no, it does not.  In fact, the re-categorization of the three dates Mr. Coffman highlights from news days to non-news days does not impact my conclusion.  In **Figures 4.A and 4.B** I replicate my event study analysis in Figure 6 of my Initial Report with two adjustments: (1) I recategorize July 29, 2021, November 3, 2021, and December 30, 2021 as non-news days (as shown in **Figure 4.A**); and (2) I incrementally add January 20, 2022 to the Proposed Class Period to match Mr. Coffman's adjustment of the Deal Event Studies (as shown in **Figure 4.B**). [173]

---

[172] Coffman Reply Report, ¶ 97.

[173] *See* Coffman Reply Report, ¶ 19.

**Figure 4.A: Summary of Results in an Illustrative Example Treating July 29, November 3, and December 30, 2021 as Non-News Days**

| Statistic | 120 day window (Original Model Used by Mr. Coffman) | | 15 day window | | 30 day window | |
| | Earnings Announcements | Non-News Days | News Days | Non-News Days | News Days | Non-News Days |
|---|---|---|---|---|---|---|
| N | 11 | 294 | 41 | 112 | 41 | 112 |
| Significant Days at 95% Confidence Level | 10 | 9 | 5 | 9 | 2 | 7 |
| % Significant Days at 95% Confidence Level | 90.91% | 3.06% | 12.20% | 8.04% | 4.88% | 6.25% |
| Difference in % Significant Days at 95% Confidence Level (p-value) | 87.85% (0.00) | | 4.16% (0.43) | | –1.37% (0.75) | |

| Statistic | 45 day window | | 60 day window | |
| | News Days | Non-News Days | News Days | Non-News Days |
|---|---|---|---|---|
| N | 41 | 112 | 41 | 112 |
| Significant Days at 95% Confidence Level | 3 | 8 | 3 | 7 |
| % Significant Days at 95% Confidence Level | 7.32% | 7.14% | 7.32% | 6.25% |
| Difference in % Significant Days at 95% Confidence Level (p-value) | 0.17% (0.97) | | 1.07% (0.81) | |

54

**Figure 4.B: Summary of Results in an Illustrative Example Treating July 29, November 3, and December 30, 2021 as Non-News Days and Including January 20, 2022**

| Statistic | 120 day window (Original Model Used by Mr. Coffman) | | 15 day window | | 30 day window | |
|---|---|---|---|---|---|---|
| | Earnings Announcements | Non-News Days | News Days | Non-News Days | News Days | Non-News Days |
| N | 11 | 294 | 42 | 112 | 42 | 112 |
| Significant Days at 95% Confidence Level | 10 | 9 | 6 | 9 | 3 | 7 |
| % Significant Days at 95% Confidence Level | 90.91% | 3.06% | 14.29% | 8.04% | 7.14% | 6.25% |
| Difference in % Significant Days at 95% Confidence Level (p-value) | 87.85% (0.00) | | 6.25% (0.24) | | 0.89% (0.84) | |

| Statistic | 45 day window | | 60 day window | |
|---|---|---|---|---|
| | News Days | Non-News Days | News Days | Non-News Days |
| N | 42 | 112 | 42 | 112 |
| Significant Days at 95% Confidence Level | 4 | 8 | 4 | 7 |
| % Significant Days at 95% Confidence Level | 9.52% | 7.14% | 9.52% | 6.25% |
| Difference in % Significant Days at 95% Confidence Level (p-value) | 2.38% (0.62) | | 3.27% (0.48) | |

93.     As can be seen across both figures**,** these adjustments do not impact the conclusions I made in my Initial Report.  The difference between the news day proportions and the non-news day proportions across all four of the Bruce Event Study windows are *still not statistically significant* at the five-percent level in both figures.  In fact, they continue to be *not even close,* with the closest model (the 15 -day window in **Figure 4.B**) having a p-value almost five times higher than the required value to be significant at the five percent level.[174]  As such,

---

[174] The standard threshold for statistical significance at a 95 percent confidence level is a p-value of 0.05 or less. The p-value for the 15-day window of 0.24 is 0.24/0.05 = 4.8 times larger than 0.05.

Mr. Coffman's critiques and adjustments still have not shown that his methodology is sufficiently rigorous to scientifically demonstrate market efficiency.

