**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HUMBERTO LOZADA and OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM Individually and on Behalf of All Others Similarly Situated,<br><br>             Plaintiffs,<br><br>v.<br><br>TASKUS, INC., BRYCE MADDOCK, JASPAR WEIR, BALAJI SEKAR, AMIT DIXIT, MUKESH MEHTA, SUSIR KUMAR, JACQUELINE D. RESES, and BCP FC AGGREGATOR L.P.,<br><br>             Defendants. | Case No. 1:22-cv-01479 JPC-GS<br><br><u>CLASS ACTION</u><br><br>Judge John P. Cronan |

**DEFENDANTS' SUPPLEMENTAL BRIEF IN FURTHER**
**OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND**
<u>**APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**</u>

**TABLE OF CONTENTS**

<u>**Page**</u>

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

ARGUMENT ..................................................................................................................... 5

I.      It is Proper for the Court to Determine Whether the Spruce Report Corrects or Matches the Alleged Low Attrition Misstatement at Class Certification ........................... 5

II.    Defendants Have Rebutted Price Impact Because the Spruce Report Does Not Correct or Match the Alleged Low Attrition Misstatement ................................................ 6

        A.      The Attrition Discussion in the Report is Based on Public Information ................ 8

        B.      That the Spruce Report Relied, in Relevant Part, On a Former Employee or Included Negative Characterizations Does Not Make it Corrective ....................... 9

CONCLUSION ................................................................................................................. 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ark Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  77 F.4th 74 (2d Cir. 2023) *("Goldman II")* .................................................................. 6

*Boston Ret. Sys. v. Alexion Pharms., Inc.*,
  556 F. Supp. 3d 100 (D. Conn. 2021) ........................................................................ 10

*Fila v. Pingtan Marine Enter. Ltd.*,
  195 F. Supp.3d 489 (S.D.N.Y. 2016) ..................................................................... 7, 10

*Goldman Sachs Grp., Inc. v. Ark Teacher Ret. Sys.*,
  141 S. Ct. 1951 (2021) ................................................................................................ 6

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) .................................................................................................... 6

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ...................................................................................... 7

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
  2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ........................................................ 6, 10

*In re MINISO Grp. Holding Ltd. Sec. Litig.*,
  2024 WL 759246 (S.D.N.Y. Feb. 23, 2024) ............................................................... 10

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ................................................................................... 7, 10

*Lanigan Grp., Inc. v. Li-Cycle Holdings Corp.*,
  2023 WL 6541884 (E.D.N.Y. Oct. 6, 2023) ................................................................ 7

*Lea v. TAL Educ. Grp.*,
  837 F. App'x 20 (2d Cir. 2020) ................................................................................. 10

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) .................................................................................. 7

*Zheng v. Pingtan Marine Enter.*,
  379 F. Supp. 3d 164 (E.D.N.Y. 2019) .......................................................................... 7

i

**INTRODUCTION[1]**

On November 5, 2024, Defendants took the 30(b)(6) deposition of Ben Axler, the Founder and Chief Investment Officer of Spruce Point Capital ("Spruce" or "Spruce Point") and author of the January 20, 2022 Report entitled, "Moderating the Bull Base Content' (the "Spruce Report" or the "Report"). As the Court is aware, only a few select pages of the Spruce Report are the sole alleged corrective disclosure in this case. Axler's testimony, as well as materials produced by Spruce, conclusively confirms that the Report, in fact, was not corrective of the alleged "low attrition" misstatement (the sole alleged 10b-5 misstatement remaining). Axler testified definitively that each of the references in the Report to attrition contained no material non-public information ("MNPI"). Notably, this includes page 36, which purportedly quotes from the interview of a former TaskUs executive (who Axler confirmed was former COO Robert Hayes). Axler testified that he took steps to ensure that he did not receive MNPI from Hayes, including contacting Hayes through a third-party research firm which would have required Hayes to go through MNPI training and instructing Hayes at the start of the interview not to provide any MNPI (which Hayes emphatically agreed to). Documents and an audio recording of the Hayes' interview also confirm that the Hayes' statements quoted pertained to the BPO industry and were not directed to TaskUs. For these reasons, among others, the Report did not correct the alleged misstatement.

