# Exhibit 1

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 1:22-CV-01479-JPC

-------------------------------------------x

HUMBERTO LOZADA, et al.,

Plaintiffs,

- against -

TASKUS, INC., et al,

Defendants.

-------------------------------------------x

November 6, 2024

8:43 a.m.


*CONFIDENTIAL*


VIDEOTAPED DEPOSITION of BEN AXLER, held at the offices of SIMPSON THACHER & BARTLETT LLP, located at 425 Lexington Avenue, New York, New York 10017, before Anthony Giarro, a Registered Professional Reporter, a Certified Realtime Reporter and a Notary Public of the State of New York.

CONFIDENTIAL

Page 27

BEN AXLER -- CONFIDENTIAL

A        Correct.  I mean in the case of TaskUs, there were a couple of issuers mentioned because we have a different opinion of some other companies in the industry.

Q        So you were looking at some of the competitors of TaskUs?

A        Correct.

Q        And, in fact, if we look at -- I'm now back to Exhibit 3, Spruce Point 3 -- if we look at page 3, you talk about your prior record of activism with companies similar to TaskUs on page 3. You list two of them.

A        Correct.

Q        And then actually in the report, including on some of the pages we're going to focus on, you occasionally focus on other BPOs?

A        Correct.

Q        Your publications indicate that you take positions on the companies that you report on?

A        Correct.

CONFIDENTIAL

Page 28

BEN AXLER -- CONFIDENTIAL

Q        And you typically take those positions before you issue the report?

MR. SORKIN:  Objection, form.

A        Correct.

Q        And I'm not going to ask you about the size or anything of your position.

But you had a position in TaskUs before you issued Exhibit 3?

A        Yeah.  The disclaimer says you should assume we have a short position, and, in fact, we did.

Q        And by and large, the positions you take are short positions on the companies that you focus your reports on?

A        Correct.

MR. SORKIN:  Objection to form.  Same objection.  Go ahead.

A        I mean we said we had a strong sell opinion.  So, yes, we had a short position.

Q        When did you make a

Page 30

BEN AXLER -- CONFIDENTIAL

A          It's a message, yeah.

Q          And it's from you to Mr. Oliver.  The other name is redacted. I don't actually know what the basis of the redaction is.  But we can take that offline with your counsel.

Is this you on the beach?

A          Probably, yeah.

Q          And you're saying, "Have you looked at TaskUs?  Sounds absurd."

MR. SORKIN:  Objection, form.

Q          Do you know what you meant by that?

A          I don't recall.

Q          You didn't have any material non-public information about TaskUs when you wrote this?

A          Absolutely not, no.  I was just looking at it on my cell phone.

Q          And, in fact, we'll do this in more detail.

But you never acquired material non-public information regarding

Page 31

BEN AXLER -- CONFIDENTIAL

TaskUs?

A        Absolutely not.

MR. SORKIN:  Objection to form.

Q        Certainly not at least up through the time you published your report?

MR. SORKIN:  Same objection.

A        No, no, no material non-public information.

Q        I'm sorry.  Say that again.

A        I had no material non-public information.

Q        You at no time prior to the time you published your report on January 20 of '22, did you acquire material non-public information regarding TaskUs?

MR. SORKIN:  Same objection.

A        I had no material non-public information.  Everything that I know is sourced in my 80-page document.  Everything's sourced or everything I knew.

Q        So everything you knew with

CONFIDENTIAL

**Page 33**

BEN AXLER -- CONFIDENTIAL

interested in having you facilitate working with a lawyer there to do legal searches to see if there are interesting civil and/or criminal cases against the company."

And then you give them some other information.

You were asking him to do a search or a range of a search for public information?

A        Absolutely, yeah.

Q        Nothing other than public information?

A        You hire a lawyer and look for legal cases.  With a lawyer, do legal searches, yeah.

Q        Do you know how much time you spent working on Exhibit 3, the January 2022 report on TaskUs?

A        How much time?  Well, I don't remember exactly.  But I would assume that I spent all of my working time between December 29th and the time it was published.

**Page 34**

BEN AXLER -- CONFIDENTIAL

Q        You tend to focus on one project at a time then?

A        Yes.

Q        And what is your general approach for investigating a company such as TaskUs as you did in the first three weeks of January 2022?

MR. SORKIN:  Objection, form.  Go ahead.

A        I evaluate management.  I evaluate the board.  I evaluate the business.  I evaluate the quality of the disclosures of the business, the growth prospects of the business.  I evaluate what the investment banks that put out positive research say about it versus, you know, what I find.  I look at the valuation.  And ultimately, I come to a view on whether or not I think the stock is over or undervalued.

