# Exhibit 3

**Plaintiffs' Fifth Requests for Documents to Defendants**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HUMBERTO LOZADA and OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> TASKUS, INC., BRYCE MADDOCK, JASPAR WEIR, BALAJI SEKAR, AMIT DIXIT, MUKESH MEHTA, SUSIR KUMAR, JACQUELINE D. RESES, and BCP FC AGGREGATOR L.P., <br><br> Defendants. | Case No. 1:22-cv-01479 <br><br> CLASS ACTION |

**PLAINTIFFS' FIFTH REQUESTS FOR DOCUMENTS**
**TO DEFENDANTS**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Lead Plaintiff Humberto Lozada and Named Plaintiff Oklahoma Firefighters Pension and Retirement System (together, "Plaintiffs") hereby request that Defendants (as defined below) produce for inspection and copying the documents described herein within 30 calendar days at the offices of Bleichmar Fonti & Auld LLP, 300 Park Avenue, Suite 1301, New York, New York, 10022.

**DOCUMENTS REQUESTED[1]**

**DOCUMENT REQUEST NO. 1**

All "discoverable information that Defendants may use to support their claims or defenses" concerning Hayes, as stated in Defendants' Second Amended Initial Disclosures served on November 15, 2024.

---

[1] Definitions and instructions follow the Requests.

**DOCUMENT REQUEST NO. 2**

All Documents concerning any agreements between Hayes and TaskUs.

**DOCUMENT REQUEST NO. 3**

All Documents concerning Hayes' departure and separation from TaskUs.

**DOCUMENT REQUEST NO. 4**

Your complete employee personnel file for Hayes.

**DOCUMENT REQUEST NO. 5**

Documents sufficient to show any cash, stock, or other compensation You paid to Hayes in connection with, or after, his separation from TaskUs.

**DOCUMENT REQUEST NO. 6**

Documents sufficient to show Hayes' trading in TaskUs Securities.

**DOCUMENT REQUEST NO. 7**

All Documents concerning Your Communications with Hayes (including through Your counsel) in connection with and since his separation from TaskUs.

**DOCUMENT REQUEST NO. 8**

All Documents concerning Your identification of Hayes in connection with the Spruce Report.

**DOCUMENT REQUEST NO. 9**

All Documents from Hayes' custodial files (including email, Google chat and other forms of instant messaging, text messaging, Google Drives, and other sources) concerning attrition, Glassdoor, and/or the Spruce Report.

**DOCUMENT REQUEST NO. 10**

All Documents concerning any witness statements or testimony (deposition or otherwise) by Hayes and any interviews of Hayes, including recordings and notes.

**DOCUMENT REQUEST NO. 11**

To the extent not included above, all documents concerning Hayes that are responsive to Plaintiffs' prior Requests or otherwise relevant to the parties' claims or defenses.

2

**DOCUMENT REQUEST NO. 12**

All Documents concerning Your contention that any information in the Spruce Report (including information provided by Hayes) was public or otherwise known to the market, including all Documents concerning when and how such information became public or otherwise known to the market.

### DEFINITIONS[2]

1.      The uniform definitions, instructions, and rules of construction set forth in the Federal Rules of Civil Procedure are incorporated by reference as if fully set forth herein.

2.      "Action" means the above-titled action.

3.      "BCP" means BCP FC Aggregator L.P., and includes any owner, director, officer, employee, agent, custodian, parent, subsidiary, affiliate, predecessor, successor, attorney, accountant, consultant, or representative of BCP, or any other person acting or purporting to act on BCP's behalf, including but not limited to Blackstone Capital Partners VII L.P., Blackstone Capital Partners Asia L.P., Blackstone Management Partners L.L.C., BCP VII/BCP Asia Holdings Manager (Cayman) L.L.C., Blackstone Inc., and Blackstone Group Management L.L.C.

4.      "Board" means TaskUs's Board of Directors, including all committees and subcommittees.

5.      "Board Materials" means all Board meeting agendas, minutes (including drafts thereof), pre-meeting Board packets, presentations made to or by the Board or any committee thereof (and related talking points or speaker notes), recorded meetings, and notes made by directors or other Board meeting attendees.

