**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HUMBERTO LOZADA and OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> TASKUS, INC., BRYCE MADDOCK, JASPAR WEIR, BALAJI SEKAR, AMIT DIXIT, MUKESH MEHTA, SUSIR KUMAR, JACQUELINE D. RESES, and BCP FC AGGREGATOR L.P., <br><br> Defendants. | Case No.  1:22-cv-01479-JPC-GS <br><br> <u>CLASS ACTION</u> |

**DECLARATION OF JOSEPH A. FONTI IN SUPPORT OF:**
**(I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION**
**SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION AND**
**(II) LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, LITIGATION**
**<u>EXPENSES, AND PLAINTIFFS' REASONABLE COSTS AND EXPENSES</u>**

**TABLE OF CONTENTS**

I.      PLAINTIFFS' PROSECUTION OF THE ACTION ..............................................3

        A.      Commencement of the Litigation and Appointment of
                Lead Plaintiff ......................................................................................3

        B.      Plaintiffs' Investigation and Filing of the Amended Class
                Action Complaint.................................................................................4

        C.      Plaintiffs Vigorously Oppose Defendants' Motion to Dismiss,
                Which the Court Grants in Part and Denies in Part ....................................6

        D.      Plaintiffs' Substantial Discovery Efforts .........................................................8

        E.      Class Certification Was Heavily Litigated ................................................12

        F.      Merits Expert Discovery ..................................................................................15

        G.      Mediation Session with David Murphy ..........................................................15

        H.      The Stipulation of Settlement and Plaintiffs' Motions for
                Preliminary and Final Approval.......................................................................16

II.     THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN
        RECOVERING A REASONABLE RANGE OF REALISTICALLY
        RECOVERABLE DAMAGES..............................................................................17

III.    COMPLIANCE WITH THE NOTICE ORDER AND REACTION OF
        THE CLASS TO DATE ........................................................................................18

IV.     THE PLAN OF ALLOCATION IS FAIR, REASONABLE,
        AND ADEQUATE ...............................................................................................19

V.      LEAD COUNSEL'S APPLICATION FOR AN AWARD OF
        ATTORNEYS' FEES ...........................................................................................20

        A.      The Risks and Duration of the Litigation .......................................................21

        B.      Plaintiffs' Counsel's Time and Labor Expended.............................................23

        C.      Plaintiffs Approve the Requested Attorneys' Fees..........................................28

VI.     LEAD COUNSEL'S APPLICATION FOR AN AWARD OF EXPENSES
        IS REASONABLE AND SHOULD BE APPROVED ..........................................28

VII.    AN AWARD OF PLAINTIFFS' REASONABLE COSTS AND
        EXPENSES IS FAIR AND REASONABLE.........................................................35

i

JOSEPH A. FONTI declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true:

1.      I am a partner at Bleichmar Fonti & Auld LLP ("Lead Counsel" or "BFA"), Court-appointed Lead Counsel in the above-captioned action (the "Litigation").[1]

2.      I submit this declaration in support of (I) Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation, and (II) Lead Counsel's Motion for Attorneys' Fees, Litigation Expenses, and Plaintiffs' Reasonable Costs and Expenses.

3.      I have personal knowledge of the matters set forth herein based on my active participation in the prosecution and settlement of the Litigation.

4.      Attached hereto are true and correct copies of the following documents:

  a.  Exhibit 1 – The Declaration of David M. Murphy in Support of Settlement (the "Murphy Declaration" or "Murphy Decl.").

  b.  Exhibit 2 – The Declaration of Lead Plaintiff Humberto Lozada in Support of (I) Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation, and (II) Lead Counsel's Motion for Attorneys' Fees, Litigation Expenses, and Plaintiffs' Reasonable Costs and Expenses (the "Lozada Declaration" or "Lozada Decl.").

  c.  Exhibit 3 – The Declaration of Chase Rankin on Behalf of Named Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma") in Support of (I) Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation, and (II) Lead Counsel's

---

[1] Capitalized terms not defined herein have the meanings stated in the Stipulation of Settlement, dated May 27, 2025 (the "Stipulation") (ECF 187-1). "¶_" citations are to the paragraphs of the Amended Complaint (ECF 26). Citations and internal quotations are omitted and emphases are added unless otherwise noted.

Motion for Attorneys' Fees, Litigation Expenses, and Plaintiffs' Reasonable Costs and Expenses (the "Rankin Declaration" or "Rankin Decl.").

d. Exhibit 4 – The Declaration of Morgan Kimball Regarding (I) Mailing of Notice; (II) Publication of Summary Notice; (III) the Settlement Website and Contact Center Services; (IV) Claim Filing; and (V) Requests for Exclusion and Objections Received to Date (the "Kimball Declaration" or "Kimball Decl.").

e. Exhibit 5 – The Declaration of Fred R. Webb Regarding CAFA Notice (the "Webb Declaration" or "Webb Decl.").

f. Exhibit 6 – The Declaration of Joseph A. Fonti in Support of Lead Counsel's Motion for Attorneys' Fees, Litigation Expenses, and Plaintiffs' Reasonable Costs and Expenses, Filed on Behalf of Bleichmar Fonti & Auld LLP (the "Fonti Fee Declaration" or "Fonti Fee Decl.").

g. Exhibit 7 – The Declaration of Michael K. Yarnoff in Support of Lead Counsel's Motion for Attorneys' Fees, Litigation Expenses, and Plaintiffs' Reasonable Costs and Expenses, Filed on Behalf of Kehoe Law Firm, P.C. (the "Yarnoff Declaration" or "Yarnoff Decl.").

h. Exhibit 8 – The Declaration of Susan R. Podolsky in Support of Lead Counsel's Motion for Attorneys' Fees, Litigation Expenses, and Plaintiffs' Reasonable Costs and Expenses, Filed on Behalf of The Law Offices of Susan R. Podolsky (the "Podolsky Declaration" or "Podolsky Decl.").

2

## I.   PLAINTIFFS' PROSECUTION OF THE ACTION

### A.   Commencement of the Litigation and Appointment of Lead Plaintiff

5.   BFA filed the initial complaint in this action on behalf of Humberto Lozada on February 23, 2022. (ECF 1.) The initial complaint alleged false and misleading statements and omissions in violation of Sections 10(b) and 20(a) of the Exchange Act of 1934 (the "Exchange Act") against TaskUs, Inc. ("TaskUs"); Bryce Maddock, TaskUs's CEO ("Maddock"); Jaspar Weir, TaskUs's President ("Weir"); and Balaji Sekar, TaskUs's CFO ("Sekar").

6.   On April 25, 2022, Mr. Lozada moved for appointment as lead plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B). (ECF 13.) No other individuals or entities moved for appointment as lead plaintiff.

7.   On October 20, 2022, the Court appointed Mr. Lozada as Lead Plaintiff and approved his selection of BFA as Lead Counsel. (ECF 20.) The Court concluded that Mr. Lozada "satisfies the various requirements that he must meet to benefit from the statutory presumption that he is the most adequate plaintiff," noting that "Lozada's alleged losses of over $300,000 easily constitute a sufficient interest in the outcome of this case to secure his vigorous advocacy on behalf of the class." (*Id.* at 3.) The Court also noted BFA's "extensive experience representing plaintiffs in class actions." (*Id.* at 4.)

8.   After Lead Plaintiff and Lead Counsel's appointment, the parties conferred and submitted an agreed-upon proposed schedule for Lead Plaintiff to file an amended class action complaint and for briefing on Defendants' anticipated motion to dismiss. (ECF 24.) The Court entered an order approving the schedule on November 3, 2022. (ECF 25.)

3

**B.**  **Plaintiffs' Investigation and Filing of the Amended Class Action Complaint**

9. Once it was clear that Mr. Lozada was the sole lead plaintiff movant, BFA commenced a further, extensive investigation to prepare the amended class action complaint.

