UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------:

HUMBERTO LOZADA, individually and on behalf of all others similarly situated, et al.,

Plaintiff,

v.

TASKUS, INC, et al.,

Defendant.

: Docket No.: 22-cv-01479

: New York, New York

: October 16, 2025

-----------------------------:

PROCEEDINGS BEFORE
THE HONORABLE GARY STEIN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff: BLEICHMAR FONTI & AULD, LLP
BY: JOSEPH A. FONTI, ESQ.
EVAN KUBOTA, ESQ.
THAYNE STODDARD, ESQ.
300 Park Avenue, Suite 1301
New York, New York 10022

For Defendant: SIMPSON THACHER & BARTLETT, LLP
BY: JONATHAN S. KAPLAN, ESQ.
CRAIG WALDMAN, ESQ.
425 Lexington Avenue
New York, New York 10017

Transcription Service: Marissa Lewandowski
Phone: (631) 813-9335
E-mail:marissamignano@gmail.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

THE DEPUTY CLERK: In the matter of 22-cv-1479, Lozada v. TaskUS, Inc., et al. Counsel, would you please state your name for the record, starting with the plaintiff.

MR. FONTI: Good afternoon, Your Honor. Joseph Fonti from Bleichmar Fonti & Auld for the plaintiffs and the class.

MR. KUBOTA: Evan Kubota, Bleichmar Fonti & Auld.

THE COURT: Good afternoon.

MR. WALDMAN: Apologize. Oh, it is working. Craig Waldman, Simpson Thacher, on behalf of the defendants.

MR. KAPLAN: Good afternoon, Your Honor. Jonathan Kaplan, Simpson Thacher, on behalf of the defendants.

THE COURT: Good afternoon to both of you. I do note one other individual sitting behind plaintiffs' counsel table.

MR. STODDARD: Thayne Stoddard, Bleichmar Fonti & Auld, on behalf of plaintiffs.

THE COURT: From where?

MR. STODDARD: From Bleichmar Fonti & Auld as well.

THE COURT: Very well.

I do want to note for the record that, other than my team, the courtroom is empty, which I infer to mean that there is no objector present or anybody representing an objector.

And, Mr. Fonti, as of your most recent submissions, there were no objectors to the settlement.

Does that remain the case today?

MR. FONTI: That remains the case, Your Honor.

THE COURT: Thank you.

All right. We're here for a fairness hearing, as you all know, to consider Plaintiffs' Motion for Final Approval of the proposed settlement and also for approval of the plan of allocation. I have reviewed the papers that were submitted in support of the motion, as well as the papers submitted in support of the motion for attorneys' fees and expenses and plaintiffs' reasonable costs and expenses.

I have a couple questions, but I'll first hear from counsel to let me know whatever they think I should know. Again, you can presume at least a basic familiarity with the papers, but you're free to tell me anything you'd like to tell me.

MR. FONTI: Thank you, Your Honor. I appreciate that and the Court's time already with these two motions that are before the Court for approval.

The Court is well-acquainted. We're here for the approval of a 17 and a half million-dollar settlement, which represents a recovery of roughly 16 percent to 65 percent of available damages. 34,000 notices, plus, have gone out, as well as publication notices, as you know, from the papers. And as I just said, there are no objections and no requests for exclusion by any class members.

There's some new information with respect to the claims which I'd like to begin with before going into the factors. We now understand and now know that there's a significantly larger number of claims that have been received. Our papers submitted on October 9th indicated that about 2,668 claims had been received at that point in time. As of today, there are almost 10 times as many: 27,034 claims.

THE COURT: Twenty-seven thousand and thirty-four?

MR. FONTI: And of those, only seven are untimely, meaning they were filed or submitted after

October 6th.

The reason for the discrepancy is that an entity called Broadridge, which acts as a nominee for shareholders -- I'll speak closer to the microphone -- submitted their claims in batch, electronically. There was a technical problem with how they did it. As I understand it, simply, the format that they used didn't match the format for the automatic upload. So now Epiq, the claims administrator, has manually uploaded that information and has confirmed that there are over 27,000 claims received.

That's a very substantial claims rate, about 78.5 percent relative to the notices that went out, which is a rather extraordinary claims rate and evidence that their notice program was highly effective, as well as the settlement being well-received in view of having no objections and no opt-outs.

THE COURT: Well, you've taken one of my questions off the board, because I was going to ask you about what seemed like -- although I didn't really know -- a low participation rate. So I'm glad to hear that that number has increased.

And those are all separate claims on behalf

of separate class members?

MR. FONTI: They're separate class members. Again, Broadridge acts as an entity that collects that information and provides it to the claims administrators for thousands of investors, typically through their investment advisors. So they will be -- the mechanism of it, an example of how it would work is if you have a Schwab account, just to use an example, each individual's information would be facilitated through Broadridge to the claims administrator, as opposed to each -- you know, each investor having to do it individually. So it makes it much more efficient.

THE COURT: And do you know or do you have an estimate of the number of class members? I don't know to what extent the 34,000 notices is a reliable proxy for that number.