94.     Mr. Coffman takes issue with my critique of his *Cammer* Factor 2 analysis of analyst coverage.  In his critique he states "the relative difference in analyst coverage between the Class Period and the Quiet Period is easily explained and does not disturb my opinion that the market for TaskUs Common Stock was efficient throughout the Class Period, including during the Quiet Period."[175]  He argues that this is to be the case because (1) "the lack of analyst coverage during the Quiet Period, standing alone, by no means indicates that the market was inefficient during the Quiet Period," [176] (2) I "ignore[] that other efficiency factors [Mr. Coffman] analyzed in [his] Report support a finding of efficiency during the Quiet Period,"[177] (3) I "rel[y] on a standard regulatory requirement for issuing companies, which [I] state[] is not uncommon in the securities industry, to mischaracterize [Mr. Coffman's] opinion that '[d]uring the Class Period there was consistent analyst coverage for TaskUs,'"[178] and (4) I "ignore[] the substantial public dissemination of news and other information regarding TaskUs during the Quiet Period."[179]

95.     As an initial matter, Mr. Coffman asserts that I agree that "the temporary lack of analyst coverage does not prove inefficiency for that period."[180]  However, this takes my

---

[175] Coffman Reply Report, ¶ 105.

[176] Coffman Reply Report, ¶ 101.

[177] Coffman Reply Report, ¶ 102.

[178] Coffman Reply Report, ¶ 103

[179] Coffman Reply Report, ¶ 104.

[180] Coffman Reply Report, ¶ 101.

deposition out of context and is beside the point.  In my deposition I stated the following (of which Mr. Coffman only quotes the emphasized portion):

> Q: **Are you saying that the temporary lack of analyst coverage during the quiet period proves inefficiency for that period?**
>
> A: **No, that would be an overstatement.** I'm take -- I'm disputing -- he says there was consistent analyst coverage for TaskUs. That's often the case in securities cases. … I think it's too strong to say that during the quiet period -- the fact that there is a quiet period and there's no analyst coverage means it must be inefficient. That's too strong. But it means -- it's a -- it is different about this case and it's something that one would want to take into consideration and analyze, and certainly not make a statement that there was consistent analyst coverage, especially during the class period. It's a relatively short class period. Several months. And for the first roughly month or so, there was no analyst coverage. So that's -- that's, you know, something that one wants to think about and a factor in deciding, is -- are the things I've looked at, are they sufficient to determine market efficiency for the class period?[181]  [Mr. Coffman's Quote is emphasized]

96.     Given it is Mr. Coffman's burden to prove that TaskUs's stock is traded in an efficient market, the fact that my critique does not necessarily "standing alone" disprove market efficiency does not devalue the critique.  Mr. Coffman asserts that his *Cammer* Factor 2 analysis showed *consistent* coverage during a seven-month Proposed Class Period, without taking into account that there was approximately one month that lacked such coverage, and that this was one month of a relatively short seven-month class period.[182]

97.     Second, Mr. Coffman's argument that because the other factors he addresses supposedly show market efficiency during the Quiet Period, my criticism of his review of *Cammer* Factor 2 is invalid is incorrect.  Taking this view to its logical conclusion, this would imply that because a majority of factors allegedly show market efficiency, *Cammer* Factor 2 should not be examined at all.  However, the reason that *Cammer* Factor 2 is considered worth

---

[181] Deal Deposition, 294:17-295:23.  *See also* **Appendix B.**

[182] Coffman Report, ¶ 33.

examining is because, as I outlined in **Section III.D.ii** and expand on below, analyst report coverage is particularly valuable in disseminating information and shaping investors' beliefs.  As such, suggestive evidence of market efficiency in other factors does not prove that Mr. Coffman provided sufficient evidence when discussing *Cammer* Factor 2.

98.    Third, Mr. Coffman's assertion that the Quiet Period is "standard" in the securities industry does not mean that TaskUs's stock price during this period trades in an efficient market.  As I state in my Initial Report, it still remains true that "[p]rior to the initiation of analyst coverage, the market operated without the benefit of comprehensive assessments from equity analysts, which are important for the incorporation of publicly available information into stock prices.  Thus, the absence of timely and comprehensive analyst coverage during the initial one month after its IPO (and thus one of the seven months of the Proposed Class Period) undermines the Mr. Coffman's claim that TaskUs was traded in an efficient market for the entirety of the Proposed Class Period."[183]

99.    Fourth, Mr. Coffman argues my critique of *Cammer* Factor 2 as invalid because of the "substantial" news and SEC filings published during this time.  Setting aside the fact that Mr. Coffman's judgement of what constitutes "substantial" is subjective, as I highlighted in **Section III.D.ii**, and in my Initial Report, analysts are particularly important in shaping investors' beliefs.  In fact, literature that Mr. Coffman cites to on the role of analysts, states as such,

> **Securities analysis produces information that is the lifeblood of the markets** and those who participate in them. As the SEC acknowledged in a November 1998 statement: 'Analysts fulfill an important function by keeping investors informed.  They digest information from Exchange Act reports and other sources,