It is axiomatic that there can be no Exchange Act Class if there is no corrective disclosure. To obtain class certification, plaintiffs rely on the *Basic* presumption of reliance, the premise of which is that investors presumptively rely on a purported misrepresentation reflected in a stock's market price. Where, as here, there is no positive "front-end" inflation, plaintiffs proceed under a

---

[1] Unless otherwise noted, citations, quotations and internal quotation marks have been omitted. "Ex." refers to the Exhibits to the Supplemental Declaration of Jonathan K. Youngwood.

1

purported price maintenance theory and rely on the "back-end" corrective disclosure as a proxy to infer front-end inflation or price impact. If, however, the alleged corrective disclosure does not match the alleged misstatement, there can be no such inference and the *Basic* presumption is rebutted. As set forth in Defendants' class certification briefs (*see* ECFs 94 and 126), the Spruce Report did not match (or correct) the alleged misstatement, which Axler's deposition and the discovery from Spruce Point definitively now confirm. Defendants also submit that, if the Spruce Report was not corrective of low attrition, there will be no material dispute under Rule 56 that any decrease in the stock price following the Report must have been caused by issues unrelated to either low attrition or Glassdoor (which is not even mentioned), rendering damages for the Securities Act claims to be zero and warranting their dismissal. We look forward to separately presenting that issue to the Court.

## BACKGROUND

Plaintiffs' Exchange Act claims are based on one remaining alleged misstatement, which made vague reference to "low attrition" and appeared in multiple drafts as well as the final versions of the Company's IPO and SPO registration statements: "The culture and focus on people . . . gives us an advantage on key people metrics of efficiency, client satisfaction, and low attrition." ¶170. Plaintiffs allege this statement was corrected with the publication of the inflammatory Spruce Report on January 20, 2022. Specifically, Plaintiffs, in their complaint and class certification motion, point to only three pages of the 80-page Spruce Report (35, 36 and 37), along with one bullet point in a 6-page Executive Summary that is based upon and derivative of the discussion on pages 35, 36 and 37. In the Motion to Dismiss decision, this Court analyzed those three pages, finding that "[i]nformation contained in public SEC filings usually cannot later serve as the basis for a corrective disclosure," noting an exception for "sophisticated analysis of accounting

disclosures," which is the "exception, not the rule." Opinion (ECF 51) at 57. With that framework in mind, page 35, which on its face is based on and quotes from SEC filings and a public article, plainly cannot be corrective. The Court also held that page 37, which, using simple math, calculated a total attrition rate based entirely on "publicly available and straightforward information" in SEC filings, could not be corrective. *Id.* While the Court did not reach a firm conclusion regarding page 36, it left open the possibility "at [the pleading] stage" that the information on that page—which was based on and purportedly quoted from an interview with a former executive—was non-public and material, and therefore new to the market and potentially corrective. *Id* at 58. The Court did not make any specific findings regarding the summary bullet in the Executive Summary (at page 6), which contained no new or additional information, but was rather a summary statement of opinion characterizing and based solely upon pages 35 through 37.

Class certification is not, of course, a pleading motion. Defendants' prior class certification briefs, with the benefit of defense expert Bruce Deal's reports, have demonstrated that the Spruce Report (page 36) did not match or correct the alleged misstatement for several reasons, including that (i) it pertains to the specific 180 day + attrition rate numbers for 2019 (26.6%) and 2020 (14.9%) disclosed by TaskUs (the "Disclosed Attrition Rates"), found by this Court to be "transparent" and not misleading (Opinion at 24); (ii) it is about the industry as a whole, and <u>not</u> TaskUs; and (iii) although based on a non-public interview of a former executive, the substance of what was said on page 36 is, in fact, public information, which was not new to the market. ECF 94 at 15-22); ECF 126 at 5-9; ECF 95-1 at ¶¶ 29-32, Figure 2.