Q        And again, that's all based on public information?

A        Correct.  I make heavy use of SEC filings.

**Page 41**

BEN AXLER -- CONFIDENTIAL

pages 35, 36 and 37; is that right?

    A    Correct.

    Q    And then if you turn to the executive summary on page 6, there is one bullet point.

    About the middle of page, it says, "Task's claim of a superior culture evidenced by below industry standard workforce attrition appear to be highly exaggerated."

    You see that?

    A    Yes.

    Q    That is based on the facts and opinions that you had in more detail on the three pages I just referenced you to:  35, 36 and 37; is that right?

    MR. KUBOTA:  Objection to form.

    A    Yes.

    Q    There's nothing new or in addition in what you have on 6 that we don't see in greater detail on 35 through 37?

    MR. KUBOTA:  Same objection.

BEN AXLER -- CONFIDENTIAL

A        Correct.

Q        There is also on page 8, a section toward the top on employees and turnover.  You see that?  "Employees and turnover" in bold.

And it says, "TaskUs doesn't not cleanly disclose"?

A        Page 8?

Q        Page 8, yeah.  Page 8 at the top, it says "Win Rate," and the second entry, "employees and turnover"?

A        Yeah.

Q        Take a look at it if you need to.

But am I correct that analysis is also based on analysis and numbers that you have on pages 35 and 37?

A        Yes.

MR. KUBOTA:  Objection to form.

Q        There's nothing new, additional or different about what you have on 8 that isn't on 35, 36, 37?

MR. KUBOTA:  Same objection.

**Page 43**

BEN AXLER -- CONFIDENTIAL

A        No.

Q        No, you agree with me?

A        I'm sorry.  Can you restate the question?

Q        I asked it as a negative.  I didn't ask it well.

Is there anything in that bullet point on 8 that isn't repeated in greater detail on 35, 36 and 37?

MR. KUBOTA:  Same objection.

A        No.

Q        And anything on 8 in that bullet point is all based on public documents and any opinions you drew from them?

MR. KUBOTA:  Objection.

A        Yes.

Q        Let's go to 35.

So Slide 35 has references, as I understand it, to three different sources, two of which are -- well, one of which is TaskUs's SEC filing; is that right?  The middle one?

A        Correct.  The middle one,

CONFIDENTIAL

**Page 44**

BEN AXLER -- CONFIDENTIAL

IPO prospectus.

(The above-referred-to document was marked as Exhibit 7 for identification, as of this date.)

Q       I'm going to give you this, Exhibit 7.

Is that the document we're referring to?

MR. KUBOTA:  Just give us a second, Jonathan, so we could get copies.

A       Yeah.  It's a prospectus, IPO prospectus, yes.

Q       So that's where we see in the middle of page 35 of Exhibit 3, IPO's prospectus.  That's your source for the quotation that is above the citation?

A       Mm-hmm, yup.

Q       And all you're attempting to do there is quote the document; correct?

A       Correct.

MR. YOUNGWOOD:  And now if I could have 12.

(The above-referred-to

CONFIDENTIAL

Page 45

BEN AXLER -- CONFIDENTIAL

document was marked as Exhibit 8 for identification, as of this date.)

Q        Let me actually do one thing, perhaps to make sure we're clear.

We looked.  The quote that you give, that you cite to, 93, I think you may have miscited by three pages, if you could take a look at page 96 --

A        Okay.

Q        -- of Exhibit 7.

And under hiring and retention of employees, that appears to be what you quote.

A        Oh.  Correct.  Page 96, not 93.

Q        Just a typo.

You meant 96?

A        Yeah.  I suppose a small typo.

Q        I'm going to give you what we're marking as Spruce 8.  That is an article from something called "Nearshore Americas TaskUs Bets on Mexico Culture, Fit for LatAM Expansion," dated

**Page 46**

BEN AXLER -- CONFIDENTIAL

February 4, 2019.

Is that the citation in the first orangy, pink box on the page?

A       Yes.

Q       And all you're attempting to do there is take a quotation from that article and reprint it in your report?

A       Yes.

Q       The emphasis, you've added?

A       Yes.

Q       The quotes?

A       That's correct.

Q       Because you're telling the reader what you think is important in the quote that you've pulled?

A       Yes.

Q       And then finally, we'll mark as 9, the TDCX prospectus.

(The above-referred-to document was marked as Exhibit 9 for identification, as of this date.)

Q       This will be 9.

MR. YOUNGWOOD:  I'll give other counsel a chance to get it.