6.      "BPO" means business process outsourcing.

---

[2] Each definition herein is to be interpreted as consistent with and incorporating the broadest interpretation of the definitions relating to document requests provided in the Federal Rules of Civil Procedure and the Local Rules.

7.    "Certificate of Incorporation" refers to TaskUs's Second Amended and Restated Certificate of Incorporation, dated as of June 10, 2021.

8.    "Class Period" means June 11, 2021 to January 19, 2022, both inclusive.

9.    "Communication(s)" is defined to be synonymous in meaning and equal in scope to the usage of the term "communication" in Local Rule 26.3(c)(1), and includes the transmittal of information (in the form of facts, ideas, inquiries or otherwise) including e-mail, facsimile, text message, instant message, Bloomberg Chat, Slack, Google Talk, WhatsApp, Skype, Jabber, Hipchat, Yahoo! Messenger, AOL Instant Messenger, Blackberry Messenger, ICQ, Pidgin, Line, Audium, Signal, Telegram, Trillian, Facebook Messenger, LinkedIn messages, Instagram messages, or any proprietary instant messaging system, internet message board posting, iMessage or any message transmitted through another personal digital device, and any other writing containing a Communication from one Person to another.

10.    "Complaint" means the Amended Class Action Complaint for Violations of the Federal Securities Laws filed in the Action on December 16, 2022.

11.    The terms "concerning," "relating to," "regarding," or "reflecting" mean, directly or indirectly, pertaining in any way to, relating to, referring to, describing, evidencing, or recording, constituting, or being in any way legally, logically or factually connected, in whole or in part, with the subject or matter described.

12.    "Defendants" means, individually and collectively, TaskUs, Maddock, Weir, Sekar, Dixit, Mehta, Kumar, Reses, and BCP.

13.    "Defendants' Counsel" means Simpson Thacher & Bartlett LLP and any other counsel for Defendants, whether or not they have formally appeared in the Action.

14. "Dixit" means Amit Dixit, TaskUs's Director, as well as his counsel, partners, affiliates, agents, and persons acting or purporting to act on his behalf.

15. "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A) (incorporated in Local Rule 26.3(c)(2)), and includes ESI and Communications. A draft or non-identical copy is a separate Document within the meaning of this term.

16. "Due Diligence" means any investigation, review, analysis, or inquiry, including any investigation of whether statements contained within a Document are true or whether the Document omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

17. "Email Threading" means a process of identifying the email in an email correspondence that includes the initiating email and all subsequent replies and forwards pertaining to that original email.

18. "ESI" or "Electronically-Stored Information" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A). For the avoidance of doubt, ESI includes Documents and data from all electronic sources, including computers, smartphones and other mobile devices, flash drives and the like, network and shared drives, and cloud storage, and includes email, chats, and text and instant messages (regardless of whether transmitted through SMS or through applications like iMessage, Lync, Slack, Teams, WhatsApp, Telegram, or similar applications).

19.    "Extracted Text" means text extracted from a Native Format file and includes at least all headers, footers, document body information, and any hidden text, if available. The extracted text must not include text of characters that were not part of the text of the original Native Format file, including but limited to, Bates Numbers and Endorsements (except in the cases of redactions).

20.    "Glassdoor" means Glassdoor LLC, which issued a Glassdoor rating for TaskUs based on reviews submitted by TaskUs employees that was available on Glassdoor's website.

21.    "Hayes" means Robert Hayes, former TaskUs Chief Operating Officer, as well as his counsel, partners, affiliates, agents, and persons acting or purporting to act on his behalf.

22.    The term "including" means "including without limitation."

23.    "IPO" means the June 10, 2021 initial public offering of shares of Class A common stock of TaskUs.

24.    "Jobvite" refers to the software platform whereby new TaskUs hires completed training assignments, as alleged in ¶¶89-91, 139(xi), 140(i), and 142(i).

25.    "Kumar" means Susir Kumar, TaskUs's director, as well as his counsel, partners, affiliates, agents, and persons acting or purporting to act on his behalf.

26.    "Load File" means an electronic file that is used to import all required production information into a document database, including, if available, document images, Extracted Text or OCR text, Native Format files, and Metadata, as well as information indicating document breaks, document relationships (such as those between an e-mail message and its attachments), and information related to embedded content.