10. As part of that investigation, BFA analyzed TaskUs's U.S. Securities and Exchange Commission ("SEC") filings and Defendants' other public statements, media reports, analyst reports, reviews submitted to Glassdoor.com ("Glassdoor") by TaskUs employees, and TaskUs's historic stock data. BFA (working with investigators) also conducted an extensive search to locate former TaskUs employees with potentially relevant information, and the amended class action complaint ultimately incorporated information from four former employees: (1) a Human Resources Information Systems ("HRIS") specialist involved in attrition reporting transmitted to TaskUs's Executive Leadership Team, (2) another HRIS specialist involved in programming TaskUs's Jobvite system in connection with Glassdoor reviews, (3) a customer service representative and team lead, and (4) a Learning Experience Leader. These former employees provided detailed information that was critical to maximizing the value of the Class's claims. In addition, BFA retained forensic accounting experts at Hemming Morse LLP to assist in the evaluation of TaskUs's financial statements.

11. On December 16, 2022, Lead Plaintiff and Named Plaintiff Oklahoma (with Lead Plaintiff, "Plaintiffs"), filed the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF 26) (the "Amended Complaint"). The Amended Complaint alleged violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") and Sections 10(b), 20(a), and 20A of the Exchange Act against Defendants TaskUs, Maddock, Weir, Sekar, Amit Dixit ("Dixit"), Mukesh Mehta ("Mehta"), Susir Kumar ("Kumar"), Jacqueline D. Reses, and BCP FC Aggregator L.P. ("BCP").

4

12.     Based on Plaintiffs' Counsel's investigation, the Amended Complaint significantly expanded and bolstered the allegations of the initial complaint, including by advancing detailed allegations that statements regarding TaskUs's attrition, culture, and Glassdoor rating were materially false and misleading because TaskUs had high attrition compared to peer companies in the business process outsourcing ("BPO") industry, TaskUs did not have a superior culture compared to other BPO companies, and Defendants inflated TaskUs's Glassdoor rating by implementing a policy that required new employees to submit reviews during training, before they experienced the reality of working at TaskUs.

13.     The Amended Complaint also incorporated information from the TaskUs former employees to allege that Defendants Maddock and Sekar received monthly reports that were provided to TaskUs's Executive Leadership Team and identified attrition rates above 40%. With regard to the Glassdoor policy, the Amended Complaint alleged that the policy was programmed in TaskUs's Jobvite training system at the direction of then-TaskUs Vice President of People Operations Brandy Zimmerman. In addition, based on extensive and proprietary analysis of over 9,000 Glassdoor reviews, the Amended Complaint alleged that as TaskUs's Glassdoor rating increased in the months leading up to the IPO and SPO, TaskUs experienced unusual, statistically significant increases in the average rating of new reviews and the number of daily reviews submitted by recently hired employees. In addition, Lead Counsel identified and alleged insider sales of TaskUs Class A common stock by Defendants Maddock and Weir, and alleged BCP's control of TaskUs via a stockholders' agreement with Maddock and Weir.

14.     From inception of the Litigation through and including December 16, 2022, Plaintiffs' Counsel devoted 849.5 hours and $716,891 in total lodestar to investigating and

5

preparing the initial complaint, preparing the lead plaintiff motion, and to investigating, researching, analyzing, and drafting the Amended Complaint.

### C. Plaintiffs Vigorously Oppose Defendants' Motion to Dismiss, Which the Court Grants in Part and Denies in Part

15. On February 17, 2023, Defendants moved to dismiss the Amended Complaint. (ECF 33.) Defendants' motion, which included a 25-page memorandum of law and seven exhibits, argued that the Amended Complaint did not adequately allege any misstatements or omissions, that the Exchange Act allegations failed to raise a strong inference of scienter, that the Amended Complaint failed to plead loss causation as to the Section 10(b) claim, that Plaintiffs lacked standing for the Section 12(a)(2) claim, and that the Sections 15, 20, and 20A claims failed for a lack of a primary violation of the Securities and/or Exchange Acts.

16. On March 31, 2023, Plaintiffs opposed Defendants' motion to dismiss, filing a 30-page memorandum of law and an exhibit. (ECF 37.) Plaintiffs argued that the statements and omissions at issue were actionable and adequately alleged to have been false and misleading when made, that the Exchange Act allegations collectively gave rise to a strong inference of scienter, that the Amended Complaint adequately pleaded loss causation, and that Plaintiffs had standing under Section 12(a)(2).

17. On April 28, 2023, Defendants filed a 13-page reply brief. (ECF 39.)

18. On September 28, 2023, the Court heard oral argument on Defendants' motion to dismiss. (*See* ECF 41.) The oral argument was extensive, with the transcript spanning 73 pages.

19. The next day, on September 29, 2023, the Court held a hearing to discuss if the Litigation should be stayed in light of the Supreme Court's recent grant of certiorari in *Macquarie Infrastructure Corporation, et al. v. Moab Partners, L.P., et al.*, No. 22-1165, 2023 WL 6319659 (U.S. Sept. 29, 2023) ("*Macquarie*"). (ECF 42.) The appeal in *Macquarie* was expected to address

whether alleged omissions in violation of Item 303 of SEC Regulation S-K gave rise to a private right of action under Section 10(b), and Plaintiffs alleged that Defendants had violated Items 101 and 303 by certain omissions.  The Court indicated that it would stay the case pending letter briefing from the parties addressing the potential impact of *Macquarie* on the Litigation. On September 30, 2023, the Court entered an order staying the Litigation until October 31, 2023. (ECF 43.)

20.     The parties conferred and, on October 10, 2023, advised the Court that the parties had agreed on a path to advance the case and requested a short conference.

21.     The Court held a telephonic conference on October 13, 2023, and the parties informed the Court that they had agreed to a stipulation to voluntarily dismiss Plaintiffs' Securities Act and Exchange Act claims solely to the extent they alleged omissions in violation of Items 101 and 303 of SEC Regulation S-K, and agreed that, on the basis of Plaintiffs' voluntary dismissal, a stay was unnecessary.

22.     On October 17, 2023, the Court approved the stipulated dismissal and lifted the temporary stay.  (ECF 48.)

23.     On January 5, 2024, the Court granted in part and denied in part Defendants' motion to dismiss in a 62-page opinion and order.  (ECF 51.)  The Court denied the motion to dismiss the Section 11 claim premised on statements in TaskUs's IPO and SPO filings that the Company had "low attrition" and statements regarding the Company's Glassdoor rating.  As to the "low attrition" statement, the Court noted that "Plaintiffs' allegations regarding the independent falsity of these 'low attrition' statements were clear" and that Plaintiffs alleged that "TaskUs did not have 'low attrition.'" (*Id.* at 26.)  As to the Glassdoor statements, the Court wrote that it "follows from the facts alleged that the Amended Complaint plausibly pleads that TaskUs's disclosures of its

Glassdoor ratings and the company's reliance on that metric were misleading" as the Amended Complaint alleged this "was not a situation where new employees were voluntarily submitting ratings," and that employees submitted ratings "prior to being fully immersed in the company's culture." (*Id.* at 31.)

24.     The Court also sustained the Section 10(b) claim as to the "low attrition" statements.

25.     The Court, however, dismissed the Section 10(b) claim based on the Glassdoor statements on scienter and loss causation grounds.  The Court also dismissed Plaintiffs' claims based on the remaining statements regarding TaskUs's reported attrition rate on the basis that the statements were not misleading, dismissed the Section 12(a)(2) claims on the basis that Plaintiffs lacked standing, and dismissed the Section 10(b) and 20A claims as to Defendant Weir on the basis that the Amended Complaint did not adequately plead his scienter.  (*See generally* ECF 51.)