MR. FONTI: We think -- we understand one way to measure that is by the number of shares that are underlying those claims. It's over 11 million shares. There are about 21 million shares that were in the float, publicly traded, that would be, arguably, members of the class as shares. So at least 50 percent of the shares are already submitted claims. And that's, in our experience, very good.

THE COURT: How does that compare? Is there --

MR. FONTI: It varies very much case to case, but that's a very healthy participation rate in our experience. I don't think there's literature or statistics measuring it, but from our individual experience, a very healthy participation rate.

You know, there's a FTC study out there that deals with all sorts of class actions, not just securities class actions, that says about 9.5 percent is the national mean for participation. So, you know, we're obviously well above that. But, again, that's a study that's very broad. You know, it doesn't look at securities cases individually.

The recognized loss -- so under the plan of allocation, which also is not subject to any objection, the calculation of those class members' loss is estimated at about $65.8 million. So if -- at that number, doing the arithmetic, as of today, that means that there is a pro rata share of about 26.5 percent per share of damage.

So if their claims are 65, the settlement on the gross basis is a recovery pro rata of about 26.5 percent net of the attorneys' fees and expenses that we're seeking. And the plaintiffs' award, it

would be about 17 percent pro rata, which is, again, in our experience, very healthy, very substantial return and reflective of our view that the settlement is very beyond -- is more than reasonable and very fair to class members.

So that's up-to-date information.

Any questions there? I was going to just quickly go through the elements for the record, but if the Court has other questions, I'm happy to --

THE COURT: Well, I do have a question on something in your papers, but that you repeated at the outset of your remarks, which relates to the percentage recovery in relation to damages or claim damages. And as your papers say and you just indicated, at the high end, at least, the settlement suggests recovery of as much as 65 percent of what you call the realistically recoverable damages.

MR. FONTI: Right.

THE COURT: And in your papers at least you compared that -- or you said that was seven times the 8.8 percent median recovery in cases that allege both claims under Section 10(b) and Section 11, basing that median on the Cornerstone most recent report for 2024, which indeed does have an 8.8 percent median recovery, but it bases that

percentage off of what it calls plaintiff-style damages.

And my question for you is: Is your metric of realistically recoverable damages the same as Cornerstone's plaintiff-style damages that's suggested by your comparison?

MR. FONTI: So I think what they refer to with the plaintiff-style damages is the nature of the model that's being used, and I don't know exactly the ins and outs of their model. But our -- the trading model that estimates the damages that we use is the one that is typically used, that has been applied in class actions for several decades and has become the standard. It's the two-trader model that assumes high-frequency and low-frequency traders exist and that -- and it makes assumptions about the amount of volume that -- transactions and volume, as well as the turnover of the shares.

So I don't know that their -- I don't know the ins and outs specifically of their model. But certainly, what we use is the typical plaintiff-side expert trading model to estimate damages. And so that --

THE COURT: And what estimate did that analysis yield?

MR. FONTI: So that generates that range -- right? -- based -- you know, the difference in the range of damages -- at the high end, $108 million and, at the low end, about $27.5 million -- is really how much inflation is attributable to the fraud or the misstatements.

So the $108 million assumption takes 100 percent of the share price decline that resulted from the disclosure of the short-seller report -- if you recall the case, the --

THE COURT: The Spruce report.

MR. FONTI: The Spruce report, right.

And so it was about a $5.02 drop.

THE COURT: 19, 20 percent, something like that.

MR. FONTI: Right. Percentage-wise. But it takes that dollar figure and then applies it through the model -- you know, the assumptions on frequency of trading and volume, as well as, you know, the high-frequency, low-frequency traders. And the algorithm that comes out there is that number, $108 million, if you take 100 percent of that drop.

THE COURT: That's using your two-trader model?

MR. FONTI: Exactly.

THE COURT: Okay. So -- well, go ahead.

MR. FONTI: So then, on the low end of the range, the difference in assumption is, as the Court, I think, is very familiar at this point, there are very serious loss causation arguments here deriving from the content of the Spruce report and the fact that it was a very lengthy report that alleged a lot of different types of conduct, some of it appropriate; some of it inappropriate; some of it based fundamentals of the business; some of it, like I said, was kind of more suggestive of improper conduct.

And it was proving very, very difficult to discern how much of the drop resulting from that report was really attributed to the misstatements we alleged.

So on a conservative basis, we estimated that no more than one quarter of that decline really could be attributed to the misstatements. Obviously, that would also face a lot --

THE COURT: That was the defendants' position, yes?

MR. FONTI: Oh, they said it was zero. So their position is that -- that we could not

establish loss causation and that the damages would be zeroed out because there was no -- we never got to that stage of the litigation, the expert stage, but at class cert, they made a number of arguments about price impact, you know, the mismatch between the disclosures and the corrective disclosure and the misstatements and all that.

So we had a very big uphill battle, to say the least, of being able to establish a trial, the connection between the corrective statement and the misstatements.

So the $27.5 million lower estimate assumes, for the purposes of this exercise, that, at best, we would prove a quarter of that drop. The 502 would be attributable to the misstatements, and that's how we get to that number.