---

[183] Deal Report, ¶ 93.

actively pursuing new company information, put all of it into context, and act as conduits in the flow of information.' This process and the value added by security analysts have been widely appreciated. For example, the U.S. Supreme Court and the SEC have both said that ' the value to the entire market of analysts' efforts cannot be gainsaid; **market efficiency in pricing is significantly enhanced** by their initiatives to ferret out and analyze information, and thus analysts' work redounds to the benefit of all investors.[184] [emphasis added]

100. As the quote above makes clear, analyst coverage is particularly important in the digestion of information and "significantly enhance[s]" "market efficiency in pricing." Indeed, much of my analysis of price impact relies on equity analysts given the nature and complexity of the allegations, whereby certain attrition statements (the Disclosed Attrition Rates) are undisputed and only the general alleged misstatements related to metrics and low attrition are at-issue. By Mr. Coffman not directly addressing the concern of a lack of analyst coverage during the Quiet Period, he fails to consider the unique role analysts play in the incorporation of public available information into stock prices.

_____
Bruce Deal                    September 20, 2024

---

[184] Fernandez, Frank, "The Roles and Responsibilities of Securities Analysts," *Securities Industry Association Research Reports,* Vol. II, No. 7, August 22, 2001, 3-14, p. 5. *See also* Coffman Reply Report, Note 71.

**Appendix A**
**Additional Materials Considered**

*Case Documents*

1. Expert Reply Report of Chad Coffman, CFA, August 23, 2024  and All Produced Materials.
2. Expert Report of Bruce Deal, July 19, 2024 and All Produced Materials.

*Other Legal Documents*

1. Expert Rebuttal Report of Chad Coffman, CFA, *Eric Weiner v. Tivity Health, Inc, et al.,* No. 3:17-cv-01469, United States District Court of Middle District of Tennessee, December 20, 2019.
2. Expert Rebuttal Report of Chad Coffman, CFA, *Mayuko Holwill v. AbbVie, Inc., et al.,* No: 1:18-cv-6790, United States District Court of the Northern District of Illinois, September 20, 2021.

*Depositions*

1. Chad Coffman, CPA, Volume II, *Humberto Lozada and Oklahoma Firefighters Pension and Retirement System, v. TaskUs, et al.,* No. 1:22-cv-01479-JPC, United States District Court for the Southern District of New York, September 13, 2024, and All Exhibits.
2. Remote Proceedings of Videotaped Deposition of Bruce Deal, *Humberto Lozada and Oklahoma Firefighters Pension and Retirement System, v. TaskUs, et al.,* No. 1:22-cv-01479-JPC, United States District Court for the Southern District of New York, August 15, 2024, and All Exhibits.

*Academic Articles and Books*

1. Fernandez, Frank, "The Roles and Responsibilities of Securities Analysts," *Securities Industry Association Research Reports,* Vol. II, No. 7, August 22, 2001, 3-14.
2. Ljungqvist, Alexander, "IPO Underpricing," in *Handbook of Corporate Finance: Empirical Corporate Finance*, *Vol. 1,* edited by B. Espen Eckbo, First Ed., North Holland, 2007, 375-422.
3. Neghab, Davood P., *et al*., "Deliberate Premarket Underpricing: New Evidence on IPO Pricing Using Machine Learning," *International Review of Economics and Finance*; Vol. 88, 2023, 902-927.
4. Ritter, Jay R., "Initial Public Offerings: Underpricing," *Warrington College of Business,* January 19, 2024, available at https://site.warrington.ufl.edu/ritter/files/IPOs-Underpricing.pdf.
5. Severini, Sabrina, "Review of IPO Primary Market Pricing Literature," *Accounting and Finance Research*, Vol. 9, No. 4, 2020, 32-43.

*Bates Stamped Documents*

1. TASK_0016576.
2. TASK_0038945.
3. TASK_0148553.

*Analyst Reports*

1. "TaskUs, Inc. (TASK): Growth Driven by Focus on Digital Economy, Inititiate at Buy," *Goldman Sachs,* July 6, 2021.
2. "Americas Technology: IT Services: Initiation: Focusing on Beneficiaries of Tailwinds Ahead; Buy CTSH & TASK, Sell GIB; Upgrade TWKS to Buy," *Goldman Sachs,* January 9, 2022.
3. "TaskUs, Inc. (TASK): Strong Fundamental Profile at a Discount; Reiterating Buy Rating," *Goldman Sachs,* January 23, 2022.
4. "TaskUs, Inc. (TASK): Solid Execution Drives Healthy Beat & Raise," *Goldman Sachs,* March 1, 2022.