That nothing in the Spruce Report related to attrition was MNPI has now been definitively confirmed by Axler, the sole author of the Spruce Report. The Spruce discovery also confirmed a fact that could not have been known at the pleadings stage – the statement attributed to the former

TaskUs executive was misquoted in the Spruce Report and the Report omitted a statement by the

former executive which clarified that TaskUs's attrition was, in fact, "better" than its peers, both

of which confirm that the former executive's comments at issue were about the BPO industry as a

whole.  The Axler deposition confirmed or revealed, *inter alia*, the following indisputable facts:

- Spruce Point had a short position in TaskUs prior to issuing the Report and was long on two other BPO companies. Ex. 1 (Spruce Tr.) at 27-28; Ex. 2 (Spruce Rpt.) at 76.

- The Report was researched and drafted almost exclusively by Axler in a three-week period from December 29, 2021 to January 19, 2022. Ex. 1 (Spruce Tr.) at 33.

- When researching companies, Axler looks at management, the Board, the quality of its disclosures, growth prospects of the business, what analysts positively covering the stock say, and he looks at valuation – all of which is based on public information.  *Id.* at 34. Spruce Point also relies on interviews of former employees to confirm its "investment research hypothesis or some of our observations."  *Id.* at 53, 58-59.

- The Spruce Report includes a disclaimer that states the Report and Spruce's research opinions are "based upon interpretation of certain facts and observations, all of which are based upon publicly available information." Ex. 2 (Spruce Rpt.) at 2.

- Consistent with this disclaimer, nothing related to attrition in the Report was based on MNPI.  Of note, this includes page 36 of the Report, which purports to quote from the interview of a former executive who Axler confirmed is TaskUs's COO Robert Hayes. Ex. 1 (Spruce Tr.) at 30-31, 43-57, 79-80.

- An audio recording of the Hayes interview[2] also confirm that Axler told Hayes he was not seeking MNPI and that Hayes agreed he would not provide MNPI.  Ex. 3 (Hayes Tr.) at 3.  Axler also testified that the third-party research firm through which he hired Hayes would have provided MNPI training.  Ex. 1 (Spruce Tr.) at 54-55.

- The Hayes quote on page 36 of the Report, which refers to BPO companies understating attrition in "many, many ways" states: "it's not **just** TaskUs, it's every company I've ever worked for".  In fact, the audio reveals the quote in the Report was incorrect. Hayes did not say the word "just" instead he said, "**and this is not TaskUs**. This is every company I've ever worked for."  *See* Ex. 3 (Hayes Tr.) at 46; *see also* Ex. 4 (Rev.com Tr., SPRUCE0002383) at 2397.

---

[2] Spruce produced a transcript of the Hayes interview that had been made from the audio recording through a service called "rev.com."  *See* Ex. 1 (Spruce Tr.) at 59-60; Ex. 4 (Rev.com Tr.). That transcript differs from the audio.  As such, Defendants played portions of the audio at the Axler deposition (Ex. 1 at 66-82) and also had Veritext transcribe the audio.  Citations to the "Hayes Tr." refers to the transcript prepared by Veritext which is certified to be a true and correct copy of the recording.

- With respect to the "industry standard" attrition figure embedded in the question asked of the former executive as shown on page 36, Axler confirmed that the industry standard number (30%) was an Asia Pacific (APAC)-specific figures, which would not be the same as a global figure. Ex. 1 (Spruce Tr.) at 101-103; Ex. 2 (Spruce Rpt). at 35 (referencing a 150% industry average).

- Although not included in the Spruce Report, Hayes told Axler during his interview that he believes TaskUs's attrition is better than its competitors. Ex. 3 (Hayes Tr. at 49) ("[Axler]: is their attrition any better or worse than the next guy?" "[Hayes]: I think they're better" "[Axler]: Little better?" "[Hayes]: And I think they'll stay better for another year or two . . . .").