BEN AXLER -- CONFIDENTIAL

Q        And this is an IPO prospectus for a company called TDCX; is that right?

A        Yes.

Q        What is that?

A        A public company competitor.

Q        Competitor of TaskUs?

A        I believe so, yes.

Q        And the quotation at the bottom of 35, that is drawn directly from this IPO prospectus of TDCX; correct?

A        Yes.

Q        You've added the underlining, the bold or the red color, but otherwise it's just a quote?

A        Yes.

Q        And the summary on the top of this page 35, you can almost trace it going to each of these sources.

So, for example, am I correct that the 30 percent in the first line at the end of the first sentence, that's coming from the Nearshore Americas article in reference to 30?

CONFIDENTIAL

**Page 48**

BEN AXLER -- CONFIDENTIAL

A       Yes.

Q       You then reference the TaskUs IPO and give some information.

That's being drawn from the IPO discussion in the middle of the page; correct?

MR. KUBOTA:  Objection to form.

A       Correct.

Q       And the discussion of TDCX in the next sentence, that is drawn directly from the TDCX prospectus and the quotations you make to it?

A       Yes.

Q       There's no material non-public information on this page?

A       No.

MR. KUBOTA:  Objection to form.

Q       We will come back to 36. But let's go to 37.  You have two sources on this page, the TaskUs draft prospectus, which I will give you now.

(The above-referred-to

**Page 49**

BEN AXLER -- CONFIDENTIAL

document was marked as Exhibit 10 for

identification, as of this date.)

Q       So I've marked as Spruce10,

what I believe to be the draft prospectus

that you've cited on page 37 of

Exhibit 3, if you could confirm that.

A       Yes.

Q       And you specifically cite to

page 122 of that; correct?

A       Yes.

Q       And you draw out of that,

that there were 1,200 new hires in 2019.

A       12,000.

Q       Thank you.

12,000 new hires in 2019.

A       Yes.

Q       And obviously, a public

fact?

A       Yes.

Q       You then make reference to

the IPO prospectus that we previously

marked as Exhibit 7, and you have a

quotation from that from page 144;

correct?

Page 50

BEN AXLER -- CONFIDENTIAL

A       Yes.

Q       I then want to go through the math that you do under the total headcount.  There's a number that I believe you pull out as well from tab 7, the IPO prospectus.  It's this 13,800 number.  I think if you look at page 23 of Exhibit 7, you will find that number.

A       Yes.  13,800.

Q       So with the information -- and the 18,400 is also on that page as well?

A       Mm-hmm, yes.

Q       So with the information we've just identified, the 12,000 from the draft prospectus and the 13,800 and the 13,400 from the final prospectus, can you walk us through the arithmetic you did here?

A       Sure.  So I took the beginning headcount, 13,800, the 12,000 new employees that were approximately hired in 2019 and then implied that there was 7,400 departures.  So the beginning

CONFIDENTIAL

**Page 51**

BEN AXLER -- CONFIDENTIAL

number, plus the new hires, less the

implied departures, equals the 18,400.

Q        And again, all drawn

obviously from public information?

A        Yes.  Right in front of me.

Q        SEC filings?

A        Yes.

Q        And then the next line,

Spruce Point 2019 estimated turnover --

A        Yes.

Q        -- can you walk me through

how you did that?

A        Yes.  So I took the

beginning headcount, 13,800, the ending

headcount, 18,400.  I average them to get

16,100.  From the line above, the

estimated departures of 7,400.  I then

took 7,400, divided by the average

headcount of 16,100, to get an estimated

turnover rate of 46 percent.

Q        So between addition,

subtraction and division, you generated

all the numbers on this page based on

TaskUs's own public filings?

**Page 52**

BEN AXLER -- CONFIDENTIAL

A        Correct.

Q        There's also a reference on the page, a footnote to CTSH, third quarter conference call.  And it ties up to the summary on the top of the page.

What is that?

A        That's just another public company that I believe operates, you know, in the space that was calling out rising, voluntary attrition, a 33 percent.

Q        Again, it's a public conference call?

A        Correct.

Q        Public information.

So the summary that you write in yellow at the top of the page, that is all tied to and derived from your conclusions you drew from public information as depicted on page 37?

MR. KUBOTA:  Objection to form.

A        Correct.

Q        Let's go to page 36.

CONFIDENTIAL

Page 53

BEN AXLER -- CONFIDENTIAL

Now, as part of your work on this report and others, you will, from time to time, conduct interviews?

A    Correct.

Q    How do you go about determining whether or not to conduct interviews?