27.    "Maddock" means Bryce Maddock, CEO and Co-Founder of TaskUs, as well as his counsel, partners, affiliates, agents, and persons acting or purporting to act on his behalf.

28. "Mehta" means Mukesh Mehta, TaskUs's director, as well as his counsel, partners, affiliates, agents, and persons acting or purporting to act on his behalf.

29. "Metadata" means structured information about ESI that is created by the file system or application, embedded in the Document or email and sometimes modified through ordinary business use. Metadata of the ESI describes, *inter alia*, the characteristics, origins, usage and validity of the collected ESI.

30. "Native Format" means the format of ESI in the application in which such ESI was originally created.

31. "Offerings" means the IPO and Secondary Offering.

32. "OCR" means the optical character recognition technology used to read paper Documents or electronic images of Documents and output such Documents to a searchable text format. The latter text is also referred to as the "OCR text" or simply "OCR."

33. "Person" means any natural person or any legal entity, including any business or governmental entity or association.

34. "Registration Rights Agreement" refers to the Registration Rights Agreement dated as of June 15, 2021 by and among TaskUs, Inc., BCP (as defined therein), the Founder Groups (as defined therein) and the other Holders (as defined therein).

35. "Reses" means Jacqueline D. Reses, TaskUs's director, as well as her counsel, partners, affiliates, agents, and persons acting or purporting to act on her behalf.

36. "Restated Bylaws" refers to TaskUs's Second Amended and Restated Bylaws, dated as of June 10, 2021.

37. "SEC" means the United States Securities and Exchange Commission and any employee, agent, or representative thereof.

7

38.    "Secondary Offering" means the secondary offering of shares of Class A common stock of TaskUs completed on October 25, 2021.

39.    "Secondary Offering Registration Statement" refers collectively to TaskUs's September 17, 2021 draft registration statement, October 18, 2021 preliminary prospectus, October 20, 2021 amended registration statement, and its October 22, 2021 prospectus filed pursuant to Rule 424(b)(4).

40.    "Sekar" means Balaji Sekar, CFO of TaskUs, as well as his counsel, partners, affiliates, agents, and persons acting or purporting to act on his behalf.

41.    "SOX" refers to the Sarbanes-Oxley Act of 2002.

42.    "Spruce Point" means Spruce Point Capital Management, LLC together with each and every one of its affiliates, parents, subsidiaries, divisions, and subdivisions, each present and former officer, director, partner, employee, representative, agent, attorney, and accountant of any of these entities, and any other Person or entity that acted or purported to act on behalf of any of the foregoing, and all other entities, directly or indirectly, owned, operated, and/or controlled by Spruce Point Management LLC.

43.    "Spruce Point Report" refers to the report on TaskUs titled "Moderating the Bull Case Content" issued by Spruce Point Capital Management, LLC on January 20, 2022 at 9:30 a.m. ET.

44.    "Stockholders Agreement" refers to the Amended and Restated Stockholders Agreement dated as of June 15, 2021 by and among TaskUs, Inc., BCP, Maddock, and Weir, the Bryce Maddock Family Trust, The Maddock 2015 Irrevocable Trust, the Jaspar Weir Family Trust, and The Weir 2015 Irrevocable Trust.

45.     "Support and Services Agreement" refers to the Support and Services Agreement dated as of October 1, 2018 between TU TopCo, Inc., TaskUs, Inc., and BCP (as defined therein).

46.     "TaskUs" and the "Company" refer to TaskUs, Inc. together with each and every one of its affiliates, parents, subsidiaries, divisions, and subdivisions, each present and former officer, director, partner, employee, and representative of any of these entities, and any other Person or entity that acted or purported to act on behalf of any of the foregoing, and all other entities, directly or indirectly, owned, operated or controlled by TaskUs, Inc.

47.     "TaskUs Securities" refers to all securities issued by TaskUs, including Class A common stock, Class B common stock, preferred stock, derivatives such as options, and debt securities.

48.     "Weir" means Jaspar Weir, President and Co-Founder of TaskUs, as well as his counsel, partners, affiliates, agents, and persons acting or purporting to act on his behalf.