26.     From December 17, 2022 through January 5, 2024, Plaintiffs' Counsel devoted 850.4 hours and $719,084 in lodestar to opposing Defendants' motion to dismiss, preparing for and attending oral argument on the motion to dismiss, and negotiating the parties' response to the *Macquarie* appeal.

### D.     Plaintiffs' Substantial Discovery Efforts

27.     Upon the partial denial of Defendants' motion to dismiss, the Court set an Initial Pretrial Conference for February 16, 2024.  The parties filed a proposed Civil Case Management Plan and Scheduling Order providing for Plaintiffs' class certification motion to be filed by May 10, 2024, fact discovery to conclude by November 8, 2024, and expert discovery to conclude by January 31, 2025, with summary judgment motions filed thereafter.  (ECF 57-1.)  The Court entered this schedule on February 20, 2024.  (ECF 58.)

28.     Immediately after the PSLRA discovery stay was lifted, Plaintiffs' Counsel pursued extensive discovery.  Plaintiffs served Defendants with initial document requests on January 26, 2024 (consisting of 32 requests), and served four more sets of document requests on June 25, 2024 (17 requests), September 30, 2024 (1 request), October 9, 2024 (1 request), and November 22, 2024 (12 requests), respectively.   Plaintiffs also served document requests specific to Defendant BCP on March 13, 2024 (29 requests).

29.     In addition to party discovery, Plaintiffs issued subpoenas to third parties and sought documents about TaskUs's IPO and SPO from its underwriters, documents about the Glassdoor requirement from Jobvite, and documents regarding the impact of TaskUs's attrition from certain customers.

30.     These document requests were vigorously contested.  Plaintiffs' Counsel made 11 submissions to obtain important discovery from Defendants, including Executive Leadership Team meeting materials, centralized headcount and attrition data, text and WhatsApp messages, documents from Google Drive accounts, and documents improperly withheld on privilege grounds.  (*See, e.g.*, ECF 66, 80, 82, 92, 99, 108, 135, 138, 142, 145, and 156.)  Plaintiffs' Counsel also participated in the initial Case Management Conference on February 16, 2024, and three discovery conferences on May 15, June 20, and August 20, 2024.

31.     These efforts ultimately enabled Plaintiffs' Counsel to secure over 540,000 pages of documents from Defendants and third parties, including key evidence that Plaintiffs' Counsel leveraged at depositions, in preparation of opening expert reports, and in connection with the mediation.

32.    Plaintiffs also pursued substantial written discovery from Defendants, serving interrogatories on June 25, 2024, October 9, 2024, and January 8, 2025 (23 interrogatories in total), and requests for admission on August 16, 2024 and October 2, 2024 (144 requests in total).

33.    To obtain relevant testimony for summary judgment and trial, Lead Counsel deposed Defendants Maddock, Weir, Sekar, and Kumar and a former TaskUs HR executive (Ryan Collins).  Lead Counsel also participated in Defendants' depositions of four former employees who provided allegations for the Amended Complaint, Oklahoma's investment manager, and Spruce Point, and defended the depositions of both Plaintiffs.  In total, Lead Counsel participated in 13 fact depositions.

34.    Preparing for and taking these fact depositions was a tightly coordinated effort that started with a focused review of the available evidence for each deponent.  This review used targeted searches, analytics, and other means to efficiently identify high-value documents, which Lead Counsel assembled into a record of the relevant events.  Notably, many of the documents involved large data sets that required complex analysis, including granular records and data of TaskUs's hiring and termination of employees to compute its true attrition rates.

35.    The 13 fact depositions are set forth below.  These depositions occurred during a compressed period, with nine conducted from October 9, 2024 to November 6, 2024:[2]

| Witness | Date | Location | Taking/Defending Attorney |
|---|---|---|---|
| Chase Rankin (Oklahoma's Rule 30(b)(6) designee) | June 25, 2024 | New York, NY | Evan A. Kubota |
| Benjamin Ebel (Oklahoma's investment manager's Rule 30(b)(6) designee) | July 9, 2024 | Via Zoom | Evan A. Kubota |
| Lead Plaintiff Humberto Lozada | July 10, 2024 | New York, NY | Evan A. Kubota |

---

[2] On October 30, 2024, given the outstanding discovery issues, the Court extended the deadline for discovery to February 10, 2025.  (ECF 151.)  Expert discovery was later extended to be completed by May 16, 2025.  (ECF 158.)

| Witness | Date | Location | Taking/Defending Attorney |
|---|---|---|---|
| Ryan Collins (TaskUs's former Vice President of Talent Acquisition) | October 9, 2024 | Columbus, OH | Benjamin F. Burry |
| Former Employee 4 | October 18, 2024 | Austin, TX (hybrid) | Evan A. Kubota |
| Defendant Balaji Sekar | October 23, 2024 | Austin, TX | Benjamin F. Burry |
| Former Employee 2 | October 24, 2024 | San Antonio, TX (hybrid) | Evan A. Kubota |
| Former Employee 1 | October 25, 2024 | San Antonio, TX (hybrid) | Evan A. Kubota |
| Defendant Jaspar Weir | October 25, 2024 | Austin, TX | Benjamin F. Burry |
| Former Employee 3 | October 26, 2024 | San Antonio, TX (hybrid) | Evan A. Kubota |
| Defendant Bryce Maddock | October 29, 2024 | Austin, TX | Benjamin F. Burry |
| Ben Axler (Spruce Point's Rule 30(b)(6) designee) | November 6, 2024 | New York, NY | Evan A. Kubota |
| Defendant Susir Kumar | January 16, 2025 | Via Zoom | Thayne Stoddard |

36.     To ensure efficiency and leverage centralized knowledge of the record, a core team of only three attorneys conducted the 13 fact depositions and three expert depositions discussed below in Section I.E.  For efficiency, seven of the fact depositions were conducted in a two-week period in Texas, while the remainder of the fact depositions were taken in New York or remotely via Zoom.

37.     Lead Counsel also pursued Rule 30(b)(6) depositions of Defendants TaskUs and BCP.  Lead Counsel conferred extensively with Defendants' counsel about the timing and scope of these Rule 30(b)(6) depositions, and these discussions were ongoing at the time of settlement.

38.     In addition, Lead Counsel scheduled depositions of Gretchen Barker (Defendant Maddock's Chief of Staff), and Defendants Mehta and Dixit for February 4, 5, and 10, 2025, and was preparing for these depositions at the time of settlement.

11

39.     Defendants aggressively pursued discovery from Plaintiffs to oppose class certification.  Defendants served Plaintiffs with 89 document requests, six interrogatories, and 22 requests for admission.[3]

40.     In response to Defendants' requests, Plaintiffs produced over 2,600 pages of documents and provided responses to six interrogatories and 22 requests for admission.

41.     Oklahoma's Executive Director, Chase Rankin, was deposed in New York on June 25, 2024 as Oklahoma's Rule 30(b)(6) designee.  On July 9, 2024, Defendants deposed Benjamin Ebel as the Rule 30(b)(6) designee of Oklahoma's investment manager that was responsible for Oklahoma's transactions in TaskUs Class A common stock.  Lead Plaintiff Lozada was deposed in New York on July 10, 2024.

42.     From January 6, 2024 through and including January 30, 2025, Plaintiffs' Counsel devoted 5,927.3 hours and $4,689,554 in lodestar to depositions and other discovery-related efforts.

### E.     Class Certification Was Heavily Litigated

43.     On May 10, 2024, Plaintiffs moved for class certification.  (ECF 71.)  Plaintiffs' motion included a 25-page memorandum of law (ECF 72) and the expert report of Chad Coffman, CFA.  (ECF 75-1.)  Mr. Coffman was deposed on June 20, 2024.