It is not, by any means, an exact science, and it takes into account a number of assumptions to get there. So I appreciate the Court's inquiry into it, because it's not -- it is what it is. It is arithmetic based on these assumptions.

THE COURT: But it doesn't sound like, under any conceivable view of the world, the 27.3 million-dollar figure, which gave a lot of credit to the defendants' loss causation arguments,

is comparable to what Cornerstone would regard as the plaintiff-style damages in this case.

Is that fair?

MR. FONTI: I think it's fair to say that Cornerstone does not dig deeper into the underlying merits of a case and says, "Oh, well, you know, we take issue with that drop."

THE COURT: I know. I know.

MR. FONTI: So, yeah, I think that -- I think that is fair. I think that is fair, yeah.

THE COURT: So -- so why are you comparing it to the Cornerstone medium? That's what I don't get.

MR. FONTI: Right.

THE COURT: It doesn't seem like an honest comparison, to put it bluntly.

MR. FONTI: Well, Your Honor, I don't agree with that. But we're trying to --

THE COURT: Why don't you agree with it?

MR. FONTI: That it's not honest? I think we're providing data points --

THE COURT: Yeah. You just said -- you said the recovery here is up to 65 percent, which is seven times the median.

But you're comparing apples and oranges,

are you not?

MR. FONTI: I think we're comparing two measures, two comparable measures of what cases of this category settle for based on best case damages. And we provided the Court the high end of best case damages -- the 108 -- and something that's more conservative and more realistic.

THE COURT: And you're totally free to do that. And that has some relevance.

What I don't see the relevance of is saying that the 65 percent recovery is seven times the median when you know it's based on a different metric. That's not a fair presentation.

MR. FONTI: I appreciate the Court's point. We by no means --

THE COURT: Is it conceivable to you that Cornerstone would measure plaintiff-style damages in this case at 27 million?

MR. FONTI: Is it conceivable? Yeah, it's not inconceivable.

THE COURT: Oh, come on. Come on.

MR. FONTI: It's not inconceivable that they would -- they would scrutinize. But I appreciate the point. This Cornerstone does not is -- not litigating the cases. They're not delving

into the minutia of the cases.

THE COURT: I understand that. Then don't make the comparison.

MR. FONTI: And the point is well taken. I just -- by no means, we're trying to mislead anybody and not provide an honest presentation. I think we wanted to provide exactly what it was. It was --

THE COURT: Well, I tell you, the effect, whatever the intent was, is misleading.

MR. FONTI: I -- I apologize for that, Your Honor, because that is, by no means, what we sought to do and, by no means, other than providing the data points, was attempting to provide that information to the Court. And I'll leave it at that. But, you know, I -- I take the point.

THE COURT: Okay. You may proceed.

Actually, before you proceed, let me just ask the good folks from Simpson Thacher.

Did you do a calculation of the plaintiff-style damages based on the Cornerstone model?

MR. KAPLAN: We were not yet at expert discovery, so while we certainly did privileged and work-product analysis, none of that has been disclosed, I think, to the plaintiffs at this point.

THE COURT: All right. Fair enough.

MR. KAPLAN: Thank you.

THE COURT: But it's not difficult to do a Cornerstone simplified, plaintiff-style damages analysis, right?

MR. KAPLAN: With some cost and some effort, it's not difficult. That's right.

THE COURT: Yeah. But you're saying the plaintiffs didn't do that? Or I'm sorry.

Mr. Fonti, you're saying the plaintiffs did not make that calculation?

MR. FONTI: We, again, we don't know the ins and outs of the Cornerstone method. We did our calculation with what is the typical securities class action plaintiff methodology, and that is what gave the output of $108 million based on the assumption of the drop -- the $5 drop being the best-case scenario for establishing damages here.

THE COURT: And can I assume that that's the number you took into the mediation rather than 27 million?

MR. FONTI: No. I mean, actually, we knew our risks. I mean, this case was very advanced, and defendants sought early summary judgment on these loss causation issues. We knew that we would

face -- we were facing a serious challenge of class certification on price impact and related issues.

We knew that at expert discovery, which was fast approaching, we would have a difficult time being able to establish admissible evidence on the quantum of damages based on the arguments that they had already advanced. And then, even if we survived a summary judgment at trial, getting an expert on the stand past that was another significant risk.

So the 27 and a half actually was very much front and center as a best-case scenario. The 108 million is the arithmetic that it is. It's that outside number, but it's not -- it was not what we think would have been presented to the jury if the case went to trial. I think we would have to take some very substantial haircuts on that number.

THE COURT: In other words, you would not have argued for -- you would not have even argued to the jury for $108 million.

Is that what you're saying?

MR. FONTI: Yes, that's what I'm saying. I think we would have to -- we would -- we would -- we would in no way be able to present that best-case scenario, given all the challenges in the case.

THE COURT: Okay.

MR. FONTI: So to move on to the Rule 23 analysis for approval of the settlement, I'll just quickly go through the requirements of the rule, starting with 23(e)(2), sub A, which is the adequacy of plaintiffs and the counsel here and our representation of the class.