- Plaintiffs asked Axler whether the public material on pages 35-37 had been previously published in the same manner and whether anyone had made the same characterizations or opinions as Axler. Ex. 1 (Spruce Tr.) at 114-117. Although Axler was not aware of such prior publication, he did not alter his testimony that none of it was MNPI. *Id.*

Following Axler's deposition and the unequivocal identification of Hayes as the sole source of the quote on page 36, Defendants amended their Rule 26(a) disclosures to add his name. Plaintiffs have requested documents from Hayes and from TaskUs regarding his time as COO. Plaintiffs have also subpoenaed third-party research firms utilized by Spruce in connection with its Report. Defendants do not believe any of this requested material could affect the issues raised by this submission, which focuses on whether anything in the Report concerning attrition actually constitutes new, non-public information concerning TaskUs. It does not.

## **ARGUMENT**

### I. It is Proper for the Court to Determine Whether the Spruce Report Corrects or Matches the Alleged Low Attrition Misstatement at Class Certification

To properly assess whether the *Basic* presumption can be invoked, the Court must consider whether the attrition discussion in the Spruce Report contained MNPI or matched the alleged misstatement (a vague reference to "low attrition"). The Supreme Court has held that the *Basic* presumption can be rebutted by "*[a]ny showing* that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . ." *Halliburton Co. v.*

*Erica P. John Fund, Inc.,* 573 U.S. 258, 269 (2014). Where plaintiffs proceed under a purported price maintenance theory (the alleged misstatement maintained the price) as Plaintiffs do here, front-end inflation is inferred based upon a back-end stock drop attributable to the alleged corrective disclosure.[3]  *Goldman Sachs Grp., Inc. v. Ark Teacher Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021).  Courts must thus analyze whether there is a "mismatch" between the alleged misstatement and corrective disclosure, and, if the alleged corrective disclosure did not in fact match or correct the alleged misstatement, then the inference necessary for price impact fails.  *Id*.  This analysis is not premature loss causation as Plaintiffs argue (*see* ECF 116 at 13), but instead is required to assess price impact at class certification.  *Id*. at 1960 (courts must look at "all probative evidence" aided by "a good dose of common sense" even if the evidence is "relevant to a merits question like materiality.").  As the Second Circuit explained, "whether there is a basis to infer that the back-end price equals front-end inflation—is a different question than loss causation, and, in light of *Goldman*, requires a closer fit (even if not precise) between the front end and back-end statements."

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc*., 77 F.4th 74, 99 n. 11 (2d Cir. 2023).

## II.    Defendants Have Rebutted Price Impact Because the Spruce Report Does Not Correct or Match the Alleged Low Attrition Misstatement

As this Court recognized, for a disclosure to be corrective in the first place—a threshold question for determining price impact—it must reveal new, non-public information.  Opinion at 57; *see In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354 at *7-8 (S.D.N.Y. Mar. 23, 2020) (consideration at class certification of whether an alleged corrective disclosure in fact revealed new, non-public information).  A negative characterization by or the opinion of a short

---

[3] Plaintiffs argue that TaskUs stock was artificially inflated and maintained by the low attrition statement, but there is no evidence of front-end price inflation. *See* ECF 94 at 14-15; ECF 126 at 3-5.

6

seller, journalist or analyst, even if such characterization or opinion was not previously published, does not, standing alone, constitute a corrective disclosure. In *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010), the Second Circuit held that, a corrective disclosure must "reveal some then-undisclosed fact with regard to the specific misrepresentations in the complaint . . ." and, accordingly, a "negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *Id.* at 511-12.

Similarly, in *Meyer v. Greene*, the Eleventh Circuit held that a short seller report alleging that a company's assets were overvalued was not corrective, rejecting arguments that the inclusion of publicly accessible, but not readily available, information rendered this information "new" facts that were "publicly revealed for the first time", and that "expert analysis" of public "source material" was anything other than "mere repackaging of already-public information." 710 F.3d 1189, 1197-99 (11th Cir. 2013) (if every "short-seller's opinion based on already-public information could form the basis for a corrective disclosure, then every investor who suffers a loss in the financial markets could sue under § 10(b) . . . [t]hat cannot be—nor is it—the law."). *See also Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp.3d 489, 497 (S.D.N.Y. 2016) (analyst article which "voiced numerous concerns about [defendant company's] books and management" was "precisely the sort of 'negative journalistic characterization of previously disclosed facts' that cannot be the basis for loss causation in this Circuit."); *Lanigan Grp., Inc. v. Li-Cycle Holdings Corp.*, 2023 WL 6541884, at *9 (E.D.N.Y. Oct. 6, 2023); *Zheng v. Pingtan Marine Enter.*, 379 F. Supp. 3d 164, 178 (E.D.N.Y. 2019).[4]