A    Well, we attempt to confirm our investment research hypothesis or some of our observations by talking to people knowledgeable about the company. In this case, you know, we were able to identify former employees to speak with from TaskUs.

Q    And this page that we're looking at, 36, reflects a portion of an interview with one of those individuals?

A    Correct.

Q    And you understood this individual to be, as the page says, a former Task executive?

A    Correct.

Q    You do not understand anything on this page, including the

BEN AXLER -- CONFIDENTIAL

quotations from this individual, to reflect material non-public information?

MR. KUBOTA: Object to form.

A     I do not believe it's material non-public information.

Q     And I think you said earlier as part of your protocol, you do whatever you can to ensure you're not receiving material non-public information from individuals you interview?

A     Yes.

Q     What steps do you do to do that?

A     Well, so Number One, we hire a third-party firm called Coleman Research that is in the business of finding former executives and former employees and/or people we identify or they identify that they think would be helpful to our research project; you know, my understanding is that they also -- as part of the program, these former executives will also go through training and make out to stations of what

**Page 55**

BEN AXLER -- CONFIDENTIAL

is and what's not material non-public information and also, you know, attest that they will not give that to us.

And then secondarily, before we conduct the interviews, we also reiterate that we do not want material non-public information or information that breaches any duty that these individuals have to the public company under question.

(The above-referred-to document was marked as Exhibit 11 for identification, as of this date.)

Q     I'm going to give you what we've marked as Exhibit 11, Spruce11. It's from your production.  It bears the Bates No. Spruce2784.  This is an e-mail chain between you and Gregory, what appears to be Gregory Miller at Coleman Research.

Who's Mr. Miller?

A     I believe he was our account manager.

Q     At Coleman?

**Page 56**

BEN AXLER -- CONFIDENTIAL

A        At the time.

Q        In it, he's setting up a call with you and Mr. Robert Hayes on January 13, 2022 at 1 p.m.?

A        Yes.

Q        Is Mr. Hayes the individual that you have attempted to quote on page 36 of Exhibit 3?

A        Yes.

Q        You mentioned the lengths you go to ensure you don't receive material non-public.

Let me look, direct you to under important reminders, No. 3, "Please abide by Coleman's research terms and conditions."

You see that?

"In accordance with -- there's a link -- experts have agreed not to disclose material non-public confidential proprietary information that may be subject to a non-disclosure agreement with their employers or another third-party.  Our clients have also

**Page 57**

BEN AXLER -- CONFIDENTIAL

agreed not to knowingly attempt to elicit such information from experts."

You see that?

A        I do, yes.

Q        And is that a policy you've followed in your work with people presented to you by Coleman?

A        Yes.

Q        Is it a policy you followed in connection with the work you did interviewing Mr. Hayes?

A        Yes.

Q        Is it the policy you followed in connection with your work interviewing anyone else you interviewed in connection with preparing the TaskUs Spruce Point report in January of 2022?

MR. KUBOTA:  Objection, no foundation.

A        Yes.  Let me be clear.  I do not ever want material non-public information in anything I do.

Q        You strive very hard to make sure you don't have it?

CONFIDENTIAL

**Page 60**

BEN AXLER -- CONFIDENTIAL

Q        What is that service?

A        I think it's rev.com.

Q        Maybe explain to me a little bit more logistically.

Mr. Miller, we saw in Exhibit 11, sent you a conference call link; correct?

A        Correct.

Q        He would have sent that to Mr. Hayes as well?

A        Correct.

Q        And then who would get on the call:  You, presumably?

A        Myself, Mr. Hayes and my chief compliance officer, Mr. Oliver.

Q        So Mr. Oliver would have been attending as well.  And then how does this -- I'm sorry.  Red Hook, you said?

A        Well, rev.com transcribes the audio recording.

Q        It's not a person; it's a service?

A        Correct.

Page 66

BEN AXLER -- CONFIDENTIAL

that you had.  So I don't know how to do that.

MR. KUBOTA:  John, can you just mark the exhibit so it's clear?

MR. YOUNGWOOD:  I would like to mark this tape.  It's a file.  We can put it into the Exhibit Share. It'll be marked as Exhibit 13.

(The above-referred-to document was marked as Exhibit 13 for identification, as of this date.)

MR. YOUNGWOOD:  So, Darcy, I want for the record to describe where we're picking up.  And obviously, anyone can play as much of the tape as they want.

Q    So we're going to start the tape on the first page of the transcript at Exhibit 12, the third reference to Speaker 1.  And we're really just going to try not to waste people's time.  We're just going to play the end of the statement of Speaker 1 which I believe -- we're going to play the end of what

BEN AXLER -- CONFIDENTIAL

Speaker 1 says on the bottom of the first page up through Mr. Hayes's response on the top of page 2.