49.     "You" or "Your" refers separately to each Defendant and all other Persons acting or purporting to act on their behalf, including but not limited to employees, representatives, attorneys, and agents.

## **INSTRUCTIONS**

1.     In responding to these Requests, all Documents shall be produced in accordance with the Federal Rules of Civil Procedure 26 and 34.

2.     The relevant time period (the "Relevant Period") of the Requests, unless otherwise stated, shall be from January 1, 2020 through the present, and shall include all Documents that relate to such period, even if such Documents were prepared, published, or occurred outside the Relevant Period.

3.      These Requests are organized in a uniform manner and directed at Defendants to avoid unnecessary duplication.  The uniform organization of these Requests is not intended to limit the scope of these Requests, and each Request shall be construed as though separately directed at each Defendant.  Thus, each Defendant is required to produce Documents or things in its, his, or her possession, custody, or control, regardless of whether such Documents or materials are possessed directly by You or by Your directors, officers, agents, employees, representatives, subsidiaries, managing agents, consultants, investigators, or by Your attorneys or their agents, employees, representatives, or investigators.  A Document shall be deemed to be within Your possession, custody or control if You have the right or ability to secure the Document or a copy of the Document from another Person having possession or custody of the Document.

4.      Pursuant to Federal Rule of Civil Procedure 34(b), Documents shall be produced as they are kept in the usual course of business so that Plaintiff can ascertain the files in which they were located, their relative order in such files, and how such files were maintained. Documents shall be produced in such fashion as to identify the department, branch, or office in whose possession they were located and, where applicable, the natural person in whose possession they were found.

5.      All Documents must be produced in their entirety, including all attachments and enclosures, and in their original folder, binder, or other cover or container, regardless of whether You consider the entire Document to be relevant or responsive to the Request.  Whenever a Document or group of Documents is removed from a file folder, binder, file drawer, file box, notebook, or other cover or container, a copy of the label of such cover or other container must be attached to the Document or group of Documents.

10

6.      All File types containing any user-generated text, such as email stores and individual messages, word processing documents, spreadsheets, hypertext documents and data saved in Portable Document Format ("PDF") will be processed and their text shall be extracted prior to searching.  Image files and PDFs containing images of potentially relevant text shall be submitted to Optical Character Recognition ("OCR") processing before search terms are applied.

7.      With respect to the production of Documents and ESI, all Documents and ESI must be produced in accordance with the instructions appended as Exhibit A.

7.1     Format Guideline: Documents shall be produced in 300 DPI Group IV Color Tagged Image File Format (.TIFF or .TIF) files ("TIFF files").  TIFF files shall be produced in single-page format along with corresponding image load files (.OPT file).  For electronically stored information ("ESI"), the TIFF files shall be, where possible, created directly from the original native documents.  The party producing documents or ESI (the "Producing Party") may not create TIFF files of electronic documents by printing out paper copies of the electronic documents and scanning those paper copies.  For documents that only exist on paper, the TIFF files shall be created by scanning either the original paper documents or first-generation photocopies of the original paper documents, running OCR and properly unitizing documents before production.  Each embedded file shall be produced as a child to the parent document to which it is embedded.  In-line images and OLE objects such as signature blocks from emails shall not be extracted as stand-alone documents.

Notwithstanding the foregoing, all electronically stored spreadsheets and multimedia files shall also be produced in native electronic format with embedded data and metadata intact and a TIFF placeholder.  Any documents that cannot be

11

converted to TIFF format shall be represented in the production with a placeholder TIFF image which bears the legend "This document cannot be converted to TIFF" and a native version of the file shall be provided. The parties agree to meet and confer regarding such documents if requested by the party receiving the production (the "Receiving Party") and to take reasonable actions to remedy such conversion problems.

7.2    Previously Produced Documents. To the extent that documents have been produced by a Producing Party in another proceeding, action or investigation in a format otherwise prohibited by this Request for Documents, the parties will meet and confer on whether such documents may be produced in the format used in the other proceeding, action or investigation.