44.     Defendants vigorously opposed Plaintiffs' motion for class certification.  On July 19, 2024, Defendants filed their 25-page opposition brief (ECF 94), along with 22 exhibits, including a 55-page expert report from Bruce Deal (ECF 95-1).  Defendants challenged, among other things, the efficiency of the market for TaskUs Class A common stock, the price

---

[3] Defendants later served a further 23 contention interrogatories, which the parties agreed Plaintiffs would answer by February 5, 2025.  The parties reached agreement on the Settlement prior to that deadline.

impact of the "low attrition" statement, Plaintiffs' proposed Class-wide damages methodology, and Oklahoma's typicality and standing. Lead Counsel deposed Mr. Deal on August 15, 2024.

45. On August 23, 2024, Plaintiffs filed a 10-page reply brief in further support of class certification (ECF 116), with ten exhibits, including a reply report from Mr. Coffman that responded to Mr. Deal's report (ECF 117-1). Plaintiffs' reply argued, among other things, that Mr. Coffman's event study demonstrated the efficiency of the market for TaskUs Class A common stock, Defendants had failed to carry their burden to prove the absence of price impact, Plaintiffs' damages methodology was adequate, and Oklahoma had standing and satisfied typicality.

46. On September 3, 2024, Defendants filed a letter motion to strike Mr. Coffman's reply report or order a second deposition of Mr. Coffman and permit Defendants to file a sur-reply brief. The Court granted the motion for a second deposition on September 4, 2024, and Defendants deposed Mr. Coffman again on September 13, 2024.

47. On September 20, 2024, Defendants filed a 10-page sur-reply brief (ECF 126) with 10 exhibits. Defendants reiterated their arguments that Mr. Coffman had not demonstrated market efficiency, that the "low attrition" statement was generic and did not match the alleged corrective disclosure, that Oklahoma could not serve as a class representative, and that Plaintiffs' damages methodology was insufficient.

48. Following the Rule 30(b)(6) deposition of Spruce Point's designee, on November 13, 2024, Defendants filed a letter seeking permission to "pause" fact discovery and either file an early summary judgment motion or supplement the class certification record to reflect the Spruce Point deposition. (ECF 157.)

49. On November 21, 2024, Plaintiffs opposed Defendants' letter, arguing that the parties should complete fact and expert discovery and proceed to dispositive motions on a

complete record.  Plaintiffs also agreed to request the Court's permission for each side to submit one supplemental class certification brief.  (ECF 162.)

50.    On December 5, 2024, the Court denied Defendants' request to file an early summary judgment motion and authorized supplemental class certification briefs.  (ECF 165.)

51.    On December 3, 2024, Defendants filed their supplemental class certification submission (ECF 163-1), along with four exhibits.[4]  Defendants argued that the "low attrition" statement had no price impact, asserting that Spruce Point's testimony showed that the Report did not contain material non-public information and that the quoted former TaskUs executive's characterizations of TaskUs did not provide any new information that was corrective of the "low attrition" statement.

52.    On December 13, 2024, Plaintiffs filed their supplemental class certification submission.  (ECF 171.)  Plaintiffs argued that Defendants failed to carry their burden to demonstrate the absence of price impact, including because the 14.1% single-day stock drop following the publication of the Spruce Report confirmed that the Report contained new information; the interview with the former TaskUs executive was not public prior to the Spruce Report's publication; and boilerplate assertions that the Report did not contain material, non-public information did not establish that the Report's content was previously public or immaterial to investors.

53.    On January 22, 2025, the Court granted Defendants' request for oral argument on Plaintiffs' motion for class certification and set the oral argument for February 18, 2025. (ECF 174.)

---

[4] Because the parties agreed that, if the Court granted permission, Defendants were to file their supplemental submission by December 3, 2024, Defendants filed a letter motion again seeking permission to file that submission on December 3, 2024 that included their submission as an exhibit. (*See* ECF 163.) Defendants refiled their submission and accompanying exhibits after the Court granted permission. (*See* ECF 166.)

14

54.     The parties reached agreement on the terms of the Settlement prior to a decision on Plaintiffs' motion for class certification.

55.     From February 15, 2024 through and including December 13, 2025, Plaintiffs' Counsel devoted 473.3 hours and $437,245 in lodestar to class-certification related work.

### F.    Merits Expert Discovery

56.     Given that the parties were to exchange opening expert reports by March 5, 2025 (*see* ECF 158 ¶7.b.), Lead Counsel devoted substantial effort to engage and work with merits experts to prepare opening reports.  Specifically, Lead Counsel retained a damages expert and an industry expert to opine on the BPO industry and the alleged misstatements concerning TaskUs's attrition, culture, and Glassdoor rating.  At the time of settlement, Plaintiffs were continuing to work with experts on their opening reports.

57.     From June 10, 2024 through and including January 30, 2025, Plaintiffs' Counsel devoted 104.7 hours and $98,348 in lodestar to merits expert work.

### G.    Mediation Session with David Murphy

58.     On January 28, 2025, the parties engaged in a full-day, in-person mediation session with David Murphy of Phillips ADR in New York City.

59.     Prior to the session, the parties submitted and exchanged detailed opening and rebuttal mediation statements and exhibits.

60.     On January 28, 2025, the parties engaged in good faith, arm's-length negotiations and exchanged several demands and counteroffers, but were unable to reach agreement.  At the conclusion of the session, Mr. Murphy made a mediator's recommendation to settle the action for a cash payment of $17.5 million.  The parties accepted the mediator's recommendation on January 30, 2025, then negotiated the Stipulation.

61.    On February 3, 2025, the parties advised the Court that they had reached an agreement in principle to settle the Litigation and requested that the Court temporarily stay proceedings pending submission of proposed settlement papers.

62.    From March 14, 2024 through and including January 30, 2025, Plaintiffs' Counsel devoted 331.9 hours and $329,350 in lodestar to preparing for and attending the mediation session.

**H.    The Stipulation of Settlement and Plaintiffs' Motions for Preliminary and Final Approval**

63.    After reaching an agreement in principle, the parties engaged in several weeks of negotiations to prepare the Stipulation and its exhibits, including the Notice, Long-Form Notice, Proof of Claim, and Summary Notice, and Plaintiffs' Counsel developed the Plan of Allocation with expert assistance.

64.    The Settlement documents and unopposed preliminary approval motion were filed on February 24, 2025.  (ECF 176-77.)

65.    Defendants' Counsel have advised that, on March 5, 2025, Defendants served the notice required under the Class Action Fairness Act, 28 U.S.C. § 1715 (2005), *et seq.*  (Ex. 5 (Webb Decl.) ¶3.)

66.    On April 14, 2025, Judge Cronan referred Plaintiffs' unopposed preliminary approval motion to Magistrate Judge Stein.  (ECF 181.)  On May 20, 2025, Judge Stein directed the parties to implement certain modifications to the Settlement papers (ECF 184), which the parties submitted on May 27, 2025 (ECF 187).

67.    On May 28, 2025, Judge Stein issued a Report and Recommendation that Judge Cronan preliminarily approve the Settlement.  (ECF 188.)  On June 13, 2025, Judge Cronan entered the Order Preliminarily Approving Settlement and Providing for Class Notice (ECF 191) (the "Notice Order").

68.     Since June 13, 2025, Plaintiffs' Counsel has overseen the class notice program and prepared Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation (submitted herewith).

69.     From January 31, 2025 through and including August 31, 2025, Plaintiffs' Counsel devoted 105.1 hours and $105,014 in lodestar to negotiating the Stipulation and its exhibits, preparing the Settlement and preliminary approval papers, overseeing the class notice program, and preparing Plaintiffs' Motion for Final Approval.

## II.     THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN RECOVERING A REASONABLE RANGE OF REALISTICALLY RECOVERABLE DAMAGES

70.     The $17.5 million Settlement is an outstanding result that provides the Settlement Class with a significant, immediate cash recovery.  It is also a favorable result relative to the range of potential recovery at trial, as discussed below.