So, as Your Honor knows, Mr. Lozada is the only plaintiff that stepped forward in this case. There was -- and this is not only scenarios where there was a highly competitive leadership process where a number of firms and plaintiffs stepped forward. So, without Mr. Lozada's interest, the class would have been left unrepresented, just as a threshold issue.

He had a very significant financial interest significant to him of $300,000, approximately -- a loss that he incurred -- so he took this extremely seriously and hired our firm and the Kehoe firm to represent him in the action, given our experience in the securities arena.

The case was advanced very, very far to a point where we had, as I just said, very -- very clear -- we're very clear-eyed when it came to mediation of what the risks and the strengths were relative to the case -- in particular, on these

issues that would always persist all the way through to, you know, post-trial practice, the issues of damages and loss causation arising from the nature of the corrective disclosure.

We reviewed -- we received over half a million pages of documents. We very efficiently reviewed those, using technology and whatnot to expedite our review, and prepared ourselves for taking depositions. Sixteen depositions were taken in the case. So, again, that -- that really helped us to be very clear-eyed about the strengths and weaknesses of it.

And so when it came to settlement, Mr. Lozada, Oklahoma Police and Fire, which came in as a name plaintiff, and us, we were very clear-eyed as to the issues. We were in front of a very capable and experienced mediator. And the representation that the class got at that -- throughout the case and at settlement was top notch.

Then the negotiations were arms' length under subsection B. Again, Mr. Murphy, decades of experience as a corporate attorney and now the private mediator, was instrumental in getting to the result, as, you know, we say in our papers. And to the extent of what we can say about the mediation

process is the parties didn't come to agreement on their own. They came to agreement by virtue of his recommendation late in the day when people -- when it was clear that the parties were at an impasse, and he made a recommendation that was then accepted by the parties.

The adequacy of the relief, I think to the Court's point on issues with relative measure, as an absolute sense, 17 and a half million-dollar settlement on a range of damaged outcomes, starting at $108 million down to a much more realistic 27 and a half, is a very good recovery. It is reflective of the risks and uncertainties, the duration, and the value of finality for the class. And we see that now in the claims data that the class is receiving this extremely well and is participating at a very healthy clip.

Subsection C of Romanette 1 looks to the merits, and I've touched on that a fair amount already, so I won't belabor it, except to say that, in the motion to dismiss, a significant part of the case was trimmed. The Section 11 claims out of the IPO shares was dismissed, and we were very much in the battle in class certification.

We also made the point that the law was

changing against plaintiffs at the time. We had to voluntarily dismiss certain misstatements from the complaint before Judge Cronan ruled on the motion to dismiss because of the Supreme Court's decision in the *Macquarie* case, which made it more difficult to bring certain types of misstatements under SEC Rule 3 -- Item 303, as well as development in the post, what we call, Goldman Sachs-era on loss causation and price impact analyses that courts are undertaking.

So there was -- there was a very hotly disputed and difficult legal playing field. The proposed method for relief, which I read as the application of the settlement, as well as the broad notice, are very well-received by the class with the claims rate as it stands today. We do fully expect that late claims will come in, and those late claims will be submitted to the Court as part of the approval process for distribution.

Up to the point where we're ready to distribute, we're going to -- we typically take claims, even if they're late. So the claims rate will, we think, decrease as of -- or the claims rate will increase and pro rata share will decrease over time. But as it stands today, we're at 78, 78 and a

half percent as I indicated.

THE COURT: How long does it typically take from the final judgment to get the distribution?

MR. FONTI: We like to get it done with -- get -- get the process completed within a nine-month window. Every case is a little different. Given where we are in this case, I feel like we can get that done, and if not sooner.

But we will, you know, keep the pedal to the metal with the claims administrator to process those claims. One year is really kind of an outside marker in our -- in our book. So we like to get it done within six to nine months, if we can.

It's just that sometimes they're -- you know, what takes the time is really giving people the due process right to cure their claims. And that -- that's -- the easy part is getting the claims. Then, if there are defects, giving people time to cure them.

So -- and the ample notice is given -- the process is given to that as specified in the plan. So -- so that -- that all is a little bit case specific, but those are our broad parameters.

Attorneys' fees we'll discuss subsequently. We've disclosed all the agreements to the Court.

The supplemental agreement is not in play, given that there are no objections and that the plan of allocation -- again, which the Court approved preliminarily -- is also not met with any objections, as I indicated earlier.

So with all of that, I would seek the Court's final approval of the settlement, certification of the settlement class, and final approval of the plan of allocation as part of the motion that we made in that regard.

I'll turn now to fees, if I may.

THE COURT: Yes.

MR. FONTI: So our request, Your Honor, as you know, is for 30 percent of the $17.5 million. So that would equate to $5.25 million, plus accrued interest at the same rate that the class has earned it. In addition to that, seeking reimbursement of expenses of $924,556 and an award to the lead plaintiffs of $16,750.