---

[4] Courts disfavor short seller reports as corrective disclosures. *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 797 (9th Cir. 2020) (a "reasonable investor" would likely have taken posts from "short-sellers who had a financial incentive to convince others to sell" "with a healthy grain of salt").

### A.     The Attrition Discussion in the Report is Based on Public Information

Here, as confirmed by its author Axler, the attrition related discussion in the Spruce Report constitutes nothing but public information (and Axler's speculative negative characterizations based on this information). *See* Ex. 1 (Spruce Tr.) at 30-31, 43-57, 79-80.  This is true for page 35 (which cites to the public sources it is based upon) and page 37 (which using simple arithmetic calculates a total attrition number based on nothing more than simple arithmetic).  *Id.*  It is also true for page 36 of the Spruce Report, which is based on an interview with a former executive, Hayes.  *Id.*  Although this interview itself was not public, the purported quote on page 36 constitutes nothing more than Hayes' opinions about how companies in the BPO publicly report attrition, in response to an inaccurate question by Axler which asked about TaskUs's reporting of a 180+ attrition number that "is below an industry standard of 30%[.]" Ex. 2 at 36.  Notably, this question itself was misleading as Axler confirmed that the 30% industry number was the Asia Pacific number quoted on page 35 of the Report, not a worldwide number.  Ex. 1 at 101-03.

Axler testified, definitively, that page 36 was not MNPI. Ex. 1 (Spruce Tr.) at 79-80.  This is corroborated by the Report's disclaimer that states it expresses Spruce Point's opinions based only upon publicly available information (Ex. 2 (Spruce Rpt.) at 2), and by the transcript of Axler's deposition and interview with Hayes, which reveal that Hayes (i) would have received MNPI training (Ex. 1 (Spruce Tr.) at 54-55), and (ii) at the start of the interview, Hayes confirmed that he would not provide Axler with any such non-public information. Ex. 3 (Hayes Tr.) at 3.  Additionally, the information on page 36 that was provided by Hayes —in essence, that companies in the BPO industry use various metrics to publicly report attrition numbers—was a publicly known fact.  *See* ECF 95-1, ¶¶ 29-32, Figure 2 and ¶¶ 42-44 (quoting a JPM Report that notes TaskUs's definition of attrition "is consistent with 3 out of 4 BPO peers in our coverage" and a Baird Report that states that certain items raised by Spruce, including attrition, are "all well

8

known"). And Hayes' belief that "attrition is significantly worse" (*see* Ex. 2 at 36) referred plainly to the BPO industry (and not TaskUs-specific) and stated nothing more than the obvious (*i.e.,* total attrition by definition is a "worse" number than a subset of total attrition).[5]

That page 36 is about the industry is further evidenced by the Hayes audio recording which demonstrates that Spruce misquoted Hayes. The Spruce Report contains the following quote: "they understate [attrition] in many, many ways. It's not **just** TaskUs, it's every company I've ever worked for in the BPO sphere." *Id.* at 36. The audio recording reveals that the quote did not include the word "just." Instead, the actual quote was: "["they understate [attrition] in many, many ways **and this is not TaskUs**. This is every company I've ever worked for in the BPO sphere"— confirming that Hayes' comments were not directed to TaskUs. Ex. 3 (Hayes Tr.) at 46. Additionally, of note, although omitted from the Spruce Report, when asked about how TaskUs's attrition compared to its peers, Hayes said TaskUs's attrition was "better," "I think they'll stay better for another year or two" and "I think as long as some of those key leaders stay in place, that their attrition will continue to be better than market." Ex. 3 (Hayes Tr.) at 49-50. This answer, in addition to calling into question the accuracy of Spruce's opinion on attrition (and whether it even revealed "the truth" as required for a corrective disclosure), also supports that the quoted language on Page 36 was about the industry, and not TaskUs specifically.