MR. YOUNGWOOD:  And, maybe, Darcy, if you could indicate the timestamp of what we're playing for the record.

MS. SAMUELSOHN:  Yes.  The timestamp is 1:32.

SPEAKER 1:  "Um, we're interested in learning a little bit more about TaskUs today, um, which recently came public here in the U.S. last year.  Um, and just obviously as a reminder, you know, because TaskUs is public, um, we don't wanna receive any material non-public information or any information that breaches any duties that you have to the company. Um, so as long as that's a good, um, framework, um, and you agree, we can get started.

SPEAKER 2:  Yeah, no absolutely agree.  It's what we're

Page 68

BEN AXLER -- CONFIDENTIAL

here to discuss.  So nice to meet you."

MR. YOUNGWOOD:  What was the timestamp it ended at?

MS. SAMUELSOHN:  2:08.

Q    If you would like to hear any more, we're happy to spend more of your day doing it.

But could you confirm that that was your voice starting?

A    That was my voice.

Q    You understand that was Mr. Hayes responding?

A    Yes.

Q    And you believe that was an audio recording of the conversation you had with him on January 13, 2022?

A    Yes.

MR. YOUNGWOOD:  I now want to play a longer excerpt.  But this is the only long excerpt we're going to play.  And it begins on the middle of page Spruce2400 which is several pages into the document.  And it will

Page 69

BEN AXLER -- CONFIDENTIAL

begin with Speaker 1 in the middle of
the page on the transcript on 2400.
It begins, "One other metric."  And
we're going to play it through
Spruce2402.  So we're going to play
basically a page and a half, ending
on the very, very top of 2402 where
Mr. Hayes says, "The likelihood that
it reverts to the industry standard
is there."

We're going to do that in
one second.

Q        Before I do, I just want to
direct you, sir, to page 36 of Exhibit 3.

And the quotation in the
third sentence of what's being attributed
to the former TaskUs executive, the
second sentence says, "I'll just start
off by saying that whenever I talk to
people about their attrition, it is just
classic that they understate it in many,
many ways."

And then your report says,
"It's not just TaskUs.  It's every

CONFIDENTIAL

Page 70

BEN AXLER -- CONFIDENTIAL

company."

I'm going to direct you, sir, before we play the tape to 2400 to Speaker 2 in this.  I believe you're going to see much of what's quoted here.  But I'll just point to what we just talked about which is him saying, third line down, "I'll just start off by saying whenever I talk to people about attrition, it's just classic that they understate it."

I don't see him saying, "It's not just TaskUs."

And then it goes on.  And it says, "And they understate it in many ways."

And what he actually says is, "And this is not."  It says "Task" which I think is a reference to TaskUs.  There is no just in the transcript; correct?

A        I'm sorry.  What?

Q        Sure.  I'm trying to match what you placed in the report.

CONFIDENTIAL

Page 71

BEN AXLER -- CONFIDENTIAL

A       Yeah.

Q       With the transcript.

A       I'm sorry.  What?

Q       Page 36 of your report.

A       Yeah.

Q       Page 2400 of the transcript.

A       Where do you see 2400?

MR. SORKIN:  The Bates number at the bottom of the page.

Q       And the best I can line up the "It's just not TaskUs, it's every company I've ever worked for" is where it says, "and this is not Task ask -- but I think that was meant to be an us -- this is every company I've ever worked for."

So I think my question is, is that portion of 2400 that I just pointed to where you believe you took the text that I've been focusing on, page 36?

MR. SORKIN:  Is it okay if I point him to where?

MR. YOUNGWOOD:  Yes.

A       Yeah.  I mean I listened to the audio.  And I tried my best to fairly

CONFIDENTIAL

Page 72

BEN AXLER -- CONFIDENTIAL

represent what he was saying.

Q        And there's no criticism here.

A        Okay.

Q        That's a bad question.

The portion we've been looking at on 2400 on the bottom --

A        Yeah.

Q        -- do you believe that to be your source for what's on page 36?

A        Yes.

Q        And we're going to now listen to the tape.

A        Yeah.

Q        And I'd ask you -- although again, the record will be the record. You don't need to be an interpreter of tapes.  I think you're going to find that the word "just" is also not on the tape.