7.3    De-Duplication: The Producing Party is only required to produce a single copy of a responsive Document. Exact duplicate Documents (*i.e.*, identical copies of the same Document) may be removed, including email, to reduce the unnecessary cost of reviewing and producing exact duplicate Documents. If the Producing Party chooses to remove exact duplicate documents, it shall make reasonable efforts to remove exact duplicate ESI according to the MD5/SHA-1 hashing method and shall identify all custodians of de-duplicated Documents in the Custodian field delimited by semicolons or in a MasterCustodian field delimited by semicolons (as set forth in Exhibit A). Moreover, (a) de-duplication shall be performed only at the Document family level[3] so that attachments are not de-

---

[3] Unless otherwise agreed upon by the Parties, a family can only be removed through de-duplication if each and every member of the de-duplication candidate family has identical MD5/SHA-1 hashcodes to the corresponding members of another family. For example, if there

duplicated against identical stand-alone versions of such Documents and vice versa, although each family member shall be hashed separately for purposes of populating the HashValue field in Exhibit A; (b) attachments to emails, instant messages or other Documents shall not be disassociated from the parent email, instant message or Document even if they are exact duplicates of another Document in the production, and (c) paper Documents shall not be eliminated as duplicates of responsive ESI. ESI that is not an exact duplicate according to the method specified in Exhibit A may not be removed. If there is any handwriting or other alteration to a document, it shall not be considered a duplicate pursuant to this Paragraph. If the Producing Party becomes aware of any file that was incorrectly filtered during the de-duplication process, the Producing Party shall promptly notify the Requesting Party and produce the file pursuant to the terms of this Request for Documents.

7.4     Extracted Text.  For all documents, the Producing Party shall provide full extracted text. Where extracted text is unavailable, such as image files and non-searchable PDFs, OCR text shall be provided. Such text files shall be produced as document-level text files and be named consistently with their corresponding TIFF files.

7.5     Documents to Be Produced Natively:    Microsoft Excel and other spreadsheet files, including comma or tab delimited text files, Microsoft Access

---

is a two-member family with a parent and an attachment, the MD5 hashcodes of the parent must be identical and the MD5 hashcodes of the attachments must also be identical. If a Party de-duplicates globally, the Party shall identify the de-duplication priority order at the request of any other Party. To the extent any Party wishes to de-duplicate emails in such a way as to eliminate earlier or incomplete chains of email, the Parties shall confer in good faith about that request.

13

and other database files, video files, audio files, animation files, Slack messages, Bloomberg chats and other instant messages, and PowerPoint and other presentation files shall be produced in Native Format. If a document to be produced in Native Format contains privileged information, the document will be produced by producing the document in TIFF format with redactions and OCR text to remove the privileged material from the searchable text. Each electronic file produced in Native Format shall be assigned a unique Document Number, as set forth in Section 7.1, and the database record for that file shall include a single page TIFF image branded with this unique Document Number in the lower right corner of the image as a Bates Number, with the phrase "PRODUCED IN NATIVE FORMAT" (or similar language) branded in the center of the page and any confidentiality designations stated on the associated TIFF placeholder in no less than 10-point font. Files produced in Native Format shall be given file names identical to the Document Number, followed by the file extension and include the confidentiality designation after the file number, *e.g.*, BATES00000000_CONF.xlsx. For each file produced in Native Format, the Producing Party shall also indicate its native status in the Native File Metadata field described in Exhibit A.

7.6    Embedded Files: Embedded files to responsive documents shall not be produced as separate documents. Examples of Embedded files include, but are not limited to, logo graphics in email signature lines (usually *.PNG or another image file format) and images, tables, or graphics in presentation software like Microsoft PowerPoint. Upon request by the Receiving Party, the Parties shall meet and confer in good faith regarding whether certain substantive records containing embedded

14

files should be produced in native format.

7.7    Databases:  Non-privileged raw data kept in enterprise databases (such as Oracle or SQL databases) will be produced in database or delimited text file format or database reports; where necessary, the parties will discuss appropriate procedures and method of production.

7.8    Attachments:  If any part of an email or its attachments is responsive, the entire email and all attachments will be produced, except as to any email or attachment that the Producing Party contends is entirely privileged or protected from disclosure.