71.     The $17.5 million cash Settlement Amount recovers between 16.2% and 65% of Plaintiffs' estimated range of realistically recoverable damages of $27.3 million to $108.1 million.

72.     The $108.1 million damages figure assumes that Defendants' negative causation and loss causation arguments would constrain damages to (at most) the $5.02 per-share price decline in the wake of the Spruce Report.[5]  In that scenario, the Settlement would recover 16.2% of realistically recoverable damages.  That 16.2% recovery is nearly double the 8.8% median

---

[5] Though the statutory formula for Section 11 damages would yield theoretical damages above $108.1 million, Defendants forcefully asserted a negative causation defense and argued that the unique facts of this case, including the facts related to the release of the Spruce Report, "render[ed] damages for the Securities Act claims to be zero." (ECF 166 at 5 of 14.)  While Plaintiffs disputed the impact of negative causation, $108.1 million is Plaintiffs' highest estimate of realistically recoverable damages.

recovery in cases alleging claims under both Section 10(b) and Section 11 between 2015 and 2024.[6]

73.    The $27.3 million damages figure assumes that Defendants' negative causation defense would limit both Securities Act and Exchange Act damages to 25% of the post-Spruce Report price decline, resulting in realistically recoverable damages of $27.3 million.  In that scenario, the Settlement would represent a 65% recovery—more than **seven times** the 8.8% median.

74.    Thus, the $17.5 million Settlement represents from 16.2% to 65% of Plaintiffs' estimated range of realistically recoverable damages.

## III.    COMPLIANCE WITH THE NOTICE ORDER AND REACTION OF THE CLASS TO DATE

75.    At Lead Counsel's direction, immediately after the Notice Order, the Court-appointed notice and Claims Administrator, Epiq Class Action and Claims Solutions, Inc. ("Epiq"), began implementing the Court-approved notice program.  Lead Counsel has received, and continues to receive, regular updates from Epiq on the status of the notice and claims process.

76.    On July 7, 2025, Epiq began mailing Notices to potential Settlement Class Members and nominees.  (Ex. 4 (Kimball Decl.) ¶¶3-5.)  As of September 10, 2025, a total of 34,433 copies of the Notice have been distributed to potential Settlement Class Members, including through copies sent to nominees at their request which were then sent by the nominees to potential Settlement Class Members.  (*Id.* ¶9-11.)

77.    On July 3, 2025, Epiq established a case-specific website, which provides copies of the Notice, Long-Form Notice, Proof of Claim form, and additional case documents and

---

[6] *See* Cornerstone Research, *Securities Class Action Settlements – 2024 Review and Analysis*, at 8, available at https://www.cornerstone.com/wp-content/uploads/2025/03/Securities-Class-Action-Settlements-2024-Review-and-Analysis.pdf.

information, and activated (and has maintained) dedicated telephone lines and an email inbox to respond to potential Settlement Class Members' inquiries. (*Id.* ¶¶14-15, 20-21.)

78. On July 7, 2025, Epiq caused the Summary Notice to be published in *Investors' Business Daily*, transmitted via *PR Newswire*, and published by the Depository Trust Corporation ("DTC") on the DTC Legal Notice System ("LENS"). (*Id.* ¶¶12-13.)

79. Pursuant to the Notice Order, the deadline for Settlement Class Members to seek exclusion from the Settlement Class was August 21, 2025. (*See* ECF 191 ¶12.) The deadline for Settlement Class Members to object to the Settlement is September 25, 2025. (*Id.* ¶13(a).) As of September 10, 2025, Epiq has not received any requests for exclusion from the Settlement Class, and Epiq has not received any objections (Ex. 4 (Kimball Decl.) ¶¶27, 29), and no objections have been provided to Lead Counsel or docketed with the Court. Lead Counsel will file reply papers by October 9, 2025 to respond to any objections that may be received.

## IV. THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE

80. The Plan of Allocation, contained in the Long-Form Notice, was developed by Lead Counsel with expert assistance, and provides a method for the fair, equitable, and reasonable distribution of the Net Settlement Fund to Authorized Claimants based on estimates of their recognized losses from transactions in TaskUs Class A common stock during the Class Period.

81. A claimant's total "Recognized Loss Amount" may consist of both Exchange Act Recognized Loss Amounts and Securities Act Recognized Loss Amounts. Transactions in TaskUs Class A common stock during the Class Period may yield Exchange Act Recognized Loss Amounts, and the calculation takes into account when the claimant purchased and/or sold their shares and whether they continued to hold them through the 90-day look-back period after the end of the Class Period. *See* 15 U.S.C. § 78u-4(e).

19

82.    Only TaskUs Class A common stock purchased in or traceable to TaskUs's Secondary Offering will result in a Securities Act Recognized Loss Amount.  The calculation of Securities Act Recognized Loss Amounts generally reflects the Securities Act's statutory damages formula and depends on the amount paid for the shares (not to exceed their offering price), whether they were held after January 19, 2022, and their price or value at the time of suit or time of sale. *See* 15 U.S.C. § 77k(e).

83.    A claimant's Recognized Claim will be the sum of their Recognized Loss Amounts. The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on their Recognized Claims in proportion to all Recognized Claims, as determined by Epiq.

84.    In sum, the proposed Plan of Allocation was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants based on estimates of recognized losses calculated using the amounts, prices, and dates of their transactions, and appropriately recognizes the different methods to calculate damages under the Securities Act and the Exchange Act.  Accordingly, Lead Counsel respectfully submits that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

## V.    LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES

85.    In addition to seeking final approval of the Settlement and approval of the Plan of Allocation, Lead Counsel is applying for a fee award of 30% of the Settlement Fund ($5,250,000 plus interest at the same rate and for the same period as earned by the Settlement Fund, until paid), to be allocated among Plaintiffs' Counsel.  Plaintiffs Lozada and Oklahoma carefully considered and authorized the requested fee, as explained in their respective declarations.  (*See* Ex. 2 (Lozada Decl.) ¶13; Ex. 3 (Rankin Decl.) ¶15.)

86.    The primary factual bases for the request are summarized below.

**A.      The Risks and Duration of the Litigation**

87.      Plaintiffs' Counsel devoted nearly three years to this Litigation, facing numerous challenges and substantial risks at every stage.

88.      First, the lack of competition for leadership of the Litigation underscores its risks. Only Plaintiffs' Counsel pursued this case, and Mr. Lozada was the sole lead plaintiff movant.

89.      Second, Plaintiffs' Counsel faced the PSLRA's high burden to plead claims, including the requirement to allege "with particularity facts giving rise to a strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(A).  A recent study showed that, between 2015 and 2024, 61% of securities class actions were dismissed at the pleading stage.[7]  Demonstrating the risk of dismissal, here, the Court granted in part Defendants' motion to dismiss, substantially narrowing the claims, Defendants, and alleged misstatements at issue.

90.      Moreover, this case did not feature any of the "plus factors" that reduce risk for plaintiffs, such as a financial restatement (*i.e.*, a company's revision of its SEC filings to correct admittedly material misstatements), an SEC enforcement action alleging securities law violations, or proof of wrongdoing such as a criminal conviction.  Indeed, this Litigation is the only proceeding that has challenged TaskUs's public disclosures.  Without such "plus factors," Plaintiffs' Counsel would have to prove every element of their claims—including falsity, materiality, and (for the Exchange Act claims) scienter—from scratch.

91.      Despite the risks, Plaintiffs' Counsel devoted significant resources to developing compelling allegations.  For example, Plaintiffs' Counsel's investigation and interviews with

---

[7] Edward Flores & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation:  2024 Full-Year Review*, at 17, NERA (Jan. 22, 2025), *available at* https://www.nera.com/insights/publications/2025/recent-trends-in-securities-class-action-litigation--2024-full-y.html?lang=en#download.

former TaskUs employees developed allegations that TaskUs experienced over 40% attrition, ¶¶139, 141, and did not have the positive employee culture Defendants touted, ¶¶140-42.