Contextually, just to put the emphasis with respect to the fees, this is a situation -- this is a case that we took on that had very real risk of no recovery at all. And at this point, we haven't been paid since, again, three years ago, having invested over 8,600 hours and over $7 million of your time

into the case, resulting in that negative multiplier of 7.4 times our lodestar.

And, again, there was no objection to the fee portion of the request or the plaintiff award portion of the request.

The result -- we've talked about it -- the $17.5 million. And we've also discussed how we've gotten there. It was a very hard-fought process, very zealous advocacy from my colleagues.

THE COURT: I remember.

MR. FONTI: On the defense side, your remember I was involved in a number of those disputes. This was not an easy one by any stretch. And we're up against the best of the best, no doubt.

Every element, as a legal thesis, was disputed, which made it unlike some cases where one element or another may be uncontested. Here, that was not the case.

The plaintiffs support the fee request, and, in fact, the fee request -- 30 percent -- is less than what they had approved in their engagement letters. And so we have their full support, as well as no objection from the class.

So with that, I'll go into the Goldberger factors quickly, just for the benefit of the record.

We've talked about the substantial risk and length of the case. That measurement needs to be taken at the inception of the case -- not today, once we've settled, but what it was on day one. And, again, no, there was no competing with lead plaintiffs, no lawyers, other than us, stepping forward to bring the case.

The motion to dismiss was a challenge, and we lost some of our claims in the statements for a variety of factors on that. And those issues of price impact and loss causation not only persisted throughout the case, but they were the product, the result -- resulted in very significant expense in the form of expert analyses and testimony that (indiscernible) the expense side. It drove over 40 percent of the expense in the case.

The reasonableness of comparable cases at pages 8 and 9 of our fee brief, at ECF 195 we lay out a number of comparable cases, comparable in size and comparable in fee percentage. One thing that, in preparing for today, became evident is that all but one of those has a positive multiplier. In fact, the *Y-mAbs* case had a multiplier of 3.84, and the *Karimi* case had a multiplier of 2.36. It's not in our brief; it's one we collected in advance of

today.

The other cases, with the exception of the *Jernigan* case, which had a 0.5 multiplier and got a 33 and a third percent fee -- all the other ones had a multiplier between 1 and 2 -- or below 2, between 1 and, I guess, 1.6-ish.

So there are comparable cases in the district that -- in terms of settlement and in terms of fee percentage.

The magnitude and complexity of the case, again, '33 Act, '34 Act are the two offerings. One of them continued in the case as the secondary offering. The volume of production -- Your Honor is very familiar with that -- not just the volume but the technical complexity of the production and the nature of what we received took a high level of expertise, time, and investment both internally and through our vendors to be able to process it and to put it to good use in the depositions that we took.

To speak to -- I'm sometimes a little uncomfortable to speak about our own effort and the quality of our own work, but we think, without our effort -- we know that, without our effort, there wouldn't be a result here because nobody else would have stepped up for it.

I'm very proud of the work we did here on behalf of the class and on behalf of Mr. Lozada and the Oklahoma Fund and being able to appreciate the risks and uncertainty of the case while pushing it very aggressively forward through all stages of litigation and settling it pretty deep into the discovery process.

The effort took the concentration of a core team of lawyers. About six of us account for 55 percent of the hours, about 66 percent of the lodestar. And that, I think, is reflective of an effort that tried to be efficient and effective and keep that institutional knowledge close to us.

THE COURT: Well, I did look at your submission, and I know you refer to a core of six, but I -- I count ten lawyers from your firm who billed a substantial amount of time.

MR. FONTI: Yes.

THE COURT: I don't know why they're excluded from the core. You have your reasons. But it was ten lawyers who billed a substantial amount of time.

And then we have Mr. Yarnoff and Ms. Podolsky, as well, billing substantial amounts of time. So that's -- actually, I think it's maybe

11 from your firm. So with two of them, that's up to 13. That seems like a lot of lawyers.

Can you explain why so many lawyers were in this?

MR. FONTI: Sure. Yeah, I could definitely do that. And, you know, the notion of the core team was the people that were really internalizing the knowledge, taking the depositions. We had three lawyers taking depositions. We had two lawyers leading the charge on the discovery effort, two lawyers that led the charge on drafting submissions and whatnot.

And then there were lawyers like Mr. Hough, who was a junior associate who was on the case at the beginning of the matter at the complaint stage and left the firm after the complaint was filed and the briefing was done, and so that -- he was Mr. Baier -- Joseph Baier, you see on page three of ACF 196-6, if that's what Your Honor is looking at.

THE COURT: It is.

MR. FONTI: So, Mr. Burry and Ms. Podolsky actually led the charge on our submissions. Mr. Burry and Mr. Kubota were two of the lawyers who took depositions. And then you had Ms. Kulesa, for instance, she was -- with 137 hours, she was very

involved in the class certification process. Mr. Stoddard, who's here as well, was very involved at the front end in the complaint drafting and then with respect to the class certification effort.

So there -- the -- there wasn't overlap. In fact, we cut out a number of people who had less than 50 hours of effort and, you know, touched the file to help out as a project or two. We cut all that out. So these are people who actually committed a substantial amount of time, you know, over what is two years of intense litigation at this point, almost three years since inception.