### B. That the Spruce Report Relied, in Relevant Part, On a Former Employee or Included Negative Characterizations Does Not Make it Corrective

As the Court recognized, short seller reports that rely on statements by a former executive can be corrective, but this is not a hard and fast rule and not all such statements are corrective. Opinion at 58. Where, as here, the former employee does not provide specific, new information,

---

[5] The Spruce Report calculates a total attrition rate for 2019 (based on public information) of 46% which, not surprisingly, is "significantly worse" than the 180 day + rate of 26.6% that TaskUs reported for 2019.

it is not corrective, regardless of the fact that the interview of the employee is non-public or that, as Axler testified in response to questioning by Plaintiffs (*see* Ex. 1 (Spruce Tr.) at 113-14), it may have been sourced by paying a third-party research firm. *See In re MINISO Grp. Holding Ltd. Sec. Litig.*, 2024 WL 759246, at \*5, 20 (S.D.N.Y. Feb. 23, 2024) (short seller report regarding a retail franchise model based, in part, on the interview of a franchisee did not "disclose any new facts"). Further, Axler's negative opinions—"TASK's claim of a superior culture evidenced by below industry standard workforce attrition appear to be highly exaggerated" (Ex. 2 (Spruce Rpt.) at 6) or "Potentially Misleading Employee Attrition Claims" (*id.* at 35))—are not corrective, especially since these opinions were based solely on the public information contained on pages 35-37. *See* Ex. 1(Spruce Tr.) at 41; *In re Omnicon,* 597 F.3d at 511-513; *see also Fila*, 195 F. Supp.3d at 497. That Axler testified he was unaware of others expressing the same opinions, or presenting the same information does not change that result. *See* Ex. 1 (Spruce Tr.) at 114-17.

At bottom, this is not a case that involves complex analysis or hard to obtain information, which, even if derived from public sources, can be deemed corrective. Opinion at 57; *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020). The three substantive attrition related pages at issue present a straightforward analysis based on public information and, at most, entail some simple math. That Axler spoke to Hayes (and paid to do so) in order to confirm Spruce's "investment research hypothesis or some of our observations" (Ex. 1 (Spruce Tr.) at 53) does not change the fact that there is no MNPI included on page 36 (or anywhere) in the Spruce Report. And the few pages of the Report at issue here are very different from cases where short seller reports have been found to be corrective.[6]

---

[6] In *Lea*, a short seller report was found to be corrective where it included "numerous interviews of former employees" which revealed non-public information and information from non-English documents available in China that were not readily accessible. 837 F. App'x at 28. In *Boston Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 141 (D. Conn. 2021), an "in-depth article" "based on interviews with more than twenty

## CONCLUSION

For the reasons set forth, the Court should deny Plaintiffs' Motion for Class Certification

with respect to Plaintiffs' Exchange Act Class.

Dated: December 6, 2024

SIMPSON THACHER & BARTLETT LLP

/s/ Jonathan K. Youngwood
Jonathan K. Youngwood
Craig S. Waldman
Janet A. Gochman
425 Lexington Avenue
New York, NY 10017
jyoungwood@stblaw.com
cwaldman@stblaw.com
jgochman@stblaw.com

*Counsel for Defendants TaskUs, Inc., BCP FC
Aggregator L.P, Bryce Maddock, Jaspar Weir, Balaji
Sekar, Amit Dixit, Mukesh Mehta, Susir Kumar, and
Jacqueline D. Reses*

---

current and former employees and a review of more than 2,000 pages of internal documents" was found corrective. In *In re Chi. Bridge*, the short seller report provided several "specific" "new pieces of information to the market" which "reveals more than speculation." 2020 WL 1329354, at *8.