SPEAKER 1:  Um, one other metric, um, so I understand, you know, for a long time, TaskUs had easy recruiting people, and they would get a lot of referrals from

CONFIDENTIAL

Page 73

BEN AXLER -- CONFIDENTIAL
existing employees, but they made a claim in their prospectus that their turnover is 15 percent for people that have been there for over 180 days, which seems like a qualifier, um, rather than just citing what the annual attrition is.  Um, and my understanding is that industry attritions are on third percent.  Um, do you agree or disagree that, you know, their attrition is lower than industry and do you think there's been any and and also, I guess, has there been any changes in that?  I mean, did you see any increases in their attrition maybe in the later part of when you were there?

SPEAKER 2:  "Um, attrition is first off, um, a tricky business in BPO.  Um, and, and and I'll just, I'll start by saying that I certainly do not trust the industry number of, of 30 to 35 percent that you quoted.  I think that that's bullshit.  And so

CONFIDENTIAL

**Page 74**

BEN AXLER -- CONFIDENTIAL

I'll just start off by saying that whenever I talk to people about their attrition, it is just classic that they understate it, and they, they understate it in many, many ways, and this is not task as this is every company I've ever worked for in the BPO sphere.  Um, what they did was they would not include 180 days. They would not include what they consider to be voluntary resignations.  Right.  They would not include internal promo, like they would remove internal promotions for that number.  Um, you know, they would, you know, if they were on leave, they wouldn't include them. Right.  Like I, it's just, there's just a lot of different ways to manipulate it.  And I think because it is so impactful, um, to BPO's businesses bottom line, yeah. They're just kind of pushed in direction to lie.  Um, and so, you

BEN AXLER -- CONFIDENTIAL

know, Number One, I would just say, uh, I think that the attrition is significantly worse.  Um, I ran some consulting studies."

MR. YOUNGWOOD:  Could you actually give the start time and the end time?

MS. SAMUELSOHN:  The start time is 48:35, and the end time is 50:46.

Q      That is the raw source -- am I correct? -- of that first paragraph --

A      Yes.

Q      Let me for the record.

-- page 36 where it says "former Task executive"?

A      Yes.

Q      And, in fact, it sounds like you did listen to the tape because the transcript doesn't have BS or -- forgive me -- bullshit in it; yet, you put the BS in.  It sounds like either from notes or from something else, you went to the more raw source than just the transcript.

CONFIDENTIAL

Page 76

BEN AXLER -- CONFIDENTIAL

MR. KUBOTA:  Objection.

A        Yeah.  I wanted to make sure it was accurate.

MR. KUBOTA:  Objection to form.

Q        What I'd like to do now is pick up and play the rest of page 2401, ending on the top of 2402.  I think within it, we're going to find that second quote.  And as best we can tell, this is the substance of what Mr. Hayes and you discuss regarding attrition.

MR. YOUNGWOOD:  If you could give the start time again, Darcy. And then when we get to the end, we'll get the end time.

MS. SAMUELSOHN:  The start time is 15:46.

MR. YOUNGWOOD:  For the record, this is Exhibit 13, the audio recording.

SPEAKER 1:  "When I was at TaskUs, they just really wanted to get a better grasp.  And the way I

**Page 77**

BEN AXLER -- CONFIDENTIAL

did it was I hired people who worked at companies in the finance workforce department because they would be the ones who would be responsible for forecasting and capacity delivery to the client to try and get a better understanding of like industry trends. And the results I got back were absolutely shocking. So, you know, case in point, you know, Teleperformance, I got back some of their U.S. numbers. They were 125 to 150 percent annualized attrition."

MR. YOUNGWOOD: I just paused. Let me just pause that there.

Q        That was a discussion of Teleperformance which is another BPO company?

A        Correct.

MR. YOUNGWOOD: What was the end time there?

MS. SAMUELSOHN: 51:28.

Q        You didn't put anything

BEN AXLER -- CONFIDENTIAL

about Teleperformance in your report,

about this quote from Teleperformance?

         A       I don't believe so.

                 MS. SAMUELSOHN:  Picking up

     at 51:28.

                 SPEAKER 1:  "I don't believe

     what people say about the industry

     because I think there's just like --

     it's almost like -- it's not

     collusion.  But it's almost collusion

     with the level of deception in that

     field.

                 SPEAKER 2:  Right.

                 SPEAKER 1:  And I think it

     forces people to all kind of jump in

     on that.  Right.  So I think it

     forces TaskUs to jump in on that as

     well because you can't go out and say

     here's the truth.  Right.  Because

     then you look really bad.

                 SPEAKER 2:  Right.

                 SPEAKER 1:  And so I think

     what it sounds like they did was, I

     was always a big believer in, include

BEN AXLER -- CONFIDENTIAL

it all, explain why it's that way and go for it.  But after they became a public company, then they decide to start looking at only 180-day greater while guess where the most of the attrition in all of these businesses comes from.  It's in the 90 days.  Right.