7.9    Encryption:  The Producing Party will make reasonable efforts to ensure that all encrypted or password-protected Documents are successfully processed for review and production under the requirements herein, and if produced in Native Format, the decrypted Document is produced.  To the extent encrypted or password-protected Documents are successfully processed according to the requirements herein, the Producing Party shall have no duty to identify the prior encrypted status of such Documents but will produce such processed Documents in accordance with the specifications herein.  If documents are not successfully processed despite use of reasonable efforts, a placeholder TIFF image will be produced stating the file is password protected.  Upon request from either Party, the Parties shall meet and confer in good faith regarding reasonable efforts or mechanisms to remove such security protection or the production of available Metadata.

7.10    Unitization:  In scanning paper Documents, each page of paper should be

15

output to a single page TIFF file.  Distinct, logical document breaks should be defined as such in a standard load file as described in Exhibit A.  In the case of an organized compilation of separate Documents (*e.g.*, a binder containing several separate Documents behind numbered tabs) the Document behind each tab should be scanned separately, but any document or family relationship among the scanned Documents in the compilation should be reflected in the data load file at the appropriate standard fields.  Pages containing post-it notes or other detachable notes that obscure the underlying Document should be scanned once with the detachable note intact, and then again without it, and made part of the same Document.  The Parties shall make reasonable efforts to unitize the Documents correctly.

7.11    <u>Document Numbering</u>:  Each page of a Document produced in TIFF file format shall have a legible, unique fixed-length numeric identifier ("Document Number") containing at least eight (8) digits electronically "burned" onto the image in no less than 10-point font.  Unless it would obscure, conceal or interfere with any information originally appearing on the Document, the Document Number shall be burned on the lower right hand corner of the Document. The Document Number for each Document shall be created so as to identify the Producing Party and the Document Number (*e.g.*, "BATES0000000000").

7.12    <u>Claims of Confidentiality</u>.  All documents shall be produced subject to a Stipulation for the Production and Use of Confidential Information agreed to by the parties and ordered by the Court in the Action (the "Confidentiality Stipulation"). For documents that the Producing Party produces in TIFF format, if the Producing Party is producing documents subject to a claim that it is protected from disclosure

16

under the Confidentiality Stipulation, the Producing Party shall electronically "burn" the appropriate confidentiality designation onto each page of the document and provide the designation in the metadata load file.  Unless it would obscure, conceal or interfere with any information originally appearing on the Document, any confidentiality designation will appear on the lower left-hand side of each page of a Document produced, in no less than 10-point font.  If there is a conflict between the provisions of this Request for Documents and a Confidentiality Stipulation, the Confidentiality Stipulation shall control.

7.13    <u>Metadata Fields and Processing</u>:  Each of the Metadata and coding fields set forth in Exhibit A that can be extracted or generated from a Document shall be produced for that Document. The Producing Party is not obligated to populate any of the fields in Exhibit A manually if such fields cannot be extracted or generated from a Document and its context in the source data, with the exception of the following fields, if available: (a) BegBates; (b) EndBates; (c) BegAttach; (d) EndAttach; (e) Custodian; (f) Redacted (Y/N); (g) Confidentiality; (h) FilePath; and (i) HashValue[4].  Metadata shall be provided in a Concordance-format delimited file with a .DAT file extension and ASCII 020 and 254 delimiters for column break and text qualifier.  The first line shall be the header with field names, and each subsequent line shall contain the fielded data for each Document. For documents produced natively, the metadata load file shall contain a link to natively produced documents via data values called "Native Link."  The Native Link values should contain the full directory path and file name of the documents as contained in the

---

[4] In the case of Documents that were scanned from paper, the HashValue field is not required.

produced media. The Native Link field should be included in the .DAT file.

7.14    Production Media:    The Producing Party will endeavor to produce documents electronically by way of a secure FTP.  To the extent a production by a secure FTP is not possible or impractical, the Producing Party shall produce documents on readily accessible computer or electronic media, including CD-ROM, DVD, external hard drive (with standard PC-compatible interface), or such other media as the parties may agree on ("Production Media").  The Producing Party shall affix a unique identifying label to each piece of Production Media, which shall identify the date of the production and the numbered sequence of the material in that production.  The Producing Party shall properly package all Production Media to ensure safe shipping and handling.  The Producing Party shall encrypt all Production Media prior to shipping.