92.    Plaintiffs' Counsel's investigation also developed unique allegations that Defendants inflated TaskUs's Glassdoor rating, informed by interviews with former employees and detailed analysis of over 9,000 individual Glassdoor reviews to identify spikes in the volume and average score of reviews before the IPO and SPO, ¶¶100-13, 139-40, 142.

93.    Third, although Plaintiffs and their counsel believe the claims asserted are meritorious, Plaintiffs faced numerous case-specific risks to proving liability.  For example, Defendants vigorously contested the material falsity of the alleged misstatements, and would have likely argued at summary judgment and at trial that the statements were true, *i.e.*, that TaskUs experienced low attrition, had a better employee culture compared to its peers in the BPO industry, and did not require employees to submit any Glassdoor reviews, much less positive ones.  Had Defendants prevailed on falsity, all of Plaintiffs' claims under both the Securities Act and Exchange Act would have been defeated.

94.    Proving scienter for the Exchange Act claims posed another substantial risk, as Defendants would have likely argued that every TaskUs executive who was deposed believed their statements were true, and that they did not intentionally lie to investors.

95.    Fourth, Defendants' price impact, loss causation, and negative causation arguments further threatened any recovery.  At class certification, Defendants extensively argued that the Spruce Report did not reveal any new, material information or impact the price of TaskUs stock such that an Exchange Act class could not be certified.  Defendants were likely to repeat these and similar arguments to support their loss causation, damages, and negative causation arguments at summary judgment and trial.  These arguments posed substantial risks that any recovery could be

22

greatly reduced—or eliminated altogether—in which case Plaintiffs' Counsel would receive no compensation for their efforts.

**B.      Plaintiffs' Counsel's Time and Labor Expended**

96.      In total, Plaintiffs' Counsel devoted 8,642.2 hours of work to this Litigation through August 31, 2025 (excluding all work related to Lead Counsel's fee application). As set forth in detail above, this work spanned over three years and included:

- Investigating and preparing the initial complaint and briefing Plaintiff Lozada's motion for appointment as lead plaintiff (*see supra* ¶¶5-8);

- Preparing the Amended Complaint, which significantly expanded the allegations of the initial complaint with details regarding TaskUs's alleged attrition and Glassdoor reviews based on interviews with multiple former employees and Plaintiffs' Counsel's proprietary analysis of thousands of Glassdoor reviews (*see supra* ¶¶9-14);

- Defeating (in part) Defendants' motion to dismiss after full briefing, oral argument, and a post-argument submission (*see supra* ¶¶15-26);

- Securing over 540,000 pages of documents over vigorous opposition, including preparing 11 submissions to the Court, addressing discovery disputes at the initial Case Management Conference and three status conferences, and efficiently analyzing the documentary record (*see supra* ¶¶27-32);

- Producing more than 2,600 pages of Plaintiffs' documents in response to Defendants' 89 requests for production and responding to Defendants' 6 interrogatories and 22 requests for admission (*see supra* ¶¶39-40);

- Preparing for and participating in 13 fact witness depositions, including the depositions of Defendants Maddock, Weir, Sekar, and Kumar, a TaskUs HR executive, the four former employees identified in the Amended Complaint, each Plaintiff, Oklahoma's investment manager, and Spruce Point (*see supra* ¶¶33-38);

- Fully briefing class certification, which included Plaintiffs' submission of three briefs and two expert reports, two depositions of Plaintiffs' expert, and the deposition of Defendants' expert (*see supra* ¶¶43-55);

- Significant preparation for merits expert discovery, including working with Plaintiffs' industry and damages experts to prepare opening reports (*see supra* ¶¶56-57);

23

- Mediating with David Murphy in a full-day session, with Plaintiffs submitting two detailed mediation statements in advance (*see supra* ¶¶58-62); and

- Negotiating and preparing the Stipulation of Settlement (*see supra* ¶¶63-64).

97.    To provide further information about the work Plaintiffs' Counsel performed in this case, the following table presents Plaintiffs' Counsel's time and lodestar based on chronological and task-specific categories tied to key case events:

| Category | Date Range | Description | Hours | Lodestar |
|---|---|---|---|---|
| 1 | 1/20/2022 – 12/16/2022 | Case inception through filing of Amended Complaint (ECF 26) | 849.5 | $716,891 |
| 2 | 12/17/2022 – 1/5/2024 | Filing of the Amended Complaint (ECF 26) through the Court's decision on the motion to dismiss (ECF 51) | 850.4 | $719,084 |
| 3 | 1/6/2024 – 1/30/2025 | All discovery-related work, including depositions. | 5,927.3 | $4,689,554 |
| 4 | 2/15/2024 – 12/13/2024 | All class certification-related work. | 473.3 | $437,245 |
| 5 | 6/10/2024 – 1/30/2025 | All merits expert-related work. | 104.7 | $98,348 |
| 6 | 3/14/2024 – 1/30/2025 | All mediation-related work. | 331.9 | $329,350 |
| 7 | 1/31/2025 – 8/31/2025 | All work to finalize and implement the Settlement from the date after which the parties accepted Mr. Murphy's recommendation to settle the Litigation through August 31, 2025. | 105.1 | $105,014 |

98.    **Category 1**:  This category commences with the inception of the case and continues through the date on which Plaintiffs filed the Amended Complaint (ECF 26).  During this time frame, Plaintiffs' Counsel prepared the initial complaint (ECF 1); prepared the lead plaintiff motion; conducted an extensive investigation, including through interviews with former TaskUs employees and a proprietary analysis of over 9,000 Glassdoor reviews; and drafted and filed the Amended Complaint (ECF 26).  Plaintiffs' Counsel devoted 849.5 hours to this category, resulting in $716,891 of lodestar.

24

99.    **Category 2**:  This category commences the day after filing the Amended Complaint and continues through January 5, 2024, the date on which the Court entered its Opinion and Order on Defendants' motion to dismiss the Amended Complaint (ECF 51).  During this time, Plaintiffs' Counsel conducted factual and legal research, drafted the opposition to Defendants' motion to dismiss, prepared for and presented at oral argument, and negotiated the stipulation whereby Plaintiffs voluntarily dismissed claims arising from alleged omissions in violation of Items 303 and 101 given the pending appeal in the *Macquarie* case.  Plaintiffs' Counsel devoted 850.4 hours to this category, resulting in $719,084 of lodestar.

100.    **Category 3**:  This category includes all discovery-related work, which commenced on January 6, 2024, the day after the Court's Opinion and Order on Defendants' motion to dismiss the Amended Complaint (ECF 51), and continued through January 30, 2025, the day on which the parties accepted Mr. Murphy's recommendation to settle the Litigation.  This category includes preparing Plaintiffs' discovery requests; factual and legal research related to discovery disputes; preparing for and meeting and conferring with Defendants and third parties regarding discovery; preparing discovery-related submissions to the Court; attending status conferences related to discovery; reviewing and analyzing Defendants' and third parties' document productions; responding to Defendants' discovery requests; reviewing and producing Plaintiffs' documents; and preparing for and taking or defending 13 fact depositions.  Plaintiffs' Counsel devoted 5,927.3 hours to this category, resulting in $4,689,554 of lodestar.

101.    **Category 4**:  This category includes all class certification-related work, which commenced on February 15, 2024 and was completed on December 13, 2024, when Plaintiffs filed their supplemental class certification submission after the Spruce Point deposition (ECF 171).  This category includes preparing Plaintiffs' class certification motion and the accompanying

papers; working with Plaintiffs' class certification expert, Mr. Coffman, on his opening and reply reports; preparing for and defending Mr. Coffman's two depositions; preparing for and taking the deposition of Defendants' class certification expert, Bruce Deal; preparing Plaintiffs' reply brief in support of class certification; and preparing further letter briefing and Plaintiffs' supplemental class certification submission. Plaintiffs' Counsel devoted 473.3 hours to this category, resulting in $437,245 of lodestar.