You have attorneys like Mr. Guglielmo; the staff attorneys; Peter Patrikios, the project associate; Franklyn Williams. Those -- those are attorneys who are -- who have been with us many years. They're permanent employees of the firm who are dedicated to first-line discovery effort and pulling together documents and preparing the materials so that the associates and partners are prepared in taking the deposition.

So it was -- it was laddered in how the team was set up. And we were very focused on not overlapping. And we cut out, for instance, people that were on -- multiple people on a phone call or

on a conference call, we slimmed that down, down to the two people that were in play. If there were more than one person -- now, in the day and age of remote depositions, you can attend the deposition from the comfort of your desk -- we only allocated time generally to the taking attorney and the second-seat attorney, nobody else.

And so we took those efforts to reflect the core -- one, the core team, but also the true, you know, bull's-eye of effort that was -- that was dedicated to this case.

And, you know, we were -- you know, litigation here was very intense. Sixteen depositions, many of which, you know, the defense took, so we were on the defending side or the sort of third-party side of them, and we had to prepare with those in parallel. So there's a very, very big effort.

The only point of the core team was to say that the senior lawyers actually dedicated over 55 percent of the hours here, which is done for the purpose of efficiency and being able to be able to be in a position to advance the case.

THE COURT: That's helpful. Thank you.

As you've noted and as is very common, you

had some associates who left during the history of the case. They had to be replaced. Sometimes the law firm will write off the time of those new associates devoted to getting up to speed on the theory that the client otherwise would essentially be paying twice for the same work.

Did you do that here?

MR. FONTI: It wasn't necessary. We did not do it here, in part, because it wasn't necessary. Mr. Hough was working with Mr. Kubota and Mr. Stoddard on the complaint. He was in a supporting role. He helped with certain allegations and analyzing certain allegations.

We then got into discovery and Mr. Baier, who was then the junior associate, was taking on, you know, a motion to dismiss decision that narrowed the case, you know, complaint that was static, and helping the team craft discovery requests. And there wasn't really any tangible ramp-up time. He wasn't -- it wasn't the roaring, you know, mid-game in the second quarter of discovery and somebody had to come in and read the transcripts and, you know, figure out the hot documents.

That's not -- the break was very clean, so we didn't see a need to do it. If there was a need

to do it, we would have done it, but -- and we've done it before as a firm. So it's -- you know, that's why it's not pertinent here.

The rest of the team continued through.

THE COURT: All right. Very good.

And then, as the arithmetic establishes, the multiplier as a result of those hours and time billed is 74.

MR. FONTI: The rates -- our rate is at the low end at $520 for attorneys, up to $1,310 for partners. Those are within the bounds of rates that have been found reasonable by courts here and by Judge Cronan specifically.

If you adjust -- so both in the *Evoqua* and the *Luckin Coffee* cases, Judge Cronan approved similar hourly rates. And if you actually adjusted those rates for inflation for the time since those were approved, the high end rate would be over $1,600 an hour.

Our colleagues here at Simpson Thacher, though their rates are not published, they are subject sometimes in submissions. And the submissions that we were able to see in the bankruptcy context were over $2,100 an hour at the high end and, for associates, between $745 and

$1,290.

The public policy interest here, to go back to the point I made about Mr. Lozada and the efforts of the Kehoe firm and BFA, there wasn't -- the class's interest would not have been advanced. And particularly here, I think the public interest was very well served by the effort.

Moving on to expenses, $924,556. Over about 42 percent -- $392,512 -- for experts. A lot of that is in relation to the -- what we would call market efficiency for class cert, a loss causation, price impact analysis that was done by an analysis called Peregrine, which was preceded by Global Economics. The same experts moved from Global Economics to Peregrine, so there was no loss of time or effort in our investment there.

And that was very hard-fought. Mr. Coffman was deposed twice. There was a round of expert courts that went through that.

Another significant expense -- $178,992 -- was for the counsel for the former employees.

THE COURT: So that one, I do have some questions for you, largely because I haven't really seen that before.

Do you have authority for the proposition

that those are a recoverable expense? You cited the settlement and the *Teva* case, or however you pronounce that. But I looked at the papers. It was you -- again, your affidavit, as you know -- your affidavit sort of combined that with a bunch of other outside counsel fees for lawyers who worked for the plaintiffs, whether it was on service issues or other things, so it wasn't even clear how much money was being paid to the lawyers who were retained to represent former employees in that case. And, yeah, Judge Underwood approved it.

But did this issue come up at all at the fairness hearing or otherwise?

MR. FONTI: It was not specifically raised. I could say that, in every case -- every case that we have submitted fees and expenses, we have submitted expenses, to the extent they've been incurred, for counsel for the former employees. You know, these are people who volunteer to provide information that becomes pivotal to the case.

The defendants made it an objective to really pursue -- very aggressively pursue discovery of them. They handed over their text messages, their personal data, any files they had, and it was necessary that they be represented.

There were four of them. They all sat for depositions. There were, I think, over 700 pages of testimony that came out of this effort.