SPEAKER 2:  Right.

SPEAKER 1:  And so, you know, it seems like that's the direction that they're heading in.  And so that would be worrisome.  But it's not worrisome from a competitive standpoint because I think that that's, it's pretty much standard across the business."

Q        Portions of what we just heard, ending in --

MS. SAMUELSOHN:  52:33.

Q        -- that's the second paragraph attributed to Mr. Hayes; right?

A        Yes.

Q        So we've now looked at

CONFIDENTIAL

Page 80

BEN AXLER -- CONFIDENTIAL

everything that you chose to include on page 36 attributable to Mr. Hayes?

A    Yes.

Q    And you don't believe anything he said there was material non-public information?

A    It was not material non-public information.

MR. KUBOTA:  Objection to form.

MS. SAMUELSOHN:  Picking back up at 52:33.

MR. YOUNGWOOD:  Hold on.

SPEAKER 1:  "But I guess bottom line, do you think that there are any better, worse?  You know, I hear what you're saying.  But if you had to hazard a guess, is their attrition any better or worse than the next guy?

SPEAKER 2:  I think they're better.

SPEAKER 1:  A little better?

SPEAKER 2:  And I think

BEN AXLER -- CONFIDENTIAL

they'll stay better for another year or two.  And then, you know, then the question will really come down is, what is that new leadership doing that's differentiated, that will keep it better?  I think right now, they're in a good position because a lot of the leaders that went through the transaction have RSUs, and I think they're going to stick, you know, for a bit.  So I think it was a three to four-year RSU for some of the leaders.  And so I think as long as some of those key leaders stay in place that their attrition will continue to be better than market.  But as time progresses, I think that the likelihood that it reverts to industry standards is there."

MS. SAMUELSOHN:  End time, 53:37.

Q        And so you ended your discussion of attrition with Mr. Hayes, asking him if you thought TaskUs was

CONFIDENTIAL

**Page 82**

BEN AXLER -- CONFIDENTIAL

better or worse than the next guy.

And his answer -- we've heard the whole thing -- began with, "I think better."

A      That's what he said, yeah. Previously, he said he thought it was worse.

Q      Well, again, we can parse the transcript, and we can parse the tape.  But you heard on the tape.  He actually said it's not TaskUs in terms of everything that follows that, it's the industry; right?

MR. KUBOTA:  Objection to form.

A      Yes.

Q      I probably asked you this, but I want to be clear.  Several other transcripts have been produced.  We may take a brief look at them.

But there are no other interviews that factored into the views and facts you presented regarding attrition in Exhibit 3?

CONFIDENTIAL

Page 83

BEN AXLER -- CONFIDENTIAL

A        No.

MR. KUBOTA:  Objection to form.

Q        No other interviews?

A        With Hayes, no.

Q        No other interviews that you relied upon in forming your views regarding attrition?

MR. KUBOTA:  Objection to form.

A        I don't believe so, no.  I mean I don't recall.  I mean if the Tegus ones had it, if I would have cited it or not, I don't recall.

Q        But if you didn't cite it, then you didn't put it in the report?

MR. KUBOTA:  Objection to form.

A        Right.

Q        One thing, among others, you're very careful about, as your disclosures say, is telling us what facts you're relying on?

A        Yes.

CONFIDENTIAL

**Page 101**

BEN AXLER -- CONFIDENTIAL

from early 2019, fair to say that this is attrition from earlier than '19?

A    That's probably fair, yes.

Q    And the quote that you take is this line, middle of page 2 of 8 from Day One through the word clients; right?

A    Yes.

Q    And so I think we can put the article to the side.

I had asked you earlier about page 36 of Exhibit 3 and where this industry standard of 30 percent came from.

And your testimony is your testimony.  But we discussed it coming from the bottom of 35, the 30 to 34 in APAC.  You see that?

A    Yes, at the bottom.

Q    And I think you agreed with me that it likely came from there; right?

A    Yes.

Q    But you also did point to the 30 percent higher up on the page?

A    Right.

**Page 102**

BEN AXLER -- CONFIDENTIAL

Q    In looking at it, that refers to TaskUs's 30 percent, not industry average; right?

MR. KUBOTA:  Objection to form.  What is that?

MR. YOUNGWOOD:  The 30 percent.

MR. KUBOTA:  Same objection.

MR. YOUNGWOOD:  The 30 percent on 35 refers to TaskUs, not to industry average.