7.15    Email Threading: Where Email Threading is available as a review tool, email threading may be employed in the review process but not to remove lesser included emails in an email thread from productions since this destroys the ability to search the To/From/CC/SentDate/SentTime/Subject Metadata Fields of the individual lesser-included emails.

8.    If any otherwise requested Document was, but is no longer, in existence or in Your possession, custody, or control, identify the type of information contained in the Document, its current or last known custodian, the location/address of such Document, the identity of all persons having knowledge or who had knowledge of the Document, and describe in full the circumstances surrounding its disposition from Your possession, custody, or control.

18

9.      A copy of a Document that varies in any way whatsoever from the original or from any other copy of the Document, including by reason of Metadata that differs in any respect, or by reason of any handwritten or other notation or any omission, constitutes a separate Document and must be produced, whether or not the original of such Document is within Your possession, custody, or control.  Accordingly, all prior versions and all drafts of all Documents must be produced.

10.     The terms "all," "any," and "each" shall each be construed as encompassing any and all.

11.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope.

12.     The use of the singular form of any word includes the plural and vice versa.

13.     If no Documents or materials exist that are responsive to a particular Request, so state in writing.

14.     If any responsive Documents are withheld under a claim of attorney-client privilege, attorney work product doctrine, or any other privilege or immunity from discovery, provide a privilege log as required by Federal Rule of Civil Procedure 26(b)(5) and in conformance with the requirements of Local Rule 26.2 by the time when any Document production of any such withheld Document is due.  If a portion of any responsive Document is withheld under a claim of privilege or other immunity from discovery pursuant to the preceding instruction, each such Document must be produced with the portion claimed to be privileged or otherwise immunized from discovery redacted.

19

15.     All Requests shall be deemed continuing Requests, and You are required to supplement Your answers with any new or newly discovered materials responsive to these Requests up to and including the time of the trial of this Action, in accordance with Federal Rule of Civil Procedure 26(e).

16.     The specificity of any Request herein shall not be construed to limit the generality or reach of any other Request herein.

Dated:  November 22, 2024

/s/ Joseph A. Fonti
Joseph A. Fonti
Nancy A. Kulesa
Benjamin F. Burry
Thayne Stoddard
**BLEICHMAR FONTI & AULD LLP**
300 Park Avenue, Suite 1301
New York, New York 10022
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jfonti@bfalaw.com
nkulesa@bfalaw.com
bburry@bfalaw.com
tstoddard@bfalaw.com

*Counsel for Lead Plaintiff Humberto Lozada and Named Plaintiff Oklahoma Firefighters Pension and Retirement System*

John A. Kehoe
Michael K. Yarnoff
**KEHOE LAW FIRM, P.C.**
41 Madison Avenue, 31st Floor
New York, New York 10010
Telephone: (212) 792-6676
jkehoe@kehoelawfirm.com
myarnoff@kehoelawfirm.com

*Additional Counsel for Lead Plaintiff Humberto Lozada*

20

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2024, a copy of the foregoing was served on Defendants' counsel by electronic mail, pursuant to the parties' agreement to accept email service.

/s/ *Evan A. Kubota*
Evan A. Kubota

21

<u>**EXHIBIT A**</u>

1.    **PRODUCTION LOAD FILES**
      There will be two Load/Unitization files accompanying all productions of ESI:
- The first will be a Metadata import file, in Concordance-format delimited file with a .DAT file extension that contains the agreed-upon Metadata fields. For all DAT files: if no foreign language is contained in the production, then UTF-8 text encoding is acceptable; however, if there will be foreign language documents, the text encoding must be in Unicode.
- The second will be a cross-reference file that contains the corresponding image information [IDX] identifying document breaks. The acceptable formats for the cross-reference files are .log and .opt.

2.    **IMAGES**
- Produce documents in Single Page Group IV TIFF color files.
- Image Resolution of at least 300 DPI.
- If either Party deems the quality of the document produced in TIFF format to be insufficient, the Parties will meet and confer in good faith to determine whether the Producing Party must produce the document as a JPEG file.
- File Naming Convention:  Match Bates Number of the page.
- Insert placeholder image for files produced in Native Format (see Paragraph 6.1).
- Original document orientation or corrected orientation shall be retained.