102. **Category 5**: This category includes all merits expert-related work, which commenced on June 10, 2024, and continued through January 30, 2025. This category includes identifying and retaining Plaintiffs' damages and industry experts and working with the experts regarding their anticipated opening reports, including reviewing and revising drafts. Plaintiffs' Counsel devoted 104.7 hours to this category, resulting in $98,348 of lodestar.

103. **Category 6**: This category includes all mediation-related work, which commenced on March 14, 2024, and continued through January 30, 2025. This category includes all work to prepare for and attend the January 28, 2025 mediation session with Mr. Murphy, including drafting opening and reply mediation statements and exhibits. Plaintiffs' Counsel devoted 331.9 hours to this category, resulting in $329,350 of lodestar.

104. **Category 7**: This category commences on January 31, 2025, *i.e.*, the day after the parties accepted Mr. Murphy's recommendation to settle the Litigation, and continues through August 31, 2025. During this time, Plaintiffs' Counsel prepared, negotiated, and finalized the Stipulation, Notice, Summary Notice, Long-Form Notice (including the Plan of Allocation), and Proof of Claim form; drafted the preliminary approval motion filed on February 24, 2025 (ECF 176); revised the Stipulation and accompanying papers in response to the Court's direction (*see* ECF 187); and drafted the motion seeking final approval of the settlement and approval of the

Plan of Allocation filed herewith. Plaintiffs' Counsel devoted 105.1 hours to this category, resulting in $105,014 of lodestar.

105. While the complexity and magnitude of this action necessarily required significant effort over a prolonged period, I ensured that our team litigated as efficiently as possible. To that end, our work was concentrated among a core team of six attorneys (Joseph Fonti, Evan Kubota, Benjamin Burry, Susan Podolsky, Thayne Stoddard, and Frederick William Green) who developed the pleadings, handled all briefs, took and defended all depositions, prepared the class certification papers, and prepared for and attended the mediation. This core team accounts for 55.6% of Plaintiffs' Counsel's hours and 66.5% of Plaintiffs' Counsel's lodestar.

106. Attached hereto as Exhibits 6-8 are declarations from Joseph Fonti on behalf of BFA, Michael Yarnoff on behalf of Kehoe Law Firm, P.C., and Susan R. Podolsky on behalf of The Law Offices of Susan R. Podolsky, respectively, in support of the request for an award of attorneys' fees and litigation expenses. Included within these declarations are schedules that summarize the hours and lodestar that each firm devoted to this Litigation, and brief descriptions of the work performed by each attorney and staff member who devoted time to the case. These declarations also include each firm's resume, which describe Plaintiffs' Counsel's extensive experience and skill in the securities litigation field, as well as their successful track records in such cases.

107. BFA's hourly billing rates for the attorneys and staff involved in this matter (using current rates for current attorneys, and the rate in the final year of employment for attorneys no longer employed by BFA) range from $1,095 to $1,310 for partners, $940 for Of Counsel, $665 to $730 for associates, $575 for a senior discovery operations manager, $575 to $595 for project attorneys, $520 for a staff attorney, and $415 for a paralegal. (Ex. 6 (Fonti Fee Decl.) ¶9.)

27

The billing rates at Kehoe Law Firm, P.C. are $950 for a partner, and $450 for a director of investigative services and litigation support. (Ex. 7 (Yarnoff Decl.) ¶8.) The billing rate for Ms. Podolsky is $750. (Ex. 8 (Podolsky Decl.) ¶8.) I believe these rates compare favorably to the rates charged by other leading attorneys in the securities litigation plaintiffs' bar as well as defense attorneys defending securities class actions.

108. The following chart presents Plaintiffs' Counsel's hours and lodestar by firm:

| Firm | Hours | Lodestar |
|---|---|---|
| Bleichmar Fonti & Auld LLP | 8,191.8 | $6,725,436 |
| Kehoe Law Firm, P.C. | 200.0 | $182,250 |
| The Law Offices of Susan R. Podolsky | 250.4 | $187,800 |
| **TOTAL** | 8,642.2 | $7,095,486 |

### C.  Plaintiffs Approve the Requested Attorneys' Fees

109. Lead Plaintiff Humberto Lozada supports the fee request, which seeks a lower percentage than Lead Plaintiff Lozada authorized under his *ex ante* retention agreement with counsel. (Ex. 2 (Lozada Decl.) ¶¶11-14.) Lead Plaintiff's support and *ex ante* agreement regarding the fee request weigh heavily in favor of approval of the requested fee.

110. Oklahoma also supports the requested fee, which it authorized Lead Counsel to seek in light of comparable awards in similarly sized cases and its experience as a PSLRA lead plaintiff in other securities class actions. (Ex. 3 (Rankin Decl.) ¶¶13-16.) Oklahoma's support for the fee request further supports Lead Counsel's requested fee.

## VI.  LEAD COUNSEL'S APPLICATION FOR AN AWARD OF EXPENSES IS REASONABLE AND SHOULD BE APPROVED

111. Lead Counsel respectfully requests $924,556 in litigation expenses that Lead Counsel reasonably and necessarily incurred in the prosecution of the case. Lead Counsel incurred these expenses with full knowledge that they might not recover any of them if the litigation was unsuccessful.

112.    Given the fully contingent representation and the risks of litigation, Lead Counsel was incentivized to prosecute the Litigation as efficiently as possible without undermining its aggressive litigation strategy.  The requested expenses are also below the maximum amount of $980,000 estimated in the Notice and disseminated to the Class.  To date, no Settlement Class Member has objected to the maximum amount of expenses set forth in the Notice, confirming the reasonableness of the requested expenses.

113.    Lead Counsel's litigation expenses incurred in prosecuting this Litigation are summarized below in Table 1 by category (*e.g.*, Expert Fees, Litigation Support Vendor Fees, Accommodations, etc.), with further breakdowns of expert and litigation support fees by vendor.

114.    The information provided in Table 1 is based on information maintained contemporaneously and in the ordinary course by BFA, including receipts, invoices, expense vouchers, check records, and similar documents.  As the lead partner supervising Plaintiffs' Counsel's work in the Litigation, I supervised and participated in the review of this supporting documentation to confirm the accuracy of the expenses incurred, as well as the reasonableness of and necessity for those expenses.  As part of the review, certain reductions were made in the exercise of judgment or based on BFA's firm policies capping expense reimbursement for business meals and hotel accommodations (described below in Paragraph 116.f and 116.i).

115.    I believe that Table 1 is an accurate record of the expenses incurred by Lead Counsel, and that these expenses were reasonably incurred and necessary for the efficient and effective prosecution of the Litigation.  Further, these expenses are all of a type that would normally be billed to a fee-paying client.