THE COURT: But in terms of precedent, are there -- you know, the one other case that you pointed me to is one of your cases.

Any other plaintiffs' firms seek recovery of these expenses?

MR. FONTI: As far as I know -- and we can go back and look for a decision on this. Though, my understanding is that this is a routine expense, that if the class is incurring expense on the behalf of -- for the benefit of the class, that it would be submitted. And then under the New York Professional Conduct Rule 3.4 and New York Ethics Opinion 96-2, Greenburg paying for attorneys' fees for a witness.

And that's all that was paid. You know, if there was any incidental out-of-pocket expenses, which are -- you know, we paid the attorneys. That's it.

THE COURT: Well, that was one of my other questions, whether there are any ethical issues surrounding this.

MR. FONTI: No. And we take the guidance from the New York Professional Rule of Conduct 3.4

and the Opinion --

THE COURT: And there's an Opinion 96-2?

MR. FONTI: -- 96-2.

96-2, yeah, from 2013.

THE COURT: 96-2.

MR. FONTI: 96-2.

THE COURT: What's the date?

MR. FONTI: March 18th, 2013.

THE COURT: Okay.

MR. FONTI: The --

THE COURT: Can I ask -- this is going out of order a little bit.

MR. FONTI: Sure.

THE COURT: But if I can ask Mr. Waldman whether the defendants perceive any ethical issues with plaintiffs' counsel paying attorneys for former employees.

MR. WALDMAN: Your Honor, you've got me in a tricky spot. I've agreed, as part of the stipulation of settlement, not to comment and to take no position on the fee application. It just so happens that I don't know the answer to your question, which is lucky for me in this one, but I don't know the answer to that.

But, otherwise, defendants take no position

at all on the fee application and the components of it.

THE COURT: All right. I don't know how much securities litigation you do, but can you give me your take, if you have one, on how common or unusual this sort of request is?

MR. WALDMAN: I don't have a -- I do lots of securities litigation. I have not dug into expenses on fee applications, because I agree in the stipulations of settlement not to take positions on the fee applications. That's pretty standard provision.

I don't know the answer to that either. I'm sorry, Your Honor.

THE COURT: Okay. Thank you.

MR. FONTI: So -- and -- and to reiterate the point, absent that expense that was incurred for the benefit of the class, these individuals who -- who basically volunteered that information would have no representation up against Simpson Thacher. So it was an essential expense.

I would say that is not -- the level of vigor that was taken here to depose all four of them, to have them sit for multiple hours each, to demand production of their text messages, of their

personal contacts, any communications they had, and personal documents, is certainly on the more -- you know, I don't want to give it a negative characterization -- but it was -- it's a more fulsome approach.

It is often that some of these people are not deposed at all, that none of them are talked to. So from case to case, it varies. Here, this was a very central focus of the discovery and of the litigation and of the expense, as a result of that.

THE COURT: And in terms of the reasonableness of those fees, what steps, if any, did you take to ensure that the fees were reasonable?

MR. FONTI: We were very mindful, given that we were advancing them and that the attorneys were, one, very capable attorneys and very experienced in the area of representing former employees. We ensured that, to the extent, as class counsel, we could have any role in facilitating or diminishing effort, we would.

You know, I can't think of a concrete scenario where something we did could be used as an example. But we were -- you know, certainly, the lawyers represented the witnesses, and we were a

third party to that. We also examined the witnesses. We kept that to a minimum. And to the extent there were things that the lawyers could have done more quickly and more effortlessly -- for instance, technologically with the production to the defendants -- you know, we were there to make sure that nothing was wasted. You know, no time was wasted. No -- no -- no expense was wasted.

And we had our own interest in that. I mean, we were the ones paying for it. And we have paid those expenses. These are not contingent.

THE COURT: And did you receive and review invoices from the firms?

MR. FONTI: Yes. Yes.

THE COURT: You did?

MR. FONTI: Yeah.

THE COURT: And they were reviewed for reasonableness?

MR. FONTI: Absolutely, yeah. Absolutely.

THE COURT: And how did they charge for their services? It's fairly -- it's listed in your submission that it was on an hourly basis, but --

MR. FONTI: It was hourly. It was a traditional hourly rate. And it was -- these are not New York lawyers, so the rates were lower than

New York lawyer rates.

THE COURT: How many lawyers were involved? I don't think that was in your papers.

MR. FONTI: There were --

THE COURT: I think there were two firms involved, right?

MR. FONTI: Correct. The two -- the two firms, and I think two principal lawyers at each firm. You know, one principal at each firm that were primarily the people who were the contact. There may have had some lower-level assistance, but it was not a big effort in terms of people. Yeah.

THE COURT: And why two different firms? I gather from your papers that you were really hiring Wheeler Trigg, but local counsel was needed. So local counsel was hired because the witnesses were in Texas.

MR. FONTI: Exactly. Yeah.

THE COURT: First of all, why did you need local counsel? This is a federal case.

MR. FONTI: I think --

THE COURT: Hard to see that there were issues of Texas state law that came up, but maybe they did.