A    Correct.  The article says "industry average is approximately 150" but that TaskUs is 30, yeah.

Q    So you've guessed my next question, which is, the 150, if we were to look at the first orange, pink box on page 35, industry average is 150?

A    According to the 2019 article, yeah.

Q    And the only other figure given on the page for industry average is the 30 to 34 in APAC?

A    Correct.

BEN AXLER -- CONFIDENTIAL

Q    So looking at that, is it fair to say that the 30 percent in your question on 36 is a reference to the 30 percent in APAC?

A    That's likely where I got it, yes.

Q    And APAC is Asia-Pacific?

A    Correct.

Q    Those numbers might be different than the rest of world?

A    They might.

Q    Or any particular other geography?

A    Yes.

MR. YOUNGWOOD:  I'll pass the witness.

EXAMINATION BY

MR. KUBOTA:

Q    Good morning, Mr. Axler.

A    Hi.

Q    I'm Evan Kubota, counsel for the class in this case.

Your investment approach at Spruce Point is predicated on publicly

CONFIDENTIAL

**Page 113**

BEN AXLER -- CONFIDENTIAL

A          That's approximately correct, yeah.

Q          Are you able to estimate how many hours per week you were working during that period?

A          Oh.  I work like an animal. I mean people that know me say I'm the hardest working person in the industry. I work 80 hours a week.

Q          So 80 times three, ballpark, 240 hours spent on the TaskUs report; is that a fair estimate?

A          Yeah.  That's fair.

Q          You mentioned earlier that as part of your investigation of TaskUs, you used a research firm called Coleman; is that correct?

A          Correct.

Q          Is Coleman a free service?

A          Is it free?

Q          Yes.

A          No.

Q          You have to pay them a fee to speak to experts?

CONFIDENTIAL

Page 114

BEN AXLER -- CONFIDENTIAL

A       We do pay them, yes.

Q       And is that a per-call fee or is it sort of an annual pricing plan? How does it work?

A       I don't know off the top. That would be something that I would have to ask my COO, who negotiated the contract.

Q       You have an estimate of how much Spruce Point has to spend to talk to experts through Coleman?

MR. SORKIN:  Objection to form.  Go ahead.

A       My estimate, 10,000, $20,000, maybe.

Q       That's an annual fee?

A       Sounds about right, if I had to wager a guess.

Q       Let's turn to Exhibit 3 which is your report on TaskUs.  Please turn to Slide 35.

Prior to the publication of your report, had you seen anyone put these pieces of information together in

**Page 115**

BEN AXLER -- CONFIDENTIAL

the way that you've done here and reached sort of the conclusion at the end of the yellow box, calling on TaskUs to clarify why its attrition is qualified for 180 days and is declining while its closest public peer is reporting a trend of rising attrition?

MR. YOUNGWOOD:  Objection to form.

A    I hadn't seen it.  But that doesn't mean that there wasn't something out there or someone else that was questioning.

Q    The top of 35 mentions potentially misleading employee attrition claims.  You see that?

A    Yes.

Q    To your knowledge, prior to your publication of this report, had you seen anyone call out TaskUs's employee attrition claims as potentially misleading?

MR. YOUNGWOOD:  Objection to form.

CONFIDENTIAL

**Page 116**

BEN AXLER -- CONFIDENTIAL

A        I hadn't.  But again, I don't have perfect knowledge of everything or all assuming knowledge.  So it's certainly possible someone else was.

Q        Please turn to Slide 36.

Prior to the publication of your report, had you seen any public documents with the language that is quoted in this slide, in the two boxes at the bottom?

MR. YOUNGWOOD:  Objection to form.

A        No.

Q        Turn to page 37, please.

Prior to the publication of your report, had you seen anyone reach the conclusion that TaskUs's estimated employee attrition was 46 percent?

MR. YOUNGWOOD:  Objection to form.

A        No.

Q        And turn to Slide 6, please.

Towards the middle of 6, there's a bullet that says, "Task's claim

CONFIDENTIAL

BEN AXLER -- CONFIDENTIAL

of a superior corporate culture evidenced by below standard industry workforce attrition appear to be highly exaggerated."

You see that?

A       Yes.

Q       Prior to the publication of your report, had you seen anyone publicly asserting that claim?

MR. YOUNGWOOD:  Objection to form.

A       No.

Q       Are you aware of any free source to learn what TaskUs's overall attrition rate was for 2020?

A       Free source, no.

Q       What about 2021, same answer?

A       No.

Q       You were asked some questions earlier about Tegus.  Do you recall that?

A       Yes.

Q       Is Tegus a free service?