3.    **SPECIAL FILE TYPE INSTRUCTIONS**
- Certain file types shall be produced in Native Format, as specified in Paragraphs 6.5 and 6.9.
- If redactions are required, see production requirements specified in Paragraph 6.5.

4.    **FULL TEXT EXTRACTION/OCR**
- Where available, produce full extracted text for all file types (Redacted text will not be produced). Redacted documents should be re-OCRed and the redacted text should be produced.
- Produce OCR text output for any paper document.
- Produce OCR text output for any ESI where the source format was an image file (such as JPG, JPEG, GIF, BMP, PCX, PNG, TIF, TIFF etc.) where extracted text cannot be provided, using industry standard OCR technology (Redacted text will not be produced).
- *Production format*: Single text file for each document, not one text file per page.
- *File Naming Convention*: Match Beg Bates Number.

5.    **ESI (AND PAPER TO THE EXTENT APPLICABLE) PRODUCTION METADATA FIELDS**
- <u>BegBates</u>:  Beginning Bates Number.
- <u>EndBates</u>:  Ending Bates Number.
- <u>BegAttach</u>:   Beginning Bates number of the first document in a document family range. Documents that are part of document families, *i.e.*, containing parents and attachments should receive a value.
- <u>EndAttach</u>:  Ending Bates number of the last document in attachment range in a document family range.  Documents that are part of document families, *i.e.*, containing parents or attachments, should receive a value.

- Custodian:  Name of the Custodian of the Document Produced.
- Duplicate Custodians:  Names of all custodians who had a copy of a document that was removed through the de-duplication process, if applicable.
- FileName:  Filename of the original source ESI as stored by the custodian.
- FilePath:  Location of the original source ESI as stored by the custodian.
- NativeLink:  Path and filename to produced Native Format file (see Paragraph 6.13).
- EmailSubject:  Subject line extracted from an email message.
- Title:  Title field extracted from the metadata of a non-email document.
- Author:  Author field extracted from the metadata of a non-email document.
- From:  From field extracted from an email message, including both the display name and the SMTP address.
- To:  To or Recipient field extracted from an email message, including both the display name and the SMTP address.
- Cc:  CC or Carbon Copy field extracted from an email message, including both the display name and the SMTP address.
- BCC:  BCC or Blind Carbon Copy field extracted from an email message, including both the display name and the SMTP address.
- DateSent:  Sent date and time of an email message (mm/dd/yyyy  format).
- TimeSent: Sent time of an email message or instant message. (hh:mm:ss format)
- TimeZoneProcessed: The originating time zone of the document.
- DateCreated: The origination date of the document. (mm/dd/yyyy format)
- TimeCreated: The origination time of the document (hh:mm:ss format)
- DateLastModified:  Last modification date (mm/dd/yyyy format).
- TimeLastModified: Last modification time (hh:mm:ss format)
- Location: The folder structure for the original native file as it existed at the time of collection.
- PageCount: The number of pages of the document, excluding the pages of documents in the same family.
- [MD5/SHA1]HashValue:  MD5 or SHA-1 hash value, but please specify using field name.
- File Extension:  File extension of document (.msg, .doc, .xls, etc.)
- ExtractedText:  File path to Extracted Text/OCR File.
- Confidentiality: "Confidential," if a document has been so designated under the Confidentiality Stipulation; otherwise, blank.
- Attach Count:  Number of attached files.
- Message-ID: The Outlook Message ID assigned by the Outlook mail server, if applicable.
- Reference Chain: The Outlook message "Reference Chain," if applicable.
- Redacted (Y/N): Whether the document contains redactions.
- Embedded Source: The Document Number of the source file from which the embedded file was extracted (if applicable).

6.    **DE-DUPLICATION**
- De-duplication method: Parties may make reasonable efforts to de-duplicate stand-alone documents or entire document families globally using MD5 or SHA-1 Hash value matching.
- Common system files defined by the NIST library (http://www.nsrl.nist.gov/) need not be produced.