**TABLE 1 – LEAD COUNSEL EXPENSE SUMMARY**

Inception through and including August 31, 2025

| CATEGORY | | AMOUNT |
|---|---|---|
| Expert Fees | | $392,512 |
| Peregrine Economics LLC | $333,422 | |
| Global Economics Group, LLC | $20,138 | |
| IMS Legal Strategies | $21,169 | |
| Hemming Morse LLP | $17,783 | |
| Counsel for Former Employees | | $178,992 |
| Litigation Support Vendor Fees | | $179,040 |
| JND eDiscovery LLC | $129,995 | |
| Gryphon Strategies | $44,661 | |
| Downstream LLC | $3,440 | |
| Accesswire | $695 | |
| eMagicOne LLC | $249 | |
| Court Reporter Services and Transcript Fees | | $88,368 |
| Mediation Fees | | $32,500 |
| Accommodations | | $12,575 |
| Out-of-Town Transportation | | $11,125 |
| Local Transportation | | $1,182 |
| Meals | | $1,051 |
| Service and Filing Fees | | $13,190 |
| Computer Research | | $11,160 |
| Postage & Overnight Mail | | $1,882 |
| External Photocopies | | $979 |
| *TOTAL* | | *$924,556* |

116.    The following provides additional information regarding the expenses set forth in Table 1:

    a.    Expert Fees:  $392,512.  This category includes the fees incurred for consulting and testifying expert work:

        i.  Peregrine Economics LLC: $333,422.  Peregrine Economics LLC provided (a) services in support of Mr. Coffman's expert testimony

at class certification (which included two expert reports and two depositions); (b) services in support of Plaintiffs' damages expert at the merits stage; and (c) consulting expert services with regard to aggregate damages and the Plan of Allocation.

ii. Global Economics Group, LLC:  $20,138.  Global Economics Group, LLC provided consulting advice concerning damages at the outset of the litigation.

iii. IMS Legal Strategies:  $21,169.  Through IMS Legal Strategies, Plaintiffs' Counsel engaged an industry expert to opine on the BPO industry and TaskUs's attrition, culture, and Glassdoor ratings.

iv. Hemming Morse LLP:  $17,783.  Hemming Morse LLP provided consulting advice regarding accounting issues at various points during the Litigation.

b.      Counsel for Former Employees:  $178,992.  This category includes counsel at Wheeler Trigg O'Donnell LLP ("WTO") and The Law Offices of Gonzalez, Chiscano, Angulo & Kasson, P.C. ("Gonzalez"), retained to represent four former TaskUs employees who provided information reflected in the Amended Complaint.  Defendants subpoenaed all four of these former employees and aggressively sought their documents and testimony; with counsel's assistance, each former employee produced documents and sat for an in-person deposition, yielding 725 pages of testimony.  WTO was primarily responsible for the representation, and Gonzalez served as local Texas counsel for the depositions (which occurred in Texas).  WTO devoted 235.9 hours to representing the former employees, with fees of $132,071 and expenses of $24,967, consisting of travel costs for two WTO attorneys to prepare the former employees and defend their depositions.

31

WTO's rates range from $550 to $650 for Of Counsel, $550 for associates, and $290 for a paralegal. Gonzalez devoted 47.9 hours to the representation, with fees of $21,555, and expenses of $399 to travel to the depositions of the former employees. Gonzalez's rate is $450 for a partner. Lead Counsel paid WTO's and Gonzalez's fees as an out-of-pocket expense.

        c.     Litigation Support Vendor Fees: $179,040. This category includes fees incurred with respect to outside vendors for the following services:

    i. JND eDiscovery LLC: $129,995. JND eDiscovery LLC provided data hosting and analytics services. Specifically, JND eDiscovery LLC hosted Defendants' and third parties' document productions (totaling over 540,000 pages) for attorney review, and provided analysis and review tools to assist with document review and deposition preparations. The electronic database provided state-of-the-art technology that Plaintiffs' Counsel utilized to identify the strongest proof for effective fact depositions and to prepare opening expert reports. JND eDiscovery LLC also processed ESI collections from Plaintiffs' files, hosted the documents on a review platform, and prepared Plaintiffs' document productions.

    ii. Gryphon Strategies: $44,661. Gryphon Strategies provided investigative services to interview former TaskUs employees for preparing the Amended Complaint.

    iii. Downstream LLC: $3,440. Downstream LLC provided forensic ESI collection services in connection with the collection of Plaintiffs' ESI for review and production.

iv. Accesswire: $695. Accesswire provided press release services to assist Plaintiffs' Counsel with providing notice in connection with the lead plaintiff appointment process, as required by the PSLRA. *See* 15 U.S.C. § 78u-4(a)(3)(A)(i).

v. eMagicOne LLC: $249. eMagicOne LLC provided services to aggregate data in a customized format regarding all Glassdoor reviews submitted by TaskUs employees for Lead Counsel's analysis in connection with preparing the Amended Complaint.

d. Court Reporter Services and Transcript Fees: $88,368. This category includes transcription and videography services for 16 depositions and fees incurred to obtain hearing transcripts.

e. Mediation Fees: $32,500. Lead Counsel paid 50% of Phillips ADR Enterprises, P.C.'s fees for the January 28, 2025 mediation session and related preparation.

f. Accommodations: $12,575. This category includes case-related hotel expenses, which are capped, pursuant to BFA firm policy, at a maximum of $500 per night for large cities and $400 per night for smaller cities.

g. Out-of-Town Transportation: $11,125. This category includes travel expenses incurred: (i) for Oklahoma's Executive Director, Chase Rankin, to travel to and attend the hearing on Defendants' motion to dismiss and the mediation in New York; (ii) for Mr. Rankin and Oklahoma's General Counsel, Marc Edwards, to travel to New York for Mr. Rankin's preparation and deposition as Oklahoma's Rule 30(b)(6) designee; (iii) for Mr. Lozada to travel to New York for his deposition; and (iv) for BFA attorneys to travel to Chicago, Illinois; Columbus,

33

Ohio; Austin, Texas; and San Antonio, Texas for one expert deposition and eight fact witness depositions.

h.    Local Transportation: $1,182.  This category includes car service to and from airports for business travel.

i.    Meals: $1,051.  This category includes meals during business travel for depositions.  Pursuant to BFA firm policy, these expenses are capped at $55 per person for dinners, $30 per person for lunches, $25 per person for breakfasts, and $15 per person for all other food and drink, and no alcohol is included.

j.    Service and Filing Fees: $13,190.  This category includes fees for Court filings and fees for process servers who served the initial complaint and subpoenas.

k.    Computer Research: $11,160.  This category includes vendors such as PACER and Thomson Reuters.  These resources were used to obtain access to legal research, factual databases, and for cite-checking of briefs.  This expense represents the expense incurred by BFA for use of these services in connection with the Litigation.  The charges for these vendors vary depending upon the type of services requested.  For example, BFA has flat-rate contracts with some of these providers for use of their services.  When BFA utilizes online services provided by a vendor with a flat-rate contract, access to the service is by a billing code entered for the specific case being litigated.  At the end of each billing period in which such service is used, BFA's costs for such services are allocated to specific cases based on the percentage of use in connection with that specific case in the billing period.

l.    Postage and Overnight Mail: $1,882.  This category includes postage and outside vendor fees for messenger services and delivery of exhibits for depositions conducted outside of New York.

34

m.    External Photocopies:  $979.  This category includes outside vendors who printed and bound certain exhibits for in-person depositions outside of New York.

## VII.  AN AWARD OF PLAINTIFFS' REASONABLE COSTS AND EXPENSES IS FAIR AND REASONABLE

117.  Plaintiffs Lozada and Oklahoma also seek awards, pursuant to 15 U.S.C. § 78u-4(a)(4), of their costs and expenses directly related to their representation of the Class.  As detailed in the Lozada and Rankin Declarations (Exhibits 2 and 3), based on Plaintiffs' time devoted to this action in place of their regular duties and reasonable hourly rates, Lead Plaintiff Lozada seeks an award of $9,750 and Oklahoma seeks an award of $7,000.  These amounts, totaling $16,750, are below the maximum amount of $17,000 that the Settlement Class was advised could be requested.

118.  I respectfully submit that these awards are consistent with Congress's intent, as expressed in the PSLRA, of encouraging investors to take active roles in supervising securities actions.  Indeed, without Mr. Lozada—who was the sole lead plaintiff movant—this action would not have proceeded at all.  As set forth in their declarations, Mr. Lozada and Oklahoma have been committed to pursuing this Litigation and diligently and effectively fulfilled their obligations as representative plaintiffs.  I respectfully submit that their efforts and contributions merit the requested awards.

Dated:  September 10, 2025

/s/ Joseph A. Fonti
Joseph A. Fonti

35