MR. FONTI: That, frankly, was a

scenario-specific assessment done by Wheeler Trigg that they thought it was necessary for them to have local counsel in Texas, where the witnesses were. And we deferred to that because, for ethical reasons, they wanted to have Texas lawyers. But those lawyers did not -- maybe Mr. Kubota could amplify the recollection here.

I don't believe they -- well, why don't you --

MR. KUBOTA: Yeah. The Texas portion of the fees, I think, was obviously a small minority of it. I think it was about $25,000 out of the total.

MR. FONTI: The work was really done by --

THE COURT: Okay. But I thought you were going to address why it was necessary.

MR. KAPLAN: Yeah, on that, I don't have much to add to what Mr. Fonti said. It was really Wheeler Trigg's decision, you know, as an independent counsel for the witnesses, that they felt they needed Texas attorneys involved, given the depositions in Texas.

THE COURT: Okay. And I was also going to ask you: Why not just hire Texas counsel to do the whole thing? There probably are capable lawyers in Texas who could have done this. I'm guessing your

answer may be you didn't know at the outset that Texas counsel might be necessary. That only happened later when Wheeler Trigg determined that local counsel was necessary.

MR. FONTI: That's correct. And the fact that the depositions were being insisted upon, right? You know, there was an iterative process. The witnesses were identified in the initial disclosures. They were -- they sought counsel.

The Wheeler Trigg firm is a firm that -- the lawyer there is somebody who's represented these kinds of former employees in this context before, so they've built a relationship. The witnesses selected the lawyer, and each retained the Wheeler Trigg firm. And then, when the depositions came to pass, the need for -- the decision was Wheeler Trigg's, because they represented the witnesses.

And, again, it was at our expense, but we deferred to their professional assessment that they needed counsel, so we paid for it.

THE COURT: And can you confirm for the record that you and your firm and the plaintiffs had and have no financial interests whatsoever in relation to those fees? You're not getting a

referral fee or anything like that?

MR. FONTI: 100 percent. No -- no interest. We are only the ones paying the bill.

THE COURT: Thank you.

MR. FONTI: Anything else on expenses?

THE COURT: I don't have any other questions.

MR. FONTI: Those are the bigger items. Just want to make sure there isn't anything else I could answer.

So, with that, moving to the plaintiffs' awards, Mr. Lozada seeks an award of $9,750. Oklahoma seeks an award of $7,000. Those are for the actual time spent being representative plaintiffs in this case. And those amounts are in line with what courts in this district have awarded, including Judge Cronan, who in the *Sasol* and *Evoqua* cases awarded larger plaintiff awards under the PSLRA, which is -- was designed to motivate institutional plaintiffs to seek elite plaintiff status and provides this provision that they be compensated for the time and cost of that time. And it's routinely granted.

So, certainly, these levels are not extraordinary requests. So we ask that the Court

approve that as well.

So, if the Court doesn't have any further questions, I'll look at my colleagues.

Is there anything I missed?

THE COURT: I just have one question about the proposed judgment.

MR. FONTI: Certainly.

THE COURT: And this is on the proposed final judgment. Paragraph 24 has a sentence in the middle of it that says, "All settlement class members shall submit a proof of claim under penalty of perjury by the date set forth in the notice sent to settlement class members."

Since, as I understand it, that date has passed, does that sentence make sense in this final judgment?

MR. FONTI: It does not. And I think it's redundant or it's moot by virtue of the deadline passing. Correct.

THE COURT: All right. But we should keep in the substance of the following sentence, "Giving lead counsel discretion to accept late-submitted proof of claims"?

MR. FONTI: Right. And that is what I was alluding to earlier. We will continue accepting

claims until we're ready to distribute. And as long as they're valid, we would seek for them to be compensated. And that's, again, why the participation rate and the pro rata rate will continue to move inversely, and we'll see where we end up at the end. But I've reported where we are today.

THE COURT: All right. Thank you very much.

MR. FONTI: Thank you, Your Honor.

THE COURT: Mr. Waldman, should we take a break? Because I assume you'll be going an hour or two.

MR. WALDMAN: At least, Your Honor.

Thank you, Your Honor. Craig Waldman from Simpson Thacher for the defendants. The defendants support final approval of the settlement and take no position on the fee application.

Happy to answer any questions Your Honor should have.

THE COURT: I think the questions I had for you, I asked during Mr. Fonti's presentation.

MR. WALDMAN: Very well, Your Honor.

THE COURT: Thank you.

All right. We will take this under

advisement. We will endeavor to get out a report and recommendation to Judge Cronan as soon as possible. As you know, they will have to take that form, and we will get that out as soon as we can.

And I appreciate counsels' work on this case throughout. It was a pleasure dealing with you all. And have a good day.

MR. FONTI: Thank you, Your Honor.

MR. WALDMAN: Thank you, Your Honor.

C E R T I F I C A T E

I, Marissa Lewandowski, certify that the foregoing transcript of proceedings in the case of Lozada v. TaskUs, Inc. et al, Docket #1:22-cv-01479-JPC-GS, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature Marissa Lewandowski

Marissa Lewandowski

Date: October 21, 2025